UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

MICHAEL BOWLING, A RESIDENT OF ARIZONA, )
)
Plaintiff, )
)
vs. ) C.A. No. 05-229 S
)
HASBRO, INC., A RHODE ISLAND CORPORATION, )
)
Defendant. )
)

THE VIDEO TAPED DEPOSITION OF ALBERT LIZARRAGA

Tucson, Arizona
March 17, 2006
9:11 a.m.

COPY

WENDY J. PULLIUM, RPR
Arizona Certified Court Reporter No. 50247

ESQUIRE DEPOSITION SERVICES

VIDEOGRAPHER: This is the videotaped deposition of Albert Lizarraga in the matter of Michael Bowling versus Hasbro, Inc., U.S. District Court, District of Rhode Island, Case No. 05 dash 2295. The deposition is being held in the offices of Kathy Fink and Associates, 2819 East 22nd Street, Tucson, Arizona, on March 17th, 2006. The time is 9:11.

Will everyone please introduce themselves.

MR. TECHENTIN: This is Jeffrey Techentin on behalf of Hasbro.

And I would just note that the case number is actually an S at the end. It's 05229 S.

MR. RASH: Scott Rash for the deponent, Al Lizarraga.

MR. LEACH: Tom Leach and Doug Williams for the plaintiff, Michael Bowling, who is here with us today.

VIDEOGRAPHER: Can the court reporter please swear in the witness.

///
///
///
///
///



**ALBERT LIZARRAGA,**

having first been duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. TECHENTIN:

Q. Good morning, Mr. Lizarraga. Again, my name is Jeffrey Techentin and I am here on behalf of the defendant, Hasbro.

Could you please state your full name for the record.

A. Albert Paul Lizarraga.

Q. And what is your address?

A. 6251 South Mesquite Trail, Tucson, Arizona 85747.

Q. By whom are you employed?

A. Raytheon Missile Systems.

Q. What is your position for Raytheon?

A. I am currently a section manager in the mechanical engineering department in the test systems design center.

Q. Can you describe generally what those duties, what your duties include in that role?

A. I am a functional manager. I have approximately 17 drafters and designers under me, and



I, functionally I ensure their career paths and make sure they have work and just assess their productivity, manpower, things like that.

Q. Are your jobs exclusively managerial?

A. At this point there is technical interface. I interface with them if they have questions technically on the jobs, things like that. So I am functional and I am technically developed as well.

Q. How long have you worked for Raytheon?

A. Raytheon/Hughes combined, about 13 years.

Q. I take it you were with Hughes before that?

A. Correct.

Q. Before Ratheon rather.

A. Correct.

Q. And what positions have you held either at Hughes or Raytheon, chronologically, if you can recall?

A. I started in the '80s as a drafter on the board, and I left for a couple of years, went to Boeing, came back and was in a position of a drafting designer, and then I was a designer, then I was a drafting lead and then supervisor, then a manager.

Q. Can you explain the difference between those different positions; that is, the drafter on the board as you said, and then later the drafter of design and



then later a designer, can you explain what those are?

A. A drafter is basically, takes input from an engineer, red lines specific, very specific information, draws it up, gets a lot of red line drawings back, changes, he incorporates changes, change paper, things like that.

VIDEOGRAPHER: Jeff, can we go off the record?

MR. TECHENTIN: Yes.

VIDEOGRAPHER: We're going of the record. The time is 9:14.

(Discussion off the record.)

VIDEOGRAPHER: We are back on the record. The time is 9:16.

BY MR. TECHENTIN:

Q. Mr. Lizarraga, did you finish describing your responsibilities as a drafter?

A. Pretty much, yes.

Q. And the next position I believe you described was the, was it the --

A. Design.

Q. Designer. Can you explain what that involves?

A. A designer, you are given a concept, you work with engineering. They pretty much tell you a

little bit about the project, what they want you to do and you kind of go off based on concept and you develop things. And then you go back and he kind of looks it over and, you know, gives you some input and you go back and maybe present another design, things like that. So it's a process.
Q. When did you become a designer for Raytheon?
A. Probably '96, started doing more designs. The more you do in drafting, they give you more; they try doing this and doing that, so they kind of stretch your wings.
Q. So if I understand you correctly, while you were a drafter, you would have done some design work before your position formally changed into that of a designer, is that what you are saying?
A. There is kind of of like a transition.
Q. And how long were you a designer for Raytheon?
A. Well, I still have my foot in it that well.
MR. WILLIAMS: Does somebody else still got a wireless device?
THE WITNESS: I've got a pager. It's on motor.
VIDEOGRAPHER: It's Tom. Is that off?
MR. WILLIAMS: It's a Blackberry.



VIDEOGRAPHER: It's gone.
MR. TECHENTIN: Can I ask you to read back his answer, please.
(Whereupon the requested portion of the record was read back by the court reporter.)
BY MR. TECHENTIN:
Q. But your position formally changed from being a designer to something else at some point, correct?
A. Yeah. To a section manager, which I am now, but I am technically involved still.
Q. And when did you become a section manager?
A. Early 2001.
Q. Can you describe in general terms your educational background.
A. I went to technical colleges, Tucson College of Business and Data Drafting III, and then took some other CAD classes after that.
Q. Where did you take your CAD classes?
A. Lanson Business College.
Q. Other than that, have you had any formal training with respect to the positions you've held?
A. Pima College a little bit, classes that you take at Ratheon and Hughes that they send you to. And I have 27 years of -- in the business.



Q. Have you ever been trained as a patent draftsman?
A. As a what?
Q. Patent draftsman.
A. No.
Q. Do you know what a patent draftsman does?
A. Not really.
MR. TECHENTIN: Can I have that marked, please.
(Deposition Exhibit No. 1 was marked for identification.)
BY MR. TECHENTIN:
Q. I am showing you what's been marked as Exhibit 1, and it's a subpoena. I will ask you if you've seen a copy of that previously?
A. No.
Q. Were you aware that there was a subpoena for today's deposition?
A. I was told that a subpoena would be sent and my attorneys would be the receiving parties.
Q. Okay. Mr. Lizarraga, when did you first come into contact with Mr. Michael Bowling?
A. In '97.
Q. Can you describe the circumstances under which that happened?



