UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

C.A. NO: 05-229S

* * * * * * * * * * * * * * * * * * *

MICHAEL BOWLING
a Resident of Arizona,

Plaintiff,

vs.

HASBRO, INC.,
a Rhode Island Corporation,

Defendant.

* * * * * * * * * * * * * * * * * * *

DEPOSITION OF MICHAEL BOWLING, a witness called on behalf of the defendant, taken pursuant to the Rhode Island Rules of Civil Procedure, before Elizabette M. Afonso, Professional Shorthand Reporter and Commissioner for the State of Rhode Island and Providence Plantations for the Commonwealth of Massachusetts, at the law offices of Adler, Pollock & Sheehan, One Citizens Plaza, Providence, Rhode Island, commencing at 10:05 a.m. on Monday, January 16, 2006.

Page 126

correctly?

MR. LEACH: Objection. I think that misstates the record.

Q. Can you answer the question?

A. Could you ask the question again? I'm sorry.

Q. Did I understand you correctly to be testifying that the number underneath five of those drawings, the D4, D6, D8, D10, D12, represents a ratio between the overall length and the length of the extension member of those dice?

MR. LEACH: I don't want you to speculate. If you know, you can answer the question, but if you're just guessing --

A. Okay. Then I don't know. It would be a guess. I don't know.

Q. Would there be a way for you to figure that out?

A. Yeah. If I studied it a bit. If I had a calculator.

Q. Let me ask it this way, during the design phase when you were designing these dice, did you consider different alternatives in terms of the ratio of the overall length of the die to the length of the extension member?

A. I think I understand what you're asking me. With

Page 127

respect to this exhibit, with this drawing, what I was trying to attempt to do here was either enlarge or reduce the overall complete shape of the die, so that I could create some uniformity between them. That's what this drawing was for. This drawing was for --

Q. I understand. Let me do it this way.

Without reference to Exhibit 4, let me ask the question again: When you were designing these dice, did you consider different ratios of overall length of the die to extension member?

A. I'd have to say that I didn't, because I don't remember Lazaraga giving me a bunch of different versions. So I think what he gave me is what he gave me, and that was such a long and drawn out process that rather than to go back to him and say, Can we do this again or this one again?

Because it was taking a long time to get them from him, long relatively speaking to me. I could make a decision instantly, but then I may have to wait a week to see, you know, an outcome or if he's going to -- you know, where he was along the process.

So then rather than change the overall --

Page 128

to change specific parts of it, I would just rather reduce, enlarge and reduce them. And as you can look at that, it looks like the ratio to the main body extension and the end caps are pretty relatively the same for all of them.

Q. Let me ask the question this way, did you ever consider using long, pointy end caps?

A. Maybe, possibly.

Q. Did you ever consider using longer and pointier end caps than what you ultimately decided to produce?

A. I might have. I guess if I did, I don't remember drawing any of them, because it didn't seem -- you see, if you try to make a long, pointy end cap, it became, again, this unsightly sort of cylinder if you made the end caps too long. Also, it might have made them a bit dangerous.

So I think pretty much the whole time I had them fairly blunted.

Q. Did you ever consider using them even shorter or more blunt than what it was that you ultimately produced?

A. I can't say much longer or more shorter was ever really considered. I just kind of sketched on paper of what I thought looked attractive, looked

Page 129

good, and that's kind of what we went with.

Q. Well, what did you give to Mr. Lazaraga that would allow him to know how long the end caps should be?

A. I think just the sketches. I think he looked at my sketches and came off of those pretty good. Because, as I said, I don't recall him giving -- a lot of stuff going back and forth.

Q. But you don't have the sketches anymore that you gave to him?

A. No. I've looked for them.

Q. Do the sketches that you gave to him indicate what the physical length of the end cap should be?

A. No. I don't recall doing any measurements.

Q. Did it express it in terms of a ratio with respect to any other measurement on the die?

A. No. I think it was more -- I was trying to convey the concept to him, and then him try to give me some working drawings something to look at, and the ones he gave me were pretty good.

It was just only then I realized that with respect to each other, some were bigger than the other. So that's when I tried to, you know, cut and paste and make them bigger, because I was trying to make a uniform set.



Esquire Deposition Services
1-877-465-7236

Page 186

mechanical drawing; is that a fair way to describe it?

A. Uh-huh, yeah.

Q. And this is the six-sided crystal die?

A. Yeah.

Q. Is this one of the drawings that Mr. Lizaraga prepared?

A. Yeah, I believe so, uh-huh. I believe so. This could have been something that came from Merchant & Gould, too. If I had to guess, I would say Lizaraga -- Lizarga.

MR. LEACH: Are you guessing or do you know?

THE WITNESS: I'm guessing. Sorry. I'm guessing.

Q. You didn't prepare it?

A. No. This was a mechanical drawing done for me.

Q. And then also attached is a drawing for a ten-sided die, correct?

A. Yes. You can see where we had the change made from the ten on the previous page.

Q. And these drawings are to a specified scale, correct?

A. Yeah, mm-hmm.

Page 187

Q. So, for example, you have a four to one and one to one rendition of the six-sided and a three to one and one to one of the ten-sided, correct?

A. I'm sorry?

Q. I think you're looking at the wrong page. On the six-sided --

A. Oh, I'm sorry. I thought it was the last page, sorry. That page that says -- looks like it says two, four to one scales, and then a one to one scale, and then the ten-sided three to one scale and a one to one scale.

Q. And so the fact that you've got scaled drawings here, indicates that at some point someone determined the size of these dice?

