UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

MICHAEL BOWLING, a Resident )of Arizona,

) Plaintiff,

)

v. )C.A. No.05-229 S

)HASBRO, INC., a Rhode Island

Corporation, )

) Defendant.

DEPOSITION OF

JULIE DAULTON

Taken April 11, 2006 Commencing at

REPORTED BY: HOLLY J. NORDAHL ESQUIRE DEP(

701 FOURTH AVENUE SOUTH SUITE

MINNEAPOLIS, MINNESOTA 55415

any recollection of whether or not there had been an interview prior to your involvement?

A. I don't remember one way or the other.

Q. When Mr. Sumners asked you to take over the -- or to handle the Bowling application, what information was provided to you with respect to the subject matter of that application?

MR. WILLIAMS: In response to the question, I would ask the witness to avoid revealing attorney-client privileged communications, but you may reveal factually what information was provided to you.

A. I don't remember.

Q. Were you provided with any drawings of dies?

A. I don't remember.

Q. Were you provided with any models of dies?

A. I don't remember.

Q. Were you provided with any written description of dies?

A. Again, I don't remember.

Q. How was it that you learned of the subject matter of the '197 patent?

A. I don't remember. It would have been typical that there would be some sort of record of invention or description from Mr. Bowling in the file, but I do not have a specific recollection.

Q. What constitutes a record of invention?
A. Well, typically it's some sort of written document that describes the thing which they believe they invented.
Q. And do you recall if Mr. Bowling provided Merchant & Gould with a record of invention?
A. I don't remember one way or the other.
Q. Did he provide a description of invention?
A. I don't remember one way or the other.
Q. If he had provided you with a record of invention or a description of the invention, would you have kept that?
A. Probably.
Q. Where would you have kept it?
A. In the physical patent application file.
Q. That's a file that's housed at Merchant & Gould?
A. Yes.
Q. Have you had any involvement with the litigation between Mr. Bowling and Hasbro?
A. No.
Q. You're aware that there have been two separate lawsuits involving Mr. Bowling and Hasbro, one in Arizona and one in Rhode Island?
A. Yes.

Q. And your answer is correct for both of those that you haven't had involvement in either piece of litigation?
A. Yes.
Q. Have you ever been asked to produce your files with respect to the '197 patent in connection with the litigation between Mr. Bowling and Hasbro?
A. I don't think I've personally been asked.
Q. Do you know if your files have been reviewed in the context of the litigation between Hasbro and Mr. Bowling?
A. I don't actually know, but I would -- I believe so.
Q. What's the basis for that belief?
A. It's fairly standard from what I do know about patent litigation.
Q. It would be fairly standard, you mean, for the lawyers to review the internal prosecution file in connection with litigation, is that what you mean?
A. Yes.
Q. You don't have any reason to believe that that did not happen in this case, do you?
A. No.
MR. TECHENTIN: Mr. Leach, if you could present to the court reporter for marking as Deposition

Exhibit 2, the Second Amended Privilege Log of Mr. Bowling, I would appreciate that.

(At this time Exhibit 2 was marked for identification.)

BY MR. TECHENTIN:

Q. Ms. Daulton, you have in front of you what's been marked as Deposition Exhibit 2. Are you familiar with what a privilege log is?

A. Nope.

Q. You've never seen a privilege log before?

A. No, I haven't.

Q. I can make the representation that a privilege log is a list of documents that are not produced in litigation to the other side on the grounds of attorney-client privilege or some sort of work product protection, and I can further represent that this is the privilege log that has been presented to Hasbro by Michael Bowling by his attorneys at Merchant & Gould. If you could please look through this log of documents, my question is: Do you see any indication of a record of invention on this log?

A. I don't see the words "record of invention."

Q. Do you see anything on that log whose

description, based on the author and the description that's listed in there, could be a record of invention?

A. There's a couple of documents authored by Michael Bowling that are not dated.

Q. I'm sorry. Could you repeat that? There was some static.

A. There's a couple of documents authored by Michael Bowling that are not dated. The description, one of them, I guess it's entry 38, says "Personal handwritten notes regarding patent prosecution." You know, it's possible there's something in there. Let's see. There was something else I saw, too. That's it.

