# I. INTRODUCTION

I have been retained as an expert witness for Michael Bowling to study U.S. Patent No. 5,938,197 ("the '197 patent") and render my opinion regarding the issue of whether the '197 patent is infringed by Defendants, Hasbro, Inc. ('Hasbro').

In my capacity as a expert witness for Michael Bowling, I expect to testify at trial regarding my opinions in this matter. More specifically, I expect to testify that Hasbro's accused dice infringe claims 1-9 and 16-19 of the '197 patent literally and under the doctrine of equivalents. I further expect to testify about my background, experience and qualifications.

I also may testify on issues on which Hasbro bears the burden of proof, or to rebut positions that Hasbro may take and which I am qualified to address.

I understand that at this time I am to disclose, pursuant to Fed. R. Civ. P. 26(a)(2)(B), details of and reasons in support of my expected direct expert testimony.

## II. STATEMENT OF OPINIONS AND BASIS AND REASONS THEREFOR

### A. Michael Bowling's '197 Patent

The '197 patent is directed to game playing dice, and more specifically to a crystal shaped die. Figure 1 of the '197 patent shows a six sided die, which is typically called a d6.

FIG. 1




A d6 is commonly used to randomly generate numbers between 1 and 6 for use in games. Some d6's have faces that do not have numbers indicated on their faces instead they can have symbols, polka dots (commonly referred to as pips), or other indicia. Tossing or rolling the d6 is the common method of generating the random outcomes.

When I first saw the Crystal Caste ™ dice, as shown below, (the preferred embodiments of the '197 patent) in October 2000, I felt that they were the most unique shaped dice I had seen in twenty-three (23) years of collecting dice.



The innovative design was a radical departure from the standard polyhedral shapes (platonic solids plus pentagonal trapezohedron).



**B. Hasbro's Accused Die**

I first acquired as set of the Hasbro accused dice (shown below) early in December 2000.




Upon examination of these dice I believed that they were Crystal Caste ™ dice. I understand that Hasbro claims that the die was independently developed. Given the vast number of different die designs that are available the chances that Hasbro independently developed their die is highly unlikely.

**C. Infringement Analysis**

I understand that for purposes of determining whether a claim of a patent is infringed, the claim must first be properly interpreted. I understand that the claim must be interpreted as one of ordinary skill in the art would view that claim as a whole in light of the teaching of the patent specification and the prior art. I also understand that statements made during the prosecution of the patent application in the patent office must also be considered in interpreting the claim.

I have interpreted the terms of the '197 claims at issue that are the subject matter of this opinion. My interpretation of the claim terms are based on my background and

investigation, based on my review of the patent, its file history, and the cited art, and reflects of how those terms would be defined on the date of filing of the application of the '197 patent.

I understand that the properly construed claims must be compared with the subject matter accused of infringement, in this case Hasbro's accused die. I understand that a product can infringe a patent claim in two ways – literally or by the doctrine of equivalents. For literal infringement to exist, I understand that every element of the claim must have a corresponding element in the accused product. I understand that under the doctrine of equivalents, a product that does not literally infringe upon the expressed terms of a patent claim may nonetheless be found to infringe if there is equivalence between the accused products and the claimed elements of the patented invention. I understand that there is infringement under the doctrine of equivalents if a change in the accused product is insubstantial from the claimed invention. One way to determine if the change is insubstantial from the claimed invention is if the element not literally found in the accused product performs the same or substantially the same function in the same or substantially the same way to achieve the same or substantially the same result. If so then infringement under the doctrine of equivalents exists.

i) **Literal Infringement**

As one skilled in the art of dice and die design, I interpret the phrase "discrete facets being identically shaped and having equal surface areas" in element (b)(i) of claim 1 of the '197 patent to mean that the facets are identically shaped and have equal surface areas, without regard to any indented indicia. I interpret the phrase "extension member facets being equal in surface area" of element (b)(iii) of claim 17 of the '197 patent to mean that the facets are of equal surface area, without regard to any indented indicia. I come to these conclusions based on the claim language, the specification, the prosecution history, the cited art, and my extensive knowledge as one skilled in the art of dice and die design reading the patent document as a whole.

As explained above, this invention is directed to a particular shape of die used for game playing. The die is used to generate random numbers by rolling or tossing it. The dice generate random numbers by having a shape such that it is equally likely to land on any one extension member facet as any other extension member facet. In the context of this invention, the claims require that the shape and size of the facets or planar surface areas be the same. Having facets of equal size and shape ensures that the die generates random numbers when tossed or rolled. For example, as one skilled in the art, I would consider a standard cubical die, such as the die shown in Figure A below, to have facets that are identically shaped and have equal surface areas, despite the indented dots or polka dots indicating the different numeric values. Likewise I consider the die in Figure B, which is a commercial embodiment of the die disclosed and claimed in the '197 patent, to have facets that are identically shaped and have equal surface areas despite the indented numbering.

