32121ADS

IN THE UNITED STATES DISTRICT COURTFOR THE DISTRICT OF RHODE ISLAND

C.A. No. 05-229 S

MICHAEL BOWLING,

Plaintiff,

vs.

HASBRO, INC.,

Defendant.

DEPOSITION OF KEVIN B. COOK

May 22, 2006

Pursuant to Notice taken on behalf of the

Defendant at 1050 17th Street, Suite 1950,Denver, Colorado 80202, at 9

Diane K. Scholl, Registered ProfessionalReporter and Notary Public wit

he's been retained as an expert, one skilled in
the art of dice.

MR. TECHENTIN: Okay.

MR. LEACH: I mean, that's --

Q. (BY MR. TECHENTIN) Do you agree with
what?

A. Yes, I -- I am an expert as one
skilled in the art of dice and dice design.

Q. Any other fields in which you have
been retained as an expert?

A. No.

Q. Any other fields in which you
believe you are an expert?

A. Not relating to this case.

Q. Well, what fields would there be as
to which you would be an expert?

A. Relational databases.

Q. Anything else?

A. Not particularly, no.

Q. And your expertise in dice and dice
design is predicated on your collection of dice;
is that correct?

A. And design of several -- of several
different kinds of dice.

Q. Designs that you yourself have made?

A. Yes.
Q. Those are the designs that are depicted on your website, www.dicecollector.com?
A. Correct.
Q. Those are the paper dice that have been assembled?
A. Some of the paper dice, yes.
Q. What dice have you designed?
A. I would have to look at the site to see, but I can say for sure I've designed the hexadie, a 16-sided dice with hexadeci -- hexadeci numerals, 64-sided die, several others.
Q. What others?
A. Again, I would have to see the site.
Q. You don't remember any others?
A. I -- not off the top of my head. There were so many.
Q. Do you consider yourself to be an expert in patent law?
A. No.
Q. What's an estoppel?
A. I don't know.
Q. When did you design the dice that you've testified you designed?
MR. LEACH: I would caution the

A. Honestly, I don't know. I just know I was cited in the reference, without my being contacted.

Q. And how was it that you found out you were cited in the reference?

A. Web search.

Q. Googling yourself?

A. Yes.

Q. Mr. Cook, are you familiar with the concept of marking products with patent numbers?

A. I know certain products are marked with patent numbers.

Q. Do you know why?

MR. LEACH: I'll caution the witness not to speculate.

Q. (BY MR. TECHENTIN) Well --

MR. LEACH: If he knows, he can answer the question.

MR. TECHENTIN: The question was "Do you know why?" I think that's a yes-or-no question --

A. I --

MR. TECHENTIN: -- and he can answer it.

A. I don't think so, no.

Q. (BY MR. TECHENTIN) In your opinion, is it possible to mark a die with a patent number?
A. It may be possible.
Q. Well, is it or is it not possible to mark a die with a patent number?
MR. LEACH: Again, I caution the witness not to speculate. If he knows, he may answer the question.
A. I don't know if it would be possible.
Q. (BY MR. TECHENTIN) Well, have you ever seen a die that was marked with a patent number?
A. I can't say for certain.
(Deposition Exhibit 1 was marked.)
A. Ah, there we are. I seem -- yes.
Q. Mr. Cook, showing you what's been marked as Exhibit 1 for your deposition. Do you recognize this?
A. Yes, I do.
Q. What is that?
A. That is a 100-sided die produced by Gamescience Corporation.
Q. And its nickname, I suppose, is the

A. No.

Q. What did you do to determine the accuracy or reliability of the analysis that was undertaken by Mr. Fitzgibbon?

A. Nothing.

Q. What did you do to independently verify that the analytical framework that Mr. Fitzgibbon had employed was the proper one?

A. Nothing.

MR. LEACH: Counsel, I object. He was pro -- the witness was provided an example expert report for the format. He's not here to testify about patent law or he's not a patent law expert. I'll represent that we provided him with an accurate statement of the law for him to use in developing his opinion.

