IN THE UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| MICHAEL BOWLING, a Resident of Arizona, Plaintiff, | : | C.A. No. 05-229S |
| v. | : | |
| HASBRO, INC., a Rhode Island Corporation, Defendant. | : | |

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. 56 and Local Rule 56, Plaintiff Michael Bowling ("Bowling"), respectfully moves this Court for entry of summary judgment that Albert Lizarraga is not a co-inventor of United States Patent No. 5,938,197.

As grounds for this Motion, Bowling relies on the Memorandum of Law and Statement of Undisputed Facts filed herewith.

Michael Bowling,
By His Attorneys,

Date: June 19, 2006

Craig M. Scott, Esq. (#4237)
Christine K. Bush, Esq. (#5587)
DUFFY SWEENEY & SCOTT, LTD
One Turks Head Place, Suite 1200
Providence, RI 02903
(401) 455-0700
(401) 455-0701 (Facsimile)

Douglas J. Williams, MN (*pro hac vice*)
Thomas J. Leach, MN (*pro hac vice*)
MERCHANT & GOULD, P.C.
3200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
(612) 332-5300
(612) 332-9081 (Facsimile)

# CERTIFICATION

TO:

Todd D. White, Esq.
Jeffrey K. Techentin, Esq.
Adler Pollock & Sheehan P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903-1345

David K. S. Cornwell, Esq.
Tracey-Gene G. Durkin, Esq.
Sterne Kessler Goldstein & Fox P.L.L.C.
1100 New York Avenue N.W.
Washington, DC 20005

I hereby certify that I caused a true copy of the within *Plaintif's Motion for Summary Judgment* to forwarded via First Class Mail to the above named counsel of record on the 19 day of June, 2006.

Theresa Benson

H:\Clients\Bowling\Pleadings\Motion for Summary Judgment.doc

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| MICHAEL BOWLING,<br>a Resident of Arizona, | : | |
| Plaintiff, | : | C.A. No. 05-229S |
| v. | : | |
| HASBRO, INC.,<br>a Rhode Island Corporation, | : | |
| Defendant. | : | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND OBJECTION TO DEFENDANT'S MOTION TO CORRECT INVENTORSHIP**

## I. INTRODUCTION

Michael Bowling ("Bowling") is presumed to be the true and sole inventor of the '197 patent. In a desperate effort to avoid clear infringement, Hasbro, Inc. ("Hasbro") attempts to create a co-inventor out of Albert Lizarraga ("Lizarraga"), the professional draftsman Bowling hired nine years ago to prepare formal drawings for the '197 patent. Lizarraga is a draftsman who has prepared formal drawings for over 20 years and has *never* been a co-inventor on any patent. Lizarraga never suggested to anyone, including Bowling, that he was a co-inventor of Bowling's new die until Hasbro sought out and found Lizarraga, suggested to him that he might be a co-inventor, and pre-paid him $10,000 for whatever "rights," if any, he might have in the patent and to cooperate in Hasbro's defense. Even though Lizarraga refuses to call himself a co-inventor, Hasbro hopes this Court will deem him to be one so that Hasbro can escape liability.[1]

[1] Co-inventors of a patent own an undivided interest in the whole patent and can transfer that right to another. 35 U.S.C. §§261-62. In addition, omitting a joint inventor may also invalidate a patent. *Acromed Corp. v. Sofamor Danek Group, Inc.*, 253 F.3d 1371, 1379 (Fed. Cir. 2001).

Hasbro bears a heavy burden to establish that Lizarraga is a co-inventor. To overcome the presumption that Bowling is the true and sole inventor of the '197 patent, Hasbro must come forward with clear and convincing evidence that Lizarraga contributed significantly to the conception of Bowling's invention. This Hasbro has not done. Instead, Hasbro's only "evidence" is Lizarraga's uncorroborated testimony about events that occurred over nine years ago.

Even if that testimony were clear and credible, which it is not, uncorroborated testimony is insufficient to prove co-inventorship or to create a factual issue sufficient to avoid summary judgment. To the contrary, hundreds of years of case law require that oral testimony be independently corroborated, usually by contemporaneously produced documentary evidence, to prevent the very situation Hasbro hopes to create. Such corroboration is required, especially for long past events, because of the frailty of memory and the temptation to overstate ones' contribution to a valuable invention. Here, Hasbro's claimed "corroboration" is insufficient as a matter of law. Lizarraga's wife's testimony does not corroborate her husband's testimony because she was not present when Bowling described his invention to Lizarraga. The patent drawings do not corroborate Lizarraga's testimony because they offer no information as to what Bowling told Lizarraga about the invention. Bowling's testimony and Julie Daulton's testimony likewise do not corroborate because both testified contrary to Hasbro's and Lizarraga's contentions.

