32121ADS

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

C.A. No. 05-229 S

---

MICHAEL BOWLING,
Plaintiff,
vs.
HASBRO, INC.,
Defendant.

---

DEPOSITION OF KEVIN B. COOK

May 22, 2006

Pursuant to Notice taken on behalf of the Defendant at 1050 17th Street, Suite 1950, Denver, Colorado 80202, at 9:06 a.m., before Diane K. Scholl, Registered Professional Reporter and Notary Public within Colorado.

Page 2

APPEARANCES:

THOMAS J. LEACH, Attorney at Law, from the Law Firm of Merchand & Gould, 3200 IDS Center, 80 South Eighth Street, Minneapolis, Minnesota 55402-2215, appearing on behalf of the Plaintiff.

JEFFREY K. TECHENTIN, Attorney at Law, from the Law Firm of Adler Pollack & Sheehan, P.C., One Citizens Plaza, 8th Floor, Providence, Rhode Island 02903-1345, appearing on behalf of the Defendant.

Page 3

INDEX


| EXAMINATION: | PAGE |
| --- | --- |
| By Mr. Techentin | 4 |
| By Mr. Leach | 267 |

| COOK DEPOSITION EXHIBITS: | INITIAL REFERENCE |
| --- | --- |
| 1 Photograph of 100-sided die | 56 |
| 2 Photograph of wooden dice and "300" game | 59 |
| 3 Photograph of "300" dice | 61 |
| 4 Prototype die | 260 |


(Exhibit 4 enclosed with original only. All other exhibits enclosed.)

Page 4

WHEREUPON, the following proceedings were taken pursuant to the Federal Rules of Civil Procedure:

KEVIN B. COOK,

having been duly sworn to state the whole truth, testified as follows:

EXAMINATION

BY MR. TECHENTIN:

Q. Good morning, Mr. Cook. Again, my name's Jeffrey Techentin. I'm here today representing Hasbro, Incorporated, in the matter of Michael Bowling versus Hasbro. Please state your full name for the record.
A. Kevin Boyce Cook.
Q. And what is your address?
A. 1102 Royale Drive, Colorado Springs, Colorado 80910-2018.
Q. And you have been retained as an expert in this case, correct?
A. Correct.
Q. And in what capacity?
A. In a capacity to examine the Hasbro accused die and how it relates to the Bowling Patent No. 193197.
MR. LEACH: For the record, Counsel,

Page 5

he's been retained as an expert, one skilled in the art of dice.
MR. TECHENTIN: Okay.
MR. LEACH: I mean, that's --
Q. (BY MR. TECHENTIN) Do you agree with what?
A. Yes, I -- I am an expert as one skilled in the art of dice and dice design.
Q. Any other fields in which you have been retained as an expert?
A. No.
Q. Any other fields in which you believe you are an expert?
A. Not relating to this case.
Q. Well, what fields would there be as to which you would be an expert?
A. Relational databases.
Q. Anything else?
A. Not particularly, no.
Q. And your expertise in dice and dice design is predicated on your collection of dice; is that correct?
A. And design of several -- of several different kinds of dice.
Q. Designs that you yourself have made?

Page 6

A. Yes.
Q. Those are the designs that are depicted on your website, www.dicecollector.com?
A. Correct.
Q. Those are the paper dice that have been assembled?
A. Some of the paper dice, yes.
Q. What dice have you designed?
A. I would have to look at the site to see, but I can say for sure I've designed the hexadie, a 16-sided dice with hexadeci -- hexadeci numerals, 64-sided die, several others.
Q. What others?
A. Again, I would have to see the site.
Q. You don't remember any others?
A. I -- not off the top of my head. There were so many.
Q. Do you consider yourself to be an expert in patent law?
A. No.
Q. What's an estoppel?
A. I don't know.
Q. When did you design the dice that you've testified you designed?
MR. LEACH: I would caution the

Page 7

witness not to speculate. Just answer the question if you know.
A. I can't say for certain.
Q. (BY MR. TECHENTIN) Do you have any recollection as to when it was that you designed the dice that you designed?
A. The hexadie was designed sometime last year.
Q. Can you describe that die for me.
A. It is a 16-sided die, which is -- I believe the term is dipyramidal, with eight sides per half. It is numbered zero through F with hexadecimal numbers.
Q. And do you believe that this was a new design?
A. I believe it was a new design.
Q. Was the physical design of the die new?
A. No. The actual shape was not new.
Q. And what was new was the indicia?
A. Yes.
Q. And that was new in that you used hexadecimal figures as opposed to Arabic numbers, correct?
A. Yes.

Page 8

Q. Well, was that the last die that you designed?
A. I don't believe so. I think I have done some since then.
Q. How many in all have you designed?
A. I can't say for certain without seeing the website.
Q. Was it more than ten?
A. Yes.
Q. When was the first time that you designed a die?
A. I can't say for certain.
Q. More than a year ago?
A. Yes.
Q. More than two years ago?
A. Yes.
Q. More than five years ago?
A. Possibly.
Q. In that neighborhood, perhaps?
A. Again, I would have to check, because the dates are shown on the photographs.
Q. The dates of the design?
A. The date stamp on -- the date stamp on the file itself.
Q. And that indicates when it was

Page 9

designed?
A. That indicates when I took the picture of it, which would be just after I designed it.
Q. Do you have a clear recollection of the process by which you designed these dice?
A. Certain ones, yes.
Q. All right. Let's talk about the hexadie. Is that the right term?
A. Yes.
Q. How long did it take you to design the hexadie?
A. Approximately two days.
Q. Two full days?
A. No, but I designed it over a period of two days.
Q. And over what period of time during those two days?
A. I would say approximately six hours.
Q. And what were the steps that you took that were involved in designing that die over those six hours?
A. I have an empty template showing the actual structure of the die. I've located a particular font that I liked, and finding the

Page 78

A. I don't recall the exact percentage. I seem to recall 10 percent, 20 percent -- 15, somewhere along in there.
Q. And that's -- that was negotiated up front?
A. Yes.
Q. And they held up their side of the bargain?
A. Yes.
Q. And you obviously did by designing the die, correct?
A. Yes.
Q. Did you think that was fair?
A. I -- yes.
Q. Do you do a lot of business with gamestation.net?
A. Can you define "a lot"?
Q. I mean, are the purchases that you make at gamestation.net just personal purchases?
A. Yes.
Q. So would it be fair to say that it's less than a couple hundred dollars a month?
A. Yes, it's less than a couple hundred dollars a month.
Q. Not the discount. The total amount

Page 79

of your purchases.
A. Yes.
Q. Other than the hexadie, have any of your -- other of your dice been commercially manufactured?
A. Not with my approval.
Q. To your knowledge?
A. I don't believe anyone has stolen any of my designs.
Q. All right.
Q. Who is James Fitzgibbon?
A. Fitzgibbon. I don't recall the name. I know that there was an owner of a local gaming store named James in Colorado Springs.
Q. I have changed topics on you, and without warning.
A. Oh, okay.
Q. When you were retained as an expert, you were asked to prepare a report, correct?
A. I do recall the name James Fitzgibbon now. I believe that is one of the previous patent holders.
Q. Let me -- let me try and get through this.
A. Sorry.

