UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| MICHAEL BOWLING, a Resident of Arizona, | : | |
| Plaintiff, | : | |
| v. | : | C.A. No. 05-229 S |
| HASBRO, INC., a Rhode Island Corporation, | : | |
| Defendant. | : | |

**OBJECTION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. Rule 56 and Local Rule (Civil) 56, Defendant/Plaintiff-in-Counterclaim Hasbro, Inc. ("Hasbro") hereby objects to Plaintiff's Motion for Summary Judgment. The grounds upon which this objection is based are set forth in the accompanying *Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment* and *Statement of Disputed and Undisputed Facts*.

HASBRO, INC.
By its Attorneys,

Todd D. White (# 5943)
Jeffrey K. Techentin (#6651)
Adler Pollock & Sheehan P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903
(401) 274-7200
Fax: (401) 751-0604/ 351-4607
Dated: July 11, 2006

Of Counsel:

David K. S. Cornwell, Esq.
Tracy-Gene G. Durkin, Esq.
Sterne Kessler Goldstein Fox
1100 New York Avenue, NW
Washington, D.C. 20005

**CERTIFICATE OF SERVICE**

I hereby certify that on this 11th day of July 2006, I caused a true copy of the within to be served on the following individuals by regular mail, postage prepaid:

Craig M. Scott, Esq.
Christine K. Bush, Esq.
Duffy & Sweeney & Scott, Ltd.
One Turks Head Place, Suite 1200
Providence, RI 02903

Of Counsel:

Thomas J. Leach, Esq.
Douglas J. Williams, Esq.
Law Firm of Merchant and Gould P.C.
3200 IDS Center
80 South 8th Street
Minneapolis, Minnesota 55402-2215

David K. S. Cornwell, Esq.
Sterne Kessler Goldstein Fox
1100 New York Avenue, NW
Washington, D.C. 20005

Kathleen A. Mooney

*386978_1*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| MICHAEL BOWLING, a Resident of Arizona, | : | |
| Plaintiff, | : | |
| v. | : | C.A. No. 05-229 S |
| HASBRO, INC., a Rhode Island Corporation, | : | |
| Defendant. | : | |

**MEMORANDUM OF LAW IN OPPOSITION**
**TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. Rule 56 and Local Rule (Civil) 56, Defendant/Plaintiff-in-Counterclaim Hasbro, Inc. ("Hasbro"), respectfully submits this Memorandum of Law in opposition to the Plaintiff's Motion for Summary Judgment.

## I. Disputed Facts Preclude The Entry of Summary Judgment

Summary judgment is entirely inappropriate. Virtually every "fact" upon which the Plaintiff relies in support of his motion is a distortion of the record. The Plaintiff's ambitious but entirely unwarranted spinning of the record evidence in this case, even when accompanied by a self-serving declaration of the Plaintiff himself – offered only after he had safely avoided cross-examination on the matters at deposition – cannot render what is essentially a question of the credibility of the various witnesses into "undisputed facts" that might serve as the basis for summary judgment.[1]

---

[1] The Plaintiff blandly asserts that "[i]nventorship is properly decided on summary judgment," citing to *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1327 (Fed. Cir. 2004) and *Stern v. Trustees of Columbia Univ.*, 434 F.3d 1375, 1377 (Fed. Cir. 2006), to suggest that the Court may now simply review the cherry-picked "record" and make a determination. That is not the case under Fed. R. Civ. P. Rule 56, and nothing about the issue of inventorship of a patent or in the cases cited by the Plaintiff alters the normal Rule 56 landscape. Rather, the Court can only enter summary judgment only where the evidence shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c). In fact, in the

As demonstrated in Hasbro's *Statement of Disputed and Undisputed Facts*, there are insufficient undisputed facts for the Court to make a determination on the issue of inventorship without an evidentiary hearing. *See, e.g., Ethicon, Inc. v. U.S. Surgical Corp.*, 921 F. Supp. 901, 904-05 (D. Conn. 1995) (directing bench trial on questions of inequitable conduct including claims regarding inventorship of the patent in suit). In essence, and as explained more fully in Hasbro's memorandum of law in support of its Motion to Correct Inventorship, the inventorship question here fundamentally raises two questions: (1) who, as between the Plaintiff, Michael Bowling ("Bowling") and Albert Lizarraga ("Lizarraga") conceived of the ideas reduced to claims in the '197 Patent, and (2) whether, even if Bowling had conceived of the idea underlying the '197 Patent, Lizarraga materially contributed to any of the claims of the '197 Patent.

