# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF RHODE ISLAND

| | |
|---|---|
| MICHAEL BOWLING,<br>a Resident of Arizona,<br><br>Plaintiff,<br><br>vs.<br><br>HASBRO, INC.,<br>a Rhode Island Corporation,<br><br>Defendant. | Case No.<br><br>05-229S |

DEPOSITION OF STEEN JENSEN
April 14, 2006
San Francisco, California

Reported by:
EMI ALBRIGHT
RPR, CSR No. 13042
Job No. 2421



e13b8d66-3b3e-473d-91dc-f216c3eff7cb

San Francisco, California, April 14, 2006
9:09 a.m. - 12:07 p.m.

STEEN JENSEN,
having been first duly sworn, was examined and testified as follows:

EXAMINATION
BY MR. TECHENTIN:
Q Good morning, Mr. Jensen. Again my name is Jeffrey Techentin, and I am here today representing Hasbro Incorporated in connection with a lawsuit brought by Michael Bowling, an individual resident of Arizona, against Hasbro Incorporated.
Before we get started I would just like to set out a little bit of the ground rules, if you will, for a deposition. And we talked about this a little bit before we started this morning but I just like to go over that again. You understand that your role here today is to give testimony in the matter of Bowling versus Hasbro?
A Yes.
Q You understand that the testimony you have to give is pursuant to the oath that you have just taken?
A Yes.
Q And just so you understand, the testimony and the



oath that you have given is for all intents and purposes just as if you were giving it in a court of law; do you understand that?
A Yes.
Q The format again is question and answer. So I will ask you a question, and subject to the oath that you have just taken, you need to give an answer to that question. Do you understand that?
A Yes.
Q If for any reason you don't understand a question that I offer or if you don't hear my words or if you have any problem with the question, please let me know that; okay?
A Okay.
Q And because you are doing very well at this, but I will just say this is being recorded stenographically, so it is important that if I ask a yes or no question or if your answer is yes or no that you actually say yes or no or respond verbally as opposed to nodding your head or uh-huh type responses. Do you understand?
A Yes.
Q Because if you don't do that, the record won't be clear as to what your testimony is; okay?
A Yes.
Q Can you state your name for the record, please?
A Steen Jensen.



Q Where do you live?
A Over in Berkeley, 1709 Curtis Street in Berkeley.
Q By whom are you employed?
A Games of Berkeley.
Q What do you do for Games of Berkeley?
A Mostly I am a buyer. I maintain the inventory in about half the store.
Q What is Games of Berkeley?
A Tabletop game store. We sell anything from chess to kind of some of the tabletop miniature games in the back of the store and anything in between including Hasbro.
Q Is this a single store business?
A Yes.
Q And can you describe generally your duties for Games of Berkeley?
A I work part time. I am a struggling writer and this is my day job. And I come in the afternoons and I go down in the basement and I see what is sold over the last few days and put together orders and send them off to distributors for the most part. Part of the ordering I handle is distributor orders. And then I do other jack of all trade chores for the owner. I am an old friend and he makes use of me for various projects he wants to pursue.
Q What is the address of Games of Berkeley?
A 2151 Shattuck Avenue over in Berkeley.



Q How long have you worked for Games of Berkeley?
A Let's see. This is three years.
Q Where did you work prior to that?
A Before I worked at Games of Berkeley, I spent about a year and a half driving a truck doing medical deliveries. Before that I worked for Berkeley Topline. Before that I worked for Berkeley Game Distributors. Both of the last two are distributors or were distributors.
Q What is Berkeley Game Distributors?
A Let's see. I believe it's started -- I started there in about 1989 and worked there until it was bought by Topline. And it was -- it was pretty much the sort of company I am buying from now, distributor, tabletop distributor, most what we call the back of the store games, the miniatures, the dungeons and dragons type game, role play games, things like that. And old fashioned distributor. We get the case lots, break them and we ship individual pieces off to the stores and bundled together into big orders.
Q And just if I could ask you to try and keep your voice up a little bit so the court reporter can hear your answers, that would be terrific.
A Okay.
Q When did you -- you said you started working for Berkeley Game Distributors in about 1989?
A 1989 as best I can recall.





