# EXHIBIT N

LEXSEE 2004 US DIST. LEXIS 24949

**METROLOGIC INSTRUMENTS, INC., Plaintiff, v. PSC, INC., Defendant.**

**Civil Action No. 99-4876 (JBS)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY**

***2004 U.S. Dist. LEXIS 24949***

**December 13, 2004, Decided**
**December 13, 2004, Filed**

**PRIOR HISTORY:** *Metrologic Instruments, Inc. v. PSC Inc., 2004 U.S. Dist. LEXIS 28422 (D.N.J., May 6, 2004)*

**DISPOSITION:** Plaintiffs' motion for summary judgment of infringement granted. Defendant's motion for summary judgment granted in part and denied in part.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** In a patent infringment action, plaintiff patentee filed a motion for summary judgment as to several of its claims, and defendant alleged infringer filed a motion for partial summary judgment of non-infringement and invalidity of the patents at issue.

**OVERVIEW:** The patentee filed an infringement action alleging that a device infringed upon its patent of a device that processed digital input signals, such as signals from bar code scanners. The alleged infringer sought a declaratory judgment of non-infringement and invalidity of the patent. Both parties sought summary judgment. The court found that the function of the accused devices appeared identical to the function disclosed in the patent's specification. Even if the accused devices could not be held to literally infringe the patent, they infringed under the doctrine of equivalents. Therefore, the court granted summary judgment to the patentee as to one of the patents. However, the court granted summary judgment in favor of the alleged infringer as to the other patent because the patentee failed to comply with marking requirement of 35 U.S.C.S. § 287.

**OUTCOME:** The court granted summary judgment in favor of the patentee and denied the alleged infringer's summary judgment motion as to one of the patents. The court granted summary judgment for the alleged infringer as to the other patent.

**LexisNexis(R) Headnotes**

***Patent Law > Claims & Specifications > Claim Language > General Overview***
[HN1] During claim construction, a court is only obligated to construe disputed claim terms.

***Civil Procedure > Summary Judgment > Appellate Review > Standards of Review***
***Patent Law > Infringement Actions > General Overview***
[HN2] An infringement analysis is a two-step process. The first step is for the court, as a matter of law, to construe the disputed claim terms. The second step is to compare the construed claims to the accused device to determine, as an issue of fact, whether all of the claim limitations are present in the accused device, either literally or by substantial equivalent.

***Patent Law > Infringement Actions > General Overview***
[HN3] A patent claim is infringed if every claim limitation finds correspondence in the accused device, either literally or by substantial equivalents. In determining literal infringement of claims written in means-plus-function language as provided for by 35 U.S.C.S. § 112, the relevant structure in the accused device must perform the identical function recited in the claim and be identical or equivalent to the corresponding structure in the patent specification. Equivalence of structure is found when the differences between the structure in the accused device and any disclosed in the specification are insubstantial. The test for insubstantial differences is whether the assertedly equivalent structure performs the claimed function in substantially the same way to achieve substantially the same result as the corresponding structure described in the specification.

***Civil Procedure > Summary Judgment > Standards > Appropriateness***
***Civil Procedure > Summary Judgment > Standards > Legal Entitlement***
***Civil Procedure > Summary Judgment > Standards > Materiality***

[HN4] Summary judgment shall be granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law, pursuant to Fed. R. Civ. P. 56(c). Summary judgment is proper in patent infringement cases, when no reasonable jury could determine that every limitation recited in the properly construed claim is not found in the accused device. Moreover, Rule 56(e) provides that judgment "shall be entered," unless the nonmoving party offers specific facts contradicting the facts averred by the movant, which indicate that there is a genuine issue for trial. If the evidence of the nonmoving party is "merely colorable or is not significantly probative, summary judgment may be granted. Summary judgment of infringement is proper after a court has conducted a Markman hearing and construed the claims.

***Patent Law > Claims & Specifications > Description Requirement > General Overview***
***Patent Law > Infringement Actions > Claim Interpretation > Claim Differentiation***
***Patent Law > Infringement Actions > Claim Interpretation > Means Plus Function***
[HN5] To determine whether a claim limitation is met literally, where expressed as a means for performing a stated function, a court must compare the accused structure with the disclosed structure, and must find equivalent structure as well as identity of claimed function for that structure.

***Patent Law > Infringement Actions > Infringing Acts > General Overview***
[HN6] To determine whether the accused devices infringe, it must be determined whether each and every element of the asserted claim is present in the accused device. If even a single claim element is not present, the claim is not infringed.

***Civil Procedure > Remedies > Damages > General Overview***
***Patent Law > Inequitable Conduct > General Overview***
***Patent Law > Infringement Actions > General Overview***
[HN7] 35 U.S.C.S. § 287 requires a patentee to give either constructive or actual notice of infringement before monetary damages for infringement can accrue. A patentee may give notice either by fixing on the patented article the word "patent" or the abbreviation "pat.", together with the number of the patent, or when, from the character of the article, this can not be done, by fixing to it, or to the package wherein one or more of them is contained, a label containing a like notice. In the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice. One way to satisfy § 287 is to provide actual notice of infringement to the infringer. The requirements as to what constitutes actual notice are strict: the patentee must provide the accused infringer with specific and actual notice that charges infringement of an identified patent by a specific accused product. Any notice that does not identify the patent number and the accused product does not qualify as actual notice under § 287.

***Patent Law > Infringement Actions > Infringing Acts > General Overview***
[HN8] One way to satisfy 35 U.S.C.S. § 287 is to provide "constructive notice" by complying with the strict marking requirements set forth in the statute. However, a patentee does not comply with the marking requirements until it can show that it "consistently marked substantially all of its patented products, and it was no longer distributing unmarked products.

***Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > Relation Back***
[HN9] See Fed. R. Civ. P. 15(c).

***Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > Relation Back***
***Governments > Legislation > Statutes of Limitations > General Overview***
[HN10] Fed. R. Civ. P. 15(c) is most frequently applied to avoid the dismissal of claims on statute of limitation grounds, but has also been applied in patent cases with respect to the patent damages provisions of 35 U.S.C.S. § 286.

***Civil Procedure > Pleading & Practice > Pleadings > General Overview***
***Governments > Legislation > Statutes of Limitations > Time Limitations***
***Patent Law > Remedies > Damages > Time Limitations***
[HN11] 35 U.S.C.S. § 286 is not a true statute of limitations, but instead serves to limit infringement damages to six years prior to the filing of the complaint. In patent cases, the two most common relation back scenarios involve adding a related patent or adding a related party.

***Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > Relation Back***
***Patent Law > Remedies > Damages > Time Limitations***
[HN12] Infringement of one patent is not the same conduct or occurrence as infringement of another patent for the purposes of relation back, unless the claims with respect to the second patent are an integral part of the claims in the first action.

**COUNSEL:** [*1] Edwin Choicey, Esq., RIKER, DANZIG, SCHERER, HYLAND & PERRETTI, LLP,

Morristown, New Jersey; Dennis J. Mondolino, Esq., Michael F. Hurley, Esq., MORGAN, LEWIS & BOCKIUS, LLP, New York, New York, for Plaintiff Metrologic Instruments, Inc.

Joel Schneider, Esq., ARCHER & GREINER, P.C., Haddonfield, New Jersey; James Shalek, Esq., Robert Mayer, Esq., PROSKAUER ROSE LLP, New York, New York, for Defendant PSC, Inc.

**JUDGES:** HONORABLE JEROME B. SIMANDLE.

**OPINIONBY:** JEROME B. SIMANDLE

**OPINION:**

**OPINION**

**Filed: December 13, 2004**

**SIMANDLE,** District Judge:

This matter comes before the Court upon Plaintiff Metrologic's motion for summary judgment of infringement of Claims 8 and 10 of *U.S. Patent No. 5,081,342* (the *'342 patent*) and Claims 1, 6 and 28 of *U.S. Patent No. 5,343,027* (the *'027 patent*). Also before the Court are Defendant PSC Inc.'s motion for partial summary judgment of noninfringement and invalidity of *U.S. Patent No. 5,637,852* (the *'852 patent*) as well as PSC Inc.'s motion for summary judgment under *35 U.S.C. § 287* on the *'342 patent*. n1

n1 Plaintiff and Defendant entered a stipulation and order on August 16, 2004 that partial summary judgment could be entered against Metrologic with respect to its claim of PSC's infringement of U.S. Patent Nos. 5,081,359 and 5,789,731. The parties also stipulated that PSC's affirmative defenses and counterclaims for invalidity and unenforceability with respect to U.S. Patent Nos. 5,081,359 and 5,789,731 are dismissed without prejudice pursuant to *Fed. R. Civ. P. 41 (a) (1)*.

[*2]

**I. BACKGROUND**

A. Procedural Posture

Metrologic Instruments, Inc. ("Metrologic") brought this action for patent infringement against PSC Inc. ("PSC") on October 12, 1999, alleging that Defendant's products infringed Metrologic's *United States Patent Nos. 5,637,852* (the *'852 patent*), 5,627,359 (the '359 patent), 5,789,731 (the '731 patent), 5,260,553 (the '553 patent), *5,343,027* (the *'027 patent*), 5,686,717 (the '717 patent), 5,828,049 (the '049 patent), and *5,081,342* (the *'342 patent*). PSC filed a counterclaim, seeking a declaratory judgment of non-infringement and alleging unfair competition under *§ 43 of the Lanham Act*.

This Court held a Markman hearing on August 6 and 7, 2002 to construe the claims at issue. After Defendant filed bankruptcy in December 2002, the case was administratively terminated on December 17, 2002. The case was reopened on July 18, 2003, after Defendant emerged from bankruptcy protection. In its lengthy Opinion of August 26, 2003, this Court set forth its construction of the disputed claim limitations in Metrologic's '359, '731, '*852*, '*027*, and *'342 patents*. Metrologic Instruments, Inc. v. PSC, Inc., 2003 WL 22077652 [*3] (D.N.J. Aug. 26, 2003) ("Markman Decision"). Metrologic filed its motion for reconsideration on an aspect of the decision relating to the multi-port *'342 patent*, which this Court denied on May 6, 2004.

The present summary judgment motions were filed and briefed by the parties at the time of the Markman hearing. However, PSC's voluntary bankruptcy placed an automatic stay on this action and, by agreement of the parties, the motions were deferred pending the Markman Decision. Supplemental briefing was permitted on the present motions and the Court heard oral argument on October 1, 2004.

