# EXHIBIT O

LEXSEE 1987 US DIST. LEXIS 13474

**Creative Pioneer Products Corporation and Roberto Casadio, Plaintiffs v. K mart Corporation, Defendant**

**Civil Action No. H–83–4137**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION**

***1987 U.S. Dist. LEXIS 13474; 5 U.S.P.Q.2D (BNA) 1841***

**July 10, 1987; July 10, 1987, Filed**


**CASE SUMMARY:**

**PROCEDURAL POSTURE:** The court made its findings of fact and conclusions of law following a judgment on the issues of liability against defendant in a patent infringement action brought by plaintiff pursuant to *35 U.S.C.S. § 281*, et seq.

**OVERVIEW:** In a patent infringement action brought by plaintiff against defendant for infringing its patent on its wire–stripping tool, judgment on the issue of liability was entered in favor of the plaintiff. Following trial on the issue of damages the court made its findings of fact and conclusions of law. The court found that although defendant had notice of the patent, defendant's attorneys believed in good faith that the patent was invalid on the basis of prior art and thus not infringed. Plaintiff never gave defendant notice of infringement of their patent until they filed the suit, which was the date the court used to measure damages. The court used a reasonable royalty figure of 10 percent to figure damages. Because defendant sought the advice of patent counsel who advised that the patent might be invalid, the court did not find clear and convincing evidence of wilful infringement and declined to assess increased damages, or an award of attorney's fees. The court also found that full and fair compensation to the plaintiff required that plaintiff be awarded prejudgment interest at the stipulated rate of 10 percent simple interest per annum for four years.

**OUTCOME:** The court awarded damages and pre–judgment interest at the stipulated rate to plaintiff, but denied its request for enhanced damages and attorney fees because there had been no willful infringement. The damages were calculated from the date plaintiff filed its suit, and the reasonable royalty rate was based on established rates of ten percent of gross sales.


**LexisNexis(R) Headnotes**

***Patent Law > Infringement Actions > Defenses > Marking***
***Patent Law > Remedies > Damages > Time Limitations***
[HN1] *35 U.S.C.S. § 287* limits the recovery of damages for patent infringement to the time period commencing with either the use of a proper patent notice, notice of infringement, or filing of an action for infringement. The statute provides that a proper patent notice may be given either by fixing the notice of the patent and number on the article, or when from the character of the article this cannot be done, by fixing to it or to the package where one or more of them is contained a label containing a like notice.

***Patent Law > Remedies > Damages > Reasonable Royalties***
[HN2] *35 U.S.C.S. § 284* provides that the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer.

***Patent Law > Ownership > Conveyances > Royalties***
***Patent Law > Remedies > Damages > Reasonable Royalties***
[HN3] The reasonable royalty assessed by the court may be based upon an established royalty, if there is one, or if not, upon a hypothetical royalty resulting from arm's length negotiations between a willing licensor and a willing licensee. When an established royalty for a patented product exists it is usually the best measure of reasonable compensation. For a royalty to be established it must be paid by such a number of persons as to indicate a general acquiescence in its reasonableness by those who have occasion to use the invention. Royalties paid under the threat of suit or in settlement of claims for past in-

fringement cannot be taken as a standard to measure a reasonable royalty.

***Copyright Law > Civil Infringement Actions > Remedies > Damages > Infringer Profits***
***Patent Law > Remedies > Damages > General Overview***
[HN4] The court may look to the infringer's profits and consider them in assessing a royalty.

***Patent Law > Remedies > Collateral Assessments > Increased Damages***
[HN5] *35 U.S.C.S. § 284* provides that the court may increase the damages up to three times the amount assessed. The assessment of increased damages is discretionary. Three factors are to be considered in determining whether to make such an award: (1) whether the infringement was wilful or deliberate; (2) whether the infringer had a good faith belief that the patent was invalid; and (3) the party's conduct of the litigation.

***Patent Law > Remedies > Collateral Assessments > General Overview***
[HN6] In deciding whether to enter an award of increased damages the court must look at the totality of the circumstances. Additionally, wilful and wanton infringement must be established by clear and convincing evidence. Wilful infringement may be found by the failure of the defendant to establish a good faith reliance upon an authoritative opinion of invalidity.

