# EXHIBIT P

LEXSEE 2003 US DIST LEXIS 5409

**TULIP COMPUTERS INTERNATIONAL B.V., Plaintiff, v. DELL COMPUTER CORPORATION, Defendant.**

**Civil Action No. 00–981–KAJ**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

***2003 U.S. Dist. LEXIS 5409***

**February 4, 2003, Decided**

**SUBSEQUENT HISTORY:** Affirmed in part and modified in part by, Partial summary judgment granted by, Partial summary judgment denied by, Summary judgment granted by, Motion denied by *Tulip Computers Int'l B.V. v. Dell Computer Corp., 262 F. Supp. 2d 358, 2003 U.S. Dist. LEXIS 7815 (D. Del., 2003)*

**PRIOR HISTORY:** *Tulip Computers Int'l B.V. v. Dell Computer Corp., 2002 U.S. Dist. LEXIS 25096 (D. Del., Dec. 19, 2002)*

**DISPOSITION:** [*1] Plaintiff's motion for summary judgment on defendant's *35 U.S.C. § 287* marking defense denied. Defendant's motion for partial summary judgment on failure to mark and noninfringement granted in part and denied in part.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff patent holder filed its complaint alleging infringement of its U.S. patent No. 5,594,621 (the '621 patent) by specific systems in defendant corporations line of computers. The patent holder moved for summary judgment on the corporation's 35 U.S.C.S. § 287 marking defense. The corporation moved for partial summary judgment on failure to mark and noninfringement.

**OVERVIEW:** None of the computers at issue sold were marked with the patent number. Therefore, 35 U.S.C.S. § 287(a) was triggered and the patent holder was precluded from recovering damages from the date of the first shipment of the infringing computers until the patent holder provided the corporation with actual knowledge of the patent on March 10, 2000. The patent holder was a non–producing patentee; therefore, constructive notice of the patent existed from the patent's issue date. Also § 287(a) did not retroactively preclude recovery of damages prior to the shipment of an unmarked patented article. Finally, the court held that § 287(a) did not preclude the patent holder from recovering damages for any infringement of the patent from January 14, 1997 until the date of the first shipment of infringing computers.

**OUTCOME:** The patent holder's motion for summary judgment on the corporation's marking defense was denied. The corporation's motion for partial summary judgment of noninfringement was denied as moot. The corporation's motion for partial summary judgment on failure to mark was granted.

**LexisNexis(R) Headnotes**

***Civil Procedure > Summary Judgment > Burdens of Production & Proof > Movants***
***Civil Procedure > Summary Judgment > Standards > Appropriateness***
***Patent Law > Inequitable Conduct > General Overview***
[HN1] A grant of summary judgment pursuant to Fed. R. Civ. P. 56(c) is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. This standard is applicable to all types of cases, including patent cases. A Fed. R. Civ. P. 56(c) movant bears the burden of establishing the lack of a genuinely disputed material fact by demonstrating that there is an absence of evidence to support the nonmoving party's case. The nonmovant must be given the benefit of all justifiable inferences and the court must resolve any disputed issue of fact in favor of the nonmovant.

***Patent Law > Infringement Actions > Defenses > Marking***
[HN2] See 35 U.S.C.S. 287(a).

***Patent Law > Infringement Actions > Defenses > Marking***
***Patent Law > Ownership > Conveyances > Licenses***

[HN3] 35 U.S.C.S. § 287(a) of the patent statute provides that a patentee who sells, or offers for sale, within the United States any patented article may give notice to the public that the same is patented, by fixing thereon the word patent or the abbreviation "pat." together with the number of the patent. Failure to so mark a patented article limits the period of time during which the patentee can recover damages. Damages can be recovered for any infringement occurring after the patentee provides constructive notice of its patent by beginning to properly mark its patented articles or for particular infringement continuing after actual notice of its patent is given to the allegedly infringing party. 35 U.S.C.S. § 287(a) can also be triggered by the unmarked sale of a patented article by a licensee of the patent holder. When the failure to mark is caused by an unrelated third party, like a licensee, the court may consider whether the patentee took reasonable steps to assure that its licensee complies with the marking requirements. If the court determines that the patentee took reasonable steps to assure this compliance, the fact that not all of the covered products sold by the licensee were marked will not automatically trigger § 287(a).

***Patent Law > Infringement Actions > Defenses > Marking***
***Patent Law > Ownership > Conveyances > Licenses***
[HN4] A licensee who makes or sells a patented article does so for or under the patentee, thereby limiting the patentee's damage recovery when the patented article is not marked.

***Computer & Internet Law > Internet Business > Licensing > Patent Assignments & Transfers***
***Patent Law > Infringement Actions > Defenses > Marking***
***Patent Law > Ownership > Conveyances > Licenses***
[HN5] 35 U.S.C.S. § 287(a) applies to patentees, and persons making, offering for sale, or selling within the United States any patented article for or under them.

***Patent Law > Infringement Actions > Defenses > Marking***
[HN6] Once marking has begun, it must be substantially consistent and continuous in order for the party to avail itself of the constructive notice provisions of the statute.

***Patent Law > Infringement Actions > Defenses > Marking***
***Patent Law > Ownership > Conveyances > Licenses***
[HN7] 35 U.S.C.S. § 287(a) precludes the recovery of damages only for the period of time that a patent holder, or its licensee, is making or selling unmarked patented articles in the United States.

***International Trade Law > Imports & Exports > General Overview***
***Patent Law > Infringement Actions > Defenses > Marking***
[HN8] See 35 U.S.C.S. § 287(a).

***International Trade Law > Imports & Exports > General Overview***
***Patent Law > Infringement Actions > Defenses > Marking***
[HN9] 35 U.S.C.S. § 287(a) applies to only certain entities, i.e., patentees, and persons making, offering for sale, or selling within the United States any patented article for or under them, or importing any patented article into the United States. With regard to those entities, the statute states that notice that the article in question is patented may be given by marking the article with its patent number. If a patentee produces patented articles in the United States and those patented articles are not marked, then the damage limitation of § 287(a) is triggered. It is important to reiterate the requirement that those two facts exist prior to the triggering of the statute.

***Patent Law > Infringement Actions > Defenses > Marking***
[HN10] In the event of patentees, and persons making, offering for sale, or selling within the United States any patented article for or under them failing to mark the patented articles being produced, then 35 U.S.C.S. § 287(a) precludes the patentee's recovery of damages until constructive or actual notice is given to the infringer and the infringer continues to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice.

***Labor & Employment Law > Wrongful Termination > Remedies > Compensatory Damages***
***Patent Law > Infringement Actions > Defenses > Marking***
[HN11] 35 U.S.C.S. § 287(a) is triggered by the unmarked sale of patented articles by the patentee and precludes recovery of damages from the date of that triggering event until notice is given to the infringer. Notice to the infringer, constructive or actual, terminates the damage–precluding effect of § 287(a) and, if the infringer continues to infringe, the patentee can recover damages for infringement after notice of the patent is given. Since § 287(a) is not triggered when the patentee is not producing patented articles, the patentee can recover damages for infringement during this period of time even if, later, § 287(a) is triggered. This construction is supported by both recent statements by the Federal Circuit and the purposes of the marking statute.

***Patent Law > Infringement Actions > Defenses > Marking***
[HN12] The Federal Circuit identifies three related purposes for the marking statute: (1) helping to avoid innocent infringement; (2) encouraging patentees to give notice to the public that the article is patented; and (3) aiding the public to identify whether an article is patented. The second and third purposes seem to be no more than means by which the first stated purpose is achieved. Encouraging patentees to give notice to the public that an article is patented (by marking the article with its patent number) aids the public in identifying whether or not an article is patented. If the public is able to identify an article as patented, innocent infringement can be avoided. If an article is not marked, an individual may innocently infringe the patent by copying what he believes is not protected by a patent. Saying that the purpose of § 287(a) is to help avoid innocent infringement is somewhat misleading, however.

***Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > General Overview***
***Patent Law > Infringement Actions > Defenses > Marking***
***Patent Law > Infringement Actions > Infringing Acts > Intent & Knowledge***
[HN13] 35 U.S.C.S. § 287(a) does not protect all innocent infringers from damage liability. Intent is irrelevant to direct infringement and an infringer of the patent of a non-producing patent holder or of a patentee who is producing products and marking them in compliance with § 287(a) may be liable for their infringement regardless of the knowledge that they are infringing. It is only those who might have innocently infringed because of unmarked product that is put into the market by the patentee that § 287(a) seeks to protect. In other words, it is only when the patentee is himself contributing to the problem of innocent infringement by producing unmarked product that § 287(a) punishes that patentee by precluding damage recovery.

***Admiralty Law > Forfeitures & Penalties > Procedure***
***Civil Procedure > Remedies > Forfeitures > Notice Requirements***
***Patent Law > Infringement Actions > Defenses > Marking***
[HN14] Although 35 U.S.C.S. § 287(a) precludes recovery of damages for infringement, even from a willful infringer, during the period of a patentee's non-compliance with the marking statute, the forfeiture of damages pertains only to the period that the patentee is actively producing unmarked product. As soon as the patentee begins shipping product marked in compliance with § 287(a), constructive notice is presumed and continuing infringers are once again liable to the patentee. This liability extends even to those who, conceivably, have innocently infringed after copying unmarked products that the patentee put into the market place. From the point in time that the patentee consistently and continuously complies with § 287(a) by marking its patented products, however, he can recover damages from any infringer for infringement occurring after the patentee's compliance with the statute. Those who may innocently, or unknowingly, infringe when a patentee is either not producing covered product or while the patentee is producing patented articles which are properly marked may still be liable for damages.

***International Trade Law > Imports & Exports > General Overview***
***Patent Law > Infringement Actions > Infringing Acts > Sale***
***Patent Law > Infringement Actions > Infringing Acts > Use***
[HN15] See 35 U.S.C.S. § 271(a).

***Patent Law > Infringement Actions > Doctrine of Equivalents > Fact & Law Issues***
[HN16] Under the doctrine of equivalents, if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form or shape. The Federal Circuit has noted, however, that if a theory of equivalence would vitiate a claim limitation then there can be no infringement under the doctrine of equivalents as a matter of law.

