# EXHIBIT A

UNITED STATES DISTRICT COURT

DISTRICT OF RHODE ISLAND

C.A. NO: 05-229S

* * * * * * * * * * * * * * * * * * *

MICHAEL BOWLING
a Resident of Arizona,

Plaintiff,

vs.

HASBRO, INC.,
a Rhode Island Corporation,

Defendant.
* * * * * * * * * * * * * * * * * * *

DEPOSITION OF MICHAEL BOWLING, a witness called on behalf of the defendant, taken pursuant to the Rhode Island Rules of Civil Procedure, before Elizabette M. Afonso, Professional Shorthand Reporter and Commissioner for the State of Rhode Island and Providence Plantations for the Commonwealth of Massachusetts, at the law offices of Adler, Pollock & Sheehan, One Citizens Plaza, Providence, Rhode Island, commencing at 10:05 a.m. on Monday, January 16, 2006.



0e833c06-3d41-44a8-baad-4c084646dbdf

Page 106

Q. But do you recall if it was the case that you went to Mr. Lazaraga, talked to him about what you wanted, and then he gave you drawings and they were finished?
A. There were several. As I said, he came to my house but only a couple of times. The only times I've met with him, a couple of times, and it could have been because we did the first three shapes, and then we did the second three shapes or -- I remember calling him on the phone and saying, "How are they coming" -- you know, but not -- I don't recall calling him and saying, You need to do this different.
Because there wasn't a big exchange of documents back and forth. I can only think of a couple of times he came to my house.
Q. And what was the first time that you ever created a die using this crystal die design?
A. I had my first mold in Germany. King Cards made a mold for me.
Q. So you never manufactured any sort of prototype?
A. No. There was never -- that's why I said, it's pretty easy to remember. There were never any. You know, it was injection molded.

Page 107

I found out -- later I found out that King Cards didn't make the mold. They had another company make the mold. And so, you know, it was just a long drawn out process. King Cards sent me what they looked like, and I said, "Yeah. That's good. Make me 10,000 pieces." Having secured permission from my wife.
Q. So you had 10,000 of the ten-sided made, correct?
A. Mm-hmm.
Q. And you had those in time for Gen Con in 1998?
A. Yes. As a matter of fact, we made them incorrectly. We numbered them one to ten instead of zero through nine, like here, like a true percentile is meant to be.
Q. And that was something that you corrected in the second run, correct?
A. Mm-hmm. But it was a great selling point. Because once I got there within the first sale or two, somebody said, "Hey, this is numbered one to ten," and I instantly saw what I had done, and so I said, "Well, for the first run, I wanted to make something unique. I want to change this on the future." And they really started buying them after that.

Page 108

Q. What type of ten-sided die did you offer for sale at Gen Con? What type of die? You have different descriptions for the various --
A. Oh, it was a pearlescent color, and it came in -- we had it in six colors.
Q. Was that the only die that you had for sale?
A. Yeah. If you can picture a trade show, right, I had a trade show, and over here is Hasbro, and here is whomever. The big castle in the middle, you know, Wizards of the Coast. You know, all this color and video, and just you're bombarded with all this noise.
And in my booth, it's a table, a single table, draped, right, with a D10 on it in six colors. That's all I had. But people -- I mean, within 20 minutes, the line started, and it didn't stop all day for four days. We sold out at the show. I mean, as fast as you were taking money, they were handing it to you. I mean, it was pretty, you know, overwhelming.
MR. TECHENTIN: Off the record.
(A lunch break was taken.)
Q. Mr. Bowling, before we move onto another subject, I'd just like to make sure that I understand the

Page 109

timeline for some of the things that you've talked about here today.
When did you submit your thesis for your MBA?
A. I believe it was late '97, summer of '97.
Q. And that took you about six months to do; is that correct?
A. Well, what they did is they approached you six months prior to your projected graduation date, and they say, "You need to pick a topic and start working on it."
I don't know that I necessarily started working on it right then and there. I procrastinated some before I started. But that's when I start thinking about, you know, putting it all together.
Q. So spring of 1997 is when you were told you needed to come up with a thesis topic?
A. Yeah, I think that's approximately, yeah. Maybe early spring, March, April. I don't know the date, and I don't remember when exactly, but I know that prior -- because we went through several classes before the last two classes which were thesis driven classes, the last two.



Esquire Deposition Services
1-877-465-7236

0e833c06-3d41-44a8-baad-4c084646dbdf

guess that would be another question?
A. There were -- some people bought one; some people bought six. There were six colors.
Q. Do you have any records of your sales at the 1998 Gen Con?
A. I don't know.
Q. Did you keep any records at the time?
A. Yes.
Q. What types of records did you keep?
A. I don't know if we had Quickbooks then or if we were using something in Quicken.
Q. What about when you were actually at Gen Con, what did you do to record your sales?
A. I didn't do anything. I don't keep that type of record at any of the trade shows we go to.
Q. How were the dice displayed when you sold them at Gen Con in 1998?
A. We had them segregated by color, you know. It was my thought that -- like, when you go to the movies, and you see the big bins of candy, the bright color. I wanted to get as many out on the table that you could see. You know, so just spread them out with a placard in the center.
Q. What did the placard say?



A. "Patent pending."
Q. Is that the form of notification you used to indicate that you had applied for a patent for these?
A. At the show, yes.
Q. And where was the placard on the table?
A. I think we may have had two of them at either side or one in the middle, I don't recall which.
Because we attended a show next year when it was -- I think it was still pending during the show the following year maybe, so maybe that's what I'm confused about the way the two were. It was either one in the center or two at the sides.
Q. Was it your idea to put out a patent pending placard?
A. I don't know.
MR. LEACH: Did you receive advice from counsel?
THE WITNESS: Yes.
MR. LEACH: Okay.
Q. Other than patent pending, did this placard say anything on it?
A. No. We had the -- it may have said, patent pending design. I don't know if it had design on it or



not.
Q. Who created those little placards?
A. We just wrote them by hand.
Q. On what?
A. I think we had some -- you can buy them in a stationery shop. They're a white cardboard, you use them to take notes in college, that kind of a thing. It had lines on one side. It was blank on the other.
And my father is really good -- you know, has a real good hand, so he usually writes all our signs at the shows. I've always found that when you go to shows, you never take as much -- you don't have all the stuff you need, so you need to have the means to -- you know, to create signs. So we'd always take markers and blank pieces of cardboard.
Q. Is that the way in which you informed your customers of the patent pending status of these dice?
A. At the show. And when people would ask, we'd tell them.
Q. Did people come up to you and ask you if a patent was pending?



