IN THE UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| MICHAEL BOWLING,<br>a Resident of Arizona,<br><br>Plaintiff,<br><br>v.<br><br>HASBRO, INC.,<br>a Rhode Island Corporation,<br><br>Defendant. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | C.A. No. 05-229S |

**STATEMENT OF DISPUTED AND UNDISPUTED FACTS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO HASBRO'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON MARKING**

Pursuant to Fed. R. Civ. P. 56 and Local Rule 56, Plaintiff Michael Bowling ("Bowling") hereby submits the following statement of disputed and undisputed facts in support of Plaintiff's Opposition to Hasbro's Motion for Partial Summary Judgment on Marking:

**PROPOSED FACT NO. 1**: Bowling was issued U.S. Patent No. 5,938,197 (the "'197 Patent") on August 17, 1999.

**RESPONSE**: Uncontroverted.

**PROPOSED FACT NO. 2**: Prior to the issuance of the '197 Patent, Bowling, through his company Crystal Caste, had sold commercial embodiments of at least one of the dice later claimed in the '197 Patent, which Bowling describes as "crystal dice."

**RESPONSE**: Uncontroverted.

**PROPOSED FACT NO. 3**: Upon issuance of the '197 Patent, Bowling continued to sell crystal dice.

**RESPONSE**: Uncontroverted.

**PROPOSED FACT NO. 4**: Beginning in approximately 2000, Bowling began selling sets of seven different crystal dice in addition to selling quantities of single types (*e.g.*, ten-sided or six-sided) of crystal dice.

**RESPONSE**: Uncontroverted.

**PROPOSED FACT NO. 5**: One of Bowling's retained expert witnesses is Kevin B. Cook, who purports to be an expert in "dice and dice design."

**RESPONSE**: Uncontroverted.

**PROPOSED FACT NO. 6**: Mr. Cook admitted that it is possible to mark dice with a patent number and that at least one patented die is marked with the corresponding patent number.

**RESPONSE**: Uncontroverted.

**PROPOSED FACT NO. 7**: Bowling did not mark the dice with the patent number even after he was issued the '197 Patent.

**RESPONSE**: Bowling denies Proposed Fact No. 7. During the 1998 and 1999 Gen Con trade show, Bowling displayed "patent pending" placards. (Bowling Deposition Transcript ("Bowling Depo.") at 143:9-13; 178:8-18; 183:6-21, attached hereto as Exhibit A.) Upon issuance of the '197 Patent, Bowling changed the "patent pending" sticker to "U.S. Patent #5,938,197." Bowling affixed these stickers to all display tubs used to sell his product and he included the stickers in all of the bags of dice to be shipped. (Id. at 199:19-205:12; Bowling Declaration at ¶ 2.) Bowling also instructed his distributor and retail customers to properly mark the dice. (Id. at 209:7-210:6; 205:7-208:9; 172:17-173:24.) Bowling, however, admits that the patent number was not physically marked on the die.

**PROPOSED FACT NO. 8**: Bowling claims that he satisfied the patent marking statute after the issuance of the '197 Patent because (1) he created stickers with the patent number on

them, (2) he sent the stickers to his customers with instructions that they place the stickers on display bins containing the crystal dice and, in the case of his distributors, send the stickers to the distributors' customers with instructions that they do the same, and (3) he only sold dice in bulk, packaged in "Zip-Lock" bags that contained one of the stickers, at least until December 1999.

**RESPONSE**: Bowling denies Proposed Fact No. 8 to the extent that Hasbro's characterization of the facts is incomplete. During the relevant period (August 17, 1999 to November 3, 1999) all that was required of Bowling is that he continuously marked substantially all of his dice and that he took reasonable steps to insure his retailers and distributors did as well. *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1111 (Fed. Cir. 1996) at 1111-12. Hasbro's characterization of the facts is incomplete. For example, Bowling personally contacted every retail and distributor customer by phone concerning marking. (Exhibit A at 209:7-210:6.) Bowling affixed the patent number sticker to point-of-purchase tubs and sent those to its customers. (Id. at 203:1-20.) Bowling also sent out detailed letters, along with patent-number stickers instructing his retail and distributor customers to properly mark his dice. (Exhibit I; Exhibit A at 204:24-210:6.)

