# EXHIBIT A

UNITED STATES DISTRICT COURT

DISTRICT OF RHODE ISLAND

C.A. NO: 05-229S

* * * * * * * * * * * * * * * * * * * *

MICHAEL BOWLING
a Resident of Arizona,

Plaintiff,

vs.

HASBRO, INC.,
a Rhode Island Corporation,

Defendant.

* * * * * * * * * * * * * * * * * * * *

DEPOSITION OF MICHAEL BOWLING, a witness called on behalf of the defendant, taken pursuant to the Rhode Island Rules of Civil Procedure, before Elizabette M. Afonso, Professional Shorthand Reporter and Commissioner for the State of Rhode Island and Providence Plantations for the Commonwealth of Massachusetts, at the law offices of Adler, Pollock & Sheehan, One Citizens Plaza, Providence, Rhode Island, commencing at 10:05 a.m. on Monday, January 16, 2006.

There's no way to look at Exhibits 9 and 10 though and discern when those sales were made within the August 1, '98 through January 1, '02 time frame, correct?
A. Looking at those documents, there isn't. But you can still filter Quickbooks, and say, I'd like to know how many I sold as of this date, and then it would tell you.
Q. My original question that started us on those was: Approximately how many crystal dice did Crystal Caste sell between Gen Con '98 and Gen Con '99? And you said, "Well, I'd need to look at the sales information to know the answer to that," correct?
A. Yeah.
Q. But you can tell just from that, correct?
A. Yeah. Less than $300,000 worth.
Q. Would it have been more than 10,000 dice during that year?
A. Again, I couldn't put a number to it without looking it up. But momentarily we can say less than $300,000 worth.
Q. How soon after Gen Con '98 did you get your second order of dice?
A. Second order placed or second order shipped?



Q. Filled, shipped.
A. Shipped within a month or two.
Q. And how big was that order?
A. I'd have to look to see. I don't know.
Q. You don't recall if it was bigger or smaller, the same as the '98 --
A. I honestly don't know.
Q. So you don't have any recollection as to how well your dice were selling from August of '98 until August of '99?
A. Well, yeah. They were selling well, but I don't etch to memory things like that that I can look up.
As an engineer, you're only as good as your reference material. So anything that can be referenced, I don't really put to memory.
Q. With respect to these dice that you were selling between August of '98 and August of '99, did you mark them as being patent pending?
A. Yeah. The manner in which we sold them was in a tub. The tub had a placard behind it, and the placard was our first advertisement, and we would sell them -- you know, we would give them the tub, placard, and then a baggy of dice inside of it.
Q. Were all of your dice sold in this tub?



A. Yeah, we sold them in the tub.
Q. Do you recall the exact words on the label on the tub?
A. I think it said -- I think it was a two-color label. It was meant to be a two-color label, because the first thing said choking hazard, not for a certain -- for young children. And then we had the patent number across the bottom of it.
The dice were too -- it wasn't practical to etch the dice with a patent number. They're too small. It's impossible.
(Exhibit No. 11, photocopy of three photographs, marked for identification.)
Q. Showing you what's been marked as Exhibit 11.
A. Yeah, this is it.
Q. And the first page of Exhibit 11 shows a tub filled with crystal dice?
A. Mm-hmm.
Q. It's a label, and that's the label you were just talking about?
A. Yes.
Q. On the second page looks like it's the same tub, but shown from a longer angle?
A. Yeah. I wanted to show the placard how -- you



know, what came with it.
See, there's a placard attached to it, see a little trident.
Q. And the trident holds the placard in the back?
A. Yeah.
Q. And the third picture is just another picture of the same thing?
A. Yeah. I couldn't -- yeah. I couldn't tell if the -- on my digital camera, it didn't look as though it took one of the close ups good, so I took two close ups.
Q. Where is this picture taken?
A. In my den.
Q. And when was it taken?
A. Three days ago.
Q. Who advised you to label this as being a choking hazard?
A. Nobody.
Q. That was your idea?
A. Yeah. I noticed that my two competitors both marked choking hazard on their packages, so I thought it was probably the prudent thing to do.
Q. And what about the decision to indicate that it was not for children under 14 years?





