UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| MICHAEL BOWLING, a Resident of Arizona, | : | |
| Plaintiff, | : | |
| v. | : | C.A. No. 05-229 S |
| HASBRO, INC., a Rhode Island Corporation, | : | |
| Defendant. | : | |

**MOTION TO STAY PROCEEDINGS PENDING *EX PARTE* REEXAMINATION OF PATENT OR, IN THE ALTERNATIVE, FOR LEAVE TO RE-OPEN EXPERT DISCOVERY**

Defendant/Plaintiff-in-Counterclaim Hasbro, Inc. ("Hasbro") respectfully moves to stay the trial of this matter pending the outcome of its Request for *Ex Parte* Reexamination of the patent-in-suit, U.S. Pat. No. 5,938,197 (the "'197 Patent"). In the alternative, Hasbro respectfully moves to re-open expert discovery to permit Hasbro to advance appropriate expert testimony on the subject of the validity and enforceability of the '197 Patent in light of prior art identified since the close of discovery in this case. The grounds for this motion are set forth in the accompanying Memorandum of Law.

Respectfully submitted,

HASBRO, INC.
By its Attorneys,

/s/ Jeffrey K. Techentin________
Todd D. White (# 5943)
twhite@apslaw.com
Jeffrey K. Techentin (#6651)
jtechentin@apslaw.com
Adler Pollock & Sheehan P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903

(401) 274-7200
Fax: (401) 751-0604/ 351-4607
Dated: July 20, 2007

<u>Of Counsel</u>:

David K. S. Cornwell, Esq.
davidc@skgf.com
Tracy-Gene G. Durkin, Esq.
tdurkin@skgf.com
Sterne Kessler Goldstein Fox
1100 New York Avenue, NW
Washington, D.C. 20005

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| MICHAEL BOWLING, a Resident of Arizona, | : | |
| Plaintiff, | : | |
| v. | : | C.A. No. 05-229 S |
| HASBRO, INC., a Rhode Island Corporation, | : | |
| Defendant. | : | |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO STAY PROCEEDINGS PENDING *EX PARTE* REEXAMINATION OF PATENT OR, IN THE ALTERNATIVE, FOR LEAVE TO RE-OPEN EXPERT DISCOVERY**

Defendant/Plaintiff-in-Counterclaim Hasbro, Inc. ("Hasbro") respectfully submits this Memorandum of Law in support of its motion to stay the trial of this matter pending the outcome of its Request for *Ex Parte* Reexamination of the patent-in-suit, U.S. Pat. No. 5,938,197 (the "'197 Patent"). In the alternative, Hasbro seeks to re-open expert discovery to permit Hasbro to advance appropriate expert testimony on the subject of the validity and enforceability of the '197 Patent in light of prior art identified since the close of discovery in this case. As explained below, staying this action in order to utilize the specialized expertise of the United States Patent and Trademark Office ("PTO") in examining the validity of the '197 Patent is both warranted and well within the discretion of this Court. Alternatively, should the Court reject Hasbro's motion to stay the matter, expert discovery should be re-opened for the limited purpose of permitting Hasbro to present evidence regarding the validity of the patent-in-suit at the trial of this matter. Under either scenario, the Plaintiff would suffer no prejudice, and the Court would merely permit full consideration of the validity of the Plaintiff's patent.

## Factual Background

As the Court is aware, the facts underlying this lawsuit occurred in 1999 and 2000. Plaintiff originally filed suit against Hasbro in the United States District Court for the District of Arizona on September 16, 2003. The Plaintiff failed to serve Hasbro and the case languished until January 2004, when District Judge David C. Bury issued an order for the Plaintiff to show cause within 30 days why the case should not be dismissed for failure to effect service within 120 days as required by Rule 4(m). The Plaintiff failed to respond at all to this order, and Judge Bury dismissed the case, with prejudice, on March 10, 2004. *See generally* Docket, C.A. No. 03-471 (D. Ariz.) (**Exhibit A**); *see also Bowling v. Hasbro*, 403 F.3d 1373, 1374 (Fed. Cir. 2005). On appeal, the Federal Circuit found that although the trial court was justified in sanctioning Plaintiff's failure to abide by pretrial orders, its *sua sponte* dismissal with prejudice exceeded its discretion. *Bowling*, 403 F.3d at 1378. It therefore reversed and remanded to the trial court. *Id.* at 1379.

Having been sanctioned once by Judge Bury for his lackadaisical prosecution of this case, the Plaintiff apparently thought better of proceeding in the District of Arizona and so submitted a voluntary dismissal of the Arizona action on May 13, 2005. **Exhibit A**. Judge Bury entered an order vacating the earlier dismissal with prejudice and dismissing the case without prejudice on May 19, 2005. *Id.* Plaintiff then filed this action on May 24, 2005.

### 1. Hasbro's Discovery of Relevant Prior Art Not Considered During the Initial Examination of Bowling's Patent Application

Following the close of discovery in this matter, Hasbro discovered several prior art[1] references that either anticipate one or more claims of the '197 Patent or render the claims

[1] "Prior art" is defined by statute to include inventions known or in use in the United States, or patented or described in printed publications in the United States or elsewhere, at any time prior to the invention of the patented subject matter by the applicant. *See* 35 U.S.C. § 102.

obvious in light of that prior art. Hasbro found U.S. Pat. No. 4,497,487 ("Chance Device") to Crippen (the '487 Patent), which anticipates at least claims 1 through 6, 10 through 12, 17, and 18 of the '197 Patent (**Exhibit B**).[2] The '487 Patent claims a game involving two twenty-sided dice and includes the following two figures to depict those dice in two-dimensional form:



FIG. 3



FIG. 4

According to the "Brief Description of the Drawings," these figures depict a "planar, diagrammatic embodiment of the invention." **Exhibit B** at Col. 2, lines 42-43. The fact that the representation is "planar" is also clear from the lines drawn across the edges of the flattened die, highlighted below:

2 "A patent claim is deemed anticipated when every element and limitation of the claim is found in a single prior art reference, either explicitly or inherently." *Pharmastem Therapeutics, Inc. v. Viacell, Inc.*, C.A. No. 05-1490, 2007 WL 1964863. *25 (Fed. Cir. July 9, 2007) (citing *Dayco Products, Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1368 (Fed. Cir. 2003)).



