# EXHIBIT U

LEXSEE

Analysis
As of: Aug 09, 2007

**Presstek, Inc. v. Creo, Inc. and Creo Americas, Inc.**

**Case No. 05-cv-65-PB**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW HAMPSHIRE**

**2007 DNH 44; 2007 U.S. Dist. LEXIS 24170**

**March 30, 2007, Decided**

**NOTICE:** [*1] NOT FOR PUBLICATION

**SUBSEQUENT HISTORY:** Summary judgment denied by Presstek, Inc. v. Creo, Inc., 2007 U.S. Dist. LEXIS 24126 (D.N.H., 2007)

**COUNSEL:** For Presstek, Inc., Plaintiff: Arpiar G. Saunders, Jr., LEAD ATTORNEY, James D. Rosenberg, Shaheen & Gordon (Concord), Concord, NH; Brian A. Comack, LEAD ATTORNEY, Kenneth P. George, LEAD ATTORNEY, Michael J. Kasdan, LEAD ATTORNEY, Michael V. Solomita, LEAD ATTORNEY, Amster Rothstein & Ebenstein LLP, New York, NY.

For Creo Inc., Creo Americas, Inc., Defendants: Lisa J. Pirozzolo, LEAD ATTORNEY, William F. Lee, LEAD ATTORNEY, Wilmer Cutler Pickering Hale & Dorr LLP (MA), Boston, MA; Nora Q.E. Passamaneck, LEAD ATTORNEY, S. Calvin Walden, LEAD ATTORNEY, Wilmer Cutler Pickering Hale & Dorr LLP (NY), New York, NY; Gordon J. MacDonald, Nixon Peabody LLP, Manchester, NH.

For Creo Inc., Creo Americas, Inc., Counter Claimants: Gordon J. MacDonald, Nixon Peabody LLP, Manchester, NH.

For Creo Inc., Creo Americas, Inc., Counter Defendants: Gordon J. MacDonald, Nixon Peabody LLP, Manchester, NH.

**JUDGES:** Paul Barbadoro, United States District Judge.

**OPINION BY:** Paul Barbadoro

**OPINION**

***MEMORANDUM AND ORDER***

Creo, Inc. and Creo Americas, Inc. (collectively "Creo") have moved to strike supplemental expert disclosures filed by Presstek, Inc. on the ground that they were [*2] filed after the parties' agreed-upon deadline for expert disclosures. Presstek denies that the disclosures were late and alternatively claims that they should not be stricken because it was justified in making the disclosures when it did, Creo was not unfairly prejudiced by the late disclosures and, in any event, a less drastic sanction is all that is necessary under the circumstances.

**I. *BACKGROUND***

**A. *The Infringement Claim***

Presstek is the owner of U.S. Patent No. 5,353,705 (filed Sept. 22, 1993) ("the '705 Patent"), entitled "Lithographic Printing Members Having Secondary Ablation Layers For Use With Laser Discharge Imaging Apparatus." The '705 Patent discloses a multilayer lithographic printing plate suitable for laser imaging. The '705 Patent's sole independent claim reads:

> 1. A lithographic printing member directly imageable by laser discharge, the member comprising:
>
> a. a topmost first layer; and

b. a second layer underlying the first layer, the second layer being characterized by ablative absorption of laser radiation;

c. a third layer underlying the second layer, the third layer:

i. being substantially transparent to [*3] the laser radiation;

ii. being ablated only partially in response to ablation of the second layer; and

iii. differing from the first layer in its affinity for at least one printing liquid selected from the group consisting of ink and a fluid that repels ink.

In the underlying patent infringement action, Presstek has sued Creo, claiming Creo's lithographic printing plate, the Clarus WL, infringes the '705 Patent because it is comprised of: (1) a topmost silicon layer, (2) an underlying second layer made of carbon black/nitrocellulose which fully ablates [1] during imaging, and (3) an underlying third layer made of amorphous Polyethlene Terephthalate ("PET") which partially ablates in response to heat generated during ablation of the carbon black/nitrocellulose layer. The parties disagree as to whether the Clarus WL has a third layer of amorphous PET and, if so, whether the third layer partially ablates during the laser imaging process.

