UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| MICHAEL BOWLING, a Resident of Arizona, | : | |
| Plaintiff, | : | |
| v. | : | C.A. No. 05-229 S |
| HASBRO, INC., a Rhode Island Corporation, | : | |
| Defendant. | : | |

**PRETRIAL MEMORANDUM OF HASBRO, INC.**

Pursuant to the pretrial order and the stipulation of the parties, Defendant/Plaintiff-in-Counterclaim Hasbro, Inc. ("Hasbro") respectfully submits its Pretrial Memorandum.

## I. Matters Expected to Be Proven in Defense and in Support of Hasbro's Counterclaims and Citations of Authority

### A. Plaintiff's Patent Claim and Hasbro's Counterclaim of Invalidity

The MONOPOLY® game was first sold in 1935 and has long been among the most popular board games in the United States. The game includes a variety of components, from the Boardwalk and Park Place properties to "Free Parking," from "Chance" cards to the little metal tokens players use to move along the game board. Players' movement on the gameboard has always been determined by a roll of the dice: two traditional, cubic, six-sided dice.

In 1997 and 1998, Hasbro developed a new premium, themed version of the MONOPOLY® game called "Millennium Edition" for release in 1999. The basic concept of the Millennium Edition game was that it would present classic MONOPOLY® gameplay in an updated, futuristic format. As developed, the Millennium Edition presented a striking difference from earlier editions of the MONOPOLY® game: the gameboard, property cards, Chance and Community Chest cards, game tokens, and money were all revised to reflect this "futuristic"

theme. Additionally, Hasbro wanted to replace the traditional cubic dice with something more in keeping with this theme.

To that end, Hasbro's developers designed an electronic randomizer, a small electronic device that was to take the place of the dice. Eventually, the electronic randomizer was deemed too expensive to include in the game and Hasbro's designers were tasked with finding a low-cost alternative. During a meeting in July 1998, Eileen Sefchick, one of Hasbro's product designers, conceived of and sketched out a new die design. That design filled both of Hasbro's goals for the Millennium Edition game – its look was significantly different from the traditional cubic dice, but its cost of manufacture would be very little more than other dice. Hasbro developed the die, performing its usual and customary safety and related testing, and ultimately included two of those dice in each of its Millennium Edition games, including a low-cost variant of the "modern" MONOPOLY® game sold through Avon, called the "Avon Special." Hasbro began shipping the Millennium Edition and Avon Special games in mid-1999.

On August 17, 1999, Plaintiff was issued U.S. Pat. No. 5,938, 197, the patent in suit. Shortly thereafter Hasbro found the '197 patent during its routine review of the Official Gazette. Realizing that the '197 patent disclosed a die bearing similarities to Hasbro's new die design, Hasbro immediately undertook to contact Plaintiff in an effort to license the patent in order to avoid any dispute. Plaintiff directed that the negotiations go through his attorney. Although Hasbro made a generous per-die royalty offer (four cents per die, or eight cents per game, representing some eight times what Hasbro would have considered to be a reasonable value-added royalty for the dice), Plaintiff refused that offer, demanding $0.25 per die, or $0.50 per game. For the Avon Special, that $0.50 represented more than 10% of the cost of the game, and even for the more upscale Millennium Edition, $0.50 was cost-prohibitive to Hasbro.

Accordingly, Hasbro rejected Plaintiff's demand and determined to stop using the new die design.

Once Hasbro determined that it would be unable to take a license from Plaintiff, Hasbro decided to discontinue using its new die design in its games. On November 2, 1999, Hasbro issued an "ASAP" specification change order directing that the new die design not be used in any further product, and instructing that the new die be replaced with traditional cubic dice. In order to effectuate the immediate changeout of the dice, Hasbro initially used standard black or white cubic dice from existing inventory. At the same time, Hasbro undertook to obtain new dice, also cubic but in a translucent material that Hasbro believed would be more in line with the design of the Millennium Edition and Avon Special games. Plaintiff had been aware of Hasbro's dice since before the '197 patent issued, but only placed Hasbro on notice of alleged infringement on November 3, 1999, after Hasbro had issued the specification change.

Due to a manufacturing error, Hasbro mistakenly included the accused dice in approximately 184,000 of the Avon Special games after the change order issued. Other than those games, Hasbro did not include the accused dice in any games after Plaintiff placed Hasbro on notice of his patent.

