IN THE UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| MICHAEL BOWLING,<br>a Resident of Arizona,<br><br>Plaintiff,<br><br>v.<br><br>HASBRO, INC.,<br>a Rhode Island Corporation,<br><br>Defendant. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | C.A. No. 05-229S |

**PLAINTIFF MICHAEL BOWLING'S TRIAL BRIEF**

Plaintiff, Michael Bowling ("Bowling"), hereby submits this Pretrial Memorandum in connection with the above-captioned matter.

## A. STATEMENT OF THE FACTS

### 1. Introduction

This case involves Hasbro, Inc.'s ("Hasbro") willful infringement of Bowling's U.S. Patent No. 5,938,197 ("the '197 patent") for innovative dice. Knowing of Bowling's '197 patent rights, and without permission, Hasbro copied Bowling's patented dice and included them in its futuristic Monopoly Millennium Edition board game in 1999. Bowling asked Hasbro to stop selling games that included the infringing dice. In response, Hasbro assured Bowling that it had stopped selling the accused dice. However, Hasbro intentionally continued to disregard Bowling's patent rights and sold the infringing dice through the 1999 Holiday Season and beyond.

Hasbro countersued Bowling for copyright infringement of copyrights on three monsters figures, namely the beholder, cockatrice, and mind flayer. Bowling denies that Hasbro owns valid copyrights or that he infringed these copyrights.

**2. Michael Bowling's Dice Invention**

In 1997, Bowling invented unique dice. In 1998, Bowling applied to the United States Patent and Trademark Office for a patent on his unique dice. Bowling then started a company named "Crystal Caste" to sell his new dice. Below are examples of Bowling's patented dice:



The dice were an instant success. At the 1998 Gen Con trade show, Bowling sold all 10,000 of his innovative dice. At that tradeshow, Bowling had signs stating that his new dice were patent pending.

Hasbro's director of game design, Mike Gray, attended the 1998 trade show and saw Bowling's new dice. Sometime thereafter, Hasbro included the accused dice shown below for use in its Monopoly Millennium Edition game the:



By mid 1999, Hasbro was already selling its Monopoly Millennium game, which contained the accused dice.[1]

On August 17, 1999, the U.S. Patent and Trademark Office granted Bowling the '197 patent, entitled Random Number Generator for Game Playing, for his unique dice.

Figures 1, 4, and 5 from the '197 patent illustrate one embodiment of Bowling's innovative new dice:




Though the dice illustrated in Figures 1, 4, and 5 have numbers on each facet, the patent covers the dice with or without insignia, such as numbers, or, as in Hasbro's case, dots that represent different values.

### 3. Bowling Properly Marked

Before Bowling's patent issued, Bowling included stickers that read "patent pending" in the bags of dice he sold. Just before the '197 patent issued, Bowling changed the sticker from "patent pending" to "U.S. Patent # 5,938,197" and affixed them to display tubs used to sell his crystal dice and included a patent-number sticker in all bags of dice sold. In addition to placing patent-number stickers on the tubs and in the individual bags, Bowling instructed all of his distributor and retail customers to mark his dice displays with the patent number. He provided them with patent-number stickers to place on any bins containing the dice.

[1] Hasbro's activities prior the issuance of the '197 patent are not included in Bowling's damages calculations.

Bowling personally contacted his distributor and retail customers by phone, instructing them to mark their bins with the patent-number sticker. On August 15, 1999, two days before Bowling's '197 patent issued, Bowling sent formal letters to his distributor and retail customers including stickers bearing "U.S. Patent # 5,938,197," instructing them to affix the patent-number stickers to all containers, bags or tubs used to sell his patented dice. Bowling explained that "[i]t is important that all Crystal Caste™ dice on display be labeled with our sticker identifying our patent protection. If you need more [stickers] please contact us at (888) 3CC-DICE." The letter also explained that Crystal Caste would be placing patent stickers on its tubs and in the bags of loose dice.

Additionally, Bowling sent a marking letter to his distributors stressing that it was "important that all Crystal Caste™ dice out in the stores, or in your inventory, today be labeled with our sticker identifying the patent protection." Bowling instructed his distributors to label all of their Crystal Caste™ containers with the sticker and place a patent sticker in each bag of dice sold. Bowling's marking letter also instructed the distributors to send a patent-number sticker to all of their retail customers so they too could appropriately mark any containers holding the patented dice.

After Bowling sent out patent-number stickers and instructed his customers to mark the dice, Bowling periodically received requests from both his distributors and retailers asking for more stickers or replacement tubs. Bowling affixed patent-number stickers on the replacement tubs or new display tubs that went out. To ensure that his employees were properly marking the packaging, Bowling would visit the factory.

On November 3, 1999, Bowling informed Hasbro of its willful infringement. Thus, in addition to giving Hasbro constructive notice through marking, Bowling provided Hasbro actual notice on November 3, 1999.

