UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| MICHAEL BOWLING, a Resident of Arizona, | : | |
| Plaintiff, | : | |
| v. | : | C.A. No. 05-229 S |
| HASBRO, INC., a Rhode Island Corporation, | : | |
| Defendant. | : | |

**DEFENDANT HASBRO'S MOTION IN LIMINE TO PRECLUDE TESTIMONY OF PLAINTIFF'S EXPERT WITNESS, NEIL N. LAPDIUS**

Pursuant to Fed. R. Civ. P. Rule 37(c)(1) and the Pretrial Order governing this case, Defendant Hasbro, Inc., hereby moves *in limine* to exclude the proposed expert testimony of Neil N. Lapidus, CPA, offered by the Plaintiff, Michael Bowling, because it does not meet the reliability standards of Rule 702 of the Federal Rules of Evidence as articulated in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), being instead the product of ill-founded, speculative assumptions. Additionally, the basis for the opinions offered by the witness at deposition were not disclosed in his written report and are therefore inadmissible by application of Fed. R. Civ. P. Rule 26(a)(2). The grounds for this motion are set forth in the accompanying Memorandum of Law.

Pursuant to L.R. (civ) 7(e), Hasbro requests an evidentiary hearing on this motion.

Respectfully submitted,

HASBRO, INC.
By its Attorneys,

/s/ Jeffrey K. Techentin___________

Todd D. White (# 5943)
twhite@apslaw.com
Jeffrey K. Techentin (#6651)
jtechentin@apslaw.com
Adler Pollock & Sheehan P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903
(401) 274-7200
Fax: (401) 751-0604/ 351-4607
Dated: December 19, 2007

Of Counsel:

David K. S. Cornwell, Esq.
davidc@skgf.com
Tracy-Gene G. Durkin, Esq.
tdurkin@skgf.com
Sterne Kessler Goldstein Fox
1100 New York Avenue, NW
Washington, D.C. 20005

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| MICHAEL BOWLING, a Resident of Arizona, | : | |
| Plaintiff, | : | |
| v. | : | C.A. No. 05-229 S |
| HASBRO, INC., a Rhode Island Corporation, | : | |
| Defendant. | : | |

**MEMORANDUM IN SUPPORT OF DEFENDANT HASBRO'S MOTION IN LIMINE TO PRECLUDE TESTIMONY OF PLAINTIFF'S EXPERT WITNESS, NEIL N. LAPDIUS**

Defendant Hasbro, Inc. ("Hasbro") hereby moves *in limine* to exclude Plaintiff Michael Bowling's ("Bowling") purported expert Neil N. Lapidus ("Lapidus") from testifying as to damages at the trial of this patent infringement case.

## I. PRELIMINARY STATEMENT

Bowling intends to introduce at trial the purported expert testimony of Neil N. Lapidus, a C.P.A. and the Administrative Partner of Lurie, Besikoff, Lapidus & Company, LLP, an accounting and consulting firm in Minneapolis, Minnesota. The testimony of this accountant is nothing more than *ipse dixit*, and the proffer of expert testimony based solely on his unsubstantiated generalizations and speculative hypotheses is improper. In an effort to create substantial damages where none exist, Lapidus offers an entirely unreliable opinion as to reasonable royalty for Bowling's patent. Lapidus has done nothing more than to select a number based on Bowling's highest wholesale price less some of Hasbro's costs. This is not a genuine, or even realistic, attempt to determine a reasonable royalty. Rather, it is speculative guesswork

engineered to put "big numbers" into play at trial. His proffered opinions do not even approach the level of reliability required by *Daubert*. The Court should therefore exercise its role as "gatekeeper" and exclude this speculation disguised as expert analysis.

There is a complete disconnect between any analysis or reasoning performed by Lapidus and his conclusions with respect to reasonable royalty. Lost profits are not at issue in this case, only what would amount to a reasonable royalty for the patented invention. Nevertheless, and without explicitly acknowledging that he is doing so, Lapidus opines that Hasbro would have agreed to pay Bowling significantly more than his profits on his own dice. Without ever connecting his factual analysis with his conclusions, Lapidus opines that the reasonable royalty consists of having Hasbro pay Bowling's full wholesale price for the die. His ***complete*** calculation of reasonable royalty is reproduced below:

**Exhibit D**

**Reasonable Royalty Per Die**

| | | |
|---|---|---|
| Bowling's Per Die Sales Price | $ | 0.6400 |
| Less: Hasbro's Cost Per Die | | 0.0575 |
| Reasonable Royalty Per Die | $ | 0.5825 |

Bowling sold some of his dice at wholesale for $0.64 and others at dramatically lower prices. Lapidus chose the highest number – 64 cents – and merely subtracted Hasbro's cost to manufacture its dice. Since Hasbro would have to incur that cost in the hypothetical situation where Hasbro had licensed the dice from Bowling, Hasbro would in effect be paying the full 64 cents that Bowling was charging at wholesale (royalty of $0.5825 per die + cost of $0.0575).

At a minimum, an expert opining on reasonable royalty damages based on a hypothetical negotiation between two parties should be required to explain why one party would be willing to

pay the amount of the royalty and why the other would be willing to accept that amount. Lapidus does neither. He merely picks a number that has nothing at all to do with licensing dice for use in a game, but instead is obviously selected to create a prejudicially-high damages claim.

In his written report, Lapidus pays lip service to the appropriate factors that he is required to consider when determining damages in a patent infringement case, but completely fails to analyze or apply those factors. Instead, he just states facts that he deems pertinent to those factors and then presents conclusions. More importantly, there is no connection whatsoever between his flawed analysis of those factors and his ultimate conclusions as to what the royalty would be. At no point does Lapidus even suggest any reasoning as to why the facts he deemed pertinent to the factors resulted in the conclusions he draws. He completely ignores and misapplies industry standards and practices – matters about which he has no experience or direct knowledge and has utterly failed to educate himself.

Lapidus offered no more reliable analysis at his deposition. His backtracking and attempts to "explain away" his faulty reasoning only served to reveal his lack of qualification to present expert opinion testimony on this matter and that his opinion is utterly *ipse dixit,* essentially saying "it's so because I say it's so." Moreover, Lapidus's analysis either overlooks or ignores evidence that is material to the issue of the amount of damages in this case. As such, if the Court were to allow Lapidus's testimony, it would only serve to confuse the jury. Therefore his proposed expert testimony is inadmissible under Fed. R. Evid. 702 and 403.

## II. BACKGROUND

On February 22, 2006, Bowling submitted the "Expert Report on Damages of Neil N. Lapidus, CPA" which purports to determine the damages sustained by Bowling as a result of Hasbro's alleged infringement of U.S. Patent No. 5,938,197 ("the '197 Patent") obtained by Bowling on August 17, 1999. A copy of the report is attached as **Exhibit A**. This report has never been supplemented or amended.

