UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

---

MICHAEL BOWLING

PLAINTIFF,

VS. FILE NO.: C.A. NO. 05-229 S

HASBRO, INC.,

DEFENDANT.

---

Deposition of Neil N. Lapidus taken pursuant to Notice of Taking Deposition and taken before Shannon J. Rothstein, a Notary Public in and for the County of Anoka, State of Minnesota, on the 24th day of May, 2006, at 701-4th Avenue South, Suite 500, Minneapolis, Minnesota, commencing at approximately 9:00 a.m.

* * *

Reported By Shannon J. Rothstein
Esquire Deposition Services
8891-162nd Lane NW
Ramsey, MN 55303
(651) 295-0066



38cb2aed-39c0-41b5-bfb4-0270517591e3

pretty good idea.
Q. And what's the significance in your mind of HASBRO's action being willful?
A. Item number 3.
Q. Explain what you mean by that.
A. Well, within that paragraph there are three options.
Q. Those three options pertain to what HASBRO could have done as of the date of the hypothetical negotiation, correct?
A. Yes.
Q. And one of those options is number 3, and if I understand you correctly, you're saying number 3 would constitute willful misappropriation?
A. I believe they chose in their business context -- the business that they do, they chose item 3, probably under a theory that it is you either ask for permission or plead for forgiveness. And I think they continued to sell their inventory and deal with the results after.
Q. My question though was what's the significance, that is what is the impact of HASBRO following item number 3, if that's what they did?
A. Approximately $15 million in sales.





Q. From the perspective of your report what's the impact?
A. Approximately $15 million in sales.
Q. Meaning what? Why is that relevant in your damage analysis?
A. Because HASBRO continued to sell its inventory, and had they not sold the inventory, their sales, HASBRO's sales, would have been approximately $15 million less or could have been approximately $15 million.
Q. Is it your opinion they would have been $15 million less?
A. Yes, I believe approximately $15 million less.
Q. Where do you get the $15 million number from?
A. Well, that's some of the information that I -- as you asked before if there's other information that I may need, I may want to look at a little bit further, and essentially that is the sales of the Millennium Monopoly game during the period of the middle of August to the say end of December.
Q. So if HASBRO had elected not to use the





infringing die, it would not have sold any of the games?
A. They would have been -- I believe they would have been substantially less.
Q. Well, how substantially?
A. Approximately $15 million.
Q. That's a 100 percent, correct?
A. Approximately, yes.
Q. So it's your opinion that if HASBRO had elected not to use the infringing die as of August 17th of 1999, it wouldn't have sold any of these games?
A. When I understand better their buying cycle, selling cycle and distribution cycle, I'd be able to have a better -- probably calculated better number as it relates to that, but sitting here today, I believe it's approximately $15 million. If that represents 100 percent, then it's 100 percent.
Q. What about its buying cycle do you need to understand?
A. How they -- the time lag that they need to buy their product, how they acquire it, the different sources. Clearly in their marketing





they're printing the boxes or the packages that they use, however that is done. Their distribution network, how long it takes to get distributed. Most retailers, like a Wal-Mart for instance, they have lead times when they need to get the product to their warehouses so that they can effectively distribute it.
Q. Assume that the lead time that HASBRO would need would be approximately one day. In that event, how much lost sales would the decision not to use the infringing die result in?
A. I don't know. I don't think that's a realistic assumption. You can say assume that, but with my retailing background, it's not a day, so I can't answer that.
Q. Would it have any impact?
A. I guess when I understand their cycle, I can address it more specifically rather than just a hypothetical.
Q. As you sit here today though, you say $15 million, and you say $15 million because changing the die would have some impact on its ability to procure the product to its customers, correct?







38cb2aed-39c0-41b5-bfb4-0270517591e3

found out.
A. And I would have to look at HASBRO's selling techniques, marketing techniques, their marketing process to understand if that would be a viable alternative to selling items at a very reduced price. I do have some information that indicates they're selling at a reduced price of this game.
Q. What's that?
A. That in the year 2000 -- towards the end of the year 2000, these sold a large number of units at a substantially less price. I don't know the circumstances behind it. I just know the numbers. That leads me to believe that a business decision was made to sell it at a reduced price. There may have been a lot of reasons why, so there's one example of the information I know that they sold it at a reduced price.
Q. In your opinion, in August of 1999 what was the most that HASBRO would have been willing to reduce its margins by in order to keep the infringed die in the game?
A. I don't know.
Q. You don't have an opinion on that





subject?
A. It would be at least the price of the royalty. It would be at least 58 and a quarter cents.
Q. You believe that you have a basis upon which to conclude that HASBRO would be willing to reduce its margins by a dollar sixteen and a half cents per game?
A. No. I'm sorry, I might have misunderstood your question. I don't know what HASBRO. I don't know what their margin would be. What decision they would make to do that. They clearly made a decision at a later date. I don't know what the decision would be, sir, in August of '99. If I misspoke or misinterpreted your question, then I'm wrong.
Q. Let me make sure I understand your answer to the last question. As of August 17th of 1999 is it your opinion that HASBRO would be willing to reduce its margin on the two Monopoly Millennium game by a dollar sixteen and a half cents?
A. No. No, I misunderstood your question. If they wanted --





MR. LEACH: Can we have the question read back, please?
(Requested material read back by the reporter.)
MR. LEACH: Can you read it one more time, please?
(Requested material read back by the reporter.)
A. No, I think I misunderstood the question or just the dialogue that we have had on the questions you've asked me, so that I think that it would be -- my response would be that would be HASBRO's decision. I don't know what they would do.
If I can add something. I guess, I would say if HASBRO wanted to use that -- if HASBRO wanted to use that die in its game and there was a fair reasonable negotiation, they would pay that price, 58 and a quarter cents per die, or times two in each game in order to use the product. And they would make that decision, so I would say yes, but it's their business strategy that would get them there.
BY MR. TECHENTIN:





Q. Would you agree that 58 and a quarter cents per die exceeds the profit expectation that Mr. Bowling would have on his own dice?
A. No.
Q. Why not?
A. Mr. Bowling generally has two distribution channels, and I believe both of those distribution channels yield a higher profit.
Q. The two distribution channels being directly to the consumer and wholesale sales?
A. Yes.
Q. Let's focus on wholesale sales. You would agree, first of all, that would be the closest analog to any relationship that might exist between Mr. Bowling and HASBRO, correct?
A. No, not necessarily.
Q. Why not?
A. Because he has developed a network of distributors that are -- either find the leads or handle the merchandise or do what they need to do that is different than the kind of inquiry that HASBRO has made, so that the ultimate consumer is different, the packaging may be different. There's a lot of differences in that I see. It's probably

A. Yes, but it would not be relevant to me.
Q. And did he give you a gross margin per die, or what was the format of his profitability analysis?
A. I don't recall, but again, for purposes of this, it would not be relevant information for me.
Q. You don't think it would be relevant from Mr. Bowling's point of view to know what he actually earned on the sales of his dice?
A. I believe from Mr. Bowling's point of view it would be important, but for purposes of the analysis, whether the margin was higher necessarily or lower, would not affect my decision as to what a reasonable royalty would be.
Q. Here we're being purely hypothetical. If Mr. Bowling had a margin on his dice of less than a penny per die, you don't think that would impact his decision making with respect to negotiating a license for the dice?
A. Not necessarily. It may not. There may be a factor, but it's not going to be the sole factor.
Q. On the contrary, if Mr. Bowling had a





margin that was over a dollar per die, would that have an impact on Mr. Bowling's negotiations for the royalty of the dice?
A. It would be one factor.
Q. You don't consider that to be an important factor?
A. I consider it to be one factor.
Q. Would it be fair to say that you didn't consider it important enough to include it in your report?
A. No. I think that's mischaracterizing what I've said.
Q. Did you request any information regarding Mr. Bowling's company's profitability that you did not receive?
A. I don't think so.
Q. Do you know if you ever or anyone working with or for you requested any information regarding Mr. Bowling's company's profitability?
A. I believe we requested some information, yes.
Q. And you requested that of counsel?
A. Maybe, possibly Mr. Bowling directly.
Q. Do you know the nature of the material





you requested?
A. No, I don't.
Q. Why is it that you recall the possibility of such a request?
A. Because I believe that I looked at some margin numbers.
Q. Let me try and make my question a little clearer. You were provided with materials upfront by Mr. Bowling's attorneys in this case, correct?
A. Yes.
Q. And my question is, after receipt of those, did you ever go back to either Mr. Bowling or the attorneys and say, you know, "We need something as respect to Mr. Bowling's company profitability"?
A. I do not recall. I was directly involved in that information.
Q. That would be Mr. Besikof, if anyone?
A. Yes.
MR. LEACH: Can we take a break?
MR. TECHENTIN: Yes.
(A short break was taken at 10:25 a.m.)
BY MR. TECHENTIN:
Q. Mr. Lapidus, you've been engaged as an





expert in litigation previously, correct?
A. Yes.
Q. Have you ever been requested to perform an analysis of reasonable royalty in a patent context before?
A. Yes.
Q. How many times?
A. Well, I don't know an exact number, but I would say probably a half dozen or more times.
Q. And did you perform that analysis by use of the Georgia Pacific factors in each of those cases?
A. Generally, yes.
Q. When you say "generally," do you mean generally in each case you were making reference to it or there are cases in which you did not make reference to Georgia Pacific?
A. I believe I made reference to Georgia Pacific in all the cases.
Q. And when you said generally, you meant that that wasn't the sum and substance of your analysis?
A. Correct.
Q. What cases were those?







