# EXHIBIT A

32121ADS

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

C.A. No. 05-229 S

---

MICHAEL BOWLING,

Plaintiff,

vs.

HASBRO, INC.,

Defendant.

---

DEPOSITION OF KEVIN B. COOK

May 22, 2006

Pursuant to Notice taken on behalf of the Defendant at 1050 17th Street, Suite 1950, Denver, Colorado 80202, at 9:06 a.m., before Diane K. Scholl, Registered Professional Reporter and Notary Public within Colorado.



dcebb40a-6755-4088-a6ff-3211f5432b0a

Page 198

by the specifications, the fact that either a printed indicia or nonimprinted indicia is not of relevance to the '197 patent.
Q. Let me ask this question again. When you analyzed the '197 patent and you looked at the question of whether Hasbro's dice were infringing --
A. Um-hum.
Q. -- you considered the question of whether or not the indentations on Hasbro's accused dice meant that the dice did not literally infringe the patent, correct?
A. I tested the Hasbro's die for purposes of determining whether it rolled true, as we've been discussing, whether the center of mass had been moved. My testing showed that the Hasbro accused die rolled fair within the number of rolls that I made.
Q. How did you test the dice?
A. I rolled it.
Q. How many times?
A. I don't remember precisely, but I seem to recall it was around 400 times.
Q. One of Hasbro's dice?
A. Actually, no. In order to be

Page 199

certain that I didn't have a defective die, I rolled two and recorded them in equal columns, so like up -- assuming I did 400, I think I did around 200 of each die.
Q. And do you have records of that?
A. I had records of it, but at -- when I was finished with them, I did throw them away.
Q. Why would you throw them away?
A. Because I was satisfied that it rolled correctly.
Q. When did you do this?
A. I did this while I was writing the patent, because I wanted to make sure that the die was a fair die.
Q. When you were writing your expert report?
A. Oh, sorry. Thank you. Thank you. When I was writing the expert report.
Q. Did you share that information with Merchant & Gould?
A. Yes, I did.
Q. Did you share the data or just the conclusion?
A. Just the conclusion.
Q. Did they ask for the data?

Page 200

A. I don't believe they asked for the data.
Q. Did they tell you what to do with the data?
A. No, not at all. I just wanted to see for myself.
Q. And how did you roll the dice?
A. It was on my girlfriend's kitchen table, and I used several different methods of rolling, meaning -- or several different ways of rolling it. Using my hand, I'd roll it allowing it to roll off the tip of my fingers; I used the dropping method to where you rotate your hand backwards and it drops and bounces; and I usually used the typical craps, "whew," and then having it roll off the palm of my hand between my thumb and forefinger.
Q. And you rolled a total of 400 die rolls or each die 400 times?
A. I believe I did -- again, assuming it was 400, 'cause I'm not a hundred percent sure, I rolled each of the two dice 200 times for a total of 400 die rolls.
Q. And what would have been a statistically significant variation between the

Page 201

results of one face versus another face?
A. Not being a mathematician, I'm not a hundred percent sure -- well, I'm not even 50 percent sure of what the -- statistical relevance it would be, but for purposes of, say, the Millennium Monopoly game, I came to the conclusion that it did roll random enough for the game.
Q. Well, all right. How do you know what's random enough and not for Millennium?
A. I've played it for 42 -- well, less than 42 years, but I've been playing it for years.
Q. But from a statistical point of view, how do you know what's random enough?
A. Again, I'm not a mathematician, so I can't say that it is statistically random enough.
Q. Am I correct in assuming that after your however many rolls of this dice, it was not precisely equal the number of times that 1 came up, versus 2, versus 3, versus 4, and so forth?
A. Correct. It was not exact.
Q. So did you do some analysis of the numbers to determine what the relative





dcebb40a-6755-4088-a6ff-3211f5432b0a

Page 202

probability of each face coming up was?
A. No, but they were close enough.
Q. So you didn't do anything other than to look at the numbers and conclude that -- good enough?
Q. I determined that -- let's use a hypothetical here. If the 6 had rolled, say -- let's take 600 rolls. If the 6 had rolled 102 times, but the 5 had rolled 98 times, and so forth down, that it was close enough for the purposes of board games. No die is going to roll 100 percent fair.
Q. You understand that craps dice in casinos don't have indented pips, right?
A. Yes.
Q. And they are typically silkscreened on?
A. No.
Q. How are they -- how are they -- how are the pips placed on the dice?
A. They are drilled indented indicia.
Q. And filled?
A. And they are backfilled with a similar density or a close -- close enough density to where it falls within the gambling

Page 203

regulations of the individual states.
Q. And there's testing involved to determine whether or not the dice are fair?
A. I would assume so.
Q. Do you know what their statistical standards are?
A. No, I don't.
Q. Did you do anything to find that out?
A. No.
Q. Do you think that that might be an arbiter of what constitutes a truly fair die?
A. It would be an arbiter of what the individual gambling commissions require as tolerances for dice for use within casino gaming.
Q. As you read the '197 patent, is there anything in the patent that indicates to you that this die will not be sufficiently fair for casino use?
A. Could you repeat that one more time. I'm sorry.
Q. As you read the '197 patent, is there anything in the patent that suggests to you that the die will not be fair enough for

Page 204

casino use?
A. I never even considered the question.
From my interpretation of the '197 patent, the entire patent, specifications, drawings, and claims, there is no -- nothing in here to indicate that this patent is attempting to describe a die that would be precise enough for casino gambling.
MR. TECHENTIN: I'm sorry. Do you have that up on the screen?
Q. (BY MR. TECHENTIN) Well, when the description of the die claims that it is a fair playing die, and that no facet -- no one facet is more likely to be rolled than any other facet, doesn't that suggest that the die will be truly random, at least within the limitations of a manufacturing process?
A. It means that it will be -- I interpret it as it means it will be random enough for game playing.
Q. One of the reasons that you offer for claiming that the '197 patent allows for indented indicia is that another -- any contrary interpretation would exclude the most common

Page 205

forms of indicia; is that correct?
A. I believe --
Q. And I'm looking at page 8 of your report.
A. Yeah, let me see that. Page 8.
Could you ask the question again, now that I've read what you're referring to.
Q. One of the reasons that you offer as an explanation for why you think the '197 patent allows for indented indicia is that a contrary interpretation would exclude the most common forms of indicia, namely, indented pips; is that right?
A. That is what I have written in the statement, and I stand by this.
Q. From a claim construction standpoint, is it relevant that a construction of the claims that required the surfaces of the extension member to be two-dimensional would exclude a common feature in other nonpatented items?
A. I couldn't say. I'm not an expert in claim design.
Q. Well, were you ever advised that this interpretation -- strike that. Did anyone





dcebb40a-6755-4088-a6ff-3211f5432b0a