# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

---------------------------------------------------

MICHAEL BOWLING

PLAINTIFF,

VS. FILE NO.: C.A. NO. 05-229 S

HASBRO, INC.,

DEFENDANT.

---------------------------------------------------

Deposition of Neil N. Lapidus taken pursuant to Notice of Taking Deposition and taken before Shannon J. Rothstein, a Notary Public in and for the County of Anoka, State of Minnesota, on the 24th day of May, 2006, at 701-4th Avenue South, Suite 500, Minneapolis, Minnesota, commencing at approximately 9:00 a.m.

* * *

Reported By Shannon J. Rothstein
Esquire Deposition Services
8891-162nd Lane NW
Ramsey, MN 55303
(651) 295-0066



ON BEHALF OF THE PLAINTIFF:

THOMAS J. LEACH
Merchant & Gould
3200 IDS Center
80 South Eighth Street
Minneapolis, Minnesota 55402
(612) 336-4665

ON BEHALF OF THE DEFENDANT:

JEFFREY K. TECHENTIN
Adler, Pollock & Sheehan
One Citizens Plaza
Eighth Floor
Providence, Rhode Island 02903-1345

* * *

INDEX

DEPOSITION OF NEIL N. LAPIDUS


| EXAMINATION: | PAGE |
|---|---|
| Mr. Techentin | 5, 242 |
| Mr. Leach | 236 |

EXHIBITS:

| | | |
|---|---|---|
| No. 1 | Mr. Sussman's report | 215 |
| No. 2 | Mr. Lapidus' report | 236 |
| No. 3 | Mr. Lapidus' report | 246 |


REQUESTED MATERIAL:
None

Shannon J. Rothstein




| OBJECTIONS: | PAGE |
|---|---|
| By Mr. Leach: | |
| Misstates report | 11 |
| Misstates opinion | 11 |
| Misstates testimony | 16 |
| Form | 28 |
| Objection | 29 |
| Objection | 30 |
| Legal Conclusion | 31 |
| Vague | 31 |
| Misstates record | 36 |
| Misstates record | 36 |
| Objection | 38 |
| Vague | 57 |
| Foundation | 70 |
| Misstates testimony | 86 |
| Misstates testimony | 87 |
| Vague | 89 |
| Vague | 92 |
| Form | 106 |
| Objection | 164 |
| Objection | 173 |
| Objection | 176 |
| Objection | 178 |
| Form | 180 |
| Objection | 181 |
| Foundation | 182 |
| Same objection | 182 |
| Mischaracterizes testimony | 185 |
| Misstates testimony | 188 |
| Objection | 189 |
| Objection | 200 |
| Objection | 202 |
| Misstates testimony | 206 |
| Misstates testimony | 208 |
| Misstates testimony | 209 |
| Misstates testimony | 210 |
| Misstates testimony | 211 |
| Misstates testimony | 212 |
| Misstates testimony | 218 |
| Misstates record | 234 |
| Objection | 234 |


Shannon J. Rothstein



OBJECTIONS CONTINUED:


| By Mr. Techentin: | |
|---|---|
| Form | 237 |
| Form | 239 |
| Form | 239 |
| Objection | 239 |
| Objection | 240 |
| Objection | 240 |
| Form | 241 |
| Objection | 242 |


Shannon J. Rothstein

expert in litigation previously, correct?
A. Yes.
Q. Have you ever been requested to perform an analysis of reasonable royalty in a patent context before?
A. Yes.
Q. How many times?
A. Well, I don't know an exact number, but I would say probably a half dozen or more times.
Q. And did you perform that analysis by use of the Georgia Pacific factors in each of those cases?
A. Generally, yes.
Q. When you say "generally," do you mean generally in each case you were making reference to it or there are cases in which you did not make reference to Georgia Pacific?
A. I believe I made reference to Georgia Pacific in all the cases.
Q. And when you said generally, you meant that that wasn't the sum and substance of your analysis?
A. Correct.
Q. What cases were those?





