# EXHIBIT G
# PART 1

LEXSEE

Analysis
As of: Jan 07, 2008

**AVOCENT HUNTSVILLE CORP., Plaintiff v. CLEARCUBE TECHNOLOGY, INC., Defendant**

**Civil Action No. CV-03-S-2875-NE**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ALABAMA, NORTHEASTERN DIVISION**

**2006 U.S. Dist. LEXIS 55307**

**July 28, 2006, Decided**
**July 28, 2006, Filed**

**SUBSEQUENT HISTORY:** Motions ruled upon by Avocent Huntsville Corp. v. Clearcube Tech., Inc., 2006 U.S. Dist. LEXIS 55308 (N.D. Ala., July 28, 2006)

**PRIOR HISTORY:** Avocent Huntsville Corp. v. ClearCube Tech., Inc., 443 F. Supp. 2d 1284, 2006 U.S. Dist. LEXIS 56073 (N.D. Ala., July 12, 2006)


**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff patent holder filed an infringement suit against defendant alleged infringer, seeking damages not less than plaintiff's lost profits and/or a reasonable royalty under 35 U.S.C.S. § 284 and for treble damages under § 284 for willful infringement of two patents in the field of video extension technology. The parties filed motions for partial summary judgment, to exclude expert testimony, and to strike a discovery response.

**OVERVIEW:** Although suit was filed in 2003, plaintiff alleged that infringement began in 2000. The court held that plaintiff failed to sufficiently show a reasonable probability it would have made a sale to a particular customer absent defendant's infringement; thus, plaintiff's motion for lost profits was dismissed. In determining a reasonable royalty by applying the Daubert standard and Fed. R. Evid. 702 (2006), the court dismissed defendant's motion to exclude testimony by plaintiff's expert because defendant's objections were based on the style of the expert's report rather than on its methodology; any weaknesses could be attacked on cross-examination. However, the court excluded the reasonable royalty analysis of defendant's expert because his methodology eviscerated the judicial rule that, under 35 U.SC.S. § 284, hypothetical negotiations between a willing licensor and a willing licensee were deemed to have occurred at the time of first infringement in 2000. Based on defendant's failure to obtain the advice of counsel as to whether it was infringing plaintiff's patents, a jury could reasonably find willful infringement and assess attorney fees and increased damages under § 284.

**OUTCOME:** The court dismissed with prejudice plaintiff's partial motion for summary judgment for lost profits and denied as moot defendant's motion to strike a discovery response. The court denied defendant's motion to exclude the report of plaintiff's expert but granted plaintiff's motion to exclude the report of defendant's expert. The court denied defendant's motion for partial summary judgment on plaintiff's claim for willful infringement.


**COUNSEL:** [*1] For Avocent Huntsville Corp, an Alabama Corporation, Plaintiff: Michael R Casey, DAVIDSON, BERQUIST, JACKSON & GOWDEY LLP, Arlington, VA, US; Donald L Jackson, DAVIDSON BERQUIST JACKSON & GOWDEY LLP, Arlington, VA; J Scott Davidson, DAVIDSON BERQUIST JACKSON & GOWDEY LLP, Arlington, VA; J Jeffery Rich, SIROTE AND PERMUTT PC, Huntsville, AL; James D Berquist, DAVIDSON BERQUIST JACKSON & GOWDEY LLP, Arlington, VA; Peter W Gowdey,

DAVIDSON BERQUIST JACKSON & GOWDEY LLP, Arlington, VA.

For Clearcube Technology Inc, Defendant: Harlan I Prater, IV, LIGHTFOOT FRANKLIN & WHITE LLC, Birmingham, AL; J David Cabello, WONG CABELLO LUTSCH RUTHERFORD & BRUCCULERI LLP, Houston, TX; Joseph M Cloud, JOSEPH M CLOUD PC, Huntsville, AL; Russell T Wong, WONG CABELLO LUTSCH, RUTHERFORD & BRUCCULERI LLP, Houston, TX.

For Clearcube Technology Inc, Counter Claimant: Harlan I Prater, IV, LIGHTFOOT FRANKLIN & WHITE LLC, Birmingham, AL; J David Cabello, WONG CABELLO LUTSCH RUTHERFORD & BRUCCULERI LLP, Houston, TX; Russell T Wong, WONG CABELLO LUTSCH, RUTHERFORD & BRUCCULERI LLP, Houston, TX.

For Avocent Huntsville Corp, Counter Defendant: Michael R Casey, DAVIDSON, BERQUIST, JACKSON & GOWDEY LLP, [*2] Arlington, VA, US; Donald L Jackson, DAVIDSON BERQUIST JACKSON & GOWDEY LLP, Arlington, VA; J Scott Davidson, DAVIDSON BERQUIST JACKSON & GOWDEY LLP, Arlington, VA; J Jeffery Rich, SIROTE AND PERMUTT PC, Huntsville, AL; James D Berquist, DAVIDSON BERQUIST JACKSON & GOWDEY LLP, Arlington, VA.

For Clearcube Technology Inc, Counter Claimant: Harlan I Prater, IV, LIGHTFOOT FRANKLIN & WHITE LLC, Birmingham, AL; J David Cabello, WONG CABELLO LUTSCH RUTHERFORD & BRUCCULERI LLP, Houston, TX; Russell T Wong, WONG CABELLO LUTSCH, RUTHERFORD & BRUCCULERI LLP, Houston, TX.

For Avocent Huntsville Corp, Counter Defendant: Michael R Casey, DAVIDSON, BERQUIST, JACKSON & GOWDEY LLP, Arlington, VA, US; Donald L Jackson, DAVIDSON BERQUIST JACKSON & GOWDEY LLP, Arlington, VA; J Scott Davidson, DAVIDSON BERQUIST JACKSON & GOWDEY LLP, Arlington, VA; J Jeffery Rich, SIROTE AND PERMUTT PC, Huntsville, AL; James D Berquist, DAVIDSON BERQUIST JACKSON & GOWDEY LLP, Arlington, VA; Peter W Gowdey, DAVIDSON BERQUIST JACKSON & GOWDEY LLP, Arlington, VA.

**JUDGES:** Lynwood Smith, United States District Judge.

**OPINION BY:** Lynwood Smith

**OPINION**

**MEMORANDUM OPINION**

In this patent infringement suit brought against ClearCube [*3] Technology, Inc., Avocent Huntsville Corporation seeks an award of damages "in an amount not less than Avocent's lost profits and/or a reasonable royalty, pursuant to 35 U.S.C. § 284." [1] Avocent also seeks an award of treble damages pursuant to 35 U.S.C. § 284 for "willful" infringement of the patents-in-suit. [2] The pending motions addressed in, and resolved by, this opinion are as follows:

**A.** Doc. no. 162 -- ClearCube's motion to strike Avocent's second supplemental response to ClearCube's interrogatory numbered 10, filed May 11, 2006;

**B.** Doc. no. 163 -- ClearCube's motion for partial summary judgment against Avocent's claim for willful infringement, filed May 11, 2006;

**C.** Doc. no. 164 -- ClearCube's motion for partial summary judgment against Avocent's claim for lost profits, filed May 11, 2006;

**D.** Doc. no. 232 -- Avocent's motion to exclude, pursuant to Rule 702 of the Federal Rules of Evidence, the reasonable royalty analysis proffered by ClearCube's damages expert, Alan Ratliff, filed June 16, 2006; and,

**E.** Doc. no. 238 -- ClearCube's motion [*4] to exclude, pursuant to Rule 702 of the Federal Rules of Evidence, the reasonable royalty analysis proffered by Avocent's damages expert, William Kerr, filed June 19, 2006.

1 Doc. no. 1 (complaint), Part C of Prayer for Relief.

2 *Id.*, Part D of Prayer for Relief.

**OUTLINE OF DISCUSSION**

*Nota bene:* All references to page numbers in this outline are approximate, because pagination will change with the electronic format used to reproduce the opinion

**PART ONE**

*Summary of the Accused Products*

(Page 6)

**A.** *Barry Thornton* (Page 8)

**B.** *The Morgan Stanley Sales* (Page 10)

**C.** *Barry Thornton's Review of the '997 Patent* (Page 12)

**PART TWO**

*Monetary Damages for Patent Infringement*

(Page 14)

**PART THREE**

*ClearCube's Motion for Partial Summary Judgment on Avocent's Claim for Lost Profits*

(Page 16)

**A.** *"But for" Causation* (Page 16)

**1.** *The Panduit test* (Page 17)

**2.** [*5] *The two-supplier test* (Page 18)

**B.** *Avocent's Proof* (Page 20)

**C.** *ClearCube's Motion to Strike Avocent's Second Supplemental Response to ClearCube's Interrogatory 10* (Page 22)

**PART FOUR**

*Principles Governing the Recovery of "a Reasonable Royalty"*

(Page 25)

**PART FIVE**

*Principles Governing the Admissibility of Expert Opinion Testimony*

(Page 30)

**A.** *The Daubert Revolution* (Page 30)

**B.** *The Kumho Extension* (Page 32)

**C.** *Amended Rule 702* (Page 33)

**D.** *Foundational Elements* (Page 33)

**PART SIX**

*ClearCube's Motion to Exclude the Reasonable Royalty Analysis of Avocent's Expert, Dr. William Kerr*

(Page 36)

**A.** *ClearCube's Argument that Dr. Kerr's Testimony is Due to be Excluded, Because He Did Not Apply the Georgia-Pacific Factors* (Page 40)

**B.** *ClearCube's Challenge to Select Steps of Dr. Kerr's Analysis* (Page 42)

**1.** *Step three: the mental state of Avocent's negotiators* (Page 42)

**2.** *Steps four and five: the mental state of ClearCube's negotiators and the parties' relative bargaining positions* (Page 44)

**3.** *Step six: quantifying* [*6] *the reasonable royalty rate* (Page 46)

**a.** *Total revenue* (Page 48)

**b.** *A fixed, per unit, dollar-amount royalty rate based on projections* (Page 49)

**c.** *$ 161 per infringing unit* (Page 51)

**C.** *Conclusion* (Page 52)

**PART SEVEN**

*Avocent's Motion to Exclude the Reasonable Royalty Analysis of ClearCube's Expert, Alan Ratliff*

(Page 54)

**A.** *Ratliff's Expert Report* (Page 56)

**B.** *Ratliff's Testimony at the Daubert Hearing* (Page 58)

**C.** *Analysis* (Page 59)

**D.** *Conclusion* (Page 63)

**PART EIGHT**

*Principles Governing a Finding of "Willful" Infringement*

(Page 65)

**A.** *Enhanced Damages and Attorney's Fees* (Page 69)

**PART NINE**

*ClearCube's Motion for Partial Summary Judgment on Avocent's Claim for Willful Infringement*

(Page 70)

**CONCLUSION**

(Page 74)

**PART ONE**

*Summary of the Accused Products*

The inventions embodied by the patents-in-suit -- *i.e.,* U.S. Patent No. 6,150,997 ("the '997 patent"), issued on November 21, 2000, and U.S. Patent No. 6,184,919 ("the '919 patent"), issued on February 6, 2001 -- were summarized [*7] in the memorandum opinion entered on July 12, 2006, as doc. no. 272. ClearCube's accused products are addressed here.