A. Sure. I was assigned to an engineer and doing a design job, and at some point he came back -- I guess I did a good job for him, so he came back and said he knew Mr. Bowling and I believe, I don't know if they were going to college at the time or finishing, something about that Mr. Bowling was interested in having somebody help with a design or drawing, something to that effect.
So the engineer asked me if I was interested. And I said, yeah, I am interested. I am just not sure if I contacted Mike or Mike contacted me, but we did get together through the engineer at work.
Q. Who is that engineer?
A. His name is Thack Ta.
Q. And he was an engineer at Raytheon for whom you were doing work?
A. Yes. I was assigned to him as a designer.
Q. Had you worked with Mister -- is it Mr. Ta?
A. Ta, uh-huh.
Q. Had you worked with Mr. Ta prior to being a designer for him?
A. No, not that I recall.
Q. You testified just now that you don't recall if you contacted Mr. Bowling or if he contacted you,

but do you recall what your first discussion with Mr. Bowling was?
A. Not really, just that we agreed to meet and we met.
Q. Where did you meet?
A. At his residence.
Q. And what happened when you met with him?
A. Mike explained that he was interested in help with a dice that resembled a crystal.
Q. Did he tell you anything else?
A. I think he was interested in getting a couple different variations, I don't remember how many at the time at the initial meeting. And I think he mentioned that he was interested in manufacturing them.
Q. Did you talk about producing drawings for him?
A. Yes.
Q. What information did he provide you about the dice that he wanted drawings for?
A. As far as I recall, it was kind of like a hand sketch, you know, white piece of paper, and it was like a sketch of a, like a crystal shard, more of a natural crystal shard. And I think the only other information that I recall is maybe an overall length



and perhaps the diameter.
Q. What do you mean by a crystal shard?
A. He was interested in getting some dice that looked kind of like crystals.
Q. Other than telling you that he wanted a die that looked like a crystal and showing you a drawing, did he provide you with any other information at that time?
A. Not too much that I recall.
Q. What type of drawings was he looking for?
A. Just, just some views of it to kind of develop -- to me it was more like a concept, then to develop it, then different views, and then Mike laid out where he wanted the numbers on the different sides.
Q. Did he lay out where the numbers would go during your initial meeting?
A. No.
Q. Going back to that initial -- I just want to focus on that initial meeting at first.
You said that he gave you --
(Sotta voce discussion between Mr. Williams and Mr. Leach.)
MR. WILLIAMS: Did the witness respond to the question?



MR. TECHENTIN: Yes, he did.
BY MR. TECHENTIN:
Q. You testified that he gave you a hand-drawn sketch; is that correct?
A. As far as I recall, it wasn't computer or anything like that.
Q. Do you still have that sketch?
A. No.
Q. Do you recall what it looked like?
A. Vaguely. I recall it being kind of like on like a white piece of paper, not grade paper or anything, and it was just kind of a, sort of a three dimensional with a lot of different facets and sides.
Q. Would it be possible for you to draw what you recall about that drawing?
A. Probably not. I don't think it would -- it was nine years ago. It was a long time ago.
Q. Aside from the drawings, what did Mr. Bowling tell you about the shape of the dice?
A. Not too much. Just he was interested in creating a dice that looked like a crystal.
Q. Did Mr. Bowling and you agree on payment terms?
A. Yes.
Q. And what were those?



A. As far as I recall it was like, it was either 30 or $40 an hour to the best of my recollection.
Q. Was all of the work that you did for Mr. Bowling based on that hourly rate?
A. Can you clarify the question?
Q. You did work for Mr. Bowling. Well --
MR. WILLIAMS: Objection, leading.
MR. LEACH: Objection, leading.
MR. TECHENTIN: You can let me ask the question first, please.
BY MR. TECHENTIN:
Q. Mr. Bowling paid you for services over the course of time; is that correct?
MR. LEACH: Objection, leading.
THE WITNESS: Do I answer?
BY MR. TECHENTIN:
Q. You can answer.
A. Relevant to the dice and the drawing, creating the dice and the drawings of the dice.
Q. And were all of the amounts that you charged based on an hourly rate or did you have some other form of compensation scheme at some point?
A. No. Hourly.
///

A. The minute I started working on it and could not, determined to myself that I couldn't do it that way, then I changed and just made it geometrically shape.
Q. How long did you work on the project before you got back to Mr. Bowling?
A. I don't recall how many hours. I don't think it was too much, but I don't recall.
Q. Did you talk to Mr. Bowling about this project before you gave him any drawings?
A. No. I just did the best I could with the concept and -- and to be honest, I didn't think he was going to like it.
Q. Why is that?
A. Because it looked like a geometric shape and not a natural crystal, but this is the best I could do.
Q. So that first time that you talked with Mr. Bowling after your initial meeting, what, is after you had drawn at least one of these dice?
A. I believe so, yes.
Q. And did you -- the second time you talked with Mr. Bowling, did you meet him in person or did you talk on the phone or how did that happen?
A. I think I went to -- I believe I went to his residence again.



Q. Did you bring with you a drawing?
A. Yes.
Q. Did you bring with you more than one drawing?
A. I don't recall.
Q. Do you remember what the drawing was of?
A. A dice with some views.
Q. Do you remember how many sides that -- the -- that first drawing had?
A. No.
Q. And did you show that drawing to Mr. Bowling?
A. Yes.
Q. And how did he react?
A. Okay. He seemed to like it.
Q. Did you discuss with him the fact -- or what you have just testified about, about the fact that it didn't look like a natural crystal?
A. A little bit, as far as I recall.
Q. What was that discussion?
A. I don't recall the discussion. I just presented him with the drawing and mentioned this was the best I can do and he liked it.
Q. So what happened after that second meeting with Mr. Bowling?



A. I think I got direction to create a couple more with different numbers of sides. How many, I don't recall. So I went back and made a couple others, presented it to him.
Q. Did Mr. Bowling pay you for your drawing when you showed up with it during your second meeting?
A. On the second meeting, I don't recall. Probably but I don't recall.
Q. Okay. When you presented the drawings to Mr. Bowling, were they just paper printouts of the drawings?
A. Yes.
Q. These were computer generated drawings, though, correct?
A. Correct.
Q. What program did you use to create that?
A. Pro/ENGINEER.
Q. Is that a computer program that you have some familiarity with?
A. Yes.
Q. What is Pro/E?
A. Pro/ENGINEER is a solid modeling program.
Q. Was all of the work that you did for Mr. Bowling done in Pro/E or was there other work involved?