A. Yeah. I believe the -- possibly the mechanical software, you know, attached scales to them. I'm guessing.

Q. And who is it that decided the length of the end cap that's reflected in this mechanical drawing?

A. I believe I did by the indications of the drawings.

Q. The drawings that you submitted to Mr. Lizaraga?

A. Yes.

Q. That had dimensions for the end caps on them?

A. Well, it showed the approximate length. So if you

Page 188

know that your end cap has to extend so far, that locks in your dimension, and there's no way for you to change your dimension.

Q. I don't understand what you mean by that.

A. If you look at the number three and the base of this end cap, if you say you want this end cap to be approximately, just shooting in the dark, if you want it to be quarter of the length of this, that determines everything else.

Q. And just so the record's clear, you're looking at the six-sided mechanical drawing, and you were suggesting that you could note that the end cap should be a quarter as long as the extension member?

A. Yes. Whatever length you wanted it to be. What I'm saying is just by pointing out that length when you say, Look, I want it to be overall this long, I want the body to be this long, then that determines the shape of the end cap.

Q. Well, did you do that?

A. I think that's how I did it, just by drawings and saying, Look, I want them about this big. I believe that's how I did it.

Q. I'm just trying to understand.

Page 189

A. Mm-hmm. That's fine.

Q. Did the drawings that you gave him say that the die is a certain length?

A. I don't believe I actually gave him specific length as much as drew them for him.

Q. And did it have any notation as to the size of the end cap?

A. I don't think the initial drawing did.

Q. Did it have any indication as to the relative size of the end cap and the extension member?

A. I don't recall.

Q. Did it have any indication as to the relative size of the end cap and the overall length of the die?

A. On the initial drawings, I don't recall.

Q. When did you communicate that to Mr. Lizaraga?

A. I think what he did was he just generated some drawings based on my sketches, and they looked good to me, so I went with them. And then I --

Q. Do you know if the mechanical drawings were the same as your sketches?

A. They looked real close.

Q. But you don't have the sketches anymore?

A. No.

Q. Does Mr. Lizaraga?



Esquire Deposition Services
1-877-465-7236

and specifications. Document the inspection and acceptance in the contract file.

**570.112 Awards to Federal employees.**

If you receive an offer from an officer or employee of the Government, follow the procedures in FAR 3.6.

**570.113 Disclosure of mistakes after award.**

If you discover a mistake in a lessor's offer after award, follow the procedures in FAR 14.407-4 and Subpart 514.407-4.

**570.114 Protests.**

FAR 33.1 and 533.1 apply to protests of lease acquisitions.

## Subpart 570.2—Simplified Lease Acquisition Procedures

**570.201 Purpose.**

This subpart prescribes simplified procedures for small leases. These procedures reduce administrative costs, while improving efficiency and economy, when acquiring small leasehold interests in real property.

**570.202 Policy.**

Use simplified lease acquisition procedures to the maximum extent practicable for actions at or below the simplified lease acquisition threshold.

**570.203 Procedures.**

**570.203-1 Market survey.**

Conduct a market survey to identify potential sources. Use information available in GSA or from other sources to identify locations that will meet the Government's requirements.

**570.203-2 Competition.**

(a) Solicit at least three sources to promote competition to the maximum extent practicable. If you have repeated requirements for space in the same market, and if practicable, invite two sources not included in the most recent solicitation to submit offers.

(b) If you solicit only one source, document the file to explain the lack of competition.

**570.203-3 Soliciting offers.**

(a) Solicit offers by providing each prospective offeror a proposed short form lease or SFO. The short form lease or SFO must provide all the following information:

(1) A description of the Government's requirements.

(2) All award factors, including price or cost, and any significant subfactors you will consider in awarding the lease.

(3) A statement of the relative importance of the evaluation factors and subfactors.

(4) A statement of whether all evaluation factors other than cost or price, when combined, are either:

(i) Significantly more important than cost or price.

(ii) Approximately equal in importance to cost or price.

(iii) Significantly less important than cost or price.

(5) Either in full text or by reference, applicable FAR provisions and contract clauses required by 570.6.

(b) As necessary, review with prospective offerors the Government's requirements, pricing matters, evaluation procedures and submission of offers.

**570.203-4 Negotiation, evaluation, and award.**

(a) If you need to conduct negotiations, use the procedures in 570.307.

(b) Evaluate offers in accordance with the solicitation. Evaluate prices and document the lease file to demonstrate whether the proposed contract prices are fair and reasonable.

(c) If the total price, including options, exceeds $500,000, consider whether you need cost and pricing data to determine that the price is fair and reasonable. In most cases the exceptions at FAR 15.403-1 will apply.

(d) If the total contract value of the lease, including options, will exceed $500,000, the proposed awardee must provide an acceptable small business subcontracting plan. This requirement does not apply if the proposed awardee is a small business concern.

(e) Make award to the responsible offeror whose proposal is most advantageous to the Government considering price and other factors included in the solicitation.

## Subpart 570.3—Contracting Procedures for Leasehold Interests in Real Property

**570.301 Market survey.**

Conduct a market survey to identify potential sources. Use information available in GSA or from other sources to identify locations capable of meeting the Government's requirements.

**570.302 Description of requirements.**

(a) The description of requirements depends on the nature of the space the agency needs and the market available to satisfy that need.

(b) The description of requirements must include all the following:

(1) A statement of the purpose of the lease.

(2) Functional, performance, or physical requirements.

(3) Any special requirements.

(4) The delivery schedule.