Q. With the exception of item number 38, are there any other items on this privilege log that could constitute a description of the invention by Mr. Bowling?

A. There are documents that are written by Michael Bowling that -- where the description -- you know, it's possible there's some sort of description of the invention maybe intermingled with other kinds of things. You know, I don't know.

Q. Would you agree that there is no indication on this privilege log of any documents that constitute or have drawings of the subject matter of the '197 patent in them?

A. I'm sorry. Could I have that question repeated, please?

(Requested portion of the record was read by the court reporter.)

A. I can't tell. I don't know.

Q. Is there any indication on this that there are any drawings?

A. I did not see the word drawings on this document -- on this privilege log.

Q. Have you ever seen any drawing by Michael Bowling of the dies that are the subject of the '197 patent?

A. I don't know.

Q. Why don't you know?

A. I can't remember.

Q. Have you ever seen any drawing of the dies that are claimed in the '197 patent?

A. Yes.

Q. Where did you see such a drawing?

A. They're printed in the '197 patent.

Q. Other than the drawings that are actually printed in the '197 patent itself, have you ever seen any other drawings of the dies that are claimed in the

A. I generally would ask him who was involved with the ideas you're describing.

Q. And what -- in this case, what did Mr. Bowling tell you about who was involved?

A. I don't remember.

Q. Did you perform an inventorship review with Mr. Bowling in this case?

A. I don't remember, but it would have been my standard practice to do so.

Q. When you would, in 1997, when you performed an inventorship review, would you take notes of that interview?

A. Maybe, maybe not.

Q. What would determine whether or not you took notes of the interview?

A. If I heard something unusual, I would probably take a note.

Q. So would it be fair to say that if you ran through the questions and they -- the responses that you got were in line with the client being a sole inventor and no red flags were raised, you wouldn't take any notes of that phone call?

A. Probably. I can't say in all circumstances that that would be the case.

Q. Other than taking notes, would you do

A. Thank you. He did my mechanical drawings for me. So I may have given them to him, and then he gives me back these nice, big drawings, and I didn't think to ask for a sketch or something.

Q. What did you sketch? What type of die?

A. It wasn't a die type. It was just -- it was more the image of the opposing triangles.

Q. Can you draw for me what you mean by that?

A. Yeah. See, what I had was this, right, and it would go around the page, so this may be a three, this might be four, right. But, I thought, why can't you take this same, right, and to simplify it, if you make it -- if you went here, this drives home the point of all of the room. Now you could do this.

But to make it to show how it would actually be laid out on the die, right, it might be more like this. This being here. This being part of, you know what I mean, there's another part that wraps around here that's like this, see, you know, the wraparound.

So what I did was I took this that had a small surface area, you can't hardly make a number legible to something that's doubled or more my



0e833c06-3d41-44a8-baad-4c084646dbdf

size. Now I can draw a big number. Now I can apply this to a D20.

Q. Okay. Just so the record is clear, could you just put a number one next to the first figure that you drew there.

A. (Witness complies.)

Q. And that, if I'm correct, is the one that you were using to describe the prototype dice that we've looked at, correct?

A. Yes, correct.

Q. And can you put a number two next to the next drawing?

A. (Witness complies.)

Q. And if I understand that correctly, that's the drawing that you were using to describe the concept of using opposing triangles, correct?

A. Yes.

Q. And if you could put a number three next to the third drawing you did there.

A. (Witness complies.)

Q. That is your representation of more of the practical application of crystal die design; is that correct?

A. Mm-hmm.

standard practice to do so, yes.
Q. What would that standard practice entail?
A. Contacting the client and discussing the proposed amendment.
Q. You don't remember having talked to Mr. Bowling about this amendment?
A. I don't remember one way or the other.
Q. Would it be fair to conclude that based on the fact that, at least according to this document, you agreed to the amendment that that was authorized by Mr. Bowling?
A. Again, I don't remember, but it would have been unusual for me to agree to an amendment without getting the client's authorization.
Q. Have you ever spoken with Albert Lizarraga?
A. Not that I know of.
Q. Do you know who he is?
A. No, sir.
Q. Have you ever heard the name before?
A. Yes.
Q. In what context?
A. In preparation for this deposition.
Q. Was that the first time that you'd ever heard of him?
A. Yes.