**Figure A** **Figure B**






In the context of this invention, the extension member facets could include indicia, such as pips or engraved numbers, which indicate which number was randomly generated from the roll of the die. The most common method of placing indicia on a die is to use pips or polka dots indented on the facets of the die. Another common method is to engrave or mold impressions of numbers on the facets of the die as shown in the commercial embodiment of the '197 patent in Figure B. The reason the pips or numbers are indented is to prevent the markings from wearing off. Any other interpretation of the disputed claim language would exclude the most common types of indicia, namely indented pips. Thus it is my opinion that the proper interpretation of elements (b)(i) in claim 1 and (b)(iii) in claim 17 is that equal surface area refers to the planar surface area without regard to the indented indicia.

Both claims 1 and 17, and as I understand, their dependant claims, include an element that requires that the extension member facets have equal surface areas. Element (b)(i) reads "each of said discrete facets being identically shaped and having equal surface areas." See '197 Patent, Col. 7, lns. 48-49. Element (b)(iii) of claim 17 reads "each of said extension member facets being equal in surface area." See '197 Patent, Col 9, lns. 4-5. As one skilled in the relevant art, reading this patent, it is clear that the claims require that the 'facets' or the planar surfaces making up each side of the die have equal surface areas without regard to the indented indicia. The majority of commercial dice available today use indented pips, and the surface area difference imposed by the difference in material removed for the pips on each side does not affect the generation of random numbers. Thus, the indented pips do not affect the randomness of the rolls, rather it is the equal planar surface area of the die that causes the randomness.

The specification confirms that the correct interpretation of the phrases "equal surface areas" or "equal in surface area" is the planar surface area of the facets of a die without regard to the indented indicia. In the Detailed Description of the Preferred Embodiment section of the patent, the specification describes a preferred embodiment of the invention by referring to Figures 1-5 of the patent. See '197 Patent, Col. 2, lns. 60-64. For example, Figure 1 of the patent shows a die having indented numerals on the extension member facets. The reference number '32' refers to the extension member facets. Additionally, in Figure 1, reference number 32 points to each of the extension member facets, the facet with a '6' engraved on it, the facet with a '2' engraved on it, and the facet with a '3' engraved on it.

**Figure 1 of the '197 Patent**

FIG. 1




In describing Figure 1 the patent specification reads as follows:

> The extension member 28 includes a plurality of discrete facets 32. Preferably, each of the discrete facets 32 are identically shaped and have equal surface areas to each other. That is, each of facets 32 has a surface area which is equal to and no greater and no less than the surface area of any other of the facets 32.

'197 Patent, Col. 3, lns. 5-10. Figure 1 clearly shows that the numerals are engraved or molded impressions. This is shown by the use of three-dimensional numbering on the extension member facets 32 in Figure 1. In describing Figure 1 the specification explicitly states, "facets 32 are identically shaped and have equal surface areas to each other." '197 Patent, Col. 3, lns. 6-8. Thus, the specification confirms that the phrases "equal surface areas" or "equal in surface area" mean that the extension member facets 32 have equal surface areas despite the indented indicia, i.e. the engraved numerals.

In the Summary of the Invention section of the patent, the specification states that the extension member has discrete facets and "each of the discrete faces is identically

shaped and has equal surface areas." The specification goes on to state, "preferably each of the extension member discrete facets includes printed indicia thereon. For example, this may take the form of a [sic] numbers or other markings such as polka dots." '197 Patent, Col. 1, lns. 47-50. This language broadly describes the types of indicia that could be used on the facets of the extension member. As one skilled in the art, I read this to broadly mean that the facets can have any type of indicia, including pips, engraved numerals, etc. The specification does not limit facets to having two-dimensional indicia. In fact the patent figures show three-dimensional indicia.

The Summary of the Invention section of the patent specifically states, "the extension member facets include printed indicia thereon." The claims of the patent explicitly state "each of said extension member discrete facets include printed indicia thereon." The term "printed" clearly includes engraved, indented, or etched indicia on the extension member facets. The definition of "print" is "to make an impression in or upon: mark with print <two small light feet that barely print the soft soil> … to cause (as a mark) to be stamped: make (an impression) by or as if by pressure <printed his seal in wax>." See Webster's Third New International Dictionary 1803 (2002). Thus the patent specifically includes engraving or depressions as a type of indicia placed on facets it considers to have equal surface areas.

Finally, I understand that a claim interpretation that excludes a preferred embodiment is rarely, if ever, a correct interpretation. Figure 1 illustrates a preferred embodiment of the patent. Figure B depicts a commercial embodiment of a die constructed according to a preferred embodiment of the '197 patent.

**Figure 1 of the '197 Patent** **Figure B**

FIG. 1






Figure 1 and Figure B show that the "6," "3," and "2" are indented or engraved numerals. Thus, it follows that the correct interpretation of the phrases "equal surface areas" and "equal in surface area" would cover the die depicted in Figure 1 of the patent and the commercial embodiment thereof.

I understand that Hasbro argues that its accused die does not infringe the asserted claims of the '197 patent because its die does not have extension member "facets" and that their extension member "facets" do not have equal surface areas because of the difference in surface area due to the different number of pips. It follows that Hasbro interprets elements (b)(i) of claim 1 and (b)(iii) of claim 17 to require that the surface area of the extension member facets include the surface area of the different number of pips on its accused die.