Q. (BY MR. TECHENTIN) Have you ever gone back and looked at your report and set it side by side with Mr. Fitzgibbon's?

A. I never made a comparison between the two.

Q. Are you aware that portions of your report are identical verbatim with Mr. Fitzgibbon's?

MR. LEACH: Again, Counsel, if

they're -- if it's the portion on law --
MR. TECHENTIN: Tom, please.
Q. (BY MR. TECHENTIN) Are you aware of that?
A. There may be some sections that I used for the structure of my report.
Q. What do you mean, the structure of your report?
A. Meaning the sections that he used and some of the legal verbiage.
Q. By sections, you mean -- you mean the section headings?
A. Yes, the section headings.
Q. And what legal verbiage? What do you mean by that?
A. I believe in the introduction, the last paragraph, I may have taken verbatim.
(A pause occurred.)
A. It is possible under -- it is possible the first paragraph under D, Validity, that may have been taken verbatim.
Q. That's on page 15 of your report?
A. Yes, it is.
Q. So is it your testimony that other than the last sentence of the introduction and

Q. So why did you include it?
A. I have already answered that question.
Q. Because you thought it would be nice to include it?
A. Because I thought it would be appropriate to show in comparison to the figures in the patent a commercial embodiment. It --
Q. Why would it be appropriate?
A. Because it would give the reader a better idea of what a physical embodiment or commercial embodiment of the '197 patent could look like.
Q. And why does anyone need to know that?
MR. LEACH: Object to the form of the question.
Q. (BY MR. TECHENTIN) You can answer that.
A. I don't know that anyone particularly would need to know that.
Q. And how is it that you came to understand that the commercial embodiment of the Bowling die was irrelevant to the analysis of infringement that you were asked to undertake?

A. Because under the definition of legal infringement and the definition of doctrine of equivalence, it makes no reference in the -- whatsoever to a commercial embodiment.

Q. Did you ask Mr. Leach about that?

MR. LEACH: Jeff, again, for the record, we discussed --

MR. TECHENTIN: Tom, I get to ask my questions. You can object or not object.

MR. LEACH: I know, but we're not putting him forward as an expert in patent law, okay?

MR. TECHENTIN: Tom, I just --

MR. LEACH: He's an expert in dice.

MR. TECHENTIN: I'm trying to under -- Tom, object or don't object.

May I have the question read back, please.

THE DEPONENT: Yeah, please. Thank you.

(Page 86, line 22, through page 87, line 5 was read back.)

A. As I recall, I did speak with him about this.

Q. (BY MR. TECHENTIN) And what was

to the Hasbro die.

Q. And did you ask Mr. Leach, either literally or in effect, "Is it okay if I include the commercial embodiment in my report?"

A. I don't recall.

Q. Did you discuss the fact that your report actually included pictures of the commercial embodiment and textual references to it?

A. We discussed what I had written.

Q. Let me ask the question again. I'll break it down.

Did you discuss with Mr. Leach the fact that the report, as you had drafted it, included pictures of the commercial embodiment of Mr. Bowling's die?

MR. LEACH: I object, and I'm instructing the witness not to speculate. If he can recall, he may answer.

MR. TECHENTIN: Tom, please. He's your expert. You don't get to coach him like this, okay? You don't.

MR. LEACH: I'm not coaching the witness.

MR. TECHENTIN: You are.

MR. LEACH: I'm specifically telling him if he recalls, he can answer.

MR. TECHENTIN: You know, Tom, if I -- it obviously goes without saying -- it goes without saying that if a witness doesn't recall an answer to a question, it's incumbent upon the witness to say, you know, "I don't remember."

MR. LEACH: Just telling him not to speculate on an answer.

MR. TECHENTIN: When I start asking him questions about conversations that he's had with you, and the only difference between that question and any other question that I'm going to pose today if the fact that it has to do with a conversation with you, and you jump in with, "Oh, I'm going to caution the witness not to speculate," that's coaching.