Moreover, Lizarraga does not become a joint inventor simply by providing formal drawings to Bowling. If that were the case, "inventorship" would become boundless.

For these reasons, and as set forth more fully below, Bowling is entitled to summary judgment that Albert Lizarraga is not a co-inventor of the '197 patent, and Hasbro's Motion to Correct Inventorship should be denied.

## II. UNDISPUTED FACTS

### A. Background Facts

Bowling, an engineer by education, has been designing dice for 20 years. (SUF[2] at 1.) In designing dice, he draws on his engineering background and specifically his study of mathematics and physics. (*Id.* at 2.) Bowling has eight patents, all with formal drawings, in which he is named as the sole inventor. (*Id.* at 3.)

While in college, Bowling noticed an old wooden six-sided pencil and thought why not make an elongated die of similar shape. (*Id.* at 4.) Bowling attempted to create a die shaped like the old wooden pencil but found that it was not practical. (*Id.* at 5.) In particular, Bowling found that it was difficult to place legible numbers on the small rectangular facets, especially when he tried to increase the number of facets on the die, which made the facets even smaller. (*Id.*) Bowling continued to think about how to make an elongated, multiple faceted die that provided enough area for legible indicia. (*Id.*)

### B. Bowling Conceives Of a Die Having Opposing Triangle Shaped Facets.

In the summer of 1997, while driving, Bowling was struck with the idea of converting the rectangular facets to opposing triangles, thereby creating a larger area (at the triangle's base) for the indicia. (*Id.* at 6.) Converting rectangular facets into opposing triangle-shaped facets creates facets that are identically shaped and of equal surface area. (*Id.* at 7.) Bowling immediately pulled over and drew his idea. (*Id.*) Bowling explained that his die design included end caps to prevent the die from landing on its end, make it more attractive, and to make it bounce more.

---

[2] Filed herewith in support of this Motion for Summary Judgment is Plaintiff's Statement of Undisputed Facts, hereinafter ("SUF at ___").

(*Id.*) Bowling drew the die a half dozen times before providing some of the sketches to Lizarraga to prepare formal drawings. (*Id.*) Below are examples of the rectangular facets, the rectangular facets converted into two opposing-triangle facets, and a three-dimensional view of the entire opposing-triangle faceted die that Bowling drew at his deposition:




(*Id.*) Bowling gave sketches such as these to Lizarraga. (*Id.*) Lizarraga confirmed that the sketches Bowling provided him were three-dimensional, multifaceted and included end caps. (*Id.* at 8.) Bowling's patented die design is depicted below along with a commercial embodiment:

FIG. 1







((*Id.* at 9.) ('197 Patent Fig. 1) (Bowling's Commercial Product)

## C. Bowling Hired Lizarraga To Prepare Formal Drawings For The Patent.

To protect his idea, Bowling decided to apply for a United States Patent. (*Id.* at 9.) Bowling hired Lizarraga, a professional draftsman, to prepare formal drawings of his new crystal-shaped die for the patent application. (*Id.* at 10.) Bowling explained to Lizarraga that the invention was a die to generate random numbers for game playing. (*Id.* at 11.) Lizarraga has no

experience designing dice. (*Id.* at 12.) His training consists of a technical degree in drafting. (*Id.* at 13.) Importantly, Lizarraga has been doing the same type of drafting work he did for Bowling for 20 years and has *never* been named as a co-inventor on *any* patent. (*Id.* at 14.)

Lizarraga came to Bowling's home and met with both Bowling and Bowling's wife, Elizabeth. (*Id.* at 15.) At that first meeting, Bowling provided Lizarraga with sketches of the invention and explained it in detail. (*Id.* at 16.) One of the sketches Bowling provided to Lizarraga looked like the following sketch of a three-dimensional, multi-faceted die having end caps:




(*Id.* at 17) Lizarraga recalled that one of the sketches Bowling provided him was three-dimensional with multiple facets and that it had end caps. (*Id.* at 18.) Bowling also provided Lizarraga with the die's overall dimension and diameter. (*Id.* at 19.)