Page 80

MR. LEACH: I can make a representation for the record.
MR. TECHENTIN: No. Let me ask my questions, if I can.
Q. (BY MR. TECHENTIN) You were asked to prepare an expert report in this case, correct?
A. Correct.
Q. And what did you do to do that?
A. I was given an example of another expert witness statement, including a claims chart. I studied that, the form of that, and then I produced a report that was in similar form.
Q. And that expert was James Fitzgibbon, correct?
A. I don't recall. I believe so. It's possible.
Q. Did you ever do anything to contact the expert who'd written the report that your report is based on?
A. No.
Q. Did you ever contact Mr. Fitzgibbon to determine whether or not the analysis that he presented in his report was accurate?

Page 81

A. No.
Q. What did you do to determine the accuracy or reliability of the analysis that was undertaken by Mr. Fitzgibbon?
A. Nothing.
Q. What did you do to independently verify that the analytical framework that Mr. Fitzgibbon had employed was the proper one?
A. Nothing.
MR. LEACH: Counsel, I object. He was pro -- the witness was provided an example expert report for the format. He's not here to testify about patent law or he's not a patent law expert. I'll represent that we provided him with an accurate statement of the law for him to use in developing his opinion.
Q. (BY MR. TECHENTIN) Have you ever gone back and looked at your report and set it side by side with Mr. Fitzgibbon's?
A. I never made a comparison between the two.
Q. Are you aware that portions of your report are identical verbatim with Mr. Fitzgibbon's?
MR. LEACH: Again, Counsel, if

Page 86

Q. So why did you include it?
A. I have already answered that question.
Q. Because you thought it would be nice to include it?
A. Because I thought it would be appropriate to show in comparison to the figures in the patent a commercial embodiment. It --
Q. Why would it be appropriate?
A. Because it would give the reader a better idea of what a physical embodiment or commercial embodiment of the '197 patent could look like.
Q. And why does anyone need to know that?
MR. LEACH: Object to the form of the question.
Q. (BY MR. TECHENTIN) You can answer that.
A. I don't know that anyone particularly would need to know that.
Q. And how is it that you came to understand that the commercial embodiment of the Bowling die was irrelevant to the analysis of infringement that you were asked to undertake?

Page 87

A. Because under the definition of legal infringement and the definition of doctrine of equivalence, it makes no reference in the -- whatsoever to a commercial embodiment.
Q. Did you ask Mr. Leach about that?
MR. LEACH: Jeff, again, for the record, we discussed --
MR. TECHENTIN: Tom, I get to ask my questions. You can object or not object.
MR. LEACH: I know, but we're not putting him forward as an expert in patent law, okay?
MR. TECHENTIN: Tom, I just --
MR. LEACH: He's an expert in dice.
MR. TECHENTIN: I'm trying to under -- Tom, object or don't object.
May I have the question read back, please.
THE DEPONENT: Yeah, please. Thank you.
(Page 86, line 22, through page 87, line 5 was read back.)
A. As I recall, I did speak with him about this.
Q. (BY MR. TECHENTIN) And what was

Page 88

that subject? What was that conversation?
A. I pointed out that the -- a commercial embodiment need not comply with the particular claims of any one patent, and that I didn't see how if -- if the commercial embodiment, by showing it in my report, would it make any difference to the report, and I decided on my own to include that particular picture.
I knew that from the verbiage of the definition of the two types of infringement, that it really didn't matter, but I still wanted to include that picture because I just felt it was appropriate.
Q. So if I understand that last answer correctly, you did discuss the question of whether or not to include a depiction of the commercial embodiment with Mr. Leach?
A. Yes.
Q. And did he say to you in words or substance, you know, the commercial embodiment is irrelevant?
A. I asked him that question, as I recall.
Q. And what was his answer?
A. His answer was that I have been

Page 89

asked to examine the '197 patent that -- the elements of the claims in the '197 patent as related to the Hasbro die.
Q. And you understood that to be an answer to that question?
MR. LEACH: He's provided an answer.
Q. (BY MR. TECHENTIN) Well, Mr. Cook, you said to Tom, "What about the commercial embodiment?"
A. (Nodded head.)
Q. And if I understood your last answer correctly --
A. (Nodded head.)
Q. -- his response was, "You've been asked to look at the patent and the Hasbro die"?
A. Yes.
Q. Okay. And my question to you is, Did you feel that that answered your question about the commercial embodiment?
A. Yes.
Q. And what did you understand that answer to be?
A. I understood that to be that the commercial embodiment is not at case here. We are only examining the '197 patent as it relates

Page 90

to the Hasbro die.
Q. And did you ask Mr. Leach, either literally or in effect, "Is it okay if I include the commercial embodiment in my report?"
A. I don't recall.
Q. Did you discuss the fact that your report actually included pictures of the commercial embodiment and textual references to it?
A. We discussed what I had written.
Q. Let me ask the question again. I'll break it down.
Did you discuss with Mr. Leach the fact that the report, as you had drafted it, included pictures of the commercial embodiment of Mr. Bowling's die?
MR. LEACH: I object, and I'm instructing the witness not to speculate. If he can recall, he may answer.
MR. TECHENTIN: Tom, please. He's your expert. You don't get to coach him like this, okay? You don't.
MR. LEACH: I'm not coaching the witness.
MR. TECHENTIN: You are.