These issues are not resolved by any undisputed facts. For example, the Plaintiff asserts as undisputed the fact that his initial conception was for a die having facets that were identically shaped and of equal surface area. Plaintiff's Br. at 3. The Plaintiff cannot point to any record evidence in support of this, because that was not the Plaintiff's testimony. Rather, the Plaintiff asks that the Court infer, as an undisputed fact, that "[c]onverting rectangular facets into opposing triangle-shaped facets creates facets that are identically shaped and of equal surface areas." *Id.* As a matter of geometry, this is simply not true. A rectangle can be "converted" into any number of "opposing triangles," as shown below:

---

*Linear Tech.* case, the Federal Circuit had reversed a lower court entry of summary judgment precisely because the evidence revealed that genuine issues of material facts precluded the entry of summary judgment. 379 F.3d at 1327.

As demonstrated in detail in Hasbro's *Statement of Disputed and Undisputed Facts*, filed contemporaneously herewith, there are few material facts that the Plaintiff might rely upon that are beyond dispute. Hasbro respectfully suggests that the Court may not adjudicate the question of inventorship of the '197 Patent without the evidentiary hearing requested by Hasbro in connection with its *Motion to Correct Inventorship*. At that point, the issue is a question of law that may be decided by the Court based upon a full record.





Obviously, the resulting triangles have neither identical shapes nor equal surface areas.

Geometry aside, the Plaintiff's description of the record evidence is incorrect. The Plaintiff's resort to inaccurate arguments about geometry is an attempt to suggest that the Plaintiff's testimony, which only described having conceived of a concept of "opposing triangles," really described the full invention of the die, but this is not the case. "Alternating triangles" are well known in dice, and the fact that a die would be based upon triangles with shared sides would be nothing new. The traditional eight- and 20-sided dice consist entirely of "opposing triangles":







(images from "Kevin Cook's (D8) Eight Sided Dice," http://www.dicecollector.com/D8.HTM and "Kevin Cook's (D20) Twenty Sided Dice," http://www.dicecollector.com/D20.HTM). Even if it is true that the Plaintiff initially conceived of using alternating triangles as a portion of his die does not mean that he conceived of the entire invention.

This whole line of inquiry is, however, a red herring. The first fundamental question that this Court must resolve is who conceived of this shape for a playing die:

FIG. 4




And, in the particular context of the Plaintiff's motion for summary judgment on this subject, the corollary question is whether the Court can resolve that question on the basis of facts not in dispute. The answer is plainly that it cannot.

Indeed, the only undisputed facts offered by the Plaintiff are the following:

1. Bowling is an engineer by education.

2. Bowling is the named inventor on a total of eight patents, each of which contains drawings.

3. Bowling attempted to make a die in the form of a segment of a pencil, Bowling found that it was difficult to place legible numbers on the small rectangular facets of the dice that he made, and Bowling testified that he continued to consider the problem of fitting indicia on the facets of elongated dice from until 1997.

4. Bowling testified that he conceived of the concept of using opposing triangles, rather than conjoined rectangles, on his elongated die in the summer of 1997, while driving, and the effect of using opposing triangles would be to increase the surface area (at the triangle's base) for the indicia.

5. Bowling's patented die design is depicted [...] along with a commercial embodiment. To protect his idea, Bowling decided to file for a United States Patent.

6. Bowling hired Lizarraga.

7. Lizarraga has never been named a co-inventor on any patent.

8. Lizarraga came to Bowling's home and met with Bowling.

9. Lizarraga recalled receiving a single sketch from Bowling, and that it was a three-dimensional drawing of a multifaceted die, and that it probably had end caps of some sort.

10. Lizarraga referred to Bowling's sketch and to his explanation for his concept of a natural-crystal-shaped die in engineering the shape of, and consequently producing the drawings of, the die that is the subject of the '197 Patent.

11. An example of the formal drawings Lizarraga provided to Bowling is depicted below Proposed Fact No. 22.

12. Bowling testified that he adjusted the size of the drawings of dice in the drawings presented to Bowling by Lizarraga using a photocopier with the purpose of providing a uniform pattern of sizes for the dice.

13. Bowling paid Lizarraga for the drafting work and did not hear from him for almost eight years.

14. Lizarraga claims to have come up with the idea of identically shaped extension-member facets.

15. Lizarraga also stated that surface area was not a design consideration on his part when he drew the dice.

16. Lizarraga testified that the ratio of the surface area of the end caps to extension member facets [*sic*] was not a design consideration.

17. Susan Lizarraga was not at the initial meeting of Bowling and Lizarraga.

18. Susan Lizarraga had no involvement in Lizarraga's work for Bowling.

19. The patent drawings do not indicate whether Bowling had conceived of the identically-shaped facets or the symmetry of the dice.