e13b8d66-3b3e-473d-91dc-f216c3eff7cb

Page 10

Q And do you recall when they were purchased by Topline?
A I think was about '97, though, yeah, good guess would be about '97. I don't recall -- I don't recall -- maybe '96. I think it was '97.
Q And was your employment continuous at Berkeley Game Distributors and then Berkeley Topline?
A Yeah, I took a month off and went with my family to Europe. But, yeah, other than that it was a transition from one to the other pretty smoothly, pretty much the same duties as well.
Q When did you stop working for Berkeley Topline?
A Let's see. Was that fall of 2000? I just burned out and I believe it was the fall of 2000, maybe 2001. I could work back but I believe it was 2000.
Q Did you have more than one position at Berkeley Game Distributors and Berkeley Topline?
A Yes.
Q What positions did you hold for those companies?
A See, I started out in Berkeley -- well, first of all, it was a start up distributor so everyone did everything. I was up packing boxes and whatever needed to getting done. Mainly, though, I help with the receivables. And I went from there to pretty much handling receivables and went from there to ordering product, which probably the thing

Page 11

best to do. And I would say again all the while sort of doing other things that needed doing around the warehouse. But those were my main duties. That's Berkeley Game Distributors. Berkeley Topline was pretty much all ordering.
Q What were your job duties as a purchaser for Berkeley Topline?
A Maintaining inventory mostly.
Q How did you do that?
A I had a monthly cycle of inventory. Yeah, had monthly cycle of inventories. I had a clip board system where I went out and did physical counts. And about every month I would order product if I thought it was necessary. Also one of the sales guys was screaming, running out of stuff, I would jump on it, make sure we got it. Kind of kept an eye on inventory systems too.
I had a system, go out, kind of eyeball what was selling, looked at sales reports and filled gaps that came up. When new product was solicited, I would look at preorder numbers and decide how much extra we got and try to pick a number that would not bury us in the product while at the same time not running out. Inventory management, you know, keep as lean an inventory as you can so you get as many turns you can a year on your product.
Q Were you the only one at Berkeley Topline who held that position?

Page 12

A Let's see. It varied. Towards the end I was -- under Berkeley Topline I was in charge of most of the table game ordering. There was kind of a collectable card thing, both sports cards and these magic -- collectable card games that other people handled. But most of everything else was responsible for.
Q Would that include dice?
A Yeah.
Q So you were the only one who was responsible for buying dice on behalf of Berkeley Topline?
A Yes.
Q That was true until you left?
A Yes. Yes. When I left, I had two or three people that were working for me, but I believe I was still ordering the dice at that time, strongly believe, yeah.
Q You mentioned that you would do physical counts of inventory. Can you explain how you did that?
A Well, I had a clip board system with basically a graph paper and columns for on hand quantities. And I would take the clip board out with a pen and I just go to the section of the warehouse where product was on the shelves and I do physical counts, six of these, six of these, seven of these. And dice, I would just count through and see how many dice we had. Sometimes I would gauge by, well, there is not many left in the bin so I will get another bag of hundred.

Page 13

But sometimes I did actual counts on the dice.
Q You and I previously talked on the phone; is that correct?
A Yes.
Q And during that conversation I asked you some questions about a declaration that you had made in this case. Do you recall that conversation?
A Yes.
Q And I also asked you about your activities with respect to being a buyer at Topline. Do you recall that?
A Not in detail but, yeah, I remember the conversation.
Q You provided me with some information about your role at Berkeley Topline during that conversation; correct?
A Yes.
Q And were your answers to me or was the information that you provided to me accurate?
A Well, I mean, as far as I know now -- and at the time I may have misspoke, but I don't recall -- as far as I know it was accurate.
Q Have you done anything since -- this telephone call happened a couple weeks ago; is that correct?
A Yes.
Q And that was after you had made a declaration in this case; correct?





e13b8d66-3b3e-473d-91dc-f216c3eff7cb

Page 22

Mr. Bowling had a set like that for his --
A I don't see in my mind's eye.
Q -- for his Crystal Caste? I need to try and finish asking my question.
Can you describe for me how Berkeley would order dice from Mr. Bowling?
A Do my inventories, go with my clip board. And I don't recall whether I actually physically counted his dice. Actually now that I think, I don't believe I did. I think I just looked in the bins. And when I saw there were 10 or less or something, I would order another bag. And I believe normally dice come in bags of 100. I think his might have been less, 50. But I would order little packages of dice, refill the bins with them, whenever I saw. And I probably did that on a monthly cycle. I would go out and check to see if I needed more along with my normal sort of just snooping the shelves and looking for runs on product.
Q Looking for --
A You know, somebody ordered like 30 of one of the dice and I would pick it up to check in sales reports or going out and seeing there was an empty bin out there. I called it walking the stacks.
Q Do you recall what level of inventory Berkeley would try to carry for these dice?
A Yeah, I think I was happy if I had in the 20s,