B. Metrologic's Motion for Partial Summary Judgment of Infringement of Claims 8 and 10 of the *'342 Patent* and Claims 1, 6 and 28 of the *'027 Patent*

Metrologic seeks partial summary judgment as to its assertion that PSC's Magellan, Magellan SL, HS1250, and VS1200 products (collectively, the "Magellan Devices") infringe claims 8 and 10 of the *'342 patent* and claims 1, 6, and 28 of the *'027 patent*.

In the original summary judgment papers submitted to the Court, Metrologic identified ten limitations in the *'342 patent* claims: Limitation 1-5 within the preamble of independent claim 5, Limitations [*4] 6-8 within the body of claim 5, and Limitation 9 and 10 within the bodies of dependent claims 8 and 10, respectively. Metrologic asserted that the preamble contains affirmative limitations, which PSC disputed, and the parties disputed the meaning of Limitation 6-9. This Court determined in its Markman Decision that the preamble did not contain affirmative limitations. Moreover, this Court held that Limitation 8 was not a limitation and declined to construe it. This Court thus construed only Limitations 6, 7, and 9 of the *'342 patent*. See Markman Decision at *43. Similarly, for the *'027 patent*, Metrologic identified nine limitations, the meanings of two of which, Limitations 5 and 7, were

disputed by the parties. The Court construed these two limitations. n2 Id.

n2 [HN1] During claim construction, a court is only obligated to construe disputed claim terms. See *United States Surgical Corp. v. Ethicon, Inc., 103 F.3d 1554, 1568 (Fed. Cir. 1997)*, cert. denied, *522 U.S. 950, 139 L. Ed. 2d 287, 118 S. Ct. 369 (1997)*.

[*5]

1. Claims 8 and 10 of the *'342 Patent*

Metrologic asserts that the Magellan Devices infringe claims 8 and 10 of the *'342 patent*. Claim 8 depends from independent claim 5, and claim 10 depends from claim 8.

The claims recite a device that processes digital input signals, such as signals from bar code scanners. The device accepts at least two digital input signals, such as an input from a high–speed, in–counter (or "slot") scanner and an input from a low–speed, hand–held scanner or light pen. (See *'342 patent*, 1:51–59.) Each digital input signal has two levels, such as low and high, representing the bars and spaces (or spaces and bars) on a bar code symbol. The input signals may be transmitted at different frequencies (or bit rates), based on the type of scanner and the resolution of the bar code symbol read. Some bar codes are "low density," such as those printed on a rough material, like cardboard, and others are "high density," such as those printed on a smooth material, like paper, and this will affect the frequency required to detect and process the bar code signal. (See id., 2:10–23.)

The claimed device generates a plurality of predetermined frequencies. It does [*6] this by using a clock input 12 to generate a fundamental or reference frequency, e.g., 40 MHz, and then uses a series of dividers (clock divider circuitry 14) to generate frequencies stepping down from the fundamental frequency by successive factors of 2, e.g., 20 MHz, 10 MHz, 5 MHz, 2.5 MHz, 1.25 MHz, 625 kHz, 312 kHz, 156 kHz, 78 kHz, 39 kHz, 19.5 kHz, 9.25 kHz, 4.875 kHz, and 2.44 kHz. (See id., 4:47–50, 9:33–68.) Clock input 12 accepts a number of input signals (which are external to clock input 12) in order to generate the fundamental or reference frequency. The word "predetermined" "refers not to a precise starting frequency determined beforehand, but to the known set of divisions that are applied through the clock divider circuitry 14 each time the device is operated, which creates the plurality of frequencies." Markman Decision at *31.

The claimed device measures the time duration of the high and low bar code signal levels using one of the plurality of frequencies previously generated. The device then produces digital data representing the measured time durations. The device measures the time durations by first selecting one of the predetermined clock frequencies using [*7] the clock mux n3 16, id. at *35, then counting the length of the high and low levels using the transition detector 24, the sequencing means 28, and the digitizing counting means 30. Id.; (*'342 patent*, 5:16–34.)

n3 The word "mux" stands for "multiplexer," an electronic device that takes several signals as inputs and selects one of the input signals as an output.

The claimed device also includes a decoder for decoding the bar code signal information. This decoder decodes UPC and EAN bar codes, as well as a wide variety of other codes. (See *'342 patent*, 2:24–33.)

2. Claims 1, 6 and 28 of the *'027 Patent*

Metrologic asserts that the Magellan Devices also infringe claims 1, 6, and 28 of the *'027 patent*. Claims 1 and 28 are independent; claim 6 depends from claim 1.

The claims recite a device that decodes digital data signals, such as signals from bar code scanners. Each digital data signal has two levels, such as low and high, representing the bars and spaces (or spaces and bars) on a bar code symbol. [*8] The device includes at least two data input ports, each of which is connected to a scanner, and each of which receives one of the digital data signals. The digital data signals are connected to a transition detector, which detects transitions from low to high and high to low. Sequencing means 28 and digitizing counting means 30 take the output of the transition detector and produce signal level transition data.

The claimed device measures the time duration of the high and low bar code signal levels and produces digital data relating to the measured time durations. The device measures the time durations by using a fundamental or reference frequency, e.g., the output of clock input 12, and clock divider circuitry 14 to generate a plurality of frequencies. Clock mux 16 selects one of the plurality of frequencies and then counters 50 and 52 are used to count the length of the high and low levels. Markman Decision at *40.

The claimed device also includes a controller that controls the operation of the clock mux 16 and the selected frequencies based on the signal level transition data produced by the transition detector. The device further includes a programmable decoder, e.g., programmable [*9] processor 26 or fixed program decoder 20, for processing the digital data to produce decoded symbol data representative of the bar code symbol being scanned. Markman Decision at *43. Decoded symbol data is transmitted to a

host device, e.g., a computer, through a data output port. The device may be realized as an integrated circuit chip. (*'027 patent*, 20:22–30.)

3. PSC's Accused Devices Relating to the *'342* and *'027 Patents*

"X," "Y," and "Z" were code names given to scanner designs that Spectra–Physics (which PSC acquired in 1996) developed beginning in 1993. The "X" became the VS1000/VS1200 models, released in 1994; the "Y" became the HS1250, released in 1995; and the "Z" became the Magellan, also released in 1994 (the Magellan SL was released in 1997). These models share much of the same internal design, but differ by virtue of their different scanning orientations: the VS1200 has a vertical scanning window, the HS1250 has a horizontal scanning window, and the Magellans combine a vertical and horizontal scanning window.

Each of the four accused devices, the Magellan, Magellan SL, VS1200 and HS1250, contain a port for connecting an undecoded hand–held device, which PSC [*10] refers to as a "hand–held laser control" (HHLC) port. (See Latimer Dep., Metrologic Ex. 5, p. 160; HS1250 Marketing Brochure, Metrologic Ex. 16, p. 2 ("peripheral port for undecoded handheld scanner"); VS1200 Marketing Brochure, Metrologic Ex. 17, p. l("peripheral port for undecoded scanner"); Magellan Marketing Brochure, Metrologic Ex. 29, p. 2 ("undecoded handheld scanner port").) The HHLC provides the input for connecting a slower speed hand–held device to the common decoding architecture of the high–speed scanner. (See Actis Dep. I, Metrologic Ex. 4, p. 33:4–8.)

The outputs from the hand–held device and the high–speed device are provided to the DAT II ("Decoder by [Robert] Actis and [Andrew] Taussig") chip to decode barcode data. (See id.) The DAT II chip is a type of integrated circuit – an "ASIC" or "application specific integrated circuit." (See Actis Dep. I, Ex. 4, 82:16–23.) The Magellans use three DAT II chips, while the VS1200 and HS1250 each use a single DAT II chip. (See Magellan System Controller Diag. (Drawing 1–0244), Metrologic Ex. 6, p. 5 (PSC 0014699), items U25, U26, and U27; VS1000/VS1200 Mega–Main Diag. (Drawing 1–0249), Metrologic [*11] Ex. 7, p. 2 (PSC 0019728), item U7; HS1250 Speaker Main Diag. (Drawing 1–0260), Metrologic Ex. 8, p. 2 (PSC 0019784), item U9). Each of these representative drawings uses the same DAT II chip.

There are several inputs to the DAT II chip. These include "undecoded auxiliary input and standard scanner input." (Actis Dep I, Metrologic Ex. 4, 79:16–23.) Standard scanner input uses the RTV[approximately]and STV_BAR[approximately]flip–flop to generate a BAR_HS (high speed) signal. (DAT II Theory of Operation, Metrologic Ex. 24, p. 7.) Auxiliary input, which could be a "single video data stream from an alternate scanning device (such as a wand)," can use the BAR LS (low–speed) input to the chip. (Id.)

The DAT II chip generates a set of frequencies, which allows the device to "switch[] from a high speed clock for a high performance scanner to a low speed clock for a slower data input from a wand, for example. (Id. at 13.) The chip does this by using a clock input circuit to generate a fundamental clock, called "CLK" ("that runs the entire chip," DAT II Theory of Operation, Ex. 24, p. 13), creating a cleaner version of the fundamental clock called CLOCK0, and then uses a series [*12] of flip–flop circuits ("ripple counter divider," id.) to generate 16 clock frequencies (labeled CLOCK1–CLOCK 16) stepping down from the fundamental frequency (e.g. 40 MHz) by successive factors of 2.

The DAT II chip "measure[s] and process[es] the relative time differences between bars and spaces in the [bar code] label." (Id. at 3.) The incoming signal from the bar code scanner is "converted into a series of 13 bit binary numbers by counting the number of cycles, of a fixed time base clock, between transitions of the signal (bar code edges)" (Id.)

The "fixed time base clock" (INTVL_CLK) is the clock selected from the 16 clock frequencies generated to match the speed of the incoming data from the bar code scanner. (Id. at 13 ("INTVL_CLK can be selected, by the scanner controller, . . . [which] allows switching from a high speed clock for a high performance scanner to a low speed clock for a slower data input from a wand, for example.").) INTVL_CLK is selected using a group of four multiplexers shown in the middle of that DAT II Clock Generation Diagram. (Metrologic Ex. 23, p. 14, col. 4.)