***Patent Law > Remedies > Collateral Assessments > General Overview***
***Torts > Negligence > Duty > Affirmative Duty to Act > General Overview***
[HN7] One with actual notice of another's patent rights has an affirmative duty to exercise due care to determine whether or not he is infringing. Included is the duty to seek legal advice before initiating infringing activity.

***Patent Law > Remedies > Collateral Assessments > Attorney Fees***
[HN8] *35 U.S.C.S. § 285* provides that in exceptional cases the court may award reasonable attorney fees to the prevailing party. Such an award is a matter within the discretion of the court. Generally, attorneys' fees are not awarded except to prevent gross injustice and where fraud and wrongdoing are clearly proved, or in circumstances where the party against whom such an award is assessed is guilty of inequitable conduct during the litigation. Proof of exceptional circumstances must be made by clear and convincing evidence.

***Patent Law > Remedies > Collateral Assessments > Attorney Fees***
***Patent Law > Remedies > Collateral Assessments > Costs***
***Patent Law > Remedies > Collateral Assessments > Prejudgment Interest***
[HN9] *35 U.S.C.S. § 284* provides that the court may award interest and costs to the claimant. A claimant prevailing in a patent infringement suit should be awarded prejudgment interest where necessary to afford the plaintiff full compensation for infringement.

**OPINIONBY:** [*1]

BOTLEY, Magistrate

**OPINION:**

MEMORANDUM AND ORDER ON DAMAGES

Calvin Botley, United States Magistrate

This is a patent infringement action brought by Creative Pioneer Products Corporation ("Creative") against the K mart Corporation ("K mart") for infringing its patent on its wire stripping tool. Roberto Casadio waived his claims for damages, therefore, Creative Pioneer Products Corporation is the sole Plaintiff claiming damages in this cause. Judgment on the issue of liability was entered in favor of the Plaintiffs on August 13, 1986, by United States District Judge James DeAnda. On June 22, 1987, the parties executed a consent to proceed before the United States Magistrate, and on June 22, and 23, 1987, the trial continued on the issue of Creative's damages pursuant to *35 U.S.C. § 281*, et. seq.

The following are the Court's Findings of Fact and Conclusions of Law together with the Admissions of Fact and Stipulations of the Parties set forth below for purposes of clarity, and the Court's rulings on pretrial motions.

It is ORDERED that the Defendant's Motion to Strike Plaintiffs' Amended Proposed Findings of Fact and Conclusions of Law and Memorandum of Law on Damages is GRANTED. [*2]

ADMISSIONS OF FACT

1. In March, 1982, K mart Corporation ("K mart") requested a patent search to be conducted to determine if the wire stripper which it proposed to purchase was covered by any issued United States patent.

2. In May, 1982, K mart's patent search showed no United States patents covering the wire stripper design.

3. In October, 1982, K mart ordered 50,208 units of Model 82–20–78 wire stripper from Four Star International Trading Co. of Taiwan to be delivered in three shipments of 20,064, 15,072 and 15,072 units, respectively. The shipments were scheduled for February 1, 1983, March 1, 1983, and April 1, 1983.

4. In October, 1982, K mart ordered 20,064 units of Model 61–44–93 wire strippers scheduled for shipment by December 30, 1982. On or before January 3, 1983, K mart ordered an additional 20,064, Model 61–44–93, wire strippers scheduled for shipment by March 31, 1983.

5. On January 4, 1983, United States Patent No. *4,333,730*, the patent in suit, was issued by the United States Patent and Trademark Office to Roberto Casadio.

6. By telex, dated March 17, 1983, from K mart's Taiwan office, K mart's International Headquarters in Troy, Michigan, was advised of a notice [*3] in a Taiwan newspaper referring to United States Patent No. *4,366,730* as covering wire strippers.

7. K mart immediately conducted an investigation, and in March, 1983, obtained a copy of the patent in suit showing the inventor as Roberto Casadio.