**COUNSEL:** Steven J. Balick, Esquire and John G. Day, Esquire, Ashby & Geddes, Wilmington, Delaware. Of Counsel: Dirk D. Thomas, Esquire, Robert A. Auchter, Esquire, William A. Marino, Esquire, and Marc N. Henshke, Esquire, Robins, Kaplan, Miller & Ciresi, L.L.P. Washington, D.C.; counsel for plaintiff Tulip Computers International B.V.

Frederick L. Cottrell, III, Esquire and Chad M. Shandler, Esquire, Richards, Layton & Finger, Wilmington, Delaware. Of Counsel: Scott F. Partridge, Esquire, Howard L. Speight, Esquire, and Maria Wyckoff Boyce, Esquire, Baker Botts L.L.P., Houston, Texas; counsel for defendant Dell Computer Corporation.

**JUDGES:** Thynge, U.S. Magistrate Judge.

**OPINIONBY:** Thynge

**OPINION:**

**MEMORANDUM OPINION**

Wilmington, Delaware
February 4, 2003

**Thynge, U.S. Magistrate** [*2] **Judge**

**I. INTRODUCTION**

This is a patent infringement case. On November 24, 2000, Tulip Computers International B.V. ("Tulip") n1 filed its complaint (D.I. 1) alleging infringement of its U.S. patent No. 5,594,621 ("the '621 patent") by specific systems in defendant Dell Computer Corporation's ("Dell") n2 OptiPlex line of computers. On January 19, 2001, Dell filed its answer (D.I. 6) denying Tulip's allegations and alleging that the '621 patent is invalid, unenforceable, and not infringed. On August 15, 2002, this court entered an amended scheduling order (D.I. 281) pursuant to which the parties filed a joint submission of disputed claim terms on September 20, 2002 (D.I. 308). Simultaneous briefing on the parties' respective claim interpretations was completed on October 25, 2002. Case dispositive pretrial summary judgment motions were filed on October 11, 2002 n3 and briefing on those motions was completed on November 1, 2002. Pursuant to *Markman v. Westview Instruments, Inc.* n4 and local practice, oral argument was held November 7, 2002 on the parties' proposed claim interpretations and motions for summary judgment. On December 9, 2002, this court issued its opinion construing [*3] the disputed claim terms (D.I. 411).

n1 Tulip is a Dutch corporation with its principal place of business in the Netherlands.

n2 Dell is a Delaware corporation with its principal place of business in Texas.

n3 Tulip's motion for partial summary judgment of validity under *35 U.S.C. § 112* (D.I. 336), Tulip's motion for partial summary judgment of literal infringement (D.I. 338), Tulip's motion for partial summary judgment of no inequitable conduct (D.I. 341), Dell's motion for partial summary judgment on failure to mark and noninfringement (D.I. 344), Dell's motion for summary judgment of unenforceability due to inequitable conduct (D.I. 347), and Dell's motion for summary judgment on invalidity (D.I. 350).

n4 *52 F.3d 967 (Fed. Cir. 1995)* (en banc), *aff'd, 517 U.S. 370, 134 L. Ed. 2d 577, 116 S. Ct. 1384 (1996)*.

In support of its motion for partial summary judgment on failure to mark and noninfringement (D.I. 344), Dell argues that it is entitled to judgment as a matter of law that [*4] the failure of Tulip's licensee to mark computers it sold which were allegedly covered by the '621 patent with that patent number triggered the damage-recovery limitation recited in *35 U.S.C. § 287(a)*. Dell contends, therefore, that it is entitled to summary judgment that Tulip is precluded from recovering damages from Dell for any sales of infringing computers sold by Dell prior to the date it received actual notice from Tulip of the '621 patent. Dell also argues for partial summary judgment of noninfringement, either literal or by the doctrine of equivalents, based upon its proposed construction of two disputed claim terms. n5 On October 25, 2002, Tulip filed a motion for leave to file a cross motion and a cross-motion for summary judgment on Dell's marking defense (D.I. 363). The court granted Tulip's motion to file its cross motion at oral argument on November 7, 2002. This is the court's determination of those motions.

N5 Dell filed its motion before the court issued its opinion on claim construction opinion (D.I. 411). Following its claim construction opinion, the court considered Tulip's motion for partial summary judgment of literal infringement (D.I. 338) and determined that certain of Dell's computers did literally infringe the '621 patent. *See* D.I. 419. As a result of those determinations, Dell's current motion for summary judgment of no literal infringement based on Dell's proposed claim construction is denied as moot. Because the court accepted Tulip's proposed construction that the claims at issue do not require that expansion boards be inserted into the riser card to practice Tulip's invention, D.I. 411 at 45-51, there is no need for Tulip to prove infringement based on the doctrine of equivalents in connection with that purported claim limitation. Accordingly, Dell's motion for partial summary judgment that Tulip can not assert infringement based on a doctrine of equivalents argument regarding the expansion-card limitation is denied as moot. The court accepted Dell's proposed construction limiting the '621 patent to cover riser cards having only a single combination connector. *Id.* at 53-57. The parties' contentions concerning Tulip's ability to assert infringement based on a doctrine of equivalents argument with regard to riser cards having more than one combination connector are addressed following the court's analysis of Dell's marking defense.

[*5]

**II. BACKGROUND** n6

n6 *See* D.I. 411 for the court's construction of disputed claim terms and a discussion of the background of the technology and the patented invention that is the subject of this litigation.

The '621 patent, entitled "Motherboard for a Computer of the AT Type, and a Computer of the AT Type Comprising Such Motherboard," describes and claims a personal computer having a novel motherboard form factor. n7 The invention concerns the placement of a riser card connector at a specific location on a motherboard and the arrangement of expansion board connectors on a riser card. On October 1, 1994, Tulip entered into a cross license agreement (the "1994 Agreement") with International Business Machines Corporation ("IBM") under which IBM was granted a license pertaining to "all [Tulip] patents ... issued or issuing on patent applications entitled to an effective filing date prior to October 1st, 1999." n8 On January 1, 1998, the 1994 Agreement was terminated and a new cross–license between Tulip [*6] and IBM was entered into (the "1998 Agreement") granting IBM a licence pertaining to "all patents ... of TULIP ... issued or issuing on patent applications entitled to an effective filing date prior to December 31, 2002." n9 The '621 patent was filed with the USPTO on June 13, 1995 and issued on January 14, 1997 and was, therefore, covered by both the 1994 Agreement and the 1998 Agreement.

n7 The term "form factor" refers to the shape and configuration of the components on a motherboard.

n8 D.I. 346, *Ex. 4 P 1*.8.

n9 *Id., Ex. 5 P 1*.3.

One aspect of IBM's business during the time period relevant to this litigation was providing information technology ("IT") services to its customers. Among the services provided to certain of its IT customers was the procurement of computer hardware. On July 21, 1994, Dell and IBM entered into a remarketing agreement which authorized IBM to act as a reseller of Dell computer equipment. n10 As part of IBM's IT procurement services, IBM purchased [*7] from Dell certain of the allegedly infringing OptiPlex computers and resold those computers to its customers. Dell maintains that if its computers infringe the '621 patent, IBM's sale of those computers constituted the sale by Tulip's licensee under the 1998 Agreement, of computers covered by the '621 patent which were not marked with that patent number. Dell contends it is entitled to summary judgment that this failure to mark triggered the damage–limiting provisions of *§ 287(a)*. Dell argues that *§ 287(a)* bars Tulip from recovering any damages for infringing sales by Dell prior to the date Tulip provided actual notice of the '621 patent to Dell via a letter dated March 10, 2000.

n10 *Id.*, Ex. 12 (Remarketer/lntegrator Agreement). At the time the remarketing agreement was executed, IBM's IT outsourcing was carried out by its wholly–owned subsidiary Integrated Systems Solutions Corporation ("ISSC"). *See id.*, Ex. 6 at 13 (deposition of IBM corporate designee Roderick Supple). Some time before or during 1997, ISSC's separate corporate existence was ended and ISSC became a part of IBM's Global Services division. *Id.; see also id.*, Ex. 7 (May 16, 1997 Amendment to Agreement for Professional Services referring to ISSC as a division of IBM). The particular sales by IBM to its third–party customers that form the basis of Dell's marking defense occurred after IBM took control of its outsourcing business from ISSC.

[*8]

Tulip argues that the proper interpretation of its licensing agreements with IBM supports its motion for summary judgment that Dell computers purchased and resold by IBM were not licensed products subject to the 1998 Agreement and, therefore, no duty to mark those computers existed. Based on this interpretation, Tulip contends that it is entitled to summary judgment that Dell's purported failure to mark defense is meritless.

## III. LEGAL STANDARD

[HN1] A grant of summary judgment pursuant to *Fed. R. Civ. P. 56(c)* is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." n11 This standard is applicable to all types of cases, including patent cases. n12 A *Rule 56(c)* movant bears the burden of establishing the lack of a genuinely disputed material fact by demonstrating "that there is an absence of evidence to support the nonmoving party's case." n13 The nonmovant must be given the benefit of all justifiable inferences and the court must resolve any disputed issue of fact in favor [*9] of the nonmovant. n14

n11 *Fed. R. Civ. Pro. 56(c)*.

n12 *Johnston v. IVAC Corp., 885 F.2d 1574, 1576–77 (Fed. Cir. 1989)*.

n13 *Celotex Corp. v. Catrett, 477 U.S. 317, 325, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*.

n14 *Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456, 119 L. Ed. 2d 265, 112 S. Ct. 2072 (1992).*

**IV. POSITIONS OF THE PARTIES**

The parties are in agreement that Tulip and IBM executed the 1994 and 1998 Agreements and there is no dispute that those agreements conveyed certain rights to IBM pertaining to the '621 patent. The parties disagree over whether *§ 287(a)* was triggered by Tulip–licensee IBM's purchase and resale of infringing Dell computers without marking those computers with the '621 patent number.

*Section 287(a)* of the patent statute states:

> patentees, and persons making, offering for sale, or selling within the United States any patented article for or under them, or importing any patented article [*10] into the United States, may give notice to the public that the same is patented, either by fixing thereon the word "patent" or the abbreviation "pat.", together with the number of the patent, ... In the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice. Filing of an action for infringement shall constitute such notice.