A. Yeah. Because they would see the sign, that would cause them to -- Oh, you're patenting this? Or they'd say, Wow! I wish I had thought of that. Are you getting a patent? You know, it was a wisecrack. It went from wisecracks to serious -- you know, we even had, I think, a lawyer ask us if we had representation.
Q. Did anyone to your knowledge come up -- did anyone come up to you or anyone from your company and inquire about the patent status of the dice who didn't appear to have seen the placard?
A. I don't recall. I don't know.
Q. The examples you gave all involved somebody who saw the placard and then followed up on it.
A. Well, the examples I gave was my personal examples. I don't know what my father or brother experienced.
Q. Well, in your own personal experience, are you aware of anyone having come up and asked you about the patent pending status or patented status of these dice who hadn't seen the placard?
MR. LEACH: Object to the form of the question. You can answer if you know whether they saw it or not, the placard. I mean, how is he to know whether they saw the placard before they

Page 162

There's no way to look at Exhibits 9 and 10 though and discern when those sales were made within the August 1, '98 through January 1, '02 time frame, correct?
A. Looking at those documents, there isn't. But you can still filter Quickbooks, and say, I'd like to know how many I sold as of this date, and then it would tell you.
Q. My original question that started us on those was: Approximately how many crystal dice did Crystal Caste sell between Gen Con '98 and Gen Con '99? And you said, "Well, I'd need to look at the sales information to know the answer to that," correct?
A. Yeah.
Q. But you can tell just from that, correct?
A. Yeah. Less than $300,000 worth.
Q. Would it have been more than 10,000 dice during that year?
A. Again, I couldn't put a number to it without looking it up. But momentarily we can say less than $300,000 worth.
Q. How soon after Gen Con '98 did you get your second order of dice?
A. Second order placed or second order shipped?

Page 163

Q. Filled, shipped.
A. Shipped within a month or two.
Q. And how big was that order?
A. I'd have to look to see. I don't know.
Q. You don't recall if it was bigger or smaller, the same as the '98 --
A. I honestly don't know.
Q. So you don't have any recollection as to how well your dice were selling from August of '98 until August of '99?
A. Well, yeah. They were selling well, but I don't etch to memory things like that that I can look up.
As an engineer, you're only as good as your reference material. So anything that can be referenced, I don't really put to memory.
Q. With respect to these dice that you were selling between August of '98 and August of '99, did you mark them as being patent pending?
A. Yeah. The manner in which we sold them was in a tub. The tub had a placard behind it, and the placard was our first advertisement, and we would sell them -- you know, we would give them the tub, placard, and then a baggy of dice inside of it.
Q. Were all of your dice sold in this tub?

Page 164

A. Yeah, we sold them in the tub.
Q. Do you recall the exact words on the label on the tub?
A. I think it said -- I think it was a two-color label. It was meant to be a two-color label, because the first thing said choking hazard, not for a certain -- for young children. And then we had the patent number across the bottom of it.
The dice were too -- it wasn't practical to etch the dice with a patent number. They're too small. It's impossible.
(Exhibit No. 11, photocopy of three photographs, marked for identification.)
Q. Showing you what's been marked as Exhibit 11.
A. Yeah, this is it.
Q. And the first page of Exhibit 11 shows a tub filled with crystal dice?
A. Mm-hmm.
Q. It's a label, and that's the label you were just talking about?
A. Yes.
Q. On the second page looks like it's the same tub, but shown from a longer angle?
A. Yeah. I wanted to show the placard how -- you

Page 165

know, what came with it.
See, there's a placard attached to it, see a little trident.
Q. And the trident holds the placard in the back?
A. Yeah.
Q. And the third picture is just another picture of the same thing?
A. Yeah. I couldn't -- yeah. I couldn't tell if the -- on my digital camera, it didn't look as though it took one of the close ups good, so I took two close ups.
Q. Where is this picture taken?
A. In my den.
Q. And when was it taken?
A. Three days ago.
Q. Who advised you to label this as being a choking hazard?
A. Nobody.
Q. That was your idea?
A. Yeah. I noticed that my two competitors both marked choking hazard on their packages, so I thought it was probably the prudent thing to do.
Q. And what about the decision to indicate that it was not for children under 14 years?





0e833c06-3d41-44a8-baad-4c084646dbdf

A. I think one of them said choking hazard. The other one said not for children under -- I take it back. One said choking hazard; and one said choking hazard, not for children under maybe, like, eight years; but the other one had choking hazard, not for children under 14, and I thought to be conservative, I'd go with the bigger number.
Q. Other than that label on the tub of dice, did you use any other labels to indicate the patent status of your dice?
A. Are you talking about during this time period?
Q. Yes. From August of 1998 until August of 1999?
A. I don't believe I had a -- I'm not sure if I had released a new -- my first catalog by that end period, because I didn't have that many products yet.
But I know that when we produced our catalog and our order forms, we had it on there as well. But I don't know that they were in existence then, but I know we used this tub method for several years, because it took a while, like I said, before we could get a cube, a whole cube.
I bought the tubs from some outfit in Colorado. They would send me a tiered pallet full



of them, you know, like, 20 to a tier, and as we used them up, we'd order a new pallet.
The object was to try to make a point of purchase display, something with a small footprint, so they could set it by a cash register and get, you know, residual change sales or whatever. They were real popular. They did real well.
Q. This label obviously has the patent number on the label?
A. Mm-hmm.
Q. Do I understand you correctly to say that that's the label that you were using prior to the issuance of your patent?
A. Not prior to the issuance of the patent. Once we got the patent number, we had to put this label on there.
I think prior to that it was a patent pending label.
Q. Okay. I had just asked you if there were any other labels that you used, and I thought you said, no, there weren't.
A. Well, this is the label. It's the same label. It's just one says patent pending; one says patent.
Q. It's the same label but different text; is that



what you mean?
A. Yeah. I think it was the same -- it was the same, you know, format.
Q. But prior to the issuance of the patent, you're saying that it had a patent pending label?
A. Yeah, I believe so, yeah.
Q. And that was affixed to every one of the tubs?
A. Yes. We would affix them.
Q. Do you have any pictures of any tubs that have the patent pending sticker?
A. No. In fact, that label is -- the electronic copy of that label is the patent pending label.
As soon as the patent was issued and I was notified that I had to start putting these on there, we just covered up the bottom line and put the patent on it.
Q. I don't understand what you meant by that.
A. In other words, there's not an electronic -- right now I have that electronic file that I printed those labels on, because I saved it under choking hazard patent label, but I don't believe I have the patent pending label anymore, because I covered it up and used the patent pending label to build this label.