**PROPOSED FACT NO. 9**: Bowling claims that the "patented dice were sold loose in bags of 50 pieces" and that "[e]ach bag included a sticker bearing the '197 patent number and instructions to place it on any display where the patented dice were sold."

**RESPONSE**: Uncontroverted.

**PROPOSED FACT NO. 10**: With respect to gaining compliance from his customers, Bowling's cover letters with the stickers indicated that unless the customers countersigned the letter, indicating their agreement to abide by its terms, he would cease doing business with them.

**RESPONSE**: Uncontroverted.

**PROPOSED FACT NO. 11**: Bowling continued to do business with customers who failed to countersign the cover letters, including selling his "crystal dice" to them.

**RESPONSE**: Bowling disputes Proposed Fact No. 11. Bowling testified that he sent letters to customers who Crystal Caste determined did not already have the proper patent-number sticker on their tubs. (Id. at 205:23-206:11.) Moreover, Bowling testified that he may not have all of the returned letters, as it is possible that he had lost some of letters that were returned to him. (Id. at 212:16-20.)

**PROPOSED FACT NO. 12**: Steen Jensen, worked as a purchaser for Berkeley Top Line North, one of Bowling distributor's prior to and after the issuance of the patent, and one that never countersigned Bowling's patent labeling agreement.

**RESPONSE**: Uncontroverted to the extent that Steen Jensen worked as a purchaser for Berkeley Top Line North ("Berkeley"). Bowling denies the remainder of Proposed Fact No. 12. Jensen confirms that Robert Waros, who worked directly under Mr. Jensen at Berkeley, signed the cover letter sent by Bowling: "The fellow who signed it, Robert Waros, I believe his name was, was one of the underbuyers that I earlier mentioned, that I had a couple of guys working for me and he was one of them." (*See* Deposition of Steen Jensen ("Jensen Depo.") at 64:18-66:13, attached hereto as Exhibit B and Jensen Depo. Exh. No. 8, attached hereto as Exhibit C.)

**PROPOSED FACT NO. 13**: Steen Jensen has no recollection of ever seeing the stickers or even knowing that the dice were patented, despite the fact that he had detailed knowledge of Bowling's dice, their inventory at Berkeley Top Line North, and Berkeley Top Line North's fulfillment of orders for "crystal dice" to its own customers.

**RESPONSE**: Bowling denies Hasbro's Proposed Fact No. 13. Mr. Jensen confidently testified that one of the people working for him, Robert Waros, signed Bowling's letter

instructing Berkeley Topline to mark all of Crystal Caste's dice and instructing their retail stores to do so as well. (Exhibit C and Exhibit B at 64:18-67:2.) Mr. Jensen also confidently testified that if Berkeley received such a letter, which it did, it would have followed those instructions. (Id. at 69:4-70:7; 74:5-76:14.) Moreover, Mr. Jensen specifically recalled Bowling providing tubs to Berkeley during the time Bowling was marking the tubs with the patent-number sticker. (Id. at 40:10-41:25.) Mr. Jensen also vaguely recalled Mr. Bowling's patent-number stickers and that Berkeley sent them out. (Id. at 64:18-66:13.) Mr. Jensen's recalls an "irritation" with having to do something extra with Crystal Caste's product. (Id. at 68:25-69:22.)

Moreover, Bowling's invoice dated November 27, 1999, clearly shows that it sent 12 "Point of Purchase Tub Displays" to Berkeley Topline North. (Jansen Depo. Exh. No. 4, attached hereto as Exhibit D.). Bowling testified that he affixed the patent-number stickers on all such point-of-purchase displays. (Exhibit A at 199:19-200:14; 203:14-204:8.) Mr. Jensen stated that if the point-of-purchase display tubs received from Bowling had patent-number stickers on them Berkeley Topline would have left the patent-number stickers on the display tubs. (Exhibit B at Jen dep. 66:9-67:2.)