0e833c06-3d41-44a8-baad-4c084646dbdf

A. I want to say my first employee was in '98 or -- I remember it was right around Christmas of either '98 or '99. Let's see -- yeah, either '98 or '99.
I could verify that date for you, you know, when I got my records, but I honestly don't know which year. I remember it was around Christmas.
Q. Okay. Who was that?
A. Mark Alexander.
Q. And what did Mark Alexander do for you?
A. He was the first full-time employee. He started making sales, phone sales primarily. He did all the busy work during the day. He would ship some things. He would label some things. He's pretty much done every part of the business at one point or other.
Q. Is he a salaried employee -- was he a salaried employee?
A. Hourly.
Q. Hourly?
A. Yeah.
Q. How much did you pay him when he first came on board?
A. I think he started at $10 an hour, I think.



Q. Does he still work for you?
A. Yes.
Q. Is he still full time?
A. Yes.
Q. Is he still being paid hourly?
A. Yes.
Q. How much is he making now?
A. I think he makes 16 an hour now.
Q. And has he worked for you this whole time?
A. Yes. There's been a couple of periods that he's taken off an extended amount of time. His wife's real ill.
Q. And it's your testimony that Mr. Alexander would have put these stickers on the buckets from time to time; is that correct?
A. Yeah. He may have. My father may have. There was a guy that did most of our shipping and receiving named Lloyd, but he has passed away.
Q. Anyone else?
A. Not during that time period, I don't believe. That sums up, you know, the people that were working around there at that time.
Q. So prior to the issuance of the patent, and the patent came out in August of 1999, right?



A. Mm-hmm.
Q. The only people who were putting stickers on these buckets were yourself, your father, Mark Alexander if he was working for you at that time?
A. Right.
Q. And Lloyd if he was working for you at that time?
A. Yes.
Q. And it's possible for you to figure out when Mark Alexander and Lloyd started working, right?
A. It's possible to tell with all of them. I actually think my father started helping me on a day-to-day basis after Mark Alexander.
In my mind, Mark Alexander is my first full-time employee, that strikes a cord, you know, he was the first one. Until then, I was working out of my garage.
Q. And do you know that the various retailers who were selling the crystal style dice were in fact selling them using the buckets that you sent them?
A. Yeah. They would say they would. They would call us from time to time and request a new bucket. The old bucket is getting smudged or dirty, or someone stole our placard, that happened a lot, people would steal the placards, remove the placard.



Q. But you said you never went to the retailers yourself, correct?
A. Yeah. I never physically saw, you know, one on a retail shelf being used.
Q. So you don't know whether all the retailers or even a significant number of the retailers were using the buckets that you've provided, would that be fair?
A. I know they were instructed to. I instructed them to use it.
Q. You instructed your customers to use the bucket?
A. Yeah.
Q. Why?
A. Because it had to have the -- we couldn't mark the individual dice, so we had to have something showing the patent number.
Q. I'm talking before the patent number was issued.
Before the patent was issued, you instructed your customers that they had to use the bucket that you sold?
A. I think that we instructed them to use the bucket after when we got the actual patent with a patent number.
I remember distinctly having to do that.

A. No. I think it's closer to maybe five to six inches maybe.
Q. How many dice does one of those tubs hold?
A. I don't know.
Q. More than 50?
A. Yes.
Q. How many plastic bags of 50 dice can you - I'm sorry. How many dice went into each Zip Lock bag?
A. At that time 50.
Q. Fifty. How many of those Zip Lock bags could you pack in one of the tubs?
A. I don't know. I never tried to see how many I could jam in, or if I did it, I never kept track, never retained a number.
Q. All right. So your wife was counting the dice, putting them into the Zip Lock bags, correct?
A. Actually, what we would do, is we'd sit around watching television, and she would, you know, count them and lump them.
I don't know that she even put them in the Zip Locks. I think I did that, too.
Q. Anybody else from the family helping out at this point?
A. At that time, no.



Q. What did you do to change the markings on tubs that you had already marked as patent pending after the patent issue?
A. We sent out stickers to stores that we knew had the patent pending label.
Q. Anything else?
A. Well, as I said, all subsequent orders had a new tub anyway.
What we noticed about those tubs was over time they would get dirty and grimy relatively quick, and so we were always sending out -- within orders, we were just sending out a tub. I mean, we sent out just scads of those tubs over time.
Q. Well, did you do anything to make sure that the tubs you had already marked as patent pending were changed to reflect the patent number?
A. Well, we sent new tubs that were marked with the patent number.
Q. What about the tubs you had in inventory?
A. We sticked them as we shipped them.
The way they sent the tubs to us in a pallet, it was a giant shrink wrap, and in Tucson, it's dusty, everything's dusty, so we would not open the whole thing up.