The fact that these figures are planar, schematic representations of the dice disclosed in the ’487 Patent renders them distinct from the disclosure in U.S. Pat. No. 5,224,708 to Gathman (the ’708 patent), which had included a similar drawing of a playing die:



**Exhibit C** at 1. When the Plaintiff applied for what would become the ’197 Patent, the United States Patent and Trademark Office only allowed the claims over the prior, Gathman patent upon an examiner’s amendment to the effect that the extension member of the die construction claimed in the ’197 patent would be comprised of facets having a surface area that is different from a surface area of the facets comprising the end caps. **Exhibit D**. Based on the examiner’s amendment, it is apparent that the examiner considered the Gathman patent to disclose a twenty-sided die composed of twenty facets of identical shape and size (and therefore surface area). This conclusion is consistent with the express language of the Gathman patent itself, which describes the dice as having “identically shaped flat surfaces” and which includes this same language in the claims. *See* **Exhibit C**. Each of the surfaces in the Gathman drawing, immediately above, is properly understood, and apparently was understood by the examiner, to be an equilateral triangle.

The disclosed die design in Figures 3 and 4 of the '487 Patent is different and not composed of twenty equilateral triangles. Because the drawn figure is planar, determination of the actual "shape" and relative sizes of the depicted facets may be readily accomplished through observation and measurement. In the '487 Patent, the dice are shown as being composed of two distinct sets of faces: (1) ten identically-shaped faces, each of which is an equilateral triangle:



and (2) ten identically-shaped faces, each of which is an isosceles triangle arranged to form a regular pentagon:



This first set of faces constitutes the "extension member" in the parlance of the '197 patent, and the second set comprises the two "end caps." There can be no dispute regarding the fact that these two sets of faces have different surface areas. Each of the triangles on the "end caps" has an edge equal to the length of an edge of each of the "extension member" equilateral triangles, but the remaining two edges are shorter and the height of the "end cap" triangles is less than that of the "extension member" faces. Because the surface area of each face is determined by the formula $a = ½ bh$, where "*b*" is the edge shared with the corresponding "extension member" triangle, and where "*h*" is the height of the triangle, the surface areas of the "end cap" faceex will be different from those of the "extension member."

Because the '487 Patent discloses polyhedral dice identical to the Gathman patent except that the surface area of the end cap facets is different from the surface area of the extension

member facets, this disclosure anticipates at least claims 1 through 6, 10 through 12, 17, and 18 of the ’197 patent, as modified by the examiner’s amendment and approved by the PTO.

Hasbro also found several references from the field of mineralogy that anticipate or so closely approximate the Plaintiff’s claimed die design as to render it obvious and therefore ineligible for patent protection. One reference, François Sulpice Beudant’s *Traité Élémentaire de Minéralogie*, v. 2 at Pl. 4 (2[d] Ed. Paris, Chez Verdière, 1832), anticipates at least claims 1 through 9 and 16 through 19 of the ’197 patent:







**Exhibit E**. Likewise, the disclosures in Jacques Louis Comte de Bournon, *Traité Complet de la Chaux Carbonattée et de l’Arragonite*, v. 3 at Pl. 17 (London, William Phillips, 1808) contain a depiction of a figure with precisely the same attributes, which reads on claims 1 through 9 and 16 through 19 of the ’197 patent (**Exhibit F**):



Other references from mineralogy and crystallography anticipate certain of the claims of the ’197 patent. For example, James D. Dana, *Descriptive Mineralogy* (6th Ed., Edward S. Dana ed., New York, John Wiley & Sons 1909) at 651, anticipates claims 1, 2, 3, and 16 of the ’197 patent, but does not reflect the limitation described in claim 4:



As a result, the Dana reference, but for the limitation in claim 4 and in claim 17(b)(iv) that the extension member facets be “triangular-shaped,” also discloses the subject matter of claims 5 through 9, and 17 through 19 of the ’197 patent.

By contrast, other figures such as that disclosed in Ian Mercer, *Crystals* at 58 (Cambridge, Mass., Harvard Univ. Press 1990) show facets that are “triangular” in shape, even if not composed of a single triangle; these references therefore anticipate claims 1 through 9 and 16 through 19 of the ’197 patent:




Models of crystals like the one depicted immediately above have been sold in the United States and elsewhere for more than 100 years for the study of crystallography, and remain commonplace in geology departments. *See*, *e.g.*, Early Crystal Models, http://www.mineralogy.be/models.html (last visited July 16, 2007). The model depicted below,

for example, is housed at the University of Rhode Island along with many dozens of other models; the one depicted here clearly anticipates at least claim 1 of the ’197 patent[3]:



In addition to the fact that the ’197 patent is invalid because the relevant claims are anticipated, each of the claims of the ’197 patent asserted to have been infringed by Hasbro are and, at the relevant time, would have been obvious to one skilled in the relevant art because they involve only “the simple substitution of one known element for another or the mere application of a known technique to a piece of prior art ready for the improvement.” *KSR Int’l v. Teleflex*, 550 U.S. ___, 127 S. Ct. 1727, 1741 (2007).