1 The '705 Patent defines "ablate" to mean "decomposes into gases and volatile fragments." '705 Patent col.5 11.16-19.

[*4] **B. *Discovery Plan***

A court-approved Amended Discovery Plan sets the deadlines for expert disclosures in this case. (Doc. Nos. 19, 54). The initial Discovery Plan includes a paragraph entitled "Dates Of Disclosure of Experts And Experts' Written Reports And Supplementations." [2] (Doc. No. 19 at 5). The paragraph states

The parties will exchange case-in-chief testifying expert reports on issues for which each party bears the burden of proof (e.g., patent infringement and damages for Plaintiff, patent invalidity for Defendants) on February 6, 2006. The parties will exchange rebuttal testifying expert reports on issues for which each party does not bear the burden of proof (e.g., patent validity for Plaintiff, patent non-infringement and damages for Defendants) on March 8, 2006. Depositions of testifying experts will occur within the following 30 days.

The Magistrate Judge subsequently approved an Assented-To Motion To Amend the Discovery Plan, which set September 15, 2006 as the date for the completion of discovery and extended the expert disclosure dates to July 21, 2006 for initial expert reports and August 18, 2006 for rebuttal expert reports. (Doc. No. [*5] 54).

2 The caption is taken from Civil Form 2, "Sample Discovery Plan," which is appended to the Local Rules. The form calls for the specification of expert disclosure dates for plaintiffs and defendants as well as any agreed-upon dates for supplemental disclosures.

**C. *Dr. Gido's Initial Infringement Report***

In accordance with the amended discovery plan, Presstek disclosed a report prepared by its infringement expert, Dr. Samuel P. Gido, on July 21, 2006. (Presstek Opposition to Motion for Summ. J., Ex. 2, Doc. No. 60-4 ("Gido I")). In preparing the report, Dr. Gido employed several different techniques to examine both imaged and unimaged samples of the Clarus WL. Using transmission electron microscopy ("TEM") on an unimaged sample, Dr. Gido concluded that the Clarus WL includes a topmost silicone layer and an underlying second layer of carbon black/nitrocellulose, which together measure 0.5 microns thick. Through selected area electron diffraction ("SAED"), he also determined that the Clarus WL [*6] has a 6-7 micron thick layer of amorphous PET between the carbon black/nitrocellulose layer and a semi-crystalline PET substrate. Dr. Gido also used scanning electron microscopy ("SEM") and atomic force microscopy ("AFM") on an imaged sample to measure the depth of the features that result from imaging. Using SEM, Dr. Gido obtained depth measurements ranging from 1.3 to 2.0 microns, depending upon the location sampled. Using AFM, Dr. Gido obtained depth measurements ranging from 1.2 to 1.8 microns. He then subtracted his thickness measurement of the top two layers

(0.5 microns) from the combined range of depth measurements for imaged features (1.2 to 2.0 microns) to determine that imaging produced features that extend from 0.7 to 1.5 microns into the amorphous PET. Dr. Gido then opined that imaging extended into the amorphous PET because the amorphous PET partially ablated in response to heat generated in the carbon black/nitrocellulose layer during its ablation. Dr. Gido did not perform any additional tests in an effort to specifically demonstrate that PET gas molecules were released as a byproduct of the imaging process.

**D. *Creo's Experts' Rebuttal***

On August 18, 2006, Creo [*7] responded with rebuttal reports from its experts, Dr. Michael F. Rubner and Brian G. Eastman. (Creo's Assented-To Motion For Leave To File Sur-reply, Ex. 8, Doc. No. 74-11 ("Rubner Rebuttal"); Presstek's Sur-reply to Creo's Motion for Summ. J., Ex. 9, Doc. No. 76-6 ("Eastman Rebuttal")). They reported that the actual thickness of the top two layers of the Clarus WL is at least 2 microns thick, rather than 0.5 microns as reported by Dr. Gido. Dr. Gido's measurement, they opined, undermines his conclusion that imaging extends into the amorphous PET. Furthermore, they claimed that Dr. Gido had failed to offer any persuasive evidence that PET removal results from ablation even if his depth measurements were correct.