**1. Infringement**

Hasbro's accused dice do not infringe the '197 patent either literally or under the doctrine of equivalents. For Plaintiff to prevail on his claim of literal infringement, he must prove that Hasbro's accused dice contain each and every limitation of one or more valid claims in his patent, and this he cannot do. *See Engel Industries, Inc. v. Lockformer Co.*, 96 F.3d 1398, 1405 (Fed. Cir.1996) (literal infringement requires that "every limitation recited in the claim is found in the accused device"). Based on this Court's construction of Plaintiff's claims, Hasbro's

accused dice do not have extension members with discrete facets that are identically shaped and have equal surface areas, a limitation that exists in each of the independent claims of Plaintiff's patent, and which is therefore present in each of the other, dependent claims.

After conducting a *Markman* hearing, this Court determined that each of the claims, both independent and dependent, contain the following element:

> That the extension members contain "discrete facets [that are] identically shaped and [have] equal surface areas, without regard to negligible variances in surface area caused by indented indicia."

First, the side surfaces of the so-called "extension member" of Hasbro's die are not "facets" because they include recessed pips. The word "facet" refers uniquely to planar surfaces. Also, as explained at the *Markman* hearing, Hasbro's accused dice do not have equal surface areas, since the varying number of pips on the "extension member" faces cause each side to have a different surface area from the others.

This variance in surface area is not negligible. The performance of the Hasbro dice is skewed as a result of the imbalance that results from the different indentations on the dice, causing the Hasbro dice, unlike the dice claimed in the '197 patent, not to be a genuinely "random number generator." *See* '197 patent at Col. 1, lines 6-7 ("Field of the Invention").

Hasbro's accused dice do not infringe any claim of the '197 patent under the doctrine of equivalents because Bowling is estopped under the doctrine of prosecution history estoppel from expanding the scope of the claims of the '197 patent under the doctrine of equivalents. "Prosecution history estoppel prevents a patentee from recapturing under the doctrine of equivalents subject matter surrendered during prosecution to obtain a patent." *Cross Mdcl. v. Medtronic*, 480 F.3d 1335, 1341 (Fed. Cir. 2007). Plaintiff amended each of his independent claims during the patent application process to add an element concerning the surface areas of the various facets of his claimed dice; each of the changes narrowed the scope of his claims and

thereby foreclosed his right to claim infringement based on equivalents to the surrendered subject matter. The limitations added to claims 1 and 17 each requires that the extension member be composed of "facets" having "a surface area." As noted above, the so-called "extension member" of Hasbro's dice is not composed of facets, and the side surfaces of the "extension member" do not have "a surface area," that is the surface area of the side surfaces are not equal as required by the amendment to claims 1 and 17. This amendment to the claims was clearly made for the purpose of patentability. Therefore, the claims cannot be expanded beyond their literal scope. As such, the claims are not infringed by the Hasbro dice. *See Festo Corp. v. Shoketsu Kinzoku Kogyokabushiki Co.*, 535 U.S. 722, 738-41 (2002) ("By amending the application, the inventor is deemed to concede that the patent does not extend as far as the original claim.") (holding that patentee bears burden of showing that amendment was for purpose other than patentability and also that the amendment does not surrender the particular equivalent in question).

Hasbro further contends that its die does not infringe, either literally or under the doctrine of equivalents, Claims 10, 11, 12, 13, 14, 15, 16, and 20 of the '197 patent. Claims 10, 11, and 12 pertain to a die with twenty facets; Hasbro's die had just twelve side surfaces. Likewise, Claims 13, 14, 15, and 20 pertain to a die with forty facets; again, Hasbro's die had just twelve side surfaces. Claim 16 identifies a die wherein the "ratio of a surface area of each of said extension member facets to a surface area of each of said first end cap discrete facets is about 2-3:1." The ratio of the surface areas of the side surfaces of the "extension member" on Hasbro's die to the surface areas of the "end cap discrete facets" on Hasbro's die is in excess of 3.5:1.

**2. Prior Public Use**

Hasbro contends that the '197 patent is invalid and unenforceable on multiple grounds. First, Plaintiff publicly claimed to have used the dice with a group of Dungeons & Dragons® players years before he filed his patent application. If true, the patent would be invalid based on the public use bar contained in 35 U.S.C. 102(b).