**4. Hasbro Willfully Infringed Bowling's '197 Patent**

Hasbro copied Bowling's die design and included it in its Monopoly Millennium Edition game. Despite knowing about Bowling's patent rights and that it infringed those patent rights, Hasbro continued to sell the infringing games right through the Holiday Season and beyond.

Hasbro prominently displayed the infringing dice on the packaging, as shown below with enlarged pictures of Hasbro's infringing dice:





Hasbro also touted on the packaging that the game includes "Futuristic, Multifaceted Dice..."




On September 30, 1999, *after* Hasbro was already using Bowling's patented dice in its Monopoly Millennium Edition game, Hasbro wrote a letter to Bowling *expressing an interest in possibly using* the dice disclosed in Bowling's '197 patent. When Bowling learned that Hasbro was already using his patented dice, he realized that Hasbro's letter was misleading and contacted his patent counsel, who wrote Hasbro.

On December 22, 1999, Hasbro responded that it had sold 269,000 Monopoly games including the accused dice and that it would not sell anymore. Hasbro explicitly stated "no

production or sales have taken place since November 1, 1999." Despite Hasbro's representations, however, Bowling confirmed that Hasbro continued selling its Monopoly Millennium Edition game containing the infringing dice through the Holiday Season, willfully infringing his patent. When Bowling raised this issue with Hasbro, Hasbro admitted that another 184,000 games including the infringing dice were "inadvertently" shipped in November and December 1999. Hasbro again assured Bowling that it had stopped selling games that included the infringing dice. Unable to resolve this dispute, Bowling sued Hasbro for willfully infringing his '197 patent and for damages. In discovery, Hasbro now admits that it sold an additional 103,828 games, bringing the total infringing games to 556,828.

**5. Crystal Caste's Sales of Elfsera EM-4 Miniatures**

In 2003, Crystal Caste purchased some box sets of monster miniature figurines manufactured by eM-4 to resell. Neither Bowling nor Crystal Caste had anything to do with the design or manufacture of the eM-4-Miniatures.

Hasbro has asserted a counterclaim against Bowling, alleging copyright infringement for his sale of the eM-4 miniatures. Hasbro alleges that three figures called beholder, mind flayer, and cockatrice infringe its copyrights. As soon as Hasbro alleged that it owned copyrights in three of the figures contained in the eM-4 miniature set, Crystal Caste immediately stopped selling them and returned any extras to eM-4. In total, Crystal Caste sold 18 eM-4 monster miniature sets. Its profits were $168.00 from those sales.

## B. <u>CLAIMS AND DEFENSES</u>

### 1. Bowling's Willful Infringement Claims

a. Bowling alleges that Hasbro willfully infringed his '197 patent
b. Bowling seeks a reasonable royalty for Hasbro's unauthorized use of Bowling's patented dice

c. Bowling seeks treble damages for Hasbro's willful infringement and the costs of this action provided by 35 U.S.C. § 284
d. Bowling contends that this is an exceptional case under 35 U.S.C. § 285 and seeks his attorneys' fees associated with this action

**2. Hasbro's Defenses**

a. Non-infringement
b. Invalidity under § 102 for prior public use
c. Inequitable conduct
d. Failure to mark under 35 U.S.C. §287
e. Damages barred or limited by date of notice of infringement

**3. Bowling's Defenses to Hasbro's Counterclaim of Copyright Infringement**

a. Hasbro does not own a valid copyright
b. Hasbro cannot prove copying
c. The accused figurines are not copies of Hasbro's copyrighted figures
d. Bowling did not infringe the asserted copyrights

## C. ARGUMENT

### 1. Hasbro Willfully Infringed Bowling's '197 Patent

Hasbro willfully infringed Bowling's '197 patent by making, importing, using, offering to sell, and selling dice covered by at least one claim of the '197 patent.

#### a. Infringement Under 35 U.S.C. § 271(a)

In order to prevail on his infringement claim, Bowling must prove that Hasbro, without permission, made, used, imported, offered for sale, or sold dice that contain each element, either literally or under the doctrine of equivalents, of one or more of the '197 patent claims. 35 U.S.C. § 271(a); *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 821-22 (Fed. Cir. 1992). Bowing alleges that Hasbro infringed claims 1-9 and 16-19 of his '197 patent by selling the accused dice.

The Court construed the relevant terms of the '197 patent in an Order dated May 30, 2007. The Court construed the following phrase in claims 1 and 17 as follows:

| Claim Phrase: | The Court's Construction: |
|---|---|
| **Claim 1**: "discrete facets being identically shaped and having equal surface areas" | "discrete facets being identically shaped and having equal surface areas, without regard to negligible variances in surface area caused by indented indicia" |
| **Claim 17**: "extension member facets being equal in surface area" | "extension member facets being equal in surface area, without regard to negligible variances in surface area caused by indented indicia" |

(Docket No. 97 at 3-4.) Hasbro's accused dice meet every limitation of claims 1-9 and 16-19 of Bowling's '197 patent. The analysis of Hasbro's infringement of the asserted '197 patent claims is shown in Exhibit 1. Hasbro admitted that the only claim element it contends are missing from the accused dice are the above elements.