In the report, Lapidus describes himself as having "served as an expert witness in a number of cases evaluating damages relating to contract matters, intellectual property, and relationships between companies." Lapidus Rpt. at 2. He also says that he is "familiar with distribution channels and the financial aspects of licensing for a variety of industries." *Id*. at 2. He also trumpets his "substantial experience in the financial analysis of both local and multi-national companies." *Id*. at 1.

Asked at his deposition to elaborate as to his particular qualifications in the field of toy and game licensing, and calculating reasonable royalty for such licenses, Lapidus revealed that he had none. In response to an inquiry as to which industries he had experience with regard to the financial aspects of licensing, Lapidus responded:

> The recorded products industry, including LPs, CDs, videos, general retailing, call it big box, gaming equipment, plumbing equipment, liquor and food, jewelry, most manufacturing that deals with metal bending.

Lapidus Depo. at 60:9-13. **Exhibit B**. When pressed as to what his experience was with regard to licensing in the metal bending industry, he merely stated that "in having a knowledge of those industries, some applications there may be some licensing applied to them and some there really isn't or it's not -- may not be applicable." *Id.* at 61:23 – 62:2. However, with regard to the toy industry, Lapidus admitted that his experience did not involve licensing, but was limited to

"[B]usiness consulting, tax consulting, review of financial information, kind of understanding their business model, maybe a specific decision that someone asked me my advice or opinion of." *Id.* at 63:7-11. While he alluded to some involvement in some licensing activity for toy inventors, he was elusive and could not recall specifics of any work he had done in that area. *See id.* at 63:12 – 65:6. There are, of course, established industry standards and practices relative to royalties (the common starting point being 5% for a complete toy or game concept). Lapidus, to the extent he claims to have considered them, misinterprets and misapplies them.

At the beginning of the analysis section of his expert report, Lapidus explains that, because no established royalty exists for the patent, he will be calculating "a hypothetically negotiated royalty that is based upon a number of considerations, known as the *Georgia Pacific* factors." Lapidus Rpt. at 5.

The *Georgia-Pacific* factors were first outlined in *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F.Supp. 1116, 1120 (D.C.N.Y. 1970), *aff'd,* 446 F.2d 295 (2nd Cir. 1971), *cert. denied,* 404 U.S. 870 (1971). The district court identified the most relevant factors to consider in determining a reasonable royalty in a patent infringement case:

> 1. The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty.
>
> 2. The rates paid by the licensee for the use of other patents comparable to the patent in suit.
>
> 3. The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.
>
> 4. The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.

5. The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter.

6. The effect of selling the patented specialty in promoting sales of other products of the licensee; that existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.

7. The duration of the patent and the term of the license.

8. The established profitability of the product made under the patent; its commercial success; and its current popularity.

9. The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.

10. The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.

11. The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.

12. The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

13. The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

14. The opinion testimony of qualified experts.

15. The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee- who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention- would have been willing to pay as a royalty and yet be

> able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

*Id.* These factors have been accepted by the Federal Circuit as the appropriate factors for a federal district court to consider when faced with the task of determining a reasonable royalty. *See, e.g., Parental Guide of Texas, Inc. v. Thomson, Inc.*, 446 F.3d 1265, 1270 (Fed. Cir. 2006) ("as both parties recognize, a 'reasonable royalty' rate under section 284 is calculated with reference to the long list of factors outlined in [*Georgia-Pacific*]"); *Dow Chemical Co. v. Mees Industries, Inc.*, 341 F.3d 1370, 1382 (Fed. Cir. 2003) ("the district court should consider the so-called *Georgia-Pacific* factors in detail, and award such reasonable royalties as the record evidence will support") (citation omitted); *Micro Chemical, Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1393 (Fed. Cir. 1993) ("Factors relevant in a reasonable royalty determination using this method include those set out in *Georgia-Pacific*."). Thus, any expert analysis of reasonable royalty for patent infringement based on a hypothetical negotiation must include detailed analysis of the *Georgia-Pacific* factors.

Before embarking on his consideration of the factors, Lapidus explains that:

> [a]t the time of the hypothetical negotiation, each party would have known that Hasbro was currently manufacturing and selling the accused dice in Millennium edition [*sic*] Monopoly and that they were faced with three options: (1) discontinuing use of the accused die, replacing the die in existing inventory, changing its packaging, and changing its advertising; (2) negotiating a license agreement and paying Mr. Bowling a royalty to use his patented die; or (3) continuing to sell its inventory, phase out of the infringing die, and risk litigation.

*Id*. at 7.

Lapidus acknowledges in the report that Hasbro estimated that its cost to employ the first option described – discontinuing its use of the accused dice – would be $70,000.00. *Id.* at 7. He

then posits that the likely cost to Hasbro for selecting the third option – risking litigation – would be nearly $1,500,000.00. *Id.* at 7 n.5. He then goes on to say: "It is my opinion that the timing of events surrounding the hypothetical negotiations, overall, indicates that the royalty rate would be high in relation to other license agreements negotiated by Hasbro and other industry standards." *Id.* at 7-8. Tellingly, Lapidus never says what might be significant about the timing of events, or what those "other licensing agreements [and] other industry standards" are.

**A. Lapidus Performed No Analysis Of The Georgia-Pacific Factors.**

Lapidus purports to apply each of the fifteen *Georgia-Pacific* factors. Lapidus Rpt. at 8. However, he merely lists each of the factors, states some facts he deemed relevant to each factor, and then makes conclusory statements about the effect of those facts, without even hinting at an explanation. Lapidus Rpt. at 8-15. Tellingly, of the factors that he deemed relevant (13 out of 15 of them), Lapidus concluded that ***not one single factor*** favored Hasbro in the negotiations. Instead, he merely recites that the factors "would tend to increase reasonable royalty" without stating from what base those effects should be applied, or to what extent any factor might actually increase the royalty.

With regard to the first factor, which calls for the consideration of royalties received for the patented product, if any, that tend to prove an established royalty, Lapidus's analysis consists of three terse sentences: "The patentee has not licensed the patent in suit. The patentee sells patented dice. This factor would tend to increase reasonable royalty." In an effort to fully understand the reasoning behind Lapidus's opinion regarding this factor, Hasbro's counsel asked Lapidus at his deposition to explain his reasoning with regard to that factor. His response was:

> I think he's probably made a decision that he, in his selling model, he can sell more or sell the way he wants to market or market his product more in a retail sense or a wholesale sense and that that type of sale [licensing] of product doesn't necessarily interest him.