38cb2aed-39c0-41b5-bfb4-0270517591e3

A. Well, that's a good question. I don't have -- I would have to get you a listing of those cases.
Q. Are any of them included in the list of cases that you had attached to your report?
A. Let me look. Well, I'm not sure. The thing I'm not sure about might be the last case, Berg v. Nelson, B-E-R-G v. N-E-L-S-O-N. The last one on the -- on page 18, I'm sorry. Excuse me. And I would want to check the last two cases on page 19.
Q. That's the Hearth & Home Technologies cases?
A. Yes.
Q. Did you submit a report in each of those cases, the Berg and Hearth & Home cases?
A. Yes. I'm not sure about Berg.
Q. In the cases of Hearth & Home, there's two separate cases, were those separate engagements for you?
A. Yes.
Q. Have you ever been retained by anyone in connection with a patent case? I'm just focusing on these two cases that we've talked about. Have





you ever been retained by the defendant in a patent case or counsel for the defendant in a patent case?
A. I don't know. I would have to check on that. I'm not giving you a kind of -- I'm not trying to give a nonanswer, because I would say that my caseload is probably split about 50/50. So I might tell you there might be a higher likelihood that the answer is yes, but I just have to look at each case.
Q. Do you recall ever serving as an expert in a patent case, other than as an expert on behalf of the plaintiff?
A. In the last two cases we talked about you have -- the cases go both ways, so in one case they're plaintiff and one case they're defendants, so that might be one situation. And I would say over some time period there probably are, but again, I'm not trying to be not be responsive.
Q. Has your testimony ever been the subjective of a Dobbler motion?
A. What do you mean?
Q. Has your preferred expert testimony ever been challenged under the Dobbler case?
A. I want to ask you a question. How





formally do you mean by that, or in the context of challenge, what do you mean by challenge?
Q. Has there ever been a motion filed that alleged in sum or in substance that your stated opinions or methodology did not satisfy the requirements of Dobbler?
A. No.
Q. Has there ever been a motion in any of the cases in which you've served as an expert in which a party sought to exclude your testimony?
A. Yes.
Q. In what case?
A. I don't know the exact case. There's a Dobbler tracker that you're probably familiar with, and every once a while I reference that myself just to see if my name comes up, and my name came up on a case, but it was not a formal motion. It may have just been challenged at the time, and I don't recall the name of the case though, but it was not effective, and it was a pretty informal challenge. In my opinion, it was a pretty informal challenge. It could have been more formal, but I'm kind of summarizing it for you. I'm not again trying to be misleading.





Q. Was your role as an expert the subject of any motion practice in either of the Hearth & Home cases?
A. Not to my knowledge, no.
Q. Has a court ever excluded your testimony?
A. No.
Q. In whole or in part?
MR. LEACH: I object to the question as vague. Are you talking about if the judge objected or someone objected to a question and the judge said sustained? I mean, that's pretty broad. Are you talking about like -- he can't give an opinion.
BY MR. TECHENTIN:
Q. Let me ask another question first. Have you ever testified at trial?
A. Yes.
Q. In a patent case?
A. Yes.
Q. And has it ever been the case that a court has ruled your expert testimony inadmissible based upon failings of your methodology?
A. No.







38cb2aed-39c0-41b5-bfb4-0270517591e3

Q. What was the last time prior to this case that you performed an analysis of the Georgia Pacific factors?
A. I don't know. I don't know not because it's been so long. I would say it's been within the last two years.
Q. What case was that?
A. I would have to go back and look and give you a reference.
Q. You don't remember?
A. No, I don't. I tend to sort of forget about the cases or a lot of the details soon after I testify or after the case has settled or goes to trial.
Q. What did you do in this case to educate yourself about what was required to perform an analysis of the Georgia Pacific factors?
A. Because I have performed -- worked on the Georgia Pacific factors on a regular basis and believe I have an understanding of them, I don't think I did anything different or did any additional work or gain additional insight into the Georgia Pacific factors.
Q. How is it that you --





A. I hope that answers your question. I'm answering it a little bit differently. Basically nothing, because I believe I have a good concept of Georgia Pacific factors.
Q. Where does that come from?
A. My professional background, my work. My day-to-day work in the area. Litigation support, understanding what they are and how they are used.
Q. Have you ever been educated formally - and by that I mean going to a seminar or something along those lines - in terms of the application of the Georgia Pacific factors?
A. Yes, I generally attend both CPE, professional education for CPAs, on a regular basis and CLEs where Georgia Pacific has been discussed, and that's over a period of years.
Q. Do you feel comfortable that today you have an understanding of the proper application of the Georgia Pacific factors?
A. Yes, I believe I do.
Q. Did you have any discussions with counsel in this case regarding the meaning or proper application of the Georgia Pacific factors, not the specific facts of this case but in general





what the factors mean?
A. No.
Q. I'd like to go through your report in a little bit of detail, and specifically on page 2 rather, in the first paragraph, you make the assertion that you're familiar with distribution channels in the financial aspects of licensing for a variety of industries. What industries?
A. The recorded products industry, including LPs, CDs, videos, general retailing, call it big box, gaming equipment, plumbing equipment, liquor and food, jewelry, most manufacturing that deals with metal bending.
Q. As you go through this list and it becomes longer -- I don't mean to cut you off. There are others, feel free -- let me clarify the question to make sure we're talking about the same thing. You made an assertion that you were familiar with both distribution channels and the financial aspects of licensing for these industries. Is your answer correct for that or is the list that you just offered a list of industries with which you generally have expertise?
A. No, I was specific to kind of





distribution channels in the financial aspects of licensing for those industries.
Q. So you're familiar with licensing principles in each of those industries?
A. Generally, yes.
Q. What does that mean "generally"? Do you have specific --
A. Well --
Q. Let me ask the question. Do you have specific experience with licensing in the metal bending manufacturing industry?
A. Yes.
Q. What is that?
A. Well, metal bending is -- first let's define industry, so it sounds like based on your questions you might not know what that is, but products that are manufactured from metal that some bending or application is applied to metal, so that can be any kind of component parts. I mean, that's kind of a wide variety. It can be as broad as airplanes, because airplane is a form of metal bending. You might not think about it that way, but that's what it is. So in having a knowledge of those industries, some applications there may be

Page 62

some licensing applied to them and some there really isn't or it's not -- may not be applicable.
Q. All right. In light of your answer then, any other industries that you would like to disclose?
A. I think that's -- I've given you a pretty good --
Q. When you referenced gaming equipment, are you talking about slot machines and the like?
A. Coin control.
Q. Explain what coin control is.
A. Any piece of equipment that is controlled by coins, so that would be beverage dispensing equipment, that could be some gambling equipment, that could be gaming equipment, pinball machines, pool tables, of that sources -- sources of industry, sources in industry.
Q. What about the toy industry?
A. No, not that much in the toy industry.
Q. But prior to this case what experience did you have with the toy industry?
A. Our firm has worked with some companies in both the invention side and some of the distribution side of toys, where we have clients

Shannon J. Rothstein

Page 63

that are involved in that.
Q. Have you yourself ever worked on matters for those clients?
A. Yes.
Q. And what was the nature of the work that you performed for those clients?
A. Business consulting, tax consulting, review of financial information, kind of understanding their business model, maybe a specific decision that someone asked me my advice or opinion of.
Q. You mentioned inventors and distribution, you mean distributors of toys are clients of your firm?
A. Yes.
Q. Which distributors?
A. Well, I would not give you those names for confidentiality. My own confidentiality of our firm.
Q. What about the inventors?
A. Similar. I couldn't give you any client names.
Q. You can't give me any client names?
A. No.

Shannon J. Rothstein

Page 64

Q. They're all confidential?
A. Yes, sir.
Q. Have you ever worked on licensing issues for any of those clients?
A. Yes.
Q. What did you do?
A. General business consulting or some decision making as to pricing or amounts, which either should be charged or what someone should pay.
Q. In terms of a royalty?
A. I don't know if it was directly royalties or fees.
Q. Are you thinking of a single instance or if there are more than one?
A. There may have been a few instances.
Q. Would it have involved a licensed product?
A. Yes.
Q. And was the product that was being licensed patented?
A. I don't remember the circumstances. I would believe so, but I do not recall the circumstances.

Shannon J. Rothstein

Page 65

Q. Do you recall the business terms that were negotiated?
A. No.
Q. Do you recall the royalty rate, if any, that was negotiated?
A. I don't recall.
Q. Did your experience with respect to these inventors or distributors of toys contribute to your analysis for this case?
A. Yes.
Q. And did you draw upon your knowledge of the relevant business practices in those industries to formulate your opinions?
A. Not necessarily.
Q. What does that mean not necessarily?
A. That I would draw upon my years of experience and sort of general business knowledge, not specifically those situations, but those situations have shaped my general business knowledge.
Q. Did you explicitly consider those situations in formulating your opinions?
A. No.
Q. Turning over to page 3 of your report.

Shannon J. Rothstein

Q. What would the cost to HASBRO have been of pursuing what is numbered option 1 on your list?
A. I don't know.
Q. Do you have any understanding as to what the cost would have been?
A. I think -- yes, yes, I do.
Q. What's that understanding?
A. We talked about this earlier today and that would be the -- not just the cost of packaging and the change of advertising. It may be a whole different manufacturing process. I would have to better understand HASBRO's -- not only their product development but their distribution channels, and to see if in fact that cost could be a lot of sales. It could be upwards to $15 million in sales.
Q. Leaving aside any potential lost sales as a result of pursuing numbered item number 1 and based upon the information that you have had available to you up to this point, do you have any understanding as to what the cost to HASBRO would have been to pursue option number 1?
A. Yes, I believe there was some deposition references as to what the cost of changing





packaging and opening the product up and whatever, but I think the biggest factor is the loss in sales. So although you're asking me to exclude it, I think that given the timing, by that I mean the August 17th date in the calendar, and how retail sales are recorded, the timing of them, I believe it was a very -- that August date represented a very sensitive date so that the time to do the items in number 1 or more would have cost sales -- would have been more a particular sales of lost sales rather than say a cost to change.
Q. Let me try again. Leaving aside any lost sales, what is your understanding of what the cost would have been to HASBRO to pursue option number 1?
A. I believe I saw some deposition references and maybe the cost was about $100,000, but I don't think that is necessarily relevant to Mr. Bowling's decision.
Q. Do you believe that the decision on royalty amount is -- should be determined as a Mr. Bowling decision?
A. As to Mr. Bowling, yes.
Q. What about as to HASBRO?