A. Well, that's a good question. I don't have -- I would have to get you a listing of those cases.
Q. Are any of them included in the list of cases that you had attached to your report?
A. Let me look. Well, I'm not sure. The thing I'm not sure about might be the last case, Berg v. Nelson, B-E-R-G v. N-E-L-S-O-N. The last one on the -- on page 18, I'm sorry. Excuse me. And I would want to check the last two cases on page 19.
Q. That's the Hearth & Home Technologies cases?
A. Yes.
Q. Did you submit a report in each of those cases, the Berg and Hearth & Home cases?
A. Yes. I'm not sure about Berg.
Q. In the cases of Hearth & Home, there's two separate cases, were those separate engagements for you?
A. Yes.
Q. Have you ever been retained by anyone in connection with a patent case? I'm just focusing on these two cases that we've talked about. Have





you ever been retained by the defendant in a patent case or counsel for the defendant in a patent case?
A. I don't know. I would have to check on that. I'm not giving you a kind of -- I'm not trying to give a nonanswer, because I would say that my caseload is probably split about 50/50. So I might tell you there might be a higher likelihood that the answer is yes, but I just have to look at each case.
Q. Do you recall ever serving as an expert in a patent case, other than as an expert on behalf of the plaintiff?
A. In the last two cases we talked about you have -- the cases go both ways, so in one case they're plaintiff and one case they're defendants, so that might be one situation. And I would say over some time period there probably are, but again, I'm not trying to be not be responsive.
Q. Has your testimony ever been the subjective of a Dobbler motion?
A. What do you mean?
Q. Has your preferred expert testimony ever been challenged under the Dobbler case?
A. I want to ask you a question. How





formally do you mean by that, or in the context of challenge, what do you mean by challenge?
Q. Has there ever been a motion filed that alleged in sum or in substance that your stated opinions or methodology did not satisfy the requirements of Dobbler?
A. No.
Q. Has there ever been a motion in any of the cases in which you've served as an expert in which a party sought to exclude your testimony?
A. Yes.
Q. In what case?
A. I don't know the exact case. There's a Dobbler tracker that you're probably familiar with, and every once a while I reference that myself just to see if my name comes up, and my name came up on a case, but it was not a formal motion. It may have just been challenged at the time, and I don't recall the name of the case though, but it was not effective, and it was a pretty informal challenge. In my opinion, it was a pretty informal challenge. It could have been more formal, but I'm kind of summarizing it for you. I'm not again trying to be misleading.

Page 57

Q. Was your role as an expert the subject of any motion practice in either of the Hearth & Home cases?
A. Not to my knowledge, no.
Q. Has a court ever excluded your testimony?
A. No.
Q. In whole or in part?
MR. LEACH: I object to the question as vague. Are you talking about if the judge objected or someone objected to a question and the judge said sustained? I mean, that's pretty broad. Are you talking about like -- he can't give an opinion.
BY MR. TECHENTIN:
Q. Let me ask another question first. Have you ever testified at trial?
A. Yes.
Q. In a patent case?
A. Yes.
Q. And has it ever been the case that a court has ruled your expert testimony inadmissible based upon failings of your methodology?
A. No.

Shannon J. Rothstein

Page 58

Q. What was the last time prior to this case that you performed an analysis of the Georgia Pacific factors?
A. I don't know. I don't know not because it's been so long. I would say it's been within the last two years.
Q. What case was that?
A. I would have to go back and look and give you a reference.
Q. You don't remember?
A. No, I don't. I tend to sort of forget about the cases or a lot of the details soon after I testify or after the case has settled or goes to trial.
Q. What did you do in this case to educate yourself about what was required to perform an analysis of the Georgia Pacific factors?
A. Because I have performed -- worked on the Georgia Pacific factors on a regular basis and believe I have an understanding of them, I don't think I did anything different or did any additional work or gain additional insight into the Georgia Pacific factors.
Q. How is it that you --

Shannon J. Rothstein

Page 59

A. I hope that answers your question. I'm answering it a little bit differently. Basically nothing, because I believe I have a good concept of Georgia Pacific factors.
Q. Where does that come from?
A. My professional background, my work. My day-to-day work in the area. Litigation support, understanding what they are and how they are used.
Q. Have you ever been educated formally - and by that I mean going to a seminar or something along those lines - in terms of the application of the Georgia Pacific factors?
A. Yes, I generally attend both CPE, professional education for CPAs, on a regular basis and CLEs where Georgia Pacific has been discussed, and that's over a period of years.
Q. Do you feel comfortable that today you have an understanding of the proper application of the Georgia Pacific factors?
A. Yes, I believe I do.
Q. Did you have any discussions with counsel in this case regarding the meaning or proper application of the Georgia Pacific factors, not the specific facts of this case but in general