ClearCube's products actually compose a "*system* [that] removes the traditional personal computer (*e.g.* tower computers and laptop computers) from a user's desktop and delivers true centralized computing." [3] This "system" -- referred to in the company's October 2000 Confidential Business Plan as "ClearCube's patented C3 Architecture" -- is said to be capable of "deliver[ing] standard Intel-based PC functionality and performance to the desktop from a centralized, rack-mounted PC located up to 200 meters away. ClearCube's managed PC solution saves desktop space while delivering unparalleled PC manageability, security, reliability and reduced cost without compromising performance or functionality." [4]

3 Doc. no. 126 (ClearCube's Summary of Technology and Background of the Technology Concerning the Accused Device), at 1 (emphasis supplied).

4 *Daubert* Hearing Defendant's Ex. 1004 (ClearCube's Oct. 2000 Confidential Business Plan), at Bates No. CC-020432.

[*8] The heart of the ClearCube system -- *i.e.,* each user's computer, or central processing unit ("CPU") -- is called a "Blade," because it is "long and thin and sits in a rack as snugly as a blade in a Swiss army knife." [5] Eight CPUs ("Blades") can be housed in a central chassis called a "Cage," and up to twelve Cages (or a total of 96 Blades) can be stored in a shelf-like structure called a "Rack." [6] Each user's keyboard, monitor, and mouse are connected to his or her CPU through a compact, desktop device called a "C/Port" -- short for "Command Port" -- a component that, among other things, receives the analog video signals transmitted from the Blade. [7] An illustration of the ClearCube system is set out below: [8]

[SEE FIGURE IN ORIGINAL]

5 *Id.* at Bates No. CC-020516 (Earl Greer, "Cutting A Good Figure," *Federal Computer Week,* Aug. 28, 2000).

6 *See* doc. no. 126 (ClearCube's Summary of Technology and Background of the Technology Concerning the Accused Device), at 1-2; doc. no. 238 (ClearCube's motion to exclude the testimony of William Kerr), Ex. A (Kerr's August 2, 2004 report), P 21 at 8.

[*9]

7 *See* doc. no. 126 (ClearCube's Summary of Technology and Background of the Technology Concerning the Accused Device), at 2; *see also, e.g.,* doc. no. 84 (ClearCube's claim construction brief), at 16 (simplified illustration of ClearCube system).

8 Doc. no. 126 (ClearCube's Summary of Technology and Background of the Technology Concerning the Accused Device), at 2.

**A.** *Barry Thornton*

Barry Thornton and Andrew Heller founded ClearCube in 1997. [9] Thornton developed the various components of ClearCube's system beginning in 1994, [10] and became the company's chief technical officer. [11] One of Thorton's duties was to research patents in ClearCube's fields of interests. [12] Thorton thus became aware that a number of patents had issued to Avocent's predecessor, Cybex Computer Products Corporation ("Cybex"), in the general area of "video extension technology." [13] The patents-in-suit, however, did not issue until November 21, 2000 and February 6, 2001, respectively.

9 *See Daubert* Hearing Defendant's Ex. 1004 (ClearCube's Oct. 2000 Confidential Business Plan), at Bates No. CC-020432.

[*10]

10 *See* doc. no. 163 (ClearCube's motion for summary judgment on willful infringement), Ex. F (ClearCube's response to Avocent's First Set of Interrogatories), response to Interrogatory No. 8, at 13.

11 *See Daubert* Hearing Defendant's Ex. 1004 (ClearCube's Oct. 2000 Confidential Business Plan), at Bates No. CC-020432.

12 *See* doc. no. 163 (ClearCube's motion for summary judgment on willful infringement), Ex. E, Deposition of Barry Thornton, at 300-01.

13 *See id.* The parties have not provided a list of all patents issued to Cybex prior to the patents-in-

suit, nor a description of the subject matter recited in each. In one of the many motions filed in this case, however, ClearCube identified at least seven patents issued to Cybex from 1989 to 1996. *See* doc. no. 136 (ClearCube's motion for summary judgment on prior art), Ex. C.

2C Computing ("2C") was another computer company located in Huntsville, Alabama, that was involved in the field of "video extension technology." [14] 2C came into existence as a "spin-off" of Cybex, but the two entities maintained an "arms-length [*11] relationship." [15] Donald Davidson was an officer with 2C, and he initiated communications with ClearCube in June 2000. [16] Davidson was interested in forging a partnership between 2C and ClearCube, [17] whereby 2C could adopt ClearCube's system structure and "Blade" technology [18] and, in return, ClearCube could adopt 2C's innovations in the field of digital signal transmission. [19] Davidson requested a breakfast meeting with Barry Thornton in New York City during June 2001. [20] Davidson testified that, after he made his proposal to Thornton, this conversation ensued:

> He [Thornton] . . . [asked] if I had looked at a particular patent. [21] And I said, "No, I haven't. No reason to have looked at anything."
>
> His comment was: "We own this space."
>
> And I said, "Well, what space are you talking about?"
>
> And he said, "The space where if you put more than one computer in one location and extend the user experience out more than 25 feet or 30 feet, that we own that space."
>
> And I said, "Well, are you saying that you don't believe that anyone has ever taken a computer and extended the user experience more than 25 feet away prior to this?"
>
> And his comment was: "Well, we have a patent [*12] on it."
>
> And I said, "Okay. Well, you're aware we have an arm's-length relationship with Avocent, and they have a significant amount of intellectual property in this area."
>
> And his reply was: *"They don't seem concerned in defending it."* [22]

Despite Thornton's (allegedly) sarcastic reference to Avocent, there is no evidence that he specifically identified either of the patents-in-suit during this, or any subsequent discussion with Davidson. Ultimately, the partnership talks between 2C and ClearCube proved unsuccessful, and no business relationship was formed. [23]

14 Doc. no. 163 (ClearCube's motion for summary judgment on willful infringement), Ex. B, Deposition of Donald Davidson, at 27-28.

15 *Id.* at 9 and 53.

16 *See id.* at 9-11.

17 *See id.* at 23.

18 *See id.* at 41.

19 *See id.* at 50.

20 *See id.* at 21, 52.

21 Donaldson later clarified that Thornton "may have made a reference to the 101 patent" owned by ClearCube. *Id.* at 55. ClearCube had "developed a series of seventeen patented and patent-pending innovations" as of October 2000, including the inventions recited in U.S. Patent No. 6,012,101 ("the '101 patent"). *Daubert* Hearing Defendant's Ex. 1004 (ClearCube's Oct. 2000 Confidential Business Plan), at Bates Nos. CC-020463 and CC-020488. ClearCube described the '101 patent as pertaining to a "computer network having multiple remotely located human interface devices." *Id.* at CC-020488.

[*13]

22 Doc. no. 163 (ClearCube's motion for summary judgment on willful infringement), Ex. B, Donaldson deposition, at 52-53 (emphasis supplied).

23 *See id.* at 51.

**B.** *The Morgan Stanley Sales*

Meanwhile, in about 2000 or 2001, the Morgan Stanley financial services firm began to look for an alternative to traditional computer systems. [24] The initiative was headed by Adam Taubman, who was in charge of a Morgan Stanley group specializing in large-scale infrastructure projects. [25] Taubman sought a product that would allow the removal of individual, personal computers from each user's desktop, and collect them in a single, secure environment. [26] Although Morgan Stanley

has offices worldwide, the pilot program was limited to the firm's New York offices. [27]

24 *See* doc. no. 164 (ClearCube's motion for partial summary judgment on lost profits), Ex. D, Deposition of Adam Taubman, at 9-10.

25 *See id.* at 7-8, 10.

26 *See id.* at 12. *See also* doc. no. 178 (Avocent's opposition to Clearcube's motion for summary judgment on lost profits), Ex. 4, Declaration of Karen Holland, P 6 at 2.

[*14]

27 *See* doc. no. 164 (ClearCube's motion for partial summary judgment on lost profits), Ex. D, Taubman deposition, at 7 and 18.

Morgan Stanley contacted Avocent and ClearCube to inquire about the feasibility of such technology. [28] Avocent subsequently teamed with Dell, Inc., and under that joint-venture arrangement Dell was to sell the computers and workstations to Morgan Stanley, and Avocent was to sell the analog video extension technology. [29] The joint Avocent/Dell submission was rejected, however. Taubman characterized the costs of the Avocent/Dell proposal as "ridiculous" and "out of control." [30] He also believed that Avocent's hardware took up too much space, [31] and that "Avocent did not have the product that we liked or needed or felt was usable for us." [32]

28 *See id.* at 12 and 43-44.

29 *See* doc. no. 178 (Avocent's opposition to Clearcube's motion for summary judgment on lost profits), Ex. 4, Holland declaration, P 5 at 2.

30 Doc. no. 164 (ClearCube's motion for partial summary judgment on lost profits), Ex. D, Taubman deposition, at 14.

[*15]

31 *See id.* at 13-14, 16-17.

32 *Id.* at 12.

In contrast, ClearCube's "system" was relatively compact, [33] and Taubman believed that its architecture reduced the risk of systemic failure. [34] In Taubman's words, "[t]here was only one kind of technology that we wanted and ClearCube was the only provider of that technology." [35] ClearCube was awarded the Morgan Stanley contract sometime in 2001. [36]

33 *See id.* at 16-17.

34 *See id.* at 12-13 (stating that the Blade, by incorporating various technologies, offered "limited points of failure").

35 *Id.* at 12.

36 *See* doc. no. 178 (Avocent's opposition to Clearcube's motion for summary judgment on lost profits), Ex. 4, Holland deposition, P 7 at 2. The precise date of the contract is not specified in the record. ClearCube states, however, that the sale occurred in 2001. *See* doc. no. 164 (ClearCube's motion for partial summary judgment on lost profits), P 9 at 5; doc. no. 192 (ClearCube's reply brief on lost profits), at 1.

[*16] **C.** *Barry Thornton's Review of the '997 Patent*

ClearCube conducted a search of patents assigned to Cybex only after winning the Morgan Stanley contract (*i.e.,* on or about September 19, 2002). The search yielded approximately forty-four patents, and these materials were reviewed by Barry Thornton. [37] At his deposition, Thornton had particular difficulty remembering why the Cybex patent search was conducted. [38] Thornton *did* recall reviewing the contents of the '997 patent, however. [39] In his words: "I would have quickly skimmed the abstract and perhaps a few of the claims and decided that it didn't bother me and gone on to other things"; [40] "I didn't think that we were doing anything that stepped into that [*i.e.,* Avocent's '997] patent"; [41] "I do not believe [that] I read it. At most I would have glanced at the abstract. . . . And as I said, I think these were provided to me in bulk so I had everything there so I just flipped through them." [42]

37 *See* doc. no. 163 (ClearCube's motion for summary judgment on willful infringement), Ex. E, Thornton deposition, at 306 and 315.

[*17]

38 Thornton first testified that he was "curious about what Cybex had at the time." *Id.* at 306. He then recalled that Avocent had acquired 2C Computing, and that 2C Computing was threatening ClearCube with a lawsuit. According to Thornton, he reviewed Avocent's patents "to figure out what the suit would have been about since there was never any suit delivered." *Id.* at 310. Thornton then recalled that in the September 2001 time frame, he was researching "frame grabbers" and "video hubs" for a new ClearCube development, and that was the motivation for conducting the search of Cybex patents. *See id.* at 317-18. Thornton blamed his inconsistent testimony on a stroke he had suffered in 1997, which limited his

ability to place events in a "clear distribution of time." *Id.* at 318.

39 *See id.* at 310-11.

40 *Id.* at 311-12.

41 *Id.* at 422.

42 *Id.* at 430.

On the other hand, Thornton testified that he was not aware of the '919 patent prior to this litigation, [43] which was commenced on October 23, 2003.