A. No. Most of the work was done basically at my house, designing and, you know, triging out angles and lengths based on how many sides. Most of the work was done at home. Then I went in and modeled it, made the drawing.
Q. Do you have any recollection as to the total amount of time you spent on this project after you left Mr. Bowling the first time until you had a final drawing, one final drawing?
A. No. It would just be speculation. It was nine years ago, I don't recall.
Q. When you met with Mr. Bowling the second time, did he direct you to change anything about the drawing?
MR. LEACH: Objection, leading.
THE WITNESS: I don't think so.
BY MR. TECHENTIN:
Q. Do you have electronic versions of the drawings that you did?
A. I do not.
Q. Did you retain copies for yourself of the drawings?
A. Up to a certain point, but no longer.
Q. You testified a few minutes ago about

triging out angles. Can you explain what that means?
MR. LEACH: Objection, leading, misstates the record.
THE WITNESS: Based -- I came up with a formula, kind of a mathematical formula that I could apply to different sides, so if I was given -- if I was told to make a ten-sided, a 12-sided, a six-sided, that the mathematical process would be the same. And based on the number of sides, you had to divide that by two and create a polygon, whether it's octagon, hexagon, whatever. And in order to figure out the lengths, you would need to divide 360 by however many sides and get an angle; and then based on those angles, you could, you could create a length and then you would use that for cutting planes. So that was trig involved.
I don't know if that answers it, but...
BY MR. TECHENTIN:
Q. Can you explain the process of creating these mechanical drawings within Pro/ENGINEER?
A. The drawings or the model?
Q. Whichever came first.
A. Okay. The drawing is created from the model. And you create a model basically like you are carving a piece of wood or a piece of metal, just the



same philosophy.
So I started with pretty much a diameter barrel laid out. Depending on the amount of sides, I laid out a polygon that was half the number of the sides. So if you wanted a 12-sided dice, you -- I think that's a hexagon, so I created a hexagon on top. On the other side I created another hexagon, and I turned it half the degree of the angle that would create the hexagon, rotated it and created point to point from the -- the apexes of the polygons, which would create a triangular shape; and I would use a plane and cut, and I would rotate, cut again, cut again, so...
And the -- you know, everything was pretty simple. I mean, the diameter, the radius of the diameter was what the height of the pyramid was. So if I had a half-inch barrel, the radius would be quarter inch, so the height of the pyramid would be quarter inch by quarter inch. So everything was pretty straightforward.
Q. Okay. And just to put -- try and translate what you were saying in some language that's relevant to the patent that we're about to discuss, are you familiar with a, what an extension member is with respect to these dice?



A. I believe I do.
Q. Is that the same thing as the barrel that you just mentioned?
A. Because I looked at the patent, the extension member I believe is the facets on the side of the dice.
Q. Okay. And you talked about a pyramid. What, is that the same as an end cap?
A. Yeah.
Q. And so if I understand what you just said, the, the end caps of the dice that you drew had a height that was equal to the radius of the extension member; is that correct?
A. No.
MR. LEACH: Objection, leading and misstates the record.
THE WITNESS: The height of the pyramid was equal to the radius of the barrel, the diameter of the barrel that I started with.
BY MR. TECHENTIN:
Q. Before you cut away faces to make the sides of the die; is that correct?
A. Yes.
Q. Had Mr. Bowling given you any direction in terms of the height of the end caps?



A. I don't recall. I know there was -- I believe he gave me an overall dimension. Whether he broke it down, the body is this big and the cap is this tall and all that, I don't believe so.
Q. Did the drawing that Mr. Bowling give you -- gave you have end caps?
A. I believe it did. I just don't recall if they were completely equal or, you know, symmetrically equal, I don't recall that. Again, it was, to my recollection actually looks like a rough natural crystal.
MR. TECHENTIN: I apologize, I don't have extra copies of what I'm about to give. This is something that came from the materials that were produced by Mr. Lizarraga.
MR. WILLIAMS: That's fine. If you can -- maybe we can make copies of them beforehand or else you need to give them to us before you ask the question.
MR. TECHENTIN: I will show you this.
(Deposition Exhibit No. 3 was marked for identification.)
MR. WILLIAMS: In connection with -- this is fine. We, we -- the, the same situation we had in the deposition of Ms. Sevcheck (sic), we would appreciate

it in advance, and we will reciprocate with the courtesy to have copies with you in advance. It does help move things along.

MR. TECHENTIN: I normally do that. I sort of expected he would have his notebook with him at the deposition and that didn't happen, so...

I don't have copies of this, but I have copies of the other materials that I will be using, most of them.

BY MR. TECHENTIN:

Q. Mr. Lizarraga, I am showing you what's been marked as Exhibit 3. Can you explain what those documents are, please?

A. This is something I put together a couple, probably a weeks ago just to, just to refresh my memory on how I went about creating this thing.

This statement is real rough, it's not wordsmith, it's just a general idea of how I went about creating one of these.

Q. You are referring to the -- to the written language --

A. Yes.

Q. -- on the first page of Exhibit 3?

A. That and this. This document was created just a few weeks ago --



Q. I think –

A. -- so...

Q. Okay. Are those -- there's a depiction of what looks like the dice on this page. Are -- you're testifying that that's a – that's a new drawing?

A. Yes.

(Sotto voce discussion between Mr. Williams and Mr. Leach.)

MR. LEACH: Objection, leading.

BY MR. TECHENTIN:

Q. When did you do that?

A. A few weeks ago.

Q. Okay. If you could turn the page. Can you explain what this and the pages that follow are.

A. This is, this was just to give an idea how I went creating the model. This is a, I believe a 16-sided dice that, that was never created (indicating). I did not create a 16-sided dice for Mr. Bowling. So I just went through this to sort of, to reaffirm how I created this.

There's an octagon at the top, an octagon at the bottom that's turned half, this -- this angle here. And then here's the barrel (indicating).

These things aren't in the right order. These drawings are bad because it really doesn't show



the shades or whatever, so this is really hard to interpret.

I was showing you how I went about making the cuts starting from a barrel (indicating). So it looks like mush without the highlights and the shadowing, so it's kind of hard to – but what I did was systemically went through to give an idea how I created the part itself.

Q. But all of those are a recreation?

A. Yes.

Q. Could you -- you indicated, I think, that those are not in the correct order. Could you place them in the correct order with the starting point on the top and the last one on the bottom?

A. It's hard to tell.

Q. Okay. And that's the -- these are five pages, just so the record is clear, these are pages 2 through 6 of Exhibit 3.

What are the remaining pages of Exhibit 3?