Hasbro's argument is wrong. First, as explained above, one skilled in the art of die design would understand that the term "facets" refers to the planar surface area of the

extension member without regard to indented indicia. According to Webster's Third New International Dictionary pg. 812 (2002) a facet is defined as "one of the small plane surfaces produced on a diamond or other precious stone." Hasbro, on its Monopoly Millennium Edition packaging, refers to the accuse die as "multifaceted."



Second, Hasbro's claim interpretation excludes the preferred embodiments shown in the patent specification. It also excludes the patentee's commercial embodiment of the die claimed in the patent.

For the reasons stated, it is my opinion that Hasbro's accused die literally infringes claims 1-9 and 16-19 of the '197 patent.

**ii) Doctrine of Equivalents**

If Hasbro's accused die is found not to literally infringe claims 1-9 and 16-19 of the '197 patent, it is my opinion that the accused die infringes those claims under the doctrine of equivalents.

The Hasbro accused die is insubstantially different from the die claimed in claims 1-9 and 16-19 in the '197 patent. In other words, Hasbro's accused die either literally contains each claim element or its equivalent. I understand that Hasbro admits that the accused die meets each element of the asserted claims except for elements (b)(i) of claim 1 and (b)(iii) of claim 17. These elements relate to the extension member facets having equal surface areas. It is my opinion that Hasbro's accused die contain at least the equivalent of elements (b)(i) of claim 1 (extension member "facets being identically shaped and having equal surface areas") and (b)(iii) of claim 17 ("extension member facets being equal in surface area"). That is, Hasbro's accused die performs the same function, in the same way, to achieve the same result, as a die having extension member facets that are identically shaped and having equal surface areas.

Hasbro's accused die performs the same function as a die having facets that are identically shaped and have equal surface areas. Hasbro's accused die has extension member facets that function to produce random numbers from one (1) to six (6) by casting or rolling the die.

Hasbro's accused die performs in the same way as a die having extension member facets that are identically shaped and have equal surface areas. Hasbro's accused die has extension member facets that are identically shaped and have the same planar surface area such that the die is as likely to land on any one extension member facet as another.

Hasbro's accused die achieves the same result as die having extension member facets that are identically shaped and have equal surface areas. That is it generates random numbers when tossed or rolled. I have tested the Hasbro's accused die and found that there was an even distribution of rolled numbers.

I have reviewed the prosecution history of the '197 patent and found nothing that would limit the application of the doctrine of equivalents. In the 30(b)(6) deposition given by Kurt Benson representing Hasbro, Page 61-65, Hasbro admits that the accused die perform the same *function*, in the same *way*, to produce the same *result* as the die claimed in the '197 patent. I conclude that Hasbro's accused die infringe the asserted claims under the doctrine of equivalents.

**D) Validity**

I understand that a patent claim may be invalidated as anticipated under 35 U.S.C. section 102 if a single prior art reference meets each and every element of a claim. I also understand that a patent claim may be invalid as obvious under 35 U.S.C. section 103(a) if the differences between the subject matter claimed and the prior art are such that the subject matter claimed as a whole would have been obvious at the time the invention was made to a person of ordinary skill in the relevant art.

I have not seen any prior art that would render any claim of the '197 patent invalid. Should Hasbro argue that any of the claims of the '197 patent are invalid I expect to provide an opinion, as one skilled in the art, regarding whether such prior art renders the patent invalid.

## III. DATA OR INFORMATION CONSIDERED

In forming the above opinions I utilized the knowledge and experience I have gained over the more than 28 years of collecting, studying and designing dice. In addition, I considered the data and information that is discussed in Section II, which includes at least the following:

1. U.S. Patent No. 5,938,197, the file history and cited art;
2. The pleadings;
3. Physical samples of the Hasbro accused dice;
4. The 30(b)(6) deposition of Hasbro;
5. Dictionary definitions;
6. Comparisons of existing dice configurations;
7. Dice related patents.

## IV. EXHIBITS TO BE USED AS SUMMARY OR SUPPORT

The exhibits I expect to use will comprise physical products of the parties, drawings or photos thereof; patents or parts thereof, including enlarged drawings and the claim chart attached as exhibit A and portions of my collection.

## V. COMPENSATION AND QUALIFICATIONS

I have declined compensation for expert services in conjunction with the present suit, however I may be compensated up to $40 per hour for my time.

I hold a Bachelors Degree in Software Engineering (BSCS) from West Georgia College (1987).

I am the current Guinness World Record holder for the world's largest collection of dice. I have been collecting and studying dice since 1977 and have been designing dice since 2002. In addition to collecting dice I have amassed and reviewed a collection of world wide dice related patents (approximately 243).

I am the Assistant Manager of the Dice Maniacs' Club aka The Random Fandom.

## VI. PUBLICATIONS AND PRIOR EXPERT TESTIMONY

I have not given any expert testimony within the last four years.

My publications regarding dice and dice collecting can be seen online at http://www.dicecollector.com.