MR. LEACH: I've told him not to speculate in other contexts.

MR. TECHENTIN: And a review of the transcript will reveal when.

MR. LEACH: Fair enough.

MR. TECHENTIN: So object or don't object.

MR. LEACH: Like I said before, he's

not here as a patent law expert. He's here to render his opinion on what the '197 patent means to one skilled in the art.

MR. TECHENTIN: Are you saying that that -- that what you've just said limits my ability to ask him the questions -- questions about the conversations that he's had with you in preparing this report?

MR. LEACH: No.

MR. TECHENTIN: All right, then. Can I have the question read back, please.

(The last question was read back.)

A. I don't recall the details of that specific discussion, but we did discuss every element of my expert witness statement.

Q. (BY MR. TECHENTIN) Did you discuss with Mr. Leach the fact that there were textual references to the commercial embodiment of the Bowling die?

A. I don't remember.

Q. Did you ever have any conversation with Mr. Leach or anyone else about the significance of including references to the commercial embodiment of the Bowling die in your report?

sections that you're referring to in terms of the literal infringement and doctrine of equivalence infringement where you were working with Mr. Leach on this subject?

A. Yes, I can.

Q. Please do.

(A pause occurred.)

MR. LEACH: Can you repeat the question again.

MR. TECHENTIN: The question might have been, "Please do," but --

MR. LEACH: Go back --

MR. TECHENTIN: Why don't you read back --

MR. LEACH: The previous one.

MR. TECHENTIN: -- the previous one.

(The last question was read back.)

MR. LEACH: I just want to caution the witness again not to speculate. If he knows, he can answer.

MR. TECHENTIN: Tom, the question was, "Can you do it?" His answer was, "Yes."

MR. LEACH: You're asking him to go back and figure out what sections he may have been discussing in a WebEx section back how long

Q. But you understand that the patent covers anything that literally fits all of the elements of a given claim of a patent, correct?

A. I understand that the elements that I have examined, and that the definitions of literal and doctrine of equivalence, and how they apply to the Hasbro accused die.

Q. Have you given any thought to shapes of dice that would be covered by the patent other than what's drawn in the patent, Mr. Bowling's commercial crystal dice, and Hasbro's die?

A. I was asked to examine how the Hasbro accused die applies and infringes the elements of the '197 patent. That was all I was asked to do.

Q. Is that a no?

A. That was all I was asked to do.

Q. Is that a no?

A. I examined the '197 patent Claims 1 through 9, 16 through 19, and how they apply to the Hasbro accused die.

Q. Is there some reason you're refusing to answer my question?

A. No.

Q. Could you answer it then, please, and I'll ask the court reporter to read it back.
(The last question was read back.)
A. I don't know how to answer that question other than the answers that I have given twice.
Q. Well, the answer, I can prospectively suggest, would either be yes or no, yes if you have in fact looked at the patent language and said, "Oh, this other shape would be covered by the patent," and no if you've never done anything like that.
MR. LEACH: For the record, he responded to your question. I mean --
MR. TECHENTIN: Yeah, he responded, but he hasn't answered it.
MR. LEACH: He's given you an answer twice.
Q. (BY MR. TECHENTIN) That's the best you can do?
A. That's the best I can do.
Q. We were talking about the -- about the likelihood of Hasbro independently developing the design for its accused die. Do you recall that?

A. Yes.

Q. How likely was it that Michael Bowling would come up with this design?

MR. LEACH: Object to the form of the question. I mean, again, you --

MR. TECHENTIN: Okay. Okay. You've objected.

MR. LEACH: I can still instruct the witness not to speculate.

MR. TECHENTIN: You --

A. Yeah, I can't -- I was about to say, please. I can't say --

MR. TECHENTIN: You can't instruct him not to speculate. You can object to the form of the question.

MR. LEACH: I can instruct --

MR. TECHENTIN: You can take it up with the Judge later on and say, "Judge, it calls for speculation. That was the basis of my objection." You can do that.