Lizarraga used Bowling's sketch and his explanation to produce formal drawings of Bowling's invention. (*Id.* at 20.) When Lizarraga showed the formal drawings to Bowling, Bowling was pleased because they were just as he explained his invention to Lizarraga. (*Id.* at 21.) An example of the formal drawings Lizarraga prepared for Bowling is below:




(*Id.* at 22.) After Bowling received the formal drawings back from Lizarraga, Bowling adjusted the die's size based on what he thought was appropriate. (*Id.* at 23.) After Bowling put all the drawings on one page, he wrote in by hand the approximate sizes of the die. (*Id.* at 24.) Bowling paid Lizarraga for the drafting work and did not hear from him for almost nine years. (*Id.* at 25.)

**D. Hasbro's Counsel Suggested To Lizarraga That He Was A Co-Inventor, Paid Him $10,000 To Assign Whatever "Rights," If Any, To Hasbro, And To Cooperate In Hasbro's Defense.**

In the nine years since Bowling paid Lizarraga for the formal drawings and the patent issued, Lizarraga never claimed to be a co-inventor. (*Id.* at 25.) Recently, Hasbro's counsel sought out Lizarraga, suggested to him that he might be a co-inventor, and offered him $10,000 for whatever "right," if any, he might have in the '197 patent. (*Id.* at 26.) Lizarraga offered to assign essentially a "quit claim" of his rights provided that Hasbro would indemnify him for any claims Bowling might bring against him. (*Id.* at 27.) Hasbro then paid Lizarraga $10,000 to assign whatever "right," if any, he might have and to cooperate in Hasbro's defense of this litigation. (*Id.* at 28.)

**E. Lizarraga Does Not Claim To Be An Inventor.**

During Lizarraga's deposition it became clear that Hasbro—not Lizarraga—claimed he was a co-inventor:

| | |
|---|---|
| Mr. Leach: | And how did [money] come up? Did Mr. Techentin say Hasbro may be willing to pay you something? |
| Mr. Lizarraga: | Just the fact that if it was found that I had any rights, that you know, if I was interested in—if it was defined that I had any rights, would I be willing to give them to Hasbro. That's kind of how [money] came up, and I am like, sure. But we would talk about it depending on the money and the conditions of the contract and all that. **I wanted to make sure that nothing defined that I was, that I was saying that I was the inventor.** |
| Mr. Leach: | You wanted to make sure what? |
| Mr. Lizarraga: | **I wanted to make sure that nothing defined that I was stating that I was part inventor.** |

(*Id.* at 29, emphasis added.)

### F. Lizarraga Does Not Clearly Recall What Bowling Provided Him Nine Years Ago.

It was nine years ago that Lizarraga prepared the formal drawings for Bowling's patent. (*Id.* at 25.) Lizarraga's recollection of what Bowling provided him is at best vague:

| | |
|---|---|
| Mr. Techentin: | What information did [Bowling] provide you about the dice that he wanted drawings for? |
| Mr. Lizarraga: | As far as I recall, it was kind of like a hand sketch, you know, white piece of paper, and it was like a sketch of a, like a crystal shard, more of a natural crystal shard. And I think the only **other information that I recall is maybe an overall length and perhaps the diameter**. |
| Mr. Techentin: | What do you mean by crystal shard? |
| Mr. Lizarraga: | [Bowling] was interested in getting some dice that looked kind of like crystals. |
| Mr. Techentin: | Other than telling you that he wanted a die that looked like a crystal and showing you a drawing, did he provide you with any other information at that time? |
| Mr. Lizarraga: | Not too much that I recall. . . . |
| Mr. Techentin: | Do you recall what [the sketch] looked like? |
| Mr. Lizarraga: | Vaguely. I recall it being kind of like on like a white piece of paper, not grade paper or anything, and it was just kind of a, sort of **a three dimensional with a lot of different facets and sides**. |
| Mr. Techentin: | **Would it be possible for you to draw what you recall about that drawing?** |
| Mr. Lizarraga: | **Probably not. I don't think it would –it was nine years ago. It was a long time ago.** |

(*Id.* at 30, emphasis added.)