Page 91

MR. LEACH: I'm specifically telling him if he recalls, he can answer.
MR. TECHENTIN: You know, Tom, if I -- it obviously goes without saying -- it goes without saying that if a witness doesn't recall an answer to a question, it's incumbent upon the witness to say, you know, "I don't remember."
MR. LEACH: Just telling him not to speculate on an answer.
MR. TECHENTIN: When I start asking him questions about conversations that he's had with you, and the only difference between that question and any other question that I'm going to pose today if the fact that it has to do with a conversation with you, and you jump in with, "Oh, I'm going to caution the witness not to speculate," that's coaching.
MR. LEACH: I've told him not to speculate in other contexts.
MR. TECHENTIN: And a review of the transcript will reveal when.
MR. LEACH: Fair enough.
MR. TECHENTIN: So object or don't object.
MR. LEACH: Like I said before, he's

Page 92

not here as a patent law expert. He's here to render his opinion on what the '197 patent means to one skilled in the art.
MR. TECHENTIN: Are you saying that that -- that what you've just said limits my ability to ask him the questions -- questions about the conversations that he's had with you in preparing this report?
MR. LEACH: No.
MR. TECHENTIN: All right, then. Can I have the question read back, please.
(The last question was read back.)
A. I don't recall the details of that specific discussion, but we did discuss every element of my expert witness statement.
Q. (BY MR. TECHENTIN) Did you discuss with Mr. Leach the fact that there were textual references to the commercial embodiment of the Bowling die?
A. I don't remember.
Q. Did you ever have any conversation with Mr. Leach or anyone else about the significance of including references to the commercial embodiment of the Bowling die in your report?

Page 93

A. I can't say for certain.
Q. Let me see if I understand this correctly. When you drafted this report, you understood that references to the commercial embodiment were irrelevant, correct?
A. Correct.
Q. And nobody at Merchant & Gould ever told you anything different, correct?
MR. LEACH: Objection. That misstates the testimony.
Q. (BY MR. TECHENTIN) Is that not correct?
A. Would you repeat the question again.
Q. No one at Merchant & Gould ever told you any different than that the commercial embodiment was irrelevant to your analysis; is that correct?
A. I don't recall anyone ever telling me that it was irrelevant. I came to the conclusion on my own.
Q. And you came to that conclusion on the basis of your review of the information that was provided to you by Mr. Leach, as well as your conversations with Mr. Leach, correct?
A. Correct.

Page 138

infringement analysis?
A. Yes.
MR. LEACH: What page are you on for subsection (c)? Is that --
MR. TECHENTIN: 5.
MR. LEACH: Is that page 5? Okay.
MR. TECHENTIN: That's the next heading above that, right?
MR. LEACH: But I -- you're on page 5, subsection (c)?
MR. TECHENTIN: The heading is on page 5.
MR. LEACH: Okay. "Infringement Analysis." I've got it. And under --
Q. (BY MR. TECHENTIN) The definition is under that heading on page 6, correct?
A. Definition is under "Infringement Analysis."
Q. And if I understood your testimony correctly, at some point in the editorial process of your report, the definition of literal infringement had been in the literal infringement section, and I presume the definition of the equivalence under the -- infringement under the doctrine of equivalence

Page 139

was under the doctrine of equivalence section --
A. As I recall.
Q. -- is that right?
A. As I recall, yes.
Q. Okay. So having looked at the paragraph on page 6 that has the definitions, does that change your response as to what portions of the report reflect the information that Mr. Leach was providing to you during your online collaborative sessions?
A. The verbiage that is in the infringement analysis, the basis of this was established while online. I chose to remove this and place it into this section due to the fact that the literal infringement and the doctrine of equivalence is only relating to how the Hasbro accused die literally infringes and infringes on the doctrine of equivalence.
Q. Well, let me ask the question another way. This full paragraph on page 6 --
A. Um-hum.
Q. -- that begins, "I understand that" --
A. Um-hum.
Q. -- who told you this?

Page 140

A. It didn't -- it wasn't told to me.
I -- I was given what is literal infringement, definition of literal infringement, and I was given the definition of doctrine of equivalence, and this paragraph was written as I interpreted that section to be.
Q. So this is your own explanation of what each of those terms means?
A. Yes.
Q. And it's based on definitions that were given to you at some point in connection with your service as an expert in this case, correct?
A. Correct.
Q. Who gave them to you?
A. Mr. Leach.
Q. And how did he give them to you?
A. We discussed them online, and I took notes on it, I went back and I put in the As, ands, and Bs, because I was only taking notes.
Once I had read the definition and had internalized it, I formed this paragraph.
MR TECHENTIN: Okay. Why don't we take a break for lunch here.
(A lunch break was taken.)

Page 141

Q. (BY MR. TECHENTIN) Okay. Mr. Cook, in your report, you indicate that the first time that you ever saw Hasbro's accused die was in September of 2000; is that correct? And I'm looking at page 5 of your report.
A. Hasbro's accused die, yes. Yes, that was according to my records and my database.
Q. And in what context did you first see the accused die?
A. A friend of mine had come to visit, and he purchased the Millennium Edition Monopoly, and he showed them to me.
Q. He showed them to you?
A. He left the Millennium game when he went back to Florida.
Q. Left the Millennium game for you?
A. Yep. Yep.
Q. And so you actually saw the dice in the game?
A. We played the game, and then after that he gave me the game, and I added it to the collection.
Q. Well, if you saw them in Hasbro's game, why did you think they were Crystal Caste

Page 150

Q. It -- would you call it unlikely?
A. No. I would say it's possible.
Q. Would it be fair to say that you wouldn't say that it's probable?
A. I would say it's possible.
Q. Why only possible and not probable?
A. I don't have enough information to -- at this time, I don't have enough information to make a quantitative judgment based on the release dates of these dice.
Q. Let's back up for just a second. How does the vast number of different die designs that are available affect the likelihood of Hasbro independently developing this die?
A. Because the number of different types of dice that have been created since I've been doing the dice timeline 10,000 BC to the present, this shape has not shown up until Michael Bowling released the commercial embodiment of this die.
Q. And how would you describe the shape that you say Michael Bowling was the first to come up with?
A. I can't accurately describe the shape. If I could, I would have done so on my

Page 151

website, because I describe the shape of every other type of die. Crystal-shaped is the most accurate I can give.
Q. Well, what about Mr. Bowling's design, the one in the '197 patent, is different from anything that came before?
A. Because it is a crystal shape or an elongated other polyhedron, nothing -- I have never seen anything like that die, or I had never seen anything like that die before that time.
Q. Well, you would agree there were other elongated die -- dice before Mr. Bowling's, correct?
A. There are stick dice, which are elongated cubes from the Middle East, from centuries back.
Q. And there are other examples of elongated dice, as well, correct?
A. There are Chinese dice of the same type.
Q. And, generally speaking, barrel dice, right?
A. I have not seen -- I had not seen barrel-shaped or crystal-shaped, as Mr. Bowling