20. Bowling's patent attorney, Julie Daulton, testified that she probably received specific information regarding the die [*sic*] from asking Bowling or possibly from the drawings.

21. Julie Daulton testified that her standard practice is to conduct inventorship reviews with clients and that the

Plaintiff signed a declaration that he was the sole inventor of the '197 Patent.

None of these facts disposes of the question of inventorship. The actual record as to who thought of what, and when, is much more complicated, mostly because the Plaintiff's story is impossible to pin down. Before filing suit, the Plaintiff told the world that he had conceived of the patented die shape back in college and that his friends loved it. Confronted with a claim of invalidity based on prior use, the Plaintiff denied having thought of the die shape before the summer of 1997 and denied ever making a prototype of the die or sharing its structure with anyone. The Plaintiff now claims that in 1997 he conceived of the entire die structure, which was going to be the basis for his business plan, but denied at his deposition that he ever even sketched out a die. Rather, he claimed he ***only*** drew out the "image of the opposing triangles" prior to filing his patent application (which, of course, included Lizarraga's drawings of the dice, not the Plaintiff's). Now the plaintiff claims to have drawn a die and to have given a drawing of that die to Lizarraga. Plaintiff's Br. at 4.

Even the Plaintiff's explanation for how he conceived of the various aspects of the die makes no sense. The plaintiff claims to have included the end caps because they prevented the dice from landing on end, made them more attractive, and made them bounce more. But the Plaintiff had never made a prototype, and had never even drawn out a complete die, so it is highly unlikely that any of these claims are true. How could he have concluded that the dice would be more attractive with end caps without drawing them out? More attractive than what? Likewise, what did they bounce "more" than? How did he know that?

Most importantly, in order to prevail, the Plaintiff must have done more than merely conceive of using "end caps": he had to conceive of the precise end caps claimed in the Patent. None of the Plaintiff's purported "undisputed facts" meets that burden, except "fact" number

seven, in which the Plaintiff claims to have drawn a complete die and to have given that drawing to Lizarraga. As explained previously in Hasbro's *Reply Memorandum in Support of Motion for Leave to Amend Counterclaim and Affirmative Defenses*, this claim is not an undisputed fact, but rather a complete fabrication.

The drawing that Bowling now claims to have given to Lizarraga was one of three that Bowling drew at his deposition:



The three drawings depicted, in sequence (1) a prototype die that Bowling testified he had conceived of years before he had the idea for the patented dice, (2) the "concept of opposing triangles" that is reflected in the patented dice, and (3) the completed die design that is now reflected in the '197 patent. Bowling volunteered drawing number one as background; drawing number two reflected what he had given Lizarraga, and drawing number three – the one included in Bowling's declaration and Memorandum – is a completed die design that Bowling testified unequivocally he did ***not*** give to Lizarraga.

The deposition transcript reflects this sequence clearly. Hasbro asked Bowling what he'd drawn when he went to Lizarraga (emphasis added):

> Q. What did you sketch? What type of die?
>
> A. **It wasn't a die type. It was just -- it was more the image of the opposing triangles.**
>
> Q. Can you draw for me what you mean by that?
>
> A. Yeah. See, what I had was this, right, and it would go around the page, so this may be a three, this might be four, right. But, I

thought, why can't you take this same, right, and to simplify it, if you make it -- if you went here, this drives home the point of all of the room. Now you could do this.

But to make it to show how it would actually be laid out on the die, right, it might be more like this. This being here. This being part of, you know what I mean, there's another part that wraps around here that's like this, see, you know, the wraparound.

So what I did was I took this that had a small surface area, you can't hardly make a number legible to something that's doubled or more my size. Now I can draw a big number. Now I can apply this to a D20.

Q. Okay. Just so the record is clear, could you just put a number one next to the first figure that you drew there.

A. (Witness complies.)

Q. And that, if I'm correct, is the one that you were using to describe the prototype dice that we've looked at, correct?

A. Yes, correct.

**Q. And can you put a number two next to the next drawing?**

**A. (Witness complies.)**

**Q. And if I understand that correctly, that's the drawing that you were using to describe the concept of using opposing triangles, correct?**

**A. Yes.**

Q. And if you could put a number three next to the third drawing you did there.

A. (Witness complies.)

Q. That is your representation of more of the practical application of crystal die design; is that correct?

A. Mm-hmm.

Bowling Dep. at 83:5-84:24.