Page 23

30s. So if I brought in a bag of 50 or whatever, they came in, it started getting below that, I would worry. If it went below 10 or something, I would order another bag. I think it was bags.
Q Explain the process by which inventory would be stocked at the Berkeley warehouse.
A You mean when we received it?
Q Yes.
A We had a receiving department. Product would come in boxes from UPS usually. Boxes would be unpacked by the fella who did the receiving. He would log it in or check the packing list, send a copy of the packing list to our payables who would match it with invoices and then pay the bill. I would get a copy of the packing list so I could log it on the inventory sheets that the product had been received. And then he sort of did the paperwork. He would either carry the product to the shelves and put it in place or he would have one of the other warehouse guys do it.
Q Did you ever perform that function yourself?
A In the early years, yeah, and occasionally later on, though less under Topline than under Berkeley.
Q Did you ever do that for the Crystal dice?
A Not that I recall. That's one reason I am not -- the packaging is a little suspect. My memory of how it was packaged whether they were 50 packs or what, I never saw them

Page 24

arriving. I just ordered them. So I have to rely on my memory of how many I ordered rather than sort of a visual memory of some little pack of dice.
Q How were the dice stored at Berkeley?
A They had these little trays. They were about yeh by yeh and about that high.
Q Just so the record is clear you are indicating it's about 6 or 7 inches square?
A Well, they would be about 7 inches long, 6 inches long, some of them are more like 4 inches long and, say, about 3 inches wide and about 2 inches high. And they were just little trays for holding dice.
Q That's the bin you were referring to before?
A Yeah, those are the bins.
Q Is that the only way in which you stocked the dice?
A Yeah, it was just too handy. It was perfect for holding dice. And I don't recall storing dice of any sort any other way other than the packaged ones, the seven packs you mentioned earlier. They would come in tubes and we would sometimes put those in small white boxes.
Q What would happen with packaging that you received from Mr. Bowling?
A Usually the dice would come in small plastic bags, and those bags would be torn open and the dice would be

Page 25

poured into the bins and the plastic bag would be thrown away.
Q How would Berkeley fulfill an order for Crystal Caste dice for one of its customers?
A An order would come in and it would say I want six 10-siders and six 6-siders. And whoever was pulling the order would go back to those bins and just pull out six dice. And usually they used one of the bins themselves and they just put all the dice into that bin and then take it over to the packing tables. And there would be a checker who would come by and double check their -- and then it would be packed up and sent off to the customers.
Q How many dice of these Crystal dice would typically be ordered by one of your customers?
A Oh, again I didn't do much order pulling. But somewhere anywhere from like one to ten. Depended on the inventory management of the particular store.
Q What --
A Sales.
Q What percentage of Berkeley's customers would order in quantities of 50 or more?
A Order 50? I can't think of a single one. I don't have any recollection of an order that big. There were occasions -- I don't think they were touched on the Crystal Caste's, but there were occasions where a customer would say,





e13b8d66-3b3e-473d-91dc-f216c3eff7cb

A No. 2 on the document probably should have read, Berkeley Game Distributors and Berkeley Topline Distributing. Berkeley Topline came in '98 or '97. And kind of wish I had noticed that before.
BY MR. LEACH:
Q Are there any other changes?
A No.
Q So you still believe this document, aside from paragraph 2 and the correction you just made, is accurate?
A Yeah, especially after having finally got a look at this invoice and seeing the fax date on it.
Q So when you said earlier you were relying on my honor -- I think that's the term you used -- it was because I was telling you what that document, the date on that document was, that's what you were relying on; correct?
A Yes.
Q Now that you have seen it, you are not relying on my honor anymore, you are relying on the document; correct?
A Yes, document rather than my memory. My memory is of the instances, not the dates.
Q But -- sorry. Go ahead and finish.
A But, yeah, this is the document that I faxed to Michael Bowling.
Q I am going to change topics a little bit. I would like to have this marked as the next exhibit, please.



(Exhibit No. 8 marked for identification.)