The counting of the 13–bit number is performed in the "front end" circuit. [*13] (See id. at 6.) This front end circuit includes a transition detector and a counter. The transition detector consists of the "front end state controller[, which] detects bar/space transitions." (Id. at 7.) The counter is a "13 bit parallel load ripple counter." (Id. at 8.)

Also included in the "front end" circuit is a sequencer. Item 28 in the *'027 patent* and *'342 patent* is called "sequencing means." This sequencer is also termed a "control means."

The DAT II chip also includes two decoders, termed "decoder 1" and "decoder 2." (See DAT II Top Level Block Diagram, Metrologic Ex. 23, p. 1 (PSC0020075); DAT II Theory of Operation, Metrologic Ex. 24, p. 4, item 3.) The decoders (also called "decode microproces-

sors" or "decode processors") can access the 13-bit binary numbers or count data (which are stored in RAM buffers) generated by the counters, and then the decoders "extract patterns from the counts, primarily by computing ratios of the numbers." (DAT II Theory of Operations, Metrologic Ex. 24, p. 3.) Each decoder "processes counts into decoded or partially decoded bar code label information." (Id. at 17.) Because the decode processors are microprocessors, they [*14] are programmable. Decoded symbol data is transmitted to a host device, e.g., a computer or controller, through a data output port.

C. PSC's Motion for Partial Summary Judgment of Noninfringement of the *'852 Patent*

Plaintiff Metrologic's *'852 patent* was filed on June 7, 1995, and issued on June 10, 1997. The patent claims priority as a continuation of U.S. Patent No. 5,216,232, which was filed on September 10, 1990. The *'852 Patent* is directed to a bar code scanner that sits above a counter and projects a narrow, dense pattern of light, the cross-section of which is patterned. The scanner is designed to read the bar code of objects placed within this dense pattern, regardless of its orientation. This is achieved by projecting many lines of laser light at different angles in front of the scanner. The ability to scan bar codes no matter what angle they face the scanner is beneficial because it allows a clerk at a high-volume check-out counter to scan items quickly, irrespective of their orientation. In addition, counter space, particularly at smaller and lower-volume retail establishments, is preserved by the scanner's placement above the counter. Although placement above the counter [*15] had previously caused scanners to inadvertently read bar codes of items located nearby, an additional benefit with this device is that items placed nearby are not scanned, due to the narrowness of the laser light. Thus, Metrologic's *'852 patent* discloses and claims an optical design capable of generating a scan pattern which is rich in scan lines and which has a scan pattern of narrow volume.

## II. DISCUSSION

A. Legal Standards

[HN2] An infringement analysis is a two-step process. The first step is for the Court, as a matter of law, to construe the disputed claim terms. The second step is to compare the construed claims to the accused device to determine, as an issue of fact, whether all of the claim limitations are present in the accused device, either literally or by substantial equivalent. *Karlin Tech., Inc. v. Surgical Dynamics, Inc., 177 F.3d 968, 971 (Fed. Cir. 1999)*. This Court has already completed the first step of the process, see Markman Decision, and now undertakes the second in the context of summary judgment review.

[HN3] A patent claim is infringed if every claim limitation finds correspondence in the accused device - either literally or [*16] by substantial equivalents. *Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17, 20, 137 L. Ed. 2d 146, 117 S. Ct. 1040 (1997)*. In determining literal infringement of claims written in means-plus-function language as provided for by *35 U.S.C. § 112*, P 6, "the relevant structure in the accused device [must] perform the identical function recited in the claim and be identical or equivalent to the corresponding structure in the [patent] specification." *Odetics, Inc. v. Storage Technology Corp., 185 F.3d 1259, 1266-67 (Fed. Cir. 1999)*. Equivalence of structure is found when "the differences between the structure in the accused device and any disclosed in the specification are insubstantial." *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc., 145 F.3d 1303, 1309 (Fed. Cir. 1998)* (emphasis added). The test for insubstantial differences is whether "the assertedly equivalent structure performs the claimed function in substantially the same way to achieve substantially the same result as the corresponding structure described in the specification." *Odetics, 185 F.3d at 1267*.

[HN4] Summary judgment shall be granted when [*17] there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*; *Karlin Tech., 177 F.3d at 970*. Summary judgment is proper in patent infringement cases, when "no reasonable jury could determine that every limitation recited in the properly construed claim . . . is not found in the accused device." *Karlin Tech., 177 F.3d at 974*; *SDS USA Inc. v. Ken Specialties Inc., 122 F. Supp. 2d 533, 536-37 (D.N.J. 2000)*. Moreover, *Rule 56(e)* provides that judgment "shall be entered," unless the nonmoving party offers specific facts contradicting the facts averred by the movant, which indicate that there is a genuine issue for trial. See *Lujan v. Nat'l Wildlife Federation, 497 U.S. 871, 888, 111 L. Ed. 2d 695, 110 S. Ct. 3177 (1990)*. If the evidence of the nonmoving party is "merely colorable or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)* (citations omitted). Summary judgment of infringement is proper after a court has conducted a Markman hearing and construed the claims. See, e.g., *SDS USA, Inc., 122 F. Supp. 2d at 536*. [*18]

B. Metrologic's Motion on the *'342 Patent*

As this Court declined to construe limitation 8 as an affirmative limitation, the parties are now only contesting the application of Limitations 6, 7, and 9 of the *'342 patent* against PSC's Magellan Devices.

1. Claims 8 & 10, Limitation 6 - "means for generating a plurality of predetermined frequencies"

Limitation 6 recites a "means for generating a plurality of predetermined frequencies." In its Markman Decision, this Court construed the function of the limitation as:

> generating a plurality of predetermined frequencies, predetermined meaning that the division of the clock pulse frequency by two is a constant, fixed process which allows the frequency to always constitute half of its original number. "Predetermined" does not mean that the frequencies must be determined in advance, or that the frequency must be fixed conclusively or authoritatively beforehand.

Markman Decision at *32 (emphasis in original). This Court construed the corresponding structure of the means as:

> Clock Input 12, which is either the Crystal Oscillator 13 or other External Clock 15, and the Clock Circuitry Divider 14 [*19] . That is, the clock input 12 consists of a 40 MHz crystal oscillator or an equivalent external clock.

Id. (emphasis in original).

This Court construed Limitation 6 to be a means–plus–function element. [HN5] "To determine whether a claim limitation is met literally, where expressed as a means for performing a stated function, the court must compare the accused structure with the disclosed structure, and must find equivalent structure as well as identity of claimed function for that structure." *Pennwalt Corp. v. Durand–Wayland, Inc., 833 F.2d 931, 934 (Fed. Cir. 1987)* (en banc) (emphasis in original). Having identified the corresponding structure of the recited means, the next question is whether the structure of the accused device is equivalent to Metrologic's patented structure. "*Section 112*, paragraph 6, rules out the possibility that any and every means which performs the function specified in the claim literally satisfies that limitation." *Pennwalt Corp., 833 F.2d at 934*. Rather, the proper test is whether the differences between the structure in the accused device and any disclosed in the specification are insubstantial. [*20] See *Chiuminatta Concrete Concepts, Inc., 145 F.3d at 1309*.

The DAT II chip in PSC's devices generates a fundamental clock, CLK (equivalent to CLOCK0). CLOCK0 is successively divided down into 16 other clocks, CLOCK1–CLOCK16, ranging from 40 MHz to 610 Hz. These 16 frequencies are "a plurality of predetermined frequencies." These are the same frequencies that are disclosed in the *'342 patent* (see *'342 patent*, 9:33–68.) PSC's expert, Roger Palmer, confirmed this division operation in his deposition. (See Palmer Dep., Metrologic Ex. 21, pp. 111–13). Thus, the function of the accused devices appears identical to the function disclosed in the patent's specification. Having determined identical identity of claimed function, the Court must additionally determine whether the structure performing that function is equivalent.

PSC argues that the Magellan scanners (and some models of VS1200 and HS1250 scanners) use a ring oscillator, not the crystal oscillator included as an example of a clock input in the *'342 patent*, thereby precluding a finding of literal infringement. Notably, though, some of PSC's products, namely a percentage of the VS1200 and HS1250 models, use [*21] crystal oscillators. However, even if the accused devices cannot be held to literally infringe the *'342 patent*, those devices certainly infringe under the doctrine of equivalents, as now explained.

In the PSC devices, the DAT II chip has a clock input circuit configured to use an external crystal oscillator, an external oscillator module, or an external ring oscillator to generate the fundamental reference frequency CLK. The VS1200 and HS1250 scanners use an external crystal oscillator for generating the fundamental clock frequency, CLK. (See VS1200 schematic, Metrologic Ex. 7, p. 2 (PSC0019728), grid B7; HS1250 schematic, Metrologic Ex. 8, p. 2 (PSC0019784), grid B7.) The Magellan products (and, according to PSC, some VS1200 and HS1250 scanners) do not use the external crystal oscillator, but instead use the ring oscillator external to the clock input circuit. (See Magellan schematic, Metrologic Ex. 6, p. 5 (PSC0014699) (XTAL1_IN is grounded and XTAL2 is not connected); DAT II Internal Oscillator Diag., Metrologic Ex. 23, p. 13 (PSC0020086), grid D3.)

The external crystal oscillator and external ring oscillator are external inputs to the DAT II chip's clock input circuit, [*22] just as the external crystal oscillator 13 and external clock 15 are external inputs to the *'342 patent*'s clock input 12. The external ring oscillator is an external clock 15. (Compare DAT II Internal Oscillator Diagram, Metrologic Ex. 23, p. 13 (PSC0020086), grid D3 and its external inputs with *'342 patent*, Figs. 1, 2, and 4A, clock input 12 and its external inputs.)

In addition, all of the Magellan Devices contain the DAT II chip, which includes a series of dividers that successively divide down the clock source so as to generate a plurality of predetermined frequencies. Metrologic contends that this is the identical function as called for by the claim as required by *Section 112*, P 6, law. See *Odetics, 185 F.3d at 1267*. As noted above, the predetermined frequencies generated by the DAT II chip include 40 MHz,

20 MHz, 10 MHz, 5 MHz, . . . , 78 kHz, 39 kHz, . . ., 4.875 kHz, and 2.44 kHz, the same ones described in the *'342 patent*.