8. K mart conducted a further investigation to attempt to obtain the identity of any United States assignee, but in early April, 1983, discovered that there were no records in the United States Patent Office relating to any such assignment.

9. K mart Corporation imported 60,192 infringing tools into the United States in 1983.

10. These infringing tools began to appear in the retail stores of K mart in approximately March or April of 1983.

11. K mart knew of the existence of United States Patent No. *4,366,730* as of the end of March, 1983.

12. In April, 1983, K mart decided on its own initiative to discontinue importation of the wire strippers in question rather than to conduct a patent validity investigation at that time. K mart also decided to cancel and did cancel all outstanding orders for importation of wire strippers that had not yet entered its commercial distribution network. More specifically, K mart was able to cancel and did cancel [*4] its two outstanding orders for 15,072 units each of the Model 82–20–78 wire stripper, for a total cancellation of 30,144 wire strippers, thus K mart imported only 60,192 infringing wire strippers of the 90,336 units that had originally been ordered.

13. Creative did not charge K mart with infringement of the patent in suit until July 15, 1983, when the Complaint and Summons were served on K mart.

14. Creative ceased to be the exclusive sublicensee of the patent in suit as of June 22, 1984.

15. K mart never published any advertisements advertising the infringing wire strippers.

16. The packaging for the patented tool was marked with the designation "USA Patent *4366730*" commencing April 1, 1983, but no patent marking was placed directly on the wire strippers.

17. K mart received the Original Complaint in this lawsuit on July 15, 1983.

18. K mart never received an opinion letter from outside counsel as to the invalidity and/or infringement of United States Patent No. *4,366,730*.

19. K mart continued to sell the tool after learning of the existence of United States Patent No. *4,366,730*.

20. K mart issued no orders directing the removal of the infringing tools from the retail shelves prior [*5] to September 3, 1986.

21. K mart discontinued importation of the infringing tools on or prior to April of 1983 and cancelled all outstanding orders for further importation.

STIPULATIONS

1. Plaintiff, Roberto Casadio, stipulates that he waives all claims to damages.

2. Defendant K mart stipulates that a simple prejudgment interest rate of ten (10%) percent should apply to any prejudgment interest awarded on compensatory damages; and Plaintiff's attorney fees have been $45,000.00.

3. Creative and K mart stipulate that Creative reduces its claim for damages and other relief by 9,748 wire stripping tools, representing wire stripping tools sold or retained by K mart after June 22, 1984, thereby reducing Creative's claim for damages and other relief to 50,444 wire stripping tools.

FINDINGS OF FACT

1. In November of 1982 Creative Pioneer Products Corporation was formed by Jack K. Rumsey, its president, to market, distribute, and sell the wire strippers which are the subject of this patent infringement suit.

2. The wire strippers were invented by Roberto Casadio, who granted an exclusive license to Yu Yuan Machinery Industrial Company, Ltd. of Taiwan to manufacture and sell the patented [*6] tool at a royalty of 10% on all sales.

3. Casadio granted another exclusive license to Leslie M. Matherne d/b/a/ World Wide Imports on December 12, 1982, giving him exclusive rights to the patent in the United States for a royalty of 10% on the purchase value of all units. Matherne purchased the patented tool at a price of $1.65 per unit from Yu Yuan Machinery.

4. On December 28, 1982, Matherne granted an exclusive sublicence to Creative to market and sell the product at an agreed royalty of 9% of Creative's gross sales.

Creative's President, Jack Rumsey, believed that he was obligated to purchase his tools only from Matherne although the sublicense agreement did not contain such a provision. Creative went into the business of distributing the patented tool in December, 1982. No royalties were paid to Matherne. Instead, the two parties by their conduct entered into a contract of wholesaler and distributor, and Plaintiff purchased his strippers at a cost of $4.00 per unit from World Wide Imports.