For the purposes of its motion for summary judgment only, Dell assumes that some of its OptiPlex computers are covered by the '621 patent as alleged by Tulip. Based on that assumption, Dell contends that IBM's sale of the infringing OptiPlex computers was the sale of "Licensed Products" under the 1998 Agreement. n15 Because IBM did not mark those computers with the '621 patent number, Dell contends that *§ 287(a)* precludes Tulip from recovering damages for any of Dell's own sales of infringing computers prior to receiving actual notice of the '621 patent from Tulip in March 2000.

n15 The sales of OptiPlex computers giving rise to Dell's marking defense all occurred after the January 1, 1998 effective date of the 1998 Agreement. *See* D.I. 346, Ex. 10 (February 11, 1998 purchase order from IBM to Dell), Ex. 14 (Dell invoices for nearly 500 OptiPlex computers each bearing the IBM purchase order number listed on IBM's February 11, 1998 purchase order), Ex. 15 (invoices from IBM to Procter & Gamble for over 350 OptiPlex computers sold by IBM to Procter & Gamble), Ex. 16 (Dell invoice to IBM for an OptiPlex GXa–EM computer), and Ex. 17 (IBM invoice to PriceWaterhouse's leasing company reselling the OptiPlex GXa–EM computer referenced in Exhibit 16). Consequently, the language of the 1998 Agreement and not the 1994 Agreement, to the extent they vary, is the focus of the court's determination.

[*11]

The provisions of the 1998 Agreement that are pertinent to the parties' positions on Dell's marking defense state:

2.1 Each party, as Grantor, on behalf of itself and its Subsidiaries grants to the other, as Grantee, a worldwide, nonexclusive License under Grantor's Licensed Patents:

> (a) to make (including the right to use any apparatus and practice any method in making), use, import, offer for sale and lease, sell and/or otherwise transfer Grantee's Licensed Products; and
> (b) to have Grantee's Licensed Products made by another manufacturer for the use and/or lease, sale or other transfer by Grantee only when the conditions set forth in Section 2.2 are met.

2.2 The license to have products made granted in Section 2.1(b) to Grantee:

> (a) shall only apply when the specifications for such Grantee's Licensed Products were created by Grantee (either solely or jointly with one or more third parties);
> ...
> (d) shall not apply to any products in the form manufactured or marketed by said other manufacturer prior to Grantee furnishing of said specifications.

The "Licensed Patents" referred to in § 2.1 to which Tulip granted rights is defined as:

1.3 ... all [*12] patents, ... of TULIP:

> (a) issued or issuing on patent applications entitled to an effective filing date prior to December 31, 2002. n16

n16 *Id.*, Ex. 5 § 1.3.

The '621 patent issued on an application entitled to an effective filing date prior to December 31, 2002 and, therefore, is one of the Tulip patents covered by the 1998 Agreement. The "[IBM] Licensed Products" subject to the grants of § 2.1 are defined in ?? 1.7 as "IHS Products." An "IHS Product" "mean[s] an Information Handling System" n17 which, in turn, is defined as: "any instrumentality or aggregate of instrumentalities primarily designed to compute, classify, process, transmit, receive, retrieve, originate, switch, store, display, manifest, measure, detect, record, reproduce, handle or utilize any form of information, intelligence or data for business, scientific, control or other purposes." n18 Tulip does not dispute that desktop computers would fit the definition of "Information Handling System" described in § 1.1 of the [*13] 1998 Agreement.

n17 *Id.*, Ex. 5 § 1.2.

n18 *Id.*, Ex. 5 § 1.1.

Dell argues, and Tulip does not dispute, that computers covered by the '621 patent are among the "Licensed Products" contemplated by the 1998 Agreement. Dell argues further that IBM's sale of OptiPlex computers was the sale of "Licensed Products" pursuant to the "make, use, or sell" grant of ?? 2.1(a) of the 1998 Agreement. Since IBM did not mark the Dell OptiPlex computers it resold, Dell contends that *35 U.S.C. § 287(a)* limits Tulip's period of recovery of damages resulting from Dell's sale of purportedly infringing computers to the period of time after which Tulip provided Dell actual notice of the '621 patent on March 10, 2000. Dell maintains that it has a valid marking defense based on IBM's sale of the OptiPlex computers because *§ 287(a)* is triggered by the unmarked sale of a patented product whether that sale is made by the patentee or the patentee's licensee. n19 Dell contends that there is no exception [*14] to the application of *§ 287(a)* where a patentee did not take reasonable steps to assure its licensee's compliance with the marking statute. Dell maintains that Tulip failed to take any steps to assure that its licensee complied with *§ 287(a)* as the 1998 Agreement did not require, and Tulip did not even request, that IBM mark any of Tulip's patented products that IBM was selling or might sell in the future.

n19 [HN2] *See 35 U.S.C. 287(a)* ("Patentees, *and persons* ... selling within the United States any patented article *for or under* [the patentee]") (emphasis added).

Although Tulip agrees with Dell that there are no material facts in dispute concerning Dell's marking defense, Tulip argues that a proper interpretation of the 1998 Agreement should lead this court to conclude that IBM's off–the–shelf purchase and resale of infringing Dell computers was not the sale of "Licensed Product" pursuant to that agreement. Tulip notes that two separate grants are included in the above–referenced [*15] provisions of the 1998 Agreement: the "make, use, or sell" grant of § 2.1(a) and the "have made" grant of § 2.1(b).

Tulip argues that § 2.1(a) applies only to products made by IBM for its use, sale, or other transfer. Based on this interpretation, Tulip contends that Dell is incorrect in its assertion that IBM's purchase and resale of OptiPlex computers comes within the "make, use, or sell" grant of § 2.1(a) as those computers were made by Dell and not IBM. Since IBM did not make the OptiPlex computers, Tulip argues that the only way the Dell computers resold by IBM could fall under the 1998 Agreement is if IBM had those computers made by Dell pursuant to the "have made" grant of § 2.1(b). Tulip insists that if the grant of § 2.1(a) is interpreted to cover "Licensed Products" made by a party other than IBM, the additional "have made" grant of § 2.1(b), and the limitationson the "have made" grant recited in § 2.2 of the 1998 Agreement, would be effectively written out of the agreement. Tulip notes that such an interpretation is contrary to proper contract construction which requires the court to construe a contract so that all of its provisions are given effect.

Furthermore, [*16] Tulip maintains that in *Intel Corp. v. Broadcom Corp.* n20 this court rejected an argument Tulip contends is similar to Dell's; that the products manufactured by a third party and purchased off–the–shelf by the plaintiff's licensee were licensed products covered by the "have made" provision of the license agreement at issue there. Consistent with the reasoning in *Broadcom*, Tulip contends that the OptiPlex computers resold by IBM could not be covered by the "have made" grant of the 1998 Agreement because of the limitations of § 2.2 on the "have made" grant of § 2.1(b). It is the existence of those limitations, Tulip suggests, that causes Dell to argue that IBM's sales of OptiPlex computers is covered by § 2.1(a) and not § 2.1(b).

n20 *173 F. Supp. 2d 201 (D. Del. 2001)*.

Section 2.2(a) limits the "have made" grant of § 2.1(b) by requiring that IBM provide the specifications for any products manufactured by third party for IBM. Section 2.2(b) further limits the "have made" grant by excluding [*17] products manufactured by a third party prior to IBM providing the required product specifications. Tulip

concludes that the § 2.2 limitations on the § 2.1(b) "have made" grant preclude applicability of the 1998 Agreement to IBM's sales of OptiPlex computers because those computers were not made for IBM after IBM provided product specifications to Dell for their manufacture. Tulip argues that since IBM's sale of the Dell OptiPlex computers can not be considered the sale of "Licensed Products" pursuant to the either grant of rights provision of the 1998 Agreement, those sales did not trigger the marking requirement recited in *§ 287(a)* of the patent statute.

Tulip argues, in the alternative, that if this court determines that IBM's sale of OptiPlex computers is covered by the 1998 Agreement, IBM's sales of approximately 500 OptiPlex computers is *de minimis* compared to the total number of infringing OptiPlex computers sold in the United States by Dell. Tulip urges the court to find that such *de minimis* sales do not trigger the marking provisions of the patent statute.

Dell responds that it is IBM's sale of OptiPlex computers to IBM's own customers that is the focus of its [*18] marking defense. According to Dell, those sales were authorized by the § 2.1(a) "make, use, or sell" clause of the 1998 Agreement. Dell argues that the *Broadcom* case cited by Tulip does not inform this court's determination because, Dell notes, unlike the issue of IBM's sale of computers covered by the patent in suit here, that case dealt with the issue of whether a licensee's purchases of infringing products from a third–party manufacturer immunizes the third–party manufacturer from an infringement action brought by the patentee. Dell emphasizes that it is not arguing it is entitled to complete immunity from damages as the result of IBM's *purchase* of infringing computers from Dell, but that the *sales* of those computers by IBM triggered *§ 287(a)* and limit the period of time for which Dell might be liable for infringement damages.

Dell disputes Tulip's assertion that clause 2.1(a) applies only to products made by IBM. Dell states that the rights given to IBM under § 2.1(a) to "make," or to "use," or to "sell" "Licensed Products" do not depend on one another. As further support for this position, Dell notes that another right granted under § 2.1(a), to "import" "Licensed [*19] Products," would be nonsensical if those products had to be made by IBM. Furthermore, Dell contends that in *Cyrix Corp. v. Intel Corporation* n21 the Federal Circuit rejected arguments made by the plaintiff there that are very similar to those made by Tulip here and which were based on the language of a license agreement having almost identical granting clauses to those at issue in the 1998 Agreement. There, as here, Dell notes that the plaintiff argued that the rights granted in a "make, use, or sell" clause were limited to products designed by the licensee. There, as here, the plaintiff's interpretation of the "make, use, or sell" grant was based on the existence of a separate right to "have made" licensed products. Because the argument rejected in *Cyrix* is almost identical to that made by Tulip in this case, Dell argues, the reasoning of *Cyrix* supports Dell's motion for partial summary judgment in this case. Finally, Dell contends that Tulip's *de minimis* argument focuses on the wrong pool of sales of OptiPlex computers in hopes of bringing this case within an exception to the effect of *§ 287(a)*. Dell maintains the sales relevant to the *de minimis* exception to [*20] the marking requirement are those by the patentee (or the licensee of the patent holder) and not those of the infringer. Therefore, the number of infringing computers sold by Dell is irrelevant to determining whether the *de minimis* exception is applicable in this case. Dell argues that 100% of the computers covered by the '621 patent sold in the United States by Tulip, or its licensee IBM, were unmarked. Therefore, Dell insists the *de minimis* exception is not applicable here.

n21 *77 F.3d 1381 (Fed. Cir. 1996)*.