Q. You're saying that you wrote over the file that had the patent pending label in it?
A. I think. I would have to see if in the discovery process if I turned any over to them, because I turned over all my documents.
MR. LEACH: Counsel, I can represent that we gave you everything in terms of markings.
MR. TECHENTIN: All right.
Q. When was the last time you saw a container that had a label that said patent pending on it for your dice?
A. Late '99 maybe.
Q. Where was that?
A. Well, as we would build them and we would send them out to the customers.
I never visited any stores, you know, to see our product in the stores. So I had never actually saw one after the fact in the store. I only saw them as I built them, and I shipped them.
Q. And, mechanically, who put the stickers on the buckets?
A. The first ones I did, but then I took on some employees, and they began stickering them.
Q. When did you start taking on employees?





0e833c06-3d41-44a8-baad-4c084646dbdf

Page 170

A. I want to say my first employee was in '98 or -- I remember it was right around Christmas of either '98 or '99. Let's see -- yeah, either '98 or '99.
I could verify that date for you, you know, when I got my records, but I honestly don't know which year. I remember it was around Christmas.
Q. Okay. Who was that?
A. Mark Alexander.
Q. And what did Mark Alexander do for you?
A. He was the first full-time employee. He started making sales, phone sales primarily. He did all the busy work during the day. He would ship some things. He would label some things. He's pretty much done every part of the business at one point or other.
Q. Is he a salaried employee -- was he a salaried employee?
A. Hourly.
Q. Hourly?
A. Yeah.
Q. How much did you pay him when he first came on board?
A. I think he started at $10 an hour, I think.

Page 171

Q. Does he still work for you?
A. Yes.
Q. Is he still full time?
A. Yes.
Q. Is he still being paid hourly?
A. Yes.
Q. How much is he making now?
A. I think he makes 16 an hour now.
Q. And has he worked for you this whole time?
A. Yes. There's been a couple of periods that he's taken off an extended amount of time. His wife's real ill.
Q. And it's your testimony that Mr. Alexander would have put these stickers on the buckets from time to time; is that correct?
A. Yeah. He may have. My father may have. There was a guy that did most of our shipping and receiving named Lloyd, but he has passed away.
Q. Anyone else?
A. Not during that time period, I don't believe. That sums up, you know, the people that were working around there at that time.
Q. So prior to the issuance of the patent, and the patent came out in August of 1999, right?

Page 172

A. Mm-hmm.
Q. The only people who were putting stickers on these buckets were yourself, your father, Mark Alexander if he was working for you at that time?
A. Right.
Q. And Lloyd if he was working for you at that time?
A. Yes.
Q. And it's possible for you to figure out when Mark Alexander and Lloyd started working, right?
A. It's possible to tell with all of them. I actually think my father started helping me on a day-to-day basis after Mark Alexander.
In my mind, Mark Alexander is my first full-time employee, that strikes a cord, you know, he was the first one. Until then, I was working out of my garage.
Q. And do you know that the various retailers who were selling the crystal style dice were in fact selling them using the buckets that you sent them?
A. Yeah. They would say they would. They would call us from time to time and request a new bucket. The old bucket is getting smudged or dirty, or someone stole our placard, that happened a lot, people would steal the placards, remove the placard.

Page 173

Q. But you said you never went to the retailers yourself, correct?
A. Yeah. I never physically saw, you know, one on a retail shelf being used.
Q. So you don't know whether all the retailers or even a significant number of the retailers were using the buckets that you've provided, would that be fair?
A. I know they were instructed to. I instructed them to use it.
Q. You instructed your customers to use the bucket?
A. Yeah.
Q. Why?
A. Because it had to have the -- we couldn't mark the individual dice, so we had to have something showing the patent number.
Q. I'm talking before the patent number was issued.
Before the patent was issued, you instructed your customers that they had to use the bucket that you sold?
A. I think that we instructed them to use the bucket after when we got the actual patent with a patent number.
I remember distinctly having to do that.





0e833c06-3d41-44a8-baad-4c084646dbdf

Page 174

I was advised to do that.
Q. But during the time between August of '98 and August of 1999, as you sit here today, do you have any -- are you aware of any evidence that retailers actually used the buckets that had this patent pending sticker on it?
A. I don't have any direct -- I never saw it with my own eyes, but I'm sure that I could find that out.
Q. But you hadn't specifically instructed the retailers to whom you sold these dice that they had to use this bucket, correct?
A. It just came along with it, the display. It was a, you know, point of purchase display, and we were led to believe that they were using them just by the fact they would call up and order additional buckets.
Q. But that's the quantity that you sold them in, correct?
A. No, no. They would say they need a bucket. They need a tub.
Q. But in addition to selling to retailers, you were also selling to distributors, correct?
A. Mm-hmm. We had the same thing, distributors -- we would send dice into distributors, and distributors

Page 175

would say, "We need more tubs. Can you give us enough tubs?"
Q. You don't know whether the distributors were distributing entire tubs to their own retailers or some quantity of dice or how they did that, do you?
A. I distinctly remember distributors requesting more tubs on several occasions, and of that, I'm sure I could get some documentation, you know.
Q. What documentation would that be?
A. I would try to get in touch with some distributors and say, Do you ever remember when we had to send you extra tubs because you didn't have enough, and they'd say, yes.
Our fulfillment wasn't the best out of the gate, but we were learning.
Q. Other than the patent pending label that you put on the tubs, did you use any other markings to indicate patent pending status for the dice?
A. I don't believe we had a catalog or an order form during that period. I may have written some text. There may have been an ad or something that said patent pending, and of course the -- you know, and the placards we put out during a trade show, but aside from that, I can't think of anything.

Page 176

Q. What trade shows did you attend between 1998 Gen Con and 1999 Gen Con?
A. We may have went to -- and I'd have to get records to research this, but we may have went to GAMA Trade Show that I've mentioned, and Origins, which is the second largest trade show.
But I don't know -- we may have waited a few years before we went to Origins, you know, until we had more depth of our product. It may have been just Gen Con the first couple of years.
Q. Between August of '98 and August of '99, how much were you selling the dice for?
A. I think they retailed for a $1.28 -- $1.25, $1.28.
Q. You weren't selling them at retail though, correct?
A. Well, our system is built on the -- you know, you have your MSR, you know, recommended price, and then you apply the wholesale discount to that which was 50 percent off.
So we were selling them wholesale for, I think, 64 and a half cents or 65 cents was the wholesale price, but that was based on -- that's suggested, and being the 50 percent off.
Q. Turning to 1999, you went back to Gen Con in August of 1999, correct?