Mr. Jensen did not have detailed knowledge of Crystal Caste's dice. Mr. Jensen was responsible for ordering products and maintaining inventory for about 20,000 products, including dice, which were a very small part of his duties. (Id. at 11:4-12:25; 63:5-23.) Mr. Jensen would not recognize small details concerning each individual product. (Id.) Mr. Jensen did not work in the receiving department and did not see how Bowling's dice arrived at Berkeley Topline. (Id. 23:5-24:3.) In fact, he testified that he never saw the packaging in which the Crystal Caste dice arrived. (Id.) Mr. Jensen also did not package orders and ship them out. (Id. at 72:8-72:20.) Mr. Jensen simply ordered the product and had very little to do with actually receiving or shipping it.

(Id. at 72:13-73:20.) Berkeley Topline's sales people may have been the ones who passed on the patent-number stickers to its customers. (Id. at 65:22-66:13.)

Bowling denies Proposed Fact No. 13 in that Jensen has no recollection of knowing that the dice were patented. In a conversation with Bowling regarding the Monopoly Millennium game, Jensen was left "with the impression that, if not explicitly, he [Bowling] had a patent, he had some say or some claim on these dice." (Id. at 27:16-18.)

**PROPOSED FACT NO. 14**: The standard procedures at Berkeley Top Line North included disposing of all packaging sent by Bowling and holding the "crystal dice" in inventory in small tubs.

**RESPONSE**: Bowling denies Proposed Fact No. 14. Mr. Jensen never testified that this was Berkeley's "standard procedure." Moreover, Mr. Jensen did not have detailed knowledge of Crystal Caste's dice. Mr. Jensen did not work in the receiving department and did not see how Bowling's dice arrived at Berkeley Topline. (Id. at 23:5-24:3.) In fact he testified that he never saw the packaging in which Crystal Caste dice arrived. (Id.) Mr. Jensen also did not package orders and ship them out. (Id. at 72:8-72:20.) Mr. Jensen simply ordered the product and had very little to do with actually receiving or shipping it. (Id. at 72:13-73:20.) Moreover, Hasbro cites to this "Undisputed Fact 14" in its brief for the proposition that "Bowling's packaging, including, the labels that might have been in the package, were simply discarded." That statement is unsupported by Hasbro's Proposed Fact No. 14.

**PROPOSED FACT NO. 15**: Berkeley Top Line North's customers typically sold small quantities of "crystal dice" to their customers; in fact, Steen Jensen did not recall a single customer ordering a quantity of 50 or more of the "crystal dice."

**RESPONSE**: Uncontroverted.

**PROPOSED FACT NO. 16**: Berkeley Top Line North did not provide any notice of the patented nature of the dice to its customers.

**RESPONSE**: Bowling denies Proposed Fact No. 16. Mr. Jensen was responsible for ordering products and maintaining inventory for about 20,000 products, including dice which were a very small part of his duties. (Id. at 11:4-12:25; 63:5-23.) Mr. Jensen would not recognize small details concerning each individual product. (Id.) Mr. Jensen, however, confidently testified that one of the people working for him, Robert Waros, signed Bowling's letter instructing Berkeley Topline to mark all of Crystal Caste's dice and instruct their retail stores to do so as well. (Exhibit C and Exhibit B at 64:18-67:2.) Mr. Jensen also confidently testified that if Berkeley received such a letter, which it did, it would have followed those instructions. (Exhibit B at 69:4-70:7; 74:5-76:14.) Mr. Jensen did not have detailed knowledge of Crystal Caste's dice. Mr. Jensen did not work in the receiving department and did not see how Bowling's dice arrived at Berkeley Topline. (Id. at 23:5-24:3.) In fact he testified that he never saw the packaging in which Crystal Caste dice arrived. (Id.) Mr. Jensen also did not package orders and ship them out. (Id. at 72:8-72:20.) Mr. Jensen simply ordered the product and had very little to do with actually receiving or shipping it. (Id. at 72:13-73:20.) Berkeley Topline's sales people may have been the ones who passed on the patent-number stickers to its customers. (Id. at 65:22-66:13.)