We would take them from the top down as we used them. And so as we pulled them, we would label them, and we'd ship them to keep them as nice and new, you know, looking as possible.
Q. And that label, either the patent pending label or the label with the number on it, that's the only sticker that goes on that tub?
A. Yes.
Q. So if I understand you correctly, when the patent issued, you wouldn't have had a single tub in your possession that had a sticker on it?
A. That had a patent pending sticker on it?
Q. Correct.
A. That's correct.
Q. And how do you know that any of the tubs that had a patent pending sticker on them in a store were actually changed to reflect the patent number?
A. I don't have direct proof of that. I never visited any of the stores, and saw -- you know, looked at the displays. I only know what I sent them.
MR. TECHENTIN: I'll have that marked.
(Exhibit No. 16, materials that relate to sending out stickers, marked for identification.)
Q. I'm handing you Exhibit 16, which I believe comes



from your files, correct?
A. Yes. This looks like something I made.
Q. And this is the material that relates to your having sent out stickers to your customers, correct?
A. Mm-hmm.
Q. And it's a form letter that you sent to various retailers and distributors, correct?
A. Yes.
Q. And you asked that they countersign it and return it to you, correct?
A. Yep.
Q. And the second page of this exhibit has the contact information for the, I guess, who are your distributors, correct, or your retail customers?
A. Yes. I recognize some of the names on here.
Q. And there are checkmarks next to some of them?
A. Uh-huh.
Q. Do you know what the checkmarks mean?
A. No.
Q. Do you know what the dots mean?
A. No.
Q. Did you ever go through to figure out -- well, let me ask it this way, did you send a letter to each

of these recipients?
A. I'm not sure I sent one to each and every one. This may have been everyone who was a customer at the time that we knew who didn't have the correct sticker on the tub.
Q. Well, what did you do to make sure that you were sending it to everybody who ought to receive it?
A. I think my wife somehow derived who they needed to go to, and so she put together, and then I sent them out, and then she filed them when they sent us back the responses.
Q. And in the last full paragraph you write, "Without this agreement, we cannot continue to sell dice to you," do you see that?
A. Yes.
Q. Did you in fact stop selling dice to anyone, because they didn't send back the agreement?
A. I don't know.
Q. How would you find out the answer to that?
A. I'd have to get in Quickbooks and see, you know, at what point we continued to do business with these people, you know, if there's a record of us continuing to sell to them.
Q. You kept copies of whatever letters were sent back



to you, correct?
A. Yes.
Q. That's why we have this file?
A. Yes. I mean, I don't know if these are all of them, but these are some of them.
Q. And the instructions that you give in this form letter is that, "Our patent number must be affixed to all containers, bags, or tubs," do you see that, it's in the first paragraph?
A. Yes.
Q. If you were only marketing in tubs, why are you talking in terms of containers and bags?
A. Well, sometimes when I sold them to a retail store, they may have their own mechanism of selling their dice, like a bin system or something or a, you know, a basket of just an assortment of dice, and so I had to send them the stickers to let them know that if they are selling them out of something other than my bin, they need to mark it.
Q. And the third paragraph you say, "From today forward, we will place a sticker on our tubs and in the bags of loose dice," do you see that?
A. Mm-hmm. The sticker in the tub was if they used our tub. The sticker in the bag, is if they had



their own display they were using.
Q. Well, didn't you just testify that you weren't shipping other than in tubs?
A. No, no. The tub that went out had a sticker on the tub, and we would put them in the bag as well. The dice were in a Zip Lock bag. Every bag of 50 we sold, had a sticker in the bag as well.
Q. Had the patent number sticker?
A. Yes.
Q. What about the patent pending sticker?
A. I believe so, yes.
Q. You believe so? Do you remember?
A. Not 100 percent. Because until I was looking at this, I had forgotten that we had put them in the loose bag as well.
Q. You sent out these letters -- I believe all of them are dated August 15th of 1999, correct?
A. Yeah, it looks like it.
Q. And other than waiting for the letters to come back countersigned by your customers, did you do anything to make sure that your customers were actually complying with your request about stickering?
A. There may have been some verbal conversations.