In light of the close relationship of crystallography, the geometry of crystals, and the pertinent art of the design of dice, the plaintiff’s invention was obvious in light of the prior art at all relevant times. Identical or substantially identical structures are present in the prior art, particularly the prior art in the fields of dice design and crystallography, the differences between which and the claimed die design would be immediately surmounted by application of ordinary skill in the art of the design of dice. Such differences are limited to (1) in some cases, the use of

3 The model depicted above does not have indicia on each of the faces of the object, and therefore does not anticipate claims 2 and 17 of the ’197 patent and the corresponding dependent claims. However, it is common for such models to have indicia on each of their facets. For example, the following model from the Krantz series of crystal models shows numerical indicia on each of its faces (from Mercer, *Crystals* at 59):



indicia on "extension member" faces, (2) in some cases, the extension of the end caps to a pyramidal point, and (3) the extrapolation of the design of the dice to dice with different numbers of indicating faces. The solution of these differences would have been readily apparent to one with ordinary skill in the relevant arts.

The prior art is replete with representations of the same or substantially the same geometric forms as those claimed in the '197 patent, including numerous representations of such figures in the context of crystallography and mineralogy.[4] *See* (in addition to the references *supra*), *e.g.*, Delvalle Lowry, *Conversations on Mineralogy* (Philadelphia, Uriah Hunt, 1822), at figs. 192, 201, 202, and 203; and George H. Williams, *Elements of Crystallography* (3[d] Ed. New York, H. Holt & Co., 1892) at 127. One example common to the prior art is depicted below:



[5]

As can be readily seen, this art is identical to the claimed six-sided die construction in the '197 patent except that the "end caps" are shortened, so that instead of a pyramidal shape, the ends have a sloped, then flattened shape:

---

4 The fields of solid geometry and crystallography are inextricably linked and have been for centuries. For example, reference continues to be made to "Haüy constructions" of various geometric solids, referring to the process of constructing polyhedra by the accumulation of identical building blocks, a method explained by René Just Haüy in his *Essai d'une théorie sur la structure des crystals appliquée à plusieurs genres de substances crystallisées* (1784). *See*, *e.g.*, http://mathworld.wolfram.com/HauyConstruction.html.

5 Bournon, *supra*, at Pl. 17.



Given such prior art, the claimed die construction in the '197 patent would have been obvious to one of ordinary skill in the art of the design of dice, who would only have to apply well documented and commonly understood principles of dice design to yield the claimed invention in its entirety.

It is well known to those with ordinary skill in the arts of dice and the design of dice that dice for use in generating a variety of randomized outcomes may be formed of polyhedral figures known initially, and primarily, in the crystallographic and mineralogical areas. For example, many of the traditional shapes for polyhedral dice are, in addition to being known geometric figures, also well-known crystallographic figures. The cube, for instance, which is the basis of the most common six-sided dice, is known in geometry as a Platonic solid, but also in crystallography as the crystalline form of fluorite. Stylistic modifications to the basic cubic form for a six-sided die echo other crystal forms as well:


[6]

131.


[7]


[8]

Likewise, the tetrahedron, commonly used as the basis for a four-sided die (and claimed as such in U.S. Pat. No. 3,208,754), is the basic crystal form of copper antimony sulfide (also known eponymously as tetrahedrite):

---

6 M. Reeks, *Hints for Crystal Drawing* (New York, Longman, Greens & Co. 1908) at 25.

7 F.S. Beudant, *Minéralogie* (Paris, Langlois & Leclercq 1851) at 22.

8 U.S. Pat. No. 1,539,015.

 [9] 

[10]  [11]

Diamond, among other substances, naturally crystallizes into a regular octahedron, its most common crystal habit and the basis of the common eight-sided die:



[12]  [13]  [14]

Closely related is the tetragonal bipyramid, similar in form but consisting of isosceles faces. This crystal form and the corresponding playing die are depicted immediately below:

 [15]  [16]

---

[9] Beudant, *supra* at n. 5, at 23.

[10] Wm. Phillips, *An Elementary Introduction to Mineralogy* (Brooke and Miller, eds., London, Longman *et al.* 1852) at 13.

[11] http://www.dicecollector.com/D4_OPAQUE_SHARP_SOLID_DRAGON_1.jpg.

[12] J. Müller, *Grundzüge der Krystallographie* (Braunschweig, Friedrich Vieweg & Sohn 1845) at 22.

[13] http://www.dicecollector.com/D8_OPAQUE_SHARP_SOLID_DIAMOND_DICE_01.jpg.

[14] U.S. Pat. No. 4,717,154.

[15] Edward S. Dana, *A Text-Book of Mineralogy* (New York, John Wiley & Sons 1908) at 60.

[16] http://www.dicecollector.com/D8_OPAQUE_SHARP_SOLID_TSR.jpg.

Where the design of dice departs from the most common forms of polyhedral dice, and where the dice have other than four, six, eight, ten, twelve, and twenty sides, the form of dice becomes steadily more disconnected from common geometry while the connection between crystallography and dice design becomes almost seamless. The most common twelve-sided dice, for example, are formed of pentagonal dodecahedra, a form also called a "pyritohedron" based on the fact that this form is a crystal habit of the mineral pyrite.


17


18


19

Another well-known method of producing twelve-sided dice is to employ a rhombic, not pentagonal, dodecahedron, a shape known as the crystal form of garnets and other minerals.


20

21

22


23

24

[17] James D. Dana, *Descriptive Mineralogy* (6th Ed., Edward S. Dana ed., New York, John Wiley & Sons 1909) at 85.

[18] U.S. Pat. No. 3,608,905.

[19] http://www.dicecollector.com/D12_OPAQUE_ROUNDED_SOLID_1.jpg.