**E. *Deposition of Creo's Expert, Dr. Rubner***

On September 14, 2006, Presstek's counsel took Dr. Rubner's deposition. (Creo's Sur-reply to its Motion for Summ. J., Ex. 11, Doc. No. 104-17). Presstek's counsel asked Dr. Rubner questions about two tests that Dr. Gido had not conducted or included in his initial report but that, unbeknownst to Creo, he would conduct the next day. First, Presstek's counsel asked whether measuring terephthalic acid as a byproduct of [*8] imaging would indicate partial ablation of PET, to which Dr. Rubner replied yes. *Id.* at 145. Second, he asked Dr. Rubner whether optical microscopy could be used to show partial ablation of PET, to which Dr. Rubner replied no. *Id.* at 146-48.

**F. *Dr. Gido's Supplemental Report***

After reviewing Presstek's expert disclosures, Presstek commissioned Dr. Gido to conduct additional testing. On September 15, 2006, the last day scheduled for discovery, and the same day Dr. Gido completed his work, Presstek filed supplemental expert disclosures. (Presstek's Sur-reply to Creo's Motion for Summ. J., Ex. 12, Doc. No. 76-10 ("Gido II")).

The supplemental disclosures describe several additional procedures that Dr. Gido and a new expert, Dr. Daniel J. Seyer, performed after Presstek made its initial disclosure. As the supplemental disclosures describe, Dr. Gido took SEM micrographs of an imaged sample of the Clarus WL using a new sample preparation method and concluded that the top two layers of the product measured 1.33 microns thick, rather than 0.5 microns thick as he had previously concluded through TEM analysis. Dr. Gido also used SEM to arrive at new depth measurements [*9] for features produced by imaging. Using this technique, Dr. Gido concluded that the depth of features he analyzed ranged from 1.5 to 2.2 microns. After subtracting his new thickness measurement for the Clarus WL's top two layers (1.3 microns) from his new range of depth measurements (1.5 to 2.2 microns), Dr. Gido determined that the imaging process caused depressions into the amorphous PET ranging from 0.2 to 0.9 microns, rather than from 0.7 to 1.5 microns as he had originally claimed.

Dr. Gido also reported on two new tests that he relied on to respond to other criticisms of his initial disclosure. Specifically, he used optical microscopy and reviewed the results of liquid chromatography/mass spectroscopy (LCMS) tests that had been performed for him by Dr. Seyer. (Gido II at PP 23-26, 27-31). These are the same two procedures that Presstek's counsel had asked Dr. Rubner about during his deposition one day earlier. Dr. Gido used these tests to confirm his initial opinion that imaging causes the Clarus WL's carbon black/nitrocellulose layer to fully ablate and amorphous PET to partially ablate. Dr. Gido's supplemental disclosure included an attached report from Dr. Seyer, summarizing [*10] his chemical testing and analysis of debris left on the Clarus WL printing plate following laser imaging.

**G. *The Aftermath***

On September 18 and 19, 2006, the parties exchanged letters of disagreement as to whether Presstek's September 15th reports were proper. (Creo's Sur-reply to its Motion for Summ. J., Ex. 12-13, Doc. No. 104-18/18). On September 19, 2006, four days after receiving Presstek's supplemental disclosures, Creo deposed Dr. Gido. On September 26, 2006, Creo filed this motion to strike. On September 27, 2006, Presstek offered to make both Dr. Gido and Dr. Seyer available for depositions and to permit Creo to submit a supplemental rebuttal report addressing the new report. (Presstek's Opposition to Creo's Motion to Strike, Ex. 8, Doc. No. 98-10). Creo declined the offer. (*Id.*, Ex. 9, Doc. No. 98-11).