**3. Derivation**

Alternatively, Plaintiff's invention is derived from the work of Albert Lizarraga, the Raytheon designer from whom the Court previously heard testimony in the context of Hasbro's motion to correct inventorship for the '197 patent. 35 U.S.C. 102(f) sets as a requirement of patentability that the applicant must have, himself, invented the subject matter sought to be patented. Here, the evidence clearly and convincingly shows that Mr. Lizarraga fully conceived of the invention on a date earlier than Mr. Bowling's date of invention (the date of his patent application), since Mr. Lizarraga presented the fully-formed drawings of the invention to Mr. Bowling. In order for Mr. Bowling to have invented, rather than derived, the invention, he must show by convincing evidence, corroborated according to the rule-of-reason analysis employed by this Court in the earlier inventorship context, that he had fully conceived of the invention prior to receiving the drawings from Mr. Lizarraga. *Kalman v. Kimberly-Clark Corp.*, 713 F.2d 760, 772 (Fed. Cir. 1983) (invention anticipated where "all limitations of the claim are found in the reference"); *Tone Bros., Inc. v. Sysco Corp.*, 28 F.3d 1192, 1197 n. 4 (Fed. Cir. 1994) (noting that once burden of production shifts to patent owner to rebut prima facie showing of invalidity, patentee must come forward with "convincing evidence"); *Howe v. General Motors*, 252 F. Supp. 924, 936 (N.D.Ill. 1968) (inventor's testimony must be corroborated).

**4. Inequitable Conduct**

The following statement by Mr. Bowling to the PTO in his application, and which appears in the published patent, was knowingly false and offered to convince the PTO of the patentability of his invention:

> The inventor has discovered that the configuration of the die [] is advantageous. In particular, the shape of the end caps [] provides for more bounce when dropping die [] onto a surface. That is, to generate a random number, the user holds die [] above a surface at a sufficient distance, such that when die [] is dropped onto the surface, die [] rolls before eventually resting upon one of the facets [] of the extension member []. The number or indicia [] displayed on the facet [] which is in the uppermost position is the number which has been randomly generated. The shapes of the end caps [] provide for more bounce and randomness when die [] is dropped onto a surface. The tapered, triangular shapes of end caps [] provide for surfaces which can abut and engage the surface on which die [] is being dropped, to create a more interesting and amusing outcome.

"Inequitable conduct includes affirmative misrepresentation of material fact, failure to disclose material information, or submission of false information, coupled with an intent to deceive." *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1178 (Fed. Cir.1995). Plaintiff now claims that he had never made any die using his patented invention until months after he filed his patent application (having backed away from his earlier claims of having used the dice with his gaming friends years earlier once Hasbro raised the public use bar). His statement about having "discovered" certain advantages to the die was therefore unquestionably wrong. At most Plaintiff speculated that there might be advantages to his dice design. In an effort to convince the PTO of the utility, and therefore the patentability, of the invention, he knowingly misrepresented the state of his invention and/or failed to disclose to the PTO that his "discoveries" were, at best, guesses.

Plaintiff's material omissions and/or misrepresentations constitute inequitable conduct and render the '197 patent unenforceable. *See generally Nilssen v. Osram Sylvania*, No. 2006-1550, *slip op.* (Fed. Cir. Oct. 10, 2007) (upholding finding of unenforceability based on various findings of inequitable conduct, including falsely claiming small entity status and falsely claiming priority date for patent).

**5. Damages**

Plaintiff's claimed damages for his patent claim consist of a reasonable royalty for infringing sales, plus interest. *See generally* Expert Report of N. Lapidus. Plaintiff's damages are limited to post-November 3, 1999 sales by virtue of Plaintiff's failure to mark his own commercially-produced dice with the patent number as required by 35 U.S.C. § 287(a). There is no dispute as to the fact that Plaintiff only placed Hasbro on actual notice of infringement on November 3, 1999. Therefore the only way in which Plaintiff could be entitled to any damages for earlier infringement would be if he had marked substantially all of his goods with his patent number.