**b. Hasbro Infringes Under The Doctrine Of Equivalents**

Alternatively, if Hasbro is found not to literally infringe the asserted claims of Bowling's '197 patent, Hasbro infringes under the doctrine of equivalents. Under the doctrine of equivalents, a product that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is "equivalence" between the elements of the accused product and the claimed element of the patented invention. *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 21 (1997). A finding of infringement under the doctrine of equivalents requires a showing that the differences between the claimed invention and the accused product was insubstantial or that the element of the accused product performs substantially the same function in substantially the same way with substantially the same result as each claim element of the patented product. *Aquatex Indus., Inc. v. Techniche Solutions*, 479 F.3d 1320, 1325 (Fed. Cir. 2007). Hasbro admitted that its accused dice meet the function/way/result for the claims Habro claims are not literally present.

**c. Hasbro's Infringement Was Willful and This is An Exceptional Case**

In order to prove willful infringement, Bowling must prove two elements: (1) Hasbro made and sold the accused dice despite an objectively high likelihood that its actions infringed a valid patent; and (2) Hasbro either knew or should have known of this likelihood. *In re Seagate Tech., LLC*, 497 F.3d 1360, 1371 (Fed. Cir. 2007). Particularly persuasive in cases of willful infringement is the continued sales of infringing products after representation by the infringer that such sales would cease. *N.A.S. Import, Corp. v. Chenson Enters., Inc.*, 968 F.2d 250, 253 (2d Cir. 1992) ("In any event, Chenson cannot escape the fact that it continued to sell infringing bags long after its own attorney wrote to Alentin representing that it would cease doing so"); *see In re Seagate Tech.*, 497 F.3d at 1370 (indicating willful patent infringement should be determined under a similar standard as willful copyright infringement).

Hasbro admits, and the documents prove, that Hasbro knew of Bowling's '197 patent days after it issued. Hasbro also admits it conducted no analysis as to whether it infringed the '197 patent. (Hasbro's Obj. and Res. to Pl.'s First Set of Requests for Admissions to Hasbro, Inc. at ¶ 2.) Furthermore, on December 22, 1999, Hasbro represented that "[n]o further shipments with accused dice have been or will be made . . ." In that same letter, Hasbro argues that it did not willfully infringe Bowling's patent because of this cessation of shipment of the accused dice. Notably missing is any contentions of non-infringement or invalidity. Despite this, Hasbro continued to sell its Monopoly games with the infringing dice through the Holiday Season and beyond. Given Hasbro's reckless disregard for Bowling's patent rights and its conduct, as described above, Hasbro willfully infringed Bowling's '197 patent.

Hasbro's willful infringement and litigation tactics justify enhanced damages. Finding willful infringement justifies finding a case exceptional and awarding attorneys' fees to the

patentee. 35 U.S.C. § 285; *Imonex Servs. v. W.H. Munzprifer Dietmar Trenner GmbH*, 408 F.3d 1374, 1378 (Fed. Cir. 2005). Additionally, finding willful infringement justifies trebling the patentee's damages. 35 U.S.C. § 284; *Johns Hopkins Univ. v. Cellpro, Inc.*, 152 F.3d 1342, 1364-65 (Fed. Cir. 1998). Because Hasbro willfully infringed his '197 patent, Bowling will seek its costs and attorneys' fees and that any damage award be trebled. 35 U.S.C §§ 284, 285.

**2. Hasbro's Defenses to Willful Infringement**

In its Answer and Counterclaims, Hasbro contends that the '197 patent is invalid and not infringed. Hasbro claims that Bowling's '197 patent is invalid under 35 U.S.C. §102 because he publicly used his invention more than a year before he filed for his patent application. (Answer and Counterclaim. at 4 (Document No. 3).) Because patents are presumed valid, Hasbro must prove that each challenged claim is invalid by clear and convincing evidence. *Knoll Pharm. Co. v. Teva Pharms. USA, Inc.*, 367 F.3d 1381, 1383 (Fed. Cir. 2004); *see also Monarch Knitting Mach. Corp. v. Sulzer Morat GmbH*, 139 F.3d 877, 881 (Fed. Cir. 1998). The facts, however, show that Bowling did not publicly use his invention more than a year before he filed his patent application. To the contrary, Bowling testified in his deposition that he did not use the dice disclosed and claimed in his '197 patent more than a year before he filed the '197 patent application. Hasbro has no evidence to the contrary.