Lapidus Dep. At 85:3-8. That response led to a protracted attempt by counsel for Hasbro to get Lapidus to explain the basis for his opinion that Bowling did not want to license the dice, what effect, if any, the fact that Bowling had inquired as to licensing in the past had on his analysis, and also as to from what starting point he was asserting reasonable royalty would increase. *See id.*.at 85:9 – 92:13. Lapidus was evasive, saying, "a single inquiry I can't draw any conclusion," with regard to the effect of Bowling's actual attempts at licensing, *id*. at 88:8-9, that the reason that reasonable royalty would increase according to this factor was merely because the product had not been licensed, *id*. at 89:2-15, and "I don't necessarily think I started at a standard," with regard to his starting point for calculating the royalty. *Id.*. at 91:22-23. In short, Lapidus's analysis concluded that the fact that Bowling had tried to license his dice but had never succeeded meant that the royalty rate should be higher. Higher than what? Lapidus cannot say. Why? Because he says so.

This cursory treatment of the first factor is illustrative of his treatment of the other factors. His review of factor two, "the rates paid by the licensee for the use of other patents comparable to the patent in suit," makes no mention of how any of the license agreements he reviewed were comparable to the hypothetical negotiation at issue. Instead, he states that he "reviewed a number of license agreements," that the range of "rates paid by Hasbro is between 1-8% of net sales," and that more than twenty of the agreements he reviewed "had royalty payments of 5% or higher." As such, he concluded that "this factor would tend to increase reasonable royalty." Lapidus Rpt. at 8. Again, increase it over what, he cannot say. At his deposition, Lapidus supported his analysis of this factor by saying that he thought all of the agreements he reviewed were comparable because they "show[] what HASBRO's license and how they do business in a negotiation." Lapidus Dep. at 96:1-3. Lapidus elaborated that the

agreements dealt with the licensing of toy and game concepts, and when asked how that made them comparable to this negotiation, which dealt with licensing for a component of a game, he replied:

> It may make a difference, but HASBRO also sent a letter saying they were interested in seeing if a licensing -- if we were interested in licensing; and therefore, this is the result of -- files you sent over are the results of licensing efforts that HASBRO has taken place. Whether it's that department or those people, those were the ones you sent over, so I'm assuming that that's representative of how you do business in licensing.

*Id*. at 97:5-13. Typical of his "analysis," Lapidus was confident that these license agreements justified a high royalty, but could not explain how the agreements he reviewed were comparable to the hypothetical negotiation he was supposed to be considering. How do the agreements that show 1% or 8% royalties compare to the present case? Are the properties similar? Is the value they connote analogous? Can he discern why some agreements have higher royalty provisions than others? What factors contribute to high royalties, or low royalties? Why would Hasbro's agreement to pay 5% of net sales on a complete game concept justify his conclusion that Hasbro would willingly give Bowling 11.92% of net sales for just one component among dozens in the Millennium Edition game? If Lapidus has an explanation, he has never shared it. The reality is that he has no explanation, and doesn't even pretend to have considered those critical questions.

The analysis of factor three, regarding whether the license would be exclusive, is similarly conclusory and inaccurate. Lapidus states that the "license would have been exclusive," but provides no reasoning as to why, nor any facts to support that assertion. Lapidus Rpt. at 9. He further states that Hasbro kept these dice exclusive by only "including them in the Millennium editions." *Id.* That, of course, says nothing about whether Hasbro was to have exclusive rights in the patent, and Lapidus does not explain why that would suggest an exclusive

licensing arrangement. Finally, he avers that this factor would "tend to increase reasonable royalty" again without any explanation. *Id.* At the deposition, Lapidus explained that the exclusivity would limit Hasbro to putting the dice in the Millennium Monopoly games and limit Bowling from licensing the dice for other games, but not limit Bowling from selling the dice on his own. Lapidus Dep. at 109:12 – 110:14. That, of course, isn't "exclusive" either. Lapidus's only attempt at explaining why this type of arrangement would increase reasonably royalty is his belief that the mutual restrictions would be to Hasbro's advantage. *Id*. at 110:20-23. Finally, when asked if he had any factual basis to determine that Hasbro would insist on exclusivity, Lapidus simply answered, "No." *Id*. at 113:9.

The remaining *Georgia-Pacific* factors are addressed with brief factual statements, often without support, followed by a common refrain, "this factor would tend to increase the reasonable royalty."[1] Factor four, which calls for consideration of the licensor's established policy with regard to licensing, is met with a three-line analysis that merely says that Bowling does not operate a licensing company. Lapidus Rpt. at 9. Consistent with his goal-based treatment of the *Georgia-Pacific* factors, Lapidus opines that this fact would increase the royalty.

Lapidus's analysis of factor five regarding the nature of the relationship between the licensor and licensee prior to the hypothetical negotiation is met with a conclusory statement that the relationship between Bowling and Hasbro would have been one of supplier and customer. Lapidus Rpt. at 9. When asked why the relationship would not have been one of inventor and promoter, Lapidus said, "I think as I recall there was some issues with color that he would probably want or I would assume that he would want a little more control in the product." Lapidus Dep. at 126:2-5. In an obvious attempt to backtrack from his counterfactual report,

[1] The analysis of each of the first twelve factors ends with that sentence. Factor thirteen is said to not "increase or decrease reasonably royalty," while factors fourteen and fifteen are not specifically analyzed.

Lapidus invoked what became his new mantra at the deposition, now announcing that whether the relationship was supplier/customer or inventor/promoter did not matter to reasonable royalty rate because of the timing. *Id.*. at 130:11-19. Furthermore, in the analysis of factor five, Lapidus asserts that Bowling would have sold to Hasbro for $0.64 per die, which represents Bowling's list wholesale price. Lapidus Rpt. at 10. However, in his deposition, Lapidus admitted that Bowling sold the dice at a lower price based on quantity, which would certainly be relevant to Hasbro purchasing hundreds of thousands of dice, yet made no reference to this fact in his report. Lapidus Dep. at 133:8 – 134:2.

The factor-six analysis in Lapidus's report references that the dice were prominently featured as a selling point in the game. Lapidus Rpt. at 10. It also states that when people ordered dice from Bowling, they would also sometimes order non-patented items. *Id*. However, there is no analysis that supports his conclusion that this factor would tend to increase reasonable royalty. Rather, Lapidus baldly asserts that the "dice were one of a number of features incorporated into the game that were designed to command a high selling price." *Id.* However, at his deposition, Lapidus conceded that he was not sure how significant the dice were in driving game sales:

> Q. Do you believe that the dice were a significant factor driving sales of the games that included the accused dice?
>
> A. Somewhat, yes. I'm not sure completely, because I don't know the impact, but in fact the advertising featured that and the slogan for that was "The familiar will take on a different slant," and so if I'm in the minds of the creator, I guess they felt that was pretty important. In the minds of the marketing people, they used that item as one item, a couple others, but they used that prominently to show that something would be different.

Lapidus Depo. at 141:12-24.