A. Possibly, yes.
Q. So this figure could be relevant to HASBRO's calculations?
A. Yes, from the moral or ethical way you do business.
Q. That's the only way in which it could be relevant?
A. Well, that's one way.
Q. How else?
A. I'll have to think about that for a while.
Q. If you come up with something, let me know, please. In the sentence that begins, "It is my opinion" at the very bottom of page 7 and continues over to page 8, you believe that the royalty rate would be high in relation to other agreements negotiated by HASBRO and other industry standards. Is that still your opinion?
A. Yes.
Q. What does it mean to be high in relation to other license agreements?
A. You have to complete the sentence "Negotiated by HASBRO and other industry standards." That's what I mean. They may be





willing to pay more or it might be higher than the general circumstances and maybe what HASBRO has paid were the general industry standards, because they were committed to using that die.
Q. So HASBRO's commitment to the use of the die, is the basis for your conclusion that the royalty rate would be high in relation to these other license agreements that you mentioned?
A. Yes, as one instance.
Q. Explain why, please.
A. Because of the timing. Given the dates and the process I believe where HASBRO should have been in the process in the inventory that was manufactured, they made a commitment to use the die; and therefore, someone would be willing to pay more to generate approximately $15 million worth of sales than to lose those kinds of sales at that critical period of time.
Q. Any further elaboration of that analysis?
A. No.
Q. And what other license agreements are you referring to?
A. A listing of other agreements that

Q. What would the cost to HASBRO have been of pursuing what is numbered option 1 on your list?
A. I don't know.
Q. Do you have any understanding as to what the cost would have been?
A. I think -- yes, yes, I do.
Q. What's that understanding?
A. We talked about this earlier today and that would be the -- not just the cost of packaging and the change of advertising. It may be a whole different manufacturing process. I would have to better understand HASBRO's -- not only their product development but their distribution channels, and to see if in fact that cost could be a lot of sales. It could be upwards to $15 million in sales.
Q. Leaving aside any potential lost sales as a result of pursuing numbered item number 1 and based upon the information that you have had available to you up to this point, do you have any understanding as to what the cost to HASBRO would have been to pursue option number 1?
A. Yes, I believe there was some deposition references as to what the cost of changing





packaging and opening the product up and whatever, but I think the biggest factor is the loss in sales. So although you're asking me to exclude it, I think that given the timing, by that I mean the August 17th date in the calendar, and how retail sales are recorded, the timing of them, I believe it was a very -- that August date represented a very sensitive date so that the time to do the items in number 1 or more would have cost sales -- would have been more a particular sales of lost sales rather than say a cost to change.
Q. Let me try again. Leaving aside any lost sales, what is your understanding of what the cost would have been to HASBRO to pursue option number 1?
A. I believe I saw some deposition references and maybe the cost was about $100,000, but I don't think that is necessarily relevant to Mr. Bowling's decision.
Q. Do you believe that the decision on royalty amount is -- should be determined as a Mr. Bowling decision?
A. As to Mr. Bowling, yes.
Q. What about as to HASBRO?





A. Possibly, yes.
Q. So this figure could be relevant to HASBRO's calculations?
A. Yes, from the moral or ethical way you do business.
Q. That's the only way in which it could be relevant?
A. Well, that's one way.
Q. How else?
A. I'll have to think about that for a while.
Q. If you come up with something, let me know, please. In the sentence that begins, "It is my opinion" at the very bottom of page 7 and continues over to page 8, you believe that the royalty rate would be high in relation to other agreements negotiated by HASBRO and other industry standards. Is that still your opinion?
A. Yes.
Q. What does it mean to be high in relation to other license agreements?
A. You have to complete the sentence "Negotiated by HASBRO and other industry standards." That's what I mean. They may be





willing to pay more or it might be higher than the general circumstances and maybe what HASBRO has paid were the general industry standards, because they were committed to using that die.
Q. So HASBRO's commitment to the use of the die, is the basis for your conclusion that the royalty rate would be high in relation to these other license agreements that you mentioned?
A. Yes, as one instance.
Q. Explain why, please.
A. Because of the timing. Given the dates and the process I believe where HASBRO should have been in the process in the inventory that was manufactured, they made a commitment to use the die; and therefore, someone would be willing to pay more to generate approximately $15 million worth of sales than to lose those kinds of sales at that critical period of time.
Q. Any further elaboration of that analysis?
A. No.
Q. And what other license agreements are you referring to?
A. A listing of other agreements that

HASBRO -- that were requested and that we reviewed that HASBRO has negotiated.
Q. And what industry standards are you referring to?
A. General review of what royalty payments are made in the industry.
Q. When did you do that review?
A. Royaltysource would give you a pretty good search as to what are standard royalties.
Q. And what are the standard royalties?
A. I think 5 percent seems to be a pretty good standard.
Q. 5 percent for what?
A. A 5-percent fee is paid.
Q. For what?
A. For either a concept, an idea. It's not necessarily just a value added. You have to go into a lot of the circumstances of how that is calculated for the use of a patent or the use of someone's product.
Q. Other than your review of Royaltysource, what did you do to educate yourself in terms of relevant industry standards as to licensing?
A. Well, I am a member of the licensing





executive society, so I kind of seek information that comes in on a regular basis, reviewed some text information in toys in what seems to be the standard, and 5 percent seems to be the standard.
Q. What was this reference to text?
A. They're another expert's report summarized your expert's report or HASBRO's expert report summarized noted to text. We reviewed that information, and in several references they're talking about a 5-percent royalty.
Q. But in connection with your preparation of this report, you didn't refer to those text or any others, correct?
A. Not at that time, but Royaltysource would also summarize toy information or byproducts that give me some general guidelines.
Q. And based on your review of Royaltysource information there's a 5-percent standard licensing -- 5 percent would be a common figure for licensing, correct?
A. Yes.
Q. And it would be fair to say, would it not, that 5 percent would be standard for a game concept?





A. Yes, but not the only factor necessarily that it would make it that. It might be the demand. It might be the timing.
Q. What factors have you considered, if any, in determining the royalty rate in this case, other than the Georgia Pacific factors?
A. Read that back to me.
(Requested material read back by the reporter.)
A. I believe those factors, the Georgia Pacific factors.
BY MR. TECHENTIN:
Q. Under the first Georgia Pacific factor you considered the royalties received by the patentee for licensing the patent, correct?
A. Yes.
Q. And you noted that Mr. Bowling has not licensed the patent, correct?
A. Yes, that's what it says.
Q. You concluded that his failure or decision not to, whatever it is, the fact that he has not licensed the product would tend to increase the reasonable royalty; is that correct?
A. Yes.





Q. And can you explain the basis for that, please?
A. I think he's probably made a decision that he, in his selling model, he can sell more or sell the way he wants to market or market his product more in a retail sense or a wholesale sense and that that type of sale of product doesn't necessarily interest him.
Q. You interviewed Mr. Bowling, correct?
A. Yes.
Q. Did you ask him as to whether in 1999 he was interested in licensing?
A. Yes, I believe we did.
Q. What did he say?
A. His interest lies in probably more in retailing than licensing. That's not to say he wouldn't consider licensing, but that was his general method of doing business.
Q. Do you know if Mr. Bowling ever actually pursued licensing his dice?
A. Yes.
Q. And did he?
A. I know of at least one occasion.
Q. And what occasion is that?

A. He made an inquiry to I think a subsidiary of yours or a division of yours, but I really don't know the circumstances surrounding that, but he did make an inquiry.
Q. Is there a reason that your report does not reflect what Mr. Bowling told you about his intentions as far as licensing is concerned in your explication of the first Georgia Pacific factor?
A. No.
Q. Does the fact that Mr. Bowling actively pursued licensing his product change your analysis of the first Georgia Pacific factor?
MR. LEACH: I object. I think that misstates the testimony here.
A. Yes, I would agree. I don't think that's what I said. In looking at this, I'm not sure that I couldn't infer the patent as being not licensed, the patent in the suit. I gave you the explanation as to why.
BY MR. TECHENTIN:
Q. Well --
A. So I think there is an explanation.
Q. Let's back up for just a second. I asked you to explain the basis for this, and you





said that Mr. Bowling was disinclined to license his product, correct?
MR. LEACH: I object. It misstates the testimony. You may answer.
A. Yeah, I don't believe I said that.
BY MR. TECHENTIN:
Q. You said, correct me if I'm wrong, but I understood you to testify as an explanation for why the lack of licensing would tend to increase the reasonable royalty, that Mr. Bowling thought he could make more money by selling in nonlicensed channels; is that correct?
A. No, I don't believe that's correct.
Q. Well, why don't you tell me what relevance Mr. Bowling's pricing structure or anything he told you in his interview has to the first Georgia Pacific factor?
A. As I expressed to you, he has -- his method of distribution was not necessarily in the licensing area. This was his method of distribution. He was probably more interested in a long-run approach to products and retailing than to maybe a two-year or a shorter term license.
Q. Those --





A. And that led itself to the fact that he had not -- that he had not licensed it before, even if he made an inquiry, so that is my response.
Q. Does the fact that he made an inquiry into licensing affect your analysis of whether Mr. Bowling was truly disinterested in licensing or not?
A. A single inquiry I can't draw any conclusion, and also there was no response to that inquiry, so I don't draw any difference from one isolated instance from someone writing a letter.
Q. Is it your opinion that the reasonable royalty would be increased by the fact that the patentee was not -- the patent was licensed or because Mr. Bowling was not interested in licensing?
A. Could you read that back to me, please?
BY MR. TECHENTIN:
Q. I garbled that. Let me try and say it again. Is your opinion that the reasonable royalty would be increased based on the fact that the patent was not licensed or on Mr. Bowling's business plans as they relate to licensing?
A. Could you say that again?