Shannon J. Rothstein

Page 60

what the factors mean?
A. No.
Q. I'd like to go through your report in a little bit of detail, and specifically on page 2 rather, in the first paragraph, you make the assertion that you're familiar with distribution channels in the financial aspects of licensing for a variety of industries. What industries?
A. The recorded products industry, including LPs, CDs, videos, general retailing, call it big box, gaming equipment, plumbing equipment, liquor and food, jewelry, most manufacturing that deals with metal bending.
Q. As you go through this list and it becomes longer -- I don't mean to cut you off. There are others, feel free -- let me clarify the question to make sure we're talking about the same thing. You made an assertion that you were familiar with both distribution channels and the financial aspects of licensing for these industries. Is your answer correct for that or is the list that you just offered a list of industries with which you generally have expertise?
A. No, I was specific to kind of

Shannon J. Rothstein

Page 61

distribution channels in the financial aspects of licensing for those industries.
Q. So you're familiar with licensing principles in each of those industries?
A. Generally, yes.
Q. What does that mean "generally"? Do you have specific --
A. Well --
Q. Let me ask the question. Do you have specific experience with licensing in the metal bending manufacturing industry?
A. Yes.
Q. What is that?
A. Well, metal bending is -- first let's define industry, so it sounds like based on your questions you might not know what that is, but products that are manufactured from metal that some bending or application is applied to metal, so that can be any kind of component parts. I mean, that's kind of a wide variety. It can be as broad as airplanes, because airplane is a form of metal bending. You might not think about it that way, but that's what it is. So in having a knowledge of those industries, some applications there may be

Shannon J. Rothstein

Page 62

some licensing applied to them and some there really isn't or it's not -- may not be applicable.
Q. All right. In light of your answer then, any other industries that you would like to disclose?
A. I think that's -- I've given you a pretty good --
Q. When you referenced gaming equipment, are you talking about slot machines and the like?
A. Coin control.
Q. Explain what coin control is.
A. Any piece of equipment that is controlled by coins, so that would be beverage dispensing equipment, that could be some gambling equipment, that could be gaming equipment, pinball machines, pool tables, of that sources -- sources of industry, sources in industry.
Q. What about the toy industry?
A. No, not that much in the toy industry.
Q. But prior to this case what experience did you have with the toy industry?
A. Our firm has worked with some companies in both the invention side and some of the distribution side of toys, where we have clients

Shannon J. Rothstein

Page 63

that are involved in that.
Q. Have you yourself ever worked on matters for those clients?
A. Yes.
Q. And what was the nature of the work that you performed for those clients?
A. Business consulting, tax consulting, review of financial information, kind of understanding their business model, maybe a specific decision that someone asked me my advice or opinion of.
Q. You mentioned inventors and distribution, you mean distributors of toys are clients of your firm?
A. Yes.
Q. Which distributors?
A. Well, I would not give you those names for confidentiality. My own confidentiality of our firm.
Q. What about the inventors?
A. Similar. I couldn't give you any client names.
Q. You can't give me any client names?
A. No.

Shannon J. Rothstein

Page 64

Q. They're all confidential?
A. Yes, sir.
Q. Have you ever worked on licensing issues for any of those clients?
A. Yes.
Q. What did you do?
A. General business consulting or some decision making as to pricing or amounts, which either should be charged or what someone should pay.
Q. In terms of a royalty?
A. I don't know if it was directly royalties or fees.
Q. Are you thinking of a single instance or if there are more than one?
A. There may have been a few instances.
Q. Would it have involved a licensed product?
A. Yes.
Q. And was the product that was being licensed patented?
A. I don't remember the circumstances. I would believe so, but I do not recall the circumstances.

Shannon J. Rothstein

Page 65

Q. Do you recall the business terms that were negotiated?
A. No.
Q. Do you recall the royalty rate, if any, that was negotiated?
A. I don't recall.
Q. Did your experience with respect to these inventors or distributors of toys contribute to your analysis for this case?
A. Yes.
Q. And did you draw upon your knowledge of the relevant business practices in those industries to formulate your opinions?
A. Not necessarily.
Q. What does that mean not necessarily?
A. That I would draw upon my years of experience and sort of general business knowledge, not specifically those situations, but those situations have shaped my general business knowledge.
Q. Did you explicitly consider those situations in formulating your opinions?
A. No.
Q. Turning over to page 3 of your report.