43 *See id.* at 420.

[*18] **PART TWO**

*Monetary Damages for Patent Infringement*

A party whose patent has been infringed is entitled to receive "damages adequate to compensate for the infringement." 35 U.S.C. § 284; *see also, e.g., General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 654, 103 S. Ct. 2058, 76 L. Ed. 2d 211 (1983); *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1544 (Fed. Cir. 1995)(*en banc*). In pertinent part, § 284 provides that:

> Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.

35 U.S.C. § 284. "There are two methods by which damages may be calculated under this statute." *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1078 (Fed. Cir. 1983). First, "[i]f the record permits the determination of actual damages, namely, the profits the patentee lost from the infringement, that determination accurately measures the patentee's loss." *Id.; see also, e.g., SmithKline Diagnostics, Inc. v. Helena Laboratories Corp.*, 926 F.2d 1161, 1164 (Fed. Cir. 1991) [*19] (same); *Trell v. Marlee Electronics Corp.*, 912 F.2d 1443, 1445 (Fed. Cir. 1990)(same).

In the event actual damages cannot be ascertained, the patentee still is entitled to recover "a reasonable royalty," which serves as the "floor below which damage awards may not fall." *Rite-Hite*, 56 F.3d at 1544 (citing *Del Mar Avionics, Inc. v. Quinton Instrument Co.*, 836 F.2d 1320, 1326 (Fed. Cir. 1987)).

A patentee may establish "a reasonable royalty" in one of two ways: by determining an "established royalty rate for the patented inventions," if there is one; or if not, by persuading the trier of facts to impose a royalty in the amount that would result from a hypothetical, arm's length negotiation between "a willing licensor and a willing licensee." *Hanson*, 718 F.2d at 1078 (citations omitted).

"The finding of the amount of damages for patent infringement is a question of fact on which the patent owner bears the burden of proof." *BIC Leisure Products, Inc. v. Windsurfing International, Inc.*, 1 F.3d 1214, 1217 (Fed. Cir. 1993)(citing *SmithKline*, 926 F.2d at 1164). "Damage awards cannot be based [*20] upon speculation or optimism, but must be established by evidence." *Hebert v. Lisle Corp.*, 99 F.3d 1109, 1119 (Fed. Cir. 1996).

**PART THREE**

*ClearCube's Motion for Partial Summary Judgment* [44] on Avocent's Claim for Lost Profits

44 As discussed fully in Part One of the memorandum opinion entered on July 12, 2006 (doc. no. 272), the Federal Rules of Civil Procedure provide that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party moving for summary judgment bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact to be decided at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

ClearCube [*21] moves for a partial summary judgment declaring that Avocent's claim for lost profits is due to be dismissed. Avocent concedes that its claim rests solely on the evidence pertaining to ClearCube's sales to Morgan Stanley in 2001.

Where, as here, a patent owner seeks to prove actual damages in the form of lost profits, there must be "(1) a showing that the patent owner would have made the sale but for the infringement, *i.e.*, causation existed, and (2) proper evidence of the computation on the loss of profits." *King Instrument Corp. v. Otari Corp.*, 767 F.2d 853, 863 (Fed. Cir. 1985).

**A.** *"But for" causation*

The burden to establish the first requirement, "but for" causation, with evidence "sufficient to show a *reasonable probability* that [the patentee] would have made the asserted profits absent infringement," rests upon Avocent. *King Instruments Corp. v. Perego*, 65 F.3d 941, 952 (Fed. Cir. 1995)(emphasis supplied). *See also, e.g., Hebert v. Lisle,* 99 F.3d 1109, 1119 (Fed. Cir. 1996)(stating that, "when the patentee asserts that lost profits are the appropriate measure, the patentee must establish to a reasonable [*22] probability that[,] but for the infringement[,] the patentee would have made the sales and profits that were lost due to the infringement")(citations omitted).

The Federal Circuit has recognized at least two methods by which a patentee may establish "but for" causation: the so-called *"Panduit"* and "two-supplier" tests.

**1.** *The Panduit test*

A useful, but non-exclusive, means of establishing that the patent holder would have made the sale, but for the infringement, is found in the four-factor test established by the Sixth Circuit's opinion in *Panduit Corp. v. Stahlin Brothers Fibre Works, Inc.,* 575 F.2d 1152 (6th Cir. 1978):

> To obtain as damages the profits on sales he would have made absent the infringement, *i.e.,* the sales made by the infringer, a patent owner must prove: (1) demand for the patented product, (2) absence of acceptable noninfringing substitutes, (3) his manufacturing and marketing capability to exploit the demand, and (4) the amount of the profit he would have made.

*Id.* at 1156. "A showing under *Panduit* permits a court to reasonably infer that the lost profits claimed were in fact caused by [*23] the infringing sales, thus establishing a patentee's *prima facie* case with respect to 'but for' causation." *Rite-Hite Corp. v. Kelley Co., Inc.,* 56 F.3d 1538, 1545 (Fed. Cir. 1995)(*en banc*). "The burden then shifts to the infringer to show that the inference is unreasonable for some or all of the lost sales." *Id.*

**2.** *The two-supplier test*

The so-called "two supplier test" is another way to establish "but for" causation, and it is appropriate when "the patent owner and infringer are *the only suppliers in the market,* and the owner is seeking to recover profits lost through *every sale made by the infringer.*" *State Industries, Inc. v. Mor-Flo Industries, Inc.,* 883 F.2d 1573, 1578 (Fed. Cir. 1989)(emphasis supplied)(citing *Water Technologies Corp. v. Calco, Ltd.,* 850 F.2d 660, 672 (Fed. Cir. 1988); *Amstar Corp. v. Envirotech Corp.,* 823 F.2d 1538, 1543 (Fed. Cir. 1987); *Lam, Inc. v. Johns-Manville Corp.,* 718 F.2d 1056, 1065 (Fed. Cir. 1983)).

"In a market with only two viable competitors, one may infer that the patentee would have made the infringer's sales or charged higher [*24] prices but for the infringing competition." *Amstar,* 823 F.2d at 1543. *See also, e.g., Lam,* 718 F.2d at 1065 ("Where, as here, the patent owner and the infringer were the only suppliers of the product, causation may be inferred.").

"The first step in a two-supplier test is to define the relevant market." *Micro Chemical, Inc. v. Lextron, Inc.,* 318 F.3d 1119, 1124 (Fed. Cir. 2003). This requires the patentee to (a) identify the patented invention, (b) include in the "relevant market" those "other devices or substitutes similar in physical and functional characteristics to the patented invention," while (c) excluding "alternatives with disparately different prices or significantly different characteristics." *Id.* at 1124-25 (citing *Crystal Semiconductor Corp. v. TriTech Microelectronics International, Inc.,* 246 F.3d 1336, 1356 (Fed. Cir. 2001)).

Once the "relevant market" is so defined, the second step is to determine how many suppliers operate in that market. This is generally the easier task, requiring the court to simply ascertain the "number of companies involved" in the relevant market. *Id.*

[*25] Assuming that there are, indeed, only two suppliers in the relevant market, the patentee must then (and thirdly) establish its manufacturing and marketing capability to exploit the demand in that market, and (fourthly) prove the amount of profit it would have made, but for the infringement. *See id.* at 1125.

Provided these four foundational-requirements are satisfied, the patentee "erects a presumption of 'but for' causation," which shifts the burden to the infringer to show that "the patentee reasonably would not have made some or all of the diverted sales 'but for' the infringement." *Id.*

**B.** *Avocent's proof*

ClearCube challenges Avocent's proof of "but for" causation on the basis that Avocent fails to meet the central requirement of the *Panduit* test: that is, Avocent cannot prove that, "but for" ClearCube's alleged infringement, Avocent would have sold its technology to Morgan Stanley in 2001. Avocent attempts to side-step this argument by asserting that it can establish causation under the two-supplier test. This court disagrees.

As discussed in Section A(2) above, the first step in a two-supplier test is to define the relevant market. This

requires a [*26] comparison of the patented invention to other devices or substitutes that may, or may not, be similar in physical and functional characteristics to the patented invention, and, similar or different in price. That analysis is conspicuously missing from Avocent's brief. The omission is telling.

ClearCube cites evidence indicating that, as early as 2000, *at least* four companies were competing in the "video extension technology" market: Avocent; ClearCube; Raritan Computer, Inc.; and, Rose Electronics. [45] Of course, if the "relevant market" were to encompass the products offered by all four companies, Avocent could not possibly substantiate a "two-supplier" market theory.

45 *See* doc. no. 164 (ClearCube's motion for partial summary judgment on lost profits), at 11 (citing *id.,* Ex. B, Deposition of William Kerr, at 20-21 (Avocent's damages expert, William Kerr, testifies that Avocent, ClearCube, Raritan, and Rose were all offering "distance technology" by 2000)).

Avocent asserts, nevertheless, that the [*27] "real question is what would Morgan Stanley have bought if ClearCube's infringing product was unavailable." [46] Avocent contends that, because Morgan Stanley received "bids" from *only* Avocent and ClearCube, Morgan Stanley ultimately would have purchased Avocent's technology, absent ClearCube's infringing alternative.

46 Doc. no. 178 (Avocent's opposition to ClearCube's motion for partial summary judgment), at 9.

Of course, it is *possible* that Morgan Stanley would have resorted to Avocent's products, despite the purportedly "ridiculous" costs and oversized hardware associated with its technology. It also is possible (if not probable), however, that Morgan Stanley would have looked to other suppliers in the "relevant market." The fact that Morgan Stanley *initially* received bids from only Avocent and ClearCube, and no other companies, is not the decisive consideration when defining the relevant market.

Avocent thus has failed to produce evidence sufficient to show a reasonable probability that it would [*28] have made the sales to Morgan Stanley, absent ClearCube's infringement. Accordingly, ClearCube's motion for partial summary judgment is due to be granted, and an order will be entered declaring that Avocent's claim for lost profits is dismissed.

**C.** *ClearCube's Motion to Strike Avocent's Second Supplemental Response to ClearCube's Interrogatory 10*

ClearCube served its First Set of Interrogatories on April 24, 2004. [47] Interrogatory number 10 requested the following information:

> To the extent that Avocent contends that it has suffered damages as a result of acts of alleged infringement by ClearCube, describe with particularity all facts and circumstances relating to any damages that Avocent claims, including, without limitation, the nature of the loss (*i.e.,* . . . lost profits . . .), the dollar amount of the loss, [and] the method by which the loss was calculated. [48]

Avocent's initial response objected to this interrogatory as premature expert witness discovery. [49] Avocent subsequently served a supplemental response, but that response still did not address the issue of lost profits. [50]

47 *See* doc. no. 162 (ClearCube's motion to strike), P 2 at 1.

[*29]

48 Doc. no. 164 (ClearCube's motion for partial summary judgment on lost profits), Ex. K, Avocent's Response to ClearCube's First Set of Interrogatories, at 15 (some letters capitalized in original).

49 *See id.*

50 *See* doc. no. 162 (ClearCube's motion to strike Avocent's second supplemental response), Ex. 1, Avocent's Second Supplemental Response, at 3 (under heading for "Supplemental Response").