A. Well, they were better looking pictures, but these were some pictures that, trying to, to recollect my memory how the crystal shard somewhat looked in terms of has the same idea of the geometric shape but you can see how the end caps are, some are bigger or smaller. And again, this is kind of hard to tell on



this, but these are just different pictures of shards that I just pulled just to -- this is what my recollection of the natural crystal was, that somewhat represented this kind of a non-geometric shape.

Q. And when you're talking about the natural crystal, is that the, the idea that Mr. Bowling presented to you?

A. As I recall, the sketch looked somewhat like a natural crystal.

Q. Thank you.

(Deposition Exhibit No. 4 was marked for identification.)

MR. RASH: Thanks.

BY MR. TECHENTIN:

Q. Mr. Lizarraga, would you take a look at Exhibit 4, just look through the entire exhibit, please.

(Sotto voce discussion between Mr. Williams and Mr. Leach.)

BY MR. TECHENTIN:

Q. Mr. Lizarraga, have you ever seen those drawings before?

A. These specific ones or representations?

Q. Well, those specific drawings.

A. On a piece of paper this size with -- this

A. Oh, okay.
Q. Was it the case with those drawings that the shape of the end cap surfaces were the same?
A. Yes. On the ones I prepared, yes.
Q. In fact, were they identically shaped?
A. Identically shaped.
Q. And, again, in the drawings that you prepared for Mr. Bowling, was it the case that each of the surfaces of the end caps had equal surface areas to one another?
MR. LEACH: Objection, leading.
THE WITNESS: Yes.
BY MR. TECHENTIN:
Q. Was it the case that Mr. Bowling's initial concept reflected identically shaped surface areas on the end caps?
MR. LEACH: Objection, leading.
THE WITNESS: I do not recall whether they did or did not. It was a sketch. On the end caps, it's difficult to say.
BY MR. TECHENTIN:
Q. Did Mr. Bowling -- and let me be clear. When I am talking about Mr. Bowling's initial concept, I am not just referring to his sketch, but anything he might have told you at the time.



A. Okay.
Q. Does your answer remain the same?
A. Yes.
Q. Did Mr. Bowling ever tell you that the end caps were to have equal surface areas on the drawings that you were to make?
MR. LEACH: Objection, leading.
THE WITNESS: I do not recall that.
BY MR. TECHENTIN:
Q. Did Mr. Bowling's initial concept reflect equal surface areas for each of the surfaces of the end caps?
MR. LEACH: Objection, leading.
MR. WILLIAMS: And form of the question.
THE WITNESS: I do not recall.
BY MR. TECHENTIN:
Q. If you turn -- no.
If you just look at column 4 on line 8, there a sentence that begins, "Second end cap 26...." Do you see that?
A. Line 8?
Q. Line 8. It's in the second paragraph, second line of the second paragraph. It begins, "Second".
A. Second end cap 26 is shaped identical to the



first end cap 24. That is, second end cap 26 includes three discrete facets 40, identically shaped to each other....
Q. Can you finish that sentence.
A. "....and identically shaped as first end cap facets 36."
Q. Do you understand that language?
MR. WILLIAMS: Same objection.
MR. LEACH: Same objection.
MR. WILLIAMS: His competence.
THE WITNESS: I believe it's saying that each facet on the end cap of that specific die is equally -- equal surface area.
BY MR. TECHENTIN:
Q. Did Mr. Bowling's initial concept reflect identically shaped surfaces on the second end cap?
MR. LEACH: Objection, asked and answered, calls for speculation. And I think he's already testified that he is not sure.
(Sotto voce discussion between Mr. Williams and Mr. Leach.)
THE WITNESS: The sketch was not definitive enough to really tell by the sketch itself whether those end caps had the same sizes or not. There wasn't multi views or it was dimensioned out where you



could tell it was the same size, same shape, same angles, that was not provided. Therefore, based on that, by looking at a sketch, it's not definitive.
BY MR. TECHENTIN:
Q. Did Mr. Bowling provide you with any oral or other written direction in terms of drawing these dice that related specifically to the shape of a second end cap?
A. I believe it showed two end caps. There was no, there was no oral definition as to the makeup of those mathematically.
Q. As a draftsman or as a, and as a designer, can you tell me if it's -- is it possible in this gyroelongated polyhedral dipyramid shape --
MR. LEACH: Objection, leading.
BY MR. TECHENTIN:
Q. -- to have identically shaped surfaces on the end caps if the extension member surfaces are not identically shaped?
MR. LEACH: Objection, calls for speculation and calls for testimony beyond his competence, calls for -- should be the subject of expert testimony.
THE WITNESS: If the extension member's facets were not of equal size, the end caps would not be of equal size because the apexes of each extension

facet defines the end cap.
BY MR. TECHENTIN:
Q. What about if the extension member sides are different shapes?
(Sotto voce discussion between Mr. Williams and Mr. Leach.)
MR. LEACH: Objection, calls for expert opinion.
THE WITNESS: If the extension members are different shapes, then the end cap would not be of identical size and area.
BY MR. TECHENTIN:
Q. And just to be clear, the language that we have, that I asked you to recite from the patent -- if you want to read it, you can, to satisfy yourself that this representation is correct -- but that arises in the context of a six-sided die.
If it's -- if we're talking about different, different numbers of sides on the dice, does that change anything as far as what testimony you have offered in terms of the -- in terms of what we have just been talking about in terms of the patent?
MR. WILLIAMS: Objection to the form of the question.
MR. LEACH: Object to the form of the



question.
COURT REPORTER: What was the answer?
THE WITNESS: I believe not. To the best of my knowledge I would say it wouldn't make a difference whether you have six sides or 12 sides.
BY MR. TECHENTIN:
Q. In the -- in your -- when you created the drawings that you did for Mr. Bowling, how did it come to be that those drawings reflected identically shaped facets on the end caps?
MR. LEACH: Objection, assumes facts not in the record.
THE WITNESS: In order to make that dice geometrically equal, they would have to be the same size, same areas, same angles. And the end caps pretty much define the extension facets.
BY MR. TECHENTIN:
MR. TECHENTIN: Okay. Can we go off the record for one second?
VIDEOGRAPHER: We're going off the record, the time is 10:38.
(A break was taken.)
VIDEOGRAPHER: We are back on the record, the time is 10:41. This is tape two.
///