MR. LEACH: I can still instruct my witness not to speculate. If he knows the answer, please answer.

THE DEPONENT: Could you read --

MR. LEACH: You're asking him to --

court reporter calculate it. I don't have a problem with that. But I'm not going to im -- I'm not even coming close to seven hours.

Q. (BY MR. TECHENTIN) Mr. Cook, you would agree that, had Hasbro manufactured a die that was similar to the accused die, but which didn't have triangular or end caps that were composed of triangular facets, for example, it would not have infringed the patent; is that correct?

MR. LEACH: Object to the question. I'm not going to have him opine on a hypothetical like that.

MR. TECHENTIN: Well, I mean --

MR. LEACH: If you want to give him a physical structure -- well, he's not going to answer it.

MR. TECHENTIN: You're going to instruct him not to answer?

MR. LEACH: That question is so vague, he can't answer it. I mean, it's a hypothetical with nothing in front of him, and you're asking him on the fly do an infringement or a validity analysis? He's not going to do it.

Q. (BY MR. TECHENTIN) Are you not going to do it?

A. I wasn't going to answer the question.

Q. Excellent. All right. That's terrific.

MR. LEACH: Excuse me?

Q. (BY MR. TECHENTIN) You would agree that the '197 patent only applies to a die that has end caps that consist of tapered or triangular facets, correct?

MR. LEACH: Object to the question.

MR. TECHENTIN: Why?

MR. LEACH: Please repeat the question.

(The last question was read back.)

A. His job as an expert has not been to determine what everything possible about this patent could cover. I mean, that's not what he's testifying as an expert on.

Like I've said before, Jeff, he's not an expert in patent law, he's not an expert in claim construction, so to try to get him to answer those questions is wrong, and I'm not going to have him do it, and I'm not going to

let him do it. He's an expert in die and die design. If you want to stick to questions that relate to that, that's fine.

Q. (BY MR. TECHENTIN) You may answer the question.

A. I would have to have time to examine the question in relation to the entire patent as it exists to make a truthful analysis.

Q. Would you agree that one aspect of any die that would be covered by the '197 patent would be that its end caps would consist of facets that are identically shaped and that have equal surface areas?

A. I would have to see the die to make a determination.

Q. Well, that's one of the elements of the first claim of the patent; isn't that correct?

MR. LEACH: Repeat the question again.

THE REPORTER: The one before that last one?

(The last question was read back.)

MR. LEACH: Can you read it one more time.

Sorry. That's what I know.

Q. Let's go back to the question that I had. My question was whether a prior art reference that shared the same basic configuration, that is, the alternating triangle format that you testified was the unique characteristic of these dice --

A. Um-hum.

Q. -- and the end caps, except that the end caps were the same length as the extension member facets --

MR. LEACH: Object.

Q. (BY MR. TECHENTIN) -- My question --

MR. LEACH: Go ahead, finish.

Q. (BY MR. TECHENTIN) -- my question is, if that had been a prior art reference, would that render this die obvious?

MR. LEACH: Object to the question. It's a hypothetical. And, again, he's not an expert in patent law, and he's not here to testify on that stuff.

A. I really couldn't say.

Q. (BY MR. TECHENTIN) Well, why not?

A. Because I'm not a hundred percent clear as to how that question would apply to

obviousness.

Q. Well, when you reviewed the prior art references --

A. Um-hum.

Q. -- for the '197 patent, you had a clear understanding as to whether obviousness would be applicable, did you not?

A. Yes.

Q. And do you still?

A. I still -- as to the prior art, yes.

Q. Why can't you apply that to the shape that I described?

A. Because I'd need to see the shape itself.

Q. Why?

A. That's the way I interpret it. I interpret it by seeing the shape and seeing if it's obvious.

Q. And if you saw the shape, you'd be able to tell whether it was obvious?

A. I believe so.

Q. All right.

A. Hmmm.

Q. Is that a shape you've seen before (indicating)?

MR. LEACH: Have you disclosed this before?