However, Lizarraga does claim to have come up with the idea of identically shaped extension-member facets. (*Id.* at 31.) Yet Lizarraga's testimony about symmetrically shaped end caps directly contradicts his claim because he agrees that equally shaped end caps would

define identically shaped facets. (*Id.* at 32.) In other words, if Bowling provided symmetrical end caps then identically shaped extension-member facets would naturally follow and could not have been created by Lizarraga:

> Mr. Techentin: Did the drawings that Mr. Bowling give you—gave you have end caps?
>
> Mr. Lizarraga: I believe it did. I just don't recall if they were completely equal or, you know, symmetrically equal. I don't recall that. Again, it was, to my recollection actually looks like a rough natural crystal.

(*Id.* at 33.)

> Mr. Techentin: Was it the case that Mr. Bowling's initial concept reflected identically shaped surface areas on the end caps?
>
> Mr. Lizarraga: **I do not recall whether they did or did not**. It was a sketch. On the end caps, it's difficult to say.

(*Id.*, emphasis added.) After admitting that he cannot remember whether Bowling instructed him to make the end caps symmetrically equal, Lizarraga admitted that if the end caps are symmetrically equal, the extension member facets would be as well:

> Mr. Lizarraga: In order to make that dice geometrically equal, they would have to be the same size, same areas, same angles. And the end caps pretty much define the extension facets.

(*Id.* at 34.)

Lizarraga also stated that surface area was not a design consideration on his part when he drew the dice:

> Lizarraga: The surface area, when I created the dice, were not a consideration in the design, only the angles and the dimensions of the segments. If all the angle are the same, it comes out that the surface area is the same, **but surface area were not a design consideration on my part**.

(*Id.* at 35, emphasis added.) Likewise, Lizarraga testified that the ratio of the surface area of the end caps to extension member facets was not a design consideration. (*Id.* at 36.)

**G. Lizarraga's Testimony Is Uncorroborated.**

Lizarraga has no drawings or other evidence that corroborate his testimony about contributing identically shaped facets to the invention. (*Id.* at 37.) First, Susan Lizarraga ("Susan") was not at the initial meeting when Bowling disclosed his invention to Lizarraga. (*Id.* at 38.) Her information basically came from what her husband told her. (*Id.* at 39.) She was told that Bowling asked her husband to do some drawings for dice. (*Id.* at 40.) However, Susan had no involvement in Lizarraga's work for Bowling. (*Id.* at 41.) Second, nothing in the patent drawings that Lizarraga prepared for Bowling show that Lizarraga, and not Bowling, conceived of the identically shaped facets or the die's symmetry. (*Id.* at 42.) Finally, neither Bowling's testimony nor that of his patent attorney corroborates Lizarraga's testimony. Bowling testified that he provided Lizarraga with sketches and explained what he wanted Lizarraga to draw. (*Id.* at 16, 17.) Bowling's patent attorney, Julie Daulton, testified that she probably received specific information regarding the die from Bowling or possibly from the drawings. (*Id.* at 43.) As part of her standard practice, Ms. Daulton performs an inventorship interview with clients. (*Id.* at 44.) Such an interview would reveal if anyone else were a co-inventor. (*Id.*) After such a review, Bowling signed a declaration that he was the sole inventor of the '197 patent. (*Id.*)

## III. ARGUMENT

**A. Summary Judgment Standard**

Inventorship is properly decided on summary judgment. *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1327 (Fed. Cir. 2004); *Stern v. The Trustees of Columbia Univ. in The City Of New York*, 434 F.3d 1375, 1377 (Fed. Cir. 2006). In deciding a motion for summary judgment, the record evidence is reviewed through the same evidentiary standard that would prevail at trial. *Linear Tech. Corp.*, 379 F.3d at 1318. In this case, Hasbro must prove by clear

and convincing evidence that Lizarraga contributed substantially to the conception of the invention. *Hess v. Advanced Cardiovascular Sys., Inc.*, 106 F.3d 976, 980 (Fed. Cir. 1997).

The clear and convincing standard is important because Hasbro cannot simply point to some factual disputes and survive summary judgment. Rather, Hasbro must demonstrate to the Court evidence that would satisfy the clear and convincing standard. *Linear Tech. Corp.*, 379 F.3d at 1327-29; *Stern*, 434 F.3d at 1377. No such evidence exists concerning Hasbro's claim that Lizarraga is a co-inventor.