Page 152

is saying, like this, prior to this.
Q. I'm not -- I'm not asking you about things that were precisely the same. You identified one of the unique characteristics of Mr. Bowling's dice as being elongated, and I'm trying to establish whether or not you believe that, prior to Mr. Bowling's design, there were examples of elongated dice.
A. Yes, there are elongated dice, but not like this.
Q. So what is it that distinguishes Mr. Bowling's design from what came before?
A. Thank you. You finally pointed it out to me. All elongated dice have a single side which is merely stretched. His elongated dice has stretched triangles.
Q. Anything else?
A. I believe that's what makes them unique at that time.
Q. So, for example, the concept of what's called in a patent end caps, that's a known phenomenon in dice, correct?
A. As to the patent that I read in the file history, there are at least, there is at least one other patent that references end caps.

Page 153

Q. Right. And you're familiar generally with elongated dice that have features on the end which effectively prevent the die from landing on its end, correct?
A. Yes.
Q. So even if the -- even if the appearance isn't exactly the same as the end caps in the '197 patent, the function is the same, correct?
A. I have not seen any other dice that have triangular end caps like the commercial embodiments of the '197 patent.
Q. You have not?
A. No.
Q. Is that part of the reason that you find the Michael Bowling dice to be unique?
A. Not really.
Q. So is it just the elongated triangles?
A. It's the crystal shape in general. You achieve the crystal shape by the elongated triangles.
Q. Do you think that the Hasbro dice are crystal-shaped?
A. I classify them in my database as

Page 154

spindle-shaped.
Q. What does that mean?
A. As I understand spindle, it means that you have two endpoints, and there are, oh, I'm not sure, but X number of connections between two points, much like a spindle for a spinning wheel.
Q. So my question is, Are the Hasbro dice crystal-shaped?
A. Oh, yes.
Q. You think they are?
A. (Nodded head.)
Q. Are they crystal-shaped in the same sense that Michael Bowling's are?
A. Yes.
Q. Are they -- and I don't mean this in a technical sense. Are they equivalently crystal-like, in your mind?
A. Yes.
Q. And would that be true of any die that was constructed according to the patent, the design that's claimed and disclosed in the patent?
MR. LEACH: Can I have the question read back again.

Page 155

(The last question was read back.)
A. I only examined the elements of the patent which are being disputed here. I did not examine elements that are not relevant to the Hasbro accused die.
Q. (BY MR. TECHENTIN) Let's back up. What's a preferred embodiment?
A. I'm not an expert in the law, in patent law.
Q. Do you know what one is?
A. Again, I'm not an expert in patent law.
Q. Do you understand that the '197 patent covers geometric shapes other than those that are depicted in the drawings that are included in that patent?
A. Yes.
Q. And by that, I'm not merely referencing other quantities of sides, but also different shapes. Do you understand that?
A. Just a moment.
(A pause occurred.)
A. I can only say that I have examined the elements that are covering this particular die. I have not considered any other elements.

Page 156

Q. But you understand that the patent covers anything that literally fits all of the elements of a given claim of a patent, correct?
A. I understand that the elements that I have examined, and that the definitions of literal and doctrine of equivalence, and how they apply to the Hasbro accused die.
Q. Have you given any thought to shapes of dice that would be covered by the patent other than what's drawn in the patent, Mr. Bowling's commercial crystal dice, and Hasbro's die?
A. I was asked to examine how the Hasbro accused die applies and infringes the elements of the '197 patent. That was all I was asked to do.
Q. Is that a no?
A. That was all I was asked to do.
Q. Is that a no?
A. I examined the '197 patent Claims 1 through 9, 16 through 19, and how they apply to the Hasbro accused die.
Q. Is there some reason you're refusing to answer my question?
A. No.

Page 157

Q. Could you answer it then, please, and I'll ask the court reporter to read it back.
(The last question was read back.)
A. I don't know how to answer that question other than the answers that I have given twice.
Q. Well, the answer, I can prospectively suggest, would either be yes or no, yes if you have in fact looked at the patent language and said, "Oh, this other shape would be covered by the patent," and no if you've never done anything like that.
MR. LEACH: For the record, he responded to your question. I mean --
MR. TECHENTIN: Yeah, he responded, but he hasn't answered it.
MR. LEACH: He's given you an answer twice.
Q. (BY MR. TECHENTIN) That's the best you can do?
A. That's the best I can do.
Q. We were talking about the -- about the likelihood of Hasbro independently developing the design for its accused die. Do you recall that?

Page 158

A. Yes.
Q. How likely was it that Michael Bowling would come up with this design?
MR. LEACH: Object to the form of the question. I mean, again, you --
MR. TECHENTIN: Okay. Okay. You've objected.
MR. LEACH: I can still instruct the witness not to speculate.
MR. TECHENTIN: You --
A. Yeah, I can't -- I was about to say, please. I can't say --
MR. TECHENTIN: You can't instruct him not to speculate. You can object to the form of the question.
MR. LEACH: I can instruct --
MR. TECHENTIN: You can take it up with the Judge later on and say, "Judge, it calls for speculation. That was the basis of my objection." You can do that.
MR. LEACH: I can still instruct my witness not to speculate. If he knows the answer, please answer.
THE DEPONENT: Could you read --
MR. LEACH: You're asking him to --

Page 159

how likely is it someone else may come up with something?
MR. TECHENTIN: He's offered an opinion as to how likely it was that Hasbro came up with it. I don't think it's that much of a stretch to say that he could come up with an explanation as to out likely it was that you came up with it or Michael Bowling.
A. Do you understand the difference for that question?
Q. (BY MR. TECHENTIN) No.
A. Okay. If someone comes up with a unique design that has never been seen before, and has no exterior motivations for coming up with that design, meaning they had no inspiration for how to come up with that design, it is very different to form an opinion as to how someone innovatively developed something new versus someone who developed it as a result of having some additional information, having seen some design that inspired them.
Q. Do you know what Michael Bowling's background is with respect to the design of dice?
A. No.