Bowling did not give anything like the third drawing to Lizarraga, but rather an "image of

the opposing triangles." Placing that drawing next to the completed mechanical drawing included in the patent provides an enormously different context for Lizarraga's testimony that he independently created the regular, symmetrical geometric shape that is embodied in the '197 patent:






Doubtless, the Plaintiff would counter the Lizarraga recalled that the drawing that he had been given by the Plaintiff likely included some depiction of end caps. However, even if Bowling had drawn end caps of the type that Lizarraga included in his drawings on the "image of opposing triangles," he would not have made the drawing of a complete die that he now claims to have given Lizarraga:



And again, the Plaintiff ***affirmatively denied*** ever having drawn a complete die prior to submitting his patent application. Moreover, Lizarraga's recollection of the Plaintiff's sketch was markedly different from the Plaintiff's, describing it as a "natural crystal shard," which was irregularly-shaped. Bowling's proffered undisputed facts make no allowance for this discrepancy, which amounts to a disputed, material fact. *See* Deposition of Albert Lizarraga at 12:19-13:1 **(Exhibit A)**. Hasbro's point in describing the evidence available to the Court is not to suggest that ***this evidence*** definitively shows that either Lizarraga or Bowling was the inventor

of the die, but rather to show that the Plaintiff is overreaching in his depiction of the relevant facts as "undisputed."

As noted, one glaring omission in the Plaintiff's moving papers is Lizarraga's basic testimony: that Bowling approached him to design and draw a die in a natural crystal shape, and that Lizarraga only delivered the actual patented shape after trying unsuccessfully to design what Bowling had requested from him. This is the fundamental question the Court must address in the context of this inventorship proceeding. Is Lizarraga correct in his description of his work for Bowling, or did Bowling fully describe the die construction to Lizarraga? Although Bowling is far from credible, extrinsic evidence also suggests that Bowling's version of events regarding the content of Bowling's and Lizarraga's first meeting is inaccurate. If Bowling's version of events is accurate, other facts simply do not fit and cannot be explained. Why did Lizarraga waste hours trying to engineer a die shape that Bowling didn't want in the first place? And why did Bowling pay Lizarraga for the time he spent trying to engineer a die in a "natural crystal shape," if he had described the die to Lizarraga "in detail" during their first meeting? If he had conceived of the entire die shape, why didn't Bowling ever sketch out an entire die? Why doesn't Bowling have a scintilla of evidence to corroborate the fact that he had, in fact, designed the die?[2]

---

[2] A review of the basic timeline reveals how unlikely it was that Bowling would have created the entire die design, drawn it numerous times, and yet have no evidence to support that claim. Bowling needed to create the die in connection with his masters thesis in mid- to late 1997. The die shape was to be the cornerstone of his new business plan, selling a revolutionary new shape of polyhedral dice. Bowling saved records from his preparation of the business plan, including notes showing his conception of the "Crystal Caste" name and logo. *See, e.g.*, B00773 (**Exhibit B**). Bowling claimed to have gone to patent attorneys even before submitting his masters thesis, and presumably would have shown his attorneys information to corroborate the fact that it was his own invention, or to show the scope of the invention, and yet no records have been produced that suggest Bowling gave anything except Lizarraga's drawings to his attorneys. Moreover, even if he had not given such drawings to his attorneys, he should have known that they would be important records no later than August of 1999, by which time he knew that Hasbro was manufacturing a die that he considered to infringe on his patent. At what point would Bowling have discarded his original drawings? While he was waiting for Lizarraga to produce mechanical drawings? While he was writing his masters thesis? While his patent application was pending? When he knew about Hasbro's "infringement?" After he filed suit?

As explained below, Bowling is simply not a credible witness, and his self-serving statements (both at deposition and in his after-filed declaration) cannot be believed. He has a clear and unmistakable history of misstating the truth about his dice, his patents, his purposes, his ideas, and his actions. Lizarraga, by contrast, is entirely credible, a designer with dozens of years' experience working for major defense contractors. His testimony is consistent, considered, and ultimately believable. This is the first task for the Court: to choose between the testimony of Bowling and that of Lizarraga.

Determining the relative credibility of Bowling and Lizarraga is not, however, the Court's only task. Even if Bowling is entirely believed in his story, the applicable legal standards require this Court to determine if Lizarraga made any material contribution to any of the claims of the '197 Patent. As explained in Hasbro's memorandum of law in support of its Motion to Correct Inventorship, Lizarraga's contribution to Claim 16 of the '197 Patent is unmistakable. Claim 16 refers to the ratio of the surface areas of the end cap facets and the extension member facets. A review of the specification reveals that the relative surface areas for the preferred embodiments was taken directly from Lizarraga's work product and transposed into Claim 16. Bowling's sole response is to allege that the "sketch [provided by Bowling to Lizarraga] combined with the overall dimensions provides for the size of the end caps and extension members, their areas, and the ratios between the two." Plaintiff's Br. at 14-15.