BY MR. LEACH:
Q Now, you testified earlier that you didn't deal with dices as the main part of your inventory?
A No.
Q Was there someone else that was in charge of those dice, keeping the inventory in the dice?
A No, I dealt with them -- I was the person to deal with them. But I thought what you meant was dice as a main part of what I did. And, no, it was I was buying a lot of product and the dice were very small part of the whole operation.
Q And what did you deal mainly with?
A Oh, games of all sorts. We had somebody once said 20,000 different items in the warehouse, and I was dealing with almost all of them, kind of maintaining inventory on almost all of them.
Q Would it be fair to say that you wouldn't recognize small details with each of those 20,000 games?
MR. TECHENTIN: Objection.
A Yeah, that would be fair.
BY MR. LEACH:
Q And how many different games were you handling at



any one time? Was it 20,000?
A Yeah, well, 15 to 20,000, I guess.
Q And those are different products?
A Different products, yeah.
Q Does each of those different products have different instructions that go along with them or little quirks?
MR. TECHENTIN: Objection. Go ahead.
A Not that we paid much mind to. Not very many companies had any special instructions with the products. I was surprised to hear that Crystal Caste had any kind of special instructions. It was 15, 20,000 products coming through, mostly we want to get them on the shelf and we wanted to sell them. And we weren't too attentive to a lot of the little details. But it would be very unusual to have those kind of special requests for things like that.
BY MR. LEACH:
Q I am handing you what is marked as Exhibit 8. Please read that document carefully.
A Okay.
Q Have you seen that document before?
A It's jogging memories but I don't specifically recall the document.
Q When you say jogging memories, can you explain that a little bit more?



A The fellow who signed it, Robert Waros, I believe his name was, was one of the underbuyers that I earlier mentioned, that I had a couple of guys working for me and he was one of them. And I am beginning to wonder if in '99 he may have been actually counting the dice with me actually looking over his shoulder. So that's one of the memories it was jogging.
Q What was this gentleman's name again?
A Waros, W-a-r-u-s? Something like that? W-a-r-o-s.
Q And his first name, Robert?
A Robert, yeah.
Q Was he in charge of handling dice or Crystal Caste dice?
A I had --
MR. TECHENTIN: Objection. Go ahead.
A I had him ordering a number of lines, again with me looking over his shoulder. And I don't recall offhand whether he was doing Crystal Caste at the time or not. May be. His name is here so maybe he was like looking after Crystal Caste at that time.
And the other thing that is jogged is maybe we did do something with these stickers. They were asking us to send these out. And I have one of those vague memories of that kind of an annoyance of like extra stuff being heaped on





e13b8d66-3b3e-473d-91dc-f216c3eff7cb

Page 66

us. And could be we may have sent a bunch of these out. But I don't have any clearer memory than that.

It's one of those things I may have run out to the sales guys and said, look, we got all these stickers, we've got to send them out to our customers, throw them in the bin, and then never thought about them after that. As I said before, warehousing, it's a pretty kind of rough and tumble sort of thing.

It may be, given this letter, it may be that we did stick those little patent marks on the dice bins and I just never paid any attention to it. So they may have been there. I still have no recollection of them. But they may have been on the bins.

(Exhibit No. 9 marked for identification.)

BY MR. LEACH:

Q I am handing you what has been marked as Exhibit 9 and then what has previously been marked as Exhibit 4. Can you take a look at both of those?

A Yeah, I think those were the tubs I mentioned earlier right there.

Q Do you recall if the tubs that you saw back in 1999, I believe, had stickers on it?

A I don't recall one way or another. I have no

Page 67

reason to believe they didn't. And if that was on there, we would have left it alone, if they were sitting on the shelf.

Q Looking at Exhibit 4, back to where it talks about tubs and there is no charge for them, can you recall possibly why there was no charge? I guess seeing the tubs and this invoice and this letter, Exhibit 8, does that refresh anything as to what was --

MR. TECHENTIN: I am going to object if you are done. Sort of trailed off into nothing. Go ahead.

A Okay. Yeah, though, I think -- well, I tried to explain before. Way something like this works, Michael Bowling would say, I want to sell tubs with dice. I say, okay. We put it in our monthly publication. Tell our customers would you like to order 100 dice, if you order 100 dice, you get a free tub.

BY MR. LEACH:

Q Is there a chance that he sent those tubs out to make sure his product was being marked at the stores at point of purchases?

MR. TECHENTIN: Objection.

A There's a chance. But I don't recall ever being having that explained in that fashion. It may be that he had that intent, but I don't, not that I recall him explaining to us.

BY MR. LEACH:

Page 68

Q What is the date on Exhibit 8?