PSC contends that the Magellan scanners (and some models of VS1200 and HS1250 scanners) use a ring oscillator, which PSC claims is not equivalent to the crystal oscillator included as an example of a clock input in the *'342 patent*. [*23] This Court, however, in its Markman Decision, concluded that the term "predetermined" means the division of the clock pulse frequency is a fixed process and does not require "that the frequency must be fixed conclusively or authoritatively beforehand." Markman Decision at *32. Thus, for purposes of equivalence, a ring oscillator functions in the same way as a crystal oscillator.

PSC further argues that whether the ring oscillator in the accused devices is equivalent to the crystal oscillator is an issue of fact, precluding summary judgment. However, based on the Court's claim construction, the record demonstrates no genuine issue of material fact to be in dispute. PSC's own documents show that for decoding purposes, the two oscillators are equivalent:

> The exact accuracy and stability of this clock is not critical as long as it does not exceed the operating frequency of the rest of the design, 48 MHz, and is relatively constant over the length of the label being scanned.

(DAT II Theory of Operation, Metrologic Ex. 24, p. 11.) A ring oscillator provides a frequency to the clock input circuit to generate the fundamental CLK operating frequency. This CLK operating [*24] frequency is stable over the millisecond or so it takes to scan a bar code making the ring oscillator equivalent to the crystal oscillator described in the *'342 patent* that generates that fundamental operating frequency. Moreover, PSC's own expert, Roger Palmer, confirmed the equivalence between the crystal oscillator and the ring oscillator:

> Q: When you answered my previous question that it wouldn't have made a difference for scanning a particular bar code at a particular time whether you used a crystal oscillator or a ring oscillator, why would there be no difference?
>
> A: Because the decoding process is looking at relative counts between bars and spaces. If the counts were differing in all respects, by 10 or 20 percent in one case versus another, that would not have made a major difference in decodability.

(Palmer Dep., Metrologic Ex. 21, at 109:6–17.)

Finally, the fact that the DAT II chip is designed to use either a ring oscillator or a crystal oscillator supports Metrologic's argument of equivalence. Some PSC products use a crystal oscillator (the VS1200 and HS1250) and some use a ring oscillator (Magellan). PSC argues, however, that interchangeability is [*25] not sufficient to establish equivalence, citing *Chiuminatta, 145 F.3d at 1309*. There, the Federal Circuit recognized that interchangeability is not "dispositive," but stated that "known interchangeability" is an "important factor" in finding equivalence, especially if "those of ordinary skill in the art recognize[] the interchangeability" of the claimed structure with the accused element. *Id. at 1309–10*.

In addition to the fact that PSC has acknowledged in its design of the DAT II chip that the ring oscillator and the crystal oscillator are interchangeable, this Court, with its claim construction, has recognized the equivalence. See *Chiuminatta, 145 F.3d at 1309* (two structures are equivalent because the differences between them are insubstantial in the context of the claim construction propounded by the Court). If the function of the clock input in the *'342 patent* is to produce a fundamental frequency that can be used to generate a plurality of subfrequencies, or, in the language of the claim, "predetermined" frequencies, then the ring oscillator is equivalent to the crystal oscillator. This Court interpreted "predetermined" to [*26] mean a set of frequencies having a known relation with one another, such as being successively divided down by two from a fundamental frequency. See Markman Decision at *32. With such an interpretation, the ring oscillator "performs the claimed function" of generating a plurality of predetermined frequencies "in substantially the same way to achieve substantially the same result as the" crystal oscillator, and is therefore "equivalent" under *Section 112*, P6. See *Odetics, 185 F.3d at 1267*. Thus, with respect to Limitation 6, summary judgment shall be granted to Metrologic.

2. Claims 8 & 10, Limitation 7 – "means for measuring the time duration of the digital input signals using one of said plurality of frequencies and producing digital data representing said measured time durations"

Limitation 7 recites "means for measuring the time duration of each of said first and second levels of said digital input signals using one of said plurality of frequencies and producing digital data representing said measured time durations." In its Markman Decision, this Court construed the functions of this limitation

> to use a frequency from one of the predeter-

> mined [*27] frequencies, thereby selecting a frequency, according to the scanner type that is inputted into the structure and to process the output signals from the input means so as to produce digital data representing measured time durations, allowing counting of the clock signals by further means.

Id. at *35 (emphasis in original). The Court construed the corresponding structure as:

> the clock mux 16, the transition detector 24, sequencing means 28, and digitizer counting means 30.

Id. (emphasis in original).

The construed functions are (1) selecting a frequency from one of the predetermined frequencies, (2) measuring the time durations using the selected frequency, and (3) producing digital time duration data. PSC's devices perform these functions by selecting one of the predetermined frequencies for each "scanner type." Each of these frequencies allows the counting means to count the time durations of the high and low levels received from the bar code from each scanner type. These time durations are indicative of the relative widths of the bars and spaces in the bar code symbols. The DAT II chip

> processes the signal [from the scanner by] convert [*28] [ing it] into a series of 13 bit binary numbers by counting the number of cycles, of a fixed time base clock, between transitions of the signal (bar code edges).

(DAT II Theory of Operation, Metrologic Ex. 24, p. 3.)

The structure for performing this function includes a clock mux, a transition detector, sequencing means, and digitizer counting means. A clock mux takes several different clock inputs and outputs one of them according to a control command. The control command may request the fastest clock or the slowest clock or a clock with a specific frequency. That DAT II chip includes a clock mux to select frequencies. (See DAT II Clock Generation Diag., Metrologic Ex. 23, p. 14, col. 4.)

"The front end state controller detects bar/space transitions and generates 13 bit numbers which are the count of . . . clock cycles between transitions." (DAT II Theory of Operations, Metrologic Ex. 24, p. 7.) This is the transition detector. According to PSC's expert, Roger Palmer, the DAT II Front End diagram, Metrologic Ex. 23, p. 6 (PSC0020080) includes a sequencer, "which provide[s] a similar functionality to that in item 28 in the *'027 patent*." Item 28 in the *'027 patent* [*29] and *'342 patent* is the "sequencing means." The "13 bit parallel load ripple counter" (id. at 8) is the digitizer counting means.

PSC's only argument regarding this limitation involved its proper construction. See Markman Decision at *34 ("The parties' dispute with respect to the corresponding structure for this function revolves around whether the clock mux 16 is included as part of the structure.") Now that the Court has construed the limitation in favor of Metrologic, the record does not reflect a factual dispute regarding infringement and summary judgment is properly entered in favor of Metrologic.

3. Claims 8 & 10, Limitation 9 – "decoder programmable for decoding a second type of bar code"

Limitation 9 recites "wherein said device comprises a second decoder for receiving said processed signals, said second decoder being programmable for decoding a second type of bar code or other digital code." This limitation is not written in means–plus–function format. The Court construed Limitation 9 as follows:

> the decoder must be programmable to decode a wide variety of codes and a symbology, and refers to a programmable processor. This decoder does not refer to [*30] the fixed program decoder, which is inflexible. The use of the word "second" does not require that a first decoder be included within the patent. Although the element is not a means–plus–function element, the corresponding structure is a programmable processor, equivalent to the programmable processor 26.

Id. at *39 (emphasis in original).

Limitation 9 requires a programmable decoder/processor. The Magellan Devices include this element. Each of PSC's devices incorporates at least one DAT II chip, and each DAT II chip has two decoders, either one of which satisfies this limitation. (See DAT II Theory of Operation, Metrologic Ex. 24, p. 4 ("The DAT II has two decode processors that can access the interval count data. This enables two different bar code types to be decoded in real time by one DAT II.").)

PSC's only arguments involved the proper construction of this limitation and thus, the record standing as it does, warrants the granting of summary judgment in favor of Metrologic.

4. Limitation 10 – "means for providing a reference input frequency and plural frequency dividing means for successively dividing said reference input frequency"

Limitation 10 recites [*31] "wherein said means for generating a plurality of frequencies compromises means for providing a reference input frequency and plural frequency dividing means for successively dividing said reference input frequency." Metrologic's construction of this claim has not been contested by PSC, and thus the Court did not construe it. This is a means–plus–function claim element that further describes the means for generating a plurality of frequencies in Limitation 6.

Limitation 10 includes two parts: the first part is "means for providing a reference input frequency," and the second part is "plural frequency dividing means for successively dividing said reference input frequency." The function of the first means is to provide a reference frequency, and the function of the second means is to successively divide the reference frequency. The reference frequency is the frequency generated by the clock input (e.g., the crystal oscillator in the *'342 patent*). Dividing the reference frequency means generating subfrequencies in a predetermined relationship to the reference frequency, such as dividing by factors of 2.

The structure of Limitation 6 was construed by the Court as "the Clock Input [*32] 12, which is either the Crystal Oscillator 13 or other External Clock 15, and the Clock Circuitry Divider 14." Markman Decision at *32 (emphasis in original). The structure of Limitation 10 is therefore parsed into two parts corresponding respectively to each of the functions in Limitation 10: (1) "the Clock Input 12, which is either the Crystal Oscillator 13 or other External Clock 15" and (2) "the Clock Circuitry Divider 14."

Metrologic contends that Limitation 10 is merely a more specific rendering of Limitation 6, where the functions and structures of the two parts were construed by the Court. The DAT II chip generates a fundamental reference clock, CLK (equivalent to CLOCK0). This fundamental clock is a reference input frequency. CLK is generated using an external crystal oscillator, an external oscillator module, or an external ring oscillator. The DAT II chip's external ring oscillator is an external input to the clock input circuit on the DAT II chip schematic, and it corresponds to external clock 15 which is an external input to clock input 12 of the *'342 patent*.

CLK (or its derivative, CLOCK0) is successively divided down into 16 other clocks, CLOCK1–CLOCK 16, ranging [*33] from 40 MHz to 610 Hz. The DAT II chip includes a series of dividers that successively divide down the clock source. This is the identical function as called for by Limitation 10 and Metrologic is therefore entitled to summary judgment.

C. Metrologic's Motion on the *'027 Patent*

Metrologic also argues that summary judgment should be granted in its favor with respect to the *'027 patent*, contending that PSC's accused devices meet each and every element of Claims 1, 6, and 28 of the *'027 Patent*.

1. Claims 1 & 6, Limitation 5 – "common timing means" Limitation 5 recites:

> common timing means for measuring the time duration of the first and second signal levels between the detected signal level transitions in the supplied digital data signal, and producing digital data related to the time duration of the first and second signal levels in the supplied digital data signal.