5. On January 24, 1983, Plaintiff was selling the wire strippers at $6.50 to $8.85 per unit depending on the volume sold. In March, 1983, Plaintiff was selling his tools to distributors [*7] for $4.30 to $4.68 and purchasing them at $3.25 per unit. In March, 1983, Plaintiff lowered the price of his wire strippers after finding out that Cable Electric was selling the Snapit brand stripper, an infringing product, at $5.95 per unit. In March, 1983, before K mart entered the market, the average selling price of Creative's product was $4.53 per tool and it was purchasing it at $4.00 per tool. It was shortly thereafter that its purchase price was reduced by agreement to $3.25, yielding a profit of twelve percent between his cost and selling price, excluding expenses.

6. Sometime in early 1983, Rumsey was advised by one of his agents, Cory, that K mart was selling an infringing tool in its retail stores for approximately $4.97.

7. By letter dated April 26, 1983, and with an enclosed package containing the patented tool, Rumsey offered to sell the tool to K mart. The package in which the tool was wrapped was marked "U.S.A. Patent *4366730*". K mart did not reply to that letter.

8. Until that time, there were many other infringers on the market, but their price was higher and Creative negotiated with them to either cease infringing or to purchase the tool from Creative. [*8]

9. In late March or early April, 1983, after K mart began to sell the tool, Creative continued to have competition from other infringers and subsequently negotiated various settlements with them whereby Creative received between $1.00 and $1.50 per unit in settlement of threatened or pending litigation and secured agreements whereby the infringers agreed to stop purchasing and selling infringing tools, or whereby they would sell the remaining tools on hand at no less than a stated price.

10. In September and October, 1983, Creative sustained drastically reduced sales because other companies, not including K mart, who were offering the tool at a cheaper price, were infringing Creative's product by advertising it in fliers.

11. Creative's gross sales for the year ending December 31, 1983, were $903,127; cost of goods purchased was $657,483; and expenses were $242,440. The 1983 financial statement included the period of time when many infringers were invading the market, depressing Creative's prices. The average selling price of Creative's product for the year 1983 was $4.36 per unit, $.17 less than the average selling price in March, 1983.

12. The average cost of each unit purchased [*9] by Creative in 1983 was $3.17 per unit. Creative's net profit averaged out to $.02 per unit, and average profit per unit deducting variable expenses was only $.23 per unit in 1983.

13. When Creative first started to sell the wire strippers in December, 1982, the product, manufactured by Roberto Casadio, was marked "MANUFACTURED BY ELCONTROL – ITALY PAT.–PAT. APPL. IN I–UK–WG–F–USA–ROC–J." This legend was embossed on the moulded plastic handle of the tool. The wire strippers sold by Creative were marked with millimeter and quarter inch calibrations embossed on the moulded plastic handle. The patent was issued on January 4, 1983. Between January, 1983 and June, 1984 there was no notice of a patent marked on the product. Starting April 1, 1983, only the package was marked, "U.S.A. Patent *4366730*." In 1985, the tool itself was marked with a notice of the patent number. It would have been a simple matter to mark the patented tools with notice of the patent.

14. After Creative's sales declined, Matherne revoked the exclusive license he had granted to Creative Pioneer Products and became the exclusive sales agent in the United States. Creative's license terminated on June 22, 1984.

15. [*10] Leslie Matherne also negotiated various settlements with parties selling infringing tools, such settlements averaging between $1.00 and $1.50 for each infringing tool.

16. K mart had 2,068 retail stores at the time of the events of this suit, and ten distribution centers serving those stores. K mart imported 60,192 wire strippers in 1983. Orders for these strippers were placed in October and December, 1982. As of June 22, 1984, 9,748 strippers remained unsold, leaving 50,444 infringing tools sold by K mart during the period of time that Creative held the license to sell the tools. K mart sold approximately 7,088 tools before July 15, 1983, the date they were served with notice of this suit. K mart purchased the units at $1.44 per unit and sold them at $4.97 in their retail stores. K mart never approached Creative, Leslie Matherne or Roberto Casadio to obtain a license to sell the tools.