**V. ANALYSIS**

This court must analyze a series of issues before determining whether either party is entitled to summary judgment with regard to Dell's marking defense. The first issue that must be addressed is whether the sale of infringing Dell OptiPlex computers by IBM to certain of its IT customers was the sale of "Licensed Products" pursuant to the 1998 Agreement. If the answer to that question is affirmative, the next issue is whether those sales give rise to a marking defense [*21] for Dell by triggering *§ 287(a)* of the patent statute and/or whether there is an exception to the application of the statute. Finally, if *§ 287(a)* is implicated by IBM's sales of Dell computers, the court must determine the period of time during which Tulip would be unable to recover damages from Dell for Dell's sale of infringing computers.

*A. Was the sale by IBM of infringing Dell OptiPlex computers the sale of "Licensed Products" pursuant to the 1998 Agreement?*

The initial question to be addressed, whether the sale by IBM of infringing Dell OptiPlex computers constitutes the sale of "Licensed Products" pursuant to the 1998 Agreement, is essentially a matter of contract interpretation. Several facts relevant to the court's determination of this question are not in dispute. Pursuant to the 1998 Agreement, Tulip granted IBM the separate rights to "make, use, or sell" and to "have made" "Licensed Products." As defined by the 1998 Agreement, "Licensed Products" would include computers covered by the '621 patent. n22 Several models of Dell's OptiPlex line of com-

puters have previously been found to be covered by the '621 patent. n23 IBM purchased certain of the infringing Dell [*22] computers from Dell and resold those computers to certain of IBM's own IT customers. n24 The Dell computers at issue were purchased "off-the-shelf" by IBM. Because IBM did not have those computers made for it by Dell pursuant to the § 2.2 limitations on the § 2.1(b) "have made" grant of the 1998 Agreement, those computers are not § 2.1(b) "Licensed Products". n25 For those computers to be "Licensed Products," therefore, they have to have been sold by IBM pursuant to the "make, use, or sell" grant of § 2.1(a) of the 1998 Agreement. It is on this point that the parties are in disagreement.

n22 *See* D.I. 346, Ex. 5 § 1.3 (defining "TULIP Licensed Patents), § 2.1 (defining the "Grants of Rights"), § 1.7 (defining "IBM Licensed Products"), and §§ 1.1 & 1.2 (defining "Information Handling System" and "IHS Product," respectively); D.I. 364 at 11 (stating Tulip's agreement that "Dell correctly notes, the 1998 Agreement granted IBM the right to make, use or sell IBM Licensed Products").

n23 The parties submitted briefs on their respective motions prior to this court's determination that some of the accused Dell computers do literally infringe the '621 patent. *See* D.I. 419. The parties' arguments were not affected by this fact as Dell accepted, for the purpose of the motions under consideration, that its computers did infringe the '621 patent.

[*23]

n24 *See* D.I. 346, Ex. 15 (IBM invoices for Dell OptiPlex computers sold to Procter & Gamble Co.); *Id.*, Ex. 17 (IBM invoice for Dell OptiPlex computer sold to PriceWaterhouse's leasing company).

n25 Tulip contends that the "have made" grant of § 2.1(b) is the section of the 1998 Agreement relevant to Dell's marking defense. As explained more fully below, Dell argues that § 2.1(a) is the relevant section and affirmatively disavows a defense to infringement based on § 2.1(b). Therefore, there is no dispute over the applicability of § 2.1(b) of the 1998 Agreement to Dell's marking defense.

Tulip argues that the sales of Dell computers by IBM cannot be considered "Licensed Products" sold pursuant to § 2.1(a) because only products made by IBM, and not products bought off-the-shelf from a third party, are covered by that section of the 1998 Agreement. Tulip focuses its arguments in opposition to Dell's marking defense on the existence of the separate "have made" grant of § 2.1(b). Tulip notes that separate rights are granted in § 2.1(a) and § 2.1(b) of its license agreement with [*24] IBM. Tulip argues that if IBM's right to "make, use, or sell" "Licensed Products" under § 2.1(a) is interpreted to include IBM's off-the-shelf purchase of infringing products made by a third party, the "have made" grant of § 2.1(b), and the restrictions placed on that grant by § 2.2, are effectively read out of the 1998 Agreement. According to Tulip, such interpretation would make § 2.1(b) a meaningless provision. Tulip asserts that such a result is contrary to basic tenants of contract interpretation which require that each provision of a contract is to be given effect if it is reasonable to do so. Tulip contends that *Intel Corp. v. Broadcom Corp.* n26 supports its proposed interpretation as that court determined that a licensee's off-the-shelf purchase of infringing product was not licensed product manufactured pursuant to the "have made" grant of the license agreement at issue.

n26 *Intel Corp. v. Broadcom Corp. 173 F. Supp. 2d 201 (D. Del. 2001).*

Tulip also contends that the interpretation of § 2.1(a) urged by Dell [*25] effectively creates a sublicense from IBM to Dell which would immunize Dell's infringing sales of OptiPlex computers. Because the 1998 Agreement does not permit IBM to grant a sublicense to sell "Licensed Products," except to IBM's own subsidiaries, Tulip maintains that Dell's interpretation is also incorrect as it would impermissibly expand the rights granted to IBM under the license agreement.

In briefing and at oral argument Tulip consistently misstates Dell's position with regard to the affect of IBM's purchase and resale of infringing Dell computers on Dell's potential liability to Tulip. It is the distinction between a finding of infringement and a determination of the period of time for which damages can be recovered as a result of infringement that is blurred by Tulip's argument. Dell does not argue that it is entitled to a determination that it is immune from damages for infringement of the '621 patent as a result of IBM's *purchase* of infringing product from Dell based on IBM's § 2.1(b) right to "have made" "Licensed Products." Instead, Dell argues that the *sales* by IBM of Dell computers—purportedly under the "make, use, or sell" grant of § 2.1(a)—were the sales [*26] of unmarked patented articles by Tulip's licensee. According to Dell, those sales triggered *§ 287(a)* of the patent statute thereby precluding Tulip from recovering any infringement damages from Dell for any infringing activities of Dell that occurred prior to Tulip providing Dell with actual notice of the '621 patent.

As noted above, in footnote 26, Dell acknowledges that the OptiPlex computers purchased by IBM were not "Licensed Products" manufactured for IBM pursuant to the "have made" grant of § 2.1(b) of the 1998 Agreement and Dell does not argue that section immunizes it from a finding of infringement. Therefore, *Broadcom* does not support Tulip's opposition to the arguments offered by Dell in favor of its marking defense. The issue in *Broadcom* was whether an unaffiliated manufacturer could escape infringement liability when its infringing products were purchased off-the-shelf by a licensee whose license agreement with the patent holder contained "have made" grants similar to § 2.1(b) of the 1998 Agreement. n27 Had Dell contended that it was immune from liability for infringing the '621 patent by arguing that IBM's off-the-shelf purchase of infringing OptiPlex computers [*27] was the purchase of "Licensed Products" pursuant to IBM's "have made" rights, *Broadcom* would be highly relevant. Contrary to the conclusion that would be drawn from examining Tulip's submissions with regard to the current motions, Dell has never made that argument. Dell's marking defense is based on § 2.1(a) of the 1998 Agreement and resolving whether IBM's sale of the Dell computers to IBM's customers was the sale of "Licensed Product" pursuant to that section is necessary to this court's determination of Dell's marking defense.

n27 *See Broadcom, 173 F. Supp. 2d at 228* (stating that "the key issues in this dispute by the parties relate to the mechanics of how a 'have made' right is exercised and the scope of its coverage. That is, (i) did the Intel licensees' exercise their 'have made' rights by purchasing allegedly infringing products from Broadcom?, and if so (ii) does the fact that Broadcom sold allegedly infringing products to Intel licensees insulate Broadcom from liability for infringement based on those sales?").

[*28]

Two cases, one by the Federal Circuit and one by this court, have construed the meaning of "Licensed Products" as that term relates to "make, use, or sell" and "have made grants" contained in license agreements using language very similar to the language of the 1998 Agreement. In each case, the courts found that, as defined by the relevant license agreements, "Licensed Products" which the licensee had a right to "make, use, or sell" were not limited to products designed and/or made by the licensee.