Page 177

A. Yes.
Q. Did you sell your dice again at Gen Con?
A. Yes.
Q. What dice did you have available at the 1999 Gen Con?
A. I want to say we had the D10, the D6. I think the D20, but I'm not 100 percent on that. Maybe a D4.
I'd have to look and see at what point they came in the inventory. But I know we had the ten and six for sure.
Q. And what packaging did you use at the 1999 Gen Con for your different products?
A. Again, it's the same concept. We tried to spread -- we had a single table, and we tried to -- actually, we may have had a corner table, and we made one side D6s and one side D10s, I think. If we had the D20s, we split it up accordingly. And we just tried to smear as much color out on the tables possible. So when they walked by, they just see all of this color, and it usually worked pretty good.
Q. So they weren't in containers or boxes --
A. No.
Q. -- or buckets?

A. No.
Q. If people purchased a number of them, did you use bags to give them to them?
A. We didn't do bags the first few years.
Q. Just here's four dice, and they take them and they're gone?
A. Mm-hmm. We tried to keep it as simple as possible.
Q. Did you provide any markings with respect to the patent status of the dice at the 1999 Gen Con?
A. Nothing aside from the placards that we would put out on the table.
Q. So, again, you had placards similar to the ones you used in 1998?
A. Yeah. Just a handwritten, you know, notation.
Q. Do you have any pictures of those?
A. No.
Q. Do you know who could corroborate that those patent pending placards were there?
A. I don't know -- my father was there and Mark Alexander. Although Mark Alexander attended a couple of trade shows with me before he became a full-time employee, so I bet you that he wasn't an employee in 90 -- did I say in '98? I bet it was '99 when he joined us.



Because I remember he went to a couple of trade shows before he -- he just went as a friend. I needed someone I could trust. My brother couldn't get out of school. So I think Mark Alexander was at that trade show.
Q. Anyone else?
A. I think it was just Mark, my dad, and myself. I'd have to corroborate. I'd have to look that up. I think there was a fourth. I'm pretty sure there was a fourth, but I don't know -- I would have to think. Maybe Jim Reeds, maybe Jim Reeds.
Because when you get a hotel room it's -- you know, the rooms are very expensive at the shows, so I thought I might as well float another airline ticket, and have someone else there with us. So I'm pretty sure there was a fourth. Again, I could look that up.
Q. How big were these placards?
A. They were -- you get them in a, you know, stationery shop or college campus. Like a I would say 3x4 maybe, 3x4.
Q. Three inches by four inches?
A. Yeah, yeah.
Q. And how many did you have?



A. Either one in the center or two at the corners.
Q. And how big was the table?
A. I believe it was an eight-foot table.
Q. Was there any risk that anybody could look at your dice and not see the placard?
A. I would say no. I don't see -- no. It was pretty -- it's a start contrast between a -- there's a table with nothing but dice, and then a couple of cards that have writing on them, your eyes are going to see what that writing is. So I would say, no. I think pretty much everybody knew.
Although, at this show, we had people ask us if we had representation at this show that we didn't -- more people. It seemed like there was -- the first show maybe one person asked me about a lawyer or patent thing, but at this show, there was, like, four or five.
And we also noticed something else -- well.
Q. What was that?
A. We were caddy corner from the Avalon Hill booth, and the Avalon Hill guys were coming over and looking at them, and they were getting their guy's attention, and there was a bit of a stir.



You know, he would kind of get the guy's attention, and the guy would come over, and they were both looking, and he was showing it to him, and they were looking, and they would go back.
They had the big Axis and Allies display there. They're a big war game company.
Q. Did anybody say anything to you at the Gen Con 1999 show that would suggest to you that they hadn't seen the patent pending sign?
A. There was a couple of people that asked us, "Is this patent pending?" But they said it in -- they said it in a manner that made me think they didn't believe the placard. Like, really? They didn't say really, but they'd say, "Is this patent pending?" Like, are you joshing me, kind of. So I assumed that they saw that.
Q. How was business at the 1999 show?
A. It was good. We did more sales than we did the 1998 show, but I attributed that to having double or triple a selection.
Q. Was it as busy as the 1998 show?
A. It was busier.
Q. Your booth was busier?
A. Yeah. That's why we had a corner, because I knew





0e833c06-3d41-44a8-baad-4c084646dbdf

Page 182

that from the first show, I knew how busy we were with just one table, so I thought with two tables, we're really going to be busy.
But that's -- I mean, I was going to try to make as much money as I could.
Q. Now, for 1998 you were describing lines of people eight-deep waiting to buy your dice. Did the same thing happen in 1999?
A. No. It wasn't as deep, but we still had lines of three on both sides. So it's quite possible that we did -- it was busier, busier, but it was spread out over two tables as opposed to one. I remember we were just as busy doing money.
Q. Other than having the placard displayed on the table, a placard or placards, I should say, did you do anything else to advise of the patent pending status of your dice?
A. Not at that show.
Q. Would it be fair to say that it was not your routine practice to tell every one of your customers about the patent pending status of the dice?
A. Not verbally, but we told them by putting the placard on the table.

Page 183

Q. But, verbally, you didn't say, that's $2.50, and they're patent pending, for example?
A. Correct. Thank you, come again, and it's patent pending.
Q. Exactly.
The same questions I had with respect to the 1998 show: Do you have a direct memory of the patent pending placard sitting on the table at the 1999 show?
A. Yeah.
Q. So you recall that independently, you haven't learned of this through some other source?
A. No, no, no. There was some confusion though as to whether it was one in the center or two at the sides. I remember a variation, and it could be that one of the placards got knocked off the front of the table, and then we moved one to the center.
At night, the people would come through and clean up all the stuff on the floor, so we may have lost a placard and just slid one to the center.
But I do remember that distinction.
MR. TECHENTIN: I want to take a break.
(A short break was taken.)

Page 184

Q. Mr. Bowling, the Mark Alexander that you mentioned as an employee of Crystal Caste, that's the same one that you played Dungeons & Dragons with?
A. Yes.
Q. I have a couple of questions about the samples that you had made and the design of these crystal dice.
Going back to your submission of hand drawings and your obtaining the mechanical drawings that you used for the production of these dice, were there any differences between the hand drawings that you provided and the mechanical drawings?
A. The hand drawings I provided to who?
Q. Lazaraga.
A. I'm not sure. They were hand drawings. I'm not sure.
Q. Did you have specifications for dimensions on the hand drawings that you provided. Is it Lizaraga?
A. Yeah. I'm sorry. I have to look at the spelling. I haven't looked at the spelling in a while.
No, I didn't have specifications. I don't believe so. I think I just said -- you know, I had a sketch and said, "Make them about this big." You know, I may have said approximately a