**PROPOSED FACT NO. 17**: Bowling's sworn interrogatory response, in which he claims that during the "relevant" time period, he only sold in bags of 50 dice with a patent sticker in each of the bags, is not true. As reflected in Bowling's own financial records, Bowling (through his company, Crystal Caste) was selling quantities other than bags of 50 dice (10, 13, 21, 25, 50, and 100), and his basic unit of sale was ten dice, not 50.

**RESPONSE**: Bowling denies Proposed Fact No. 17. Bowling's interrogatory response, consistent with his testimony, states that "from August 17, 1999, through November 3, 1999, all dice were properly marked under 35 U.S.C. § 287." (Exhibit E at p. 4.) Bowling's interrogatory response stated that "the patented dice were sold loose in bags of 50 pieces." (Id. at p. 4; Exhibit A at 201:1-14.) It does not state that they were *only* sold in bags of 50, however, at that time that was generally how they were sold, despite some exceptions, which were evident from the documents Bowling produced.

**PROPOSED FACT NO. 18:** Bowling has never adduced any evidence that he associated any markings, whatsoever, with sales of dice in quantities less than 50.

**RESPONSE**: Bowling denies Proposed Fact No. 18. First, Bowling's interrogatory response unambiguously states that "from August 17, 1999, through November 3, 1999, all dice were properly marked under 35 U.S.C. § 287." (Exhibit E at p. 4.) Moreover, Bowling stated that "[e]ach bag included a sticker bearing the '197 patent number and instructions to place it on any display in which the patented dice were sold." (Id.)

**PROPOSED FACT NO. 19**: Bowling contends that the only period of relevance to his marking of dice was from August 17, 1999 (the date of issuance of the patent) through November 3, 1999 (the date on which he gave Hasbro actual notice of alleged infringement).

**RESPONSE**: Uncontroverted.

**PROPOSED FACT NO. 20**: Bowling has never systematically marked either the dice or their packaging. For example, during his deposition, Bowling disclosed that he had distributed some 60,000 dice as a giveaway with Dragon Magazine. Hasbro has obtained one of those magazines with the free dice enclosed, and there was no marking whatsoever associated with the dice.

**RESPONSE**: Bowling denies Proposed Fact No. 20 that Bowling has never systematically marked either the dice or the packaging. (*See* Bowling's Brief In Opposition To Hasbro's Motion For Partial Summary Judgment.) For example, just before the '197 patent issued, Bowling changed the patent sticker from "patent pending" to "U.S. Patent # 5,938,197" and affixed them to every display tub used to sell his crystal dice and included a patent-number sticker in all the bags of dice sold. (Exhibit A at 199:19-205:12; Exhibit E at p. 4; and Bowling Declaration at ¶ 2.) Bowling personally contacted every retail and distributor customer by phone and instructed them to mark their bins with the patent-number sticker. (Exhibit A at 209:7-210:6.) To drive the point home, on August 15, 1999, two days before Bowling's '197 patent issued, Bowling sent formal letters to its distributor and retail customers including stickers bearing "U.S. Patent # 5,938,197" instructing them to affix the patent-number stickers to all containers, bags or tubs. (Id. at 205:7-208:9.) The letter Bowling sent to its retail customers explained that "[i]t is important that all Crystal Caste™ dice on display be labeled with our sticker identifying our patent protection. If you need more [stickers] please contact us at (888) 3CC-DICE." (Exhibit C.) The letter also explained that Crystal Caste would be placing patent stickers on its tubs and in the bags of loose dice. (Id.)

**PROPOSED FACT NO. 21**: Hasbro's agent has purchased numerous dice and visited numerous hobby shops that carry Bowling's dice and has ordered Bowling's dice from various online retailers, and has never found a crystal die that is marked, nor has Bowling produced a single marked die.