Q. Well, were there or weren't there?
A. Well, all of these people I talked to at the time I was doing the sales, and so I talked to these people on the phone. I remember talking to different ones. I remember I talked to them as well as sent the letters.
The letters were a formal way of doing it, but I believe I communicated it to them individually, you know, in addition. The letters just drove the point home.
Q. Do you have any record of when you received these letters from the customers?
A. Other than their date and signature, no. I didn't save the letters that they came in.
Q. So, for example, on the letter from Games People Play dated 9/8 of '99, do you see that one?
A. Uh-huh.
Q. Do you have any knowledge as to whether or not Games People Play did anything with respect to stickering your dice between August 15th and September 8th of 1999?
A. Well, like I said, I initially made phone calls to make the request, and then I followed up, you know, with the letter, so that they would see the letter.





0e833c06-3d41-44a8-baad-4c084646dbdf

Q. You say that in fairly general terms, are you saying you specifically remember calling up someone at Games People Play and having a conversation about the stickering?
A. I remember speaking to each store individually, but I don't remember the exact conversation.
Q. Then more than halfway through there's -- on B00705 --
A. Yeah. There's the distributors I was listing to you.
Q. So at this point you've got 12 distributors listed, correct?
A. Yeah, it looks like it.
Q. And each of these distributors is selling to retail customers somewhere, right?
A. Mm-hmm.
Q. And you used a different form letter for the distributors than you did for the retailers, correct?
A. Yeah, it looks like it, yep.
Q. And, most importantly, you changed it by asking them to please send a label to all of your retail customers with an existing supply of Crystal Caste dice, so that they may place the sticker on our or



whatever container our dice is in, correct?
A. Correct.
Q. So you seem to recognize in this that some of your customers were selling other than in your presupplied bins, correct?
A. Yeah, right.
Q. And going back to the page that had the list of distributors, you've got a checkmark next to some of those distributors, do you see that?
A. Uh-huh.
Q. And there's a checkmark actually next to five of the twelve distributors. Do you know what that checkmark means?
A. No.
Q. Could it mean that that's somebody that you actually received the letter back from?
A. Yeah. It could be that their letter had come in already or that I talked to them on the phone already. I'm not sure.
Q. And in the form letter that you sent out to your distributors you wrote, "Without this agreement, we cannot continue to sell dice to you," just as you had with the retailers, correct?
A. Uh-huh.



Q. Did you actually stop selling any dice because a distributor failed to return the agreement?
A. I know that we -- I don't believe we did anything further with the Yellow Submarine or Gameboard Distributors. But I don't --
Q. You continued to do business with Zocchi, didn't you?
A. Not for long.
Q. But you did?
A. Yeah.
Q. Zocchi went out of business subsequently?
A. Yeah, right.
Q. But after August of 1999, you were still doing business with Zocchi, right?
A. Mm-hmm.
Q. But you didn't receive a letter back from Zocchi?
A. I don't have a letter in this packet, no.
Q. And if you'd received a countersigned letter from Zocchi, you would have kept it, right?
A. If I didn't lose it.

(Exhibit No. 17, Choking hazard labels, marked for identification.)

Q. Taking a look at Exhibit 17. Are these the labels that you sent out to your retail customers?



A. Yep, this looks like them.
Q. Are these the same labels that you sent out to your distributors?
A. Yes. It appears to be the sheet.

(Exhibit No. 18, labels, marked for identification.)

Q. Exhibit 18 --
A. Yeah, there you go.

MR. LEACH: Can I get a copy?
MR. TECHENTIN: I'm sorry.
MR. LEACH: Thank you.

Q. Exhibit 18, another series of labels it appears to be. Can you tell me what these labels are?
A. These are when I would send out mixes, this was a label that we would affix to the exterior of the Zip Lock bag.

Because we started getting so many dice that it was getting confusing to tell what was what, so we would make this sticker, cut it out, and adhere it to the Zip Lock bag, then we could store them. Rather than make them to order as the orders came in. And then the employees could look at it and say -- and we would put a checkmark beside it to what was in the bag.





0e833c06-3d41-44a8-baad-4c084646dbdf