[20] Fredrick Accum, *Elements of Crystallography* (London, Longman, Hurst, Rees, Orme, and Brown, 1813) at Pl. II.

[21] U.S. Pat. No. 1,517,113.

[22] U.S. Pat. No. 3,904,208.

[23] http://www.dicecollector.com/D12_OPAQUE_SHARP_SOLID_5.jpg.

[24] http://www.dicecollector.com/D12_OPAQUE_ROUNDED_SOLID_BLACK_LOUVRE_EGYPTIAN_COPY.jpg.

A further method of producing dice with different numbers of sides (so long as the total number of sides is even) is based on the use of dipyramidal structures analogous to the octahedral diamond example, above. Twelve-sided dice can be (and have been) made in the form of a truncated hexagonal dipyramid, the crystal habit of Bucklandite.


[25]

[26]

As noted above, eight-sided dice can be (and have been) made of square, or tetragonal, bipyramids, the crystal habit of scheelite. Four-sided dice can be (and have been) made in the form of a tetragonal disphenoid, a crystal habit of chalcopyrite:


[27]


[28]


[29]

Indeed, mineralogy has proved a great resource for dice design, whether directly or indirectly. One designer, at least, has created a six-sided die in the form of a tristetrahedron, known primarily as a crystal habit of the mineral sphalerite



[30]

[31]

---

[25] http://www.dicecollector.com/LOTTERY_07_ROLL_TO_RICHES.jpg.

[26] Dana, *supra* at n. 15, at 517.

[27] Reeks, *supra* at n. 4, at 95.

[28] U.S. Pat. No. 4,346,900.

[29] http://www.dicecollector.com/D4_OPAQUE_ROUNDED_SWIRL_WEDGE.jpg.

Other six-sided dice have been made of hexagonal prisms (a crystal habit of calcite), which can be modified (to avoid the possibility of the die landing on the ends) by the addition of "end caps":


[32]

[33]

The use of "end caps" is common in the prior art. U.S. Pat. No. 5,150,900, for example, discloses rounded end caps on an octagonal prism die:




Utilizing pyramidal end caps, as the plaintiff did, on a prismatic die yields the crystal form of quartz[34]:



[35]

In fact, this is apparently exactly what the plaintiff himself did in creating a "crystal"-shaped four-sided die for inclusion with his set of "crystal dice." He took a standard elongated cube and

---

[30] Edward S. Dana, *A Text-Book of Mineralogy* (New York, John Wiley & Sons 1908) at 48.

[31] http://www.dicecollector.com/PAPER_D06_MY_DESIGN_TRIAKIS_TETRAHEDRON_PIPPED.jpg.

[32] Dana, *supra* at n. 28, at 54.

[33] http://www.dicecollector.com/METAL_BRASS_D6_05.jpg.

[34] Edward S. Dana, *A Text-Book of Mineralogy* (New York, J. Wiley & Sons 1908) at 83.

[35] Dana, *supra* at n. 28, at 83.

placed pyramidal “end caps” on the form in order to prevent the dice from landing on any but the four rectangular faces. The Plaintiff’s die is virtually indistinguishable from the artwork created in the crystallographic context:



[36]


[37]

Such use of pyramidal end caps comprised of discrete facets is nothing new, but rather is present in the prior art involving the design of dice; and indeed, the use of pyramidal structures is itself suggested by the crystallographic prior art:


[38]

[39]

Other aspects of dice design involve the interpolation or extrapolation of existing crystal forms to yield additional types of dice, which do not occur naturally. For example, dice designers have varied the hexagonal prism die form, referenced above, by selecting a different number of sides, creating dice that consists of a prism of some selected number of non-pinacoidal sides:

---

36 P. Groth, *Physikalische Krystallographie* (Leipzig, Wilhelm Engelmann 1905) at 427.

37 http://crystalcaste.com/mm5/graphics/00000001/011xxF.gif.

38 U.S. Pat. No. 4,566,697.

39 Müller, *supra* at n. 10, at 26.

 [40]  [41]

Likewise, the notion of using dipyramidal or deltahedral structures (common in mineralogy) can be expanded to permit the creation of a theoretically infinite variety of dice. U.S. Pat. No. D323,684 discloses one such die, a fifty-sided bipyramidal structure. That die, the die manufactured under that patent, and other die forms following the same basic pattern are depicted immediately below:

 [42]  [43]  [44]  [45]

Essentially, die design has often comprised nothing more than the placement of indicia on certain, or all, faces of a corresponding crystal figure to create a functioning die. That is precisely what the plaintiff did in designing his dice, regardless of whether he believed the design to be innovative. One example not involving the plaintiff involves the 24-sided die disclosed (but not claimed) in U.S. Pat. No. 4,489,946. That die consists of a tetrahexahedron with indicia on each of the 24 faces of the polyhedron. The tetrahexahedron – the crystal habit of copper – has been well known in the crystallographic and mineralogical areas for centuries.

[40] http://www.dicecollector.com/D08_OPAQUE_SHARP_SOLID_STICK_02.jpg

[41] U.S. Pat. No. 4,900,034.

[42] U.S. Pat. No. D323,684.

[43] http://www.dicecollector.com/D50_OPAQUE_ROUNDED_SOLID.jpg.

[44] http://www.dicecollector.com/D34_OPAQUE_ROUNDED_SOLID_2.jpg.

[45] http://www.dicecollector.com/D16_OPAQUE_SHARP_SOLID_METASCAPE.jpg.

*See*, *e.g.*, Tennant and Mitchell, *Mineralogy and Crystallography* (London, R. Griffin & Co., 1860) at 308; P. Groth, *Physikalische Krystallographie* (Leipzig, Wilhelm Engelmann, 1905) at 521.