**II. *ANALYSIS***

Creo contends that Dr. Gido's supplemental disclosure and Dr. Seyer's supporting report should be stricken pursuant to Fed. R. Civ. P. 37(c)(1) because they were filed after the amended discovery plan's expert disclosure deadline. Presstek responds by claiming that the disclosures are permitted [*11] by Fed. R. Civ. P. 26(a)(2)(C)

and Fed. R. Civ. P. 26(e). Alternatively, it argues that the disclosures should not be stricken pursuant to Rule 37(c)(1) even if they were late because: (1) its delay in making the disclosures was substantially justified, (2) Creo was not unfairly prejudiced by the late disclosures, and (3) a less drastic sanction than preclusion is all that is required under the circumstances.

I begin by addressing Presstek's contention that the supplemental disclosures were timely under Rule 26(a)(2)(C) and Rule 26(e). I then turn to the parties' arguments under Rule 37(c)(1).

**A. *Rule 26(a)(2)(C)***

Rule 26(a)(2)(C) establishes a default time line for the disclosure of expert materials. Fed. R. Civ. P. 26(a)(2)(C). The rule provides that, "in the absence of other directions from the court or stipulation by the parties, the disclosures shall be made at least 90 days before the trial date or the date the case is to be ready for trial." *Id.* Disclosures intended "solely to contradict or rebut evidence on the same subject matter identified [*12] by another party" must be filed no later than 30 days after the disclosure to which it responds, and supplemental disclosures must be made when required by Rule 26(e). *Id.* Rule 26(e) provides that supplemental disclosures must be made "at appropriate intervals" but no later than the date that final pretrial disclosures are due under Fed. R. Civ. P. 26(a)(3).

Rule 26(a)(2)(C)'s default disclosure schedule is inapplicable here because the parties specified their own dates for expert disclosures in the court-approved amended discovery plan. Under the plan, Presstek agreed to make its expert disclosures on the issue of infringement by July 21, 2006. It did not reserve the right to make additional disclosures to respond to Creo's expert disclosures. Accordingly, its September 15, 2006 disclosures were not timely unless they qualify as supplemental disclosures under Rule 26(e).

**B. *Rule 26(e)***

Under Rule 26(e)(1), a party has a "duty to supplement or correct" expert reports if the party learns that the original report is either "incomplete or incorrect and if the additional or corrective information has not otherwise been made known [*13] to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1). The duty to supplement is intended to benefit the recipient of the earlier disclosure by correcting misinformation or omissions in the prior disclosure. It "does not grant a license to supplement a previously filed expert report because a party wants to, but instead imposes an obligation to supplement the report when a party discovers the information it has disclosed is incomplete or incorrect." *Coles v. Perry*, 217 F.R.D. 1, 3 (D.D.C. 2003).

This case provides useful examples that help distinguish cases in which supplementation is authorized under Rule 26(e) from those where it is not. Dr. Gido's acknowledgment in his supplemental disclosure that the top two layers of Clarus WL were actually 1.3 microns thick rather than 0.5 microns thick is the type of supplemental disclosure that is contemplated by Rule 26(e). Dr. Gido discovered that his initial measurement was erroneous after he prepared his initial report, and his supplemental disclosure corrects his earlier error on this point. The remaining disclosures, in contrast, do not correct [*14] misstatements or misleading omissions in the earlier disclosure. Instead, they describe new work that attempts to bolster Dr. Gido's previously disclosed opinions and immunize them from attack by Creo's experts.

Rule 26(e) cannot reasonably be read to encompass expert disclosures that merely serve to bolster previously disclosed opinions without compromising the default discovery schedule envisioned by Rule 26(a)(2)(C). [3] Rule 26(a)(2)(C)'s default disclosure schedule draws sharp distinctions between initial disclosures, disclosures that are intended "solely to contradict or rebut evidence on the same subject matter identified by another party," and supplemental disclosures covered by Rule 26(e). If Presstek were correct in claiming that Dr. Gido's new depth measurements and test results qualify as supplemental disclosures under Rule 26(e), then Rule 26(a)(2)(C)'s distinction between rebuttal disclosures and supplemental disclosures would be meaningless because the new depth measurements and test results rebut Creo's expert disclosures rather than correct misstatements or misleading omissions in the initial disclosure.

3 Although, as discussed above, Rule 26(a)(2)(C)'s default schedule is inapplicable in this case, the rule remains relevant to my analysis because it is important to consider it when construing related rules such as Rule 26(e).