"When there has been a failure to mark a patented product, 35 U.S.C. § 287(a) forecloses damages for infringement 'except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice.'" *U.S. Philips Corp. v. Iwasaki Elec. Co.*, No. 2007-1117, *slip op.* at 6 (Fed. Cir. Nov. 2, 2007). "[A]ctual notice under § 287(a) 'requires the affirmative communication of a specific charge of infringement by a specific accused product or device.'" *Id.* (quoting *Amsted Indus. Inc. v. Buckeye Steel Castings Co.*, 24 F.3d 178, 187 (Fed. Cir. 1994)).

Because Plaintiff did not provide actual notice prior to November 3, 1999, he is barred from recovering damages for sales prior to that date unless he can show constructive notice by means of the marking statute. Constructive notice is provided "when the patentee consistently mark[s] substantially all of its patented products [.]" *Am. Med. Sys. v. Med. Eng'g Corp.*, 6 F.3d 1523, 1538 (Fed. Cir. 1993). Plaintiff never marked his patented products, even though his own expert on "dice and dice design" admits that they can be marked. He also failed to mark the packaging for the product, the only alternative permitted under the marking statute. *See* 35 U.S.C. § 287(a) (permitting alternative marking "when, from the character of the article, this cannot be done, by fixing to [the patented article], or to the package wherein one or more of them is contained, a label containing a like notice.").

Plaintiff did not mark substantially all of his patented dice, and continued to sell unmarked dice after the issuance of the patent. Accordingly, he cannot be entitled to any damages for any infringing sales that occurred prior to November 3, 1999, the date on which he gave actual notice to Hasbro.

The damages to which Plaintiff would be entitled for any infringing sales would be a reasonable royalty, determined with reference to the factors outlined in *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120 (D.C.N.Y. 1970), *aff'd,* 446 F.2d 295 (2d Cir. 1971), *cert. denied*, 404 U.S. 870 (1971). Because of Plaintiff's failure to mark his dice, the only sales for which he might be entitled to a royalty would be sales of approximately 184,000 of the low-cost Avon Special games. As explained in greater detail in the expert report of Barry Sussman, a reasonable royalty for the dice themselves would be less than the cost to Hasbro of eliminating the dice from the games, and therefore the appropriate amount that a reasonable

licensor and licensee would agree upon would be determined in relation to the cost to avoid infringement.

**B. Hasbro's Copyright Claim**

Dungeons & Dragons® was developed, owned, and published in 1974 by a company called Tactical Studies Rules, Inc., or TSR, Inc. Dungeons & Dragons®, more commonly called by its acronym "D&D," has been played by millions of people since that time. The Dungeons & Dragons® game is a "role playing game," in which players create characters that embark upon imaginary adventures within a fantasy setting. These fantasy settings frequently include various monsters or other fantastic creatures, who collectively amount to a centerpiece of the game. Many of the monsters are unique to Dungeons & Dragons®, while some are creatures of legend that have been adapted to the D&D "universe." Hasbro, like Wizards of the Coast and TSR before it, has assiduously maintained its rights in the intellectual property, including copyrights, surrounding the Dungeons & Dragons®game.

Dungeons & Dragons® is the best-selling role-playing game of all time, accounting for more than $1 Billion in book and equipment sales. In 1997, Dungeons & Dragons® was acquired by Wizards of the Coast, which itself was acquired by Hasbro in 1999. Hasbro therefore now owns, and at all relevant times owned, all Dungeons & Dragons® content, including relevant intellectual property.

Bowling is a self-described "gamer," who played a regular Friday-night game of Dungeons & Dragons® for many years. Bowling's dice and his dice company are specifically directed to other "gamers" who, like himself, use polyhedral dice for the gaming adventures. Bowling's years of Dungeons & Dragons® playing and his business position within the gaming

industry make it impossible that Bowling was unaware of the various monsters in the Dungeons & Dragons® universe and Hasbro's copyrights in those works.

Notwithstanding this knowledge, Bowling purposefully and intentionally traded on Hasbro's copyrighted works by selling a series of "miniatures" depicting monsters from Hasbro's Dungeons & Dragons® line. These creatures included a "Beholder" (a monster unique to D&D), a "Mind Flayer" (likewise, unique to D&D), and a "Cockatrice" (a creature of legend, but depicted in precisely the same fashion as in Hasbro's copyrighted works). These "miniatures" are small, painted three-dimensional figurines for collecting or use during gameplay. His sale of the miniatures was without the knowledge or consent of Hasbro.