Hasbro also claims that Bowling's patent is unenforceable due to inequitable conduct. (Answer and Counterclaim at 5.) To prove inequitable conduct, Hasbro must prove by clear and convincing evidence that Bowling, or his attorney, withheld or misrepresented material information with an intent to deceive the Patent & Trademark Office. *M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co.*, 439 F.3d 1335, 1339-40 (Fed. Cir. 2006).

Here, Hasbro's inequitable conduct claim is based on statements made in portions of Bowling's '197 patent specification. Bowling's patent specification states that the "inventor has discovered that the configuration of the die 20 is advantageous. In particular, the shape of the end caps 24, 26 provides for more bounce when dropping the die 20 onto a surface." '197 patent at Col. 4:39-42. Hasbro claims that this statement was material to patentability, false, and made with the intent to deceive the patent office. Bowling disagrees that the statement is false or misleading, that it is material, or that it was made with intent to deceive the PTO.

### 3. Damages For Hasbro's Infringement

#### a. Bowling Properly Marked During the Relevant Period

Whether Bowling complied with the marking statute is a question of fact for the jury to decide. *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1111 (Fed. Cir. 1996). In this case, Bowling must prove by a preponderance of the evidence that he complied with the marking statute. *Nike, Inc. v. Wal-Mart Stores, Inc.*, 138 F.3d 1437, 1446 (Fed. Cir. 1998).[2] Bowling properly complied with the marking statute, 35 U.S.C. § 287, by placing stickers bearing the '197 patent number in the bags of dice sold and on the tubs displayed, by instructing his distributors and retailers to place the stickers on display tubs, and by following up with letters and telephone calls.

During the relevant period (August 17, 1999 to November 3, 1999) all that was required of Bowling is that he continuously marked substantially all of his dice and that he took reasonable steps to insure his retailers and distributors did as well. *Maxwell*, 86 F. 3d at 1111-12. The law recognizes that with parties unrelated to the patentee it is more difficult for a

[2] However, the only relevant inquire is whether Bowling continuously marked substantially all of his products from the date the patent issued until Bowling gave actual notice to Hasbro. *Metrologic Instruments*, 2004 U.S. Dist. LEXIS 24949 at *60-61 (holding that a subsequent failure to mark does not insulate the infringer from damages for the period in which proper marking was in effect before Bowling's patent issued, Bowling included in bags of dice he sold stickers that)

patentee to ensure compliance with marking. *Id*. Thus, courts apply a "rule of reason" approach to determine whether the marking statute was properly complied with. *Id*. When a failure to mark is caused by a third party, courts consider whether the patentee took reasonable steps to ensure compliance. *Id*. In this case Bowling contacted his distributor and retail customers by letter and telephone, instructing them to mark. He provided them with the materials to properly mark the bins from which the dice were sold. He sent letter agreements to his customers instructing them to mark. Bowling received feedback that marking instructions were being followed because his customers periodically asked for more tubs and patent-number stickers.

**1. Bowling Appropriately Gave Notice To The Public By Marking The Packaging**

Hasbro contends that it is not liable for damages for nearly 60 percent of its infringing sales arguing that Bowling was required to place "U.S. Patent # 5,938,197" directly on his patented dice rather than mark the packaging. The products Hasbro claims Bowling must have marked are dice for game playing are too small to mark, as shown below:




Hasbro incorrectly focuses on "technicalities" in an attempt to escape liability, rather than on the purpose of the statute, which is to provide notice to the public that the product is patented. *Rutherford v. Trim-Tex, Inc.*, 803 F.Supp. 158, 161-63 (N.D. Ill. 1992).

The law does not require Bowling to physically mark the die. As far back as 1892 the Supreme Court has recognized that some discretion must be left to the patentee as whether to mark the packaging instead of a small product. *Sessions v. Romadka*, 145 U.S. 29, 50 (1892) ("It is not altogether clear that the stamp could not have been made upon the smaller sizes [of trunk

catches], but, in a doubtful case, something must be left to the judgment of the patentee, who . . . affix[ed] a label to the packages in which the fasteners were shipped and sold."); *Metrologic Instruments., Inc. v. PSC, Inc.*, No. 99-4876, 2004 U.S. Dist. LEXIS 24949, at *57 (D. N.J. Dec. 13, 2004) (marking the packaging is sufficient even though it is physically possible to place the patent number on the article); *Wayne-Gossard Corp. v. Sondra Mfg. Co.*, 579 F.2d 41, 43 (3d Cir. 1978) (finding that despite being able to mark socks, marking the packaging satisfied the notice requirement of § 287). The objects size is an important factor in determining whether marking the packaging is sufficient. *Rutherford*, 803 F. Supp. at 162.

While Hasbro may attempt to introduce evidence that it is *possible* to mark *a die* with a patent number, such evidence would not be dispositive as to whether Bowling complied with the marking statute by marking the packaging. *Rutherford*, 803 F.Supp. at 162 ("Marking the package is a sufficient alternative so long as the patentee, the licensees or distributors act so that the package marking is actually seen by the consuming public.); *Wayne-Gossard Corp.*, 579 F.2d at 43; *Sessions*, 145 U.S. at 50.