Similarly, there is no explanation as to why Lapidus believes that the short life of the Millenium Monopoly game would increase royalty, Lapidus Rpt. at 11, or that the dice were "a cost effective means of generating random numbers and looking 'futuristic,'" *id*. at 12. Finally, when he arrives at his conclusion, that $0.5825 per die is the reasonable royalty, he does not explain how that number is derived. In his attached Exhibit D to his report he does reveal a formula that consists of Bowling's posited sales price minus Hasbro's cost to manufacture the dice, but this is supposedly a royalty analysis, not a lost profit analysis.

There is no reasoning provided for the use of that lost-profit formula. When confronted with the fact that the royalty he calculated when framed as a percentage of net revenue for the sales of the game exceeded the royalty paid for the use of the Monopoly game concept as a whole, he said he did not know enough about that license to comment on it. Lapidus Dep. at 213:16 – 214:18. However, he did admit that the fact that the game was called Monopoly was more important to sales of the game than the fact that it included the allegedly infringing dice. *Id.*. at 214:19-24. Finally, at no point – either in his report or his deposition responses – does Lapidus indicate that he even considered the fact that Hasbro ultimately removed the infringing dice from the game after licensing negotiations broke down and replaced them with non-infringing dice. This fact, which Lapidus ignored, is strong evidence that Hasbro was not willing to pay "anything," but rather would have made a rational business determination of the value of a license. But to reach a conclusion on the subject, Lapidus would have had to analyze the *Georgia-Pacific* factors in detail, which he did not do and which, of course, would have dramatically reduced the claimed royalty rate.

**B. At Deposition, Lapidus Presented An Analysis, Not Grounded in Fact Or His Expertise, Based On Hasbro's Business Cycle That Was Not In His Written Report.**

At his deposition, Lapidus refined his reference to the importance of the timing of events to mean that he believed that August 17 was a (or perhaps ***the***) critical date in the life cycle of the Millennium Edition Monopoly game. When Hasbro's counsel attempted to have Lapidus confirm that there was no indication in his report, whatsoever, that his opinions had been based even in part upon some aspect of Hasbro's business cycle, Lapidus was evasive, claiming that there were "references" to Hasbro's business cycle in his report. Even if his evasive comments are credited, however, there is no question that Lapidus ***never*** disclosed Hasbro's business cycle, or some purported significance of the August 17 date within that cycle, as a basis for his opinion regarding a reasonable royalty for the dice. Under these circumstances, Lapidus should not be permitted to testify as to that basis for his opinions. But even if the Court were inclined to excuse his failure to disclose this purported basis for his opinions, even his newly-identified theory is an insufficient predicate for his conclusions as to reasonable royalty and should be excluded under the *Daubert* requirement of reliability.

Lapidus first identified August 17 as a critical point in Hasbro's "business cycle" in response to a question as to his understanding was as to what Hasbro's cost would have been to replace the infringing dice:

> Yes, I believe there was some deposition references as to what the cost of changing packaging and opening the product up and whatever, but I think the biggest factor is the loss in sales. So although you're asking me to exclude it, I think that **given the timing, by that I mean the August 17th date in the calendar**, and how retail sales are recorded, the timing of them, I believe it was a very -- **that August date represented a very sensitive date** so that the time to do the items in number 1 or more would have cost sales -- would have been more a particular sales of lost sales rather than say a cost to change.

Lapidus Dep. at 78:23 – 79:11 (emphasis added). When asked whether he thought a determination by Hasbro that fifty cents per pair of dice would be cost prohibitive was relevant to his analysis, Lapidus responded:

> It may be. I think then the issue -- I think you're kind of giving me a little of a hypothetical, but I also get into the issue of timing. And on August 17, at the date that I am taking myself to or supposed to take myself to, you also have the timing of the dice are already in the box. They're there or they're being manufactured and they're there. The orders are out, and I think there is probably a more complicated decision that has to be made in this context.

*Id.* at 170:1-10. Despite *never* discussing or addressing or even mentioning Hasbro's business cycle in his report, the "fact" that August 17 was somehow "critical" to Hasbro's business cycle became a mantra at Lapidus's deposition. In fact, at his deposition, Lapidus testified that virtually ***every*** *Georgia-Pacific* factor suggested higher royalties based primarily or exclusively on this consideration. *See, e.g., id.* at 78:17 – 79:11; 99:13 – 101:16; 129:9 – 131:5; 169:20 – 171:16; 195:1 – 197:4; 204:11 – 205:11. The importance of this "business cycle" consideration in Lapidus's conclusion cannot be overstated; he concludes that because of the timing of Bowling's patent, Hasbro would have seen ***zero*** sales of the Monopoly Millennium Edition product post-patent issuance if it had discontinued using the accused dice. *Id.* at 23:24 – 24:8.

The following exchange illustrates not only that Lapidus placed special emphasis on what he perceived to be the extreme importance of August 17, but also that he failed to reference the importance of that date in his expert report:

> Q. And just so that I'm clear, your comments about timing, which you've made frequently in today's deposition, go to the precarious situation in which HASBRO found itself, is that correct, because of the inclusion of the dice up until August 17th?
>
> A. Yes.

Q. And it's compounded by the fact that August 17th in your opinion is significant time in HASBRO's business cycle?

A. Yes.

Q. Where in your report do you discuss the significance of August 17th to HASBRO's business cycle?

A. I think it is shown in various places or referred to, maybe not directly, but it is there.

Q. Is it ever directly referred to?

A. Well, I'd have to go through the report and look.

Q. Please do. That one I'm willing to wait for.

A. But if it is not directly, it is indirectly referred to.

. . .

Q. What did you find?

. . .

A. I believe there are both direct and indirect references in my report.

. . .

Q. Okay. I'm only asking about direct.

A. I believe on page 6, on line 1, in my mind that is a direct reference.

Q. When you posit that HASBRO had a decision of replacing the infringing dice changing its advertising and changing its packaging, is that what you're referring to?

A. Yes. And continuing through line 3.

Q. Semicolon, Negotiating a licensing agreement with Bowling, semicolon, or continuing to sell the remaining inventory risking litigation?

A. Yes.

Q. It's your testimony that that's a direct reference to the significance of August 17th as opposed to some other date when that might be the case?

A. That's one reference, yes.

Q. What's the next?

A. Page 7, lines 1 through 3.

Q. Those are the quotations from Mr. Hirtle's deposition?

A. Yes.

Q. In which he testifies that at the time that -- well, it's not even his testimony. It's a question, correct?

A. Yes.

Q. So you're referring to Mr. Leach's question to him that at the time that he called Mr. Bowling in September or October of 1999, I'm inserting, you were already manufacturing the accused dice and including them in the Monopoly Millennium edition game?