BY MR. TECHENTIN:
Q. This time I'll have her read it back.
(Requested material read back by the reporter.)
A. The latter.
BY MR. TECHENTIN:
Q. That's not reflected in your report though, correct?
A. I believe it is.
Q. Understand paragraph 1?
A. Yes.
Q. Where?
A. The first sentence.
Q. That he has not licensed it?
A. Yes.
Q. How much higher would the royalty be based on Factor 1?
MR. LEACH: Objection, vague.
A. I don't know that in all of these that you necessarily take any one factor and say that it would be a quarter percent higher or attach necessarily any dollar amount or any percentage amount to it.
BY MR. TECHENTIN:

Q. Can you do that?
A. I did not.
Q. If you were to assume that Georgia Pacific Factor 1 was neutral as to the rate of royalty, what would the reasonable royalty be?
A. It may not be affected. I can't answer your question.
Q. Why not?
A. Because as to number 1 it would be neutral. It would be saying that it would not have an effect on either increasing, decreasing or substantially changing what a royalty would be. It's not a factor that's taken into account.
Q. It would be fair to say though that your 58.25 cent per die royalty figure is at that level, at least in part because it has been pushed up as a result of your analysis of Factor 1?
A. Yes.
Q. And my question is, if Factor 1 had not pushed it up at all, what would the royalty have been?
A. I'm telling you I don't have an answer for that. I don't know what that would be because I'm taking into account all 50 and not just one or





number 2 or any of them.
Q. That would be true for each of your conclusions?
A. Yes.
Q. So you have no idea how much any factor contributes to the royalty?
A. I look at them in total and is the trend higher, is the trend neutral, is it lower.
Q. Let me try to ask it from this point of view. You say that Factor number 1 would tend to increase the reasonable royalty. Increase it from what?
A. From what might be a -- if there were some absolute standard it would have a tendency to increase it over and above some standard, some average.
Q. Is there an absolute standard in this case?
A. No, I don't believe there is.
Q. So where did you start?
A. I'm saying I don't think I necessarily started at a standard. If the standard because the industry shows 5 percent, maybe that's where you start.





Q. Well, if the industry shows 5 percent, that's one of the Georgia Pacific factors, right?
A. Yes.
Q. But it's your testimony that none of the Georgia Pacific factors in this case gave you a number, right?
A. No, that wasn't my testimony. My testimony was that no one single factor will give me a number. That's mischaracterizing what I said.
Q. So would it be fair to say that as to Factor number 1, it's your opinion that it would be higher, but you have no idea how much higher?
A. That's correct.
Q. Let's turn it around. Do you have any idea what the financial impact to Mr. Bowling would be if he were to license this product to HASBRO?
MR. LEACH: Objection to the question, vague. You may answer if you understand it.
A. I don't even know that I understand the question.
BY MR. TECHENTIN:
Q. Would it have been to Mr. Bowling's detriment to license the product?
A. I don't know.





Q. Do you have any basis to believe that it would have been?
A. I think that's probably a better question for Mr. Bowling.
Q. The second factor that you have on page 8 relates to rates paid by the licensee for the use of other patents comparable to the patent in suit, correct?
A. Yes.
Q. What rates did you consider relevant here?
A. I think HASBRO -- I think second sentence says it effectively in that HASBRO has licensed a number of games, a number of entire concepts or just a toy concept, and that they on a regular basis have licensing agreements. When they do, they have a range of what they have paid. I don't know if that's responsive to your question. Can we take a two-minute break?
(A short break was taken at 11:45 a.m.)
BY MR. TECHENTIN:
Q. Mr. Lapidus, in discussing Factor 2 you noted that you had reviewed a number of HASBRO license agreements, correct?







38cb2aed-39c0-41b5-bfb4-0270517591e3

A. Yes.
Q. How many agreements did you review?
A. You know, in part I would say -- was there about 50 agreements that you sent over? I might ask you how many you sent over, agreements, and that's what I would tell you I reviewed.
Q. You reviewed everything that was made available to you?
A. In part, yeah. I mean, I may not have reviewed them fully.
Q. And --
A. Does that answer your question?
Q. It's good enough for now, I think.
A. For now.
Q. How many of those licensing agreements, HASBRO licensing agreements, did you deem not to be comparable to the patent in suit?
A. None.
Q. So you thought they were all comparable?
A. Yes.
Q. How many of those exceeded 5 percent?
A. You know, I'm sorry, I don't know the exact count. If you're going to say how many exceeded less and how many exceeded more, I don't





know the exact count.
Q. Did --
A. Just to be fair, not that many were greater than 5 percent, but that's not only measure, just a percentage. I think you also have to consider upfront payments and maybe different or unusual terms, so I more get an idea of how HASBRO does business.
Q. Is it your understanding that upfront payments are in addition to the percentage royalty?
A. Just depends on the terms of the agreement. If it was, then the answer may be yes, but normally it's not but everyone could be different.
Q. You reviewed the agreements, right?
A. Yes.
Q. Did you see any in which the upfront payment was in addition to the percentage royalty?
A. Not that I recall, but that doesn't mean it couldn't have been done.
Q. In what way are these licensing agreements from HASBRO that you reviewed comparable to the hypothetical license agreement that you were analyzing?





A. It is comparable in that it shows what HASBRO's license and how they do business in a negotiation.
Q. Was there anything about the license agreement that rendered them comparable, other than the fact that HASBRO was a party to them?
A. Yes.
Q. What?
A. They're of similar concepts that they are either toys or games and it -- and that's it.
Q. Was it your understanding that your hypothetical negotiation was for a toy or game concept?
A. No.
Q. So why would the fact that they were for, as you've put it, toy or game concepts make them comparable to the hypothetical license agreement you were examining?
A. Because it shows what HASBRO will pay, and regardless of if it's a whole concept or not, how they are doing business, if there's a specific intellectual property concept that they want or idea or specific part.
Q. So the fact that the license agreements





that you're referencing were for entire game concepts or entire toy concepts, doesn't make a difference in terms of your consideration of a license agreement for a component?
A. It may make a difference, but HASBRO also sent a letter saying they were interested in seeing if a licensing -- if we were interested in licensing; and therefore, this is the result of -- files you sent over are the results of licensing efforts that HASBRO has taken place. Whether it's that department or those people, those were the ones you sent over, so I'm assuming that that's representative of how you do business in licensing.
Q. Well, you reviewed the deposition testimony of Mr. Hirtle, correct?
A. Yes.
Q. Is it your understanding of HASBRO's practices, based upon that deposition, that HASBRO's approach to this situation would be the same as it would be for a game concept?
A. I'm saying there would be some similarities, yes.
Q. Well --
A. Because that's how HASBRO does business.







38cb2aed-39c0-41b5-bfb4-0270517591e3

Page 98

You sent them over. I guess, if you didn't think they were relevant, you wouldn't have sent them over.
Q. So is it your opinion that without regard to the fact that as to the Bowling situation, HASBRO was negotiating for a component as opposed to a concept, HASBRO would have been willing to offer Mr. Bowling the same amount of money as they would have for a complete game concept?
A. No, not necessarily, but there is a price, and if you want that and you have the proper margins so you could afford it, maybe that's what you would pay. I don't know HASBRO's strategy in that regard, but there was an inquiry. The results are what was sent over to me. I have nothing else to rely on, so I'm not sure I would necessarily believe it might be different. It might be less.
Q. How much less?
A. It might as well be less. I don't know.
Q. Would it be reasonable --
A. I actually think it's going to be more.
Q. Would it be reasonable --
A. Based upon my conclusion here, I think

Shannon J. Rothstein

Page 99

it's going to be more, because I also think you have very unique timing.
Q. But would it be unreasonable for HASBRO to at least attempt to negotiate for substantially lower royalty rates for a game component, such as dice, in a board game as opposed to entire game concepts such as Monopoly?
A. Not necessarily, no.
Q. Do you have any reason to believe as a general principle that would be unreasonable?
A. Could be, yes. Could be unreasonable.
Q. Why?
A. Well, I would like to see the Monopoly agreement, that licensing agreement. Maybe the dates, the timing, the industry standard at that particular time of the year -- or not that particular time of the year. At that particular time in terms of the 1930s or 40s versus today, and the standard at that time may be very different. The terms, the fact that you are comparing 200 million units with something that I would think HASBRO would not go on record as saying to Mr. Bowling that we think we can sell 200 units, that might have a tendency to increase it.

Shannon J. Rothstein

Page 100

The demand, the marketing strategy of the product might be very important to them, that they have one particular component versus using something else. Someone made that decision, and obviously it was an important decision to them, but if I could see the Monopoly agreement, I might have better insight into that.
Q. Based on your review of the other agreements, which you would agree are more contemporary than the 1930s, are you aware of any specific rationale for it being unreasonable for HASBRO to attempt to negotiate a royalty rate that's substantially lower for a component than for the entire game itself?
A. Yes.
Q. Explain.
A. It's already in the package. It's there. You have to ship it out. If they want to generate those kind of sales without a lot of disruption to the normal supply chain, in August for December merchandise, millennium merchandise, they might make the decision to pay more.
Q. You would agree that that fact does not enter into Georgia Pacific Factor 2, would you not,

Shannon J. Rothstein

Page 101

that is the cost for HASBRO to avoid further use of the product?
A. No, it might.
Q. You believe that the factor which reads, quote, The rates paid by the licensee for the use of other patents comparable to the patent in suit incorporates an analysis of the cost to avoid infringement?
A. No, it might as to the timing.
Q. The timing, and again, you're talking about the fact that this happens in August, and there can be repercussions of HASBRO's supply chain?
A. And in revenue chain -- in revenue cycle. If I said chain, I misspoke. I meant cycle.
Q. In what ways were the licensing agreements that you reviewed different from the hypothetical agreement you were considering?
A. I mean, I would have to go back and look at them.
Q. You don't remember any salient differences?
A. I would want to look at them before I