Shannon J. Rothstein

Page 66

Your section 2 recites the information that you relied on. Do you see that?
A. Yes.
Q. And in the second paragraph of that section you indicate that you have reviewed publicly available information deemed pertinent. Do you see that?
A. Yes.
Q. What information is that?
A. Generally, let's see -- generally website information.
Q. What website information?
A. Well, Royaltysource, and we usually look at the websites of both the plaintiffs and defendants in the matters, and I don't see that listed, but I would say that was also used.
Q. Royaltysource's public information?
A. Oh, I think it is.
Q. You paid for that information, correct?
A. Yeah, it may not be in that regard. It might be a service.
Q. You would agree generally that the possible exception of Royaltysource, there are no references to publicly available information in

Shannon J. Rothstein

Page 67

Exhibit B to your report, correct?
A. Correct.
Q. But other than Royaltysource and a review of the websites for Mr. Bowling and HASBRO, are you aware of any other publicly available information that you considered?
A. No.
Q. Do you recall what you're referring to when you wrote "Publicly available information deemed pertinent" in your report?
A. That's what I was referring to, what I answered.
Q. On page 4 you have a section number 4 entitled "Analysis," and the last line before the words "reasonable royalty" says, "I have calculated damages based on a reasonable royalty." Do you see that?
A. Yes.
Q. Why did you do that?
A. I believe that that was the proper method to calculate damages in this case.
Q. What caused you to believe that?
A. That I do not believe that lost profits, necessarily that analysis applies.

Shannon J. Rothstein

Page 68

Q. Why not?
A. Given the say the petulant factors, I concluded that that would not necessarily be the appropriate way to measure damages.
Q. Were you asked to provide an opinion as to what the appropriate measure of damages would be, that is lost profits or reasonable royalty?
A. Yes, it was my decision as to how to calculate damages.
Q. What facts contributed to your conclusion that the appropriate methodology would be reasonable royalty?
A. The review of the information.
Q. Anything in particular?
A. All of that information.
Q. All of what information?
A. All of the information that's located on my report. Everything that I reviewed --
Q. So --
A. -- brought me to that conclusion. My understanding of the other factors in terms of damages led me to believe that that was the appropriate way to calculate it.
Q. Do you continue to abide by that

Shannon J. Rothstein

Page 237

developed today on the record?
A. Yes, but I do have some concerns and other information that I would like to see.
Q. What would that information be?
A. I think I discussed it in my deposition. I'd like to see the Monopoly license that they've been referring to, only because I've been asked questions about it. If I don't see it, it's harder for me to respond to some of the questions.
Q. Did you review any documents that showed Mr. Bowling's foreign sales?
A. I don't recall. Someone in my office may have. I don't recall if I did. I believe that information did come over.
Q. How much did Michael Bowling sell his dice directly to the consumer -- or his retail sales, what is that? Do you know approximately what he sells them for?
MR. TECHENTIN: I object to the form.
A. Yes, I believe so.
BY MR. LEACH:
Q. And how much would that be?
A. It's 1.30, 1.29.
Q. And he sells to his distributor at a



Page 238

lower price; is that correct?
A. Yes. Lower price than?
Q. 1.30, the retail price.
A. Yes.
Q. Do you recall what that price is?
A. Yes, except someone is Xeroxing it. I believe it's 49 cents.
Q. To the retailers? What Michael Bowling sells to his retailers?
A. Oh, his retailers?
Q. Yes.
A. I believe it's 64 cents.
Q. Otherwise I was going to give you a copy of your report because I have one. Is there a reason in your mind and from your discussions with Mr. Bowling that he would not want to sell to HASBRO for less than what would equate to be 64 cents?
A. Yes, I think that his strategy regardless of whether it is kind of right or wrong or how he developed that strategy, what his marketing thinking was, was to sell at that price; and one reason why is because he believed in his dealer or distributor network. And he did not want