Discovery closed on December 10, 2004, [51] but was reopened for limited purposes following claim construction. [52] For example, paragraph 3 of the court's Revised Scheduling Order permitted the parties to engage in limited, "additional discovery" until May 3, 2006. [53] On that date, Avocent served its second supplemental response to Interrogatory 10. In pertinent part, Avocent stated that its "lost profits damages [could] be calculated by multiplying the number of C/Ports sold to Morgan Stanley by $ 229." [54] ClearCube moves to strike that response, stating two independent grounds for doing so: there is no explanation as to how the $ 229 figure was calculated; [55] and, Avocent's [*30] "last hour" disclosure unfairly precludes ClearCube from conducting additional discovery to form a rebuttal. Avocent opposes ClearCube's motion.

51 *See* doc. no. 73 (Revised Scheduling Order entered October 25, 2004), P 1.

52 *See* doc. no. 138 (Revised Scheduling Order entered March 31, 2006).

53 *Id.*, P 3 at 3.

54 *See* doc. no. 162 (ClearCube's motion to strike), Ex. 1, Avocent's Second Supplemental Response, at 3 (under heading for "Supplemental Response").

55 Indeed, as discussed in Part Six *infra*, Avocent's expert concluded that a reasonable royalty rate for ClearCube's alleged infringement was $ 161 for each infringing unit sold. The $ 229 per unit figure claimed by Avocent in its second supplemental response to interrogatory number 10 apparently is based upon the fact that, in the 2000-2001 time frame, Avocent was realizing a profit in that amount on each sale of its "LongView" product. *See* doc. no. 238 (ClearCube's motion to exclude the testimony of William Kerr), Ex. A, Kerr Report, P 39 at 13.

[*31] As discussed in the introductory paragraphs of the discussion on lost profits *supra*, when a patent owner seeks to prove actual damages in the form of lost profits there must be "(1) a showing that the patent owner would have made the sale but for the infringement, *i.e.*, causation existed, and (2) proper evidence of the computation on the loss of profits." *King Instrument*, 767 F.2d at 864. The $ 229 figure recently disclosed by Avocent is relevant to the second step of this inquiry.

The court has dismissed Avocent's claim for lost profits on the basis of its failure to establish the first requirement, however. Accordingly, the parties' dispute regarding the computation of lost profits is moot, and ClearCube's motion will be denied on that basis.

**PART FOUR**

*Principles Governing the Recovery of "a Reasonable Royalty"*

In the event infringement is proven, but the evidence is not adequate to establish actual damages in the form of lost profits, 35 U.S.C § 284 requires that "a reasonable royalty" be determined. *See also, e.g., Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1544-45 (Fed. Cir. 1995)(*en banc* [*32] ). A reasonable royalty for purposes of § 284 is "the amount that a person, desiring to manufacture, use, or sell a patented article, as a business proposition, would be willing to pay as a royalty and yet be able to make, use, or sell the patented article, in the market, at a reasonable profit." *Trans-World Manufacturing Corp. v. Al Nyman & Sons, Inc.*, 750 F.2d 1552, 1568 (Fed. Cir. 1984)(citations and internal alterations omitted).

The parties agree that there is no established royalty for the inventions claimed in either the '997 or '919 patent. The parties must, therefore, resort to the judicially-created methodology of determining a reasonable royalty on the basis of hypothetical negotiations between a hypothetically willing licensor and hypothetically willing licensee. This methodology requires the trier-of-fact to set aside the obvious fact that the parties are embroiled in litigation. *See, e.g., Fromson v. Western Litho Plate and Supply Co.*, 853 F.2d 1568, 1575-76 (Fed. Cir. 1988). Instead, one must imagine that the parties are negotiating an agreement that would (a) allow ClearCube to receive a license from Avocent to use its patented inventions [*33] and (b) in turn provide Avocent "a reasonable royalty" as compensation for that license. *See id.*

The first step in this methodology is to determine when the hypothetical negotiations would have occurred. Precedent mandates that the negotiations be imagined to have occurred on or about the date infringement began -- *i.e.*, "when both a patent had issued and accused products were sold." *Wang Laboratories, Inc. v. Toshiba Corp.*, 993 F.2d 858, 869 (Fed. Cir. 1993). *See also, e.g., id.* ("Wang argues that negotiations should have been hypothesized at the start of infringement . . . . We agree."); *Applied Medical Resources Corp. v. United States Surgical Corp.*, 435 F.3d 1356, 1361 (Fed. Cir. 2006)("We have held that a reasonable royalty determination for purposes of making a damages evaluation must relate to the time infringement occurred."); *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1079 (Fed. Cir. 1983)("'The key element in setting a reasonable royalty . . . is the necessity for return to the date when the infringement began.'")(quoting *Panduit Corp. v. Stahlin Brothers Fibre Works, Inc.*, 575 F.2d 1152, 1158 (6th Cir. 1978)). [*34]

The trier of facts must then determine the amount of royalty that would have been negotiated. The district court in *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970), endeavored to compile a comprehensive list of evidentiary considerations that would be "relevant, in general, to the determination of the amount of a reasonable royalty for a patent license." *Id.* at 1120. The following fifteen factors were enumerated in that case:

> 1. The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty.

2. The rates paid by the licensee for the use of other patents comparable to the patent in suit.

3. The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.

4. The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.

5. The commercial relationship [*35] between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter.

6. The effect of selling the patented specialty in promoting sales of other products of the licensee; that existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.

7. The duration of the patent and the term of the license.

8. The established profitability of the product made under the patent; its commercial success; and its current popularity.

9. The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.

10. The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.

11. The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.

12. The portion of the profit or of the selling price that may be customary in the particular business or [*36] in comparable businesses to allow for the use of the invention or analogous inventions.

13. The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

14. The opinion testimony of qualified experts.

15. The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee -- who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention -- would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

*Georgia-Pacific,* 318 F. Supp. at 1120. *See also, e.g., Rite-Hite,* 56 F.3d at 1554-55 (recognizing that the *Georgia-Pacific* factors may be relevant to the determination [*37] of a reasonable royalty); *Trans-World Manufacturing,* 750 F.2d at 1568 (same); *SmithKline Diagnostics, Inc. v. Helena Laboratories Corp.,* 926 F.2d 1161, 1168 (Fed. Cir. 1991)(same).

The fifteen *Georgia-Pacific* factors are not exclusive, however; other factors also may be relevant. *See, e.g., Micro Chemical, Inc. v. Lextron, Inc.,* 317 F.3d 1387, 1393 (Fed. Cir. 2003)(stating that the factors relevant to a hypothetical reasonable royalty analysis "*include* those set out in *Georgia-Pacific*")(emphasis supplied).

The critical point is that the royalty arrived at by the trier of facts "must be 'reasonable' under all the circumstances; *i.e.,* it must be at least a close approximation of what would be 'adequate to compensate' for the 'use made of the invention by the infringer.'" *Fromson v. Western Litho Plate and Supply Co.,* 853 F.2d 1568, 1575 (Fed. Cir. 1988)(quoting 35 U.S.C. § 284). A district court may allow the trier of facts to consider expert testimony as an aid to the determination of such a royalty. *See* 35 U.S.C. § 284.

**PART FIVE**

*Principles* [*38] *Governing the Admissibility of Expert Opinion Testimony*

For more than seven decades, the standard for determining the admissibility of expert opinion testimony in virtually all American courts was the so-called "general acceptance test" framed in *Frye v. United States,* 54 App. D.C. 46, 293 F. 1013 (D.C. Cir. 1923). That case addressed the sole issue of whether the trial court had erred when refusing to admit the results of a "systolic blood pressure deception test" (a crude precursor of the present-day, polygraph examination) when offered by a defendant accused of murder. The District of Columbia Circuit affirmed the exclusion of such opinion testimony, saying:

> Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, *the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which* [*39] *it belongs.*

*Id.* at 47, 293 F. at 1014 (emphasis supplied).

**A.** *The Daubert Revolution*

Dramatic changes in federal evidentiary principles occurred during the last decade of the Twentieth Century, however, as a result of the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). That case held that the *Frye* test "should not be applied in federal trials," because it had been superseded by the Federal Rules of Evidence enacted by Congress in 1975. *Id.* at 588-89 & n.6. In place of *Frye's* "general acceptance" standard, *Daubert* substituted *the trial court judge,* acting in the role of "gatekeeper" to the jury box, *id.* at 589 n.7, 597, and charged the judge with the "obligation" to "ensure that any and all scientific testimony or evidence admitted is not only relevant, *but reliable.*" *Id.* at 589 (emphasis supplied).

In procedural terms, this means that the trial judge is required to conduct "a preliminary assessment" pursuant to Federal Rule of Evidence 104(a), as to "whether the reasoning [*40] or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 593-94. [56]

> 56 Rule 104(a) provides that: "Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b). In making this determination it is not bound by the rules of evidence except those with respect to privileges."

*Daubert* states that "[m]any factors" will bear upon a trial court's decision on the question of whether a particular expert's testimony will *reliably* assist the jury to understand or determine a fact in issue; accordingly, the Court did "not presume to set out a definitive checklist or test," but only "some general observations." *Id.* at 593. It was suggested that trial judges should ask: (1) whether the theory or technique upon which [*41] the expert's testimony is based can be, or had been, tested; (2) whether the theory or technique had been subjected to peer review or publication; (3) whether the theory or technique had gained widespread acceptance within a relevant community of experts; (4) whether there was a known or potential rate of error for the technique; and (5) whether the technique's application was controlled by standards. *See Daubert,* 509 U.S. at 593-94.

Stated differently, but more to the point of the decision, *Daubert* obligates the trial judge "to *ensure* that *speculative, unreliable* expert testimony *does not reach the jury.*" *McCorvey v. Baxter Healthcare Corp.,* 298 F.3d 1253, 1256 (11th Cir. 2002)(emphasis supplied).

**B.** *The Kumho Extension*

The *Daubert* opinion directly addressed the admissibility of expert testimony based upon *scientific* methodology and procedures; consequently, for a time, some courts, including the Eleventh Circuit, attempted to restrict its holding to that context. *See, e.g., Carmichael v. Samyang Tire, Inc.,* 131 F.3d 1433, 1435-36 (11th Cir. 1997), *reversed sub nom. Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999). [*42]

In 1999, however, the Supreme Court made clear that the gatekeeping responsibilities imposed upon trial judges by *Daubert* applied to *all* expert testimony, regardless of whether the witness's opinion was based upon scientific, engineering, or other technical knowledge, or even just "personal knowledge or experience." *Kumho Tire,* 526 U.S. at 150.

**C.** *Amended Rule 702*

Federal Rule of Evidence 702 was amended in 2000, in response to the *Daubert* and *Kumho Tire* decisions. As amended, the rule now provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702 (2006).

**D.** [*43] *Foundational Elements*

A distillation of the requirements specified in Rule 702 and binding authorities yields at least six, basic, foundational prerequisites that must be satisfied before *any* expert witness may present opinion testimony to a jury. [57] Specifically, the proponent of the witness must demonstrate by a preponderance of the evidence [58] that:

> (1) testimony in the form of an opinion will assist the jury to understand the evidence, or to determine a fact in issue, [59] because comprehension of the subject of the witness's testimony is beyond the experiences of the average lay-person;
>
> (2) the witness is qualified on the basis of "knowledge, skill, experience, training, or education" to testify competently concerning the matters to be addressed;
>
> (3) the witness's "testimony is based upon sufficient facts or data"; [60]
>
> (4) the witness's "testimony is the product of reliable principles and methods," [61] as determined by the type of inquiry mandated in *Daubert;*
>
> (5) "the witness has applied the principles and methods reliably to the facts of the case"; [62] and,
>
> (6) the witness can -- based upon the principles controlling his or her [*44] particular discipline, and, the witness's background, training, and experience -- state an opinion with "a reasonable degree of certainty."