BY MR. TECHENTIN:
Q. Mr. Lizarraga, I would like to direct your attention to the claims in the patent, and those start on column 7, I think two pages later in the patent from where you are.
A. Oh, okay.
Q. If you go down to line 48, if you follow the numbers, I'm looking at big 1 (b), little (i). Do you see where I am?
A. Here, set extension?
Q. The next, it's a little (i) underneath that.
A. Oh. That's an i, isn't it?
Q. Yeah, it's an i, but it's a Roman numeral I.
A. Oh, okay.
Q. Can you read that paragraph for me.
A. "Each of said discrete facets being identically shaped and having equal surface areas."
Q. And if you go up to the paragraph right above that, right above that, starts out with (b).
A. "Said extension member having a first number of discrete facets and no more than said first number."
Q. Do you understand that language that you've just read from the patent?
(Sotto voce discussion between Mr. Williams



and Mr. Leach.)
MR. LEACH: Objection, calls for speculation, beyond his competency.
THE WITNESS: "Said extension member having a first number of discrete facets and no more than said first number."
That I don't understand.
BY MR. TECHENTIN:
Q. Do you understand what it means by extension member?
A. Yes.
Q. What about the language of the little (i) paragraph, do you understand that?
A. "Each of the discrete facets being identically shaped and having equal surface areas."
Yes.
MR. LEACH: Same objection to that question.
BY MR. TECHENTIN:
Q. And if you turn to column 9, just the next page, line 4, it's Roman numeral (iii). Do you see that?
A. Roman numeral (iii)? Yes.
Q. Can you read that paragraph.
A. "Each of said extension member facets being equal in surface area."

Q. Do you understand that language?
MR. WILLIAMS: Same objection.
MR. LEACH: Same objection.
THE WITNESS: Yes.
BY MR. TECHENTIN:
Q. Whose idea was it to have identical shapes on the extension member surfaces?
MR. LEACH: Objection, calls for speculation.
THE WITNESS: I believe that was my idea because the concept received from Mr. Bowling did not identify the surfaces being equal.
BY MR. TECHENTIN:
Q. And whose idea was it that the surface areas of the extension member surfaces would be equal?
MR. LEACH: Objection, calls for speculation.
THE WITNESS: The surface area, when I created the dice, were not a consideration in the design, only the angles and the dimension of the segments. If all the angles are the same, it comes out that the surface area is the same, but surface areas were not a design consideration on my part.
BY MR. TECHENTIN:
Q. So whose idea was it to have consistent



angles in the extension member sides?
MR. LEACH: Objection, calls for speculation.
THE WITNESS: I believe that was my idea because it wasn't defined. The concept wasn't defined much more than just a hand sketch. So based on the look of the sketch --
(Interruption by jet flying over.)
COURT REPORTER: What a minute, I can't hear you.
So based on the look of the sketch, is what I've got.
THE WITNESS: Based on the conceptual sketch, I made everything as geometrically exact as I could, because there was not enough definition to the sketch that was provided to me.
BY MR. TECHENTIN:
Q. Can you explain -- and we can, you can close up the patent right now. This is a more general question about the shape of these dice.
When you were preparing these drawings for Mr. Bowling, did you give any consideration to the relative size of the extension member surfaces and the end cap surfaces?
MR. LEACH: Objection, leading and calls for



speculation.
THE WITNESS: Did I give any consideration? There was an overall -- I believe it was an overall dimension that was provided to me, and just based on the diameter of the barrel, the caps -- the diameter actually defined the height of the pyramid or the end caps on each side. So if you take that away from the overall dimension, that defines the center, the body.
BY MR. TECHENTIN:
Q. But whose idea was it to have the height of the end cap be equal to the radius of the barrel?
MR. LEACH: Objection, calls for speculation.
THE WITNESS: It was just assumed on my part.
BY MR. TECHENTIN:
Q. But did you talk to Mr. Bowling about that?
A. I don't believe so.
Q. Did he provide you with any guidance as to what the height of the end cap was supposed to be?
A. Not that I recall.
COURT REPORTER: Would you repeat that question, please.
MR. TECHENTIN: Did he provide you with any guidance as to what the height of the end cap was



supposed to be.
MR. WILLIAMS: You got his response?
COURT REPORTER: (Nods head.)
MR. WILLIAMS: Thank you.
BY MR. TECHENTIN:
Q. And once you used that formula to calculate the height of the end caps, is it the case that the ratio of the surface areas or the extension member surfaces to the surface areas of the end cap surfaces, is just a function of the mathematics of the geometrical shape that is created?
MR. LEACH: Objection, calls for speculation.
THE WITNESS: The ratio of one surface area of the extension to the cap?
BY MR. TECHENTIN:
Q. Yes.
A. That was not a design consideration. I am sure there is -- there is probably some relation from one to the other, but it wasn't design criteria in developing the dice. If it's a coincidence that it's one, two, three to one, that's -- it is what it is. But it wasn't used as a design consideration.
Q. Were you instructed by Mr. Bowling to create a drawing of dice with any specific ratio as between

the extension member surfaces and the end cap surfaces?
A. No.
Q. Would it be the case that if you used a different formula to determine the height of the end caps, that that would impact the ratio of the surface area size of the extension members to the end caps?
MR. LEACH: Objection, calls for speculation.
THE WITNESS: I do not know.
BY MR. TECHENTIN:
Q. Well, if you'd used a higher end cap, would that have an effect on the surface area of the end cap surfaces?
MR. LEACH: Objection, asked and answered, calls for speculation.
THE WITNESS: In relation to what?
If this point was taller and this remained the same, would the surface area between this and this be different (indicating)?
BY MR. TECHENTIN:
Q. No, no, I'm sorry.
If you were to increase the height of the end cap --
A. Okay.