MR. TECHENTIN: Yes.

MR. LEACH: To us?

MR. TECHENTIN: Well, not that physical die, but it didn't exist until a couple weeks ago.

MR. LEACH: So I -- and you haven't -- you haven't given us any pictures of it?

MR. TECHENTIN: Oh, yeah.

MR. LEACH: You've given us -- you've provided pictures of it? Do you know the Bates numbers of those pictures?

MR. TECHENTIN: Not offhand.

MR. LEACH: I'm not going to have him do an analysis on the fly, Counsel.

MR. TECHENTIN: Well, he just told me he can.

MR. LEACH: I'm not going to let him do an analysis on the fly.

MR. TECHENTIN: You're going to instruct him not to answer my question?

MR. LEACH: We've got five minutes left, and, no, I'm not going to let him sit here

and do that.

Q. (BY MR. TECHENTIN) Let me ask this prefatory question.

MR. LEACH: You can ask -- you can ask the question, but he's not an expert in patent law, and I believe I've been stating this all along.

Q. (BY MR. TECHENTIN) Can you analyze whether this would constitute a prior art reference, assuming it's prior art to the '197 patent, that would render the '197 patent obvious?

A. I have never seen this die before.

MR. LEACH: And I object to the question.

Q. (BY MR. TECHENTIN) I understand that, and I asked you to hypothesize a shape, and you said I'd need to see the die. I said if you could see the die, could you do it, and you said you could. Can you?

A. Yes, I can.

Q. And what's your conclusion?

A. I would need to study it more in depth.

Q. Well, I thought you said you could

do it.

A. I can.

Q. How long will it take you?

A. I can't say at this point.

Q. More than five minutes?

A. Yes.

Q. More than a day?

A. I would say yes.

Q. So you spent over 200 days doing prior art analysis when you went through the patents when you were doing your analysis for your expert report?

A. I spent more than 200 days looking at these patents. I knew them long before I was asked.

MR. LEACH: Right about seven hours.

MR. TECHENTIN: No, we're not.

MR. LEACH: Yes, we are.

MR. TECHENTIN: And we can argue about that.

MR. LEACH: Sure, we can.

Q. (BY MR. TECHENTIN) So are you not willing to tell me whether you think that, assuming it's a prior art reference, would render the '197 patent obvious?

A. Not at this time, no.
Q. All right. What would you need to do in order to be able to analyze that?
A. I would need to study the die.
MR. LEACH: I'm going to object --
Q. (BY MR. TECHENTIN) What about --
MR. LEACH: -- to that question, too. He's not an expert in patent law, again. I just want to reconfirm that objection.
Q. (BY MR. TECHENTIN) You'd need to study the die?
A. Yes.
Q. What else?
A. And I would need to come to a conclusion as to what my feelings are about obviousness.
Q. You don't have a conclusion about obviousness?
A. Not for that die, I do not.
Q. Well, you said before, though, that you're clear on what it takes to trigger obviousness, correct?
A. That is correct.
Q. And you did an analysis of prior art references specifically with respect to the '197

patent for obviousness, correct?
A. I reviewed the patents that I had seen, because I had spent a good deal of time, as we stated earlier, looking at figures of the die for all the patents that are listed in my website, and I concluded that there was no prior art that was obvious as far as the '197 patent is concerned.
Q. So that was a yes to my question?
A. That was my answer.
THE DEPONENT: I need to use the restroom.
MR. TECHENTIN: Go off the record.
MR. LEACH: Let's take a break, please.
(Discussion off the record.)
MR. TECHENTIN: All right. I'm -- at this point, I'm going to adjourn Hasbro's questioning of Mr. Cook. I understand that Mr. Leach believes that the deposition should be done, but we can take that up later.
MR. LEACH: I believe we've had seven hours. We started at 9, we ended at 5, with about an hour lunch break, subject to reasonable breaks, but none of those breaks were