**B. As A Matter Of Law Hasbro Cannot Establish By Clear And Convincing Evidence That Lizarraga Is A Co-Inventor, So Bowling is Entitled to Summary Judgment That He is the Sole Inventor**

Inventorship is a question of law for this Court to decide. *Acromed Corp. v. Sofamor Danek Group, Inc.*, 253 F.3d 1371, 1378 (Fed. Cir. 2001). The issuance of a patent creates a presumption that the named inventor, such as Bowling, is the true and only inventor. *Acromed Corp.*, 253 F.3d at 1379, (*citing Hess*, 106 F.3d at 980.) To rebut this heavy presumption, Hasbro must present clear and convincing evidence that Lizarraga is a co-inventor. *Acromed Corp.*, 253 F.3d 1379; *Hess*, 106 F.3d at 980 (stating the "burden of showing misjoinder or nonjoinder of inventors is a heavy one and must be proved by clear and convincing evidence"). Clear and convincing evidence is "evidence which produces in the mind of the trier of fact an abiding conviction that the truth of a factual contention is highly probable." *Price v. Symsek*, 988 F.2d 1187, 1191 (Fed. Cir. 1993).

The law is unequivocal that an *alleged* inventor's uncorroborated testimony, even if clear and credible, is insufficient as a matter of law to meet the clear and convincing standard required to prove co-inventorship. *Acromed Corp.*, 253 F.3d at 1379-81; *Price*, 988 F.2d at 1194. Instead, the law demands that an alleged co-inventor produce evidence that corroborates his

asserted significant contribution to the conception of the invention. *Acromed Corp.*, 253 F.3d at 1379. This heavy burden is required because, as here, where a patent has been outstanding for a considerable time and the patented invention has been successful, there is "a strong temptation for persons who consulted with the inventor and provided him with materials and advice, to reconstruct, so as to further their own position, the extent of their contribution to the conception of the invention." *Hess*, 106 F.3d at 980; *see also The Barbed Wire Patent*, 143 U.S. 275, 284-85 (1892).

Whether an alleged inventor's testimony is sufficiently corroborated is evaluated under the "rule of reason" analysis, which requires that all pertinent evidence be considered so a sound determination of the credibility of the alleged inventor's story can be made. *Gemstar-TV Guid Int'l v. Int'l Trade Comm'n*, 383 F.3d 1352, 1382 (Fed. Cir. 2004).

**1. Lizarraga's Oral Testimony Is Insufficient As A Matter Of Law To Prove Co-inventorship Because It Is Not Corroborated**

Lizarraga's testimony—even if clear and credible—is insufficient as a matter of law to establish that he is a co-inventor because it is uncorroborated. *Gemstar-TV Guid Int'l*, 383 F.3d at 1382-83 (reversing a trial court's finding of co-invention due to lack of corroboration *despite* accepting that the alleged co-inventor's testimony was more credible than the inventor's); *Acromed Corp.*, 253 F.3d at 1379-81 (affirming a holding that an alleged inventor's testimony without corroboration is insufficient to meet the clear and convincing standard); *Price*, 988 F.2d at 1194. Even if there is some corroboration, it has to be sufficient to satisfy the heightened clear and convincing standard. *Linear Tech Corp.*, 379 F.3d at 1327-29 (affirming summary judgment because the co-inventor's testimony was *insufficiently* corroborated).[3]

[3] Cases concerning invalidity using the "rule of reason" analysis, decided under the same heightened clear and convincing standard, also support granting summary judgment. See *Juicy Whip, Inc. v. Orange Bang, Inc.*, 292 F.3d 728, 742-43 (Fed. Cir. 2002) (holding the oral testimony of six witnesses insufficient as a matter of law to meet the

**a. Lizarraga's wife, Susan, does not corroborate Lizarraga's testimony**

Hasbro argues that Susan Lizarraga's testimony corroborates the testimony of her husband, Al Lizarraga. It does not. First, her oral testimony cannot corroborate Lizarraga's testimony because the oral testimony of an interested witness is insufficient as a matter of law.[4] *Woodland Trust v. Flowertree Nursery, Inc.*, 148 F.3d 1368, 1371-73 (Fed. Cir. 1998) (holding the testimony of interested parties insufficient under the "rule of reason" analysis to meet the clear and convincing standard); *Juicy Whip, Inc. v. Orange Bang, Inc.*, 292 F.3d 728, 742-43 (Fed. Cir. 2002); *The Barbed Wire Patent*, 143 U.S. at 288-92 (holding the oral testimony from 24 witnesses insufficient to invalidate a patent). Second, Ms. Lizarraga was not involved in this project. (SUF at 41.) She was not even present for the meeting where Bowling provided sketches and explained his invention to Lizarraga. (*Id.* at 38.) She has no personal knowledge of what Bowling did or did not do at that meeting because she was not there. (*Id.* at 38-9.) To the contrary, Susan Lizarraga's testimony about what information Bowling provided to her husband is based entirely on what her husband told her. (*Id.* at 39.) Therefore, Susan Lizarraga's testimony, based not on personal knowledge, but on information provided to her by her husband, the alleged co-inventor, cannot serve as corroboration of her husband's testimony. *Linear Tech. Corp.*, 379 F.3d at 1328.