Page 160

Q. Have you ever asked him?
A. No.
Q. Have you ever asked him if he came up with any new dice designs before the crystal dice?
A. No.
Q. Would that be relevant to your determination of whether he was likely or unlikely to come up with a design, a new and unique design?
A. I really couldn't speculate.
Q. In your opinion, would it be more or less likely that a new die design would be arrived at by someone whose training and background was in component design or an engineer in a power company?
MR. LEACH: Object to the form of the question.
A. I -- that's not enough information to make a decision.
Q. (BY MR. TECHENTIN) Well, how much information did you need to have before you concluded that it was highly unlikely that Hasbro came up with a design independently?
A. Because the -- as I remember, or as

Page 161

I seem to recall, the Hasbro accused die was developed after the commercial embodiment, but I can't be sure. I'd have to know the exact details.
Q. Is that the only reason for you to conclude that it's highly unlikely?
A. I also understand from having attended GenCon last year that Hasbro, since its acquiring of Wizard of the Coasts, which owns Dungeons and Dragons, TSR, that they now have a presence at GenCon every year.
Q. But, again, Hasbro wouldn't see Mr. Bowling's dice at GenCon until after Mr. Bowling disclosed them at GenCon, correct?
A. Correct.
Q. And so that would be, again, the same reference date in terms of public disclosure by Mr. Bowling, right?
A. If the commercial embodiment of the '197 patent was released at GenCon, that would be the time at which it became public.
Q. My question is, is the only reason you conclude that it is highly unlikely that Hasbro independently developed this die your understanding that Hasbro did not develop the

Page 166

it was highly unlikely that Hasbro independently created the die?
A. That includes the entire expert witness statement.
Q. And you're willing to offer an opinion at trial without the benefit of information of -- without the benefit of the evidence that's available as to the development of the die?
A. I don't see the relevance.
Q. You don't see the relevance of the testimony --
A. I don't see --
Q. -- that --
A. -- the relevance.
Q. You don't see the relevance of the testimony of Ms. Sefgic or the relevance of your opinion?
A. I don't see the relevance of it being independently developed.
Q. Then why are you going to offer that opinion?
A. You asked me what I would offer, and I have to stand by my statement. It is in my statement.

Page 167

Q. So the only reason that you expect to offer the testimony that, in your opinion, it was highly unlikely that Hasbro independently developed it is because it's in your report?
A. And it is my opinion.
Q. And you're completely comfortable with that remaining your opinion, despite the fact that there is evidence in the record that bears on this issue that you have not seen?
A. Yes.
Q. You don't care to see that evidence?
A. Not at this time.
Q. What does it mean that someone have ordinary skill in the art?
MR. LEACH: Objection to the form of the question, and that it calls for a legal conclusion.
A. I understand that that is a legal term that is used in expert witness statements.
Q. (BY MR. TECHENTIN) That -- well, does it have any meaning?
A. It means someone of ordinary skill in the art.
Q. Well --
A. You can't define a term with a term.

Page 168

Q. Well, what's the art that's at issue, in your opinion?
A. The art in issue is dice and dice design.
Q. Dice is an art?
A. Yes.
Q. The -- and dice and dice design are the only arts that are at issue?
A. Dice and dice designs are the only issues by which I have been retained as an expert witness.
Q. And the only arts -- and those are the only arts as to which you, for this case, anyway, believe yourself qualified to offer any opinions?
A. I answered that earlier.
Q. That is correct, right?
A. I answered that earlier.
Q. What does it mean that you have to interpret a claim as a whole in light of the teaching of the patent specification?
A. Not being an expert in patent law, I interpret that to mean I need to read the patent as a whole, the specifications and the claims, and as one who is skilled in the art, give my

Page 169

interpretation of the patent.
Q. What does it mean -- what does the expression "the teaching of the patent specification" mean?
A. The patent specification is different from the claims itself. They go into more detail than the actual legal verbiage of the -- of the claims, the elements of the claims themselves.
Q. And so what does it mean when you're construing claims to look at the specification language?
A. It gives me a clearer understanding of what was trying to be achieved with the claims.
Q. What if the language of the claims and the specification are inconsistent?
A. I'm not an expert in law. I couldn't say.
Q. If something exists in the specification, but is not referenced in the claims, how do you construe that?
A. As I --
MR. LEACH: Objection.
A. As I understand it, the claims are





dcebb40a-6755-4088-a6ff-3211f5432b0a

Page 174

patent, I reviewed the specifications for clarity, and the figures of the '197 patent.

Q. What language in the claims of the '197 patent indicated to you that the reference to equal surface area should be performed without regard to indented indicia?

A. It is my opinion, as one skilled in the art, that the references to having equal surface area refers to the planar surface area, without regards to indented indicia.

Q. And that's based on your skill in the art of dice and dice design?

A. As well as the specifications and the claims of the '197 patent.

Q. But you said -- and I'm not going to quote you verbatim, but you said, "Based on my opinion" -- "It's my opinion based" -- "as one skilled in the art that this should be done without regard to printed indicia," correct?

A. As one who is skilled in the art, equal surface areas means the planar surface area without regards to indented indicia.

Q. And my question to you is the art you're referring to is dice and dice design, correct?

Page 175

A. Yes.

Q. You don't have any expertise in terms of geometry or mathematics or any other fields that would impact on an ability to interpret the phrase "equal surface areas," do you?

A. As a software engineer, I had to take a great deal of mathematics in college. I understand what equal surface area means.

Q. And equal surface area -- well, tell me what equal surface area means.

A. I interpret, for purposes of the '197 patent, equal surface area to mean the planar surface area.

Q. Is that the usual interpretation of equal surface areas?

A. I have been asked to interpret the '197 patent as it regards the Hasbro accused die.

Q. Well, without regard to the '197 patent, what does surface area mean?

A. Surface area means the square unit area of a particular surface.

Q. And a surface can be contoured, correct?

Page 176

A. Yes.

Q. And the ordinary definition of surface area would account for the contours on the surface, correct?

A. I have been asked to interpret the '197 patent as regards the facets, the extension member facets, and the relationship between equal surface areas and my interpretation of what equal surface area means.

Q. Mr. Cook, this is going to take a lot longer if you don't answer the questions I ask.

A. I know.

MR. LEACH: He's trying to answer your questions.

MR. TECHENTIN: No, he's not.

Could I have that last question read back, please.

MR. LEACH: That's your opinion.

(The last question was read back.)

A. As I'd stated before, I am interpreting this patent. I'm not going to comment outside of the scope of this patent.

Q. (BY MR. TECHENTIN) Are you telling me that you didn't look up what surface area

Page 177

means before you rendered this opinion?