There are two fundamental problems with Plaintiff's analysis on Claim 16. First, it relies on the credibility of Bowling's statement that he gave a complete sketch of a die to Lizarraga, which Bowling denied having done before inventorship was at issue. Essentially, the Plaintiff is putting the rabbit in the hat: if he gave the complete design to Lizarraga, then Lizarraga was working with the complete design. But there is ***no evidence*** to show what Bowling actually gave

Lizarraga as far as a sketch was concerned, and the ***only evidence*** available shows that Lizarraga, and not Bowling, determined the relative sizes of the end cap facets and extension member facets. *See, e.g.*, Lizarraga Dep. at 49:14-24; 54:15-55:11; 61:21-62:21; 63:24-64:2.

Second, Bowling assumes that the drawing had a degree of precision that would allow Lizarraga to measure the size of the end caps based on the drawing and an overall diameter.[3] That is not in evidence, and the crude hand-drawn sketches that Bowling performed at his deposition (depicted above) suggest that it is highly unlikely that Lizarraga could have done so even if he wanted to. Lizarraga testified that it was, in fact, the case that the sketch was crude:

> Number one, the sketch wasn't defined to the point that anybody could take that and just go run off and draw the thing up. So it was a concept just like engineers give you, here's an idea. But again, the fact that it looked like trying – for me to reproduce something that looked like a natural crystal and have it balance, I couldn't do it.

Lizarraga Dep. at 21:7-13.[4] Bowling's testimony in this regard is critical. After Bowling had testified that he did not recall if his initial sketches given to Lizarraga had any information about the length of the dice, their diameter, or the relative sizes of the extension member and the end caps, Hasbro asked "When did you communicate that to Mr. Lizarraga?" Bowling's response was "I think what he did was he just generated some drawings based on my sketches, and they looked good to me, so I went with them." Bowling Dep. at 189:2-18 **(Exhibit C)**. Thus when asked at what time he gave Lizarraga the information that Bowling now unambiguously claims he gave to Lizarraga, Bowling ***did not*** testify that had had given that information to Lizarraga at

---

3 It is ***not*** undisputed that the drawing provided by Bowling actually had an overall dimension or a diameter. *See* Response to Proposed Fact No. 19.

4 Bowling admitted that the information he gave Lizarraga was far from definite. With respect to overall dimensions, Bowling testified "I think I just said – you know, I had a sketch and said, "Make them about this big." You know, I may have said approximately a half inch, three quarter inch. I don't know that I – I honestly don't recall." Bowling Dep. at 184:22-185:2 **(Exhibit C)**. He also testified "I don't believe I actually gave him specific length as much as drew them for him." *Id.* at 189:4-5.

their initial meeting or through his original drawing. Rather, Bowling admitted that it was Lizarraga who came up with the dimensions, including relative dimensions.

With respect to Claim 16, there is a clear and believable explanation for its inclusion in the patent. Bowling did not specifically conceive of the relative surface areas of the extension member facets and end cap facets. Lizarraga had to do so; not intentionally, but by default his creation of the dice yielded a measurable ratio between the two surface areas. Bowling's attorney, armed with Lizarraga's drawings, elected to insert a claim into the patent application that claimed the ratios that had been discovered through Lizarraga's engineering of the dice. To compute the ratios to be claimed, she simply measured the drawings, Lizarraga's drawings. If she performed an inventorship review with her client, Bowling, she either did not discover that Bowling had presented Lizarraga's work product as his own or did not inquire into the nature of the information that Bowling had provided Lizarraga. In the context of this "simple" patent application, that oversight might be understandable; or perhaps she asked and Bowling elected not to tell her about Lizarraga. But Bowling elected to include Claim 16, and Claim 16 is unmistakably the result of Lizarraga's work even if Bowling had explicitly and unambiguously defined the rest of the patented idea. As such, Lizarraga is a co-inventor of the patent.

## II. Bowling Is Not Credible

Bowling's motion for summary judgment relies almost exclusively on his own testimony. He has no evidence of his conception of the idea other than his own testimony: not a drawing, a sketch, a prototype, a friend who can corroborate, records from his attorneys; in short, nothing. Lizarraga testified that Bowling's concept, at the time they first met, was for a natural crystal-shaped die, asymmetrical and irregular, and that Bowling's sketch reflected that concept. To counter Lizarraga's testimony, Bowling offers nothing more than his own story and the

argument, essentially, that he knew that "the die must be symmetrical and have facets of identical shapes and equal surface areas for the die to generate random numbers." Plaintiff's Br. at 18.