A August 15th.

MR. TECHENTIN: Objection.

A August 15, 1999.

BY MR. LEACH:

Q What is the date on this?

A November 17th 1999.

MR. TECHENTIN: Just so the record is clear, the reference was to Exhibit 4.

BY MR. LEACH:

Q 4 for the last one.

A Could I finish explaining about the tubs?

Q Please.

A I felt that I was -- we solicit them we get numbers from our customers. And when we are invoiced for it, he bills us for the dice that are in the tub, 1,200 packs of those dice. And then he includes the tubs, the 12 tubs that go with those dice for at no charge. And that's the way the reason the invoice looks as it does. So the 12 tubs go with the 100 dice we were billed for.

(Exhibit No. 10 and 11 marked for identification.)

BY MR. LEACH:

Q You mentioned earlier that you may have seen some

Page 69

stickers. Are you remembering this back then that you may have received some stickers from Bowling?

MR. TECHENTIN: Objection.

A I may have. I have no -- the only memory that I am recalling is sort of a sense of irritation with having to do something extra. And it popped into my head when I read the letter here, and it makes me think that it's an echo of an irritation I felt when I saw a letter like this and realized we should send these stickers out. But beyond that I have no specific recollection.

BY MR. LEACH:

Q Do you have any reason to believe that you did not follow the instructions on that letter agreement? I am referring to Exhibit 8.

MR. TECHENTIN: Objection.

A If I had to say, I would say we would have followed directions. In a warehouse operation dealing with matters like this, unless we are asked, we tend to let it slide because it's just more hassle. But if we get a specific request, in general we would honor that. We would do what we are asked to do but only what we are asked to do and no more.

BY MR. LEACH:

Q Do you have any reason to believe that that wasn't done?

MR. TECHENTIN: Objection.
A If it reached the right people, if somebody responsible for doing it. There is a chance that maybe Robert signed it and shuffled it away and didn't pass it on to someone who could actually do it. But in general with a letter like this received by us, we would do what they asked us to do.
BY MR. LEACH:
Q I am handing you Exhibits 10 and 11. Can you review those photographs, please?
MR. TECHENTIN: Can I see those, please?
BY MR. LEACH:
Q Have you ever seen anything like Exhibits 10 and 11 before?
A I don't recall them. I don't recall seeing these, though they are exactly the sort of thing that we would carry. And I got to believe that if they were available at the time, they would have brought them in. And I am just not remembering them, because these sorts of dice sell probably better like this than they do loose in the bins. But I don't have a clear recollection of them on the shelves.
(Exhibit No. 12 marked for identification.)



BY MR. LEACH:
Q Mr. Jensen, I am handing you what has been marked as Exhibit 12. Have you ever seen Exhibit 12 before?
MR. TECHENTIN: Objection. Do you mean the paper or do you mean the object depicted?
BY MR. LEACH:
Q I mean the picture contained in Exhibit 12?
A I don't recall ever seeing that. I can add that it's not something we would have been happy with. And we probably would not have passed it on to our customers if we had seen it because it has a toll free number on here that goes for direct contact with the manufacturer. And we were always loathe to sort of pass contact information on to our customers for fear that our customers would just begin to buy direct. So if we had seen something like this -- this seems like some kind of product header -- our inclination would have been to not make use of it, not send it on to our retailers.
(Exhibit No. 13 marked for identification.)
BY MR. LEACH:
Q I am handing you Exhibit 13. Have you ever seen what's depicted on Exhibit 13?
A Not particularly. Best of my recollection we



never carried it. Our stock of Crystal Caste was fairly limited. And this looks like some of the stuff that we would have passed on. But I don't recollect having this in our inventory. I assume we are talking about the plastic case rather than the dice themselves?
Q Correct.
A Yeah.
Q Were you the person at Berkeley Topline that would package orders and send them out?
A Rarely. In a rush I would go out and help but there was a packing crew, pulling and packing crew that handled most of that.
Q Is it possible that someone -- who would have given the packing crew instructions on how to send out shipments of Crystal Caste dice?
A Let's see. Probably the warehouse manager.
Q Who was that?
A It varied. In this time it probably would have been -- now you got to forgive me. I cannot remember his name. We all called him Fraggle because he looked like a muppet. He was a plaid pants wearing punk who was very good at his job.
As far as dice go, there weren't much in the way of special instructions. You pull them, you put them probably in a small container so they wouldn't get scattered