In its Markman Decision, this Court construed the function of this limitation as "measuring the time durations of the digital data signals using the frequency appropriate for the scanner type detected." Id. at *40 (emphasis in original). The Court construed the corresponding structure [*34] as:

> the clock input 12 (either from a crystal oscillator 13 or other external clock 15), the clock divider circuitry 14, the clock mux 16, and the counters 50 and 52.

Id. (emphasis in original).

The construed functions thus are (1) measuring the time durations of the digital data signals using the frequency appropriate for the scanner type detected and (2) producing digital time duration data. The Magellan Devices perform the recited function of using a clock input that is either a crystal oscillator or another external clock, a clock circuitry divider, clock mux, and counters (or their equivalents).

Metrologic contends that infringement of this limitation is extremely similar to infringement of Limitations 6 and 7 of the *'342 patent*. The Magellan Devices perform these functions by generating a fundamental clock reference frequency, CLK, and generating a plurality of subfrequencies (CLOCK0–CLOCK16) related to the fundamental frequency. One of the subfrequencies is selected for each "scanner type" and each of these frequencies allows the counting means to count the time durations of the high and low levels received from the bar code for each scanner type. [*35]

These time durations are indicative of the relative widths of the bars and spaces in the bar code symbols. The DAT II chip then produces digital count data related to the time duration of the high and low signals coming

from the scanners.

The structures for performing these functions include a clock input, clock divider circuitry, clock multiplexer, and counters. The DAT II chip has a clock input circuit to generate the fundamental frequency. This clock input circuit has inputs from an external crystal oscillator, an external oscillator module, or an external ring oscillator. The DAT II chip's external ring oscillator used with the Magellan scanners and some of the VS1200 and HS1250 scanners is an external input to the clock input circuit on the DAT II chip schematic, and it corresponds to external clock 15 which is an external input to clock input 12 of the *'027 patent*. The DAT II chip has clock divider circuitry as well made up of a bank of flip-flops to divide the fundamental frequency into subfrequencies. Metrologic contends that this is the identical function as called for by the claim and *§ 112,* P 6. See *Odetics, 185 F.3d at 1267*.

In addition, the DAT II [*36] chip has a clock mux that takes as inputs the subfrequencies and outputs one of them according to a control command. The control command may request the fastest clock or the slowest clock or a clock with a specific frequency. The DAT II chip has a counter realized by the "13 bit parallel load ripple counter" depicted in DAT II Front End Diagram, Metrologic Ex. 23, p. 8 (PSC0020080).

PSC again argues that the ring oscillator frequency it uses is not as exact as that of a crystal oscillator and therefore "the count values measured in the bar/space counters in [devices using a ring oscillator] do not correspond to time durations." (PSC's Opp. Brief at 25.) Instead, PSC argues, its devices process "the ratios of neighboring bar/space widths . . . regardless of the actual amount of time of any given bar or space" and do not know the "amount of time that corresponds to any given count" and therefore do not perform the function of measuring time durations. (Id.)

In its Markman Decision, this Court stated that "there is nothing in the claim language itself which requires that the actual time corresponding to bar and space widths be known." Id. at *40. Thus, even if PSC's devices [*37] do not know the "amount of time that corresponds to any given count," they do nonetheless count pulses and bar and space widths, thereby performing the recited function and infringing this limitation. For this reason, Metrologic's motion for summary judgment will be granted.

2. Claims 1 & 6, Limitation 7 - "common data processing means"

Limitation 7 recites:

> common data processing means operably associated with said common timing means and programmed for processing said digital data from the supplied digital data signal, so as to produce decoded symbol data representative of the bar code symbol being scanned by said scanning device producing the supplied digital signal.

This Court construed the function of this limitation as:

> processing digital data from the supplied data signal to produce decoded symbol data representative of the bar code symbol being scanned by said scanning device producing the supplied digital signal.

Markman Decision at *43 (emphasis in original). Neither party disputed the interpretation of this function. Id at *41. The Court thus construed the corresponding structure as:

> consisting of either the programmable [*38] processor 26 or the fixed program decoder 20. There is no requirement that the structure must consist of both the programmable processor 26 and the fixed program decoder 20.

Id. (emphasis in original). Thus, Limitation 7 requires a programmable processor or a fixed program decoder.

PSC argues that summary judgment must be denied because Metrologic has not established that the common data processing means in the *'027 patent* is present in the accused devices. [HN6] To determine whether the accused devices infringe, it must be determined whether each and every element of the asserted claim is present in the accused device. If even a single claim element is not present, the claim is not infringed. *Telemac Cellular Corp. v. Topp Telecom, Inc., 247 F.3d 1316, 1330 (Fed. Cir. 2001)*.

PSC relies primarily upon the second paragraph of *35 U.S.C. § 112* for purposes of opposing Metrologic's motion for summary judgment. *35 U.S.C. § 112,* P 2 provides: "The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention. [*39] " PSC, citing to *Tehrani v. Hamilton Medical, Inc., 331 F.3d 1355 (Fed. Cir. 2003)* and *WMS Gaming Inc. v. International Game Tech., 184 F.3d 1339 (Fed. Cir. 1999)*, argues that the structure of a microprocessor in a means-plus-function element includes the algorithm used to implement the recited function. Moreover, PSC contends that under Federal Circuit precedent, *§ 112* P 2 requires disclosure of structure in the specification, and does not permit reliance on knowledge of persons skilled

in the relevant arts when no structure is disclosed. See *Atmel Corp. v. Information Storage Devices Inc., 198 F.3d 1374, 1382 (Fed. Cir. 1999)*. PSC concludes that because the *'027 patent* does not disclose the relevant algorithm or reference known algorithms, its accused devices cannot infringe. In other words, in view of the requirements for reciting structure in the specification, and in view of the fact that the algorithm or program for microprocessor-based devices is part of the structure, failure to disclose the algorithm or program implemented in such devices is a failure to disclose the structure that is required by *§ 112* PP 2 and [*40] 6.

The Federal Circuit has found, however, that "there would be no need for a disclosure of the specific program code if . . . one skilled in the art would know the kind of program to use." *Medical Instrumentation and Diagnostics Corp. v. Elekta AB, 344 F.3d 1205, 1214 (Fed. Cir. 2003)*, cert. denied, *541 U.S. 959*, *124 S. Ct. 1715*, *158 L. Ed. 2d 400 (2004)*. The cases cited by PSC specifically held that the corresponding structure for the claim limitations at issue necessarily included the algorithms. That is not the case here. As the *'027 patent* discloses, the "programmable processor decoder can be programmed to decode a wide variety of codes," including UPC and EAN codes. (*'027 patent*, 2:36-49.) The programmable processor 26 is described in the illustrative embodiment as an 8-bit microprocessor with a first-in, first-out (FIFO) memory having the same characteristic as known programmable processor decoders. (Id., 4:2-8 and 20:2-4.)

Moreover, both cases cited by PSC are inapposite to the present situation and thus distinguishable. In WMS Gaming, the algorithm at issue was not only unknown to one of ordinary skill in the art, but was also the only point of novelty in the patent [*41] at issue. In the instant case, however, the algorithms used by the programmable processor in the *'027 patent* are well known, not novel, and "in prevalent use." (See *'027 patent*, 2:30). Indeed, PSC's own expert, Roger Palmer conceded as much:

> Q: Would one of ordinary skill in the art understand what was involved in writing software for a programmable processor to be able to decode a symbology without any further instruction in the patent?
>
> A: Yes.

(Palmer Dep., Metrologic Ex. 21, 155:24 to 156:5; see also Dec. of Roger Palmer in Support of PSC's Opposition to Metrologic's Motion for Summary Judgment of Infringement of *U.S. Patent Nos. 5,081,342* & *5,343,027* (May 30, 2002), PP97-101.)

In Tehrani, the invention at issue was an apparatus which automatically controlled a respirator and used an algorithm to calculate breath frequency and tidal volume based on five variables or data inputs. The parties there agreed that the structure corresponding to the processing function included a microprocessor and an algorithm. The algorithm in Tehrani was not known to one of ordinary skill in the art and was instead the point of novelty. *Tehrani, 331 F.3d at 1360* [*42] (noting that the inventor so advised the Patent and Trademark Office during prosecution, "The novelty of the present invention lies in its use of all of the data recited in claims 1 and 16 in determining the ventilation and breathing frequency for a patient.").

As Metrologic points out, here neither the programmable decoder of the *'027 patent* nor the decoding algorithm is the precise point of novelty. The invention of the *'027 patent* is not a bar code decoder per se, but rather a bar code reader having the ability to handle inputs from multiple bar code scanners. The bar codes decoded by the *'027 patent* decoder are standard bar code symbologies and the decoding algorithms are standardized in the industry and thus very well known.

Thus, no genuine issue of material fact appears to exist as to structural equivalence between programmable processor 26 and the DAT II chip's programmable decoder, as they seemingly perform the same function of processing and decoding data with identical structure, a programmable processor. Summary judgment is therefore appropriate on Limitation 7 in favor of Metrologic.

D. PSC's Motion on the *'852 Patent*

PSC moves for summary judgment, alleging that [*43] its Duet and VS800 bar code scanners do not infringe Metrologic's *'852 patent*. PSC contends that under this Court's construction of the first of the asserted four claim limitations - the highly collimated projected scanning pattern - PSC is entitled to summary judgment.

1. Claim Construction of the "Highly Collimated Scanning Pattern" Limitation and Alleged Infringement

This Court stated in its Markman Decision:

> This Court construes the claim language "highly collimated projected scanning pattern" as a scanning pattern of scan lines that is columnar in nature, or as columnar as possible, given practicable design constraints. The Court does not construe "highly collimated" as referring to the richness of the scan pattern into which bar coded items can be presented for reading irrespective of orientation. Rather, "highly collimated" refers to the columnar nature of the laser light projection

containing the scan pattern.

Id. at *22 (emphasis in original). The Court warned further that "plaintiff is estopped from asserting that the claim language 'highly collimated' refers to anything other than 'roughly columnar,' opposite from widely divergent." Id [*44] . at *20.