17. In May, 1982, a patent investigation was undertaken by K mart, at the request of a K mart Import

Department executive who was interested in purchasing the wire stripper, to determine if there was a patent on that tool because there was information that a patent was pending on the wire stripping [*11] tool. K mart's in-house trademark and patent counsel, David Haarz, referred the request to John Pacocha of the firm of Alexander & Zalewa, of Chicago, Illinois, outside counsel retained by K mart in connection with K mart's patent matters and patent litigation. The product sent to Pacocha had the same structure as the product which K mart ultimately purchased which was found to infringe Creative's tool. Pacocha conducted a patent search and sent David Haarz a report on or about May 7, 1982, indicating no patent was discovered in connection with the product being investigated which was the Snapit wire stripping tool made by Cable Electric. The Snapit tool was the subject of a settlement of an infringement dispute between Cable Electric and Creative. The report from Pacocha also indicated that if a patent were to issue, its validity would be questionable. The report included copies of various patents. Due to the strict secrecy maintained on patent applications, however, it was not possible to obtain copies of documents and applications of patents pending or even to determine if a patent application was pending on that product. David Haarz then advised the buyer in K mart's Import Department [*12] that there was no patent issued on the tool and that they could purchase it. Orders for 90,000 wire stripping tools were then placed in October and December, 1982.

18. In March, 1983, K mart's Import Department received a telex, dated March 17, 1983, from K mart's Taiwan office indicating that a local newspaper had reported a patent on a wire stripper, and requested Haarz to investigate that announcement. Haarz then contacted James Zalewa of Alexander and Zalewa and requested him to obtain a copy of the patent referenced in the telex and to determine who was the owner of the patent. At that time no other infringement and validity investigation was undertaken. Zalewa sent Haarz a copy of the patent and then telephoned Haarz to advise him of the ownership of the patent by Casadio. The call was followed up with a letter dated April 11, 1983, confirming the information regarding the ownership of the patent, and advising Haarz that no record of any assignment of the patent by the patent owner existed.

19. K mart's counsel, including Haarz, did not attempt to contact World Wide Imports, the licensee referenced in the cable message, or Roberto Casadio, the owner of the patent.

20. David [*13] Haarz then recommended that, in light of the patent, the buyer cancel all outstanding orders for the wire strippers, amounting to cancellation of 30,144 wire stripping tools. As to the orders which had already been shipped, no action was taken.

21. David Haarz was served with the instant lawsuit on July 15, 1983. He referred the complaint to the firm of Alexander and Zalewa and requested that Zalewa obtain the file history of the patent on which suit was brought and search for existence of prior art.

22. In the summer and fall of 1983, Haarz and Zalewa had several telephone conversations after the search was completed. Zalewa and Haarz concluded that if the patent was valid it was infringed and that K mart would not contest the charge of infringement. Zalewa advised that the search further supported Pacocha's original opinion on the invalidity of the patent on the basis of prior art. Zalewa and Haarz felt that prior patents belonging to Utica Tool and some German patents could impact on the validity of the patent in this case. Haarz instructed Zalewa to defend on the basis of invalidity and to concede infringement if the patent was held valid. No written opinion was sought by K mart [*14] on the invalidity of the patent. Haarz' opinion regarding the invalidity of the patent was unchanged until the Court ruled that the patent was valid.

CONCLUSIONS OF LAW

Creative seeks damages for the infringement of 50,444 tools at $1.83 per tool, plus prejudgment interest at 10% and attorney fees of $45,000. K mart stipulates to the 10% prejudgment interest rate, but contends that the number of infringing tools is only 43,356, and the award should be only $.23 per tool. K mart also contests the award of attorney fees, but stipulates that should the Court make an award of attorney fees, Creative should be awarded $45,000.00.

[HN1] Section 287 of Title 35, United States Code, limits the recovery of damages for patent infringement to the time period commencing with either the use of a proper patent notice, notice of infringement, or filing of an action for infringement. The statute provides that a proper patent notice may be given either by fixing the notice of the patent and number on the article, or when from the character of the article this cannot be done, by fixing to it or to the package where one or more of them is contained a label containing a like notice.