In *Cyrix Corp. v. Intel Corp.*, Intel Corporation ("Intel") appealed from the trial court's determination that Intel-licensee IBM acted within the scope of its license agreement when it acted as a foundry for Cyrix Corporation ("Cyrix") by manufacturing microprocessors according to specifications supplied by Cyrix and selling that finished product back to Cyrix for resale under Cyrix' brand name. n28 Cyrix, in apprehension of an infringement suit from Intel, filed an action seeking declaratory judgment that it was immune from infringement liability based on the argument that IBM was acting within its rights under the Intel/IBM license in acting as a foundry for Cyrix. n29 Cyrix' argument [*29] was that IBM had the right, under the "make, use, or sell" grant of the Intel/IBM license agreement, to manufacture products covered by Intel's patents regardless of who designed those products. Because the purchase of a patented product from a valid licensee shields the purchaser from infringement liability to the patentee, Cyrix argued that it was free from liability to Intel when it purchased the microprocessors IBM manufactured at its request. n30 Intel countered that the "make, use, or sell" grant of the Intel/IBM agreement only permitted IBM to sell products designed by IBM.

n28 *Cyrix Corp. v. SGS-Thompson Microelectronics 77 F.3d 1381, 1382-83 (Fed. Cir. 1996).*

n29 *Id. at 1383-84.*

n30 *Id. at 1384.*

In considering the parties' arguments, the Federal Circuit examined what it determined was the unambiguous language of the "make, use, or sell" grant of the Intel/IBM license agreement. That provision granted IBM the right "to make, use, lease, sell and otherwise transfer IBM Licensed Products." n31 [*30] "IBM Licensed Products" was defined in a separate section to mean "IHS Products, IHS Complexes, IHS Programs, Supplies and any combination of any, some or all of the foregoing and, also, Semiconductor Apparatus." n32 When the court read those sections together, it found that "IBM Licensed Products" were not limited to products designed by IBM. n33 The court also disagreed with Intel's argument that the restricted "have made" grant of the Intel/IBM agreement limited IBM's right to have Cyrix design products for IBM. The court concluded that since "IBM did not have the products made for it, ... [the 'have made'] provision does not limit its rights to make and have designed the products it sold to Cyrix." n34 The *Cyrix* court's summary of its holding illustrates the separateness of the rights conveyed in the Intel/IBM license agreement:

> IBM properly made and sold microprocessors under section 2.2.1 [the "make, use, or sell" grant]; IBM properly had microprocessors designed under section 2.2.2; and IBM

did not "have made" microprocessors under the more limited section 2.2.3 [the "have made" grant]. Thus IBM did not act outside the terms of the Intel agreement. n35

The [*31] distinction between the separate rights granted under the "make, use, or sell" and "have made" grants is clear from this language. The existence of the "have made" right did not limit IBM's separate rights, under the "make, use, or sell" grant, to make products designed by a third party or to sell those products to the third–party designer.

n31 *Id. at 1383*.

n32 *Id.*

n33 *Id. at 1385*. The Intel/IBM license agreement further defined the terms used to define "IBM Licensed Products" ("IHS Product," "IHS Complexes" "IHS Programs," "Supplies," and "Semiconductor Apparatus") without any limitation as to design by IBM.

n34 *Id. at 1386*.

n35 *Id. at 1386*. Section 2.2.2 of the Intel/IBM license agreement granted IBM a separate right to "have designed Semiconductor Apparatus," the definition of which the court said clearly included the microprocessors at issue in that case. *Id. at 1386*. The fact that the Intel/IBM license agreement had this distinct right is of no consequence to this court's determination of Dell's marking defense as the existence of the "have designed" grant was part of the *Cyrix* court's determination that the third party manufacturer in that case was immune from infringement for the transactions at issue. Here, Dell is not seeking immunity from a finding of infringement.

[*32]

That a "make, use, or sell" grant is a bundle of separate rights is also apparent from this court's analysis in *Thorn EMI North America, Inc. v. Hyundai Electronics Indus. Co., Ltd.* n36 There, Thorn EMI North America, Inc. ("TENA") alleged that computer memory chips produced by Hyundai Electronics Industries Co., Ltd. and Hyundai Electronics America ("Hyundai") infringed TENA's patents. n37 The transaction at issue was the sale by Hyundai of memory chips to IBM for use in IBM–manufactured computers. n38 TENA alleged that Hyundai induced or contributed to IBM's infringement of TENA's patent through that sale. n39 Hyundai contended that, pursuant to the "make, use, or sell" grant contained in a license agreement executed by IBM and TENA's corporate predecessor, IBM had an unrestricted licence to use the allegedly infringing memory chips. n40 TENA contended that IBM's purchase of the memory chips violated the "have made" grant of the license agreement. TENA argued, as Tulip does here, that for products made by a third party to come under the "make, use, or sell" grant, those products had to have been manufactured for the licensee pursuant to the license agreement's limited "have [*33] made" grant or the "have made" grant would be meaningless. n41

n36 No. 94–332–RRM, Thorn EMI N. Am. v. Hyundai Elecs. Indus. Co., 1996 U.S. Dist. LEXIS 21170 (D. Del. July 12, 1996); *see also Adams v. Burke, 84 U.S. 453, 456, 21 L. Ed. 700, 1885 Dec. Comm'r Pat. 438 (1873)* ("The right to manufacture, the right to sell, and the right to use are each substantive rights, and may be granted or conferred separately by the patentee."); *Intel Corp. v. Broadcom Corp., 173 F. Supp. 2d 201, 228 (D. Del. 2001)* (stating that by means of a license agreement, "the parties agree that the patent owner will allow the licensee either to make, to use, to sell (or some combination of, or derivative of, these *three rights*) without subjecting the licensee to an infringement suit") (emphasis added).

n37 *Thorn EMI,* 1996 U.S. Dist. LEXIS 21170, at [WL]*1.

n38 *Id.*

n39 *Id.* at [WL] *6. The memory chips at issue were manufactured and sold by Hyundai in Korea. Because TENA's patent did not provide protection for infringing acts occurring outside the United States, TENA could only bring an inducement or contributory infringement claim against Hyundai. *Id.* IBM was not a party to the litigation.

[*34]

n40 *Id.*

n41 *Id.* at [WL] *9.

The *Thorn EMI* court noted that the Federal Circuit had addressed a similar argument in *Cyrix* and had analyzed nearly identical "make, use, or sell" and "have made" language in the license agreement at issue there. As in *Cyrix*, the *Thorn EMI* court noted that the "make, use, or sell" grant of the licensee agreement it was construing did not limit the "IHS products," which were defined as the "IBM Licensed Products," to products designed by

the licensee. n42 The court stated:

> the definition of IHS products is likewise not limited as to the manufacturer. The license grants the rights to sell, use, lease, and otherwise transfer in the same section as the right to make the licensed products. The section granting these rights does not restrict them to products of IBM's design. Thus, reading § 2.8.1 [the "make, use, or sell" grant] in the context of the entire agreement, IBM has unrestricted rights to use, sell, or otherwise transfer "off the shelf" parts. n43

n42 *Id.* at [WL] *13
[*35]

n43 *Id.* at [WL] *13-14.

After construing the "make, use, or sell" grant of that the license agreement at issue to include products purchased off-the-shelf by the licensee, the court went on to consider TENA's argument that such a construction would make the limited "have made" grant meaningless. The court agreed with Hyundai that its proposed construction did not make the separate "have made" right meaningless. Hyundai argued that "the purpose of [the 'have made'] grant is to extend the license protections to the foundry and to protect [the licensee] from inducement suits." n44 The court noted that:

> [a] license that grants "have made" rights to a licensee protects a third party manufacturer to the extent that it produces for the use or sale of the original licensee. Thus, a foundry commissioned by [the licensee] to manufacture IHS products would have the protection of the license agreement, subject to the restrictions [limiting the "have made" grant]. A manufacturer of "off the shelf" products is not a foundry. Such a manufacturer, therefore, whether or not it sold the products [*36] to [the licensee], would not be protected by the agreement. n45

Therefore, had Hyundai manufactured and sold the infringing product in the United States, TENA could have sued Hyundai for infringement as Hyundai would have no protection under IBM's license agreement. The fact that because the infringing products were manufactured and sold in Korea precluded such action against Hyundai did not alter the court's construction of what constituted licensed products under the "make, use, or sell" grant and did not make the "have made" grant meaningless. The *Thorn EMI* court concluded that, "[the licensor] simply failed to consider the risk of overseas infringers selling 'off the shelf' parts to [its] licensees and accordingly failed to protect itself against that risk. Having agreed to be bound by the terms of the agreement, TENA must accept the consequences of [the licensor's] drafting error." n46

n44 *Id.* at [WL] *14.

n45 *Id.* at [WL] *14-15 (citations omitted).

n46 *Id.* at [WL] *16.

The reasoning [*37] set forth in *Cyrix* and *Thorn EMI* leads this court to determine that IBM's sale of infringing Dell OptiPlex computers was the sale of "Licensed Products" made pursuant to the "make, use, or sell" grant of § 2.1(a) of the 1998 Agreement. As with the language contained in the license agreements at issue in those two cases, nothing in the 1998 Agreement limits the "IBM Licensed Products," as defined in § 1.2 and § 1.1 of the agreement, to products designed or manufactured by IBM. Section 2.1(a) grants IBM the rights "to make ???, use, import, offer for sale and lease, sell and/or otherwise transfer [IBM] Licensed Products." n47 "IBM Licensed Products" are defined by § 1.7 to mean "IHS Products." When § 2.1(a) is read substituting the definition of "IHS Product," from § 1.2, for "[IBM] Licensed Products," it states that IBM has the right:

> to make ..., use, import, offer for sale and lease, sell and/or otherwise transfer *an Information Handling System or any instrumentality or aggregate of instrumentalities (including, without limitation, any component, subassembly, computer program or supply) designed for incorporation in an Information Handling System. Any instrumentality* [*38] *or aggregate of instrumentalities primarily designed for use in the fabrication (including testing) of an IHS Product licensed herein shall not be considered to be an IHS Product.*

"Information Handling System" is not defined to restrict the source of products covered by the § 2.1(a) grant. Section 1.1 defines "Information Handling System" as "any instrumentality or aggregate of instrumentalities primarily designed to compute, classify, process, transmit,

receive, retrieve, originate, switch, store, display, manifest, measure, detect, record, reproduce, handle or utilize any form of information, intelligence or data for business, scientific, control or other purposes." n48 The language of the 1998 Agreement is unambiguous and although language could have been included creating the limitation on § 2.1(a) suggested by Tulip, such language was not included. n49 Consequently, the court concludes that there is no limitation on the source of "[IBM] Licensed Products" that are covered by the § 2.1(a) "make, use, or sell" grant.

n47 D.I. 346, Ex. 5 § 2.1(a).

n48 *Id.*, Ex. 5 § 1.1.

[*39]

n49 *See, e.g., Intel Corp. v. U.S. Int'l Trade Comm'n, 946 F.2d 821, 828 (Fed. Cir. 1991)* (construing the language of the "make, use, or sell" grant in the license agreement at issue as limiting that grant to cover only products designed and manufactured by the licensee).