Page 185

half inch, three quarter inch. I don't know that I -- I honestly don't recall.
Q. When the mechanical drawings came back, did they have specified dimensions associated with them?
A. I don't know that they had -- I don't know. You know, his software may have generated some specific specifications maybe.
(Exhibit No. 12, letter dated 08/26/98 to Mr. Radu from Michael Bowling, marked for identification.)
Q. Mr. Bowling, I'm handing you Exhibit 12. Do you recognize Exhibit 12?
A. Yes, uh-huh.
Q. And this is a letter dated August 26, '98 from you to I presume someone at your manufacturer, correct?
A. Yes.
Q. Radu?
A. Yeah. Radu Curtan (phonetic).
Q. Is he with King Cards?
A. Yes.
Q. And King Cards was the manufacturer of the mold?
A. Yeah. But I don't think they're in business anymore. He was the owner.
Q. And attached to this letter is -- is this a





0e833c06-3d41-44a8-baad-4c084646dbdf

Page 198

the United States, correct?
A. Yeah. But the next line says, our price and structure for terms outside the United States.
Q. Right. It has both, correct?
A. Oh, both, I'm sorry, yeah.
Q. And as you set it out for outside the United States, with an order of over 20,000 units, your price was just 35 and a half cents, correct?
A. Mm-hmm.
Q. Yes?
A. That's correct.
Q. And, in fact, there's a note down at the bottom, that's your handwriting, correct?
A. Yes, it is.
Q. And you offered to go down to 30 cents?
A. Yes.
Q. And the terms that you've mentioned for the United States in this are less than 50 cents per die, correct?
A. No. It looks like they're $1.25 is the MSR. Wholesale is approximately 50 percent of that, and distributor level is around .625.
Q. Well, what does this mean, "Our terms in the United States are '.495' cents"?

Page 199

A. That's distributors.
Q. But you were selling to distributors, correct?
A. Yes, we sold to distributors, correct.
Q. So you don't get a wholesale price on a sale to a distributor?
A. No. Distributors we sell .645, that's wholesale. We considered wholesale half off.
Q. You sell to your distributors -- according to this, you sell to your distributors at 49 and a half cents per unit, correct?
A. Yes.
Q. And your distributors turn around and sell them for 64 cents?
A. Yes, 64 and a half cents, yes.
Q. With a theoretical retail price of a buck and a quarter?
A. Yes.
Q. All right. Thank you.
When the 197 patent was issued, what did you do with respect to marketing your goods?
A. We changed the sticker from patent pending to the patent number.
Q. Did you do anything else?
A. That was the only manner in which we sold them.

Page 200

Q. What did you do to change the sticker?
A. I covered up -- you know, I backspaced off the patent pending, and added in the US patent number 197.
Q. So, in other words, you went into your computer, pulled up the file, put your cursor at the end, hit backspace a bunch of times, and then typed in the patent number, correct?
A. Yes.
Q. And then you hit print and you printed a bunch of those labels?
A. Mm-hmm.
Q. Who physically put these new stickers on tubs?
A. At that time I believe I was doing it.
Q. Anyone else?
A. I don't think we had our first employee yet.
Q. Was anyone else from your family helping out?
A. My wife, but she was primarily counting dice, you know, counting, sorting.
Q. Putting them into the buckets?
A. Into Zip Locks.
Q. Well, why were dice being put into Zip Lock bags?
A. So that they could be shipped to the outlet.
Q. You were shipping dice packed in Zip Lock bags?

Page 201

A. Yeah. I would put them in a Zip Lock bag, drop them in the tub, put the placard in the tub, put it in a box.
If I didn't put them in the Zip Lock, they would bang around inside the box, and when the tub got there, it would be all scratched up.
Q. How many dice went into a Zip Lock bag?
A. Depending on how many they had ordered. They were at that time increments of 50. Sometimes a store would by 200 to go with their tub. Sometimes they would just buy 50 to go with their tub. Just depending on what they wanted.
Q. But it's your testimony that every shipment got a tub?
A. Yes. Because the prices on the tub were negligible.
Q. And the tub is the size shown in Exhibit 11?
A. Mm-hmm.
Q. How big is that?
A. You could make a fist and put it in there and bring it out.
The next picture shows it better. That's a much better representation.
Q. Could that be six or eight inches across?

A. No. I think it's closer to maybe five to six inches maybe.
Q. How many dice does one of those tubs hold?
A. I don't know.
Q. More than 50?
A. Yes.
Q. How many plastic bags of 50 dice can you - I'm sorry. How many dice went into each Zip Lock bag?
A. At that time 50.
Q. Fifty. How many of those Zip Lock bags could you pack in one of the tubs?
A. I don't know. I never tried to see how many I could jam in, or if I did it, I never kept track, never retained a number.
Q. All right. So your wife was counting the dice, putting them into the Zip Lock bags, correct?
A. Actually, what we would do, is we'd sit around watching television, and she would, you know, count them and lump them.
I don't know that she even put them in the Zip Locks. I think I did that, too.
Q. Anybody else from the family helping out at this point?
A. At that time, no.



Q. What did you do to change the markings on tubs that you had already marked as patent pending after the patent issue?
A. We sent out stickers to stores that we knew had the patent pending label.
Q. Anything else?
A. Well, as I said, all subsequent orders had a new tub anyway.
What we noticed about those tubs was over time they would get dirty and grimy relatively quick, and so we were always sending out -- within orders, we were just sending out a tub. I mean, we sent out just scads of those tubs over time.
Q. Well, did you do anything to make sure that the tubs you had already marked as patent pending were changed to reflect the patent number?
A. Well, we sent new tubs that were marked with the patent number.
Q. What about the tubs you had in inventory?
A. We sticked them as we shipped them.
The way they sent the tubs to us in a pallet, it was a giant shrink wrap, and in Tucson, it's dusty, everything's dusty, so we would not open the whole thing up.



We would take them from the top down as we used them. And so as we pulled them, we would label them, and we'd ship them to keep them as nice and new, you know, looking as possible.
Q. And that label, either the patent pending label or the label with the number on it, that's the only sticker that goes on that tub?
A. Yes.
Q. So if I understand you correctly, when the patent issued, you wouldn't have had a single tub in your possession that had a sticker on it?
A. That had a patent pending sticker on it?
Q. Correct.
A. That's correct.
Q. And how do you know that any of the tubs that had a patent pending sticker on them in a store were actually changed to reflect the patent number?
A. I don't have direct proof of that. I never visited any of the stores, and saw -- you know, looked at the displays. I only know what I sent them.
MR. TECHENTIN: I'll have that marked.
(Exhibit No. 16, materials that relate to sending out stickers, marked for identification.)
Q. I'm handing you Exhibit 16, which I believe comes



from your files, correct?
A. Yes. This looks like something I made.
Q. And this is the material that relates to your having sent out stickers to your customers, correct?
A. Mm-hmm.
Q. And it's a form letter that you sent to various retailers and distributors, correct?
A. Yes.
Q. And you asked that they countersign it and return it to you, correct?
A. Yep.
Q. And the second page of this exhibit has the contact information for the, I guess, who are your distributors, correct, or your retail customers?
A. Yes. I recognize some of the names on here.
Q. And there are checkmarks next to some of them?
A. Uh-huh.
Q. Do you know what the checkmarks mean?
A. No.
Q. Do you know what the dots mean?
A. No.
Q. Did you ever go through to figure out -- well, let me ask it this way, did you send a letter to each