**RESPONSE**: Bowling denies Proposed Fact No. 21. Hasbro blatantly misstates its own agent's testimony. Irina Slavina, Hasbro's agent, in a sworn declaration stated that two of the stores she visited sold the crystal dice in displays tubs that were marked with the patent number.

(*See* Declaration of Irina Slavina at ¶¶ 5-6; Court Docket No. 39.) Specifically one of the locations she visited carried Bowling's dice in a tub and that tub was marked with the patent number. (Id. at ¶ 5.) While she claims that the tub only included "four-sided" dice, the picture of the tub and the dice, shown in Exhibit E to her declaration, clearly shows Bowling's six and 10 sided crystal dice that are covered by the patent. (Id. at Ex. E.) Hasbro's agent also testified that another store she visited carried Crystal Caste dice and those dice were sold in a tub with the patent-number sticker on the tub. (Id. at ¶6.) Bowling specifically denies Proposed Fact No. 21 to the extent that Bowling has never produced a single marked die. (*See* photographs of dice produced by Bowling (B01578-B01580 and B01628-B01629), attached hereto as Exhibit F.)

**PROPOSED FACT NO. 22**: None of the agent's direct-to-consumer purchases of the dice had any patent markings either on the dice or on the packaging. Only one of the several locations that Hasbro's agent visited, and which were identified on Bowling's own website as retailers for his dice, actually had crystal dice in a bin bearing a sticker with the '197 Patent number on it. One of the other locations, far from displaying patent information on the bin, simply had a label reading "Ugly Dice for Half Price 50 Cents."

**RESPONSE**: Bowling denies Proposed Fact No. 22 in part. Bowling admits that Hasbro's agent alleges that none of the direct-to-consumer purchases of the dice had any patent markings either on the dice or on the packaging. Bowling denies that only one of the locations she visited had the dice marked with the patent number. In fact, Hasbro's agent's statement shows that two locations she visited sold Bowling's patented dice in a tub bearing the patent number. (*See* Declaration of Irina Slavina at ¶¶5-6.)

**PROPOSED FACT NO. 23**: Even "cubes" of dice that delivered by Bowling's own company during the pendency of this suit when marking was directly at issue, do not have a sticker.

**RESPONSE**: Bowling admits that Hasbro alleges it recently received a few cubes of dice that were unmarked.

**PROPOSED FACT NO. 24**: Bowling's deposition testimony, in which he claims that he and his employees manually affix stickers, or verify that the cubes of dice have stickers, is inaccurate.

**RESPONSE**: Bowling denies Proposed Fact No. 24. Bowling testified that Crystal Caste employees properly marked its products. (Exhibit A at 222:10-224:2.)

**PROPOSED FACT NO. 25**: On June 5, 2006, Thomas F. McCabe, an employee of Adler Pollock & Sheehan, P.C., ordered two sets of dice from Bowling's website, www.crystalcaste.com

**RESPONSE**: Uncontroverted.

**PROPOSED FACT NO. 26**: On approximately June 19, 2006, Mr. McCabe received the dice ordered from www.crystalcaste.com, which were sent to Mr. McCabe at Adler Pollock & Sheehan, P.C.

**RESPONSE**: Uncontroverted.

**PROPOSED FACT NO. 27**: Unlike the containers of dice sent to Irina Slavina at her home address, the containers of dice sent to Mr. McCabe at Adler Pollock & Sheehan had stickers bearing the '197 Patent number.

**RESPONSE**: Uncontroverted.

**PROPOSED FACT NO. 28**: Bowling was aware of Hasbro's use of the accused dice in its Monopoly Millennium Edition even prior to the issuance of the patent.

**RESPONSE**: Uncontroverted.

**PROPOSED FACT NO. 29**: Bowling sent actual notice that he considered Hasbro's dice to infringe the '197 Patent to Hasbro on November 3, 1999.

**RESPONSE**: Uncontroverted.

**PROPOSED FACT NO. 30**: In his Complaint for patent infringement, Bowling did not plead compliances with the marking statue, 35 U.S.C. § 287(a).