[46]


[47]


[48]

The dice are formed merely by placing indicia on the faces, something that is already reflected in the crystallographic reference shown above. Only subtly different from the tetrahexahedral shape of copper crystals, the crystallized form of Leucite forms a trapezohedral 24-sided shape disclosed in the prior art. Once again, dice design tracks the crystallographic forms perfectly:


[49]


[50]


[51]


[52]

In the context of the '197 patent, the plaintiff's invention amounted to nothing more than placing indicia on certain sides of a known crystal form. In essence, his die invention consisted of supplementing the indicia on the following shape, designed some two hundred years ago by

---

[46] T. Liebisch, *Geometrische Krystallographie* (Leipzig, Verlag von Wilhelm Engelman, 1881) at 235.

[47] U.S. Pat. No. 4,489,946.

[48] http://www.dicecollector.com/D24_PRODUCTION_GAMESCIENCE.jpg.

[49] http://webmineral.com/specimens/Leucite.jpg.

[50] P. Groth, *Physikalische Krystallographie* (Leipzig, Verlag von Wilhelm Engelmann 1876) at 323.

[51] Dana, *supra* at n. 28, at 460.

[52] http://www.dicecollector.com/D24_LD_DIFFUSION_01.jpg.

Jacques Louis, Comte de Bournon and now housed at the Natural History Museum in London, with five more numbers, a mere ministerial task for anyone with rudimentary knowledge of dice:



### 2. Hasbro's Request for *Ex Parte* Reexamination of the '197 Patent

Under federal law, any person can request that the PTO reexamine or reevaluate the patentability of any unexpired United States patent. *See* 35 U.S.C. § 302. In the context of patent infringement litigation, this process effectively shifts the burden of the reexamination process from the courts, where the matter would be decided by a jury upon instructions from the judge, to the PTO. *See*, *e.g.*, *eSoft, Inc. v. Blue Coat Systems, Inc.*, C.A. No. 06-442, 2007 WL 549843, *2 (D. Colo. Feb. 15, 2007) (citing *Canady v. Erbe Elektromedizin GmbH*, 271 F. Supp. 2d 64, 78 (D.D.C. 2002)). Reexamination may be sought only on the basis of prior art in the form of patents or printed publications. 35 U.S.C. §§301, 302.

Because the new prior art that Hasbro had discovered had not been considered by the PTO during the course of its original examination of the Plaintiff's patent application, and further because the new references fell within the scope of permissible art for an *ex parte* reexamination[53] under Section 302, on July 11, 2007 Hasbro requested that the PTO re-examine the '197 patent.[54] **Exhibit G**. The PTO has three months from the filing of the request to

---

[53] The reexamination is deemed "*ex parte*" because the requesting party (here, Hasbro) may not participate in the process. *See* 37 C.F.R. § 1.550(g) ("The active participation of the ex parte reexamination requester ends with the reply pursuant to § 1.535, and no further submissions on behalf of the reexamination requester will be acknowledged or considered.").

[54] As mentioned above, a request for *ex parte* reexamination is limited to certain types of prior art, so not all references included in the discussion above were included in the request for reexamination.

determine whether Hasbro's request raises "a substantial new question of patentability affecting any claim of the patent." 35 U.S.C. § 303(a); 37 C.F.R. § 1.1515. If the PTO concludes that the request does raise a substantial new question of patentability, the PTO will conduct a new examination of the patent claims in the same manner as its original examination of the Plaintiff's application, within the subject matter limitations of the reexamination procedure. 35 U.S.C. § 304; 37 C.F.R. § 1.552.

Hasbro anticipates that the PTO will grant the reexamination and, at the chambers conference at which this issue was recently raised, counsel for the Plaintiff agreed. The next step will then be for the PTO to issue an initial "office action," which Hasbro anticipates will issue within approximately one year to one year and a half. If the office action indicates that the PTO intends to find all of the claims valid, presumably the Plaintiff will be satisfied and no further substantive action by the PTO would be necessary. In the event the PTO's initial office action suggests that it intends to invalidate some or all of the claims as written, the process would likely continue (assuming the Plaintiff wishes to press the matter). However, that initial office action would provide this Court with, in effect, a "status report" germane to whether it makes sense to continue to stay this matter.

## Argument

### 1. A Stay of Proceedings Would Serve the Interests of Justice

Since the close of discovery in this case, Hasbro has become aware of significant prior art that was not disclosed to or reviewed by the patent examiner during the prosecution of the '197 Patent. Hasbro submits that the '197 Patent would not have issued had this prior art been disclosed to or reviewed by the patent examiner during that prosecution. Hasbro further submits that this prior art is sufficient to render all claims, or at the very least all relevant claims, of the '197 Patent invalid at this time. Hasbro anticipates that the reexamination of the '197 Patent will

result in its invalidation, or at a minimum, in significant limitations to the scope of the claims asserted in the patent. The outcome of the reexamination procedure will have a substantial, and perhaps dispositive, impact on the issues in this litigation. Rather than forcing the parties to incur the expense of litigating these issues when the PTO is likely to substantially alter or invalidate the claims (thus rendering the Plaintiff's patent infringement claims moot), Hasbro asks that this action be stayed pending resolution of the reexamination procedure before the PTO.

**a. <u>Public Policy Favors Stays</u>**

It is entirely within the discretion of this Court to order a stay pending conclusion of a reexamination by the PTO. *Ethicon, Inc. v. Quigg*, 849 F.2d 1422 (Fed. Cir. 1988) (citing *Landis v. North American Co.*, 299 U.S. 248, 254 (1936)); *Lentek International, Inc. v. Sharper Image Corp.*, 169 F. Supp. 2d 1360, 1362 (M.D.Fla. 2001).[55] Reexamination of patent validity is authorized under 35 U.S.C. Section 301 *et seq.*, and "the sponsors of the patent reexamination legislation clearly favored the liberal grant of stays by the district courts when patents are submitted for reexamination as a mechanism for settling disputes quickly and less expensively and for providing the district courts with the expertise of the patent office." *Id.* (citations omitted); *see also Gould v. Control Laser Corp.*, 705 F.2d 1340, 1342, 217 USPQ 985, 986 (Fed. Cir. 1983) (discussing legislative history).