[*15] Presstek's reading of Rule 26(e) is also unreasonable because it is inconsistent with the rule's manifest purpose. Rule 26(e) exists to protect recipients of information. It is not designed to give producing parties a way to avoid agreed-upon discovery deadlines. Instead, if a party needs to conduct additional tests to respond to criticism leveled by an opposing party's experts after agreed-upon disclosure deadlines have passed, the proper course of action is to request a modification of the disclosure deadlines. It may not seek to achieve the same result unilaterally by waiting until the last possible moment and making its supplemental disclosure pursuant to Rule 26(e). Accordingly, while I agree that Presstek may supplement its initial disclosure to correct Dr. Gido's earlier thickness mismeasurement, I determine that

Presstek's additional disclosures are not authorized by Rule 26(e).

**C. *Rule 37(c)(1)***

Rule 37(c)(1) provides in pertinent part that

> [a] party that without substantial justification fails to disclose information required by Rule 26(a) or Rule 26(e)(1) or to amend a prior response to discovery as required by Rule 26(e)(2) is not, unless such [*16] failure is harmless, permitted to use as evidence at trial, at a hearing, or on motion any witness or information not so disclosed. In addition to or in lieu of this sanction, the court on motion and an opportunity to be heard, may impose other appropriate sanctions . . . .

The First Circuit has recognized that "the required sanction in the ordinary case [for a late disclosure in violation of Rule 37] is mandatory preclusion." [4] *Lohnes v. Level 3 Commc'ns, Inc.*, 272 F.3d 49, 60 (1st Cir. 2002) (quoting *Klonski v. Mahlab*, 156 F.3d 255, 269 (1st Cir. 1998)). This "baseline" rule, however, is subject to exceptions. *Santiago-Diaz v. Laboratorio Clinico Y De Referencia Del Este*, 456 F.3d 272, 276 (1st Cir. 2006). Preclusion generally will not be appropriate where the delay in disclosure was either "substantially justified" or "harmless." *Poulis-Minott v. Smith*, 388 F.3d 354, 358 (1st Cir. 2004). Moreover, the court retains "some" discretion to impose an alternative sanction when the totality of relevant circumstances warrants a different approach. *See Santiago-Diaz*, 456 F.3d at 276. Among the [*17] factors that the First Circuit has found potentially relevant in reviewing a preclusion order under Rule 37(c)(1) are "the history of the litigation, the proponent's need for the challenged evidence, the justification, if any, for the late disclosure and the opponent's ability to overcome its adverse effects." *Id.* at 276-77 (quoting *Macaulay v. Anas*, 321 F.3d 45, 51 (1st Cir. 2003)).

4 I rely on First Circuit case law in construing Rule 37(c)(1) because the Federal Circuit generally follows the law of the circuit in which the district court sits in resolving questions concerning the rules of civil procedure. *See Trilogy Commc'ns, Inc. v. Times Fiber Commc'ns, Inc.*, 109 F.3d 739, 744 (Fed. Cir. 1997). *See also O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1368 (Fed. Cir. 2006).

Presstek argues that its supplemental disclosures should not be precluded both because it was substantially justified in making the disclosures after [*18] the disclosure deadline and because its delay was harmless. Alternatively, it claims that a sanction less drastic than preclusion is warranted under the circumstances. I address each argument in turn.

1. *Substantial Justification*

Presstek has failed to persuasively argue that its delay in making the disclosures was substantially justified. Its central claim is that it was entitled to make the disclosure when it did because it did not foresee the need to perform the procedures described in the disclosures until Creo's experts attacked its initial disclosure. In cases such as this, however, where the plaintiff bears the burden of proof at trial and has not itself properly reserved the right to make rebuttal disclosures, it may not wait to fill gaps in its proof by deferring necessary tests until after the defendant has made its expert disclosures. *See Trost v. Trek Bicycle Corp.*, 162 F.3d 1004, 1008 (8th Cir. 1998); James W. Moore, *Moore's Federal Practice* (3d Ed.) § 26.27[2][c].