The miniatures sold by Bowling are so strikingly similar to Hasbro's Dungeons & Dragons® characters as to cause confusion, mistake, and deception among consumers as to their source. Bowling knowingly and willfully traded on Hasbro's good will and character development and knowingly and willfully infringed Hasbro's copyrights for his own commercial gain at Hasbro's expense. Hasbro, in fact, has sole a directly competing line of miniatures.

Hasbro will show at trial that Bowling knowingly and intentionally infringed at least the copyrights with registration numbers TX-1-314-910; TX-1-134-908; TX-2-191-165; TX-2-653-882; TX-2-818-515; TX-3-643-953; TX-3-223-879; TX-4-182-004; TX-4-143-286; TX-4-375-067; TX-4-334-621; TX-4-334-620; TX-5-364-554; TX-5-817-950; TX-6-001-623; VA-934-193; VA-941-205; VA-954-938; VA-1-126-351; VA-1-130-842; and VA-1-290-942. At trial, Hasbro seeks statutory damages from Bowling as a jury matter, and "full costs" as permitted by 17 U.S.C. § 505, which is a matter within the discretion of this Court.

Bowling is no innocent infringer, and if Hasbro had not brought its counterclaim there is no evidence that Bowling would ever have ceased his infringement of Hasbro's copyrighted

works. Bowling infringed Hasbro's copyrights intentionally and willfully in order to line his own pockets. Hasbro's statutory damages are in an amount to be assessed by the jury, taking into account the fact that Bowling's infringements were willful. Under 17 U.S.C. § 504, the jury is entitled to award damages of a minimum of $750 up to $150,000 per infringement. *See Venegas-Hernandez v. Sonolux Records*, 370 F.3d 183, 195 (1st Cir. 2004) ("The sliding scale is also designed to deter willful infringements, and the award can go up to $150,000 per work where willfulness has been found."). Although the First Circuit has not specifically addressed the question of how many infringements are deemed to have occurred under circumstances like this one, a reasonable analysis consistent with other circuits' treatment of the issue would yield at least three separate infringements, thus fixing the appropriate damages at an amount no less than $2,250 and no more than $450,000. *Venegas-Hernandez v. Sonolux Records*, 370 F.3d 183, 191 (1st Cir. 2004); *Gamma Audio & Video, Inc. v. Ean-Chea*, 11 F.3d 1106, 1115-16 (1st Cir. 1993); *Xoom, Inc. v. Imageline, Inc.*, 323 F.3d 279, 285 (4th Cir. 2003); *Walt Disney Co. v. Powell*, 897 F.2d 565, 569-70 (D.C. Cir. 1990).

## II. <u>Trial Witnesses</u>

Hasbro anticipates calling the following trial witnesses, who will testify on the subjects identified:

1. Kurt Benson: Will testify as to Hasbro's discovery of the '197 patent and its actions after discovery of the patent and the absence of willfulness. Will also testify as to USPTO procedures.

2. Dottie Echlin: Will testify as to the games containing the accused dice, their manufacture and sale, the development and decision to include the accused dice, the decision to

discontinue using the accused dice, the change from the accused dice to other dice, and the value of the dice to the Monopoly games in which they had been included.

3. Mike Hirtle: Will testify as to his and Hasbro's efforts to negotiate a license with Plaintiff; will also testify as both a fact witness and as an expert witness with respect to the sales of Millennium Edition and Avon Special games.

4. Mike Gray: Will testify as to his knowledge of Plaintiff's die prior to the development of the accused dice by Hasbro, Hasbro's attendance at gaming conventions at which Plaintiff's dice were on display, the availability of noninfringing alternatives to the accused dice, and will also testify as an expert with respect to the differences between the dice claimed in the '197 patent and Hasbro's accused dice. Mr. Gray will also testify, as both a fact and an expert witness, as to Hasbro's Dungeons & Dragons® game, associated copyrights, and Plaintiff's unlawful copying of Hasbro's intellectual property.

5. Doreen Mars: Will testify about the consumer reaction to Hasbro's inclusion of dice other than the accused dice following the decision to discontinue using the accused dice in November 1999.

6. Eileen Sefchick: Will testify about her design and development of the accused dice and the decisions surrounding their inclusion in certain Hasbro games.