Here, it would have been very difficult, if not impossible, to mark the dice because of their small size and the manufacturing process used. Bowling has testified that each die was too small to place "Pat. # 5,938,197" on it. Bowling's dice could not be marked with the patent number because of the manufacturing process used to make the die's mold tool. The process would only allow very shallow lettering of the size required to fit "Pat. # 5,938,197" on the dice. Lettering of this depth would be removed in the post mold process when the dice are barreled (sanded) to remove mold tool lines and excess paint. In sum, the size of the product and the manufacturing process made it difficult to mark the individual die with a legible patent notice. *Cf. Creative Pioneer Prods. Corp. v. K Mart Corp.*, No. H-83-4137, 1987 U.S. Dist. LEXIS

13474, at *15 (S.D. Tex. July 10, 1987) (holding that marking the packaging was insufficient when marking the product would have been a "relatively simple matter"); *John L. Rie, Inc. v. Shelly Bros., Inc.*, 366 F. Supp. 84, 90-91 (E.D. Pa. 1973) (rejecting argument that it would be hard to mark the product where the patentee had already marked the devise PAT PENDING)

In this case, not only did Bowling mark the product as he sold it, by placing patent-number stickers in the see-through bags of dice, he provided patent-number stickers to his distributor and retail customers and instructed them to mark the product's display container so consumers would know that his dice were patented. Just before the patent issued, Bowling provided his distributor and retail customers with patent-number stickers and point-of-purchase display tubs on which he affixed the patent-number sticker. In addition, Bowling called every customer and personally instructed them how to mark his die. That Bowling did not "affix" the patent-number sticker directly to the bag of dice, but rather placed it in the bag provided *better* notice to the public given the industry and how his products were sold, i.e. loose in tubs. While Bowling sent out point-of-purchase displays and patent-number stickers to his customers, he also included a sticker in every one of the bags of dice he shipped so when the dice were removed from the bags and placed in the sales tubs or bins, the sticker could be affixed to the display rather than be thrown out with the bag as would have occurred had it been "affixed" to the bag. Thus, not only did Bowling mark the packaging, but he made it easy for retailers to properly mark the containers in which the dice were sold.

Such marking complies with the marking statute given "the Court's long-standing focus on the notice effected by the method of marking the patented article rather than on the precise mechanistic compliance with the statute." *Rutherford*, 803 F. Supp. at 161 (citing *Sessions*, 145

U.S. at 50). Not only did Bowling properly mark, but his method of marking was specifically tailored to the industry to assure that the public received notice of his patent.

**b. Bowling's Damage For Hasbro's Willful Infringement**

Bowling seeks damages in the amount of a reasonable royalty for Hasbro's infringing sales from the date the '197 patent issued on August 17, 1999. 35 U.S.C. §284. A reasonable royalty is not necessarily the actual measure of damages, but is merely the floor below which damages should not fall. *Del Mar Avionics, Inc. v. Quinton Instruments Co.*, 836 F.2d 1320, 1326 (Fed. Cir 1987).

One key factor in determining a reasonable royalty is what Hasbro would have been willing to pay Bowling for his patented die. One of Hasbro's subsidiaries purchased Bowling's die for $0.64 a die and resold them for $1.25, which establishes what Hasbro was willing to pay for Bowling's patented die. Moreover, a reasonably royalty is determined from the perspective of the parties at the time the infringement begins. At that time Hasbro had completed its advertising for the Monopoly Millennium game, it was already selling infringing games, its packaging touted the accused die, and it had infringing inventory in stock ready for the Holiday Season. Hasbro was in a poor bargaining position.

Bowling's damages expert calculates that a reasonable royalty under these circumstances would be $0.5825 per infringing die sold. This equals an overall royalty of 5.28% for the infringing sales, which is in line with other royalties Hasbro has paid inventors for use of their inventions. Applying that royalty to Hasbro's infringing sales, Bowling's pre-interest damages are $648,705.00. Applying Rhode Island's statutory 12% rate of prejudgment interest, Bowling's total damages equal $1,340,050.00.

Finally, Bowling believes that the amount of damages should be trebled because Hasbro's infringement was willful and because of Hasbro's misleading conduct in dealing with Bowling. Not only did Hasbro willfully disregard Bowling's patent rights, but it continued to purge its inventory while lying to Bowling that its continued sales of the accused games had ceased. Bowling also believes that this is an exceptional case under 35 U.S.C. §285 because of Hasbro's willful infringement. Thus, Bowling believes that he should be awarded his costs and attorneys' fees, which have been driven up by Hasbro's baseless defenses.