A. Yes.

Q. And it's your testimony today that that quotation of Mr. Leach is a direct reference to the significance of August 17th in HASBRO's business cycle?

A. Yes.

Q. Okay. What's the next one?

MR. LEACH: You excluded Michael Hirtle's answer.

A. And his answer.

MR. TECHENTIN: He said the first three lines, but that's fine.

A. My next reference was the answer also.

BY MR. TECHENTIN:
Q. Okay.

A. Same page, actually continuing through the next answer of, Yes, maybe that would be easier to do it or maybe a little faster. HASBRO has a bit of a disadvantage if Mr. Bowling knew that you already had inventory and were selling these games and committed to his dice. Answer, Yes. I believe that's a reference.

Q. That's a reference to August 17th's significance in HASBRO's business cycle?

A. Yes.

Q. Okay.

A. And line 17, again, the similar quotation that was on page 6.

Q. The numbers 1 –

A. Continue to sell it's inventory, yes.

Q. Numbers 1, 2 and 3, and we discussed those?

A. Yes.

Q. And that, again, you're saying is direct reference to –

A. Yes.

Q. -- August 17th, and its significance within the HASBRO business cycle?

A. Yes.

Q. Okay.

A. Page 11, number 7, the response -- generally the response to number 7.

Q. Okay. What's the next reference?

A. The sales pattern on Exhibit G, that's an unnumbered page. If you want a copy of this, you can get a copy of it.

Q. The sales units shown?

A. Yes.

Q. The numbers?

A. Yes, and the sales -- the dollars right below it.

Q. Any others?

A. No.

*Id.*. at 227:16 – 233:24.

Significantly, despite Lapidus's insistence that August 17 was a crucial date for Hasbro in relation the Monopoly Millennium Edition game, he regularly admitted that he did not know enough about the way Hasbro does business to arrive at firm opinions on the subject. When he was asked about how many Hasbro licensing agreements that he reviewed exceeded a five-percent royalty, he responded:

> Just to be fair, not that many were greater than 5 percent, but that's not only measure, just a percentage. I think you also have to consider upfront payments and maybe different or unusual terms, so I more get an idea of how HASBRO does business.

*Id*. at 95:3-8.

Also, when Hasbro's counsel inquired as to whether Lapidus believed that Hasbro would have been willing to reduce its margin by one dollar and sixteen cents per game in August of 1999 – the time of the hypothetical negotiation – Lapidus pled ignorance:

> I'm sorry, I might have misunderstood your question. I don't know what HASBRO. I don't know what their margin would be. What decision they would make to do that. They clearly made a decision at a later date. I don't know what the decision would be, sir, in August of '99. If I misspoke or misinterpreted your question, then I'm wrong.

*Id.* at 43:9-16. Critically, Lapidus candidly acknowledged that he had no basis whatsoever for his assertion that August 17 was a critical point in Hasbro's business cycle:

> Q. So it's your opinion that if HASBRO had elected not to use the infringing die as of August 17th of 1999, it wouldn't have sold any of these games?
>
> A. When I understand better their buying cycle, selling cycle and distribution cycle, I'd be able to have a better -- probably calculated better number as it relates to that, but sitting here today, I believe it's approximately $15 million. If that represents 100 percent, then it's 100 percent.
>
> Q. What about its buying cycle do you need to understand?
>
> A. How they -- the time lag that they need to buy their product, how they acquire it, the different sources. Clearly in their marketing they're printing the boxes or the packages that they use, however that is done. Their distribution network, how long it takes to get distributed. Most retailers, like a Wal-Mart for instance, they have lead times when they need to get the product to their warehouses so that they can effectively distribute it.

*Id.* at 24:9 – 25:7.

Lapidus firmly averred that his expertise made him certain that August 17 was a critical date for Hasbro with regard to this particular product, yet openly admitted that he was not knowledgeable enough about the way that Hasbro did business to know what decision Hasbro would have made during the time of the hypothetical negotiation with regard to how much it would have been willing to reduce its profit margin. The outcome of his "analysis" is as unsurprising as it is unfounded: Hasbro would have paid **anything**, according to Lapidus, to be able to license Bowling's patent.

Lapidus presents no good-faith analysis of the *Georgia-Pacfic* factors; he simply puts voice to an outrageous damages number to inflame the jury. The Court should exercise its "gatekeeper" function and exclude this utterly unreliable opinion evidence.

### C. Lapidus Improperly Opined About Prejudgment Interest and Miscalculated the Amount of Interest.

On the first page of his report, Lapidus states that "[i]ncluding prejudgment interest, my opinion is that Michael Bowling sustained damages of $1,340,050." Lapidus Rpt. at 1 (emphasis omitted). On page four of his report, he again makes reference to the fact that his total damages number includes prejudgment interest, and, this time, he reveals that the rate he has used to calculate that interest is the "Rhode Island Statutory Rate of Interest." *Id.* at 4. Finally, he applies the prejudgment interest beginning from August 17, 1999 "with compounding" to increase the total damages from "$691.345" to "$1,340,050." *Id.* at 15. In so doing, he cites to Gen. Laws 1956 § 9-21-10. *Id.*

Lapidus was not employed by Bowling to do anything more than to opine as to the amount of damages he sustained. The question of prejudgment interest is not one for the jury, and expert testimony is admissible only to assist the trier of fact to determine a fact in issue. Prejudgment interest, as Lapidus correctly points out, is a statutory matter. Any attempt to include such testimony by an expert would only serve to inflate the size of the damages number that is stated by the expert before the jury. Lapidus's attempt to pigeon-hole prejudgment interest into his purportedly expert opinion on damages is consistent with the basic tactic employed by Bowling with regard damages – presenting an unreasonably high damages figure to the jury to create the misimpression that more than a million dollars is at issue.

Even if the Court were to permit Bowling, through Lapidus, to usurp the function of the clerk and have the jury render a damages verdict inclusive of prejudgment interest, it cannot permit Lapidus to testify as to his interest calculations because Lapidus fails even to apply interest properly. Rhode Island law does not permit compounding of prejudgment interest in this case. R.I. Gen Laws § 9-21-10 calls for the calculation of prejudgment interest at a rate of "twelve percent (12%) per annum." Nowhere in that statute is there any mention of

compounding. In fact, the Rhode Island courts have explicitly rejected compounding as a permissible method of calculating prejudgment interest. *See DiLuglio v. Providence Auto Body, Inc.*, 755 A.2d 757, 775 (R.I. 2000) ("Indeed, '[t]his court has held that because the right to receive interest on judgments was unknown at common law as it is a right created by statute, the court will strictly construe any statute that awards interest on judgments so as not to extend unduly the changes enacted by the legislature.'") (quoting *Clark-Fitzpatrick, Inc./Franki Foundation Co. v. Gill*, 652 A.2d 440, 451 (R.I. 1994)).