Shannon J. Rothstein





38cb2aed-39c0-41b5-bfb4-0270517591e3

other areas.
Q. When you interviewed Mr. Bowling did he indicate that he was willing to go out of business in order to enter into a license agreement with HASBRO?
MR. LEACH: Object to the form of the question.
A. No.
BY MR. TECHENTIN:
Q. Did you have some reason to believe that Mr. Bowling would forego selling his own dice in order to be able to enter into a license agreement with HASBRO?
A. Depending on the nature he might, yes.
Q. What's the basis for that?
A. Monopoly has sold over 200 million games, and maybe as a result it's incorporated in a lot more games, and it becomes the standard.
Q. What's the basis for your conclusion that HASBRO and Mr. Bowling would have negotiated an exclusive license?
A. A) He has not sought out any other licenses with anyone other than HASBRO, and because his general distribution is not in gaming, I





believe it would have been exclusive.
Q. You understand that --
A. And now we have several years later and in fact that's been the case.
Q. As of August 17th or thereabouts what evidence is there to suggest that HASBRO and Mr. Bowling would have negotiated an exclusive license?
A. The fact that he was not talking to anyone else.
Q. You understand that in an exclusive license HASBRO would have exclusive rights to exploit the licensed product, correct?
A. Not necessarily. It may be exclusive as to gaming or exclusive as to board games or something like that. It may not be exclusive as to distribution.
Q. Have you formed an opinion as to the nature of the exclusivity that would have been negotiated between HASBRO and Mr. Bowling?
A. No, but because he has talked to anyone else I believe that would indicate that it would be exclusive.
Q. It wouldn't be exclusive to Mr. Bowling though, right, exclusive of Mr. Bowling or would it





be?
A. I'm sorry. I'm not sure I understand your question.
Q. Well, you've posited an exclusive relationship, correct?
A. Yes.
Q. Would that be exclusive of Mr. Bowling as well?
A. I don't know. I don't necessarily believe so, not in -- I'm sorry, I'm not sure I understand the question.
Q. You've concluded that the license agreement would be exclusive, correct?
A. Exclusive as to gaming, yes.
Q. Is that your conclusion that it would be exclusive as to gaming?
A. I believe it would be exclusive as to including them in that game, the Millennium game.
Q. I need to understand the scope of exclusivity. Can you describe that in any greater detail?
A. I think the penultimate sentence in number 3, HASBRO would have and in fact did keep these dice exclusive by including them only in the





Millennium editions which have premium packaging and pricing. That is the --
Q. That's the nature of the exclusivity?
A. Yes, sir.
Q. That HASBRO wouldn't use it in any of its other products?
A. I think at the time this is what they were talking about. I believe that's what they would have been talking about.
Q. So Mr. Bowling could have gone to Mattel and licensed the same item?
A. I believe that as to HASBRO they would have required in gaming that it be exclusive in this edition and that it would not have gone to other companies, Mattel or anyone else.
Q. Okay. So it wasn't just a restriction on HASBRO's exploitation of the invention. It restricted Mr. Bowling in some way, correct?
A. Yes.
Q. Would that exclusivity have restricted Mr. Bowling from selling the dice himself?
A. I do not believe so. I thought I stated that it would have been exclusive as to the gaming.
Q. And by gaming, what do you mean by that?

A. As a component of a game.
Q. So would HASBRO have had the right to sell the dice in direct competition with Mr. Bowling?
A. No.
Q. So --
A. That was my statement. He would -- he would have not. He would have said, "You can have exclusive use in gaming, not only will I not go anywhere else, but you will not go anywhere else."
Q. So HASBRO would not have had the right to start selling these as individual items in its Wizard of the Coast stores, for example?
A. Possible, yes.
Q. Wouldn't the fact that HASBRO's use of the item was restricted in that way tend to reduce the royalty?
A. No.
Q. Why not?
A. Because I believe it also puts restrictions on Mr. Bowling as well as HASBRO, and I think in this case it would be to HASBRO's advantage.
Q. You would agree that your interpretation





of the exclusive nature of the license is different from the exclusivity provisions that exist in other HASBRO licensing contracts that you have reviewed, would you not?
A. I would want to look at them in more detail before I answer it.
Q. Let me put it this way, did you base your conclusion as to the nature of the exclusivity for the HASBRO Bowling negotiation on the HASBRO contracts that you reviewed?
A. Somewhat, yes.
Q. In what way?
A. By reviewing the details of them.
Q. And --
A. As I'm sitting here today I'm telling you I don't recall the details specifically, and I would want to look at them. Given the number of contracts I might be able to find an instance where there might have been some limits on exclusivity.
Q. Would you agree that your explanation of Factor 3 does not include any reference to what you've talked about in terms of restrictions on Mr. Bowling's exploitation?
A. No, I think it does. I don't agree.





Q. Where is that?
A. HASBRO would have in fact -- did keep these dice exclusive by including them only in the Millennium editions. I believe that they would have also -- even the first sentence it would have been exclusive to HASBRO, so it does put some conditions on him, so he can't go to Mattel or other game manufacturers or other inventors and say, "Let's include my die in your game." And his distribution channels, how he was doing business was not necessarily in this type of distribution channel.
Q. And again, you don't know by how much this factor is going to increase the royalty; is that correct?
A. A specific amount, no.
Q. Did you discuss that with Mr. Bowling?
A. Did I discuss what with Mr. Bowling?
Q. How much an exclusivity provision might be worth with him or he might demand for an exclusivity provision?
A. No, I didn't, not in that context.
Q. Do you have any basis to conclude that HASBRO would have insisted upon exclusivity?





A. Well, yes --
Q. What's the basis for that?
A. -- and no. They didn't put it in any other game.
Q. But as a matter of a contract are you aware of any factual basis upon which to conclude that HASBRO would have insisted upon an exclusivity provision?
A. No, but I know what they did.
Q. And you think that an exclusivity provision means that HASBRO won't use it in any other games?
A. It would be depending on the negotiation of the parties and how they define exclusive, the word exclusive and what that means.
Q. What's your understanding of Georgia Pacific factors, Factor 3's reference to exclusive or nonexclusive licensing?
A. I think the factors in Georgia Pacific Factor 3 are probably broader than the application that we are using it here.
Q. In what sense?
A. In the sense that exclusive means we have full rights and maybe it would not include a

actual accused dice as inventor and promotor?
A. No, I think as I recall there was some issues with color that he would probably want or I would assume that he would want a little more control in the product; and therefore, I'm saying supplier and customer, and that could mean that it might be manufactured somewhere else using HASBRO'S source, but he would have a little more control over the quality; and therefore, because it's under his direction, it might be -- you could characterize as supplier relationship or he would oversee it in some fashion. That's how I characterized it, but I don't think for this factor it makes any difference.
Q. What evidence do you have or have you seen that would support an assumption that Mr. Bowling would have that control over the product?
A. Only discussions with Mr. Bowling.
Q. And what did Mr. Bowling say in that regard?
A. Well, as I say I think there was some issues as to color; and therefore, I would think, and I am thinking, that he would want more control, more ability to inspect and ensure that its the





standards that he would want.
Q. I'm trying not to ask you about your conclusions based on Mr. Bowling. I'm trying to find out what Mr. Bowling said, so let me try again. What did Mr. Bowling say in that regard?
A. I think directly I might not have asked the question directly, but because I know there were issues about color, that's what I believe he said in that context.
Q. What issues about color?
A. I do not -- I believe that the issue was around the jewel-like appearance or the perception of being more jewel-like die.
Q. Where did you see this?
A. Some of the reading information that I looked at. I might have discussed that with him also.
Q. Other than the issues pertaining to color, is there any other reason why you would conclude that Mr. Bowling would exercise some control over the precise nature of the dice that HASBRO would include?
A. No.
Q. If Mr. Bowling had control over the





character of the die that would be used under this license, would that increase or decrease the value of the license to HASBRO?
A. Well, it may do both.
Q. Do you make any accounting in your analysis under the fifth Georgia Pacific factor for the possibility that Mr. Bowling's exercise of control over the nature of the die that was used could reduce the value of the royalty to HASBRO?
A. Yes.
Q. Where?
A. I just think implied within the relationship. At the time you're negotiating a relationship or negotiating -- two parties negotiating, that would enter into HASBRO's thinking as to what to pay.
Q. But you don't, for example, suggest in your discussion of Georgia Pacific Factor 5 that this relationship could both increase or in the alternative decrease the royalty for this product, do you?
A. Yes, I believe I considered both sides.
Q. But in your report is there any reflection of both sides?





A. Yes, within the conclusion there is both sides.
Q. Where is that?
A. I believe it has more tendency to increase, but I believe in considering it, it was both. It may not be written here, but it was both. In considering that factor, you have to consider both sides, therefore, it was considered.
Q. What was the basis for concluding that Factor 5 as a whole would increase the reasonable royalty?
A. HASBRO was in a unique position in that given the timing as to when they were negotiating, they would pay more, and in terms of this relationship that they had, they would have to do so in order to be able to ship the merchandise in a timely manner, and I think you pay more for that.
Q. Does the relationship being one of supplier and customer as opposed to being one of inventor and promotor in itself cause you to conclude that the royalty would be higher?
A. No.
Q. So supplier and customer that type of relationship doesn't dictate a higher royalty as

apposed to an inventor/promoter relationship?
A. No, I don't believe that that would dictate a higher royalty.
Q. Isn't Factor 5 supposed to be the consideration of what the commercial relationship is?
A. Yes.
Q. So how does the fact that you conclude that the relationship was one of supplier and customer impact the royalty rate?
A. I believe that it's the same, and I don't believe that the word "promotor" in this context is an accurate description of HASBRO, and Mr. Bowling clearly is the inventor, but I believe that he would probably have been at this time supplying them the merchandise. Had he not, I don't think it makes any difference given the timing, more the timing of the relationship and the terms of.
Q. What about the nature of the relationship would tend to increase the royalty?
A. Well, I think surrounding the nature of the relationship is the fact that HASBRO as the customer has this merchandise or as a promotor has





this merchandise in stock and has to make a decision about it, their own economic decision as to how to deal with this, what to do, how to properly negotiate when they have some of the product they need to negotiate something for.
Q. As of August of 1999, what game manufacturers had Mr. Bowling sold to?
A. I don't believe any.
Q. How is it that you know that Mr. Bowling had a pricing strategy with respect to what he charged game manufacturers for his dice?
A. Because he would have done it in his similar strategy of either a some kind of wholesale price or a regular retail price, that's how he was selling his merchandise.
Q. Is that an assumption on your part that he would sell to game manufacturers at that wholesale price?
A. Well, yes, it is an assumption because it didn't take place. It didn't happen.
Q. Well, did Mr. Bowling tell you that he had a pricing strategy in place; he charged the wholesale price?
A. Yes.