Page 239

to be in conflict with his distributors, so therefore, by selling at a higher price, he felt that was more in his sales capability then to take sales away or be perceived that he would be taking sales away from a distributor.
Q. If you add on the cost to HASBRO to produce the dice to the royalty that you opined out of 58 and a half cents, does that equal the 64 cents that he sells to his distributors?
MR. TECHENTIN: I object to form.
A. Yes.
BY MR. LEACH:
Q. Can you explain --
A. Without the rounding, yes. Generally without rounding.
Q. If Bowling would have licensed HASBRO such that it could procure the dice for less than 64 cents, what effect would that have had on Bowling's distribution network?
MR. TECHENTIN: Objection to form.
A. I don't know that it would have had any effect. I don't know.
BY MR. LEACH:
Q. Would his distribution people be upset



Page 240

by Mr. Bowling undercutting them in the market?
MR. TECHENTIN: Objection. Go ahead. I'm sorry, but that -- sorry, go ahead.
A. I think I've said that, yes, or I thought I stated that, that he was trying to maintain or his perception of how his distributors would deal with different kind of pricing or pricing that approximates their price, his perception was that that would be either unfair or not appropriate to those distributors.
BY MR. LEACH:
Q. Do you believe Michael Bowling would have started at a higher number in negotiating with HASBRO this hypothetical negotiation back in August of '99? When I say higher number, a higher number than 64 cents.
MR. TECHENTIN: Objection.
A. I don't know.
BY MR. LEACH:
Q. Would it have been reasonable for Mr. Bowling to start at say his retail price of 1.29 or whatever that is?
MR. TECHENTIN: Objection.
A. Well, it may have. I think given the

timing that we discussed, and I believe HASBRO's urgency, it might have started at something greater than that.
BY MR. LEACH:
Q. In your conversations with Michael what was his state of mind back in 1998 and 1999 in terms of sales of his product? I'm talking from '98 up until August 17th of 1999.
MR. TECHENTIN: Objection, form.
A. I believe that his state of mind as he told me is he felt that the product was new and innovative and that he had developed something not only that he was very proud of but that was going to be a real success. In his mind it was going to be just a booming success for selling and appearing at shows, and selling out in a very short period of time. He was very excited about the product.
BY MR. LEACH:
Q. Does that affect how he would have negotiated in a hypothetical negotiation as of August 17, 1999?
A. I'm sure it would, yes. It -- no other answer.
Q. Earlier in the deposition Mr. Techentin





asked you some questions about the cost of the random number generator as compared to the cost of the dice, and he compared those two. If the analysis of whether they chose to include the random number generator because of its cost different from whether to include the dice given the circumstance HASBRO was in as of August 17, 1999?
MR. TECHENTIN: Objection.
A. Well, I think there were other considerations, and one of them was it was already in the package, so I think they were in a -- I think HASBRO was in a difficult position. Could they make a change, yes. I mean, there's a cost to make it, and they could spend whatever money they wanted to spend. I don't think it was just economics. I think that there were other considerations.
Q. I have no further questions.

* * *

EXAMINATION

* * *

BY MR. TECHENTIN:
Q. I have just a couple of follow-up





questions. You just talked about the fact that HASBRO could make a change and would evaluate whether to do so on the basis of cost, correct?
A. As one factor, not solely cost. If I said that or you interpreted that, it was not solely cost.
Q. Is it your opinion that HASBRO would have voluntarily entered into a license agreement for these dice that would exceed the costs that it faced to change out from those dice as of August 17, 1999?
A. Oh, yes. I think you've asked me that and that was a subject of some discussion, and I answered.
Q. HASBRO would be willing to pay more than whatever its costs to change would be?
A. Yes. The costs as you showed me a schedule of costs. Is that what you're referring to?
Q. I mean costs in the sense that you're using them, what you told me embraces more, but whatever that more is, my question is --
A. Excuse me, whatever my definition of cost is?





Q. Right. Whatever you ultimately conclude would be the cost to change as of August 17th, is it your opinion that HASBRO would be willing to spend more than that on a license with Mr. Bowling?
A. No. Under my definition of cost, no.
Q. You talked in response to some of Mr. Leach's questions about your understanding that Mr. Bowling sought to avoid taking away sales from his distributors and retailer customers. Do you recall that?
MR. TECHENTIN: You got to give me two minutes of follow-up here.
MR. LEACH: Go.
A. Yes. Talk quick.
BY MR. TECHENTIN:
Q. Is your understanding in that regard based on your interview with Mr. Bowling?
A. Yes.
Q. Anything else?
A. No, his perception.
Q. Do you believe it to be the case that Mr. Bowling organized his business in such a way as to avoid pirating, if you will, or pillaging the sales from his retailer and distributor customers?