57 The Eleventh Circuit has held that *Daubert* requires trial courts to "engage in a rigorous three-part inquiry," which consists of determining whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert;* and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*United States v. Frazier,* 387 F.3d 1244, 1260 (11th Cir. 2004)(*en banc*)(quoting *City of Tuscaloosa v. Harcros Chemicals, Inc.,* 158 F.3d 548, 562 (11th Cir. 1998)); *see also Rink v. Cheminova, Inc.,* 400 F.3d 1286, 2005 WL 428418, at *3 (11th Cir. 2005)(same).

58 *See, e.g., Daubert,* 509 U.S. at 592 n.10 ("These matters should be established by a preponderance of proof.")(citing *Bourjaily v. United States,* 483 U.S. 171, 107 S. Ct. 2775, 97 L. Ed. 2d 144 (1987)(holding that, while Rule 104(a) assigns the trial court the task of determining preliminary admissibility questions without specifying any particular standard of proof, a preponderance of the evidence standard is traditionally imposed regardless of the burden of proof on the substantive issues submitted to the jury); Fed. R. Evid. 702, advisory committee notes (2000)("[T]he the admissibility of all expert testimony is governed by the principles of Rule 104(a). Under that Rule, the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence."); *Frazier,* 387 F.3d at 1260 ("The

burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion."); *Hall v. United Ins. Co. of America,* 367 F.3d 1255, 1261 (11th Cir. 2004)(same); *McCorvey v. Baxter Healthcare Corp.,* 298 F.3d 1253, 1257 (11th Cir. 2002)(same). *See also Allison v. McGhan Medical Corp.,* 184 F.3d 1300, 1306 (11th Cir. 1999)(observing that "the proponent of the [expert's] testimony does not have the burden of proving that [the expert's opinion] is *scientifically correct,* but that[,] by a preponderance of the evidence, *it is reliable*")(emphasis supplied).

[*45]

59 Fed. R. Evid. 702 (stating, in part, that a witness may testify in the form of an opinion, or in response to hypothetical questions,"[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue").

60 Fed. R. Evid. 702(1).

61 Fed. R. Evid. 702(2).

62 Fed. R. Evid. 702(3); *see also Frazier,* 387 F.3d at 1264 (stating that the proponent must demonstrate that the expert witness's opinions are "methodologically reliable or sound").

**PART SIX**

*ClearCube's Motion to Exclude the Reasonable Royalty Analysis of Avocent's Expert, Dr. William Kerr*

Avocent retained William Kerr, Ph.D., to determine the amount of damages allegedly owed to Avocent for ClearCube's infringement of the patents-in-suit. [63] Dr. Kerr received his Ph.D. in economics from The Graduate Faculty of the New School University in 1979. [64] He is a co-director of the [*46] Intellectual Property consulting group at Navigant Consulting, Inc., located in Washington, D.C. [65] Kerr's professional experience includes providing expert testimony on the amount of lost profits or reasonable royalties owed as damages in patent litigation proceedings, [66] and he has published extensively on the subject. [67]

63 Doc. no. 238 (ClearCube's motion to exclude the testimony of William Kerr), Ex. A (Expert Report of William O. Kerr, Ph.D. Dated August 2, 2004).

64 *See id.,* Kerr report, Appendix A, curriculum vitae.

65 *See id.,* Kerr report, P 3 at 2; *see also id.* at curriculum vitae.

66 *See id.,* Kerr report, P 4 at 3; *see also id.* at curriculum vitae (under the heading "Testimony in Litigation and Arbitration Matters (2000-2004)").

67 *See id.,* Kerr report, P 4 at 2; *see also id.* at curriculum vitae (under the heading "Publications/Presentations (1993-2004)").

Dr. Kerr disclosed an expert report on August 2, 2004. He determined that, based upon his [*47] work to that date, an award of reasonable royalty damages, calculated on the basis of hypothetical negotiations between a willing licensor and willing licensee, was appropriate to determine Avocent's damages. [68] In the opinion of Dr. Kerr, Avocent was due to be paid as of January 1, 2005 a royalty in the amount of $ 2,126,783 as compensation for ClearCube's alleged infringement, plus prejudgment interest in the sum of $ 49,892, for a total of $ 2,176,674. [69] There are seven essential steps to Dr. Kerr's reasoning process, leading to this conclusion, and each is summarized below.

68 *See id.,* Kerr report, P 29 at 11.

69 *See* doc. no. 238 (ClearCube's motion to exclude the testimony of William Kerr), Ex. A, Kerr report, Table 1 at 5.

*Step one: date of the hypothetical negotiation.* Dr. Kerr first identified the time frame during which Avocent and ClearCube would have conducted their hypothetical negotiations. [70] He states that the negotiations would have ensued during "the autumn of 2000," and [*48] would have concluded "in November 2000," just prior to the issuance of the '997 patent. [71]

70 *See id.,* PP 32-34 at 11-12.

71 *Id.,* P 33 at 12.

*Step two: a royalty based on a dollar amount for each unit sold.* Dr. Kerr next determined that the parties ultimately would have agreed upon a fixed royalty rate based on a dollar amount for each infringing unit sold by ClearCube. He rejected the notion that the negotiators would have agreed to a royalty based on a percentage of ClearCube's revenues, [72] because that approach would *either* have underpaid Avocent, *or* required that the parties anticipate numerous factors complicating the royalty calculations. [73]

72 *See id.,* P 36 at 12.

73 *See id.*

*Step three: the mental state of Avocent's negotiators.* Dr. Kerr hypothesized that Avocent's negotiators would [*49] have been extremely reluctant to grant a license to ClearCube to employ the technology claimed in the patents-in-suit. [74] At the time of the hypothetical negotiations, for example, Avocent was realizing a profit of $ 229 on each sale of its "LongView" product. [75] Those profits could be lost if ClearCube were granted a license to use the patented technology, and thereby allowed to compete with Avocent. [76]

74 *Id.*, PP 37-39 at 13.

75 *See* doc. no. 238 (ClearCube's motion to exclude the testimony of William Kerr), Ex. A, Kerr report, P 39 at 13.

76 *See id.*

*Step four: the mental state of ClearCube's negotiators.* Dr. Kerr hypothesized that ClearCube's negotiators would have been keenly aware that, without a license to use Avocent's patented technology, ClearCube's entire business model would fail. [77] Just as important, however, the ClearCube negotiators also would have been aware of the company's anticipated profits. ClearCube generated a "Confidential Business Plan" in October of 2000, [*50] for the purpose of persuading potential investors to invest additional capital in the company, [78] and projected that sales of ClearCube's back-racking system would produce a positive net-income by late 2001, and net-income at (or exceeding) fifteen percent of sales through 2005. [79]

77 *See id.*, PP 41-44 at 14.

78 The Confidential Business Plan states that it is directed to "investors and/or their agents for the sole purpose of evaluating ClearCube as an investment opportunity." *Daubert* Hearing Defendant's Ex. 1004 (Oct. 2000 Confidential Business Plan), Bates No. CC-020429.

79 *See* doc. no. 238 (ClearCube's motion to exclude the testimony of William Kerr), Ex. A, Kerr report, P 42 at 14 (citing Oct. 2000 Confidential Business Plan, at Bates Nos. CC-020497 through CC-020504).

*Step five: relative bargaining positions.* In view of the foregoing, Dr. Ken-opined that Avocent's negotiators would have possessed the "bargaining strength necessary to demand a large share of ClearCube's expected [*51] profits from sales of its system." [80] Moreover, because ClearCube's negotiators would have recognized that licensing Avocent's patents was "essential to its entire business model," [81] it would have been reasonable for ClearCube's negotiators to acquiesce in a license on terms favorable to Avocent. [82]

80 *Id.*, P 47 at 15.

81 *Id.*

82 *See id.*

*Step six: quantifying the royalty rate.* ClearCube's October 2000 Confidential Business Plan projected that, by fiscal year 2003, the company would recoup an operating profit of $ 322 for each system unit sold. [83] It is the opinion of Dr. Kerr that, due to Avocent's superior bargaining position, ClearCube's negotiators would have agreed to a royalty rate amounting to fifty percent (50%) of that figure: *i.e.*, $ 161 for each infringing unit sold. [84]

83 *See Daubert* Hearing Defendant's Ex. 1004 (Oct. 2000 Confidential Business Plan), at Bates No. CC-020503; *see also* doc. no. 238 (ClearCube's motion to exclude the testimony of William Kerr), Ex. A, Kerr report, Ex. 4 (showing calculations of the $ 322 per unit operating margin).

[*52]

84 *See* doc. no. 238 (ClearCube's motion to exclude the testimony of William Kerr), Ex. A, Kerr report, P 49 at 16.

*Step seven: damages calculation.* Finally, Dr. Kerr multiplied the royalty rate of $ 161 per unit by the number of infringing units actually sold by ClearCube from October 23, 2003 [85] through January 1, 2005, and the product is his opinion of the amount owed: $ 2,126,783 in damages, plus prejudgment interest in the sum of $ 49,892, for a total of $ 2,176,674. [86]

85 Avocent commenced this litigation on October 23, 2003. That parties agree that Avocent may not recoup damages for infringing sales made prior to that date. The reason for this limitation is explained in note 118 *infra*.

86 *See* doc. no. 238 (ClearCube's motion to exclude the testimony of William Kerr), Ex. A, Kerr report, PP 48-50 at 15-16 and report exhibits 5 and 6.

**A.** *ClearCube's Argument that Dr. Kerr's Testimony [*53] is Due to Be Excluded, Because He Did Not Apply the Georgia-Pacific Factors*

ClearCube first challenges Dr. Kerr's opinion on the basis that it is not the product of reliable principles and

methods. In paragraph 45 of his report, Dr. Kerr summarily stated that his opinions were founded upon a consideration of those *Georgia-Pacific* factors that he deemed "appropriate" to his analysis:

> The court in *Georgia-Pacific* described a set of factors that are frequently cited as an aid in determination of a reasonable royalty. The factors explicitly include consideration of a hypothetical negotiation between the patent owner and the infringer, the approach I have taken in this report. Other factors provide a convenient list of criteria that a licensor and licensee would be likely to consider in negotiating a royalty. I have considered each of these factors in my analysis *as appropriate.* [87]

Even so, Dr. Kerr did not *expressly* reference the *Georgia-Pacific* factors in subsequent sections of his report. On the basis of that omission, ClearCube complains that, while Dr. Kerr purported to base his analysis on the *Georgia-Pacific* factors, he did not actually [*54] utilize that methodology. This court disagrees.

87 *Id.*, P 45 at 14-15 (emphasis supplied).

It is true that Dr. Kerr's report could have been more explicit in identifying those *Georgia-Pacific* factors he considered "appropriate" to his analysis, or in explaining whether other considerations were more important under the circumstances of this case. ClearCube prefers the approach adopted by its expert witness, Alan Ratliff, in his rebuttal report. Ratliff isolates each of the fifteen *Georgia-Pacific* factors, and addresses each independently, determining each factor's applicability (if any) to his analysis. [88] Arguably, that approach is clearer than Dr. Kerr's; certainly, it is more methodical.

88 *See Daubert* Hearing Defendant's Ex. 1000 (Expert Report of Alan Ratliff), at 10-16.