Q. -- would that have an effect, without changing anything else about the die, would that have an effect on the surface area of each of the end cap surfaces?
MR. LEACH: Objection, calls for speculation.
THE WITNESS: I don't know. At this point I am not sure. Because as you are pulling it taller, the angles are coming in, so I am not going to speculate.
BY MR. TECHENTIN:
Q. When did you first become aware of the 197 patent?
A. A month and a half ago. Within the last two months.
Q. And what was your reaction when you looked at the patent?
A. Can you clarify that?
Q. Did you have any reaction at all to looking at the patent?
A. Kind of cool to see my drawings on a patent, but that was about it.
Q. Do you believe that you contributed to the invention of the dice that are depicted in the patent?
MR. LEACH: Objection, calls for



speculation.
MR. WILLIAMS: Beyond his competency.
MR. LEACH: And beyond his competency.
THE WITNESS: I am not a patent lawyer so I am not going to define what an invention is. Did I contribute to the design? I would say yes.
BY MR. TECHENTIN:
Q. And is that design different from what Mr. Bowling presented to you either orally or through any drawing?
MR. LEACH: Objection, calls for speculation.
THE WITNESS: Yes.
BY MR. TECHENTIN:
Q. And what are those differences?
MR. LEACH: Again, objection, calls for speculation.
THE WITNESS: Again, the conceptual sketch seemed a little more of a natural, non-geometrical exact delineation and mine was exact in each facet on the extension members and caps; and there was no specific oral or written delineation of angles or dimensions or sides or surface areas, that was not provided. It was more of a concept.
///



BY MR. TECHENTIN:
Q. You have assigned whatever rights you might have or had in the past to this design to Hasbro; is that correct?
A. That's correct.
Q. And you've also agreed to release Hasbro from any claim for infringement of your rights; is that correct?
A. Correct.
Q. And that agreement is reflected in a contract; is that correct?
A. Correct.
(Deposition Exhibit No. 8 was marked for identification.)
BY MR. TECHENTIN:
Q. Showing you what's been marked as Exhibit 8. Is that the agreement?
A. I believe it is, yes.
Q. And other than what's contained in that agreement, do you have -- are there any other terms governing your relationship with Hasbro?
A. No.
Q. Do you have any stake in the outcome of the dispute between Mr. Bowling and Hasbro?
A. No.

Q. Do you have any stake in the outcome of any question as to whether you were an inventor or co-inventor of the dice claimed in the 197 patent?
A. No.
MR. TECHENTIN: Thank you. I don't have any further questions.
MR. WILLIAMS: Why don't we take a few-minute break and then start.
VIDEOGRAPHER: We're going off the record. The time is 10:55.
(A break was taken.)
VIDEOGRAPHER: We are back on the record, the time is 11:25.

EXAMINATION

BY MR. LEACH:
Q. Mr. Lizarraga, do you know that Mike Bowling has a degree from Arizona State University in engineering?
MR. WILLIAMS: Arizona.
MR. LEACH: Or Arizona.
THE WITNESS: No.
BY MR. LEACH:
Q. Do you know that he has taken courses in mathematics, geometry, physics, and trigonometry?



A. No.
Q. Do you also know that Mr. Bowling was a gamer and used dice in a lot of games that he's played and worked on designing dice and stuff like that?
A. Well, you just said did you also know. Well, I don't know the first things that you told me.
Q. Okay. Did you know that he was a gamer and he's used dice in games and stuff?
A. I knew he collected dice and he was into dice, yeah.
Q. And you also knew when he came to you the dice he wanted -- or the dice that he showed you that he wanted to draw, were to generate random numbers, correct?
COURT REPORTER: Was to generate what?
MR. LEACH: Random numbers.
THE WITNESS: I don't know if he said that, but he just talked about dice, so I would assume so.
BY MR. LEACH:
Q. You understood that he wanted the dice to generate random numbers, correct?
A. I would assume, yes. Whether he specifically said make it random, I just assumed. That's why I made it the way I did.
Q. Because that's the purpose of the dice,



right?
A. Correct.
Q. So is it your testimony -- so is it your testimony that you taught Mr. Bowling that irregular surfaces would generate irregular responses?
MR. RASH: Object to form.
MR. TECHENTIN: I'm going to object to form as well.
THE WITNESS: What did you say?
BY MR. LEACH:
Q. Is it your testimony that you're the one that taught Mr. Bowling that an irregular surface would generate irregular responses?
A. That I taught him?
Q. Yeah, that you came back and told him that, that he didn't already know it.
MR. RASH: Object to form.
THE WITNESS: I didn't tell him. I just said that based on the sketch, I couldn't make it the way he showed it to me, so this is what I came up with.
BY MR. LEACH:
Q. But it's not your testimony that he didn't know that before he contacted you?
MR. TECHENTIN: Object to form.



THE WITNESS: I don't know that.
BY MR. LEACH:
Q. You don't know what he knew before that?
A. Correct.
Q. And you also testified that you've never seen a patent before you were shown the 197 patent; is that correct?
A. Correct.
Q. And in your work at Ratheon you routinely support engineers, correct?
A. Correct.
Q. As a draftsman designer, correct?
A. Well, I did in a design capacity years ago, and I still interface because my people support them now.
Q. Okay. So at one time you did work as a design draftsman?
A. Yes.
Q. You did both that work.
And that's the same type of work you did in working for Mr. Bowling, correct?
A. Same type of work in terms of design?
Q. Yeah.
A. I was used a design capacity, sure.
Q. Are you a named inventor on any patents?

A. No, I am not.
Q. So in all the time that you worked as a designer for Raytheon working with engineers as a designer, you've never been named as an inventor on a patent, correct?
MR. TECHENTIN: Object to form.
THE WITNESS: Correct.
COURT REPORTER: And the answer was "correct"?
THE WITNESS: Correct, that I have not been named as a -- on any patent.
BY MR. LEACH:
Q. You also testified that you first met Mr. Bowling at his house, correct?
A. In person at his house, yeah.
Q. Okay.
A. We spoke on the phone prior.
Q. And what did you speak about over the phone?
A. Probably that, that I -- something about that I heard that he was interested in getting some help on a design or drawings or something to that effect, and when we were going to hook up and, you know, where and that kind of thing.
Q. The logistics?
A. (No audible response.)



Q. And when you first --
COURT REPORTER: You have to answer out loud.
MR. RASH: Was it yes? When he said logistics, did you mean to say yes?
THE WITNESS: Logistically to me means coordinating and getting together --
BY MR. LEACH:
Q. Scheduling.
A. -- so yes.
Q. And when you first met Mr. Bowling at his house, was Mr. Bowling's wife present?
A. I believe so.
Q. And is it at that meeting that Mr. Bowling disclosed to you his dice concept and design?
A. Yes.
Q. And he provided you with a 3D hand-drawn sketch?
A. As far as I recall, yeah.
Q. And it had a mid section and end caps?
A. I believe it did.
Q. And it had opposing triangles?
A. That I am not sure.
Q. Can you tell me a little bit about when Mr. Techentin first contacted you, what was the



conversation?
A. Well, Mr. Techentin actually contacted my father first because he was looking for me because we share the same name.
Q. Okay.
A. My father gave me Mr. Techentin's phone number and I contacted Mr. Techentin.
Q. And can you explain the conversation?
A. He -- first he wanted to validate that I was the person that worked on the drawings for Mr. Bowling and that I was the one working at Hughes, make sure I was the right person.
Q. Okay. And what else was said?
A. Then he was asking about a -- if I could help to define a time line as to when I worked with Mike on these dice.
Q. Okay. Anything else?
A. (Witness shakes head.)
Q. So in the first conversation he identified you as the person that worked with Mike on the dice and a time line and that's it?
A. Yes.
Q. When did you talk to him next?
A. Maybe four days later or something like that.