**b. The patent drawings do not corroborate Lizarraga's testimony**

Hasbro argues that the patent drawings corroborate Lizarraga's testimony that he, not Bowling, conceived of the invention. (Hasbro's Brief at 11.) But the drawings show the

---

clear and convincing standard to invalidate a patent); Woodland Trust, 148 F.3d at 1371-72; *The Barbed Wire Patent*, 143 U.S. at 287-92 (holding the oral testimony from 24 witnesses insufficient to invalidate a patent).

[4] Ms. Lizarraga is far from an independent witness. She is Lizarraga's wife, and as such, presumably shares in the $10,000 Hasbro paid Lizarraga to cooperate in its defense.

invention – nothing more. Nothing in the drawings identifies who *conceived* of the invention. Moreover, the drawings were done after Lizarraga met with Bowling, after Bowling hired Lizarraga to prepare them, and after Bowling disclosed his invention to Lizarraga. Nothing in the drawings establishes that Bowling did not provide Lizarraga with what is shown in the drawings. Only Lizarraga's uncorroborated testimony claims that he conceived of the die's symmetry that is shown in the drawings. Lizarraga's testimony about the drawings is insufficient as a matter of law to establish his co-inventorship. *Gemstar-TV Guide Int'l, Inc.*, 383 F.3d at 1382-83 (holding that a product brochure that failed to explicitly identify the alleged inventor's contribution insufficient to corroborate and not allowing the alleged inventor to fill the gap with oral testimony).

Hasbro cites *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456 (Fed. Cir. 1998), to support its claim that Lizarraga should be named as a co-inventor. In *Ethicon*, the court applied the "rule of reason analysis" to hold that the alleged co-inventor Choi was a co-inventor of the sophisticated electrical portion of the invention. *Id.* at 1464. The *Ethicon* court noted that the testimony of the named inventor Yoon was not credible and that he had backdated documents to make it appear that he independently invented. *Id.* at 1462. The Court also noted many circumstantial factors that corroborated the alleged co-inventor Choi's claim, namely, that (1) Mr. Yoon had no experience in electronics; (2) Choi's experience and training in electronics; (3) Yoon's proposal that they work together to develop new products, (4) their informal business relationship; (5) the length of time they worked together; and (6) the absence of any pay to Choi for his work, among others. *Id.* at 1464. Importantly, the court found that Choi's sketches, which were included in the patent drawings, dealt with sophisticated concepts that only an electrical engineer or technician, such as Choi, would understand. *Id.* On this evidence, the

court found that Yoon could not have instructed Choi to make the sketches, but rather that Choi was presenting his ideas to Yoon. *Id.*

*Ethicon* is distinguishable from the present case. Bowling is skilled in dice design and has an engineering degree, not Lizarraga. (SUF at 1.) Bowling hired and paid Lizarraga to prepare formal drawings. (*Id.* at 10.) The two were not working together to develop new products. It is undisputed that Bowling provided three-dimensional, multifaceted sketches of his design to Lizarraga from which he was to prepare the formal drawings. (*Id.* at 7-8.) Unlike *Ethicon*, nothing about the circumstances or the drawings establishes by clear and convincing evidence that Lizarraga must have contributed to the invention. To the contrary the facts and circumstances show he did not.

Hasbro also argues that Lizarraga's drawings, combined with the specificity in the patent regarding the die's size, corroborate Lizarraga's testimony. (Hasbro's Brief at 5.) To reach this conclusion, Hasbro relies on Lizarraga's uncorroborated oral testimony claiming that Bowling did not provide sufficient detail of his invention, verbally, or through the sketch Bowling provided. Lizarraga does not claim to have determined the appropriate size of the die and Hasbro can provide no evidence suggesting that he does.