A. I know what surface area means.

Q. But you won't tell me?

A. Correct.

Q. Because it's different from your interpretation of the '197 patent?

A. No.

Q. They're the same?

A. My interpretation of the '197 patent -- do you want me to continue?

Q. I'd like an answer to my question.

Q. Are they the same?

Are you not going to answer that question?

A. I have answered it when you asked me the question. I told you what I'm willing to answer.

Q. Are you familiar with Mount Rainier?

A. I know it is a mountain.

Q. And I'm only picking it because it's -- it stands sort of alone and there aren't a lot of mountains around.

If someone were to ask you to calculate the surface area of Mount Rainier, what would you do?

The results of the '197 patent die design and the Hasbro accused die is random results, which I tested by rolling the die.

Q. And you tested the Hasbro dice?

A. Yes.

Q. And you're assuming random results in the -- on the part of the '197 patent because that's what's claimed?

A. There -- I couldn't use the commercial embodiment, because it really was not the patent itself.

MR. LEACH: It's -- I think you're misstating the patent when you say --

MR. TECHENTIN: I'm sorry.

MR. LEACH: -- generating random numbers is what's claimed. I disagree with that.

MR. TECHENTIN: Yeah, I -- you're right. I was using it in a nontechnical sense.

Q. (BY MR. TECHENTIN) Random numbers are what the patent generally describes the function of the die being; is that fair?

A. Correct.

Q. And this analysis that you performed comparing the function-way-result of the -- of



these two dice, was that your understanding of your mandate under the doctrine of equivalence?

A. Yes.

Q. Who told you to do that?

A. That was the -- when I asked about what is the doctrine of equivalence and how do you achieve -- interpretation, how do you determine something is infringing a patent under the doctrine of equivalence, it was explained to me what function-way-results were.

Q. And did you discuss the fact that this was the function-way-result analysis that you had done with Merchant & Gould?

MR. LEACH: Object to the question.

A. Yeah, I don't -- I don't understand what you're asking.

Q. (BY MR. TECHENTIN) Well, at some point, you completed your function-way-result analysis of the Hasbro die, correct?

A. Correct.

Q. Did you report that analysis to Merchant & Gould?

A. Yes, when I showed them the final copy.

Q. And did you get any feedback on



that?

A. Feedback such as?

Q. "You did it wrong"?

A. No, I didn't receive any feedback like that.

Q. "You did it right"?

A. I didn't receive any feedback like that. I mean --

Q. "Do you have any test data that supports your analysis?"

A. I don't recall that even being asked.

MR. LEACH: Jeff, it's now about 4:05, so we've been going for about seven hours now.

MR. TECHENTIN: No, we haven't.

MR. LEACH: We started at 9. We --

MR. TECHENTIN: Took an hour off for lunch.

MR. LEACH: Okay. So --

MR. TECHENTIN: That's six, plus breaks. We're at about five and a half hours, at the most.

MR. LEACH: I disagree, but --

MR. TECHENTIN: We can have the



court reporter calculate it. I don't have a problem with that. But I'm not going to im -- I'm not even coming close to seven hours.

Q. (BY MR. TECHENTIN) Mr. Cook, you would agree that, had Hasbro manufactured a die that was similar to the accused die, but which didn't have triangular or end caps that were composed of triangular facets, for example, it would not have infringed the patent; is that correct?

MR. LEACH: Object to the question. I'm not going to have him opine on a hypothetical like that.

MR. TECHENTIN: Well, I mean --

MR. LEACH: If you want to give him a physical structure -- well, he's not going to answer it.

MR. TECHENTIN: You're going to instruct him not to answer?

MR. LEACH: That question is so vague, he can't answer it. I mean, it's a hypothetical with nothing in front of him, and you're asking him on the fly do an infringement or a validity analysis? He's not going to do it.

Page 226

Q. (BY MR. TECHENTIN) Are you not going to do it?
A. I wasn't going to answer the question.
Q. Excellent. All right. That's terrific.
MR. LEACH: Excuse me?
Q. (BY MR. TECHENTIN) You would agree that the '197 patent only applies to a die that has end caps that consist of tapered or triangular facets, correct?
MR. LEACH: Object to the question.
MR. TECHENTIN: Why?
MR. LEACH: Please repeat the question.
(The last question was read back.)
A. His job as an expert has not been to determine what everything possible about this patent could cover. I mean, that's not what he's testifying as an expert on.
Like I've said before, Jeff, he's not an expert in patent law, he's not an expert in claim construction, so to try to get him to answer those questions is wrong, and I'm not going to have him do it, and I'm not going to _

Page 227

let him do it. He's an expert in die and die design. If you want to stick to questions that relate to that, that's fine.
Q. (BY MR. TECHENTIN) You may answer the question.
A. I would have to have time to examine the question in relation to the entire patent as it exists to make a truthful analysis.
Q. Would you agree that one aspect of any die that would be covered by the '197 patent would be that its end caps would consist of facets that are identically shaped and that have equal surface areas?
A. I would have to see the die to make a determination.
Q. Well, that's one of the elements of the first claim of the patent; isn't that correct?
MR. LEACH: Repeat the question again.
THE REPORTER: The one before that last one?
(The last question was read back.)
MR. LEACH: Can you read it one more time.

Page 228

(The last question was read back.)
MR. LEACH: Again, Jeff, he's not here to testify about the total breadth of the patent.
MR. TECHENTIN: He's construing your claims. He can answer it.
MR. LEACH: He's not construing all the claims. He's not an expert in patent law. He's telling you what certain terms mean to one skilled in the art.
Q. (BY MR. TECHENTIN) Okay. Can you answer that question?
A. I would answer the question by reading you Claim 1, if you wish me to do so.
Q. And if Claim 1 is not satisfied, the die isn't covered by the patent; is that fair?
MR. LEACH: What die are we talking about? Are you simply asking -- it seems to me you're asking him a simple question on what -- about patent law, and that's not his testi -- expertise, and you're outside of the scope, and I'm not going to let him answer it.
A. I can't answer a question on a theoretical die that I have not examined yet.
Q. (BY MR. TECHENTIN) Because you have