Of course, it is not necessarily the case that a die must be symmetrical or that its facets must be identically shaped and of equal surface areas in order for it to function properly. All that is required is that the die be engineered in a way that it is equally likely for it to land on any given facet. The collection of Plaintiff's dice expert, Kevin Cook, contains numerous examples of dice that do not meet either criterion:




(Images taken from "What Shapes do Dice Have?," http://www.dicecollector.com/diceinfo _how_ many_ shapes.html) (**Exhibit D**). Nor is it impossible to have irregular dice that are fair. One leading expert on dice, Ed Pegg, Jr.,[5] opines that the dice below are "fair enough," despite their irregularity, although he acknowledges that the surface on which the dice are thrown can affect the likelihood of the 5 or 7, respectively, turning up.

---

[5] Ed Pegg Jr. is the webmaster for mathpuzzle.com. He works at Wolfram Research, Inc. as an associate editor of MathWorld, and as administrator of the Mathematica Information Center. Wolfram Research's MathWorld is one of the reference sources relied upon by the Plaintiff's expert, Kevin Cook.



*See* "Math Games: Fair Dice," http://www.maa.org/editorial/mathgames/mathgames_05_16_05.html (**Exhibit E**).

These dice disprove Bowling's assertion that "of course" he understood that the dice ***had to be*** regular and symmetrical. It is entirely possible, and indeed highly probable, that Bowling sought to create a truly innovative die for his new company, one that really was "crystalline," and one that was irregular and yet fair. To do that, he sought out and engaged the services of a designer working for a major defense contractor, and ultimately paid him more than $2,000 for his services. Working under the impending deadline of his masters thesis (*see* Bowling Dep. at 109:3-110:13) (**Exhibit C**), and having no alternatives, Bowling accepted what was given to him: an A-B symmetrical die that he could call "crystal shaped."

That is not Bowling's story, however. Rather, he testified that he invented the dice in a flash, what he described as an "epiphany." No mathematics, no physics, no calculations, no sketching, no modeling, no testing. The idea, like Athena from the head of Zeus, was born fully developed and required no refinement. This idea he communicated entirely to Lizarraga, who did nothing more than draw straight lines where Bowling's hand had been inadequate to the task. In this, as in virtually every other important aspect of Bowling's testimony, he is simply not credible. Bowling's various explanations about his dice have been so inconsistent, incomplete, and deceptive that he simply cannot be believed.

**A. Bowling Testified Misleadingly About His Own Prior Statements About The Origin of His Dice**

Before filing this suit, Bowling publicly proclaimed that his idea for his "new dice shape"

came from his playing Dungeons & Dragons in college, years before his alleged epiphany. *See, e.g.*, Bowling Dep. at Exhibit 5 (**Exhibit F**). In one interview, he talked about having come up with a completely new geometric shape for dice as a game enthusiast during college:

> Where to begin, well the company founded in 1997 and was the result of a thesis project for my MBA. I came up with a completely new geometric shape for dice as a game enthusiast during college. Put on a shelf, the design was revisited when I needed a topic for my MBA thesis years later. The shape is placed prominently in the Crystal Caste logo to show where it all began.

Confronted with this statement, and insisting that he had not, in fact, come up with the idea for his "crystal" dice "during college," Bowling could not bring himself to admit that the statement was incorrect. Instead, during his deposition, Bowling freely admitted having made the statement, but claimed that the first reference to a "completely new geometric shape" referred to the pencil-shaped dice he claims to have created years before his "crystal" dice, even though the pencil shape dice weren't a new shape at all. Bowling Dep. at 131:1-13 (**Exhibit C**). Then he explained that the second reference to the "design" also referred to the pencil-shaped dice, but the third reference to the "shape" meant his "crystal" dice, the shape of which is, in fact, contained in the Plaintiff's business logo. *Id.* at 132:14-134:1.

The Plaintiff's story is incredible. If he did not, in fact, invent the "crystal" dice back in college, Bowling's interview statements were likely just advertising puffery, but Bowling, under oath, tried to dance around admitting that he was either incorrect in his public statement or incorrect in his deposition testimony. So he claimed that he had not been talking about the "crystal" shape when he talked about a "completely new geometric shape" rather than admit that years before, he had stretched the truth to make a good advertising point.

**B. Bowling Misled His Own Customers About His Design Mistake**

Bowling's initial production run of ten-sided dice bore indicia from one to ten, whereas

traditional ten-sided dice are marked zero through nine, so that they can be easily used in pairs to determine values from one to 100 (*e.g.*, "9" and "0" combine to make 90, "0" and "3" to make three). Rather than admit a mistake to his potential clientele, when the error was pointed out to him he decided to tell customers that he had intentionally numbered the dice from one to ten in order to create a buzz over the product. Bowling Dep. at 107:10-24. Bowling takes his deception as a point of pride. *Id.* ("It was a great selling point.").