around the box, and then they go in the box. If it's the tubes or the cubes, sometimes they would go in small boxes, again to keep them from getting sort of scattered around in the larger shipment. But that would be the -- that would be the only special instructions.
There is a possibility -- I don't remember it with Crystal Caste, but occasionally we get calls from customers for other product display units. And typically we do not carry display units. That's what this plastic thing is, is a display unit. People would want those. We would not carry them as stock but we would special order them. And sometimes it would be dropped shipped from the manufacturer directly to the retailer and sometimes it would come through us. And if something like that happened, it could be sales would take the order.
I probably ordered the product but then I wouldn't see it after that. It would come in and get shipped off to the customer. And it is possible that that may have happened on some occasion with Crystal Caste, though I have no recollection of that ever happening.
Q In terms of packaging dice you mentioned a Robert -- what was his last name again?
A Robert Waros.
Q Would he have given direction on how to package dice that were sent out?

MR. TECHENTIN: Objection.
A No. There would be no reason for him to give those directions.
BY MR. LEACH:
Q Can I direct your attention to Exhibit 8 again and specifically paragraph -- the fourth paragraph down, can you read that?
A Please indicate your agreement with this by signing below and returning this letter to us. You may return this letter to 7931 South Avenida De Pina, Tucson, Arizona 85747 or you may fax it to 520-571-4065. And it appears to have been faxed.
Q And again Robert Waros signed that; correct?
A Yes.
MR. TECHENTIN: Objection.
BY MR. LEACH:
Q Was Mr. Waros good at his job?
MR. TECHENTIN: Objection.
A Pretty good.
BY MR. LEACH:
Q Was he a diligent employee?
A Fairly diligent.
Q If he was signing an agreement on behalf of Berkeley Topline, would he share that with his boss?
MR. TECHENTIN: Objection.



A I'm sure he would in this case. He worked pretty close to me. And, yeah, I'm sure that he would have shown this to me.
BY MR. LEACH:
Q And he reported directly to you?
A Yes.
Q Do you think a letter like this, would you have shown a letter like this to the warehouse manager?
MR. TECHENTIN: Objection.
A Yes, if I received this letter, I would have groaned and felt a headache and I would have informed the appropriate people and done what it asked because, yeah, it's all in writing and it's not something we could just let slide.
BY MR. LEACH:
Q So to the best of your recollection do you recall whether you saw this letter or not?
MR. TECHENTIN: Objection. Go ahead.
A I don't remember seeing this letter.
BY MR. LEACH:
Q Is it possible you did?
A Yes.
Q And if you saw a letter like this, what would you do with it?
MR. TECHENTIN: Objection.



A I would grudgingly do what it asked. I would get the stickers -- does it say the stickers were included? Inform you the patent --
MR. TECHENTIN: The court reporter is trying to take down what you are reading so you can't make noise or you need to make it clear. It's one of the two.
A Sorry. I was scanning over looking to see if they had enclosed labels with this letter. Yeah, I can't find in the letter if they enclosed labels. My inclination is to believe that they did but didn't mention it in the letter. If we had labels, we would have followed these directions. If we had not, I would have called and asked, you know, where are the labels. And I don't recall -- I don't have a recollection of this. Let's see. Yeah.
BY MR. LEACH:
Q Can I hand you Exhibit 1? In dealing with the 20,000 some products that you deal with, is it entirely possible that that's how the dice from Crystal Caste came and you --
MR. TECHENTIN: Objection.
A Yes, yeah, it looks like a typical dice bag to me.
BY MR. LEACH:
Q What about with respect to the stickers and the labels in the bag?



A That part isn't usual. The other dice suppliers, they didn't have things like that in there.
MR. LEACH: Can we take a break, go off the record for a second?
(Discussion off the record.)

EXAMINATION (Continuing)
BY MR. LEACH:
Q In selling bags of dice and specifically Crystal Caste, was it typical ever to contact your customers and give special instructions to them?
MR. TECHENTIN: Objection.
A No.
BY MR. LEACH:
Q Do you recall if you have ever done that?
MR. TECHENTIN: Objection.
A I thought on the sales staff -- I did very little sales -- but my recollection would be that it would be not unprecedented but very rare. It may have happened once or twice but it certainly wasn't common.
BY MR. LEACH:
Q Did you communicate with the customers that Berkeley sold to?
A Very rarely.
Q Who dealt with them mainly?





e13b8d66-3b3e-473d-91dc-f216c3eff7cb