PSC argues that the accused devices do not have a highly collimated scanning pattern, thereby not infringing the *'852 patent*, and points to four separate pieces of evidence to establish that the scanning patterns of its devices are not highly collimated. If even a single claim element is not present in the accused device, the claim is not infringed. *Telemac Cellular Corp. v. Topp Telecom, Inc., 247 F.3d 1316, 1330 (Fed. Cir. 2001)*.

First, PSC finds support for its position in the photos attached to its expert, Roger Palmer's Declaration. Exhibit J to Roger Palmer's Declaration shows the projected scan pattern of the Duet at 0, 2, 4, 6, and 8 inches from the scanner window. Also, Exhibit K shows the projected scan pattern of the VS800 at 0, 2, 4, 6, and 8 inches from the scanner window. Second, PSC asserts that Roger Palmer's expert declaration establishes that the scanning patterns are not columnar in nature. In that Declaration, Mr. Palmer concluded, based on his observations of the scanning patterns, that the scanning patterns "are not columnar. To the contrary - they rapidly increase in size and drastically change in shape as the distance from the scanner [*45] window increases." (Palmer Decl. at P 62.) Third, PSC argues that the scanning patterns were intentionally designed to be relatively wide and diverging to accommodate sweep scanning applications. (See Palmer Decl. at P 72.) PSC contends that no evidence has been proffered in opposition to PSC's proof that the accused devices were designed to operate in sweep mode, where a wider scanning pattern is more desirable. It thus follows that the scan patterns of the accused devices are neither columnar in nature, nor as columnar as possible, given practicable design constraints. Finally, PSC asserts that the testimony of Mark Schmidt, Vice President of Metrologic, confirms that the scanning patterns are not columnar in nature. Mr. Schmidt testified that the scanning patterns had vertical lines that extended "quite far up" and "off to the sides." (Palmer Decl. at P 69 and Exhibit O attached thereto.) Moreover, after examining a Duet at a trade show, Mr. Schmidt wrote a memorandum that described the scan pattern of the Duet as "not highly collimated (not really narrow)." (Palmer Decl. at P 65 and Exhibit L thereto.)

Metrologic responds that Figure 1 of the '842 patent actually illustrates the [*46] scan pattern of the patented device. (See '842 Patent, Figure 1; 10/1/04 Oral Argument Tr. 39:3-5.) Figure 1 shows a scan pattern that is a frustrum shape, radiating out and producing a scan that is highly collimated. Metrologic contends that if Figure 1's scan pattern is compared with Palmer's photographed scanning patterns of the accused devices, the two are of a very similar shape. Moreover, Metrologic argues that the tests performed by Mr. Palmer are misleading in that there are a number of single lines that extend out, giving the impression that the scan pattern is not columnar, but rather is widely divergent. However, such an image does not indicate where, within the scan pattern, the barcode scanner is actually capable of reading the barcode that is placed before it. (10/1/04 Oral Argument Tr. 40:6-15.) Metrologic's expert, Dr. David Daut, performed tests similar to those of Mr. Palmer, but produced diagrams showing the scan pattern for the areas in which the barcode was actually readable. (See Decl. of David Daut, Ph.D., Metrologic Ex. 1; Metrologic Ex. 2.) These images, Metrologic contends, support its position that the accused devices' scan patterns are indeed columnar [*47] in nature.

This conflicting evidence contained in the record as presently developed demonstrates that a question of fact indeed remains that is best resolved by a jury, rather than an issue which can be decided on a motion for summary judgment. While it is well established that "patent drawings do not define the precise proportions of the elements and may not be relied on to show particular sizes if the specification is completely silent on the issue," *Hockerson-Halberstadt, Inc. v. Avia Group Intern., Inc., 222 F.3d 951, 55 U.S.P.Q.2d 1487, 1491 (Fed. Cir. 2000)*, reasonable minds could conclude that the accused devices do indeed produce a scan pattern that is "columnar in nature, or as columnar as possible, given practicable design constraints." At the same time, reasonable minds could conclude the exact opposite. Thus, summary judgment must be denied.

E. PSC's Motion for Summary Judgment under *35 U.S.C. § 287* on the *'342 Patent*

Defendant PSC moves for summary judgment under *35 U.S.C. § 287*, arguing that this statute provides a basis for eliminating damages for its infringement of the *'342 patent* between 1994 and June 2001. Notably, [*48] in footnote 1 of its Opposition Brief, Metrologic states that it is not contesting PSC's motion as to the patents-in-suit other than the *'342 patent*. Accordingly, the date of notice for the other patents-in-suit should be the date of the filing of the initial complaint and PSC's motion should be granted as to all patents-in-suit other than the *'342 patent*.

Metrologic's *'342 patent* issued on January 14, 1992. Shortly thereafter, Metrologic began to mark the *'342 patent* number on a label that was affixed to the products. (Declaration of Dari Buchhofer at P 3, Metrologic Ex.

2). From February 1992 continuously through December 1999, Metrologic affixed a label with the *'342 patent* on the Metrologic covered products. During this time period, the labels typically had no more than 2–3 patent numbers. (Id.)

In December 1996, Metrologic entered into a license agreement with Symbol, the leading seller of bar code scanners for the United States retail market. (Declaration of Mark Schmidt at P 2, Metrologic Ex. 3). Under this license agreement, both parties elected (or could elect) to take certain licenses to the other party's patents. Consequently, Metrologic ultimately became obligated [*49] to mark each of its products with approximately 45–50 Symbol patents depending on the product. Owing to the number of patents involved and the impracticality of placing all the Symbol patents on Metrologic's products, the agreement specified that Metrologic mark its products by placing "See Reference Manual for Patent Coverage" (or a substantially similar statement) on the product and list the patent numbers in the reference manual. (See Metrologic Ex. 17; Declaration of Nancy Smith at P 2, Metrologic Ex. 4.)

In December 1999, Metrologic adopted the marking approach set forth in the agreement with Symbol for its patents as well as the Symbol patents. Thus, Metrologic patent numbers were removed from the products and in place of the specific patent numbers, the product label contained the notice phrase, "See User's Guide for Patent Coverage." (Metrologic Ex. 8.)

The *'342 patent* was added to this suit in June of 2001, and the first time Metrologic placed PSC on actual notice of this claim of infringement of the *'342 patent* was in a letter dated April 10, 2001, requesting leave to amend its Complaint. PSC contends that because Metrologic failed to mark substantially all its products [*50] consistently and continuously in compliance with *§ 287*, Metrologic is barred from recovering damages for any acts of infringement of the *'342 patent* prior to April 10, 2001.

[HN7] *Section 287* of the patent statute requires a patentee to give either constructive or actual notice of infringement before monetary damages for infringement can accrue. A patentee may give notice

> either by fixing [on the patented article] the word "patent" or the abbreviation "pat.", together with the number of the patent, or when, from the character of the article, this can not be done, by fixing to it, or to the package wherein one or more of them is contained, a label containing a like notice. In the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice.

*35 U.S.C. § 287*.

One way to satisfy *§ 287* is to provide actual notice of infringement to the infringer. *Lans v. Digital Equipment Co., 252 F.3d 1320, 1326 (Fed Cir. 2001)*; *Amsted Indus. v. Buckeye Steel Castings Co., 24 F.3d 178, 185 (Fed. Cir. 1993)*. [*51] The requirements as to what constitutes actual notice are strict: the patentee must provide the accused infringer with specific and actual notice that charges infringement of an identified patent by a specific accused product. *Amstead Indus. Inc., 24 F.3d at 187*. Any notice that does not identify the patent number and the accused product does not qualify as actual notice under *§ 287*.

[HN8] The other way to satisfy *§ 287* is to provide "constructive notice" by complying with the strict marking requirements set forth in the statute. However, a patentee does not comply with the marking requirements until it can show that it "consistently marked substantially all of its patented products, and it was no longer distributing unmarked products." *American Medical Systems, Inc. v. Medical Engineering Corp., 6 F.3d 1523, 1538 (Fed Cir. 1993)*, cert. denied, *511 U.S. 1070, 128 L. Ed. 2d 366, 114 S. Ct. 1647 (1997)*.

PSC argues that Metrologic did not comply with *35 U.S.C. § 287* in two separate ways, either one of which would be sufficient to bar damages. First, PSC argues that Metrologic's use of the "See User's Guide" marking does not satisfy the strict requirements [*52] of *§ 287*. Second, PSC contends that Metrologic failed to mark the *'342 patent* on its MS7120 and MS6720 barcode scanners ("the unmarked products"), which are covered by at least claim 5 of the *'342 patent*.

1. Improper Marking: The User Guide

PSC argues that Metrologic did not provide actual notice of infringement to PSC until April 10, 2001, at the time that it filed its amended complaint. (Hyun Decl. at P 15.) Metrologic, however, contends that this is incorrect because its amended complaint "relates back" to the October 1999 filing date under *Fed. R. Civ. P. 15(c)*. *Rule 15(c)* provides in pertinent part:

> [HN9] An amendment of a pleading relates back to the date of the original pleading when . . . (2) the claim or defense asserted in the amended pleading arose out of conduct, transaction, or occurrence set forth or attempted to be set forth in the original plead-

ing.

*Fed. R. Civ. P. 15(c)* (emphasis added). [HN10] *Rule 15(c)* is most frequently applied to avoid the dismissal of claims on statute of limitation grounds, but has also been applied in patent cases with respect to the patent damages provisions of *35 U.S.C. § 286*. n4

n4 [HN11] *35 U.S.C. § 286* is not a true statute of limitations, but instead serves to limit infringement damages to six years prior to the filing of the Complaint. See *Standard Oil Co. v. Nippon Shokubai Kagaku Kogyo Co., 754 F.2d 345, 348 (Fed. Cir. 1985)*. In patent cases, the two most common relation back scenarios involve adding a related patent, see *Applied Vision Inc. v. Optical Coating Lab., 1997 U.S. Dist. LEXIS 16306, 1997 WL 601425 (N.D. Cal. Sept. 23, 1997)*; *Hooker Chem. & Plastics Corp. v. Diamond Shamrock Corp., 87 F.R.D. 398, 503 (W.D.N.Y. 1980)*, or adding a related party, see *Aerotel, Ltd. v. Sprint Corp., 100 F. Supp. 2d 189 (S.D.N.Y. 2000)*; *E.I. duPont de Nemours & Co. v. Phillips Petroleum Co., 621 F. Supp. 310 (D. Del. 1985)*.