The wire stripping [*15] tool in the instant case was not marked with notice of the patent. Instead, commencing April 1, 1983, the patent notice was placed on the packaging. However, the character of the product was such that a marking on the product would have been a relatively simple matter. Therefore, marking the packaging of Creative's wire strippers is insufficient to commence the period for the recovery of damages. *Wayne Gossard Corp. v. Sondra, Inc., 434 F. Supp. 1340* (E.D. Pa., 1977),

aff'd, *579 F.2d. 41 (3rd Cir. 1978).*

Although K mart had notice of the patent, K mart's attorneys believed in good faith that the patent was invalid on the basis of prior art and thus not infringed. Creative never gave K mart notice of infringement of their patent as contemplated by § 287. Therefore, the period of accounting this case begins on July 8, 1983, upon filing of suit.

[HN2] Section 284 of Title 35, United States Code, provides that the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer.

Royalty damages must be calculated on the basis of 60,192 infringing tools imported, less [*16] 9,748 tools on hand at the time Plaintiff's license was terminated, less 7,088 tools sold prior to the date of effective notice of patent infringement, for a total of 43,356 tools.

[HN3] The reasonable royalty assessed by the court may be based upon an established royalty, if there is one, or if not, upon a hypothetical royalty resulting from arm's length negotiations between a willing licensor and a willing licensee. *Hanson v. Alpine Ski Area Inc., 718 F.2d. 1075, 1078, 219 USPQ 679, 682 (Fed. Cir. 1983).* When an established royalty for a patented product exists it is usually the best measure of reasonable compensation. *Tektronix v. United States, 552 F.2d. 343, 347,* (Ct. Cl. 1977), cert. denied, *439 U.S. 1048 (1978).* For a royalty to be established it must be paid by such a number of persons as to indicate a general acquiescence in its reasonableness by those who have occasion to use the invention. *Rude v. Westcott, 130 U.S. 152, 165 (1889).*

Royalties paid under the threat of suit or in settlement of claims for past infringement cannot be taken as a standard to measure a reasonable royalty. *Rude v. Westcott, 130 U.S. 152 (1889); Panduit Corp, v. Stahlin Bros. Fibreworks,* [*17] *575 F.2d. 1152 (6th Cir. 1978); Faulkner v. Gibbs, 199 F.2d. 635, 638 (9th Cir. 1952).*

Creative's profits may be considered only if Creative can show that but for the infringer's sales it would have sold those products. *Bio-Rad Laboratories, Inc. v. Nicolet Instrument Corp., 739 F.2d. 604* (Fed. Cir.), cert. denied, *469 U.S. 1038 (1984);* See also *Gyromat Corp. v. Champion Spark Plug Co., 735 F.2d. 549 (Fed. Cir. 1984).* This, the Plaintiff did not establish, especially in light of the numbers of other infringers of his product.

Additionally, [HN4] the Court may look to the infringer's profits and consider them in assessing a royalty. *Kori Corp. v. Wilco Marsh Buggies and Draglines, Inc., 761 F.2d. 649* (Fed. Cir.), cert. denied, *106 S.Ct. 230 (1985).* K mart, however, provided no evidence of its net profits on the strippers. In its memorandum of law K mart gratuitously suggests that its net income from sales of the wire strippers was no more than $.98 per tool. Creative's rate of profits with deductions for variable expenses yields a royalty rate which is less than the reasonable royalty rate based on established rates of 9 to 10 percent of gross sales, and which [*18] is somewhat depressed by competition from infringing products sold by K mart and others.

The Court therefore concludes that a reasonable royalty should be ten percent of K mart's gross sales, at its retail price of $4.97 which averages $.50 per tool. Based on a total of 43,356 tools, royalties of $21,679.00 are awarded to Creative Pioneer Products Corporation.