The court also disagrees with Tulip that this construction of the "make, use, or sell" grant makes the separate "have made" grant meaningless. As explained in *Thorn EMI*, the "have made" grant protects a third party who manufactures product for a licensee from an infringement action and protects the licensee from an inducement suit. n50 These are not meaningless protections. Furthermore, as evidenced by the § 2.2 restrictions on the § 2.1(b) "have made" rights in the 1998 Agreement, a licensor can limit the extent to which a third party receives the benefit of license protection when its licensee exercises "have made" rights.

n50 *Thorn EMI*, 1996 U.S. Dist. LEXIS 21170, [WL] at *15; *see also Intel Corp. v. Broadcom Corp., 173 F. Supp. 2d 201, 233 (D. Del. 2001)* (stating that "when exercised, the 'have made' right passes on certain protections to the third party. That third party's actions in making the product and selling the product back to the licensee become impliedly licensed.").

[*40]

The court's construction of § 2.1(a) does not immunize Dell from a finding of infringement because, unlike Cyrix which purchased licensed product from a licensee, Dell sold infringing product to Tulip's licensee. n51 This determination only means that IBM, and IBM's customers to whom the OptiPlex computers were resold, are protected from a claim of infringement by Tulip. Since IBM did not "have made" the OptiPlex computers pursuant to the § 2.1(b) grant, Dell's activities are not immunized from liability. Having determined that IBM's sale of OptiPlex computers was the sale of "Licensed Product" pursuant to the "make, use, or sell" grant of § 2.1(a) of the 1998 Agreement, the next issue to be addressed by the court is the whether those sales triggered *§ 287(a)* of the patent statute.

n51 The fact that Dell is not immunized from a finding of infringement also negates Tulip's allegation that Dell is asserting a construction that would improperly make Dell a sublicensee of IBM.

*B. Did the sale by IBM of "Licensed* [*41] *Products," in the form of the infringing Dell OptiPlex computers, trigger the damage limitations recited in 35 U.S.C. § 287(a)?*

[HN3] *Section 287(a)* of the patent statute provides that a patentee who sells, or offers for sale, "within the United States any patented article ... may give notice to the public that the same is patented, ... by fixing thereon the word 'patent' or the abbreviation 'pat.', together with the number of the patent." Failure to so mark a patented article limits the period of time during which the patentee can recover damages. Damages can be recovered for any infringement occurring after the patentee provides constructive notice of its patent by beginning to properly mark its patented articles or for particular infringement continuing after actual notice of its patent is given to the allegedly infringing party. *Section 287(a)* can also be triggered by the unmarked sale of a patented article by a licensee of the patent holder. n52 When the failure to mark is caused by an unrelated third party, like a licensee, the court may consider whether the patentee took reasonable steps to assure that its licensee complies with the marking requirements. [*42] n53 If the court determines that the patentee took reasonable steps to assure this compliance, the fact that not all of the covered products sold by the licensee were marked will not automatically trigger *§ 287(a)*. n54

n52 *Amsted Indus. Inc. v. Buckeye Steel Castings Co., 24 F.3d 178, 185 (Fed. Cir. 1994)* [HN4] ("A licensee who makes or sells a patented article does so 'for or under' the patentee, thereby limiting the patentee's damage recovery when the patented article is not marked.") (citing *Devices for Medicine, Inc. v. Boehl, 822 F.2d 1062, 1066 (Fed. Cir. 1987))*.

n53 *Maxwell v. J. Baker, Inc., 86 F.3d 1098,*

*1111-12 (Fed. Cir. 1996)*.

n54 *Id. at 1112* (finding the fact that 95% of the product sold by the patent holder's licensee was properly marked, coupled with evidence of the "extensive and continuous efforts to ensure compliance by [the licensee]," supported the jury's determination that the patent holder had complied with *§ 287(a)*).

[*43]

As explained above, the OptiPlex computers resold by IBM were "Licensed Products" sold pursuant to § 2.1(a) of the 1998 Agreement. It is undisputed that IBM did not mark those computers with the '621 patent number. It is also undisputed that the 1998 Agreement does not include a requirement that IBM mark any licensed products it sold with the relevant Tulip patent numbers. Finally, Tulip has presented no evidence of any steps it took to ensure that its licensee complied with the marking requirements of *§ 287(a)*. These facts lead the court to conclude that *§ 287(a)* was triggered by IBM's sale of unmarked infringing Dell OptiPlex computers. n55 Had the 1998 Agreement included a requirement that IBM mark all "Licensed Product" it sold pursuant to that agreement, perhaps Tulip would have an alternative source of recovery for damages it suffered during the period of time *§ 287(a)* precludes recovery from Dell. Like the plaintiff in *Thorn EMI* which was forced to suffered the consequences resulting from a licensor's failure to consider a particular risk in drafting the license agreement at issue there, n56 however, Tulip must suffer the consequences of its own failure to draft the [*44] 1998 Agreement to protect itself from the risk that its licensee would sell unmarked product. This conclusion leaves the court with the final determination of the period of time for which Tulip cannot recover damages for sales by Dell of computers that infringe the '621 patent.

n55 Tulip made the alternative argument that, even if the court agreed with Dell that there was an obligation to have the infringing Dell computers resold by IBM marked with the '621 patent number, the sales of approximately 500 OptiPlex computers by IBM was a *de minimis* amount of sales when compared to the number of infringing computers sold by Dell itself. Based on this comparison, Tulip maintains that this *de minimis* failure to mark does not equate with a failure to comply with *§ 287(a)*. The only case cited by Tulip in support of this alternative argument is *Maxwell v. J. Baker, Inc., 86 F.3d 1098 (Fed. Cir. 1996)*. There, however, not only did the court consider the number of articles covered by the patent that were sold without being properly marked, it also applied a "rule of reason" in examining the efforts taken by the patentee to ensure that its licensee complied with the marking statute. *Id. at 1111-12*. There is no evidence of record that Tulip took any steps to assure that IBM properly marked products it sold that were covered by the 1998 Agreement. More importantly, however, the *Maxwell* court's consideration of the percentage of computers sold that were properly marked with those that were not marked concerned sales of covered product by the licensee. *Id. at 1112*. [HN5] *Section 287(a)* applies to "patentees, and persons making, offering for sale, or selling within the United States any patented article for or under them." That language does not apply to infringing sales made by a non-licensee third party like Dell. Therefore, the number of infringing computers sold by Dell is irrelevant to this court's determination of whether Tulip, and its licensee IBM, complied with the requirements of *§ 287(a)*. Because none of the "Licensed Products" sold by IBM were marked, Tulip's *de minimis* argument necessarily fails.

[*45]

n56 *See 190 F.R.D. 556, 1999 U.S. Dist. LEXIS 21170, at [WL]*16* (concluding that despite patentee's failure to consider and protect itself from a particular risk, "having agreed to be bound by the terms of the agreement, TENA must accept the consequences of ... [the] drafting error").

*C. What is the period of time during which Tulip is precluded from recovering damages from Dell for its sales of computers that infringe the '621 patent?*

Dell insists that if the court finds, as it has, that IBM's sale of the OptiPlex triggers *35 U.S.C. § 287(a)*, then Tulip can only recover damages for Dell's sales of infringing computers made after Tulip gave Dell actual notice of the '621 patent. In the event that a patentee, or one selling patented articles "for or under" the patentee, fails to mark those patented articles in accordance with the statute, *§ 287(a)* provides that, "no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages [*46] may be recovered only for infringement occurring after such notice. Filing of an action for infringement shall constitute such notice." The notice required by *§ 287(a)* in the event that a patentee is producing products covered by its patent may take the form of constructive notice to the world through consistent and continuous compliance with the marking requirements of

the statute or actual notice to a particular infringer. n57

n57 *American Medical Sys. Inc. v. Medical Eng'g Corp., 6 F.3d 1523, 1537 (Fed. Cir. 1993).*

There is no evidence, that after IBM's first sale of unmarked computers, constructive notice of the '621 through proper marking was ever provided. Although Tulip is not alleged to have sold any product covered by the '621 patented in the United States (marked or unmarked), none of the infringing Dell computers resold by IBM were marked with the '621 patent number. Dell acknowledges that it received actual notice from Tulip of the '621 patent on March 10, 2000. n58 Dell's position [*47] is that *§ 287(a)* serves to preclude Tulip from recovering damages from Dell for any its sales of infringing OptiPlex computers made before that date. The court disagrees with Dell's position to the extent that such an interpretation would retroactively immunize Dell from damages for any sales of infringing OptiPlex computers it made prior to the first sale and shipment by IBM of unmarked computers covered by the '621 patent. It was not until that shipment by IBM that the damage limitation of *§ 287(a)* was triggered.

n58 In a letter dated March 10, 2000, Tulip notified Dell that it believed several of Dell's products, including the Dell OptiPlex GX1, literally infringed claim 1 of the '621 patent. *See* D.I. 346, Ex. 3.

Dell does not allege that Tulip sold any products covered by the '621 patent in the United States. The sale of unmarked computers by IBM, which Dell correctly asserts triggered *§ 287(a)*, was the sale of OptiPlex computers covered by the '621 patent that IBM purchased from Dell and resold to [*48] IBM's customers. Dell states that "IBM's purchases from Dell [of the relevant OptiPlex computers] *commenced* in March 1998." n59 Prior to that date, there is no evidence that any product covered by the '621 patent was made, sold, or offered for sale in the United States by Tulip or any other entity "for or under" Tulip. For the reasons that follow, the court concludes that *§ 287(a)* carves out a period of time from the first shipment by IBM of OptiPlex computers covered by the '621 patent until Dell received actual notice of the '621 patent from Tulip on March 10, 2000, during which Tulip can not recover damages from Dell for Dell's infringement of the '621 patent. *Section 287(a)* does not eliminate Dell's liability for any of its infringing activities from the '621 patent's January 14, 1997 issue date until IBM's first shipment of covered product in 1998 and for any of its continuing infringing activities occurring after Dell received actual notice of the '621 patent on March 10, 2000.

n59 D.I. 345 at 6 (emphasis added).