0e833c06-3d41-44a8-baad-4c084646dbdf

of these recipients?
A. I'm not sure I sent one to each and every one. This may have been everyone who was a customer at the time that we knew who didn't have the correct sticker on the tub.
Q. Well, what did you do to make sure that you were sending it to everybody who ought to receive it?
A. I think my wife somehow derived who they needed to go to, and so she put together, and then I sent them out, and then she filed them when they sent us back the responses.
Q. And in the last full paragraph you write, "Without this agreement, we cannot continue to sell dice to you," do you see that?
A. Yes.
Q. Did you in fact stop selling dice to anyone, because they didn't send back the agreement?
A. I don't know.
Q. How would you find out the answer to that?
A. I'd have to get in Quickbooks and see, you know, at what point we continued to do business with these people, you know, if there's a record of us continuing to sell to them.
Q. You kept copies of whatever letters were sent back



to you, correct?
A. Yes.
Q. That's why we have this file?
A. Yes. I mean, I don't know if these are all of them, but these are some of them.
Q. And the instructions that you give in this form letter is that, "Our patent number must be affixed to all containers, bags, or tubs," do you see that, it's in the first paragraph?
A. Yes.
Q. If you were only marketing in tubs, why are you talking in terms of containers and bags?
A. Well, sometimes when I sold them to a retail store, they may have their own mechanism of selling their dice, like a bin system or something or a, you know, a basket of just an assortment of dice, and so I had to send them the stickers to let them know that if they are selling them out of something other than my bin, they need to mark it.
Q. And the third paragraph you say, "From today forward, we will place a sticker on our tubs and in the bags of loose dice," do you see that?
A. Mm-hmm. The sticker in the tub was if they used our tub. The sticker in the bag, is if they had



their own display they were using.
Q. Well, didn't you just testify that you weren't shipping other than in tubs?
A. No, no. The tub that went out had a sticker on the tub, and we would put them in the bag as well. The dice were in a Zip Lock bag. Every bag of 50 we sold, had a sticker in the bag as well.
Q. Had the patent number sticker?
A. Yes.
Q. What about the patent pending sticker?
A. I believe so, yes.
Q. You believe so? Do you remember?
A. Not 100 percent. Because until I was looking at this, I had forgotten that we had put them in the loose bag as well.
Q. You sent out these letters -- I believe all of them are dated August 15th of 1999, correct?
A. Yeah, it looks like it.
Q. And other than waiting for the letters to come back countersigned by your customers, did you do anything to make sure that your customers were actually complying with your request about stickering?
A. There may have been some verbal conversations.



Q. Well, were there or weren't there?
A. Well, all of these people I talked to at the time I was doing the sales, and so I talked to these people on the phone. I remember talking to different ones. I remember I talked to them as well as sent the letters.
The letters were a formal way of doing it, but I believe I communicated it to them individually, you know, in addition. The letters just drove the point home.
Q. Do you have any record of when you received these letters from the customers?
A. Other than their date and signature, no. I didn't save the letters that they came in.
Q. So, for example, on the letter from Games People Play dated 9/8 of '99, do you see that one?
A. Uh-huh.
Q. Do you have any knowledge as to whether or not Games People Play did anything with respect to stickering your dice between August 15th and September 8th of 1999?
A. Well, like I said, I initially made phone calls to make the request, and then I followed up, you know, with the letter, so that they would see the letter.





0e833c06-3d41-44a8-baad-4c084646dbdf

Page 210

Q. You say that in fairly general terms, are you saying you specifically remember calling up someone at Games People Play and having a conversation about the stickering?
A. I remember speaking to each store individually, but I don't remember the exact conversation.
Q. Then more than halfway through there's -- on B00705 --
A. Yeah. There's the distributors I was listing to you.
Q. So at this point you've got 12 distributors listed, correct?
A. Yeah, it looks like it.
Q. And each of these distributors is selling to retail customers somewhere, right?
A. Mm-hmm.
Q. And you used a different form letter for the distributors than you did for the retailers, correct?
A. Yeah, it looks like it, yep.
Q. And, most importantly, you changed it by asking them to please send a label to all of your retail customers with an existing supply of Crystal Caste dice, so that they may place the sticker on our or

Page 211

whatever container our dice is in, correct?
A. Correct.
Q. So you seem to recognize in this that some of your customers were selling other than in your presupplied bins, correct?
A. Yeah, right.
Q. And going back to the page that had the list of distributors, you've got a checkmark next to some of those distributors, do you see that?
A. Uh-huh.
Q. And there's a checkmark actually next to five of the twelve distributors. Do you know what that checkmark means?
A. No.
Q. Could it mean that that's somebody that you actually received the letter back from?
A. Yeah. It could be that their letter had come in already or that I talked to them on the phone already. I'm not sure.
Q. And in the form letter that you sent out to your distributors you wrote, "Without this agreement, we cannot continue to sell dice to you," just as you had with the retailers, correct?
A. Uh-huh.

Page 212

Q. Did you actually stop selling any dice because a distributor failed to return the agreement?
A. I know that we -- I don't believe we did anything further with the Yellow Submarine or Gameboard Distributors. But I don't --
Q. You continued to do business with Zocchi, didn't you?
A. Not for long.
Q. But you did?
A. Yeah.
Q. Zocchi went out of business subsequently?
A. Yeah, right.
Q. But after August of 1999, you were still doing business with Zocchi, right?
A. Mm-hmm.
Q. But you didn't receive a letter back from Zocchi?
A. I don't have a letter in this packet, no.
Q. And if you'd received a countersigned letter from Zocchi, you would have kept it, right?
A. If I didn't lose it.
(Exhibit No. 17, Choking hazard labels, marked for identification.)
Q. Taking a look at Exhibit 17. Are these the labels that you sent out to your retail customers?