**RESPONSE**: Denied. (*See* Complaint at ¶ 14 and Hasbro's Answer.)

**PROPOSED FACT NO. 31**: Bowling has never stated his damages or his damage calculations except by reference to the Expert Report on Damages of Neil N. Lapidus, CPA.

**RESPONSE**: Bowling denies Proposed Fact No. 31. Hasbro's Answer included an Affirmative Defense to Bowling's claim that it properly marked under 35 U.S.C. § 287: "Pursuant to 35 USC § 287, *Plaintiff's claims* are barred or limited based on Plaintiff's failure to properly mark the product and/or packaging with the requisite patent designation. (*See* Answer at p. 4 (emphasis added).)

Aside from properly pleading marking, from the beginning of this dispute Bowling claimed that he was entitled to damages from the date the patent issued, August 17, 1999, which necessarily means that Bowling claimed he properly marked. (Exhibit G.) ("For each die having the geometry as shown in the photographs of Exhibit A, the number of dice sold by or on behalf of Hasbro *since August 17, 1999*.) (emphasis added).) In Hasbro's deposition of Bowling, nearly 20 percent of the deposition was dedicated to whether Bowling sufficiently marked his product under 35 U.S.C. § 287. (Exhibit A at 162-183; 199-227.) In Hasbro's first set of interrogatories

to Bowling, dated August 5, 2005, Hasbro specifically asked Bowling to explain how he complied with the marking statute:

**INTERROGATORY NO. 18:**

State whether any die manufactured or sold under Patent '197 carried any notice of the type described in 35 U.S.C. § 287, either on the product or its packaging and, if so, explain where the patent designation may be found and state in detail which dice bore such notice.

(Exhibit H.) On October 20, 2005, Bowling served responses to Hasbro's interrogatory directed to marking explaining how Bowling properly marked its products. (Id.)

**PROPOSED FACT NO. 32**: Mr. Lapidus opines that "the damages period begins to run from the date of the patent's issuance" and further opines that Bowling's damages include a reasonably royalty on all allegedly infringing dice sold by Hasbro after the issuance of the patent.

**RESPONSE**: Uncontroverted.

**PROPOSED FACT NO. 33**: Hasbro purchased the accused dice for approximately $0.115 per pair, each pair individually bagged.

**RESPONSE**: Uncontroverted.

**PROPOSED FACT NO. 34**: In 1999, Bowling maintained a gross profit margin on his crystal dice of approximately $0.3215 per die, having procured his dice for approximately $0.13 each and sold them to distributors for approximately $0.4515, even after accounting for a 30% "distributor discount" off his wholesale prices.

**RESPONSE**: Bowling denies Proposed Fact No. 34. Bowling denies this request to the extent it mischaracterizes the record and is incomplete.

Michael Bowling,
By His Attorneys,

Date: August 2, 2006

/s/ Christine K. Bush
Craig M. Scott, Esq. (#4237)
Christine K. Bush, Esq. (#5587)
DUFFY SWEENEY & SCOTT, LTD
One Turks Head Place, Suite 1200
Providence, RI 02903
(401) 455-0700
(401) 455-0701 (Facsimile)
cbush@duffysweeney.com

Douglas J. Williams, MN (*pro hac vice*)
Thomas J. Leach, MN (*pro hac vice*)
MERCHANT & GOULD, P.C.
3200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
(612) 332-5300
(612) 332-9081 (Facsimile)

**CERTIFICATION**

TO:

Todd D. White, Esq.
Jeffrey K. Techentin, Esq.
Adler Pollock & Sheehan P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903-1345

David K. S. Cornwell, Esq.
Tracey-Gene G. Durkin, Esq.
Sterne Kessler Goldstein & Fox P.L.L.C.
1100 New York Avenue N.W.
Washington, DC 20005

I hereby certify that the within *Statement of Disputed and Undisputed Facts in Support of Plaintiff Bowling's Opposition to Motion for Partial Summary Judgment* was filed through the ECF system on the 2nd day of August, 2006, and will be sent electronically to the above-named counsel who are registered participants identified on the Notice of Electronic Filing.

/s/ Christine K. Bush