As explained by then Chief Judge Markey of the Federal Circuit, "[o]ne purpose of the reexamination procedure is to eliminate trial of [a patent claim validity] issue (when the claim is cancelled) or to facilitate trial of that issue by providing the district court with the expert view of

---

[55] Indeed, as mentioned at the chambers conference at which the issue of a possible stay was first mentioned, this Court has previously granted stays under analogous situations. In the *Hasbro v. Rose Art Indus., Inc.* matter (C.A. No. 04-448S), the Court granted cross-motions to stay proceedings pending the outcome of Hasbro's reissue application and the defendant's *inter partes* reexamination request. In that case, the Court initially stayed the matter for one year, directing quarterly status reports. *See* Docket Entry No. 40.

the PTO (when a claim survives the reexamination proceeding)." *Gould*, 705 F.2d at 1342. In addition to being appropriate and encouraged, there are several benefits to suspending litigation while a PTO proceeding is underway. For example, all prior art presented to the Court will have been first considered by the PTO, with its particular expertise; many discovery problems relating to prior art can be alleviated by the PTO examination; and, in those cases resulting in effective invalidity of the patent, the suit will likely be dismissed. Courts have found such rationales to justify staying proceedings while the PTO conducts its examination. *See*, *e.g.*, *United Merchants and Mfrs., Inc. v. Henderson*, 495 F. Supp. 444, 447 (N.D.Ga. 1980) (granting stay); *Fisher Controls C.O., Inc. v. Control Components*, 443 F. Supp. 581, 582 (S.D.Iowa 1977) (same). Additionally, the outcome of the reexamination may encourage a settlement without the further use of the Court; the record of reexamination would likely be entered at trial, thereby reducing the complexity and length of the litigation; and issues, defenses, and evidence will be more easily limited in pre-trial conferences after a reexamination. *United Merchants*, 495 F. Supp. at 447; *Fisher Controls*, 443 F. Supp. at 582. Finally, the cost will likely be reduced both for the parties and for the Court. *United Merchants*, 495 F. Supp. at 447; *Fisher Controls*, 443 F. Supp. at 582.

All of the benefits listed above apply here. The requested reexamination is based upon significant prior art that was not previously considered by the PTO during the initial prosecution of the '197 Patent. This prior art can now be considered by the PTO with its particular expertise, and the litigation of this case can benefit from that review. The results of the reexamination will likely serve to alleviate the need for substantial discovery and litigation relating to the prior art cited *supra*. Moreover, Hasbro anticipates that the reexamination will result in a finding of

invalidity of all of the relevant claims of the '197 Patent, which should result in the dismissal of this action.

**b. <u>The PTO Treats Reexaminations with "Special Dispatch"</u>**

The Patent Office is required by statute and regulation to conduct reexamination proceedings with "special dispatch." 35 U.S.C. § 305; 37 C.F.R. § 1.550. Such language "envisions some type of unique, extraordinary, or accelerated movement." *Ethicon*, 849 F.2d at 1426. The Patent Office has expressly instructed its employees to handle reexaminations accordingly: "In view of the requirement for 'special dispatch,' reexamination proceedings will be 'special' throughout their pendency in the Office." *See* Manual of Patent Examining Procedure § 2261 (**Exhibit H**). Thus, the duration of the proposed stay should be minimized by the Patent Office's guidelines requiring a swift reexamination proceeding. The proceedings are further expedited when a stay of pending litigation has been granted as the patentee then is given only one month to respond to communications from the Patent Office, instead of two months. *See id.* at § 2263.

**c. <u>A Stay Is Warranted</u>**

In determining whether to stay litigation pending reexamination by the PTO, courts generally consider the following factors:

> (1) whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party;
>
> (2) whether a stay will simplify the issues in question and trial of the case; and
>
> (3) whether discovery is complete and whether a trial date has been set.

*See, e.g.*, *United Sweetener USA, Inc. v. Nutrasweet Co.*, 766 F. Supp. 212, 217 (D. Del. 1991). Reviewing each of these issues weighs in favor of granting a stay in this matter

A stay will not prejudice Plaintiff or present any sort of tactical disadvantage. There is no ongoing alleged infringement; Plaintiff will suffer no irreparable harm by any delay. Even if the Plaintiff is successful in this suit following a stay, his royalty damages would fully compensate any harm done during the stay.[56] *See Emhart Indus., Inc. v. Sankyo Seiki Mfg. Co.*, 1987 WL 6314, at *2 (N.D. Ill. Feb. 2, 1987) (granting stay where money damages would be sufficient to compensate patentee for any alleged infringement during stay); *Perricone v. Unimed Nutritional Services, Inc.*, 2002 WL 31075868, at *3 (D. Conn. July 18, 2002) (same). Hasbro discerns no tactical advantage or disadvantage from a stay (except for avoiding the possibility of the manifestly unjust result of the Plaintiff obtaining a final judgment and payment of royalties based on a patent that the PTO later determines to have been wrongfully issued).