Presstek's alternative argument that its delay is excusable because it misconstrued the discovery plan is also unavailing. The amended discovery [*19] plan established clear deadlines for expert disclosures and Presstek did not reserve the right to rebut Creo's expert disclosures. Accordingly, Presstek is in no position to credibly claim that it was somehow misled by the amended discovery plan into a reasonable but mistaken belief that it was authorized to make the supplemental disclosures when it did. [5]

5 I also find unpersuasive Presstek's claims that its late disclosures were justified either because Creo too made late disclosures or because Presstek reserved the right to make supplemental disclosures in its initial disclosure. The disclosures that Presstek points to were made by Creo in support of its motion for summary judgment. However, these disclosures do not contain new information and thus they do not qualify as supplemental disclosures. In any event, a party's failure to comply with its disclosure obligations is not excused by the opposing party's noncompliance. *See Carney v. KMart Corp.*, 176 F.R.D. 227, 230 (S.D.W.Va. 1997); *Moore's Federal Practice* at § 26.27[2][c]. Finally, a unilateral reservation of the right to supplement after a disclosure deadline cannot alter the agreed-upon disclosure schedule because Rule 26(a)(2)(C) permits expert disclosure schedules to be modified only by "directions from the court or stipulation by the parties."

[*20] 2. *Harmlessness*

Presstek argues that Creo was not harmed by the timing of the supplemental disclosures because it made the disclosures before Dr. Gido's deposition. I disagree.

Presstek made the supplemental disclosures on the last day of the discovery period and only four days before the agreed-upon date for Dr. Gido's deposition. Moreover, Presstek did not make the disclosures until after it had deposed Creo's experts and asked them about new tests that it was secretly planning to have Dr. Gido perform. Moreover, the disclosures were not made until after Creo had filed its summary judgment motion and replied to Presstek's objection. Under these circumstances, I am simply unpersuaded by Presstek's claim that the timing of its supplemental disclosures was harmless.

3. *Alternatives to Preclusion*

Presstek argues that the supplemental disclosures should not be precluded because they describe evidence that is "highly relevant to the 'key issues' in the case" and because any harm to Creo can be redressed by allowing Creo to file rebuttal expert reports, redepose Dr. Gido, and depose Dr. Seyer. I find neither argument persuasive.

While it is true that the supplemental [*21] disclosures address evidence that might well prove crucial to Presstek's infringement claim, this fact alone does not bar preclusion of expert testimony where other factors make the sanction appropriate. *See* *O2 Micro Int'l Ltd.*, 467 F.3d at 1369 (rejecting argument that court's exclusion order was an abuse of discretion where exclusion was tantamount to dismissal); *Santiago-Diaz*, 456 F.3d at 277 (affirming preclusion order even though precluded testimony was vital to plaintiff's claim). In this case, Presstek attained a significant tactical advantage by failing to make the supplemental disclosure until: (1) after summary judgment briefing was nearly complete, (2) after Creo's expert had been deposed and questioned about tests that he did not know Presstek was planning to discuss, and (3) only four days before Dr. Gido was deposed. At this point, it is impossible to "unring the bell" by simply extending the discovery period as Presstek suggests. Moreover, because Presstek has no good explanation for its failure to have Dr. Gido perform the tests described in the supplemental disclosure at a time when it could have included the results in its initial [*22] disclosure, it is not unfair to subject it to the "baseline" standard of preclusion called for by Rule 37(c)(1).

**III. *CONCLUSION***

Creo's Motion to Strike (Doc. No. 75) is granted except to the extent that it seeks to preclude Dr. Gido from testifying concerning his most recent measurements of the thickness of the top two layers of the Clarus WL. If Creo chooses to do so, it may conduct additional discovery concerning Dr. Gido's thickness measurements and amend its own disclosures on this issue. On or before April 13, 2007, the parties shall submit an amended discovery plan proposing dates for the completion of the discovery on this issue and the service of the supplemental disclosures that are authorized by this Memorandum and Order.

SO ORDERED.

/s/ Paul Barbadoro

United States District Judge

March 30, 2007