7. Irina Slavina: Will testify as to her observations of Plaintiff's marking of his patented dice.

8. Thomas McCabe: Will testify as to his observations Plaintiff's marking of his patented dice.

9. Eric Burke: Will testify as to his lack of knowledge that Plaintiff's dice were covered by a patent, the ineffectiveness of his marking efforts, the lack of any commitment by

him or his company to engage in any patent marking, the lack of any patent marking by him or his company, and the actual display of Plaintiff's dice at his store.

10. David Wheeler: Will testify as to the lack of any communication from Plaintiff to him or his company with respect to patent marking for Plaintiff's patented dice.

11. Steen Jensen: Will testify as to the lack of any marking associated with Plaintiff's patented dice.

12. Albert Lizarraga: Will testify as to his participation in the development of Plaintiff's patented dice design.

13. Susan Lizarraga: Will testify as to Albert Lizarraga's actions with respect to the development of Plaintiff's patented dice design.

14. Julie Daulton: Will testify as to Plaintiff's patent application and her and Plaintiff's knowledge of Hasbro's accused dice.

15. Barry Sussman: Will testify as an expert with respect to Plaintiff's damages.

Hasbro also reserves the right to call Plaintiff or any of his witnesses in Hasbro's case in chief.

## III. Anticipated Motions *in Limine*

Hasbro anticipates filing the following motions *in limine*, all of which it expects to file on or before December 19, 2007 (a date agreed upon by the parties):

1. Motion *in Limine* to Preclude Plaintiff's Infringement Expert from Testifying About Tests He Performed on Hasbro's Dice

2. Motion *in Limine* to Preclude Testimony Contrary to Plaintiff's Business Records

3. Motion *in Limine* to Preclude Reference to Presumption of Validity

4. Motion *in Limine* to Exclude Testimony of Neil N. Lapidus (with request for *Daubert* hearing)

**IV. <u>Estimated Time of Trial</u>**

Hasbro anticipates that presentation of its evidence will take 3 days, and the entire trial will take 5-6 days.

**V. <u>Trial Exhibits</u>**

The Parties have agreed to exchange lists of trial exhibits, and copies of the exhibits, on or before December 21, 2007.

**VI. <u>Jury Instructions</u>**

Hasbro's proposed jury instructions are attached as **Exhibit A** hereto.

**VI. <u>Jury Verdict Form</u>**

Hasbro's proposed jury verdict form is attached as **Exhibit B** hereto.

**VII. <u>Additional Matters</u>**

Hasbro reserves its right to supplement this Pretrial Memorandum in the event the Court grants either of its pending motions, specifically its Motion for Reconsideration of the Court's exclusion of invalidity evidence and its Motion for Leave to File Motion to Compel other evidence relating to the validity of the patent in suit.

Respectfully submitted,

HASBRO, INC.
By its Attorneys,
/s/ Jeffrey K. Techentin___________
Todd D. White (#5943)
twhite@apslaw.com
Jeffrey K. Techentin (#6651)
jtechentin@apslaw.com
Adler Pollock & Sheehan P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903
(401) 274-7200
Fax: (401) 751-0604/ 351-4607
Dated: December 12, 2007

Of Counsel:

David K. S. Cornwell, Esq.
davidc@skgf.com
Tracy-Gene G. Durkin, Esq.
tdurkin@skgf.com
Sterne Kessler Goldstein Fox
1100 New York Avenue, NW
Washington, D.C. 20005

**CERTIFICATE OF SERVICE**

TO:

Craig M. Scott, Esq.
Christine K. Bush, Esq.
Duffy & Sweeney & Scott, Ltd.
One Turks Head Place, Suite 1200
Providence, RI 02903

Thomas J. Leach, Esq.
Douglas J. Williams, Esq.
Anthony R. Zeuli, Esq.
Law Firm of Merchant and Gould P.C.
3200 IDS Center
80 South 8th Street
Minneapolis, Minnesota 55402-2215

David K. S. Cornwell, Esq.
Tracy-Gene G. Durkin, Esq.
Sterne Kessler Goldstein Fox
1100 New York Avenue, NW
Washington, D.C. 20005

I hereby certify that I filed the within Pretrial Memorandum through the ECF system on the 12th day of December, 2007, and that notice will be sent electronically to the above-named counsel who are registered participants identified on the Mailing Information for Case No. 05-229S.

/s/ Jeffrey K. Techentin__________

*437644_1*