**4. Hasbro's Claims of Copyright Infringement and Bowling's Defenses**

Hasbro's counterclaim alleges that Bowling infringed its copyrights in three monsters by selling certain Elfsera Monster miniature figures through Crystal Caste. Hasbro calls these monsters "Beholder," "Cockatrice," and "Mind Flayer." Crystal Caste was unaware of Hasbro's alleged copyrights until Hasbro's counterclaims. As soon as Bowling learned of Hasbro's copyright claims, Crystal Caste immediately stopped selling the accused miniatures. Crystal Caste sold a total of 18 Elfsera Monster miniature sets for a total profit of about $168.00.

To succeed on its claim of copyright infringement, Hasbro must establish (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original. *Feist Publications Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). Hasbro must also prove that the copying of the copyrighted material was so extensive that it rendered the accused and copyrighted works substantially similar. *See Yankee Candle Co., Inc. v. Bridgewater Candle Co.*, 259 F.3d 25, 33 (1st Cir. 2001) (citations omitted). Thus, to prevail, Hasbro must establish by a preponderance of the evidence the following: (1) ownership of a valid copyright; (2) unlawful copying of protectable elements; and (3) substantial similarity. In this case, Hasbro

cannot show that it owns a valid copyright or that the accused products are copies of Hasbro's works.

**a. Hasbro Cannot Prove Ownership of a Valid Copyright**

Hasbro fails in the first element necessary to prove infringement – ownership of a valid copyright. While it is true that a copyright registration certificate gives rise to a presumption of validity, that presumption is rebuttable. *Lotus Dev. Corp. v. Borland Int'l,* 49 F.3d 807, 813 (1st Cir. 1995) ("In judicial proceedings, a certificate of copyright registration constitutes prima facie evidence of copyrightability and shifts the burden to the defendant to demonstrate why the copyright is not valid"); *see also Folio Impressions, Inc. v. Byer California*, 937 F.2d 759, 763-64 (2d Cir. 1991) (presumption overcome by evidence that the work had been copied from the public domain); *Carol Barnhart Inc v. Economy cover Corp.*, 773 F.2d 411, 414 (2d Cir. 1985) (presumption overcome by evidence that the work was a non-copyrightable utilitarian article).

**b. The Copyrighted Monsters Lack Creativity**

In *M&D Int'l Corp .v Chan*, the court also stressed that evidence of similar "preexisting works previously and widely published, registered or released into the public domain" by competitors further undermined the originality of the designs. 901 F. Supp. 1502, 1516 (D. HI 1995). This evidence of similar third-party creations demonstrates "that many minds laboring on the same problem have been unable to produce greatly different expressions of the ideas at issue . . . [and] implies limited range of expression is possible . . . ." *See Kepner-Tregoe, Inc. v. Carabio*, 1979 U.S. Dist. LEXIS 12910 *4 n.2 (E.D. Mich. 1979). This is particularly true where, as with the monsters, the design reflects a common or generic image. *See Concrete Machinery Co.,* 843 F.2d at 606 (If an idea "admit[s] of only a limited number of expressions . . . [then] copyright is no bar to copying that expression").

### c. Hasbro is Subject to the Same Presumption of Access and Copying That It Seeks to Apply Against the Plaintiffs

Hasbro cannot raise the inference of copying by access and substantial similarity against the Bowling without being subject to the same inference – that it copied its monsters from pre-existing works. "Upon proof by a defendant that a plaintiff had access to similar prior works, the burden of proving originality shifts back to the plaintiff . . . .To show a lack of originality and thereby rebut a plaintiff's registration certificate, a defendant should, in the absence of direct proof of copying, make the same showing of copying by plaintiff required in a prima facie infringement case, i.e., access and substantial similarity as between plaintiff's work and that form which it was allegedly copied." *Midway Mfg. Co. v. Bandai-America, Inc.*, 546 F. Supp. 125, 140 (D.N.J. 1982); 3-12 Nimmer on Copyright § 12.11 ("Proof that the plaintiff copied from prior works should involve the same elements as are required to establish copying by the defendant from the plaintiff, i.e., access and probative similarity"); *see also CMM Cable Rep v. Ocean Coast Props.,* 97 F.3d 1504, 1513 (1st Cir. 1996) ("Upon defendant's proof of lack of originality by plaintiff through evidence that the plaintiff copied from prior works, the burden shifts back to the plaintiff to prove originality.") Moreover, if "the prior works are sufficiently well-known . . . the plaintiff's work may itself constitute 'mute testimony' that plaintiff copied from these prior works." *R. Dakin & Co. v. A & L Novelty Co.*, 444 F. Supp. 1080 (E.D.N.Y. 1978).

The evidence shows that substantially similar monsters were extensively available and that Hasbro had access to these earlier designs. Accordingly, the burden of proving originality shifts back to Hasbro.