Thus, by attempting to testify as to the proper amount of prejudgment interest to be applied to any damages Bowling received, Lapidus has revealed two fatal flaws to the admissibility of such testimony. First, he is attempting to testify on a subject that is improper for expert testimony. As such, his testimony does not serve to enlighten the jury on a complex subject, but instead serves only to have the jury hear a high damages number from the mouth of an expert. Second, he reveals his lack of qualification by failing to properly calculate the amount of interest – a mistake that would add hundreds of thousands of dollars to his total damages number. This court cannot not permit such faulty testimony.

## III. ARGUMENT

Lapidus's expert testimony fails to meet the standards for the admission of such testimony under Rule 702 of the Federal Rules of Evidence as well as the test laid out by the Supreme Court in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), for three reasons. First, Lapidus is not qualified to give an expert opinion as to "reasonable royalty" for the licensing of a component of a game, despite his status as a C.P.A.. Second, despite all of his academic qualifications, Lapidus belies them by improperly calculating the amount of prejudgment interest – a subject about which he is not permitted to testify. Finally, even if

Lapidus is found to be qualified to give an opinion as to "reasonable royalty" under these circumstances, he failed to reasonably apply an accepted methodology to the particular facts of this case, and, as such, his opinion is utterly *ipse dixit*, unreliable, and inadmissible.

### A. Lapidus is Unqualified to Give Expert Opinion Testimony as to "Reasonable Royalty" in This Case Because He Lacks the Requisite Experience in the Area of Game-Component Licensing.

Lapidus has no experience with regard to licensing agreements in the gaming industry. While he is a licensed C.P.A., to the extent that he does have experience in evaluating royalty agreements in the licensing context it is irrelevant experience.

In his Expert Report, Lapidus asserts that he has extensive financial analysis experience. Lapidus Rpt. at 1. He also highlights the fact that he has given expert testimony with regard to damages in the past. *Id.* at 2. Additionally, he states that he is knowledgeable in the areas of distribution channels and the financial aspects of licensing. *Id.* Nowhere in the expert report does he elaborate on the nature of this experience or how any of his experience is relevant to his ability to determine reasonable royalty for a license to use a patented product for a component in a game.

When Lapidus was asked to elaborate on his experience at his deposition, his answers only served to highlight his lack of qualifications in this area. He waxed about his experience with licensing in the metal-bending industry and gaming (meaning gambling) equipment but, when counsel inquired as to whether he had dealt with licensing agreements in the toy industry, he replied that he had not. Lapidus Dep. at 59:3 – 65:6. Additionally, while he regularly referred to his general experience and knowledge with regard to product cycles and distribution channels, *see, e.g., id.* at 65:16-20, he also conceded consistently that he did not have enough

information about the way Hasbro does business to arrive at a firm opinion. *See, e.g.*, *id*. at 43:9-16.

The district court must ensure that all expert testimony is not only relevant but reliable. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). "Fed. R. Evid. 702 consists of three distinct but related requirements. First, a proposed expert witness must be qualified to testify as an expert by 'knowledge, skill experience, training, or education.' Second, the expert's testimony must concern 'scientific, technical or other specialized knowledge.' Finally, the testimony must 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *United States v. Shay*, 57 F.3d 126, 132 (1st Cir. 1995) (citations omitted).

The Federal Circuit has determined that experience in the particular industry for which the licensing of the patent is intended is relevant to the question of whether an expert is qualified to opine as to reasonable royalty. In *State Contracting & Engineering Corp. v. Condotte America, Inc.*, 346 F.3d 1057, 1073 (Fed. Cir. 2003), the Federal Circuit upheld the district court's disqualification of an expert who sought to opine on a reasonable royalty for a patent because "he had no experience placing a value on a patent and did not have any knowledge regarding reasonable royalties for construction-related patents." Similarly, the Federal Circuit upheld the exclusion of an expert witness who planned to testify as to a reasonable royalty for a patented medical invention because he had "no prior experience of analyzing the market for a medical device." *Abbott Laboratories v. Brennan*, 952 F.2d 1346, 1351-52 (Fed. Cir. 1991).

Other district courts have also seen fit to disqualify experts on the basis that they lack particularized experience in the relevant field. In the course of admitting an expert to opine as to reasonable royalty, the United States District Court for the Eastern District of Louisiana

highlighted the fact that the proposed expert's "education and background are sufficiently related to the subject matter" to permit him to give an expert opinion. *Cameco Indus., Inc. v. Louisiana Cane Mfg., Inc.*, No. 92-3158, 1995 WL 468234, at *4 (E.D.La. July 27, 1995) (twenty years experience as a patent attorney, along with B.A. in mathematics and M.S. in Nuclear Energy with an emphasis in mechanical engineering gives expert enough familiarity with patent royalty agreements in the mechanical engineering field to testify as to reasonable royalty). Thus, it is clear that particular experience in the unique subject area, as opposed to general expertise in an area peripherally related to the subject matter, is required to qualify an individual to give expert testimony based on experience.

Lapidus does not claim to be experienced in game or toy industry licenses. He has no industry experience. He is a C.P.A., and so is qualified on accounting issues. But his report is not an accounting matter. Lapidus's experience with regard to patent royalties is sorely lacking. While he states in his expert report that he has testified in many trials regarding damages relating to – among many other things – intellectual property, there is no indication in his listing of recent cases that any of them involved determining a reasonable royalty from a hypothetical negotiation for the licensing of a patent, much less a license for a game component. In fact, when asked at his deposition whether any of the cases listed in his expert report as cases in which he testified as an expert asked him to give testimony with regard to reasonable royalty, he responded that he wasn't sure and thought that one or two of them may have called for such analysis. Lapidus Dep. at 53:3 – 55:18. But even if they did, the fact that he has performed one *Georgia-Pacific* analysis, or even two, certainly does not make him qualified to perform *every Georgia-Pacific* analysis, regardless of context.

Indeed, to the extent that Lapidus indicated that he had any experience at all with regard to the licensing of patents, that experience is in fields outside and different from the toy and game industry that relates to the patent at issue in this case. He highlights his experience in licensing patents in the metal bending and gaming equipment industries. However, when asked for details about his experience in those industries, the type of work involved "products that are manufactured from metal" and coin control for products such as slot machines and pool tables. *Id.* at 61:14 – 62:17. His testimony as to his level of experience in the toy industry was that he had very little such experience, and that it was in the area of business consulting. *Id*. at 63:7-11.

Lapidus's experience level in the area of patent licensing for game components is likewise sorely lacking. Like the putative expert in *Abbott Laboratories*, he can point to no prior experience in analyzing the market for game components, s*ee* 952 F.2d at 1351-52, and he does not have any knowledge regarding reasonable royalties for game-component-related patents. *See State Contracting & Engineering Corp.*, 346 F.3d at 1073. As such, this Court should exclude his proposed expert testimony because it fails to meet the *Daubert* standard for admissibility with regard to his qualifications, and thus, the testimony is inadmissible under Rule 702 of the Federal Rules of Evidence.