Q. Do you know if Mr. Bowling ever sold his dice for less than 60 cents a piece?
A. I believe he did, yes.
Q. Isn't it true that Mr. Bowling had an explicit policy that allowed for discounts below the standard wholesale price for his dice based upon quantities?
A. Some, yes.
Q. And that the quantities involved in the HASBRO situation were well in excess of the quantities required by Mr. Bowling to obtain discounts?
A. Yes, but in a very different situation.
Q. Have you taken that into account in your report?
A. In all these factors, yes.
Q. How?
A. In that HASBRO is in a position they had the merchandise. They were already using it, and they have the inventory there and probably sold, so you put Mr. Bowling in really an unfair position.
Q. Put Mr. Bowling in an unfair position?
A. Sure.
Q. In what sense?





A. The product is already sitting in inventory. A decision has probably been made to ship it or going to ship it, and you are negotiating without telling him necessarily all the facts. I think given the unique timing this merchandise had to go out for the Christmas season and for the millennium.
Q. Let me try to ask the question again. Without regard to HASBRO's situation and the timing of that situation, as far as having product that enclosed the accused dice, how in your report have you accounted for the fact that Mr. Bowling sold dice at less than wholesale price?
A. I don't understand the question.
Q. Let me ask it this way, is there any reference in your report to the fact that Mr. Bowling sold dice for less than 64 cents per dice for wholesale price?
A. I do not see a specific reference.
Q. And you know --
A. But that doesn't mean that it wasn't considered.
Q. You know that Mr. Bowling was selling to all of his distributors significantly less than 64







38cb2aed-39c0-41b5-bfb4-0270517591e3

Page 134

cents per die, correct?
A. Yes.
Q. And likewise, there's no mention of that fact in your report, correct?
A. No, but it was considered.
Q. So you know that Mr. Bowling under the circumstances that he deemed to be economically beneficial sold his dice for significantly less than 64 cents per die, correct?
A. Yes, not necessarily significantly less. He sold them for less.
Q. Is 25 percent significant?
A. I don't know. I'm not here to argue with you over significant.
Q. Is 50 percent significant?
A. I think I've answered your question.
Q. You don't have an opinion as to whether that's significant?
A. I don't have an opinion as to a definition of what is significant.
Q. If Mr. Bowling had been willing to sell his dice under a supplier/customer relationship to HASBRO for 32 cents per die, would that have been significant to your analysis?

Shannon J. Rothstein

Page 135

A. I don't know.
Q. Why don't you know?
A. Because I haven't thought about it.
Q. You thought about whether he would be willing to sell them at 64 cents per die, right?
A. Yes.
Q. And that factored into your analysis, correct?
A. Yes.
Q. And you assumed that Mr. Bowling would in a supplier/customer relationship sell the dice for 64 cents a piece, correct?
A. Yes.
Q. Wouldn't it be fair to say that if he were willing to sell them for 32 cents a piece under a supplier/customer relationship that that would have an impact on the reasonable royalty number?
A. Not necessarily.
Q. Why not?
A. Because in this instance the reasonable royalty number would be negotiated around the date of August 17th.
Q. So it comes back to the timing?

Shannon J. Rothstein

Page 136

A. Timing would be a very important factor. The fact that the product is manufactured, packaged and ready to ship would be an important factor.
Q. What's the basis for your assertion that Mr. Bowling put his pricing strategy with respect to game manufacturers into place in order to help maintain a high retail price and controlled distribution?
A. What is my -- excuse me, I didn't hear.
Q. What is your basis for making that statement?
A. My interview with Mr. Bowling.
Q. When did he say he put this strategy in place?
A. I don't know that I asked him that.
Q. Would that have been relevant?
A. It may have been.
Q. For example, if this strategy were not in place as of August 17th of 1999, would that have been relevant?
A. May have been.
Q. Wouldn't it be fair to say that it would be inappropriate to consider that strategy if it were not in place at that time?

Shannon J. Rothstein

Page 137

A. No, not necessarily.
Q. You think it would be appropriate to consider Mr. Bowling's post-negotiation pricing strategies to determine what the reasonable royalty rate would have been as of the negotiation?
A. No.
Q. Explain your response then that it would be inappropriate -- that it would not be inappropriate to reference such a strategy?
A. I do not think in reviewing the Georgia Pacific factors and the timing that it would necessarily be relevant. It is more -- I also think what enters into this is just the timing surrounding the shipments of HASBRO's merchandise.
Q. In the paragraph discussing Georgia Pacific Factor 5 you haven't cited any evidentiary support for your statements; is that correct?
A. Yes.
Q. Why?
A. I don't necessarily believe any was needed. It cites a price. We've agreed on a price. I don't believe any was needed. If I thought it was needed, I would have referenced it.
Q. Do you think it's reasonable to assume

Shannon J. Rothstein

that HASBRO would have disregarded its established supplier relationship in favor of obtaining dice from Mr. Bowling?
A. Could I have that read back, please?
(Requested material read back by the reporter.)
A. Possibly, yes.
BY MR. TECHENTIN:
Q. Why?
A. I believe there was a specific -- I made reference to it earlier in terms to color, and it may not have been unlike Mr. Bowling to have wanted to maintain some kind of control over the product.
Q. Would you agree though that HASBRO, as a first principle in the negotiating process would favor remaining with its existing supply?
A. Not necessarily.
Q. Do you have any reason to think that they wouldn't?
A. No more than I think they would. If they want the product, they will generally find a way to work it out or pay a higher price to use their supplier, that would tend to increase the royalty.





Q. What do you believe was the significance of the accused dice to the Millennium edition games?
A. I'm sorry, what was the question?
Q. What do you believe was the significance of the accused dice to the games that included those dice?
A. I think the advertising and futuristic approach was the reason, was the theme of those dice.
Q. Have you seen the Millennium edition Monopoly game?
A. Yes.
Q. Have you ever played Monopoly before?
A. Yes.
Q. So you're generally familiar with what a regular version of Monopoly might look like?
A. Yes. I mean, 200 million sets were sold. It's a pretty popular game.
Q. Were the dice the only difference between the Millennium edition and the normal Monopoly game?
A. No.
Q. What other differences were there?





A. I would not be that close to venture a guess to sit here and tell you each and every edition.
Q. Was the board changed?
A. I believe the board was changed.
Q. Were the cards, Chance and Community Chest, changed?
A. Yes.
Q. Were the tokens changed?
A. Yes.
Q. Were the houses and the hotels changed?
A. Yes.
Q. Was the packaging changed?
A. There's been a couple different editions, but I think it was different, from what I remember.
Q. The Millennium edition came in a tin box with a mylar sleeve, correct?
A. Yes.
Q. The standard edition of Monopoly comes in a cardboard box, correct?
A. Yes.
Q. Viewed against the other changes that were inherent in the Millennium edition game, how





prominent a factor were the dice?
A. Probably the most important.
Q. Why is that?
A. It's the only game piece that is used by each participant each time they play the game. It's used to start the game, it's used to conclude the game, and it's the only piece that's used every time in order to engage in playing the game. You don't need houses. You don't need a lot of things, but you have to have that die in order to determine where you are going to be on the board.
Q. Do you believe that the dice were a significant factor driving sales of the games that included the accused dice?
A. Somewhat, yes. I'm not sure completely, because I don't know the impact, but in fact the advertising featured that and the slogan for that was "The familiar will take on a different slant," and so if I'm in the minds of the creator, I guess they felt that was pretty important. In the minds of the marketing people, they used that item as one item, a couple others, but they used that prominently to show that something would be different.







38cb2aed-39c0-41b5-bfb4-0270517591e3

A. It may be. I think then the issue -- I think you're kind of giving me a little of a hypothetical, but I also get into the issue of timing. And on August 17, at the date that I am taking myself to or supposed to take myself to, you also have the timing of the dice are already in the box. They're there or they're being manufactured and they're there. The orders are out, and I think there is probably a more complicated decision that has to be made in this context.
Q. Let me ask you the same question slightly different. As you say hypothetical, if HASBRO had looked at the dice and determined that the cost to include the dice would be approximately 62 or 63 cents per game but decided that that was too expensive, would that be relevant to your analysis?
A. I don't know. I don't know.
Q. You don't think it would be germane to the question of what HASBRO and Mr. Bowling would mutually be able to agree upon as a royalty rate what HASBRO actually rejected as being too high?
A. I think there were other considerations after any negotiation that took place that entered





into that decision as to what might be too high.
Q. Explain that.
A. Again, I think timing was important here, repackaging was important, the ads that were written around that particular die, all the other costs and just the change, I believe were important in that consideration, what they ultimately decided to do.
Q. If I understand you correctly, you're saying that the timing unique to August 17th or thereabouts is so important that you need not even actively consider HASBRO's rejection of a royalty figure based on the conclusion that it was too expensive that occurred a few months later?
A. I think that's not the only factor, that's why.
Q. Have you considered HASBRO's rejection of a total cost for the die of under 65 cents as being too expensive in your analysis of royalty rates?
MR. LEACH: Can you repeat that question, Jim?
BY MR. TECHENTIN:
Q. Have you considered HASBRO's rejection