ClearCube is incorrect, however, when contending [*55] that Dr. Kerr did not actually utilize the *Georgia-Pacific* factors in his analysis. Unquestionably, Dr. Kerr is intimately familiar with the factors, as demonstrated both by his responses to specific questions of this court during the *Daubert* hearing, and, the discussion contained in §§ 5.23 -- .39 of the galley proofs of his forthcoming book, to be published by West. In support of Dr. Kelt's statement that he considered each of the factors "as appropriate," Avocent's counsel provided a table that identifies the specific *Georgia-Pacific* factors deemed pertinent to Dr. Kerr's analysis, and correlates the specific paragraphs of his report that relate to each factor. [89] ClearCube does not quarrel with Avocent's tabular correlations, except to observe that they were not included in the original text of Dr. Kerr's report.

89 *See* doc. no. 269 (Avocent's opposition to ClearCube's motion to exclude the testimony of William Kerr), at 4-5.

In view of the foregoing, the court finds that ClearCube's objection [*56] is ultimately limited to the style of Dr. Kerr's report, rather than to its substantive content; and, while the presentation of the report arguably could be improved, that is no basis for excluding Dr. Kerr's testimony, especially when one considers that the *Georgia-Pacific* factors should not be regarded as the only relevant considerations when attempting to derive "a reasonable royalty."

**B.** *ClearCube's Challenge to Select Steps of Dr. Kerr's Analysis*

ClearCube also challenges the third, fourth, fifth, and sixth steps of Dr. Kerr's analysis, as each was identified at the beginning of this Part.

**1.** *Step three: the mental state of Avocent's negotiators*

Dr. Kerr opined that Avocent's hypothetical negotiators would have perceived ClearCube as a competitor in November 2000. ClearCube argues that there are insufficient facts to support this contention.

Avocent's predecessor, Cybex Computer Products Corporation, filed a Form 10-K with the Securities and Exchange Commission for fiscal year 1999, and a Form 10-K for fiscal year 2000. [90] In those documents, Cybex specified the names of nearly a dozen companies that it considered its "primary competitors," but, [*57] notably, neither ClearCube nor its predecessor, "Innovative Network Technologies, Inc.," was listed among those entities. [91] Additionally, at the *Daubert* hearing, Dr. Kerr could not cite a specific instance prior to 2001 upon which Avocent and ClearCube had directly competed for sales. [92]

90 *Daubert* Hearing Defendant's Ex. 216.

91 *See id.* at Bates No. A-003755 (fiscal year 1999 submission) and Bates No. A-003834 (fiscal year 2000 submission). *See also* Transcript of *Daubert* Hearing (July 18, 2006 testimony), at 115.

92 *See* Transcript of *Daubert* Hearing (July 18, 2006 testimony), at 102-03.

The fact that Cybex did not perceive ClearCube to be a "primary competitor" in 1999-2000 is not decisive,

however. Instead, the important question is whether Avocent's *hypothetical* negotiators, having ascertained ClearCube's business background and developing technology, would have perceived a *potential* and *future* market threat from the company. There is sufficient evidence [*58] to support Dr. Kerr's opinion on that issue. Avocent's so-called "LongView" extender product line allowed a user "to centralize computing functions by removing computers from users' desktops and storing them up to 500 feet away." [93] ClearCube's products also touted the ability to store each user's computer (the "Blade") "hundreds of feet from the desktop." [94] Dr. Kerr concluded on the basis of those facts that Avocent's hypothetical negotiators would have been extremely reluctant to agree to a licensing agreement with ClearCube.

93 Doc. no. 238 (ClearCube's motion to exclude the testimony of William Kerr), Ex. A, Kerr report, P 14 at 6.

94 *Id.*, P 22 at 9.

**2.** *Steps four and five: the mental state of ClearCube's negotiators and the parties' relative bargaining positions*

ClearCube presents a better argument when challenging the fourth and fifth steps of Dr. Kerr's analytical progression. The focal point of ClearCube's argument is paragraph 41 of his report, opining that:

> At the time [*59] of the hypothetical negotiation, the ClearCube negotiator would be aware that ClearCube's entire back-racking solution was dependent on extension technology, *i.e.* the Patented Technology. Unless ClearCube licensed the Avocent technology, the Defendant would not have been able to generate any sales or profits, unless or until a sufficient non-infringing alternative could be developed and introduced. [95]

Dr. Kerr also opined in paragraph 43 of his report that, "[i]n order to stay in business and not risk the loss of a profitable future on a possible non-infringing alternative technology arising sooner rather than later, it would have been reasonable for [ClearCube] to have taken on a license, even though it meant the loss of short-run profits." [96]

95 *Id.*, P 41 at 14.

96 *Id.*, P 43 at 14.

ClearCube contends that these aspects of Dr. Kerr's analysis, purporting to identify the mental state of ClearCube's negotiators, and the parties' relative bargaining positions, are founded upon the [*60] erroneous assumption that *only* Avocent and ClearCube offered "video extension technology" at the time of the hypothetical negotiations. In fact, however, it is apparently undisputed that at least four companies offered some form of that technology in 2000: Avocent; ClearCube; Raritan Computer, Inc.; and, Rose Electronics. [97] Dr. Kerr testified at his deposition that he "considered" all four of these companies in his reasonable royalty analysis, but admitted that neither Raritan nor Rose were expressly mentioned in his report. [98]

97 *See* Transcript of *Daubert* Hearing (July 18, 2006 testimony), at 104.

98 Doc. no. 238 (ClearCube's motion to exclude the opinions of Dr. Kerr), Ex. 9(B), Ken deposition, at 94.

This court therefore will accept for purposes of the following discussion ClearCube's contention: *i.e.*, that Dr. Kerr erroneously assumed that only Avocent and ClearCube offered "video extension technology" at the time of the hypothetical negotiations. Such an error would undermine Dr. [*61] Kerr's opinions of the mental state of ClearCube's hypothetical negotiators, and the parties' relative bargaining positions.

Even so, this court cannot say that such an error in Dr. Kerr's analytical progression, standing alone, is sufficient to exclude his testimony altogether. Vigorous cross-examination and presentation of impeaching evidence are the appropriate means for ClearCube to attack these aspects of Dr. Kerr's opinions. *See Daubert,* 509 U.S. at 594-95 (stating that the focus of the *Daubert* inquiry "must be solely on principles and methodology, [and] not on the conclusions that they generate"). State differently, this error affects only the weight a jury may choose to accord Dr. Kerr's opinion testimony, but not its admissibility.

**3.** *Step six: quantifying the reasonable royalty rate*

ClearCube also challenges the sixth step of Dr. Kerr's analysis quantifying the reasonable royalty rate. Dr. Kerr's opinion is that the hypothetical negotiators would have agreed to a royalty rate in the amount of $ 161 for each unit sold by ClearCube. Dr. Kerr derived that figure from ClearCube's own projections of its performance for fiscal year 2003. The [*62] accounting is summarized below.

ClearCube generated a Confidential Business Plan in October of 2000 for the purpose of persuading potential investors to invest additional capital in the company. [99]

The Plan included ClearCube's best judgment, as of October 15, 2000, of the company's anticipated profits through the end of the 2005 fiscal year. [100] In pertinent part, the Plan included a projected income statement for the 2003 fiscal year. [101]

99 *Daubert* Hearing Defendant's Ex. 1004 (Oct. 2000 Confidential Business Plan).

100 *See id.* § 10.1 ("Summary Financial Data") and Appendix E (year-by-year financial statements and forecasts).

101 *See id.* at Bates No. CC-020503.

That statement projected the sale of 251,000 "units" during fiscal year 2003, generating "Desktop Revenue" in the estimated amount of $ 263,550,000, "Out of the Box Revenue" in the amount of $ 24,225,071, and "Network and Communications Revenue" in the amount of $ 47,439,000, for *total* gross revenues in fiscal year [*63] 2003 of $ 335,104,071. [102] Subtracting the estimated "costs of good sold" and operating expenses from total revenues resulted in a projected, net operating income of $ 80,745,921 for fiscal year 2003. Dr. Kerr then divided that amount by the number of units projected to be sold in fiscal year 2003 (251,000), yielding a projected operating profit margin of $ 322 per unit.

102 The Confidential Business Plan did not precisely define each of these categories. It did, however, explain ClearCube's "out of the box" service program as follows:

> ClearCube is developing a comprehensive "out-of-the-box"service and support offering for customers who adopt its C3 Architecture. ClearCube will offer customers a full-life cycle, 24x7 enterprise computing infrastructure management solution on an outsourced basis. Service components that ClearCube currently plans to offer as part of the Company's out-of-the-box services offering include: Image Management; Asset Tracking & Management; Help Desk; Ten-minute Onsite Replacement & Service; O/S Migration; Financing; and Technology Life Cycle Management.

*Id.* at Bates No. CC-020439 (text format altered).

[*64] On the basis of these calculations, Dr. Kerr opined that ClearCube ultimately would have agreed to pay to Avocent a royalty rate amounting to fifty percent of its $ 322 per unit operating profit margin -- *i.e.,* $ 161 per infringing unit sold.

ClearCube challenges Dr. Kerr's opinion on three independent grounds: (a) he erroneously adopted "total revenue" as the starting point for his royalty rate calculation; (b) Dr. Kerr is unable to point to another license in the computer industry that, during the time frame of the hypothetical negotiations, also utilized a fixed, per-unit, dollar-amount royalty rate based on profit projections; and (c) Dr. Kerr's selection of the royalty rate ($ 161 per infringing unit) was "arbitrary." Each of these contentions is discussed below.

**a.** *Total revenue*

As noted, Dr. Kerr adopted *total* gross revenues as the starting point for his royalty calculation. ClearCube contends that under the correct methodology, Dr. Kerr should have isolated the specific, infringing components in ClearCube's system, and calculated a *subtotal* reflecting the revenues received from the sales of *those* specific, individual components. If Dr. Kerr had [*65] used that subtotal as the starting point for his calculations, ClearCube argues, then his resulting royalty rate would have been lower than $ 161 per infringing unit.

This court finds that, while ClearCube's argument may ultimately prove persuasive to a jury, it is not an appropriate ground for exclusion of Dr. Kerr's testimony. ClearCube does not market individual components, but a "system" that includes all of the hardware and software necessary to locate each user's computer ("Blade") at a distance from the user's desktop. [103] Avocent alleges that its patented "extender technology" is central to ClearCube's system because, without it, ClearCube could not sell a single integrated unit. [104] In view of the foregoing, Dr. Kerr determined that starting with the *total* revenue generated by sales of ClearCube's "system" was appropriate. This court cannot say that such a conclusion was error.

103 Transcript of *Daubert* Hearing (July 18, 2006 testimony), at 127.

104 *See id.* at 127-28.

**b.** [*66] *A fixed, per-unit, dollar-amount rate based on projections*

ClearClube also complains that, while Dr. Kerr ultimately derives a fixed, per-unit, dollar-amount royalty rate based on profit projections made in October of 2000, he is unable to cite an example of an actual royalty in the computer industry during the 2000 time frame that

adopted the same form. ClearClube's counsel questioned Dr. Kerr at the *Daubert* hearing as follows:

> Q. And at your deposition, though, you couldn't tell me other licenses in the computer industry in 2000 that utilized a fixed, per-unit dollar royalty; correct?
>
> A. I think I said I didn't know any specific ones.
>
> Q. Yes. You also could not tell me a fixed dollar royalty based on projections, isn't that right, sir?
>
> A. All -- virtually all royalties are based on projections. . . .
>
> . . .
>
> Q. Thank you. But you couldn't give me a specific example, could you, sir?
>
> A. No. [105]

The inference ClearCube would have this court draw from this line of questioning is obvious. Because Dr. Ken is unable to cite an analogous example of a fixed, per-unit, dollar royalty rate based on profit projections, his reliance on such a rate [*67] must be in discord with industry practices. This court declines to draw that inference, however. ClearCube retained Alan Ratliff to rebut Dr. Kerr's opinions on the reasonable royalty. In his report, Ratliff opined that "there is no customary royalty in *this industry*" [106] -- which this court understands to mean the "video extension technology" market. Ratliff did not provide an opinion on whether there was a customary royalty in the broader "computer industry."