Q. In the first meeting did he suggest that you may be an inventor on the 197 patent?
MR. TECHENTIN: Object to form.
THE WITNESS: On the first meeting, no, I don't think so, or the first talk I don't believe so.
BY MR. LEACH:
Q. Do you know how that talk ended?
A. Which talk?
Q. The first time you spoke with Mr. Techentin.
A. The first one was I said I would look for drawings, see if I could find the drawings that I created.
Q. And in the second meeting what did you talk about?
A. I said I looked all over and I couldn't find any drawings.
Q. Did he ask you and -- did you have any discussions about what your involvement was in preparing the dice?
A. There was some talk about as to the drawing and that I just created the drawings, and then somehow we got to the fact that I did a little more than the drawings, so actually with the design as well.
Q. Was it Mr. Techentin's suggestion that you did more than just create drawings?

MR. TECHENTIN: Object to form.
THE WITNESS: I don't think at that point.
BY MR. LEACH:
Q. At what point did he suggest that, you know, you may be an inventor or you may have did more than just draw what Mr. Bowling told you to draw?
MR. TECHENTIN: Object to form.
THE WITNESS: Maybe third time we talked or something like that.
BY MR. LEACH:
Q. Can you recall that conversation? Can you explain it?
A. Not specifically. Just something to the fact that when I mentioned there was a little bit more than just doing a drawing, I said, well, I did a little bit of the design too, so. And then it may have come up with I may have possible rights.
Q. Is he the one that suggested that you may have rights?
A. I believe so. Possible rights.
Q. Possible rights.
A. And I said, I don't know. You know, I don't understand the patent laws or any of that.
Q. Did he tell you that he thought you were an inventor?



A. Not -- no, not that he thought I was; there's possibilities, but left it at that, pretty kind of open.
(Sotto voce discussion between Mr. Williams and Mr. Leach.)
BY MR. LEACH:
Q. At what point did Mr. Techentin say he was going to send you something?
A. Actually, in the first meeting I wanted to verify who he was, so he did send me the patent and the complaints, because -- just because I am talking to somebody over the phone, I didn't -- I wanted to verify, you know, this person was legit.
Q. In the earlier, these earlier meetings that we are talking about, did he say that Hasbro may be willing to pay you some money?
A. Not at the first couple meetings.
Q. When did money first come up?
A. Maybe fourth meeting, something like that. Fourth, fifth, I am not sure.
Q. And how did that come up? Did Mr. Techentin say Hasbro may be willing to pay you something?
A. Just the fact that if it was found that I had any rights, that you know, if I was interested in -- if it was defined that I had any rights, would I



be willing to give them to Hasbro. That's kind of how it came up, and I am like, sure. But we would talk about it depending on the money and the conditions of the contract and all that. I wanted to make sure nothing defined that I was, that I was saying that I was the inventor.
Q. You wanted to make sure what?
A. I wanted to make sure that nothing defined that I was stating that I was part inventor.
Q. So you don't believe you are part inventor?
A. I'm not saying that. I am saying I don't have the legal background to know what constitutes what is an inventor and what is not. So I didn't want to put myself in that position, so...
If somebody else says based on the facts that I'm part inventor, okay, but I am not making that call.
MR. LEACH: Can you mark that, please.
(Deposition Exhibit No. 9 was marked for identification.)
BY MR. LEACH:
Q. I am handing you what's been marked as Exhibit 9. Can you review that, please.
And what is this document?
A. What is the document? This is the license



agreement that Jeff sent to me to review. What kind of document, I mean, in terms of license agreements, what they mean and all that, I was not a lawyer, I don't know how these things work. So I told Mr. Techentin that I was going to have legal representation review this document.
Q. And you did that?
A. Yes.
Q. And who did you have review it?
A. My attorney.
Q. And who is that?
A. Steve Bossé.
Q. Did you at some point communicate back to Mr. Techentin whether this draft was acceptable or not?
A. I did not. I -- at that point I had Steve Bossé have any further conversations with Mr. Techentin.
Q. So it was Mr. Bossé that spoke with Mr. Techentin, basically negotiated the agreement with --
A. Correct.
Q. -- Mr. Techentin?
And is it true that this initial agreement is a license agreement?

A. I am not a lawyer, I don't know what kind of agreement it is, although it says it there. But what it states, how it works.
Q. Did you generally understand what the document --
A. Somewhat. But that's why I seeked legal counsel.
Q. At some point did you make some changes to this draft?
A. I was provided a second draft by Mr. Bossé, and I looked at that and made some changes to that a little bit.
(Deposition Exhibit No. 10 was marked for identification.)
BY MR. LEACH:
Q. Can you turn to the second page of Exhibit 9, that would be page 1 of the license agreement. And in paragraph (e) it talks about, it has Roman numeral (i), (i), (ii), (iii) and (iv).
Are you familiar with those paragraphs?
A. Somewhat.
Q. Isn't it true that at some point you struck out paragraphs (iii) and (iv)?
A. Yes.
Q. I am handing you what's been marked as



Exhibit 10 (indicating).
Can you turn to page 2 of 3. And on that page, this looks like an e-mail from you to Steve Bossé saying you don't want the previous word in there, "invented", and say re: defined. If this is acceptable, of course.
A. Re: defined, meaning change the word "invented" to "defined". Not redefined, but. Re: defined.
Q. Sure. So do you know when you were talking compensation, what, what was the negotiation on compensation? Can you describe that a little bit?
A. That was between my attorney and Mr. Techentin.
Q. So you have no idea how much they were talking about back and forth?
A. Not at the beginning. I mean, there was an amount provided to me at the beginning by Mr. Techentin when we first started.
Q. How much was that?
A. Twenty-five hundred.
Q. And that wasn't enough?
MR. RASH: Object to the form of the question.
THE WITNESS: Enough for what?