To the contrary, before Hasbro claimed Lizarraga contributed specific facet sizes, Bowling testified that he determined the size of the die claimed in the patent. (SUF at 16-19, 23-24 ("The concept was pretty easy to lay out and explain to [Lizarraga]. The ratio as far as the sizes of one compared to the other, compared to the other, that took some durations.")) Lizarraga's testimony is consistent: Bowling provided him with a three-dimensional sketch, which included an overall dimension (length and diameter). (*Id.* at 18-19.) The sketch combined with the overall dimensions provides for the size of the end caps and extension members, their

areas, and the ratios between the two. Lizarraga also testified that the ratio of the surface area of the extension-member facets to the surface area of the end cap facets was not a design consideration on his part. (*Id.* at 35-36.)

**c. Neither Bowling's testimony nor the testimony of his patent attorney corroborate Lizarraga's testimony**

Hasbro also argues that Bowling's testimony, and that of his patent attorney, corroborate Lizarraga's testimony. (Hasbro's Brief at 11.) Both are wrong. As to Bowling's testimony, it is undisputed that Bowling disclosed the "image of the opposing triangles," to Lizarraga.[5] (SUF at 7.) It is also undisputed that Bowling provided to Lizarraga a three-dimensional, multi-faceted sketch that included end caps. (*Id.* at 7, 8.) As shown below, these two pieces of uncontroverted testimony establish that Bowling, not Lizarraga, conceived of identically shaped facets having equal surface areas. Opposing triangles are simply a rectangular facet with a diagonal divider:



The above concept explains Bowling's testimony cited by Hasbro at pages 2 and 3 of it brief.

In 1997, Bowling was trying to achieve two goals in a new die design: increase the number of facets and keep those facets large enough for printed indicia. (*Id.* at 5-6.) With rectangular facets each additional facet that was added decreased the facet's surface area. (*Id.*) Bowling recognized that a lot of the rectangular facet's surface area was not used for printed indicia: "I saw this rectangle, and I said, this is a long rectangle, and all I need is you know I number it here on one side of that rectangle. I put my number and look at all that extra space that

[5] Bowling claims he provided much more and Lizarraga cannot recall, but there is no dispute as to the opposing triangles.

I have there. And I said, it's a shame that I couldn't squeeze that extra space down into the – an as I thought that squeezing it down, I thought of the triangle." (*Id.* at 6.) Bowling was describing a die, with rectangular facets converted to opposing triangular facets. Importantly, by definition, opposing triangle facets made from a rectangle have identical shape to one another and are of equal surface area, as can be seen above. Thus, Bowling testified that he conceived of the opposing triangles having identical shape and equal surface areas.

Bowling provided to Lizarraga a sketch that looked like the following sketch:



(*Id.* at 7.) Lizarraga's testimony confirms that the sketch Bowling provided him was a three dimensional multifaceted die which included end caps rather than just a sketch of opposing triangles. (*Id.* at 8.) An example of one of the drawings Lizarraga drew at Bowling's direction is as follows:



(*Id.* at 22.) When Lizarraga showed the formal drawings to Bowling, Bowling was pleased because they were just as he explained his invention to Lizarraga. (*Id.* at 21.)

As to Bowling's patent attorney, she does not corroborate Lizarraga's testimony. Bowling's patent attorney's standard practice was to do an inventorship interview with clients. (*Id.* at 44.) Such an interview would reveal if anyone else were a co-inventor. (*Id.*) After such an interview, Bowling signed a declaration that he was the sole inventor of the '197 patent. (*Id.*)

Thus, contrary to Hasbro's assertions, neither Bowling's nor his patent attorney's testimony corroborates Hasbro's claim that Lizarraga is a co-inventor.