Page 229

no understanding of what the construction of the claims is?
A. No, because I understand the claim, and I have to apply the -- each and every element of the claim to the hypothetical die you are asking about.
Q. You would agree, as a general matter, that a die would not be covered by the patent if an essential element of the patent is not present in the die?
A. I'm not an expert in patent law or patent interpretation. I am an expert in die design. I have interpreted this patent as per the figures, specifications, and claim -- claim elements, and have made the conclusion that the Hasbro accused die infringes both literally and under the doctrine of equivalence.
Q. And one of the reasons -- one of the reasons that you've concluded that the Hasbro dice infringe is that they have end caps that consist of facets that are of -- that are identically shaped and that have equal surface areas to one another?
A. I have concluded --
Q. Is that correct? That's a yes-or-no

Page 254

close.
MR. LEACH: I hope so.
(Discussion off the record.)
Q. (BY MR. TECHENTIN) On page 15 of your report, you in -- under the section entitled, "Validity," you say that you understand that a patent claim may be invalid as obvious under 35 U.S. Code Section 103A for certain reasons. Do you see that?
A. I'm trying to find it, but --
MR. LEACH: And, again, I'll object as not a patent lawyer or an expert in patent law.
A. I understand that a patent may be rejected by the United States Patent obvious -- obvious -- Office as being obvious.
Q. (BY MR. TECHENTIN) What would render a patent obvious?
MR. LEACH: Objection, outside the scope of this witness's testimony here today. He's not -- he's not an expert in patent law, Jeff.
Q. (BY MR. TECHENTIN) Can you answer the question?
A. I can't answer the question 'cause I

Page 255

don't know.
Q. And yet you have offered an opinion on that subject, have you not?
A. Yes.
Q. So, presumably, if you have an opinion, then you have a basis for that opinion, correct?
A. Yes.
Q. So what's your understanding of what -- of when obviousness results in a patent -- presents an obstacle to patenting an idea?
A. It is my opinion that a patent may be rejected as obvious if the patent being applied for has a -- I'm looking for a word here -- an insubstantially different change to an existing patent.
Q. In the section on Validity, you talk about the differences between the claimed subject matter and the prior art having been obvious at the time the invention was made to a person of ordinary skill in the relevant art as being the trigger for obviousness. Do you see that?
A. You're talking about the entire

Page 256

first paragraph here?
Q. No. The last part of that first paragraph, yeah.
A. Okay.
(A pause occurred.)
A. Yes, this is also -- now that I'm rereading this, this is also my interpretation.
Q. And it's your opinion that you have not seen any prior art that you think would render the '197 patent obvious?
A. That is correct.
Q. What prior art have you reviewed?
A. As we discussed earlier, I collected those 200-some patents on dice. Having gone through and observed figures and, if there were no figures, read enough to get a general idea of what the die was about, I found no dice that would be considered obvious as far as the '197 patent is concerned.
Q. Let's look at that. Let's look at the commercial embodiment of the '197 patent, and here we're looking at an eight-sided die; is that correct?
A. That is correct.
Q. And if you had found a prior art

Page 257

reference that had had the same basic configuration of faces on a die, except that the extension member faces and the end cap faces were the same length -- do you understand what I'm saying?
A. Yes.
Q. -- would that have rendered this obvious?
MR. LEACH: Object to the question. Again, you're asking him to testify about fundamental principles of patent law, and he's not an expert on patent law.
MR. TECHENTIN: Then he shouldn't have written about obviousness in his report.
A. I have experience outside of this case with obviousness.
Q. (BY MR. TECHENTIN) In what sense?
A. I'm defending two other patents for another dice company.
Q. Ah. Which dice company?
A. Gamescience.
Q. Manufacturer of the Saki hedron?
A. Yes.
Q. What dice?
A. The -- originally the d16, and I

Page 258

believe now we're going to the d5 at this point.
Q. You say you're defending them in what context?
A. I've been asked by the attorney for Gamescience to write a rebuttal to the obviousness claim by the United States Patent Office.
Q. So those are in the application process?
A. Yes.
Q. And so you're saying that as a result of your participation in that, you have some understanding as to the concept of obviousness?
A. As they described it to me, yes.
Q. "They" being?
A. The letter from the attorney for Gamescience.
Q. Who's the attorney for Gamescience?
A. I'm not sure. I would have to look it up.
Q. What firm?
A. I -- again, I don't know.
Q. What city?
A. I believe it was New Orleans.

Page 259

Sorry. That's what I know.
Q. Let's go back to the question that I had. My question was whether a prior art reference that shared the same basic configuration, that is, the alternating triangle format that you testified was the unique characteristic of these dice --
A. Um-hum.
Q. -- and the end caps, except that the end caps were the same length as the extension member facets --
MR. LEACH: Object.
Q. (BY MR. TECHENTIN) -- My question --
MR. LEACH: Go ahead, finish.
Q. (BY MR. TECHENTIN) -- my question is, if that had been a prior art reference, would that render this die obvious?
MR. LEACH: Object to the question. It's a hypothetical. And, again, he's not an expert in patent law, and he's not here to testify on that stuff.
A. I really couldn't say.
Q. (BY MR. TECHENTIN) Well, why not?
A. Because I'm not a hundred percent clear as to how that question would apply to

Page 260

obviousness.
Q. Well, when you reviewed the prior art references --
A. Um-hum.
Q. -- for the '197 patent, you had a clear understanding as to whether obviousness would be applicable, did you not?
A. Yes.
Q. And do you still?
A. I still -- as to the prior art, yes.
Q. Why can't you apply that to the shape that I described?
A. Because I'd need to see the shape itself.
Q. Why?
A. That's the way I interpret it. I interpret it by seeing the shape and seeing if it's obvious.
Q. And if you saw the shape, you'd be able to tell whether it was obvious?
A. I believe so.
Q. All right.
A. Hmmm.
Q. Is that a shape you've seen before (indicating)?