### C. Bowling Signed An Inaccurate Interrogatory Response to Support His Claim of Marking His Dice

Knowing that he is not entitled to damages for any infringement that occurred prior to providing Hasbro with actual notice of his contention of infringement unless he had consistently marked his dice with the patent number, Bowling again misrepresented the facts to create the impression that he had complied with the marking statute, 35 U.S.C. § 287(a). In Bowling's sworn interrogatory response, in which he explained his purported compliance with the marking statute, Bowling claims that "the patented dice were sold loose in bags of 50 pieces" and that "[e]ach bag included a sticker bearing the '197 patent number and instructions to place it on any display where the patented dice were sold." Response to Interrogatory No. 21 (**Exhibit G**). Bowling may have sold bags of 50 dice, but his sales records reveal that he also sold dice in other, much smaller quantities. Even during the short three-month span identified as Bowling as "relevant" to his marking activities, the invoices produced reveal that Bowling was selling the patented dice in various quantities (10, 13, 21, 25, 50, and 100) and that his basic quantity for sales was ten, not 50. *See* Invoices dated from August 17, 1999 through November 3, 1999 (B03226, B03227, B03230, B03242, B03253) (**Exhibit H**). Bowling's interrogatory response, issued before the invoices were produced to Hasbro, both (1) fails to account for his having shipped patented dice in these quantities, and (2) does not even claim that Bowling was packing

quantities of 10, 13, or 21 dice in the same manner as his supposed packs of 50. The significance of this misstatement lies in the fact that Bowling seeks to have the Court conclude that he followed a plan that would result in his dice being sold consistently with the patent information displayed with the dice. Bowling thus describes, in his interrogatory response, a simple and straightforward distribution program that he involved a simple and consistent "marking" scheme. However, because Bowling was in fact selling in much smaller quantities than those claimed in the interrogatory response, it would have been much more burdensome to ensure that all of his sales included the referenced patent labels. It would therefore be less likely that Bowling would have actually followed his stated plan. To avoid the risk that the Court might conclude that he didn't actually follow this plan, Bowling was willing to sign a declaration, under oath, that the Interrogatory response was correct before he knew that Hasbro would have available to it the sales records that would reveal that the truth was, in fact, far different.

### D. Bowling Deceived The Patent Office In His Patent Application

In the draft language for the patent, submitted to the U.S. Patent and Trademark Office, and ultimately in the published '197 Patent, Bowling misleadingly told the Patent Office that his die design was advantageous, suggesting that he had done testing to compare his die design with existing dice when, in fact, he had done no such thing. In the Detailed Description of the Preferred Embodiments, Bowling states ('197 Patent at Col. 4, Lines 39-54; emphasis added):

> The inventor ***has discovered*** that the configuration of the die 20 is advantageous. In particular, the shape of the end caps 24, 26 ***provides for more bounce*** when dropping die 20 onto a surface. That is, to generate a random number, the user holds die 20 above a surface at a sufficient distance, such that when die 20 is dropped onto the surface, die 20 rolls before eventually resting upon one of the facets 32 of the extension member 28. The number or indicia 30 displayed on the facet 32 which is in the uppermost position is the number which has been randomly generated. The shapes of the end caps 24, 26 ***provide for more bounce and randomness*** when

> die 20 is dropped onto a surface. The tapered, triangular shapes of end caps 24, 26 provide for surfaces which can abut and engage the surface on which die 20 is being dropped, to create ***a more interesting and amusing outcome.***

Of course, Bowling could have no idea what the actual "outcome" of rolling his dice might be, whether they would be more random than, or bounce more than other existing dice because Bowling had ***never actually made*** a prototype of his dice. Without a prototype, Bowling could not have performed the sort of comparative analysis that he implicitly described to the Patent Office. Without such an analysis, Bowling's statements to the Patent Office were rank speculation clothed as actual knowledge based on observation. These statements were and are misleading.

### E. Bowling's Recent Declaration Is Inconsistent With Prior Deposition Testimony And Contains Half-Truths

Bowling's post-deposition Declaration, offered in support of his memorandum of law in opposition to Hasbro's motion for leave to amend affirmative defenses and counterclaims, (Exhibit B to his Statement of Undisputed Facts) contains numerous misstatements, despite being offered under oath. First, he claims that he had "sketched the die disclosed and claimed in my '197 patent before contacting and meeting with Mr. Lizarraga." Declaration of M. Bowling at ¶ 1. This is not true. In his deposition, he testified unambiguously that he had ***never*** sketched such a die before filing his patent application. Bowling Dep. at 97:12-98-5. The patent application, of course, contained Lizarraga's drawings, so could not have been submitted prior to Bowling having met with Lizarraga.