[*53]

The Federal Circuit has offered little, if any, guidance on the applicability of the relation back doctrine to patent infringement claims. District courts which have entertained the issue tend to find that [HN12] infringement of one patent is not the same conduct or occurrence as infringement of another patent for the purposes of relation back, unless the claims with respect to the second patent are an integral part of the claims in the first action. See e.g., *Taho Sierra Preservation Council v. Tahoe Regional Planning Agency, 808 F. Supp. 1474, 1482 (D. Nev. 1992)*, aff'd in part, rev'd in part on other grounds, *34 F.3d 753 (9th Cir. 1992)*,amended by, *42 F.3d 1306 (9th Cir. 1994)*, cert. denied sub nom, *514 U.S. 1036, 131 L. Ed. 2d 288, 115 S. Ct. 1401 (1995)*; *Illinois Tool Works, Inc. v. Foster Grant Co., Inc., 395 F. Supp. 234, 250–51 (N.D. Ill. 1974)*, aff'd, *574 F.2d 1300, 1976 U.S. App. LEXIS 6009 (7th Cir. 1976)*.

Many of the cases dealing with relation back focus on whether fair notice was given to the opposing party. However, the concept of fair notice under *Fed. R. Civ. P. 15(c)* is seemingly in direct tension with *35 U.S.C. § 287* [*54] 's strict requirements of actual notice, wherein the patentee must provide the accused infringer with specific and actual notice that charges infringement of an identified patent by a specific accused product. See *Amsted, 24 F.3d at 187*.

Moreover, unlike in the cases cited by Metrologic in support of its position, namely *Hooker Chem. & Plastics Corp. v. Diamond Shamrock Corp., 87 F.R.D. 398 (W.D.N.Y. 1980)*, and *Applied Vision, Inc. v. Optical Coating Lab., 1997 U.S. Dist. LEXIS 16306, 1997 WL 601425 (N.D. Cal. Sept. 23, 1997)*, this is not a situation in which the amendment concerned the inclusion of a newly issued continuation patent of the patent–in–suit. Instead, the *'342 patent* is the parent application to the three later continuations – the *'027 patent*, the '717 patent, and the '049 patent – all three of which were included in the original Complaint. While it may be said that a Complaint including allegations of infringement of the parent patent (the *'342*) would provide sufficient notice of infringement of the continuations (the *'027*, '717, and '049 patents) as well, the reverse does not necessarily hold true. Thus, the Court finds that Metrologic's original [*55] Complaint did not afford the degree of notice contemplated by *35 U.S.C. § 287* and holds relation back to be inappropriate.

Metrologic nevertheless contends that even if PSC lacked actual notice, it had constructive notice of its alleged infringement. Constructive notice is provided only when the patentee complies with the marking requirements set forth in *35 U.S.C. § 287*. Moreover, marking of the patented article must comply strictly with this section to constitute notice to the world. See *T.C. Weygandt Co. v. Van Emden, 40 F.2d 938 (S.D.N.Y. 1930)*. Here, it is undisputed that after December 1999, Metrologic stopped marking the number of the *'342 patent* directly on its covered products (e.g., the 700 series scanners), and replaced the patent number with the phrase "See User's Guide for Patent Coverage." After December 1999, the *'342 patent* number was listed only in the user's guide. (Hyun Decl. at P 20.) The statutory language plainly recites, however, that marking is proper when it appears either on the product itself or on the package containing the product.

Metrologic has admitted that, although it was physically possible [*56] to continue marking the patent number directly on its products after December 1999, it ceased doing so for pure reasons of marketing; aesthetics counseled against defacing the product with a multitude of patent numbers. (Id. at P 22.) Despite the fact that Plaintiff failed to comply with the statute's preferred method of marking, Metrologic further failed in not adhering to the statute's alternative method of providing constructive notice: marking the package. Instead, Metrologic, through a label on its products' boxes, directed the public to the user guide for patent information.

Metrologic argues that listing the patent numbers of its products in the related instruction manuals comports with the marking requirement imposed by *35 U.S.C. § 287*. It is true that lower courts have refused to "severely

scrutinize the character of the patented articles to determine whether the article was capable of being marked." See *Rutherford v. Trim-Tex, Inc., 803 F. Supp. 158, 161 (N.D. Ill. 1992)*. Indeed, a variety of product character considerations such as "defacement, custom of the trade, expense and other reasonable factors" are taken into account in [*57] determining whether alternative marking is permissible. *Id. at 163* (citing *Wayne-Gossard Corp. v. Sondra Mfg., Inc., 579 F.2d 41, 43 (3d Cir. 1978)*). Furthermore, Metrologic points to a sizable line of cases that stand for the proposition that placing patent numbers on the associated packaging complies with the marking statute even though it is physically possible to place the patent number on the article itself. See e.g., *Chicago Pneumatic Tool Co. v. Hughes Tool Co., 192 F.2d 620, 626 (10th Cir. 1951)*; *Saf-gard Prods., Inc. v. Serv. Parts, Inc., 491 F. Supp. 996, 1010 (D. Ariz. 1980)*; *Bergstrom v. Sears, Roebuck and Co., 496 F. Supp. 476, 494 n.9 (D. Minn. 1980)*. Even the Supreme Court has not mandated that the article be marked if at all physically possible, but rather allows great discretion in the patentee to alternatively mark the package. *Sessions v. Romadka, 145 U.S. 29, 36 L. Ed. 609, 12 S. Ct. 799, 1892 Dec. Comm'r Pat. 382 (1892)*. This precedent, therefore, would seemingly excuse Metrologic for its failure to mark its patent numbers directly on the associated products, even though it was physically possible to do so.

Those same [*58] cases, however, do not excuse Metrologic for its additional failure in providing patent numbers on the packages containing the product, as the language of the marking statute explicitly requires. Metrologic points to *Rexnord, Inc. v. Laitram Corp., 6 U.S.P.Q.2d 1817, 1845 (E.D. Wisc. 1988)*, to argue that packaging for purposes of *§ 287* is broadly construed to include any literature that is shipped with the device. In Rexnord, patented conveyor belt products were marked with some but not all applicable patent numbers. Included with each shipment, however, were installation instructions that listed all the patents-in-suit including one patent that was not marked on the product. *Id. at 1845*. The court held there that listing the additional patent numbers in the installation guide shipped with the product constituted proper notice under *§ 287*. Id.

Unlike in*Rexnord*, however, here, Metrologic did not include a single patent number in either of the two ways that the statute delineates: either on the product itself or on that product's package. In Rexnord, at least one patent-in-suit number was included in the statutorily proscribed manner, [*59] with additional applicable patent numbers appearing in the installation guide.

Courts have noted that a practical common sense approach must be taken when dealing with issues of compliance for the marking provisions of *§ 287*, given that the purpose of the statute is to provide notice to the public of patent coverage. See *Rutherford, 803 F. Supp. at 163*; *Shields—Jetco, Inc. v. Torti, 314 F. Supp. 1292 (D.R.I. 1970)*, aff'd, *436 F.2d 1061 (1st Cir. 1971)*. When, as here, the public finds no marking or writing on the product itself, the statute contemplates that the packaging is the next most logical place for effective notice of the existence of the patent. Metrologic failed to provide that notice on the package. All that was to be found on those packages were labels stating "See User's Guide for Patent Coverage." Although Metrologic argues that a user's guide is different in important ways from the fact sheets bearing the appropriate patent numbers that were distributed in *Calmar, Inc. v. Emson Research, Inc., 850 F. Supp. 861 (C.D. Cal. 1994)*, and is likely to follow the product through its life in a way that the packaging [*60] is not, marking the user's guide is yet another step removed from the product. And it is, in addition, a step beyond that which the explicit language of the marking statute contemplates.

While this Court now finds that PSC is entitled to summary judgment and Metrologic is therefore precluded from collecting damages under the *'342 patent* after December 1999 and prior to April 10, 2001, that portion of PSC's motion pertaining to damages from January 1994 to December 1999 must be denied. PSC does not dispute that Metrologic properly marked its products shortly after the issuance of the *'342 patent* in 1992 or that Metrologic properly marks its products continuously through December 1999. As PSC's first date of alleged infringement was in 1994, it is further undisputed that Metrologic was properly marking its products at the time PSC began to infringe. During this period of proper marking, would-be-infringers had constructive notice. Moreover, as the District of Colorado held in *Clancy Sys. Int'l., Inc. v. Symbol Techs., Inc., 953 F. Supp. 1170 (D. Col. 1997)*, a subsequent failure to mark does not insulate the infringer from damages for the period in which proper marking [*61] was in effect. *Id. at 1174*. n5 "It would make no sense to hold that . . . failure to mark eliminates, retroactively, years of appropriate proper notice." Id. Thus, that portion of PSC's motion with respect to damages from January 1994 to December 1999 must be denied.

n5 PSC argues that Clancy is inapplicable because it applies only to licensees, not patentees. It is not entirely clear that this is an accurate characterization, however. Indeed, both the court's actual language in*Clancy* as well as its underlying logic does not support PSC's argument on this point.

2. Failure to Mark the MS7120 and MS6720 Scanners

Even if Metrologic had properly complied with the marking statute, PSC contends that it additionally does not satisfy the requirements of *35 U.S.C. § 287* by its failure to mark the MS7120 and MS 6720 scanners. PSC argues that these scanners are covered by claim 5 of the *'342 patent* based on this Court's August 26, 2003 claim construction and, furthermore, [*62] contends that because Metrologic did not mark these scanners, Metrologic's damages should be limited. While Metrologic does not dispute that its MS6720 and MS7120 scanners meet the "means for generating" element of claim 5, Metrologic contends that these products do not meet the "means for measuring" element because they do not select a frequency.

Claim 5 of the *'342 patent* states as follows:

> [Preamble] A device for processing plural digital input signals, each said digital input signal having first and second levels, and being provided to said device by at least one input means, and each said digital input signal representing a code symbol recorded on a medium read by said input means, the frequency of each said digital input signal from said input means being a function of the type of said input means and the resolution of said code symbol as recorded on said medium, said device comprising
>
> [Limitation 6] means for generating a plurality of predetermined frequencies and
>
> [Limitation 7] means for measuring the time duration of each of said first and second levels of said digital input signals using one of said plurality of frequencies and producing digital data [*63] representing said measured time durations for use by decoder means for decoding said code symbol.