[HN5] Section 284 of Title 35, United States Code, provides that the Court may increase the damages up to three times the amount assessed. The assessment of increased damages is discretionary. *American Original Corp. v. Jenkins Food Corp., 774 F.2d. 459 (Fed. Cir. 1985).* White. v. Mar-*Bel Inc., 509 F.2d. 287 (5th Cir. 1975).* This Court must consider whether such an award of increased damages is justified in this case. Three factors are to be considered in determining whether to make such an award: (1) whether the infringement was wilful or deliberate; (2) whether the infringer had a good faith belief that the patent was invalid; and (3) the party's conduct of the litigation. *Lam Inc. v. Johns-Manville Corp., 668 F.2d. 462* (10th Cir.), cert. denied, *456 U.S. 1007 (1982).* [HN6] In deciding whether to enter an award of [*19] increased damages the court must look at the totality of the circumstances. *American Original Corp. v. Jenkins Food Corp., 774 F.2d. 459 (Fed. Cir. 1985).* Additionally, wilful and wanton infringement must be established by clear and convincing evidence. *Shatterproof, Glass Corp. v. Libbey-Owens Ford Company, 758 F.2d. 613, 628 (Fed. Cir. 1985).* Wilful infringment may be found by the failure of the defendant to establish a good faith reliance upon an authoritative opinion of invalidity. *Underwater Devices, Inc. v. Morrison-Knudsen Co., 717 F.2d. 1380, 1389 (Fed. Cir. 1983).*

[HN7] One with actual notice of another's patent rights has an affirmative duty to exercise due care to determine whether or not he is infringing. Included is the duty to seek legal advice before initiating infringing activity. *Ralston Purina v. Far-Mar Co. Inc., 772 F.2d. 1570 (Fed. Cir. 1985).*

Based on the evidence adduced at Plaintiff's damage hearing, and upon a review of the record as a whole, this court does not find clear and convincing evidence of wilful infringement in this case. The action was prosecuted with a minimum of motion practice and discovery disputes. Defendant ordered all the infringing [*20] tools before

issuance of the patent. Orders not shipped were cancelled after defendant received notice of the patent from Taiwan. Defendant sought the advice of patent counsel who advised that the patent may be invalid. Therefore, this Court declines to assess and enter an award of increased damages and Plaintiff's request therefor is DENIED.

[HN8] Section 285 of Title 35, United States Code, provides that in exceptional cases the court may award reasonable attorney fees to the prevaling party. Such an award is a matter within the discretion of the Court. *Faulkner v. Baldwin Piano and Organ Co., 561 F.2d. 677 (7th Cir. 1977);* cert. denied, *435 U.S. 905 (1978).* Generally, attorneys' fees are not awarded except to prevent gross injustice and where fraud and wrongdoing are clearly proved, *Maurice Garbell, Inc. v. Boeing Co., 546 F.2d. 297 (9th Cir. 1976),* cert. denied, *431 U.S. 955 (1977); Milgo Electronic Corp. v. United Business Communications, Inc., 623 F.2d. 645* (10th Cir.), cert. denied, *449 U.S. 1066 (1980)*, or in circumstances where the party against whom such an award is assessed is guilty of inequitable conduct during the litigation. Reactive Metals and Alloys [*21] *Corp. v. ESM, Inc., 769 F.2d. 1578 (Fed. Cir. 1985).* Proof of exceptional circumstances must be made by clear and convincing evidence. Id.

Based on the evidence adduced in this case, and for the reasons stated above with respect to the assessment of increased damages, the court finds that an award of attorney's fees is not justified and Plaintiff's claim for attorney's fees is DENIED.

[HN9] Section 284 of Title 35, United States Code, provides that the Court may award interest and costs to the claimant. A claimant prevailing in a patent infringement suit should be awarded prejudgment interest where necessary to afford the Plaintiff full compensation for infringement. *General Motors Corp. v. Devex Corp., 461 U.S. 648 (1983).* The Court finds that full and fair compensation to the Plaintiff requires that Plaintiff be awarded prejudgment interest at the stipulated rate of 10% simple interest per annum for four years (July, 1983 through July, 1987) on the amount of $21,679.00 or $8,671.60.

Therefore, it is ORDERED that Creative is awarded as damages for K mart's infringement $21,679 as compensatory damages, $8,671.60 prejudgment interest and all costs are taxed against K mart pursuant [*22] to *28 U.S.C. § 1920,* et seq.

The Clerk will enter this Memorandum and Order and provide all parties with a true copy.

DONE at Houston, Texas, this the 10th day of July, 1987.