[*49]

In *Wine Ry. Appliance Co. v. Enterprise Ry Co.*, n60 the United States Supreme Court considered the application of the then-current marking statute to a non-producing patentee suing for infringement damages. The Court was presented with the question of whether the marking statute limited the period during which a non-producing patentee could recover damages to infringement occurring after the patentee gave actual notice of the patent to the infringer. The defendant contended that, whether or not a patent holder made or sold a covered article, the marking statute required that a patent holder give notice of its patent by either producing and marking a covered article or giving actual notice to the infringer before damages for infringement could be recovered. n61 In rejecting the defendant's interpretation of the statute, the Court noted that "issuance of a patent and recordation in the Patent Office constitute notice to the world of its existence." n62 The Court reasoned:

> If respondent's position is correct, process patents and patents under which nothing has been manufactured may be secretly infringed with impunity, notwithstanding injury to owners guilty of no neglect [*50] ... The idea of a tangible article proclaiming its own character runs through this and related provisions. Two kinds of notice are specified—one to the public by a visible mark, another by actual advice to the infringer. The second becomes necessary only when the first has not been given; and the first can only be given in connection with some fabricated article. Penalty for failure implies opportunity to perform. n63

Although the Supreme Court was construing a prior version of the marking statute, the Federal Circuit recently noted its application of *Wine Railway* to the current version of the marking statute, *§ 287(a)*, n64 and confirmed that "the recovery of damages is not limited where there is no failure to mark, i.e., where the proper patent notice appears on products or where there are no products to mark." n65 Therefore, for the period of time when no product covered by '621 patent was being produced or sold by Tulip or its licensee, the recordation of Tulip's patent in the USPTO put the world on constructive notice of the patent's existence and *§ 287(a)* would not preclude the recovery of damages. Since Tulip has never made or sold product covered by the '621 [*51] patent in the

United States, there is no question that Dell would be liable to Tulip for damages for all of its infringing computer sales absent the sale of unmarked OptiPlex computers by Tulip-licensee IBM. The question this court must answer is whether IBM's triggering of *§ 287(a)*'s damage limitation retroactively immunizes Dell from damage liability even for its infringing activity occurring during the period before the relevant IBM sales when no product covered by the '621 patent was being made or sold by an entity having a duty to mark. While the Federal Circuit has not answered this question, at least one district court found that *§ 287(a)* did not retroactively preclude that plaintiff's recovery of infringement damages. n66 In *Clancy Sys. Int'l, Inc. v. Symbol Technologies, Inc.*, n67 another district court, although not ultimately having to decide the question, also mentions the possibility of *§ 287(a)* affecting a "carve-out" period of damage forfeiture. The *Clancy* court noted that it:

> had been unable to locate case law regarding whether a licensee's failure to mark negates prior constructive notice. The Federal Circuit has stated, in dicta, that [HN6] "once marking [*52] has begun, it must be substantially consistent and continuous in order for the party to avail itself of the constructive notice provisions of the statute." *American Medical Systems, 6 F.3d at 1537*. However, I do not read that language as addressing the situation here—i.e., where marking may have been proper at the start of a patent term and only became improper after the present defendant began infringing.
>
> For example, assume a patentee and all of its licensees have marked appropriately patented articles for several years before a new licensee begins selling unmarked products. Under such circumstances, it would make no sense to hold that the new licensee's failure to mark eliminates, retroactively, years of appropriate notice.
>
> If a defendant began infringing before the new licensee sold unmarked products, that defendant could hardly contend that it did not have sufficient constructive notice of the patent. Certainly, damages for infringement occurring after the unmarked products were sold and before actual notice of infringement would be excluded by *section 287(a)*. Damages for infringement to the time unmarked products were sold, however, may be recoverable. [*53] n68

n60 *Wine R. Appliance Co. v. Enterprise R. Equipment Co.297 U.S. 387, 80 L. Ed. 736, 56 S. Ct. 528, 1936 Dec. Comm'r Pat. 657 (1936)*.

n61 *Id. at 392*.

n62 *Id. at 393*.

n63 *Id. at 395*.

N64 *Texas Digital Sys., Inc. v. Telegenix, Inc., 308 F.3d 1193, 1219 (Fed. Cir. 2002)*.

n65 *Id. at 1220* (citing *Wine Railway, 297 U.S. at 393*).

n66 *See Wokas v. Dresser Indus., Inc., 978 F. Supp. 839 (N.D. Ind. 1997)*. In *Wokas*, the court determined that the failure of a licensee to properly mark covered product did not preclude recovery of damages for infringement occurring during the period of time the patentee was not producing any covered product. There, a non-producing patentee granted an alleged infringer a license under the patent in suit as part of a settlement agreement concerning past infringement by that entity. *978 F. Supp. at 842*. As a result of the licensee's failure to mark covered product, the defendant argued, citing *Konstant Products Inc. v. Frazier Indus. Co., 1992 U.S. Dist. LEXIS 14214, 25 U.S.P.Q.2d 1223 (N.D. Ill. 1992)*, that *§ 287(a)* precluded the plaintiff from recovering damages for infringement by the defendant from the date of the licensee's (itself formerly an infringer) first infringing sale of covered product rather than only from the licensee's first unmarked sale made as licensee. *978 F. Supp. at 846*. The *Wokas* court distinguished *Konstant*, which involved the assignment rather than license of a patent, and held that *§ 287(a)* did not preclude recovery of damages prior to the shipment of unmarked product by the licensee. *Id. at 848*. The *Wokas* court concluded that *§ 287(a)* does not retroactively bar the recovery of damages for a period during which the patentee was not producing patented articles. There, however, the defendant argued that the *§ 287(a)* bar extends to the first infringing sale of a former infringer who is later granted a license to produce product under a particular patent. Here, Dell argues that Tulip can only collect damages for Dell's infringement occurring after actual notice. It seems, therefore, that the issue confronting this court is somewhat broader than that addressed in *Wokas* in that the *Wokas* defendant argued for an increased period of damage preclu-

sion based on a licensee's formerly infringing sales where Dell is arguing that the mere fact of a licensee's unmarked sale precludes damages for any infringement other than that occurring after actual notice was received.

[*54]

n67 *953 F. Supp. 1170 (D. Colo. 1997)*.

n68 *Id. at 1174*.

The facts of this case, regarding periods of compliance and non-compliance with *§ 287(a)*, are the same as those posited by the hypothetical in *Clancy*. Here, there was a time period of constructive notice during which *§ 287(a)* was not implicated (from the issue date of the '621 patent until IBM's shipment of unmarked product), a period of time during which *§ 287(a)* precludes recovery of infringement damages (from IBM's shipment of unmarked product until actual notice of the '621 patent to Dell), and a period after which *§ 287(a)* no longer precludes damage recovery (from actual notice of the '621 patent to Dell). n69 This court agrees with the result implied by the *Clancy* hypothetical. An examination of the language and purpose of the marking statute leads this court to conclude that [HN7] *§ 287(a)* precludes the recovery of damages only for the period of time that a patent holder, or its licensee, is making or selling unmarked patented articles in the United States.

N69 It is of no significance that the *Clancy* hypothetical contemplates an initial period of constructive notice via marking and, in this case, there is an initial period of constructive notice of the '621 patent via the issuance of that patent and its recordation in the Patent Office. As *Wine Railway* and *Texas Digital* make clear, constructive notice of a patent is presumed in the case of a non-producing patentee.

[*55]

Once again, [HN8] *§ 287(a)* states:

> patentees, and persons making, offering for sale, or selling within the United States any patented article for or under them, or importing any patented article into the United States, may give notice to the public that the same is patented, either by fixing thereon the word "patent" or the abbreviation "pat.", together with the number of the patent, ... In the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice. Filing of an action for infringement shall constitute such notice.

[HN9] *Section 287(a)* applies to only certain entities, i.e., "patentees, and persons making, offering for sale, or selling within the United States any patented article for or under them, or importing any patented article into the United States." With regard to those entities, the statute states that notice that the article in question is patented may be given by marking the article with its patent number. If a patentee [*56] n70 produces patented articles in the United States *and* those patented articles are not marked, then the damage limitation of *§ 287(a)* is triggered. It is important to reiterate the requirement that those two facts exist prior to the triggering of the statute. [HN10] "*In the event of* [patentees, and persons making, offering for sale, or selling within the United States any patented article for or under them] failing ??? to mark" the patented articles being produced, then *§ 287(a)* precludes the patentee's recovery of damages until constructive or actual notice is given to the infringer and the infringer "continues to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice." [HN11] *Section 287(a)* is triggered by the unmarked sale of patented articles by the patentee and precludes recovery of damages from the date of that triggering event until notice is given to the infringer. Notice to the infringer, constructive or actual, terminates the damage-precluding effect of *§ 287(a)* and, if the infringer continues to infringe, the patentee can recover damages for infringement after notice of the patent is given. Since *§ 287(a)* is not triggered [*57] when the patentee is not producing patented articles, the patentee can recover damages for infringement during this period of time even if, later, *§ 287(a)* is triggered. This construction is supported by both recent statements by the Federal Circuit and the purposes of the marking statute.

n70 References to activities of "the patentee" triggering *§ 287(a)* include actions by the patentee and those acting "for or under" the patentee, e.g., licensees.

In rejecting the *Texas Digital* defendant's argument that the rule of *Wine Railway* undermined the notice requirement of *§ 287(a)*, the Federal Circuit stated that "[the defendant's] arguments reveal a misunderstanding

of the patent marking statute. The statute does not specify when or under what circumstances damages may be recovered. Rather, it describes circumstances that effect a forfeiture of damages." n71 The circumstances that effect a forfeiture of damages are a patentee's unmarked sale of patented products. Damages are not forfeited when the patentee [*58] is producing no patented products at all. Not only does the language of the statute support the court's interpretation, the purpose of *§ 287(a)* would not be furthered by retroactively precluding damages for a period of time during which the patentee did nothing to warrant a forfeiture of the right to damages.

n71 *Texas Digital Sys., Inc. v. Telegenix, Inc., 308 F.3d 1193, 1219–20 (Fed. Cir. 2002).*

[HN12] The Federal Circuit has identified "three related purposes" for the marking statute: "1) helping to avoid innocent infringement, 2) encouraging patentees to give notice to the public that the article is patented, and 3) aiding the public to identify whether an article is patented." n72 The second and third purposes seem to be no more than means by which the first stated purpose is achieved. Encouraging patentees to give notice to the public that an article is patented (by marking the article with its patent number) aids the public in identifying whether or not an article is patented. If the public [*59] is able to identify an article as patented, innocent infringement can be avoided. If an article is not marked, an individual may innocently infringe the patent by copying what he believes is not protected by a patent. Saying that the purpose of *§ 287(a)* is to help avoid "innocent infringement" is somewhat misleading, however.