Page 213

A. Yep, this looks like them.
Q. Are these the same labels that you sent out to your distributors?
A. Yes. It appears to be the sheet.
(Exhibit No. 18, labels, marked for identification.)
Q. Exhibit 18 --
A. Yeah, there you go.
MR. LEACH: Can I get a copy?
MR. TECHENTIN: I'm sorry.
MR. LEACH: Thank you.
Q. Exhibit 18, another series of labels it appears to be. Can you tell me what these labels are?
A. These are when I would send out mixes, this was a label that we would affix to the exterior of the Zip Lock bag.
Because we started getting so many dice that it was getting confusing to tell what was what, so we would make this sticker, cut it out, and adhere it to the Zip Lock bag, then we could store them. Rather than make them to order as the orders came in. And then the employees could look at it and say -- and we would put a checkmark beside it to what was in the bag.

Q. And how many dice were in each of these bags?
A. I think at this point we had switched from the 50 bags to the 25 bags.
Q. Was that a unit quantity that you sold these dice in, or was that just for storage?
A. It was a unit quantity we sold them in.
Q. In other words, you had a specific price for 25?
A. Yes.
Q. And you'd send them a Zip Lock bag full of 25 dice, correct?
A. Yes. And that's that accounting that I was showing you. You could look and see that there were different numbering systems.
Some of it -- what I was trying to explain, that some of the earlier numbering systems had them in groups of 50. Another numbering system had them in groups of 25. This was labels for pearl in Otherworld, which was the first two mediums that we made, and I believe these were in bags of 25.
Q. And were you using these stickers --
A. The formatting doesn't look correct. It looks like it's come up jumbled.
Q. Were you using the stickers like the ones that



you're describing on Exhibit 18 in August of 1999 when the patent first issued, or is this something you came up with later?
A. I don't believe so. This was, I think, later. Because it's the Otherworlds, I don't think we had the Otherworld style in that time period.
Q. Did you explore any packaging alternatives that would allow you to mark each die?
A. Nothing was viable.
Q. What did you consider?
A. Well, the price point was so small, you couldn't sell them singlely.
Q. You sold the dice singlely, correct?
A. At trade shows on a table.
Q. But the retailers sell them singlely, correct?
A. Right.
Q. So why does the price point make any difference in terms of being able to mark them?
A. Well, on one hand, I have the cost of the tub for 50 pieces as opposed to a placard for 50 singles. Plus, I don't believe retailers would want bulky packaging, you know, for single dice.
The most efficient way was how all the other single dice were being sold, which was in



bins, so that's why, you know, I pursued that method.
Q. Did you seek any advice with respect to the manner in which you were marking these items with the patent number?
A. Advice from? I'm not sure --
Q. Anyone.
A. The only ones I talked over marking was with my attorneys.
Q. Did you consult with your attorneys with respect to the decision to put stickers on these bins?
A. I believe that's privileged. Is that privileged?
Q. It's a yes or no question. If the answer is yes, I'll probably stop, but it's a yes or no question as to whether you consulted with them?
A. I don't know to be honest. I wish I could say yes or no. I don't recall. I know we talked about labeling.
Q. Okay. Did you consult with anyone else other than your attorneys with respect to how you should mark these dice with your patent number?
A. No.
Q. Is there any reason why you couldn't package these dice in a small plastic bag?



A. Theft. When you sell individual -- something individual like that, you would need a big placard, so no one could just steal them and walk away.
Q. No. I mean, you've got a bucket with a bunch of dice in it, right?
A. Mm-hmm.
Q. Is there any reason why you couldn't have a bucket with a bunch of dice each of which is in a plastic bag?
A. Just cost.
Q. You could put the mark on a plastic bag that you put the die in, right?
A. Say again?
Q. If you packaged the die in a plastic bag, you could put the mark on it, correct?
A. I don't believe so. I think the bag would have to be either large enough to put a label on it or small enough to be not legible.
Q. The bag would need to be big enough to hold patent number 5938197, right, or whatever the patent number is?
A. Yes.
Q. That's all that would need to be on there, right?
A. Well, again, it was not the mold in which dice were





0e833c06-3d41-44a8-baad-4c084646dbdf

being sold. You can come up with an innovative, new shape, but if you make it too new or too progressive, it may affect your sales.

So I sold them just the way my competitors sold theirs.

Q. Did your competitors have patent markings on their bins?

A. I've never seen a competitor sell a single die in a bag that had a patent notation on it. I never seen one.

Q. The question was: Did your competitor have patent numbers on their bins?

A. Which bins?

Q. The bins that they were being sold in, the dice?

A. I'd have to say, no.

Q. Did there come a time when Crystal Caste began selling dice directly to consumers?

A. Yes. Off the web site.

MR. WILLIAMS: Counsel, it's now five o'clock. How much more do you have to go?

MR. TECHENTIN: I would have to say a fair amount.

MR. WILLIAMS: What do you mean by that? We'll give you some additional time, but we're at



the end of the day, and if it's a reasonable amount, but if it's going to be -- what's your best guesstimate?

MR. TECHENTIN: Well over an hour.

MR. WILLIAMS: We don't have an agreement to go beyond a reasonable day. Why don't we compromise, and we'll give you another half hour, and see if you can really focus and wrap it up. How does that sound?

MR. TECHENTIN: I don't think I'm going to be able to wrap it up in a half an hour. I'm happy to take a half an hour and do what I can.

MR. WILLIAMS: We're not going to stipulate to giving another day on it. You get one and -- so what's your preference?

You've been over this marking before the break, and it's obviously been asked and answered. So we haven't interposed virtually no objection today, and we've given you every opportunity. We've not taken any excessive breaks. We've been taking only the breaks that you called, and we've given you a full day, but I'm just saying we'll give you another 30 minutes, so you ought to plan accordingly.



MR. TECHENTIN: Okay. Well, I understand what you're saying, and we can add up the time of the deposition. I mean, I would note that, not withstanding breaks, it's only been seven hours since we started.

If you want to suspend in a half an hour -- I mean, I realize that it's 5:30. I also realize that you're all here tomorrow.

MR. WILLIAMS: No. Michael is not. He is not here tomorrow.

MR. TECHENTIN: Do you have a plane to catch tonight?

THE WITNESS: I have a plane at 7:00 in the morning to get to the west. The flights from Tucson to Providence are really --

MR. WILLIAMS: Well, just do your best, but we're not going to agree to stay for, you know, onto the evening.

MR. TECHENTIN: I don't have any particular desire to stay on into the evening.

BY MR. TECHENTIN:

Q. When you sold your dice to consumers, did you sell them in the tubs?

A. To consumers?



Q. Yes.

A. No. We sold them out on the table.

Q. Okay. What about through your web site?

A. Through our web site, we sold them in seven-piece sets, but that wasn't until 2000, you know, three years ago, maybe four years ago. We haven't had a web site presence very long.

Q. How did you package them for the seven-piece sets?

A. Initially, we packaged them in a cube. It was an acrylic cube, translucent cube that had a black base, and then about year and a half ago or so, we switched to that new pop top. You know, we developed that.