Certainly there has been no undue delay on Hasbro's part in bringing this matter to trial. Although the facts of the case go back seven years and more, this case was only filed in May 2005. It was the Plaintiff's lackadaisical approach to litigation, and nothing done by Hasbro, that resulted in fully five years' delay. Even if one were to the **entire** period during which this case has been pending as delay by Hasbro, and even if the PTO were to take over two years to reach a conclusion on the reexamination, Hasbro would not have "delayed" this case any more than the Plaintiff himself did. If this case is "old," that fact lies squarely at the feet of the Plaintiff, and that fact is key in determining whether to grant a stay here. See *Ingro v. Tyco Indus., Inc.*, 1985 WL 1649, at *3 (N.D. Ill. May 31, 1985) ("especially in light of plaintiff's own delay in initiating litigation, a stay pending completion of reexamination proceedings . . . will constitute neither undue nor unreasonable delay").

[56] Additionally, if the Plaintiff ultimately obtains a verdict against Hasbro, its value will have been enhanced by Rhode Island's 12% prejudgment interest rate, a far better rate of return than the current post-judgment rates available under 28 U.S.C. § 1961.

Moreover, Plaintiff will be provided a full opportunity to present his position and arguments on the validity of the patent claims over the prior art before the PTO, which is best suited to consider those issues with its particular expertise. A stay will actually benefit Plaintiff during the course of the reexamination by avoiding the need to simultaneously litigate these issues in two separate fora. Most importantly, a stay during the reexamination of the patent at issue will most certainly serve to simplify the issues in question, and to simplify any eventual trial. The reexamination of the patent at issue will, by necessity, result in a) a finding of invalidity of the patent; b) a finding of invalidity of certain claims, or the limitation of the scope of those claims; or c) a finding of validity of all of the claims over the prior art. Any of these results will simplify the issues in question in this matter. A finding of invalidity of the patent will result in the dismissal of the action. A finding of invalidity of certain claims, or limiting the scope of those claims, will eliminate numerous issues, thereby eliminating the need to perform discovery on those issues and the need to litigate those issues at trial. Even a finding of validity of the claims will provide this Court with the benefit of the PTO's scrutiny of the claims, and may well eliminate some of Hasbro's defenses or counterclaims. If the PTO upholds the validity of Plaintiff's patent, "the plaintiff's rights will only be strengthened, as the challenger's burden of proof becomes more difficult to sustain." *Pegasus Dev. Corp. v. Directv, Inc.*, 2003 WL 21105073, at *2 (D. Del. May 14, 2003) (citing *Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*, 807 F.2d 955, 961 (Fed. Cir. 1986)). Of course, any of these results will also serve to dramatically reduce the costs of any remaining litigation to both parties.

Finally, the fact that fact discovery is closed does not militate against the grant of a stay. *See*, *e.g.*, *Gould v. Control Laser Corp.*, 705 F.2d 1340 (Fed. Cir. 1983) (stay granted five years after commencement of litigation and only 20 days before trial); *Grayling Industries, Inc. v.*

*GPAC, Inc.*, 1991 WL 236196, at *3 (N.D.Ga. Mar. 25, 1991) (stay granted with discovery completed and only trial remaining in case); *Emhart Indus.,* 1987 WL 6314 at *1, *3 (granting stay despite the parties having engaged in "costly" discovery, including depositions and document production in Japan); *Loffland Brothers Co. v. Mid-Western Energy Corp.*, 1985 WL 1483 at *1 (W.D.Okla. Jan. 3, 1985) (stay granted after significant discovery, pretrial conference, and trial date set). As explained below, even if a stay is not granted, the Court should reopen discovery in order to permit the question of the validity of the '197 Patent to be aired before the jury. To do otherwise would be to turn a blind eye to the truth in favor of allowing the Plaintiff to collect a potential jackpot judgment against Hasbro based on a patent that is, and will ultimately be found to be, invalid. Although the period of discovery need not be long, it will of necessity cause both parties to incur litigation costs and render more complex the parties' pretrial submissions. A stay pending review by the PTO would avoid this cost for both parties. Of course, it almost goes without saying that a stay would avoid the significant cost and burden to both the parties and the Court of empanelling and jury and taking the matter through a trial that may be utterly unnecessary. "Put simply, trial time doesn't always tell the tale." *Broadcast Innovation, LLC v. Charter Communications, Inc.*, C.A. No. 03-2223, 2006 WL 1897165, *9 (D. Colo. July 11, 2006) (citing cases).

**2. <u>In the Alternative, Discovery Should be Reopened to Permit Hasbro to Present Evidence That the '197 Patent Is Invalid</u>**

Should the Court decline to stay these proceedings at all, Hasbro respectfully requests that the Court reopen discovery for the limited purpose of permitting Hasbro to identify appropriate expert testimony in order to present evidence germane to the validity of the Plaintiff's patent. Hasbro respectfully submits that a period of 45 days would be sufficient for

Hasbro to make supplemental disclosures pursuant to Fed. R. Civ. P. Rule 26(b)(2) and for the Plaintiff to depose any experts so designated.

If the Court does not reopen discovery on this issue, it will effectively preclude Hasbro from presenting material, probative evidence at trial No good grounds exist for excluding the prior art evidence that Hasbro contends to invalidate the '197 Patent. First and foremost, the Hasbro's disclosure of the prior art is timely under 35 U.S.C. § 282. Section 282 sets a deadline (which may be shortened by the trial court as it deems appropriate) of 30 days prior to trial for the disclosure of prior art that is to be used in connection with an invalidity defense. There is not any trial date; Hasbro disclosed the relevant prior art in June 2007. The information is not "late" or "untimely" or "unfair."