**d. Hasbro Cannot Prove Copying**

It is axiomatic that, regardless of the similarity of two designs, "[i]f there is no copying, there can be no infringement." *Franklin Mint Corp. v. National Wildlife Art Exchange, Inc.*, 575 F.2d 62, 64 (3d Cir. 1978). To prevail, Hasbro must establish not simply that eM-4 copied some monster figures, but specifically that eM-4 copied Hasbro's *design*. "[J]ust as a [copyright holder] is no less an 'author' because others have preceded him, so another who follows him is not a tort-feasor unless he pirates his work." *See Sheldon v. Metro-Goldwyn Pictures Corp.*, 81 F.2d 49, 54 (2d Cir. 1936). Unlike a patent, a copyright does not prevent all others from making, using, or selling the protected material. A copyright prevents only the unauthorized *copying* of a protected work. Hasbro has no such evidence.

To show actionable copying, and therefore satisfy *Feist's* second prong, Hasbro would have to first prove that eM-4 copied Hasbro's copyrighted work as a factual matter. To do this, it may either present direct evidence of actual copying or, if that is unavailable, inferentially, by evidence that eM-4 "had access to the copyrighted work and that the allegedly infringing work is substantially similar to the copyrighted work." *See Concrete Machinery*, 843 F.2d at 606; *Lotus Dev. Corp. v. Borland Int'l*, 49 F.3d 807,813 (1st Cir. 1995).[3] Here, there is no direct evidence of copying.

The *inference* of copying by access and substantial similarity is also unavailable to Hasbro. Inferential proof of copying makes no sense in this case where there are other independently created monsters in the public domain and on the market. It would require untrustworthy speculation that Hasbro's monsters, as opposed to some other monster, was the source of the eM-4 monster figures. It is well established that *"[a]cess must be more than a*

[3] The "substantial similarity" analysis at this stage is sometimes referred to as "probative similarity" and has been characterized as an "evidentiary inference." *See Yankee Candle Co., Inc. v. The Bridgewater Candle Co., LLC,* 259 F.3d 25, 33 n.4 (1st Cir. 2001).

*bare possibility and may not be inferred through speculation or conjecture.*" *See Hoffman v. Pressman Toy Corp.*, 790 F. Supp. 498, 505 (D.N.J. 1990) (citing *Gaste v. Kaiserman*, 863 F.2d 1061, 1066 (2d Cir. 1988)) (emphasis added). Moreover, "[t]o satisfy its burden of showing access, [a] plaintiff must produce evidence from which a reasonable finder of fact could infer that the defendant had a reasonable opportunity to copy his or her work. . . . Evidence that only creates a 'bare possibility' that the defendant had access is not sufficient." *Grubb v. KMS Patriots, L.P.*, 88 F.3d. 1, 3 (1st Cir. 1996).

Hasbro cannot prove copying inferentially because it has no evidence of access and probative similarity because other monsters exist in the public domain, such as the Cockatrice, in Greek mythology.

**e. Hasbro Cannot Prove Substantial Similarity**

In addition to being unable to establish that eM-4 had access to Hasbro's monsters, Hasbro is unable to make out a *prima facie* case for copyright infringement because – as a matter of law – it cannot establish that the eM-4's monsters are substantially similar to the Hasbro monsters. The determination is not so simple a task as a strict visual comparison of the two items. The extent to which the Hasbro monsters contain protected expression is a matter of law, determined by the court. Only once this determination is made does the question of whether the works are substantially similar (and corresponding application of the ordinary observer test) become a matter for the trier of fact. *Yankee Candle Co. v. Bridgewater Candle Co.*, 259 F.3d 25, 33-34 n.5 (1st Cir. 2001); *see Concrete Machinery*, 843 F.2d at 606.

While substantial similarity is typically evaluated under the so-called "ordinary observer" test, a more stringent test (the "more discerning observer" test) is applied where, as here, the

plaintiff's work contains both protectable and unpredictable content.[4] In such cases, the fact finder must "exclude comparison of the unprotectable elements from [its] application of the ordinary observer test." *See Fisher-Price, Inc. v. Well-Made Mfg. Corp.*, 25 F.3d 119, 123 (2d Cir. 1994). "Any comparison between the two works must be informed by a key theoretical foundation of copyright law: that ideas cannot be copyrighted, and therefore than an artist can claim to own only an original manner of expressing ideas, not the ideas themselves." *Yankee Candle Co. v. Bridgewater Candle Co.*, 259 F.3d 25, 33-34 (1st Cir. 2001) (citations omitted).[5] Because an "idea" cannot be copyrighted, only the "protected expression" is relevant to an evaluation of substantial similarity and the court must first determine to what extent the monsters contain protected expression.