**B. Lapidus's Testimony on Prejudgment Interest is Inadmissible Because it is an Improper Subject for Expert Testimony, and His Miscalculation of That Interest Reveals His Lack of Qualification to Testify At All.**

Lapidus was engaged to produce an expert opinion as to the purported amount of damages incurred by Bowling as a result of Hasbro's alleged infringement of the dice patent. Lapidus's expert report does give an opinion as to damages. However, couched within that report are several references to the amount of prejudgment interest he thinks is appropriate to add to the actual damages he calculated. Lapidus Rpt. at 1,4,15. Not only is that part of his opinion

inadmissible because it is an improper subject for expert testimony, but his failure to calculate interest properly underscores his total lack of qualification as an expert in patent infringement damages.

Expert testimony is admissible when "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. R. 702. Prejudgment interest in civil suits, on the other hand, is not a fact in issue. The amount of prejudgment interest to be added is fixed by statute – "twelve percent (12%) per annum." Gen Laws 1956 § 9-21-10. Thus, the amount of prejudgment interest is not a fact in issue. Rather, it is an amount to be added to an award of damages in a civil action by "the clerk of the court." *Id.* Any attempt by an expert to give an opinion as to prejudgment interest is merely an effort to inflate that dollar value of the damages being presented by the expert to the jury.

Furthermore, Lapidus's prejudgment interest opinion serves to undermine his academic qualifications, and reveals that he is completely unqualified to give testimony as to damages in this case. He cites to the proper Rhode Island statute for the rate of interest to be applied, but then proceeds to utterly misapply that rate by compounding the interest. Lapidus Rpt. at 15. Section 9-21-10 of the General Laws calls for an interest rate of twelve percent per annum, but does not indicate anywhere that such interest should be compounded. In fact, Rhode Island law prohibits compounding. *See, e.g., DiLuglio*, 755 A.2d at 775; *Clark-Fitzpatrick/Franki Foundation Co.*, 652 A.2d at 451; *Gott v. Norberg*, 417 A.2d 1352, 1357 (R.I. 1984).

Because Lapidus's opinions are demonstrably incorrect and represent conclusions that are contrary to controlling law, his testimony as to prejudgment interest is not a proper subject for expert testimony.

### C. Lapidus's Proposed Expert Testimony is Unreliable and Should be Excluded Because He Does Not Explain the Reasoning that Leads to His Conclusion.

The expert report submitted by Lapidus is rife with *ipse dixit* conclusions and assertions that directly contradict the facts of this case. His conclusion regarding what reasonable royalty would have resulted from a hypothetical negotiation between Bowling and Hasbro at the time of infringement is entirely without basis or explanation. Although he purports to have considered the *Georgia-Pacific* factors in developing his opinion, both his report and his answers to deposition questions reveal that he failed to analyze the factors, and instead posited baseless conclusions. As such, Lapidus's opinion is not the product of reliable principles and methods and will not assist the jury in determining a fact in issue.

An expert's use of a reasonably accepted methodology is only adequate when the particularized application of that methodology utilized by the expert is reasonable with regard to "***the particular matter to which the expert testimony [is] directly relevant***." *Kumho Tire Co.*, 526 U.S. at 153-54 (emphasis in original). Furthermore:

> Trained experts commonly extrapolate from existing data. But nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

*General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997).

In *Monolithic Power Systems, Inc. v. O2 Micro International Limited*, 476 F. Supp. 2d 1143, 1154 (N.D. Cal. 2007), the defendants challenged the plaintiff's damages expert's report regarding a reasonable royalty in a patent infringement case regarding microchips on the grounds that it failed to meet the standards outlines in Rule 702 of the Federal Rules of Evidence, as well as *Daubert*. In deciding on the admissibility of the expert's testimony, the court noted that

calculating a reasonably royalty is an inexact science in which an expert must consider many factors, including those outlined in *Georgia-Pacific*. *Id.* The court, however, warned that an expert opinion on reasonable royalty "may not rely on unreasonable inferences or resort to 'mere speculation or guess.'" *Id.* at 1155 (quoting *Central Soya Co. v. Geo. A. Hormel & Co.*, 723 F.2d 1573, 1576 (Fed. Cir. 1983)). That standard, of course, comports with the basic requirements for expert testimony on damages. *See, e.g., Wallace Motor Sales, Inc. v. American Motor Sales*, 780 F.2d 1049, 1062 (1st Cir. 1985) ("there is a distinction between proof which allows the jury to make a 'just and reasonable inference' of damages and proof which only provides a basis for 'pure speculation and guesswork.'"). *See also Seahorse Marine Supplies v. Puerto Rico Sun Oil*, 295 F.3d 68, 82 (1st Cir. 2002) (citing *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 22 (2d Cir. 1996) for the proposition that "Admission of expert testimony based on speculative assumptions is an abuse of discretion.").

The *Monolithic Power Systems* court excluded the expert's report on multiple grounds. First, it stated that he relied on an inappropriate basis for calculating reasonable royalty. 476 F. Supp. 2d at 1155. Specifically, the court noted that he based his damages number on the total sales of certain notebook computers, despite the fact that some of the infringing chips were used in other products. *Id.* Furthermore, the court noted that the starting point for reasonable royalty was based on a premium paid by another company on a product that did not use the patented technology, and as such was wholly inappropriate. *Id.* Finally, the court faulted the report for ignoring the laws of supply and demand by not accounting for a lower price based on a higher volume of sales. *Id.* at 1156 (quoting *Crystal Semiconductor Corp. v. TriTech Microelectronics Intern., Inc.*, 246 F.3d 1336, 1359 (Fed. Cir. 2001)) ("All markets must respect the law of

demand. According to the law of demand, consumers will almost always purchase fewer units of a product at higher price than at a lower price, possibly substituting other products.").

Similarly, in *Minebea Co., Ltd. v. Papst*, No. 97-0590, 2005 WL 1459704, at *3 (D.D.C. June 21, 2005), the United States District Court for the District of the District of Columbia excluded the expert testimony of a patent and licensing attorney regarding reasonable royalty for patent infringement. The court reasoned that the report left it unclear what facts the expert relied upon and that his methodology was unreliable. *Id.* In particular, the court faulted the expert for failing to apply mathematical formulas, failing to take into account market conditions, among other concerns. *Id.* Ultimately, the court deemed the testimony "too speculative" for admission and concluded that it would "invite conjecture and confusion." *Id.*

Another case in which an expert's testimony has been excluded regarding reasonable royalty damages resulting from patent infringement is *Avocent Huntsville Corp. v. Clearcube Technology*, *Inc.*, No. CV-03-S-2875-NE, 2006 WL 2109503 (N.D. Ala. July 28, 2006). In that case, the defendant's expert was excluded because he applied an improper time period for the hypothetical negotiation. *Id.* at *23. Specifically, he asserted that the date for the hypothetical negotiation could have been after the date that infringement began. *Id.* at *22. As such, the court determined that the expert's opinion was not based upon "reliable principles and methods." *Id.* at *23.