of a total cost of 65 cents per game for these dice as too expensive in determining the royalty rate?
MR. LEACH: I'm not sure if you're stating that question correctly. I want to make sure I understand before I let him answer. Are you talking about the dice or do you mean the randomizer?
MR. TECHENTIN: The dice.
MR. LEACH: One more time.
BY MR. TECHENTIN:
Q. Did you understand the question?
MR. LEACH: If you understand, please answer.
A. I'm not sure I do understand the question.
BY MR. TECHENTIN:
Q. You understand that shortly after August of 1999 HASBRO rejected the use of the accused dice at a cost of under 65 cents per pair, correct?
A. No, I don't necessarily know that.
Q. So it would be fair to say that that has not been entered into your calculus?
A. No. I'm a little confused because you could probably go out and get them at retail at 64





if you can get enough of them or at least offer 64, and you'd be at a similar level. I don't know what kind of posturing they were doing just to reject that.
Q. On the flip side, have you considered Mr. Bowling's demand for 25 cents per die as relevant to your analysis of reasonable royalty in this case?
MR. LEACH: I'm going to object to that question, and I'm not sure where you're getting that from, but to the extent it's from something that would be considered a settlement offer or anything like that, it would be subject to 408, that would be my objection.
BY MR. TECHENTIN:
Q. That's an interesting objection in light of some of the posturing that's been done in this case, but in light, that stands as no obstacle to your answering the question.
MR. LEACH: You may answer the question.
A. I did not understand an offer of 25 cents per die. I do not believe that there was an offer.

distinct in the sense that the Phase 10 dice game is a complete game concept license agreement as opposed to a component licensing agreement in this case?
A. I'm sorry, what was the question?
Q. Would you agree that the two license agreements, your hypothetical one and the Phase 10 agreement, would be different in the sense that the Phase 10 agreement is a complete concept agreement as opposed to a component, which is what's being considered in your analysis?
A. It has some relevance.
Q. So do you agree that that is a distinction between the two?
A. Not necessarily, no.
Q. You don't see componentry and complete game ideas as being distinct?
A. Based upon -- yes, they are two different concepts, but it's also indicative of the industry and what royalties are willing to be paid, so that I believe that there are two examples. It gives you a range, and that's not to say that the component may not be worth just as much as the game or more.





Q. So it's your opinion that two licensed agreements for complete game concepts are indicative of what the industry does with respect to componentry?
A. I think it has some relevance, yes. It may be indicative.
Q. Is it indicative of what the industry does as a general practice with respect to components in games?
A. It may, yes.
Q. Well, do you know if it is?
A. I don't know of that many that have had a component licensing, so therefore, I'm using this as the analysis. And I think when you also take into account the agreements and the timing with which this would take place, it would have the effect of probably increasing the price, the royalty.
Q. Same goes for the Magic agreements. Those were complete game concept agreements, correct?
A. Yes.
Q. And what impact does it have on your analysis that a complete game concept like Magic,





the gathering, could command as little as a 2 percent royalty on net sales?
A. It's indicative of a negotiation process to get a product, and whether it's a full game or a component, they're still negotiating for a product. And clearly HASBRO thought it was important or they wouldn't have used it.
MR. LEACH: So the record's clear, are you talking about the accused dice?
A. The accused dice, excuse me.
BY MR. TECHENTIN:
Q. That's just a truism, isn't it, that they use the die?
A. What do you mean?
Q. Well, of what significance is it that HASBRO elected to use this die as opposed to something else?
A. They could have elected to use something else.
Q. But they didn't opt to use the die with the knowledge that Mr. Bowling had a patent, correct?
A. I don't know what their thinking was.
Q. So how do you know that it was important





that they use the die?
A. Because they have pictures of it, it was advertised, and they placed some relevance in marketing to that die.
Q. You don't have any idea how much, do you?
A. I don't know what you mean.
Q. At the time that HASBRO elected to use the die in the game, you don't have any idea how important it was that HASBRO used that die, do you?
A. I don't know what you mean by how important.
Q. Well, you opined that it was important, correct.
A. Yes.
Q. I'm saying that you don't know how important?
A. If a standard is important, I don't know the level of importance, but it was important.
Q. It could be -- never mind. I'm turning to Factor 13 now. Other than your observation that the agreements by HASBRO didn't calculate royalties based on value added, what's the basis for your assertion that Mr. Hirtle's value added analysis







38cb2aed-39c0-41b5-bfb4-0270517591e3

Page 202

Q. That's what I'm asking about.
A. Okay. But I'm asking you in your hypothetical, what was the agreement?
Q. The agreement pertains solely to the sale of dice as individual dice, and so now the question becomes if HASBRO is going to market this as a component. My question is, is it your understanding of industry practice that HASBRO would use the same item and pay potentially tens of times more royalties on it? Is that your understanding of the industry practice?
MR. LEACH: I object to the question and the hypothetical.
A. Yeah, I think at that point you would go back and negotiate if it was a different use, in your hypothetical agreement, at what those terms would be.
Q. But is it your understanding that an industry standard would call for Mr. Bowling to be paid 5 percent of the net sales of the item in which his item was a component?
A. An industry standard may have nothing to do with this, so I can tell you that whatever the parties would have agreed to, that's what it would

Shannon J. Rothstein

Page 203

have been. It may have been 10 percent of the total, of the total price. The industry standard between the parties may not necessarily even be relevant. It's what they agree to.
Q. Are you aware of any industry standard that would suggest the appropriate royalty rate for a component in a game?
A. The Georgia Pacific factors really aren't necessarily considering an absolute standard. It's what a hypothetical buyer or what a hypothetical negotiation would take place.
Q. That wasn't my question. My question was, are you aware of any industry standard that would suggest an appropriate royalty rate for a component in a game?
A. I'm not aware of that.
Q. Can you explain the mechanism by which you arrived at .5825 dollars as a royalty? 58 and a quarter cents. It's just stated differently.
MR. LEACH: Say the question again.
BY MR. TECHENTIN:
Q. Please explain the method by which you arrive at 58.25 cents per die as a reasonable royalty in this case?

Shannon J. Rothstein

Page 204

A. Based upon the pricing strategy that Mr. Bowling would sell, less probably -- less the cost to acquire the product, HASBRO's cost to acquire the product.
Q. So you have taken a sales price of 64 cents per die, correct?
A. Yes.
Q. And you've deducted HASBRO's cost of producing the accused die, correct?
A. Yes.
Q. Why did you pick HASBRO's cost per die?
A. Because that's what they would spend, I believe, to have these dice manufactured, and so it really gets back to at that point what Mr. Bowling would sell for, what he would be interested in selling for.
Q. Well, as you've already indicated, Mr. Bowling has a cost of goods of 13 cents per die, correct?
A. Yes.
Q. Wouldn't Mr. Bowling have been willing to sell then if he's able to avoid the cost of goods for 51 cents?
A. I believe they've given -- the answer

Shannon J. Rothstein

Page 205

can be yes, but given the timing in the market and the need to have that product, HASBRO already had it in their inventory.
Q. Well, if we follow that logic, if that's the only driving force though, is there any limit to what HASBRO would have been willing to pay as of August 17th of 1999?
A. I think the limit would be much higher than at some other time. Would there be a limit? Yes, there might be a limit. I'm not sure what that would be, but there might be a limit.
Q. Would it be more than a total of 64 cents per die?
A. It might be.
Q. Do you think it would be?
A. It might be, yes.
Q. What is the highest price that you think HASBRO would be willing to have paid to keep these dice in its games?
A. At this point I would agree I think it would have been agreed upon at 58 and a quarter cents per die.
Q. Because that's all that Mr. Bowling wanted?

Shannon J. Rothstein





38cb2aed-39c0-41b5-bfb4-0270517591e3

don't think you can ask it in that context and come up with the conclusion of what you're trying to have me say.

Q. The 64 cent figure that you start with to calculate the royalty is what you take as Mr. Bowling's per die sales price, correct?

MR. LEACH: I object to the question as it misstates the testimony here and the record.

A. What is the question?

BY MR. TECHENTIN:

Q. In Exhibit D in your report you calculate the reasonable royalty per die, correct?

A. Yes.

Q. And the first line of your calculation is Mr. Bowling's per die sales price, correct?

A. Yes.

Q. Which you list as 64 cents?

A. Yes.

Q. And the sum and substance of the calculus of this reasonable royalty is that from that 64 cents you subtract HASBRO's cost of making the accused die, correct?

A. Yes.





Q. So fundamentally your calculation of the reasonable royalty figure starts with what you believe Mr. Bowling wanted to receive for his dice based on his pricing strategy, correct?

A. No.

MR. LEACH: I object, misstates his testimony.

A. I don't agree with that.

BY MR. TECHENTIN:

Q. You don't agree that you think that Mr. Bowling's pricing strategy called for him to get 64 cents per die?

A. I don't agree that that was necessarily where the negotiation may or may not have started.

Q. I asked about your calculation, not the negotiation.

A. Yes, but I have to deal with it in terms of a negotiation also.

Q. Is that --

A. There may have been increases or decreases to that level, and you may have started out with a different price and gotten to that 64 cents, so I think that mischaracterizes everything we talked about.





Q. Well, did you start with a different price and after the application of the Georgia Pacific factors arrive at 64 cents?

A. No, but whatever with that being a benchmark, it could increase or decrease due to those factors, and other considerations might be the number of units that are being sold, the timing that they are being sold. And in this case I believe that his sales price of -- that Bowling's sales price would be 64 cents versus he says he has another sales price of 49 cents.

Q. Am I understanding you correctly to say that you use the 64 cent figure as a benchmark against which you weighed the factors, the Georgia Pacific factors?

MR. LEACH: Object, misstates the testimony.

A. No, I did not say that.

BY MR. TECHENTIN:

Q. Why did you refer to the 64 cents as a benchmark?

A. That is he has two different sales prices. He also has 49 cents as a sales price. He is selling at 49 cents.





Q. Why did you pick 64 cents instead of 49 cents?

A. Because I believe that that price is more representative given the Georgia Pacific factors of what he would sell it to HASBRO for or how HASBRO would use it, I guess.