105 Transcript of *Daubert* Hearing (July 18, 2006 testimony), at 107-08.

106 *Daubert* Hearing Defendant's Ex. 1000 (Expert Report of Alan Ratliff), at 15 (emphasis supplied).

On the other hand, it is undisputed that as a general rule, a fixed, per-unit, dollar-amount royalty rate *may* be utilized to craft a reasonable royalty, and such a rate *may* be based on profit projections. This court is not persuaded that Dr. Kerr's reliance on such a royalty rate, in the context of the video extension technology market during the time frame [*68] of the hypothetical negotiations, is cause for exclusion of his testimony.

**c.** *$ 161 per infringing unit*

ClearCube also asserts that Dr. Kerr arbitrarily selected $ 161 per infringing unit as the amount of the reasonable royalty rate. As ClearCube's counsel argued at the *Daubert* hearing, "Why $ 161 per unit? Why not 200? Why not 20? Because [Dr. Kerr simply says] $ 161 per unit is reasonable. That doesn't, Your Honor, meet the *Daubert* requirements." [107]

107 *See* Transcript of *Daubert* Hearing (July 19, 2006 arguments), at 77.

This court has taken pains to identify each step of Dr. Kerr's analysis. Upon review, the court is persuaded that Dr. Kerr followed a reasoned (and reasonable) methodology to arrive at his conclusion of $ 161 per infringing unit as "a reasonable royalty" rate. The court also notes that, in paragraph 50 of his report, Dr. Kerr tested the reasonableness of the rate by applying it to ClearCube's projected profits as of October 2000. [108] Dr. Kerr determined that, [*69] despite paying the $ 161 royalty rate,

> ClearCube would have expected to be profitable only four months later than originally anticipated and would have expected a long run operating profit margin of 12 to 16 percent. Although this analysis shows ClearCube losing a portion of its expected profits through 2005, it would still have an expectation of a healthy profit margin. [109]

Dr. Kerr thus determined the royalty rate after consideration of the circumstances he believed would be pertinent to the hypothetical negotiators, and tested his conclusion against ClearCube's projected profits, as of the time of the hypothetical negotiations. This court cannot say that Dr. Kerr's reasoning, or his resulting royalty rate, was "arbitrary" under these circumstances.

108 *See* doc. no. 238 (ClearCube's motion to exclude the testimony of William Kerr), Ex. A, Kerr report, P 50 at 16.

109 *Id.*

**C.** *Conclusion*

This court concludes that ClearCube's motion to exclude the testimony of Dr. [*70] William Kerr, premised upon Rule 702 of the Federal Rules of Evidence, is due to be denied. Unquestionably, there are aspects of Dr. Kerr's testimony that are tempting targets for cross-examination -- for example, his arguably erroneous assumption that Avocent and ClearCube were the only competitors in the distance technology market in 2000. This court cannot conclude, however, that Dr. Kerr's testimony is due to be deemed inadmissible. *See*

*Daubert,* 509 U.S. at 595 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

**PART SEVEN**

*Avocent's Motion to Exclude the Reasonable Royalty Analysis of ClearCube's Expert, Alan Ratliff*

Alan Ratliff was retained by ClearCube to rebut the findings and conclusions of Dr. Kerr regarding a reasonable royalty, and he disclosed his expert report on September 17, 2004. [110] Ratliff received a Master of Accounting from Baylor University, and a Juris Doctorate from Southern Methodist University. [111] He is a Managing Director in the Financial and [*71] Economic Consulting services practice at Huron Consulting Group, a business consulting firm headquartered in Chicago, Illinois. [112] His prior experience includes providing expert testimony on damages in patent infringement suits, and he has published on the subject. [113]

110 *See Daubert* Hearing Defendant's Ex. 1000 (Expert Report of Alan Ratliff). Mr. Ratliff's report also is located in the record at: doc. no. 232 (Avocent's motion to exclude the testimony of Alan Ratliff), Ex. 2; and doc. no. 250 (ClearCube's response to Avocent's motion to exclude the testimony of Alan Ratliff), Ex. A.

111 *See id.,* Ratliff report, Huron Ex. 1 (curriculum vitae). Ratliff's curriculum vitae does not specify when he received these degrees.

112 *See id.; see also* description of Huron Consulting Group, *available at* http://www.huronconsultinggroup.com. Ratliff practices in the firm's Houston, Texas office.

113 *See Daubert* Hearing Defendant's Ex. 1000, Ratliff report, PP 5-6 at 2-3; *see also id.,* Ratliff report, Huron Ex. 1, at curriculum vitae (under the headings "Select Testimony Experience" and "Publications and Speeches").

[*72] Ratliff agreed with Dr. Kerr's basic methodology for determining Avocent's damages -- *i.e.,* determining the reasonable royalty that would have resulted from a hypothetical negotiation between a willing licensor and willing licensee. He disagreed, however, with the underlying premises and conclusions adopted in Dr. Kerr's report, including, among other things: Kerr's utilization of a fixed, per-unit, dollar royalty rate based on revenue projections; [114] his reliance on ClearCube's "total revenue" for fiscal year 2003 as a basis for his rate calculation; [115] and, his heavy reliance on ClearCube's October 2000 Confidential Business Plan, which included the company's profit projections for fiscal year 2003. [116]

114 *See id.,* Ratliff report, PP 27-31 at 9-10.

115 *See id.,* PP 19-22 at 7-8.

116 *See, e.g., id.,* 123 at 8.

Avocent asserts, however, that there is a critical point of legal error in Ratliff's methodology. Ratliff purportedly bases his reasonable royalty analysis on the theory [*73] that the hypothetical negotiations would have occurred in *2003, when this lawsuit was filed,* rather than at the time of first infringement, which the parties agree was in November 2000 and February 2001, when the '997 patent and '919 patent issued, respectively, and the accused products were sold.

This court understands Avocent's challenge to Ratliff's testimony as directed to the fourth foundational element identified in Part Five, Section D of this opinion *supra -- i.e.,* the question of whether Ratliff's opinion "testimony is the product of reliable principles and methods," [117] as determined by the type of inquiry mandated in Daubert.

117 Fed. R. Evid. 702(2).

**A.** *Ratliff's Expert Report*

Mr. Ratliff opined that "there is no bright line rule for setting the hypothetical negotiation date" when, "in situations such as this," the *time of first infringement* is deemed to have occurred in the time frame of November 2000 through February 2001, but Avocent's [*74] *entitlement to damages* did not arise until October 23, 2003, the date on which this lawsuit was filed. [118]

118 The first concept asserted in Ratliff's argument, that of the time of first infringement, must be distinguished from the second concept, that of limitations on damages under 35 U.S.C. § 287.

The '997 patent issued on November 21, 2000, and the '919 patent issued on February 6, 2001. It is undisputed that ClearCube was selling its accused products on both dates. The parties therefore agree that the time of first infringement of the '997 patent was on or about November 21, 2000, and the time of first infringement of the '919 patent was on or about February 6, 2001. *See Wang Laboratories, Inc. v. Toshiba Corp.,* 993 F.2d 858, 869 (Fed. Cir. 1993).

The parties also agree that Avocent's recoverable damages are limited to infringing sales

made on or after October 23, 2003, the date this lawsuit was filed. *See* doc. no. 238 (ClearCube's motion to exclude the testimony of William Kerr), Ex. A, Kerr report, P 48 at 15 ("I understand that for legal reasons, the damage period begins on October 23, 2003, even though infringement apparently began in the fall of 2000."); Transcript of July 18, 2006 *Daubert* Hearing, at 38 (Ratliff testified that the "damages period begins, as I understand it, in 2003, when the suit was filed."). That is due to the operation of 35 U.S.C. § 287, which provides in part:

> (a) Patentees, and persons making, offering for sale, or selling within the United States any patented article for or under them, or importing any patented article into the United States, may give notice to the public that the same is patented, either by fixing thereon the word "patent" or the abbreviation "pat.", together with the number of the patent, or when, from the character of the article, this can not be done, by fixing to it, or to the package wherein one or more of them is contained, a label containing a like notice. In the event of failure so to mark, *no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice. Filing of an action for infringement shall constitute such notice.*

35 U.S.C. § 287(a)(emphasis supplied). Limitations on damages under 35 U.S.C. § 287 are not relevant to the question at issue here -- *i.e.,* when hypothetical negotiations are deemed to have occurred for purposes of determining a reasonable royalty under 35 U.S.C. § 284. *See Wang,* 993 F.2d at 870 ("However, the court confused limitation on damages due to lack of notice with determination of the time when damages first began to accrue, and it is the latter which is controlling in a hypothetical royalty determination.").

[*75] Ratliff further criticized Dr. Kerr's opinions for failing to consider the parties' actual financial results through the year 2003. In context, and in pertinent part, paragraphs 23 and 24 of Ratliff's report provided that:

> 23. Another conceptual flaw in Avocent's damage model relates to its efforts to avoid actual financial results and rely solely upon early, outdated projections in developing its royalty rate. Avocent bases this approach on a late-2000 hypothetical negotiation date and assumes that ClearCube's projections reflected what both parties really believed would happen. In situations such as this, there is no bright line rule for setting the hypothetical negotiation date. While the hypothetical negotiation is generally considered to have occurred at the time of first infringement, this approach was developed in situations where damages commenced soon after. In this case, the patents issued in late-2000 and early 2001. However, Avocent's entitlement to damages does not arise until nearly three years later.
>
> 24. Avocent ignores ClearCube's and its own large financial losses during that time period. . . . [119]

119 *Daubert* Hearing Defendant's Ex. 1000, Ratliff report, PP 23 and 24 at 8 (footnote omitted).

[*76] Following through on these observations, Ratliff opined that the hypothetical negotiators would have considered "their own poor financial performance in 1999, 2000 and early 2001," [120] Additionally, what "transpired between 2000-2003 is that the market was down (Avocent did not return to double digit operating profitability until 2003), ClearCube continued to experience operating losses, and pressure remained on prices." [121] Ratliff asserted that such information from 2001 to 2003, *even though it would not have been available to negotiators in the November 2000 through February 2001 timeframe,* was, nevertheless, "relevant to the hypothetical negotiation." [122]

120 *Id.,* Ratliff report, P 24 at 8.

121 *Id.,* P 25 at 9.

122 *Id.,* P 26 at 9.

I agree with Avocent that the Book of Wisdom generally focuses on information known at the time of first infringement, but "that knowledge provided by subsequent events might also be considered." Thus, under the circumstances, the information from [*77] 2001-2003 that I've described is relevant to the hypothetical negotiation. Moreover, I do not believe what the parties knew in 2000 and 2001 is limited to what is reflected in ClearCube's projections. Thus, the totality of considerations would have tempered the optimistic scenario upon which Avocent bases its hypothetical negotiation. [123]

123 *Id.*

Ratliff also criticized the profit projections included in ClearCube's October 2000 Confidential Business Plan -- a key component of Dr. Kerr's reasonable royalty analysis -- as "outdated." [124]

124 *Id.*, P 23 at 8, P 27 at 9.