BY MR. LEACH:
Q. For what you were going to provide Hasbro.
A. I didn't feel it was enough because I'm getting dragged into this and I need to pay for legal counsel.
Q. Do you know what you asked for?
A. At the end?
Q. Not at the end but after. When they said 2500, did you come back and say, well, I want this much?
A. No, I did not.
Q. At any time did you ask for a different amount?
A. Well, that's where my attorney worked with Mr. Techentin.
Q. Do you know what he asked for?
A. No, I don't.
Q. When did you find out that Hasbro would pay you $10,000?
A. At the end, close to the end, Mr. Bossé said they're only willing to go up to 7500. And I said, well, offer them 10,000 and I'll sign today.
Q. So you said if they would give you 10,000 today, you would sign?
A. Correct.



Q. And did they do that? Did they pay you? Did Hasbro pay you the $10,000?
A. Yes.
Q. And you signed that day?
A. I signed on the day that I said I would sign. The check came after.
MR. LEACH: Please mark this.
(Deposition Exhibit No. 11 was marked for identification.)
BY MR. LEACH:
Q. So you do have some interest in this case in that you were paid $10,000 for the testimony you're giving, correct?
MR. TECHENTIN: Object to form.
MR. RASH: Join.
THE WITNESS: I have no interest in the outcome of this case at this point.
BY MR. LEACH:
Q. If you said you didn't contribute at all to the invention, would they have paid you $10,000, do you believe?
MR. RASH: Object to foundation.
MR. TECHENTIN: Object to form.
THE WITNESS: I don't believe they would, no, would have.

A. Not really.
Q. So one-eighth of your salary, your yearly salary you don't consider to be a lot of money?
A. It's -- my wife makes money too.
Q. How much does she make?
A. Between 40 and 50.
Q. So it's your testimony that $10,000 isn't a lot of money?
MR. TECHENTIN: Objection.
THE WITNESS: The fact that I don't want to take money out of my pocket to do something that I did not initiate, therefore, I want to be compensated for the time that I have to spend, period.
Is it a lot of money? I'll tell you what, I'd trade it for not even being here today, but by law I have to be here, therefore, I want to be compensated.
BY MR. LEACH:
Q. And getting back to your education, you don't have an engineering degree, do you?
A. No.
Q. You have a degree as a draftsman?
A. I have a, like a technical degree, yeah.
Q. And how many year course or how many year degree is that?



A. Probably equivalent to a two year.
Q. And you have -- you have no experience in designing dice prior to doing work for Mr. Bowling?
A. Nope.
Q. And you've never designed dice prior to doing work for Mr. Bowling?
A. No.
Q. When you were trying to draw the dice for Mr. Bowling, did you look at any sources or look at any books or any other material?
A. No, not at that point.
Q. When you first met with Mr. Bowling, do you recall a discussion about a confidentiality agreement?
A. There was some document that he wanted me to review and sign.
Q. And did he say that he wouldn't provide you with any -- he wouldn't disclose his invention to you unless you agreed to the terms of the confidentiality agreement?
A. No.
Q. He just handed it to you and said --
A. I signed nothing.
Q. I understand that your testimony is that you didn't sign it.
Before Mr. Bowling gave you or provided you



the detailed disclosure of his invention, did he ask that you sign this?
MR. TECHENTIN: Objection.
THE WITNESS: Not at that particular time. He said here's a document that he would probably want me to sign, but I didn't state whether I was going sign it or not. I needed to review it, so we just kind of went on with business.
BY MR. LEACH:
Q. Did you talk about what was contained in the confidentiality agreement?
A. I don't recall.
MR. LEACH: Let's go off the record.
VIDEOGRAPHER: We're going off the record. The time is 11:53.
(A break was taken.)
VIDEOGRAPHER: We are back on the record. The time is 12:00.
MR. LEACH: I have no further questions.
MR. TECHENTIN: Could you show the witness Exhibit 8, please.

FURTHER EXAMINATION

BY MR. TECHENTIN:
Q. Mr. Lizarraga, are you being compensated by



Hasbro for your time today?
A. No.
Q. And is there anything in the agreement that you have before you, Exhibit 8, that makes any representation about payments for your time?
A. For my time today or?
Q. Ever.
A. I would have to --
MR. LEACH: Objection.
THE WITNESS: I would have to go through --
MR. LEACH: Lack of foundation, and he's already testified that he wasn't involved in drafting that or understanding it.
THE WITNESS: Well, I read it before I signed it. Whether I completely understand legalese is a different thing, so...
(A pause in testimony.)
THE WITNESS: It talks about cooperation with the signee, expense in every reasonable way possible in obtaining evidence and going forward. So that was my assumption, that if I had to travel or something, continuing this. But again, I am not a lawyer, so...
BY MR. TECHENTIN:
Q. Okay. If you -- you can put that aside.

If at the first meeting that you had with Mr. Bowling, you had been provided a detailed description of the die that is -- that was consistent with your drawings, the drawings that you made, would that have saved you time?
A. Oh, absolutely.
Q. How so?
A. I wouldn't have to sit there and try to design and figure out based on his concept what could I really come up with. I mean, that's a drafter. If you dimension out every line, every angle, you can give it to a drafter and he's going to take it and completely define, and he'll do it. There's no thought.
Q. And if you had been provided a detailed description at your initial meeting with Mr. Bowling, would you have had to do any work at home?
A. Probably not.
Q. Did you charge Mr. Bowling for all the time you spent working for him?
A. Yes.
Q. Did he pay you?
A. Yes.
MR. TECHENTIN: No further questions.
VIDEOGRAPHER: Anything else?



MR. LEACH: I have no further questions.
This concludes the deposition. The time is 12:06.
(Deposition concluded at 12:06 p.m.)
* * * * *



CERTIFICATE

STATE OF ARIZONA )
) ss.
COUNTY OF PIMA )

BE IT KNOWN that I took the foregoing deposition pursuant to Notice; that I was then and there a Certified Court Reporter, CCR #50247, in the State of Arizona; that the witness was duly sworn by me to tell the truth; that said witness's testimony was reduced to writing by me.

I DO FURTHER CERTIFY that I am not a relative or attorney of either party, or financially or otherwise interested in the action.

( ) Pursuant to request, notification was provided that the deposition is available for review and signature.

(X) Deposition review and signature was not requested.

WITNESS MY HAND this 21st day of March 2006.

WENDY J. PULLIUM, RPR, CCR #50247