### 2. Lizarraga's Testimony Is Neither Clear Nor Convincing

In addition to being uncorroborated, Lizarraga's testimony is not clear or convincing on his alleged contribution to the invention of the '197 patent. First, Lizarraga refused to state that he is a co-inventor. (*Id.* at 29 ("I wanted to make sure that nothing [in the assignment to Hasbro] defined that I was stating that I was part inventor."))[6] Lizarraga's testimony is also inconsistent with Hasbro's argument that Lizarraga conceived of the die's facets being identically shaped and having equal surface area. Lizarraga could not remember whether Bowling told him to make the end caps symmetrical and of equal surface areas. (*Id.* at 34.) Lizarraga agreed that the end caps defined the extension member facets. (*Id.* at 32.) According to Lizarraga, Bowling may have instructed him to make the end caps symmetrical and of equal surface area and that would have determined the same of the die's extension-member facets. (*Id.* at 34.) Lizarraga's testimony shows that he cannot recall whether he conceived of the extension member and end cap facets being symmetrical. In addition, Lizarraga testified that surface areas were not a design consideration on his part. (*Id.* at 35.) Likewise, Lizarraga testified that the ratios of the surface areas of the end cap facets and extension-member facets were also not a design consideration. (*Id.* at 36.) Not only is Lizarraga's testimony insufficient as a matter of law to prove by clear and convincing evidence Hasbro's claim of co-inventorship, his vague testimony shows that he is not a co-inventor.

---

[6] While Lizarraga would not claim to be a co-inventor, he testified that he did not know the legal standard for inventorship. (SUF at 29.) While he may not know the legal standard for inventorship, inherently one knows when his ideas have been taken or used. He never claimed that he contributed anything to Bowling's invention before being prodded and then paid by Hasbro.

### 3. Lizarraga, A Hired Draftsman, Provided Only Drafting Services

Finally, an inventor, such as Bowling, may solicit the assistance of others when perfecting the invention without "losing" any patent rights. *Acromed Corp.*, 253 F.3d at 1379-80; *Hess*, 106 F.3d at 981 (*quoting Shatterproof Glass Corp. v. Libbey-Owens Ford Co.*, 758 F.2d 613, 624 (Fed. Cir. 1985) ("an inventor 'may use the services, ideas, and aid of other in the process of perfecting his invention without losing his right to a patent'")). The undisputed facts show that Lizarraga provided nothing more than what he was hired to do—use his drafting skills to prepare formal drawings at the direction of Bowling. The law is clear that to be a joint inventor, Lizarraga must have contributed in some significant manner to the conception of the invention. *Gemstar-TV Guide Int'l*, 383 F.3d at 1381.

Beyond conception, an alleged inventor must show that his contribution to the claimed invention is not insignificant in quality, when compared to the full invention, and that he did more than merely explain to the real inventor well-known concepts or the current state of the art. *Acromed Corp.*, 253 F.3d at 1379. That Lizarraga exercised the ordinary skill of a draftsman does not make him an inventor of Bowling's die. His claim also presupposes that Bowling, an engineer and dice designer, did not know that die must be symmetrical and have facets of identical shapes and equal surface areas for the die to generate random numbers or that Bowling did not know the appropriate size to make the die. All Lizarraga did was translate Bowling's hand sketch and instruction to formal drawings. That does not make him a co-inventor of Bowling's patent.

**CONCLUSION**

For the foregoing reasons, Bowling's motion for summary judgment that Lizarraga is not a co-inventor of the '197 patent should be granted. Taking the evidence in the light most favorable to Hasbro, Hasbro has failed to establish that Lizarraga is a co-inventor by clear and convincing evidence. Because Lizarraga is not a co-inventor, Hasbro's motion to correct inventorship should be denied.

Plaintiff,
Michael Bowling,
By his attorneys,

Craig M. Scott, Esq. (#4237)
Christine K. Bush, Esq. (#5587)
DUFFY SWEENEY & SCOTT, LTD
One Turks Head Place, Suite 1200
Providence, RI 02903
(401) 455-0700
(401) 455-0701 (Facsimile)

CKB

Douglas J. Williams, *pro hac vice*
Thomas J. Leach, *pro hac vice*
MERCHANT & GOULD, P.C.
3200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
(612) 332-5300
(612) 332-9081 (Facsimile)

Date: June 19, 2006

**CERTIFICATION**

TO:

Todd D. White, Esq.
Jeffrey K. Techentin, Esq.
Adler Pollock & Sheehan P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903-1345

David K. S. Cornwell, Esq.
Tracey-Gene G. Durkin, Esq.
Sterne Kessler Goldstein & Fox P.L.L.C.
1100 New York Avenue N.W.
Washington, DC 20005

I hereby certify that I caused a true copy of the within *Plaintiff's Memorandum of Law in Support of Motion for Summary Judgment and Objection to Motion to Correct Inventorship* to be delivered via First Class Mail to the above named counsel of record on the 19 day of June 2006.

.9081