Page 261

MR. LEACH: Have you disclosed this before?
MR. TECHENTIN: Yes.
MR. LEACH: To us?
MR. TECHENTIN: Well, not that physical die, but it didn't exist until a couple weeks ago.
MR. LEACH: So I -- and you haven't -- you haven't given us any pictures of it?
MR. TECHENTIN: Oh, yeah.
MR. LEACH: You've given us --
you've provided pictures of it? Do you know the Bates numbers of those pictures?
MR. TECHENTIN: Not offhand.
MR. LEACH: I'm not going to have him do an analysis on the fly, Counsel.
MR. TECHENTIN: Well, he just told me he can.
MR. LEACH: I'm not going to let him do an analysis on the fly.
MR. TECHENTIN: You're going to instruct him not to answer my question?
MR. LEACH: We've got five minutes left, and, no, I'm not going to let him sit here

and do that.
Q. (BY MR. TECHENTIN) Let me ask this prefatory question.
MR. LEACH: You can ask -- you can ask the question, but he's not an expert in patent law, and I believe I've been stating this all along.
Q. (BY MR. TECHENTIN) Can you analyze whether this would constitute a prior art reference, assuming it's prior art to the '197 patent, that would render the '197 patent obvious?
A. I have never seen this die before.
MR. LEACH: And I object to the question.
Q. (BY MR. TECHENTIN) I understand that, and I asked you to hypothesize a shape, and you said I'd need to see the die. I said if you could see the die, could you do it, and you said you could. Can you?
A. Yes, I can.
Q. And what's your conclusion?
A. I would need to study it more in depth.
Q. Well, I thought you said you could



do it.
A. I can.
Q. How long will it take you?
A. I can't say at this point.
Q. More than five minutes?
A. Yes.
Q. More than a day?
A. I would say yes.
Q. So you spent over 200 days doing prior art analysis when you went through the patents when you were doing your analysis for your expert report?
A. I spent more than 200 days looking at these patents. I knew them long before I was asked.
MR. LEACH: Right about seven hours.
MR. TECHENTIN: No, we're not.
MR. LEACH: Yes, we are.
MR. TECHENTIN: And we can argue about that.
MR. LEACH: Sure, we can.
Q. (BY MR. TECHENTIN) So are you not willing to tell me whether you think that, assuming it's a prior art reference, would render the '197 patent obvious?



A. Not at this time, no.
Q. All right. What would you need to do in order to be able to analyze that?
A. I would need to study the die.
MR. LEACH: I'm going to object --
Q. (BY MR. TECHENTIN) What about --
MR. LEACH: -- to that question, too. He's not an expert in patent law, again. I just want to reconfirm that objection.
Q. (BY MR. TECHENTIN) You'd need to study the die?
A. Yes.
Q. What else?
A. And I would need to come to a conclusion as to what my feelings are about obviousness.
Q. You don't have a conclusion about obviousness?
A. Not for that die, I do not.
Q. Well, you said before, though, that you're clear on what it takes to trigger obviousness, correct?
A. That is correct.
Q. And you did an analysis of prior art references specifically with respect to the '197



patent for obviousness, correct?
A. I reviewed the patents that I had seen, because I had spent a good deal of time, as we stated earlier, looking at figures of the die for all the patents that are listed in my website, and I concluded that there was no prior art that was obvious as far as the '197 patent is concerned.
Q. So that was a yes to my question?
A. That was my answer.
THE DEPONENT: I need to use the restroom.
MR. TECHENTIN: Go off the record.
MR. LEACH: Let's take a break, please.
(Discussion off the record.)
MR. TECHENTIN: All right. I'm -- at this point, I'm going to adjourn Hasbro's questioning of Mr. Cook. I understand that Mr. Leach believes that the deposition should be done, but we can take that up later.
MR. LEACH: I believe we've had seven hours. We started at 9, we ended at 5, with about an hour lunch break, subject to reasonable breaks, but none of those breaks were

Page 266

long, by no means. Would you agree with that?
MR. TECHENTIN: Well, I mean, I think we chalk up a significant amount of the record to you and me bickering over whether or not you can object in the way that you were objecting, and I think there was a significant portion of the time that was otherwise occupied, and not to mention that fact that I had to ask numerous questions numerous times to get the numerous -- to get numerous identical long-winded responses -- nonresponses from Mr. Cook.
MR. LEACH: I disagree.
MR. TECHENTIN: So we'll all -- talk about all that later. Tom, you have a plane to catch. I understand you want to ask some questions. I'm not making a big deal about this. I'm not asking for you to concede anything today. We can talk about that later.
MR. LEACH: Okay. But I just want to state for the record, too, that you talk about, you know, long questions, there were a lot of repetitive questions, questions that he'd answered and you weren't happy with the answers, so you kept asking again, so --

Page 267

MR. TECHENTIN: Okay.
MR. LEACH: I've got some questions for you, Kevin.
THE DEPONENT: Okay.
EXAMINATION
BY MR. LEACH:
Q. You're not an expert in patent law, correct?
A. I'm not an expert in patent law.
Q. And you're not an expert in claim construction, are you?
A. I'm not an expert in claim construction.
Q. And you're here to provide your opinion on whether -- or what certain language in a patent means to one skilled in the art, correct?
A. That is correct.
Q. And when you read Claim 1 of the '197 patent, and in particular I want you to address Element B(i). In terms of reading the patent specification and the drawings of that, what does Element B(i) mean to you, and I want -- I'm going to narrow it down to the language, "Each of said discrete facets being

Page 268

identically shaped and having equal surface areas." What does that mean to you as one skilled in the art?
A. It means that the discrete facets of a die -- you may call it any term you choose -- have to be shaped exactly the same and have equal planar surface areas.
Q. Okay. And if I recall, you testified that you came to that conclusion, in part, looking at the drawings which include Figure 1 and column 3, lines 5 to 10; is that correct?
MR. TECHENTIN: Objection.
A. That is correct.
Q. (BY MR. LEACH) And is it also your testimony that you have reviewed the claims, and interpreted them to the best of your ability, and looked at Hasbro's accused die, and you're satisfied that Hasbro's accused die meets every element of Claims 1 through 9 and 16 through 19? I believe those are your asserted claims; is that correct?
MR. TECHENTIN: Objection.
Q. (BY MR. LEACH) You may answer.
A. Yes, I believe that the Hasbro's

Page 269

accused die meets every element of the '197 patent with regards to Claims 1 through 9 and 16 through 19.
Q. (BY MR. LEACH) And when you say you're not an expert in patent law, in determining that Hasbro's die infringes those claims, you're basing that off of your understanding, which I provided you, of infringement, correct?
A. Correct.
MR. TECHENTIN: Objection. Go ahead.
MR. LEACH: And if you can just slow down a little bit, give him time to --
MR. TECHENTIN: Yeah, I think I'm going to object to all of these questions.
Q. (BY MR. LEACH) Okay. With respect to the opinions contained in your report, aside from the ones on validity or obviousness and stuff that relate heavily on an understanding of patent law, you believe that the opinions in your report are accurate, and are they your opinions?
MR. TECHENTIN: Objection.
A. Yes.