Second, Bowling self-servingly and misleadingly describes his own experience with dice design. He states that he has "been designing dice for 20 years," but that is incorrect. *See* Bowling Declaration at ¶ 4. Bowling has "created" two designs for dice. The first was for a die in the shape of the barrel of a pencil, which Bowling now acknowledges was not an original

design. Bowling Dep. at 132:10-13 (**Exhibit C**). At his deposition, he testified that he had that idea somewhere around 1990. *Id.* at 61:23-62:1. The second design was for his "crystal" dice, which are now described in the '197 Patent, which he claims to have conceived of in 1997, but Bowling testified that he did ***nothing*** to design dice between those two timeframes. *Id.* at 96:23-97:2 (Bowling did no sketching of any conceived-of die designs "until my epiphany."). There is no evidence that Bowling has conceived of any other die design since creating the "crystal" dice. None of his eight patents is for a die design other than traditional dice shapes and the "crystal" die design. In short, Bowling has not been "designing dice for 20 years." A more fair statement would be that at two points in the past 20 years, Bowling had an idea about making a new-shaped die.

In an attempt to paint himself somehow more capable of designing the crystal dice than was Lizarraga, Bowling next states that in "designing dice, I draw on my technical education and specifically my courses in mathematics and physics." Bowling Declaration at ¶ 4. This, too, is misleading at best. Bowling has never designed dice by sitting down with pencil and paper, calculating the proper arrangement of lines, corners, and facets to create a new die. Rather, he has simply come up with the ideas, if he is to be believed in his deposition testimony, in a flash. First, he observed a pencil, and thought the beveled cylinder could be used for a die. Bowling Dep. at 57:13-59:10. His conception of the "crystal" dice was even less complex. Bowling testified that while driving, he had an epiphany that revealed to him the entire concept of the new die shape. Bowling Dep. at 70:19-71:5 ("it truly was an epiphany, just like looking at the pencil."). Bowling "drew on" neither math nor physics, nor engineering, nor his technical background.

Finally, Bowling's declaration entirely fabricates the information he now claims to have

given Lizarraga. Bowling also now claims to have told Lizarraga that he needed the drawings for a patent application, but he did not testify to that effect at his deposition. *See* Bowling Dep. at 101:19-24. He claims to have given him a sketch of a complete die, when Bowling had previously testified that he had never even drawn a complete die. *Compare* Bowling Declaration at ¶ 8 *with* Bowling Dep. at 98:2-5. He claims to have "explained to Mr. Lizarraga that the die had to be symmetrical to generate random numbers." At his deposition, Bowling only testified that he gave Lizarraga a sketch, saying "This is kind of what I want." Bowling Dep. at 101:19-24.

## CONCLUSION

There are insufficient undisputed facts for the Court to enter summary judgment. Based upon the "rule of reason" analysis that the Court must employ to examine the question of inventorship, the evidence, both of record and that Hasbro anticipates introducing at the requested evidentiary hearing, clearly and convincingly shows that Lizarraga was either the true inventor or, at a minimum, a co-inventor of one or more claims of the '197 Patent. Hasbro therefore respectfully asks that the Motion for Summary Judgment be denied and that the Court grant Hasbro's Motion to Correct Inventorship.

HASBRO, INC.
By its Attorneys,

Todd D. White (#5943)
Jeffrey K. Techentin (#6651)
Adler Pollock & Sheehan P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903
(401) 274-7200
Fax: (401) 751-0604/ 351-4607
Dated: July 10, 2006

Of Counsel:

David K. S. Cornwell, Esq.
Tracy-Gene G. Durkin, Esq.
Sterne Kessler Goldstein Fox
1100 New York Avenue, NW
Washington, D.C. 20005

**CERTIFICATE OF SERVICE**

I hereby certify that on this 10th day of July 2006, I caused a true copy of the within to be served on the following individuals by regular mail, postage prepaid:

Craig M. Scott, Esq.
Christine K. Bush, Esq.
Duffy & Sweeney & Scott, Ltd.
One Turks Head Place, Suite 1200
Providence, RI 02903

Of Counsel:

Thomas J. Leach, Esq.
Douglas J. Williams, Esq.
Law Firm of Merchant and Gould P.C.
3200 IDS Center
80 South 8th Street
Minneapolis, Minnesota 55402-2215

David K. S. Cornwell, Esq.
Sterne Kessler Goldstein Fox
1100 New York Avenue, NW
Washington, D.C. 20005

*386828_1*