This Court ruled that the preamble of claim 5 is not a limitation and that the decoder means is not a separate element of claim 5. Markman Decision at *30, *38. Thus, claim 5 is left with only two limiting elements: the "means for generating" element and the "means for measuring" element. The frequency selection requirement, which Metrologic now asserts is not present in the MS6720 and MS7120, is part of the "means for measuring" element.

This Court treated both of these elements as "means plus function" elements. For the means for generating element, this Court ruled that the function is "to generate a plurality of predetermined frequencies, predetermined meaning that the division of the clock pulse frequency by two is a constant, fixed process which allows the frequency to always constitute half its original number." Id. at *30, *33. It also identified the structures corresponding to this function as: (a) the clock input 12, (b) either the crystal oscillator 13 or the external clock 15, and (c) the clock divider circuitry 14. Id. at *32.

For the means for measuring [*64] element, this Court ruled that the function is

> to use a frequency from one of the predetermined frequencies, thereby selecting a frequency, according to the scanner type that is inputted into the structure and to process the output signals from the input means so as to produce digital data representing measured time durations, allowing counting of the clock signals by further means.

Id. at *35. Moreover, this Court identified the structures corresponding to this function as: (a) the clock mux 16, (b) the transition detector 24, (c) the sequencing means 28, and (d) the digitizer counting means 30. Id. As claim 5 includes only the two limitations discussed above, that claim covers any device that includes both elements.

Metrologic does not dispute that its MS6720 and MS7120 scanners meet the "means for generating" element, but does contend that these products do not meet the "means for measuring" element because they do not select a frequency. PSC asserts that since the unmarked products include a structure that is the same as or equivalent to the transition detector 24, the sequencing means 28, the digitizer counting means 30, and since the unmarked products [*65] also include a structure that is the same as or equivalent to the clock mux 16, the unmarked products satisfy the means for measuring element of claim 5 of the *'342 patent*. These products are therefore patented articles and invoke the marking requirements of *35 U.S.C. § 287*.

Metrologic argues that the MS6720 and MS7120 scanners do not perform the function of "selecting a frequency" from one of the predetermined frequencies and therefore do not meet all the limitations of claim 5. In particular, these products do not "use a frequency from one of the predetermined frequencies, thereby selecting a frequency" because the scanners operate at only a single frequency. The MS6720 and MS7120 are not designed or configured to handle digital input signals at different frequencies. (Wilz Decl., App., Ex. 5, P 2.) The *'342 patent*, however, is directed toward a device that operates at more than one frequency, and is capable of selecting "one of a plurality of operating frequencies." Markman Decision at *35 (emphasis in original). Metrologic's ba-

sic argument therefore is that because the MS6720 and MS7120 scanners do not select a frequency from one of the predetermined [*66] frequencies, as a matter of law they cannot fall within the claims.

PSC previously set forth proof at the Markman hearing that establishes that the unmarked products contain the transition detector 24, the sequencing means 28, and the digitizer counting means. The only issue remaining for this Court therefore is whether the unmarked products also contain a structure that is identical or equivalent to the clock mux 16.

Metrologic has admitted that it sold MS6720 and MS7120 scanners that included a 26282 ASIC. (Palmer's *§ 287* Decl. at PP 70, 76.) That ASIC contains a clock mux. PSC's expert, Roger Palmer, relied on DX110 to explain the operation of the 26282 ASIC as follows:

> In the 26282 ASIC, a plurality of predetermined frequencies are available (see Exhibit E at page M010798 and the Kolis 11/12/01 deposition, Exhibit F, at p 460). Those frequencies are binary divisions of the crystal frequency (see Exhibit E at page M010798). One of those frequencies is selected by writing to the four CLOCK CONTROL bits of register # 5. (See Exhibit E at page M010798).

(Palmer's *§ 287* Decl. at P 66). DX110 describes the operation of the 26282 ASIC in more detail:

> Basically, [*67] the digitizer–sequencer section of the ASIC is responsible for converting the varying width intervals of a scanner's bi–level data signal into "time count" and "sign" information for decoding. The time duration of each count is dependent upon the ASIC's crystal frequency and the programming of the CLOCK CONTROL bits in register # 5. This "digitizing frequency" is selected to match the line speed of the scanner which produced the scan signal. Generally, the faster this line speed is, the higher the digitizing frequency required to resolve the scan signal.

(Palmer's *§ 287* Decl. Ex. E at M10797–98.) This passage thus discloses the function that this Court identified previously of "selecting a frequency, according to the scanner type that is inputted into the structure." DX110 continues, providing additional detail on selecting an appropriate frequency:

> Fifteen digitizing frequencies are available for selection by using the 4 CLOCK CONTROL bits of register # 5. The highest is the crystal frequency which is what the circuit defaults to when the CLOCK CONTROL bits are all zero. Programming the CLOCK CONTROL for 1–14 provides binary divisions of the crystal frequency while [*68] programming a 15 disables the digitizer by turning the clock off. The digitizing clock is selected so that it produces valid interval time counts from the incoming scanner signal within a range of 8 to 255 or 8 to 2047 depending upon which count resolution is selected (8 or 11 bits).

(Palmer's *§ 287* Decl. Ex. E at M10798).

This language supports PSC's contention that the unmarked products "use a frequency from one of the predetermined frequencies" and "[select] a frequency, according to the scanner type that is inputted into the structure," as required by this Court's claim construction.

The remaining functions of "processing the output signals from the input means so as to produce digital data representing measured time durations, allowing counting of the clock signals by further means" are performed by the transition detector, the sequencing means, and the digitizer counting means – for which PSC has previously submitted sufficient evidence to establish the presence of those structures in the unmarked products.

Having established this, the Court must now determine whether the selecting structure in the unmarked products is the same as or equivalent to the clock mux [*69] 16 shown in Fig. 1 of the *'342 patent*. In S3 *Inc. v. Nvidia Corp., 259 F.3d 1364 (Fed. Cir. 2001)*, the Federal Circuit held that "a selector is of well known electronic structure that performs a common electronic function." *Id. at 1371*. There, the Federal Circuit effectively accepted testimony that equated a selector with a multiplexer as well. *Id. at 1370–71*. DX110's description of the 26282 establishes that it selects one of the available frequencies in the 26282 and therefore contains a selector. The New IEEE (Institute of Electrical and Electronics Engineers) Standard Dictionary of Electrical and Electronics Terms defines a multiplexer as a "device for selecting one of a number of inputs and switching its information to the output." (PSC's Supplemental Ex. A.) Thus, the 26282 ASIC contains a structure that is the same as or equivalent to the clock mux 16 in the *'342 patent*.

Metrologic, in response, now attempts to argue that the MS6720 and MS7120 scanners do not perform the function of "selecting a frequency" from one of the pre-

determined frequencies and therefore do not meet all the limitations in claim 5. These products, according [*70] to Metrologic, do not "use a frequency from one of the predetermined frequencies, thereby selecting a frequency" because the scanners operate at only a single frequency. In so arguing, Metrologic apparently would read into the words "thereby selecting a frequency" in this Court's August 26, 2003 Opinion the requirement of a device that operates at different frequencies at two different times depending upon what signals are input into the device. This Court came to a very different conclusion and Metrologic's interpretation, which seemingly reads the programmable processor 26 into the claim, misconstrues this Court's construction of the claim.

The unmarked products therefore include all the elements of claim 5, thereby rendering them "patented articles" and invoking the marking requirements of *35 U.S.C. § 287*. Despite the fact that these articles should have been marked pursuant to the marking statute, they were not. Therefore, PSC is entitled to summary judgment on this issue.

**III. CONCLUSION**

For the reasons discussed above, summary judgment will be granted in favor of Metrologic on its motion regarding infringement of Claims 8 and 10 of the [*71] *'342 patent* and Claims 1, 6 and 28 of the *'027 patent*. In addition, PSC's motion for partial summary judgment of noninfringement and invalidity of the *'852 patent* will be denied. Finally, PSC's motion for summary judgment under *35 U.S.C. § 287* will be granted in part and denied in part. The accompanying Order will be entered.

**December 13, 2004**
Date

**s/ Jerome B. Simandle**

JEROME B. SIMANDLE

United States District Judge

**ORDER**

**Filed: December 13, 2004**

This matter came before the Court upon Plaintiff Metrologic Instruments, Inc.'s motion for summary judgment of infringement of Claims 8 and 10 of *U.S. Patent No. 5,081,342* (the *'342 patent*) and Claims 1, 6 and 28 of *U.S. Patent No. 5,343,027* (the *'027 patent*), in addition to Defendant PSC, Inc.'s motion for partial summary judgment of noninfringment and invalidity of U.S. *Patent No. 5,637,852* (the *'852 patent*), and finally, Defendant PSC, Inc.'s motion for summary judgment under *35 U.S.C. § 287*; and the Court having considered the papers submitted in supported thereof and in opposition thereto; and the Court having heard oral argument on October 1, 2004; [*72] and for the reasons stated in the Opinion of today's date; and for good cause shown;

IT IS on this **13th** day of December, 2004 hereby

ORDERED that Plaintiff Metrologic Instruments, Inc.'s motion for summary judgment of infringement of Claims 8 and 10 of the *'342 patent* and Claims 1, 6 and 28 of the *'027 patent* [Docket Item No. 84-1] shall be, and hereby is, **GRANTED;** and

IT IS FURTHER ORDERED that Defendant PSC, Inc.'s motion for partial summary judgment of noninfringement and invalidity of the *'852 patent* [Docket Item No. 77-1] shall be, and hereby is, **DENIED;** and

IT IS FURTHER ORDERED that Defendant PSC, Inc.'s motion for summary judgment under *35 U.S.C. § 287* [Docket Item No. 63-1] shall be, and hereby is, **GRANTED IN PART AND DENIED IN PART;** and

IT IS FURTHER ORDERED that with respect to Defendant PSC, Inc.'s motion for summary judgment under *35 U.S.C. § 287*, Plaintiff Metrologic Instruments, Inc. is precluded from asserting damages under the *'342 patent* after December 1999 and prior to April 10, 2001, but may do so for the period of alleged infringement occurring between January 1994 [*73] and December 1999.

**s/ Jerome B. Simandle**

JEROME B. SIMANDLE

United States District Judge