N72 *Nike, Inc. v. Wal–Mart Stores, Inc., 138 F.3d 1437, 1443 (Fed. Cir. 1998)* (citations omitted).

[HN13] *Section 287(a)* does not protect *all* innocent infringers from damage liability. Intent is irrelevant to direct infringement n73 and an infringer of the patent of a non–producing patent holder n74 or of a patentee who is producing products and marking them in compliance with *§ 287(a)* n75 may be liable for their infringement regardless of the knowledge that they are infringing. n76 It is only those who might have innocently infringed because of unmarked product that is put into the market *by the patentee* that *§ 287(a)* seeks to protect. In other words, it is only when [*60] the patentee is himself contributing to the problem of innocent infringement by producing unmarked product that *§ 287(a)* punishes that patentee by precluding damage recovery. [HN14] Although *§ 287(a)* precludes the recovery of damages for infringement, even from a willful infringer, n77 during the period of a patentee's non–compliance with the marking statute, the forfeiture of damages pertains only to the period that the patentee is actively producing unmarked product. As soon as the patentee begins shipping product marked in compliance with *§ 287(a)*, constructive notice is presumed and continuing infringers are once again liable to the patentee. n78 This liability extends even to those who, conceivably, have innocently infringed after copying unmarked products that the patentee put into the market place. n79 From the point in time that the patentee consistently and continuously complies with *§ 287(a)* by marking its patented products, however, he can recover damages from any infringer for infringement occurring after the patentee's compliance with the statute. While it is clear that the purpose of *§ 287(a)* is to avoid innocent infringement, it is also clear that the specific innocent [*61] infringers *§ 287(a)* is designed to protect are those who might infringe during the period of time the patent holder is contributing to the problem of innocent infringement through its failure to comply with the statute. Those who may innocently, or unknowingly, infringe when a patentee is either not producing covered product or while the patentee is producing patented articles which are properly marked may still be liable for damages.

n73 *See Intel Corp. v. U.S. Int'l Trade Comm'n, 946 F.2d 821, 832* (stating that "there is no intent element to *direct* infringement").

N74 *See Texas Digital, 308 F.3d at 1219–1220.*

n75 *See American Med. Sys., Inc. v. Medical Eng'g Corp., 6 F.3d 1523, 1537 (Fed. Cir. 1993)*

N76 [HN15] *Section 271(a)* of the patent statute states, "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent." *35 U.S.C. 271(a).*

n77 *See Amsted Indus. Inc. v. Buckeye Steel Castings Co., 24 F.3d 178, 187 (Fed. Cir. 1994)* (stating that "it is irrelevant ... whether the defendant knew of the patent or knew of his own infringement. The correct approach to determining notice under *section 287* must focus on the action of the patentee, not the knowledge or understanding of the infringer"). In *Amsted*, the court held that *§ 287(a)* protected even a willful infringer from damages during the period of the patentee's non–compliance with the statute. There, implied licensees of the patentee did not mark patented articles they sold. The *Amsted* court held that *§ 287(a)* precluded the plaintiff's recovery for even willful infringement on

the part of the defendant until the *patentee* provided the infringer with actual notice of its infringement. [*62]

n78 *See American Med., 6 F.3d at 1537* ("We construe *section 287(a)* to preclude recovery of damages only for infringement for any time prior to compliance with the marking or actual notice requirements of the statute ... We hold that AMS is entitled to damages from the time that it began shipping its marked products.").

n79 In *American Medical*, the Federal Circuit stated that "preventing recovery of damages for an initial failure to mark does not remedy *the problem of having unmarked products in the marketplace.* Any products entering the market prior to issuance of the patent will not be marked. Even the *Hazeltine* court recognized that 'it is not the number of articles seen by the defendant which is controlling on an issue of marking ... but whether the patentee performed this statutory duty which was a prerequisite to his *in rem* notice to the world.' Therefore, once marking has begun in compliance with the statute, *in rem* notice is provided and there is no reason to further limit damages on this account." *American Med., 6 F.3d at 1537* (quoting *Hazeltine Corp. v. Radio Corp. of Am., 20 F. Supp. 668, 671 (S.D.N.Y. 1937)* (emphasis added). The *American Medical* court was considering the question of whether *§ 287(a)* precluded the patentee's recovery of infringement damage until the infringer was provided actual notice of the patent when the patentee had been shipping the product at issue prior to issuance of the patent (necessarily without marking that product with an, as yet, unassigned patent number) and failed to mark its products until about two months after the patent issued. The reasoning of that court as to the effect on the ability of the patentee to recover damages from possibly innocent infringers applies equally to this case. In that case, the patentee put unmarked product into the marketplace (both prior to its patent being issued and for a period of time after issuance). Despite the court's acknowledgment of "the problem of having unmarked products in the marketplace," constructive notice to the world of the patent was deemed to have occurred when the patentee began marking its product in compliance with the statute. Therefore, even "innocent infringers" who copied what they thought was an unpatented product could be liable for infringement damages if they continued to produce covered product after the date at which the patentee began complying with the statute.

[*63]

Accordingly, the court finds that *§ 287(a)* only precludes Tulip's ability to recover damages from Dell for the period of time beginning on the date of IBM's first shipment to its customers of Dell OptiPlex computers covered by the '621 patent until Dell received actual notice of the '621 patent on March 10, 2000.

*D. Can Tulip present a doctrine of equivalents argument with regard to expansion cards having more than one combination connector?*

The court construed the claims 1 and 2 of the '621 patent to cover a riser card with a single expansion position having a single combi-connector. n80 Dell contends that this construction precludes Tulip from arguing that Dell computers having riser cards with more than one combi-connector, although not literally infringing, infringe under the doctrine of equivalents. Tulip argues that Dell's motion for summary judgment on this point should be rejected because it contends material questions of fact remain as to whether Dell's computers having riser cards with more than one combi-connector infringe under the doctrine of equivalents.

n80 *See* D.I. 411 at 53-57.

[*64]

[HN16] Under the doctrine of equivalents, "'if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form or shape.'" n81 The Federal Circuit has noted, however, that "if a theory of equivalence would vitiate a claim limitation ... then there can be no infringement under the doctrine of equivalents as a matter of law." n82

n81 *Grover Tank & Mfg. Co. v. Linde Air Products, Co., 339 U.S. 605, 608, 94 L. Ed. 1097, 70 S. Ct. 854, 1950 Dec. Comm'r Pat. 597 (1950)* (quoting *Union Paper-Bag Machine Co. v. Murphy, 97 U.S. 120, 125, 24 L. Ed. 935, 1878 Dec. Comm'r Pat. 199 (1877)).*

n82 *Tronzo v. Biomet, Inc., 156 F.3d 1154, 1160 (Fed. Cir. 1998).*

With regard to the combi-connector, the '621 patent recites:

at one position of the riser card, a connector

> intended for an ISA expansion card as well as a connector intended for a PCI expansion card, above each other. The result is a so–called combi–connector, consisting [*65] of two connectors, so that at one position, as desired, an ISA expansion card or a PCI expansion card can be arranged. n83

n83 '621 patent at 2:17–24.

The '621 patent claims the combi–connector with the following language: "wherein a predefined one of the positions on the riser card has both ISA type and PCI type expansion connectors associated therewith and situated one above another so as to accommodate either an ISA type or a PCI type expansion board in said predefined one position." n84 The court construed this language to cover a riser card having a single combi–connector. Tulip is not arguing that a different structure performs substantially the same function in substantially the same way to obtain the same result. Tulip is arguing that a riser card having more than one combi–connector is equivalent to a riser card having only one combi–connector. Accepting that argument would vitiate the limitation of the '621 patent's claims as construed by this court and, therefore, fails as a matter of law.

n84 *Id.* at 6:27–31 (claim 1); *Id.* at 6:66–7:3 (claim 2).

[*66]

**VI. CONCLUSION**

The court finds that IBM's sale of infringing OptiPlex computers was the sale of "Licensed Products" pursuant to § 2.1(a) of the 1998 Agreement. Because none of the OptiPlex computers sold by IBM was marked with the '621 patent number, the court finds that *35 U.S.C. § 287(a)* was triggered and precludes Tulip from recovering damages from the date of IBM's first shipment of infringing OptiPlex computers until Tulip provided Dell with actual knowledge of the '621 patent on March 10, 2000. The court finds that since Tulip was a non–producing patentee, constructive notice of the '621 patent existed from that patent's issue date on January 14, 1997. The court concludes that *§ 287(a)* does not retroactively preclude recovery of damages prior to the shipment of an unmarked patented article. Finally, the court finds that *§ 287(a)* does not preclude Tulip from recovering damages for any infringement of the '621 patent from January 14, 1997 until the date of the first shipment of infringing OptiPlex computers by IBM.

Consequently, Tulip's motion for summary judgment on defendant's *35 U.S.C. § 287* marking defense (D.I. 363) [*67] is denied. Dell's motion for partial summary judgment on failure to mark and noninfringement (D.I. 344) is granted in part and denied in part. Dell's motion for partial summary judgment of noninfringement is denied as moot, this court having previously determined that certain of Dell's OptiPlex computers literally infringe the '621 patent. Dell's motion for partial summary judgment on failure to mark is granted to the extent that the court has determined that *§ 287(a)* precludes Tulip's recovery for damages resulting from Dell's infringement of the '621 patent for the period of time beginning on the date of the first shipment by IBM of infringing OptiPlex computers until the date of Tulip's actual notice to Dell of the '621 patent on March 10, 2000. Dell's motion for partial summary judgment on failure to mark is denied to the extent that the court has determined that *§ 287(a)* does not preclude Tulip from recovering damages from January 14, 1997 until the date of the first shipment of infringing OptiPlex computers by IBM. Dell's motion for summary judgment that Tulip cannot present a doctrine of equivalents argument with regard to the disputed claim language concerning the presence [*68] of expansion cards inserted into the riser card is denied as moot. Dell's motion for summary judgment that Tulip cannot present a doctrine of equivalents argument with regard to riser cards having more than one combination connector is granted.

An order consistent with this opinion will follow.