Q. I'm holding two boxes here, and the first one -- they're both acrylic boxes. They're about the same size.

A. They're both pop tops, so they're recent packaging.

Q. These are both what you would call recent packaging --

A. Yeah.

Q. -- this is the second generation?

A. Yes. Of seven-piece set packaging.

The first generation of packaging they were -- that's like a perfect cube in the shape.





0e833c06-3d41-44a8-baad-4c084646dbdf

Page 222

The first one were oblong and tall, taller and more narrow, and it's the kind of packaging my two competitors use.
Q. Do you have any samples of that?
A. I had samples, but I don't have anything with me right now.
Q. And this comes with those little mylars or something sleeve around the container?
A. Mm-hmm.
Q. Other than the plastic pop top container and the sleeve that goes around it, was there any other packaging associated with selling the seven-dice sets?
A. On this generation I don't see anything else. On the first generation, we had a sticker that went on the bottom.
Q. And what did the sticker say?
A. One was a skew number, and the other one was a patent number.
In fact, you had that in one of your earlier sets, you had the stickers in there that went on the cubes.
Q. In one of my earlier sets of what?
A. I'm sorry. One of your earlier exhibits. That

Page 223

exhibit right there on top.
Q. Exhibit 18?
A. Yeah, uh-huh.
Q. One of these stickers would go on the --
A. No. It's further back in the stack. As I paged through it, I saw them. There you go.
Q. So page B01577?
A. Can I see it? Yeah, see them. These ones.
And what I did was I made the template, so that there's a label set that you can purchase that had these skinny, little labels, four columns of them. So I built it so that you could then take those labels, and you could cut them in two instead of getting this many, you'd double them, and those went on the bottom of the cube.
Q. But how do you know that they went on the bottom of the cube?
A. Because we stuck them on ourselves.
Q. Who did?
A. My employees. By that time we had employees when we were selling seven-piece sets.
Lloyd's last names was Hood. I just thought of it, Lloyd Hood.
Q. And so your employees placed the stickers on the

Page 224

bottom of those?
A. And groused about it quite a bit.
Q. Why don't the new generation have a label like that on them?
A. They're meant to have some sort of notation, and I can't explain why they don't have them, because we certainly have them built.
Q. And who manufactures this packaging?
A. The cube itself?
Q. Yes.
A. I have them made in China.
Q. By whom?
A. I want to say Aple, a company called Aple, A-P-L-E.
Q. And where are they located?
A. I don't know where the factory is, but they have an office I think in Hong Kong. Kowloon maybe.
Q. Do you have their contact information somewhere, I take it?
A. Yes, yes. Both for -- Aple, I believe, does the cube, and the sleeve is a different company.
Q. Do you know that name?
A. No.
Q. Also in China?
A. I mean, I know the name, but I just don't know it

Page 225

now. Uh-huh, also in China.
I made a trip to Hong Kong a couple of years ago and got some ideas on new things, new products.
Q. How do you do distributing for the seven-piece sets? Do they actually come through your house?
A. I'm not sure I understand the question.
Q. When you make a sale off a web site, how is that processed?
A. They're downloaded -- you know, secured, downloaded through the web site, and then we process the orders.
Q. Well, do you have an inventory on hand, then you ship from the inventory?
A. Uh-huh.
Q. And where is that inventory located -- at your business address?
A. Yes.
Q. And is that business address your home address?
A. No.
Q. What kind of location is it -- is it a building you own, or what is it?
A. It's a home that I own.
Q. But not your home?

A. I don't live there.
Q. Right.
A. No one lives there.
Q. So it's a residential place --
A. That I use for the business, yeah. It's the house adjacent to my parent's old house.
Q. And then somebody from your company actually packages this into something that is shipped to the consumer?
A. Yes, sir.
Q. And is there some reason why -- well, on the new generation --
A. You can see the new percentiles in there.
Q. On the new generation of packaging, who's suppose to put the label on there that has the patent number?
A. Someone in the shipping receiving.
Q. In your company?
A. Yes.
Q. Are these dice manufactured in China?
A. No.
Q. So you bring in the packaging, you put the dice -- your company puts the dice in the packaging, correct?



A. Yes.
Q. Do you have any examples of any Crystal Caste dice that have been sold in this sort of cube that have a patent marking on it?
A. No.
Q. Do you personally do anything to verify that there are markings on your products?
A. Yes. Periodically I go out to the factory.
Q. Without going over what we already talked about before in terms of the odds that you described, what evidence do you have that Hasbro willfully infringed your patent?
A. Oh, the odds. I didn't understand what you meant. I had no, you know, no direct proof other than at one point when they were suppose to cease and desist, they continued to sell them.
Q. What do you mean by that?
A. In April or May of 2000, I got a call from a distributor congratulating me on my contract with Hasbro, and I said -- you know, I didn't understand what he meant.
And he said, "Well, I just got in some Monopoly sets that have your dice still in them." And I said, "That can't be. They said they were



not selling them anymore." And he said, "Well, I just got in a dozen or two dozen games." And I said, "Are you sure my dice are in them?" And he said, "Yep."
Q. And who was that?
A. Mike Web.
Q. With?
A. Zocchi.
Q. Where is Zocchi Distributing located?
A. They use to be based out of Mississippi.
Q. Is that where these games were supposedly received?
A. I think Holly Springs, Mississippi. I'm thinking. I don't know 100 percent, but I think the invoice showed where it was shipped to.
Q. Did you actually go look at the games?
A. No. I just had him opening games and telling me that they were in there.
So then I -- it caused me to think, Well, if they're selling here, maybe they're selling somewhere else.
Q. When did you ask Mr. -- what was his name?
A. Michael Web.
Q. When did you ask Mr. Web to order these game?
A. When did I ask him to order what games?



Q. The Monopoly.
MR. LEACH: Objection. Assumes facts not on the record.
A. I didn't ask him to order any games. He called me to tell me he found games that had them in there.
Q. So Zocchi --
A. Zocchi bought those from Hasbro.
Q. -- ordered 24 of these Hasbro games, received them in June of 2000, and reported to you about the dice that were in them on June 21st of 2000; but prior to that time, you hadn't discussed Zocchi purchasing these games from Hasbro?
A. No.
Q. Why was Zocchi opening the games that it was purchasing?
A. I don't know what caused him to open the game.
Q. Did you ask him?
A. No.
Q. What did you ask him to do?
A. I asked him to check another game.
Q. And what did he do?
A. I think he opened another game, and said, "Yeah, they're in that, too." Just to make sure it wasn't a fluke.





0e833c06-3d41-44a8-baad-4c084646dbdf