Although this evidence has come to the fore only after the close of discovery, the fact that Hasbro had not found it earlier should come as no surprise and is not a basis for precluding Hasbro from using the evidence at trial. The basic rules governing this action recognize that not all salient facts or admissible evidence will be immediately available to litigants, and therefore place an affirmative burden on parties "to supplement or correct the disclosure or response to include information thereafter acquired." Fed. R. Civ. P. Rule 26(e). Rule 26(e)(2) clarifies this requirement, stating that a "party is under a duty seasonably to amend a prior response to an interrogatory, request for production, or request for admission if the party learns that the response is in some material respect incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." This duty continues to and through the trial. *See*, *e.g.*, *Weiss v. Chrysler Motors Corp.*, 515 F.2d 449, 457 (2d Cir. 1975) (rejecting claim that duty to supplement ends at

commencement of trial). Where a party fails to make timely disclosures, sanctions can include exclusion of the evidence. *See* Fed. R. Civ. P. Rule 37(c).

The corollary to Rule 37's exclusion of evidence not timely disclosed is the maxim that where it is timely disclosed, parties should be free to present relevant, probative evidence in support of claims or defenses. *See*, *e.g.*, *Doe v. Solvay Pharm., Inc.*, 153 F. App'x 1, 2-3 (1st Cir. 2005) (no exclusion of evidence where no discovery misconduct under Rule 37(c)(1)). This is, of course, consistent with the basic principles underlying federal court litigation. *See*, *e.g.*, Fed. R. Civ. P. Rule 1 (mandating construction of rules to "secure the just, speedy, and inexpensive determination of every action"); Fed. R. Evid. R. 102 (mandating construction to "secure fairness in administration, elimination of unjustifiable expense and delay, and promotion of growth and development of the law of evidence to the end that truth may be ascertained and proceedings justly determined"); and Fed. R. Evid. R. 402 ("All relevant evidence is admissible, except as otherwise provided [….]). To prohibit Hasbro from arguing that 

and 

anticipate  would be contrary to principles of justice and truth.

Reopening discovery to allow the presentation of this evidence at trial would be consistent with other courts' treatment of similar facts. Where courts have found that staying an action in favor of PTO reexamination of a patent in suit is not appropriate, they have uniformly allowed the evidence to be presented at trial. *See*, *e.g.*, *Synopsys, Inc. v. Magma Design Automation*, C.A. No. 05-701, 2006 WL 1452803, *5 (D. Del. May 25, 2006) ("The validity of the asserted patents will be litigated regardless of whether a stay is granted because that issue is

relevant to Magma's Sherman Act claims. The most efficient course of action, then, is to also litigate infringement in order to capitalize on the jury's understanding of the relevant technology."); *In re Columbia Univ. Pat. Litig.*, 330 F. Supp. 2d 12, 14 (D. Mass 2004) (denying stay but directing trial on issues also presented to PTO for review in reexamination proceedings); *see also Nillsen v. Universal Lighting Technologies*, C.A. No. 04-80, 2006 WL 38909, *3 (M.D. Tenn. Jan. 5, 2006) (granting stay during PTO reexamination but noting that "depending upon the outcome of the reexamination, the Court will likely be required to permit the parties to completely re-open expert discovery, including the re-submission of Rule 26 expert disclosures, to address any changes in the scope of this litigation."). Hasbro is not aware of any case in which relevant prior art has been excluded without a showing that its disclosure was unreasonably delayed, a completely inapplicable circumstance. The information was timely presented to the Plaintiff, who can suffer no prejudice from a full airing of the facts as they pertain to the validity of his patent. The short delay necessary to present this evidence pales in comparison to the importance of permitting the factfinder to determine whether the Plaintiff has any valid patent claims whatsoever. To preclude Hasbro from presenting this evidence in an orderly fashion would be both unfair and unjust, particularly where the solution is to simply reopen discovery for a short period.

**Conclusion**

For all of the foregoing reasons, a stay of this proceeding pending the completion of the reexamination of the '197 Patent is favored and appropriate. This request is not made for purposes of delay, but instead to promote judicial efficiency by eliminating duplicate litigation and insuring consistency with regard to rulings on the validity and scope of the '197 Patent. Should the Court choose not to stay these proceedings, reopening discovery for the limited

purpose of permitting expert discovery on issues relating to the newly discovered prior art is both warranted and appropriate.

Respectfully submitted,

HASBRO, INC.
By its Attorneys,

/s/ Jeffrey K. Techentin________
Todd D. White (#5943)
twhite@apslaw.com
Jeffrey K. Techentin (#6651)
jtechentin@apslaw.com
Adler Pollock & Sheehan P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903
(401) 274-7200
Fax: (401) 751-0604/ 351-4607
Dated: July 20, 2007

Of Counsel:

David K. S. Cornwell, Esq.
davidc@skgf.com
Tracy-Gene G. Durkin, Esq.
tdurkin@skgf.com
Sterne Kessler Goldstein Fox
1100 New York Avenue, NW
Washington, D.C. 20005

**CERTIFICATE OF SERVICE**

TO:

Craig M. Scott, Esq.
Christine K. Bush, Esq.
Duffy & Sweeney & Scott, Ltd.
One Turks Head Place, Suite 1200
Providence, RI 02903

Thomas J. Leach, Esq.
Douglas J. Williams, Esq.
Law Firm of Merchant and Gould P.C.
3200 IDS Center
80 South 8th Street
Minneapolis, Minnesota 55402-2215

David K. S. Cornwell, Esq.
Tracy-Gene G. Durkin, Esq.
Sterne Kessler Goldstein Fox
1100 New York Avenue, NW
Washington, D.C. 20005

I hereby certify that I filed the within Motion to Stay Proceedings Pending *Ex Parte* Reexamination of Patent or, in the Alternative, for Leave to Reopen Discovery and the Memorandum of Law in support thereof through the ECF system on the 20th day of July, 2007, and that notice will be sent electronically to the above-named counsel who are registered participants identified on the Mailing Information for Case No. 05-229S.

/s/ Jeffrey K. Techentin__________

*423271_1*