Whatever similarity exists between eM-4 monsters and Hasbro's monsters results from a similarity of unprotectable elements. Specifically, while both the Hasbro and eM-4 monsters are comprised of stock monsters assembled to form features that are not protectable. *See M&D Int'l,* 901 F. Supp. at 1509; *cf. Aaron Basha Corp.*, 88 F. Supp. at 230. Moreover, while both the Hasbro and eM-4 monsters are comprised of basic characteristics, for example a chicken head, dragon tail, and wings, those components of the monsters are stereotypical or classic elements (i.e., virtually each monster of that type depicted possesses these elements), and thus they are not protectable under copyright law.[6] *See Aaron Basha Corp.*, 88 F. Supp. at 230 (protectable

---

[4] *See CMM Cable Rep v. Ocean Coast Props.*, 97 F.3d 1504, 1514 (1st Cir. 1996) (noting that "the Copyright Act itself seems to mandate the 'dissection' of works into copyrightable and uncopyrightable elements").

[5] The First Circuit calls this a "dissection" test. *See Yankee Candle*, 259 F.2d at 34. *See Concrete Machinery,* 843 F.2d at 606. Thus, Hasbro cannot claim an exclusive right to make a simple monster. *See Concrete Machinery,* 843 F.2d at 606. Thus, Hasbro cannot claim an exclusive right to make a simple monster. *See Concrete Machinery*, 843 F.2d at 607 (emphasizing appellant "cannot prohibit others from appropriating" idea of creating "realistic-looking concrete deer"); *Aaron Basha Corp. v. Felix B. Vollman, Inc.*, 88 F. Supp. 2d 226, 230 (S.D.N.Y. 2000) (dismissing copyright claim because "the simple idea of a baby shoe pendant" and "using precious metals, gemstones, and enamel to decorate a pendant" are "unprotectable").

[6] The Copyright Office's own interpretive regulations explicitly embrace this rule of non-copyrightability. See 37 C.F.R. § 202.1(a) (1994) (excluding from copyright protection "familiar symbols and designs"). "While this

elements of baby shoe pendant include only those elements that go "beyond its stereotypical features").

Bowling contends, among other defenses, that the miniatures do not infringe Hasbro's alleged copyrights. EM-4's miniatures are not copies of Hasbro's version of its monsters, but rather are taken from the public domain. For example, a Cockatrice is a mythical creature that existed long before Hasbro copyrighted its version.

**f. Damages Regarding Hasbro's Copyright Claims Against Bowling**

In the unlikely event that Bowling is found to infringe any of Hasbro's copyrights, damages will be minimal. Crystal Caste only sold 18 monster miniature sets. Its profits were $168.00 from those sales. Moreover, as Crystal Caste was unaware of Hasbro's copyrights until Hasbro's counterclaims, and because it immediately stopped selling the accused products, it is likely that any statutory damage award would be reduced to $200 per infringement. *See* 17 U.S.C. § 504(c)(2). Thus, Hasbro's damages should be no more than $600.

**D. OTHER MATTERS**

Attached hereto are the following pretrial documents:

Exhibit A: Plaintiff Michael Bowling's Witness List

Exhibit B: Plaintiff Michael Bowling's Proposed Jury Instructions

Exhibit C: Plaintiff Michael Bowling's Proposed Special Verdict Form

Exhibit D: Plaintiff Michael Bowling's List of Anticipated Motions in *Limine*

Exhibit E: Plaintiff Michael Bowling's Statement of Probably Length of Trial

The parties agreed to exchange exhibits and exhibit lists on Friday, December 21, 2007.

---

Copyright Office regulation 'does not have the force of statute, it is a fair summary of the law.'" *CMM Cable Rep. v. Ocean Coast Props.*, 97 F. 3d 1504, 1520 (1st Cir. 1996) (quoting *Kitchens of Sara Lee, Inc. v. Nifty Foods Corp.*, 266 F.2d 541, 544 (2d Cir. 1959).

Michael Bowling,
By His Attorneys

Date: December 12, 2007

s/Thomas J. Leach
Anthony R. Zeuli (*pro hac vice*)
Thomas J. Leach, (*pro hac vice*)
MERCHANT & GOULD, P.C.
3200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Phone: 612.332.5300
Fax: 612.332.9081

Craig M. Scott, Esq. (R.I. Bar #4237)
Christine K. Bush, Esq. (R.I. Bar #5587)
DUFFY SWEENEY & SCOTT, LTD
One Turks Head Place, Suite 1200
Providence, RI 02903
(401) 455-0700
(401) 455-0701 (Facsimile)

**CERTIFICATE OF SERVICE**

TO:

Todd D. White, Esq.
Jeffrey K. Techentin, Esq.
Adler Pollock & Sheehan P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903-1345

David K. S. Cornwell, Esq.
Tracey-Gene G. Durkin, Esq.
Sterne Kessler Goldstein & Fox P.L.L.C.
1100 New York Avenue N.W.
Washington, DC 20005

I hereby certify that the within Plaintiff Michael Bowling's Trial Brief with attached Exhibit 1 and Exhibits A-E were filed through the ECF system on the 12th day of December, 2007, and will be sent electronically to the above-named counsel who are registered participants identified on the Notice of Electronic Filing for Case No. 05-229S.

/s/ Thomas J. Leach__________