Lapidus's analysis suffers from even worse flaws. Rather than starting with an inappropriate starting point, Lapidus did not have one at all. He also completely disregarded the law of supply and demand, simply assuming that Hasbro would pay Bowling's full wholesale price despite Bowling's demonstrated willingness to take less money even for relatively small quantities of sales. And, of course, Lapidus entirely failed to account for many facts of record,

most particularly that Hasbro actually (1) refused to pay more than fifty cents per die, (2) offered Plaintiff much less to license the die, and (3) chose to remove the die from the game.

Lapidus's analysis consists *entirely* of the sort of unreasonable inferences, speculation, and guesswork (not to mention outright incorrect statements) that courts routinely exclude. Lapidus concludes in his expert report that a reasonable royalty for the use of Bowling's patent is $0.5825 per die. In arriving at that figure, he purports to examine each of the fifteen factors outlined in *Georgia-Pacific*. However, a close look at the report reveals that he merely recited the factors, but did not truly evaluate them. Instead, he cited facts beneath each factor, and posited a conclusion as to the effect of that factor on the calculation of reasonable royalty without any explanation. Furthermore, he applied inappropriate methodologies in arriving at his ultimate conclusion as to reasonable royalty.

To begin, Lapidus's conclusion that each of the first twelve factors in the *Georgia-Pacific* analysis would "tend to increase reasonable royalty" can only be described as mere speculation. *See Monolithic Power Systems, Inc.*, 476 F.Supp.2d at 1155. He made that conclusory statement, but, similar to the expert in *Monolithic Power Systems, Inc.*, who relied on a faulty base point for the start of his reasonable royalty analysis, Lapidus articulated that he did not start from any base point at all. *See id.*

Moreover, in Lapidus's discussion of each factor, he provides very little, if any, explanation for why the facts he recites lead to his conclusions. He provides no mathematical basis for discerning that the reasonable royalty should be equal to Bowling's wholesale price less Hasbro's cost to manufacture the dice. In fact, exhibit D to his report that reveals his formula is the only mention of Hasbro's manufacturing cost in the entire report. It is also noteworthy that Lapidus completely omits any consideration of the fact that Hasbro ceased using the infringing

dice and replaced them with a non-infringing alternative once licensing negotiations proved fruitless. These facts lead inexorably to the conclusion that, like the expert in *Minebea*, who did not provide a mathematical basis for arriving at his formula and failed to consider all the undisputed relevant facts, Lapidus's testimony regarding a reasonable royalty for Bowling's patented dice is too speculative and invites conjecture and confusion. *Minebea Co., Ltd.*, 2005 WL 1459704 at *3.

Application of the *Georgia-Pacific* factors is an accepted methodology for determining the result of a hypothetical negotiation to arrive at a reasonable royalty. However, where Lapidus falls short of meeting the requirements for the admissibility of expert opinion testimony is in his particularized application of the factors. *See Kumho Tire Co.*, 526 U.S. at 153-54. His cursory treatment of each factor, his acknowledged lack of experience in the particular field of game-component licensing, and his direct factual error with regard to Hasbro's ability to swap out the dice on August 17 without significant disruption to its distribution cycle all show evidence of an analytical gap between the facts he considered and the conclusions at which he arrived that is simply too great to bridge. *See General Electric Co.*, 522 U.S. at 146. Lapidus's reliance on his generalized knowledge of retail and distribution cycles, and his statements in his deposition that he didn't really have enough information about the way Hasbro does business to know how it negotiates serves to show that his opinion is merely the result of his own *ipse dixit*, and is, in fact, based only "upon unsubstantiated generalizations, speculative hypotheses and subjective evaluation that are based neither upon any professional study or experience-based observation." *Cacciola*, 127 F.Supp.2d at 183.

Lapidus's application of the *Georgia-Pacific* factors is deeply flawed. There is no basis to conclude, either from his report or from his deposition, that his opinion is that of an individual

with any greater expertise than the average individual. *See U.S. v. Anderson*, 61 F.3d 1290, 1298 (7th Cir. 1995). As such, his testimony is not likely to "assist the trier of fact to understand the evidence or to determine a fact in issue." *United States v. Shay*, 57 F.3d 126, 132 (1st Cir. 1995). Because Lapidus's opinion does not meet the standards of reliability outlined in *Daubert*, it is legally irrelevant and should be excluded pursuant to Rule 403 and Rule 702 of the Federal Rules of Evidence.

## IV. CONCLUSION

For the reasons stated above, Hasbro respectfully requests that this Court exclude the proposed expert testimony of Neil N. Lapidus.

Respectfully submitted,

HASBRO, INC.
By its Attorneys,

/s/ Jeffrey K. Techentin
Todd D. White (# 5943)
twhite@apslaw.com
Jeffrey K. Techentin (#6651)
jtechentin@apslaw.com
Adler Pollock & Sheehan P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903
(401) 274-7200
Fax: (401) 751-0604/ 351-4607
Dated: December 19, 2007

Of Counsel:

David K. S. Cornwell, Esq.
davidc@skgf.com
Tracy-Gene G. Durkin, Esq.
tdurkin@skgf.com
Sterne Kessler Goldstein Fox
1100 New York Avenue, NW
Washington, D.C. 20005

**CERTIFICATE OF SERVICE**

TO:

Craig M. Scott, Esq.
Christine K. Bush, Esq.
Duffy & Sweeney & Scott, Ltd.
One Turks Head Place, Suite 1200
Providence, RI 02903

Thomas J. Leach, Esq.
Anthony R. Zeuli, Esq.
Douglas J. Williams, Esq.
Law Firm of Merchant and Gould P.C.
3200 IDS Center
80 South 8th Street
Minneapolis, Minnesota 55402-2215

David K. S. Cornwell, Esq.
Tracy-Gene G. Durkin, Esq.
Sterne Kessler Goldstein Fox
1100 New York Avenue, NW
Washington, D.C. 20005

I hereby certify that I filed the within Motion *in Limine* to Preclude Testimony of Plaintiff's Expert Witness, Neil N. Lapidus and the Memorandum in Support thereof through the ECF system on the 19th day of December, 2007, and that notice will be sent electronically to the above-named counsel who are registered participants identified on the Mailing Information for Case No. 05-229S.

/s/ Jeffrey K. Techentin________

*438674_1*