Q. As you sit here today, if I understand you correctly, you don't have any means by which you can take the royalty number that you have and back out any one or more of the Georgia Pacific factors, correct?

A. That's correct.

(Reporter interruption.)

(A Short break was taken at 3:30 p.m.)

BY MR. TECHENTIN:

Q. Mr. Lapidus, do you believe that a 11.92 percent royalty on the Avon edition is reasonable in light of the payment of just 3 percent on the Monopoly property itself?

MR. LEACH: Can you explain Monopoly property? You mean the game?

MR. TECHENTIN: The intellectual property for Monopoly. I didn't mean Board Walk.







38cb2aed-39c0-41b5-bfb4-0270517591e3

Page 214

A. I don't know enough about the 3 percent. Can you explain the 3 percent and what are the terms? Before I answer that, I'm not understanding how the 3 percent is arrived at, and when it was arrived or anything about it.
BY MR. TECHENTIN:
Q. Do you believe that the value of the accused dice to the Monopoly Avon 2000 edition was merely four times as valuable as the concept of the Monopoly game?
A. I have the same concern. You haven't given me any basis to evaluate the 3 percent to say it is fair or not fair, and the fact that the 3 percent is based on or may be based on 200 million games, and this is based on 5 percent of that, I have no basis to even answer that question. What are the terms of the Monopoly -- the 3 percent Monopoly?
Q. Which of the following two do you believe was more important in terms of the sales of the Monopoly Millennium edition games, the fact that it was Monopoly or the fact that it had the accused dice in it?
A. The fact that it was Monopoly.

Shannon J. Rothstein

Page 215

Q. Have you reviewed the report by Mr. Sussman?
A. Yes.
Q. Do you have any disagreement as to his methodology?
A. I did not look at it in preparation for this deposition today, so I don't know that I could specifically comment. I haven't studied it. I studied it when it came out, but I haven't spent anymore time on it. I will before trial.
Q. What is your understanding of Mr. Sussman's analysis of the Georgia Pacific factors?
A. I'd have to go through his report and look at it. I don't have it with me. I don't want to spend a half-hour and read it.
MR. LEACH: And I'm going to instruct you to take as much time as you need to answer the question. Look at it if you haven't studied it in detail.
(N. Lapidus Deposition Exhibit Number 1 marked for identification.)
A. Can I take a half-hour and read this?
BY MR. TECHENTIN:
Q. No. I'm going to ask you some specific

Shannon J. Rothstein

Page 216

questions.
A. Well, I'm not going to be able to answer this in the context of one question. Well, go ahead and try. That's probably not fair for me to say that, excuse me.
Q. If you could turn to page 2 of this report.
MR. LEACH: Do you have a copy for me?
MR. TECHENTIN: Yes, I'm sorry.
BY MR. TECHENTIN:
Q. Do you disagree that HASBRO had noninfringing alternative dice that were commercially acceptable and available to use in its Monopoly Millennium games in August of 1999?
A. I don't know.
Q. You didn't consider that question in connection with your analysis?
A. Not in terms of futuristic dice. They had alternative but not futuristic alternative.
Q. You know that to be the case?
A. I believe so, yes.
Q. And what's your basis for that conclusion?
A. Well, I'm going to have to spend some

Shannon J. Rothstein

Page 217

time and get an answer.
Q. To do what?
A. Anything I want to do. You asked me a question, I want to read this, and I want to look at my report, and I want to spend some time thinking about it.
Q. As you sit here today --
A. You're asking me questions about this report, specifically 4A, and I want to look at the whole report before I answer any specific questions about it.
Q. With all due respect, the first question that I opposed to you had nothing to do with Mr. Sussman's report. It had to do with your own analysis and what the basis was of your assertion that there was not a commercially available noninfringing alternative for futuristic dice.
A. But you're referring to his report, and before I respond I -- because you're referring to his report, I believe I need the time to go through it and look at it. I'm not going to argue with you. I'm just going to take the time to look at it, if you want to ask me specific questions this way.

Shannon J. Rothstein

you can't answer the questions, that's fine. As you sit here today, having done your own analysis, do you have reason to believe that that $145,880 figure does not accurately represent the cost to HASBRO to change the dice on or about August 17th of 1999?
A. Yes. And that was a question that you've asked me before, and I've given you an answer.
Q. What would the cost to HASBRO have been as of August of 1999 to change the dice?
A. It might be a number that is much greater than 145,000. You've asked me a whole series of questions about that. Unless my memory has really gone or yours is really gone, to say that whole dialogue was already discussed.
Q. All right. You're a CPA; is that right?
A. Yes.
Q. Do you understand lost sales as being a cost?
A. Yes.
Q. Okay. Assume for a second that I'm excluding lost sales from costs. You with me so far?





A. No.
Q. Leaving aside the question of lost sales, do you have any reason to believe that this figure of roughly 146,000 is incorrect?
A. I have no reason to know that it's correct or incorrect.
Q. Did you yourself do an analysis of the cost to change --
A. No, because the largest cost is going to be lost sales.
Q. Did you do an analysis of what those lost sales would be?
A. No. But given the timing I know it's a significant number, and that is directly omitted from this report.
Q. And just so that I'm clear, your comments about timing, which you've made frequently in today's deposition, go to the precarious situation in which HASBRO found itself, is that correct, because of the inclusion of the dice up until August 17th?
A. Yes.
Q. And it's compounded by the fact that August 17th in your opinion is significant time in





HASBRO's business cycle?
A. Yes.
Q. Where in your report do you discuss the significance of August 17th to HASBRO's business cycle?
A. I think it is shown in various places or referred to, maybe not directly, but it is there.
Q. Is it ever directly referred to?
A. Well, I'd have to go through the report and look.
Q. Please do. That one I'm willing to wait for.
A. But if it is not directly, it is indirectly referred to.
MR. LEACH: Jeff, we've gone through this.
A. Yeah.
MR. TECHENTIN: Are you willing to stipulate it's not in there?
MR. LEACH: No, of course not.
MR. TECHENTIN: Directly. Then I want an answer to the question as to whether he has made any references --
MR. LEACH: Go ahead. We've got some





time yet.
(Off the record.)
A. The question that you asked me.
BY MR. TECHENTIN:
Q. What did you find?
MR. LEACH: Let's have the question back, please.
(Requested material read back by the reporter.)
A. So your question is?
BY MR. TECHENTIN:
Q. Do you ever in your report directly refer to significance of August 17th to HASBRO's business cycle? Just so the record was clear, I asked you that, and you indicated that you were going to review the report for that, and you made notes. We waited and now you're going back to the report.
A. Am I entitled to do that?
Q. Sure. But I --
MR. LEACH: You're asking him where in the report. You want him to say off the top of his head the points you went through? He looked through the report and now he's going







38cb2aed-39c0-41b5-bfb4-0270517591e3

to tell you, I presume.
MR. TECHENTIN: That's fine.
MR. LEACH: But he can look where in the report, right?
MR. TECHENTIN: Sure.
MR. LEACH: The question is where in the report, right?
MR. TECHENTIN: Yes.
A. I believe there are both direct and indirect references in my report.
BY MR. TECHENTIN:
Q. Okay. I'm only asking about direct.
A. I believe on page 6, on line 1, in my mind that is a direct reference.
Q. When you posit that HASBRO had a decision of replacing the infringing dice changing its advertising and changing its packaging, is that what you're referring to?
A. Yes. And continuing through line 3.
Q. Semicolon, Negotiating a licensing agreement with Bowling, semicolon, or continuing to sell the remaining inventory risking litigation?
A. Yes.
Q. It's your testimony that that's a direct





reference to the significance of August 17th as opposed to some other date when that might be the case?
A. That's one reference, yes.
Q. What's the next?
A. Page 7, lines 1 through 3.
Q. Those are the quotations from Mr. Hirtle's deposition?
A. Yes.
Q. In which he testifies that at the time that -- well, it's not even his testimony. It's a question, correct?
A. Yes.
Q. So you're referring to Mr. Leach's question to him that at the time that he called Mr. Bowling in September or October of 1999, I'm inserting, you were already manufacturing the accused dice and including them in the Monopoly Millennium edition game?
A. Yes.
Q. And it's your testimony today that that quotation of Mr. Leach is a direct reference to the significance of August 17th in HASBRO's business cycle?





A. Yes.
Q. Okay. What's the next one?
MR. LEACH: You excluded Michael Hirtle's answer.
A. And his answer.
MR. TECHENTIN: He said the first three lines, but that's fine.
A. My next reference was the answer also.
BY MR. TECHENTIN:
Q. Okay.
A. Same page, actually continuing through the next answer of, Yes, maybe that would be easier to do it or maybe a little faster. HASBRO has a bit of a disadvantage if Mr. Bowling knew that you already had inventory and were selling these games and committed to his dice. Answer, Yes. I believe that's a reference.
Q. That's a reference to August 17th's significance in HASBRO's business cycle?
A. Yes.
Q. Okay.
A. And line 17, again, the similar quotation that was on page 6.
Q. The numbers 1 --





A. Continue to sell it's inventory, yes.
Q. Numbers 1, 2 and 3, and we discussed those?
A. Yes.
Q. And that, again, you're saying is direct reference to --
A. Yes.
Q. -- August 17th, and its significance within the HASBRO business cycle?
A. Yes.
Q. Okay.
A. Page 11, number 7, the response -- generally the response to number 7.
Q. Okay. What's the next reference?
A. The sales pattern on Exhibit G, that's an unnumbered page. If you want a copy of this, you can get a copy of it.
Q. The sales units shown?
A. Yes.
Q. The numbers?
A. Yes, and the sales -- the dollars right below it.
Q. Any others?
A. No.







38cb2aed-39c0-41b5-bfb4-0270517591e3