**B.** *Ratliff's Testimony at the Daubert Hearing*

Ratliff admitted at the *Daubert* hearing that his written report failed to state that the hypothetical negotiations between Avocent and ClearCube would have occurred from November 2000 through [*78] February 2001. In his words, "I agree with you, I did not come out and explicitly make the statement that I assumed the 2000-2001 hypothetical. . . ." [125] Ratliff added, however, that he nevertheless "applied the general rule that a hypothetical negotiation generally occurs on the date of first infringement, which in this case is the 2000, 2001 time frame." [126] Ratliff noted that in his report, he assessed the poor financial performances of Avocent and ClearCube in 1999, 2000, and early 2001, consistent with his assumption that the hypothetical negotiations between the companies' negotiators occurred in the 2000 to 2001 time frame. [127] As for his reliance on information arising after February 2001, Ratliff testified that these were "subsequent results, which I think in this case *could be* relevant." [128]

125 Transcript of July 18, 2006 *Daubert* Hearing, at 17.

126 *Id.* at 9.

127 *See id.* at 17.

128 *Id.* at 11 (emphasis supplied).

**C.** *Analysis*

The best that can [*79] be said for Alan Ratliff's written report is that, in certain passages, it *alludes* to hypothetical negotiations occurring in November 2000 and February 2001. The following statements in his report *suggest* adherence to controlling precedent: "In reality, while the parties would have considered the projections [contained in ClearCube's October 2000 Confidential Business Plan], they would have also considered . . . their own poor financial performance in 1999, 2000 and early 2001"; [129] "Moreover, I do not believe what the parties knew in 2000 and 2001 is limited to what is reflected in ClearCube's projections"; [130] and, "the parties would have negotiated the royalty before the actual sales occurred." [131]

129 *Daubert* Hearing Defendant's Ex. 1000, Ratliff report, P 24 at 8.

130 *Id.*, P 26 at 9.

131 *Id.*, P 30 at 10.

Even so, it is difficult to reconcile these statements with other passages in Ratliff's report: for example, his unequivocal statement that, "[i]n situations such [*80] as this, there is no bright line rule for setting the hypothetical negotiation date"; [132] his observation that Avocent was not entitled to damages until October 23, 2003, when this lawsuit was filed; [133] his criticism of Dr. Kerr's failure to consider the parties' actual financial results through 2003; [134] and his characterization of the profit projections included in ClearCube's *October 2000* Confidential Business Plan as "outdated." [135] These statements clearly indicate that Ratliff viewed the hypothetical negotiations as occurring in 2003, when this lawsuit was filed. There is thus a troubling ambiguity, and apparent inconsistency, in Ratliff's written report.

132 *Id.*, P 23 at 8.

133 *Id.*

134 *Id.*, PP 24-25 at 8-9.

135 *Id.*, PP 23 at 8 and P 27 at 9.

Ratliff's testimony at the *Daubert* hearing did not alleviate these problems. As a preliminary matter, Ratliff was forced to concede a fundamental point: nowhere in his expert report did he explicitly state that the hypothetical [*81] negotiations between Avocent and ClearCube were deemed to occur between November 2000 and February 2001. Ratliff attempted to excuse this

omission by saying that he had *applied* the correct negotiation period dictated by Federal Circuit precedent. But that is not what he actually did in his written report.

The problem begins with Ratliff's characterization of ClearCube's October 2000 Confidential Business Plan as "outdated." That Plan, which included ClearCube's projected profits through 2005, was produced just one month before the date of first infringement of the '997 patent, and four months before the date of first infringement of the '919 patent. Thus, Ratliff was not simply incorrect when dismissing the Plan as "outdated," his opinion was contrary to binding precedent. *See Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1385 (Fed. Cir. 2001)("In this case, the 1996 business plan and its projections for future sales were prepared by Infinite two months before infringement began. Thus, rather than being outdated for purposes of the hypothetical negotiation, those projections would have been available to Infinte at the time of the hypothetical [*82] negotiation.").

Ratliff compounded the problem in paragraphs 23 through 26 of his report. For reasons still unclear to this court, Ratliff deemed it significant that, while the times of first infringement for the patents-in-suit were fixed in the timeframe of November 2000 through February 2001, Avocent was not entitled to recover damages from ClearCube until the institution of this suit in October of 2003. Ratliff then criticized Dr. Kerr's reasonable royalty analysis for failing to consider Avocent's and ClearCube's respective financial losses through the end of 2003. These premises clearly framed the focus of Ratliff's analysis. He considered the parties' financial results, as well as market conditions, in 1998, 1999, 2000, and early 2001, but he placed just as much, if not far greater emphasis, on post-infringement financial figures through the end of 2003. [136]

136 This court agrees with ClearCube that post-infringement evidence *may* be relevant and admissible. *See, e.g., Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1257 (Fed. Cir. 2005)("The court correctly understood *Wang* [*Laboratories, Inc. v. Toshiba Corp.*, 993 F.2d 858 (Fed. Cir. 1993)] as mandating consideration of a hypothetical negotiation on the date of first infringement but not automatically excluding evidence of subsequent events."); *Fromson v. Western Litho Plate and Supply Co.*, 853 F.2d 1568, 1575 (Fed. Cir. 1988)(observing that the reasonable royalty methodology encompasses a degree of "flexibility," because "it speaks of negotiations as of the time infringement began, yet permits and often requires a court to look to events and facts that occurred thereafter and that could not have been known to or predicted by the hypothesized negotiators"); *Studiengesellschaft Kohle v. Dart Industries, Inc.*, 862 F.2d 1564, 1571 (Fed. Cir. 1988)(finding no *per se* rule, in light of prior Federal Circuit decisions, that "all post-infringement evidence is irrelevant to a reasonable royalty calculation"). However, as discussed in the text following this footnote, the focus of the reasonable royalty analysis must remain on the positions of the hypothetical negotiators at the time of first infringement -- which Ratliff fails to do in this case.

[*83] In doing so, Ratliff essentially eviscerated the Federal Circuit's rule that hypothetical negotiations must be deemed to occur at the time of first infringement. This court cannot conclude, upon a searching review of Ratliff's written report and the exhibits attached thereto, that he actually *focused* his analysis on the positions of the hypothetical negotiators during the November 2000 to February 2001 timeframe. While Ratliff testified that he "applied" binding precedent of the Federal Circuit, this court cannot conclude that he did. Indeed, to the extent that Ratliff "applied" a hypothetical negotiation date at all, this court agrees with Avocent that his analysis focused on 2003, when this lawsuit was filed. That is clear legal error.

**D.** *Conclusion*

"The key element in setting a reasonable royalty after determination of validity and infringement is the necessity for return to the date when the infringement began." *Panduit Corp. v. Stahlin Brothers Fibre Works, Inc.*, 575 F.2d 1152, 1158 (6th Cir. 1978). The correct determination of that date is essential for properly assessing the evidence that would have been available to the hypothetical negotiators, [*84] and influenced their respective bargaining positions, *at that time*.

> A reasonable royalty calculation envisions and ascertains the results of a hypothetical negotiation between the patentee and the infringer at a time before the infringing activity began. Thus, the reasonable royalty calculus, assesses the relevant market as it would have developed before and absent the infringing activity. Although an exercise in approximation, *this analysis must be based on sound* economic and *factual predicates*. . . .
>
> The first step in a reasonable royalty calculation is to ascertain the date on which the hypothetical negotiation in advance of infringement would have occurred. *The correct determination of this*

> *date is essential for properly assessing damages. . . .*

*Integra Lifesciences I, Ltd. v. Merck KGAA,* 331 F.3d 860, 869-70 (Fed. Cir. 2003)(emphasis supplied)(citations and internal quotation marks omitted), *rev'd on other grounds,* 545 U.S. 193, 125 S. Ct. 2372, 162 L. Ed. 2d 160 (2005).

ClearCube has failed to prove by a preponderance of the evidence that the proffered testimony of its expert witness "is the product of reliable principles and methods." [137] Accordingly, [*85] Avocent's motion to exclude the testimony of Alan Ratliff will be granted.

137 Fed. R. Evid. 702(2).

**PART EIGHT**

*Principles Governing a Finding of "Willful" Infringement*

"The word 'willful' is widely used in the law, and, although it has not by any means been given a perfectly consistent interpretation, it is generally understood to refer to conduct that is not merely negligent." *McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 133, 108 S. Ct. 1677, 100 L. Ed. 2d 115 (1988). In common usage, the word is considered to be synonymous with such terms as "voluntary," "deliberate," and "intentional." *Id.* (citation omitted).

In patent law, however, "various criteria have been stated for determining 'willful infringement.'" *SRI International, Inc. v. Advanced Technology Laboratories, Inc.,* 127 F.3d 1462, 1464 (Fed. Cir. 1997). It may, nevertheless, be said that the concepts of "intent and reasonable beliefs are the primary focus of a willful infringement inquiry." *Ortho Pharmaceutical Corp. v. Smith,* 959 F.2d 936, 944 (Fed. Cir. 1992). [*86] *See also, e.g., Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.,* 372 F. Supp. 2d 833, 845 (E.D. Va. 2005)("Thus, the primary focus in a willful infringement inquiry is ultimately on the infringer's intent and reasonable beliefs concerning non-infringement and patent invalidity."). "Whether infringement is 'willful' is by definition a question of the infringer's intent." *Ortho Pharmaceutical,* 959 F.2d at 944. Moreover, "precedent displays the consistent theme of [asking] whether a prudent person would have had sound reason to believe that the patent was not infringed or was invalid or unenforceable, and would be so held if litigated." *SRI International,* 127 F.3d at 1465 (citing collecting cases).

A finding of willfulness must be based upon "the totality of circumstances." *Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.,* 383 F.3d 1337, 1342 (Fed. Cir. 2004)(*en banc*).

> Determination of willfulness is made on consideration of the totality of the circumstances, *see Gustafson, Inc. v. Intersystems Indus. Prods., Inc.,* 897 F.2d 508, 510 (Fed. Cir. 1990), and may include contributions [*87] of several factors, as compiled, *e.g.,* in *Rolls-Royce Ltd. v. GTE Valeron Corp.,* 800 F.2d 1101, 1110 (Fed. Cir. 1986) and *Read Corp. v. Portec, Inc.,* 970 F.2d 816, 826-27 (Fed. Cir. 1992). These contributions are evaluated and weighed by the trier of fact, for, as this court remarked in *Rite-Hite Corp. v. Kelley Co.,* 819 F.2d 1120, 1125-26 (Fed. Cir. 1987), "'[w]illfulness' in infringement, as in life, is not an all-or-nothing trait, but one of degree. It recognizes that infringement may range from unknowing, or accidental, to deliberate, or reckless, disregard of a patentee's legal rights."

*Knorr-Bremse,* 383 F.3d at 1342-43. Of the cases cited in the immediately preceding quotation, the *Read* Court set forth the most comprehensive list of relevant factors, as follows:

> *In Bott v. Four Star Corp.,* 807 F.2d 1567, 1572, 1 USPQ 2d 1210, 1213 (Fed. Cir. 1986), three factors were identified for consideration in determining when an infringer "acted in [such] bad faith as to merit an increase in damages awarded against him":
>
> (1) whether the infringer deliberately copied the ideas [*88] or design of another;
>
> (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; and
>
> (3) the infringer's behavior as a party to the litigation. [138]
>
> The *Bott* factors are not all inclusive. In addition, other circumstances which courts appropriately have considered, particularly in deciding on the extent of enhancement, are: