IN THE UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| MICHAEL BOWLING,<br>a Resident of Arizona,<br><br>Plaintiff,<br>v.<br><br>HASBRO, INC.,<br>a Rhode Island Corporation,<br><br>Defendant. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | C.A. No. 05-229S |

**PLAINTIFF'S POST-DAUBERT HEARING BRIEF IN OPPOSITION TO DEFENDANT'S MOTION IN *LIMINE* TO PRECLUDE TESTIMONY OF EXPERT WITNESS, NEIL N. LAPIDUS**

## I. Introduction

Mr. Lapidus applied all fifteen *Georgia-Pacific* factors, the proper methodology in a reasonable-royalty patent case, to the facts in reaching his opinion on the amount of damages. His opinion, $0.58 per die or about 4-5% of net sales, is consistent with industry standards, Hasbro's own licensing practices, and Mr. Lapidus's background experience. Hasbro's expert, Mr. Sussman, applied the same factors but to Hasbro's version of the facts. Although the two arrived at different conclusions, Mr. Lapidus should not be prevented from testifying because of the methodology he used – the Federal Circuit has affirmed the *Georgia-Pacific* factors as a proper methodology and Defendant's expert used the same factors. Mr. Lapidus's report and testimony show how each of the 15 factors, taken as a whole, were used to arrive at the opinion. It may look slightly different than Mr. Sussman's report, but the methodology was the same. Both experts gave more weight to some factors than others (e.g., Sussman concluded Hasbro would pay no more than the cost of replacing the accused dice - $0.07 per die and Lapidus found Bowling's price of $0.64 particularly important), and arrived at different opinions. While

reasonable minds may disagree about the conclusions reached and the weight given to particular facts, that goes to the weight of the evidence – not its admissibility. *Micro Chem. Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1393 (Fed. Cir. 2003).

Hasbro's brief alleged that Mr. Lapidus's testimony should be precluded because he: (1) is not qualified, (2) did not apply the *Georgia-Pacific* factors, and (3) used the wrong interest rate. (Court Dkt. No. 134.) Hasbro seems to have abandoned reasons one and three.[1] As to number two, Hasbro established during *its* examination of Mr. Lapidus that he applied the correct methodology:

> Q: We've now gone through every one of the *Georgia-Pacific* factors that you dealt with in any detail. I did skip over one. You brought us back to that. So on the basis of that analysis, you then reach a conclusion as to a reasonable royalty, correct?
>
> A. Yes.

(Lapidus Tr.[2] 146:14-20.) Under Federal Circuit law, Mr. Lapidus's answer to Hasbro's question is alone enough to deny Hasbro's motion. *Micro Chem.*, 317 F.3d at 1393-94. The Federal Circuit was quite clear that the *Georgia-Pacific* factors are a proper methodology:

> Furthermore, we cannot say that [plaintiff's expert's] testimony was the product of an unreliable methodology. This court has 'endorsed the conceptual framework of a hypothetical negotiation between patentee and infringer as a means for determining a reasonable royalty.' (citation omitted) Factors relevant in a reasonable royalty determination using this method include those set out in Georgia-Pacific.

Hasbro's complaints about the facts Mr. Lapidus used do not make his testimony improper. *Id.*

---

[1] For good reasons: Hasbro's own expert used 12% compound interest in his report apparently at the recommendation of Hasbro's counsel and Mr. Lapidus is at least as qualified as Mr. Sussman, Hasbro's expert whom it claims is qualified.

[2] Transcript of Daubert Hearing held on January 16, 2008 (Ex. A.) hereinafter "Lapidus Tr."

## II. Findings Of Fact

### A. Lapidus And Sussman Both Applied The Same *Georgia-Pacific* Methodology In Reaching Their Opinions On Damages.

1. The parties agree that the *Georgia-Pacific* factors are "well established as a measure of royalty damages in patent cases." (Lapidus Tr. 80:18-20.)

2. Both Mr. Lapidus and Mr. Sussman agreed that the 15 *Georgia-Pacific* factors were the correct method of determining reasonable-royalty damages in this case. (Lapidus Tr. 22:3-7, 84:12-13; Sussman Tr.[3] 18:3-5, 22:1-3.)

3. Both experts have used the *Georgia-Pacific* methodology numerous times before in determining reasonable-royalty damages. (Lapidus Tr. 80:24 – 81:2, 175:23 – 176:8; Sussman Tr. 12:16-22.)

4. Neither Mr. Lapidus nor Mr. Sussman had ever been precluded from testifying as to a reasonable royalty that was based on the *Georgia-Pacific* methodology. (Lapidus Tr. 15:7-9; Sussman Tr. 13:18-21.)

5. Mr. Lapidus prepared a 25 page report in which he described his application of each *George-Pacific* factor, whether it would weigh in favor of a higher royalty or not, and provided his opinion. (Lapidus R.[4] pp. 8-15.)

6. Mr. Sussman also prepared a report in which he described each *Georgia-Pacific* factor and his opinion, but Mr. Sussman did not indicate whether any of the 15 factors favored a higher or lower royalty. (Sussman Tr. 18:15-18; Sussman R. [5] ¶¶ 25-74.)

---

[3] Testimony of Barry Sussman held on January 24, 2008 (Ex. B.) hereinafter "Sussman Tr."
[4] Expert Report on Damages of Neil N. Lapidus, CPA, dated February 22, 2006 (Plaintiff's Ex. 1 to the January 16, 2008 Hearing Transcript) hereinafter "Lapidus R."
[5] Expert Report of Barry Sussman, CPA, dated April 24, 2006 (Plaintiff's Ex. 2 to the January 24, 2008 Hearing Transcript) hereinafter "Sussman R."

7. Both experts applied all 15 factors in reaching their opinion as to the reasonable royalty amount. (Lapidus Tr. 23:6-8, 25:19-25, 78:1-16; Sussman Tr. 18:6-7.)

8. Neither expert began with a particular starting point when each applied the other factors, despite both being aware of industry standards. (Lapidus Tr. 89:2 – 90:6; Sussman Tr. 7:5-7, 18:19 – 19:15; Sussman R. ¶¶ 63, 69-73.)

9. Mr. Lapidus explained that he considered all of the 15 *Georgia-Pacific* factors in total. (Lapidus Tr. 86:18 – 87:2.)

10. Mr. Lapidus testified that he did *not* limit his analysis to simply subtracting Hasbro's costs from Bowling's established sales price. (Lapidus Tr. 25:19 – 26:4.)

11. Mr. Sussman did limit his analysis to adopting the cost of replacement dice. (Sussman R. ¶¶ 73-74; Sussman Tr. 19:20-24.)

12. Prior to analyzing the 15 *Georgia Pacific* factors, Mr. Lapidus conducted a search of licenses in the toy/game industry through RoyaltySource and considered his own background experience in the area of toy/game licenses. (Lapidus Tr. 69:21 – 70:10, 70:22 – 71:14.)

13. Mr. Lapidus determined that 12 of the *Georgia-Pacific* factors favored a higher royalty and the remaining three were neutral. (Lapidus Tr. 79:1-14.)

14. Mr. Sussman did not state whether any of the *Georgia-Pacific* factors favored Hasbro or Bowling. (Sussman Tr. 18:15-18.)

15. As shown more fully below, there is a link between Mr. Lapidus's analysis of the 15 factors and his opinion. (Lapidus Tr. 28:16-24, 31:8-21, 32:1-19, 70:6-7.)

**B. <u>Lapidus Explained His Analysis of Each Factor And Its Effect On The Negotiation.</u>**

16. Both Lapidus and Sussman agreed that, for factor number 1, there was no established royalty for the Bowling patent. (Lapidus Tr. 81:6-16; Sussman Tr. 18:8-10.)

17. Mr. Lapidus explained that the lack of prior licensing royalties tends to increase the royalty rate because it demonstrates that Bowling has not licensed the patent to others and maintained the monopoly for the benefit of the products he sells under the patent. (Lapidus Tr. 83:1-6, 84:21 – 85:5; Lapidus R. p. 8.)

18. Mr. Sussman offered no explanation as to whether the lack of prior licensing activity increased the royalty rate. (Sussman R. ¶ 25.) Mr. Sussman did not even mention this factor at all in his analysis of what the parties would have considered. (Sussman R. ¶¶ 69-73.)

19. Mr. Sussman's opinion that Hasbro would have paid only $0.07 per die was based on one factor alone: that was the cost Hasbro estimated it would have cost to remove the accused dice. (Sussman Tr. 19:16-23, 20:16-19.)

**C. <u>Lapidus's Opinion Is Reasonably Related To Industry Standards.</u>**

20. In analyzing factor 2, the rates paid by Hasbro, for the use of comparable patents, Mr. Lapidus reviewed somewhere between one and two bankers boxes. (Lapidus Tr. 96:1-10.) Mr. Lapidus learned that the "rates paid by Hasbro are between 1 – 8% of net sales. Over twenty license agreements provided by Hasbro had royalty payments of 5% or higher." (Lapidus R. p. 8.) This range was consistent with Mr. Lapidus's experience of a 2 – 8% range in the toy/game industry. (Lapidus Tr. 87:22 – 88:4.)

21. Mr. Sussman testified that there is a 5% of net sales "industry standard" for licensing in the toy/game industry. (Sussman Tr. 19:4-6.)

22. Mr. Sussman confirmed a similar range and that a "majority of the agreements [were] paying 5 percent of net sales." (Sussman R. ¶ 27.)

23. Mr. Lapidus's research of comparable licenses through RoyaltySource also showed a rate of 5% of net sales. (Lapidus R. p.14.) It does not appear that Mr. Sussman performed an independent search for comparable licenses. (Sussman R. ¶ 26.)

24. Lapidus's opinion of $0.58 per die (or 4.22%[6] of net sales) is consistent with Hasbro's licensing practices, the range identified in Mr. Lapidus's experience, and the 5% "industry standard." (Sussman R. ¶ 27.)

25. Mr. Sussman has opined in other cases that royalty rates, including for component parts, can exceed 5% of net sales. (Sussman Tr. 6:19-25.)

26. Mr. Sussman's opinion of $0.07 per die (or 0.25% of net sales) in this case lacks any relationship to the licenses paid by Hasbro, Mr. Sussman's own experience or the 5% "industry standard." There is no mention of the 5% industry standard or Hasbro's licenses, of which the "majority" are 5% of net sales, in Mr. Sussman's analysis as to how he reached the 0.25% figure. (Sussman R. ¶¶ 69-74.)

## D. <u>The Nature of the License Is Consistent With Lapidus's Opinion</u>.

27. Mr. Lapidus considered factor 3 and concluded that the license to Hasbro would have been exclusive as to the accused die, but that Bowling would be allowed to continue selling other dice under the patent to his non-game customers. (Lapidus Tr. 105:9-22.)

[6] 383,984 Monopoly Millennium games were sold with the accused device compared to only 172,884 Avon games.

28. He also explained that the basis for his conclusion was the deposition of Hasbro's Mr. Hirtle in which he testified on behalf of Hasbro that its policy was to license on an exclusive basis and that Hasbro would not have wanted the Bowling dice to appear in any games other than Monopoly. (Lapidus Tr. 108:25 – 110:9; Lapidus R. p. 9.)

29. Mr. Sussman considered the same facts. (Sussman R. ¶ 33.) Mr. Sussman agrees with Mr. Lapidus that "Crystal Caste [Bowling's company] does not sell its dice in other products [e.g., games or toys], and has primarily sold them to adventure game players, such as D&D [Dungeons & Dragons] players." (Sussman R. ¶ 34.)

30. Mr. Sussman does not mention these facts in his computation of a royalty rate. (Sussman R. ¶ 69-74.)

**E. <u>Lapidus's Opinion of $0.58 Is Consistent With Mr. Bowling's *U.S.* Pricing.</u>**

31. Mr. Bowling's dice sell for $1.25 retail. (Lapidus Tr. 170:10-11.)

32. The gross margin on Bowling's dice was on average 70%. (Lapidus R. p.11.)

33. During a tradeshow before the hypothetical negotiation, Bowling sold out of 10,000 dice in four days. (Lapidus R. p. 11.)

34. Both Mr. Lapidus and Mr. Sussman agreed that Bowling sold his dice in the U.S. for $0.64, the same price that his distributors charged. (Lapidus Tr. 116:11-13; Lapidus R. pp. 9-10; Sussman R. ¶ 40.)

35. Mr. Lapidus explained that Bowling was adamant about maintaining that $0.64 price in the U.S. to protect his distributors. (Lapidus Tr. 117:7 – 118:13; 119:5-19; 169:18 – 171:1.) Mr. Lapidus noted that Bowling's letters stated that he would not give any

discounts off the $0.64. (Lapidus Tr. 171:15-20.) Lapidus explained that this was done to maintain a high retail price and control distribution. (Lapidus R. p. 10.)

36. Mr. Bowling only lowered that price for *non-U.S. sales* where he does not have patents. (Lapidus Tr. 171:21 – 172:2.)

37. Although Mr. Sussman notes the above prices charged by Bowling, he dismisses them entirely from his analysis because "[t]he cost of an acceptable non-infringing alternative can cap a royalty that a 'prudent' licensee will be willing to pay," he says. (Sussman R. ¶ 73.)

38. However, close in time to the hypothetical negotiation, Hasbro's own marketing department deemed the "alternative" dice unacceptable and the replacement dice generated over 818 complaints within 6 weeks of use. (Lapidus Tr. 172:13 – 173:13; Lapidus R. p.6.)

39. Lapidus also considered the facts that Hasbro's Monopoly Millennium game had a gross margin of $10.28 profit (almost 50%) even after factoring in paying Bowling $0.58 per die. (Lapidus R. Ex. F.) Lapidus also considered that after accounting for the royalty, the gross margin would still be within the Hasbro's Engineering Quick Costs. (*Id.*) Prior to adopting Bowling's dice, Hasbro had factored into the cost of Monopoly Millennium a random number generator costing *more* than the price of a royalty to Bowling. (Lapidus R. p.12.)

**F. <u>Hasbro Admitted It Would Have Been At A Disadvantage.</u>**

40. At the time of the hypothetical negotiation, August 1999, Hasbro was already selling the infringing dice. (Lapidus R. pp. 5-6.)

41. Hasbro had sales orders for more than 170,000 units to fill in September. (Lapidus R. Ex. G.)

42. The new millennium and holiday shopping-season were only four months away.

43. Hasbro had already invested in manufacturing and advertising. (Lapidus R. p.10) The futuristic dice were prominently displayed on the box of the Monopoly Millennium edition and were prominent in TV advertisements. (*Id*.) Lapidus also reviewed websites that talked about how important the futuristic dice were to the Millennium edition. (*Id*.)

44. Hasbro would have to assume that the patent was valid, enforceable and infringed. (Sussman R. ¶24.)

45. Hasbro was itself charging a premium for the Millennium Edition -- $28.50 for a product that cost about $13.00 to make. (Lapidus R. Ex. F.)

46. Mr. Lapidus considered Hasbro's testimony that it would have been at a "disadvantage" in negotiation with Bowling. (Lapidus R. p.7.)

47. Mr. Lapidus noted that Hasbro would have paid more. (Lapidus R. p.7.)

48. Mr. Lapidus concluded that the royalty rate "would be high in relation to other license agreements negotiated by Hasbro and other industry standards." (Lapidus R. p.8.)

## III. Conclusions Of Law.

### A. The Trial Court's Role As Gatekeeper Is Not Intended To Serve As A Replacement For The Adversary System.

1. Under *Daubert*, the trial court acts as a gate-keeper to exclude expert testimony that is irrelevant or does not result from the application of reliable methodologies or theories to the facts of the case. *Micro Chem*., 317 F.3d at 1391.

2. In 2000, Rule 702 was amended in response to *Daubert* and cases applying it. That rule provides that an expert witness can testify in the form of an opinion if "(1) the testimony

is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702.

3. However, the Advisory Committee note warns that "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." *Id*.

4. The U.S. Supreme Court stated in *Daubert*: "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence. *Micro Chem.*, 317 F.3d at 1392 (quoting *Daubert v. Merrell Dow Pharms*., Inc., 509 U.S. 579, 595 (1993).

5. It is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony when the parties' experts rely on conflicting sets of facts. *Id.*.

6. As this Court has previously noted, "[m]ost importantly for the instant motion [in *limine* to exclude expert testimony], 'the ultimate credibility determination and the testimony's accorded weight are in the jury's province.'" *Beacon Mut. Ins. Co. v. OneBeacon Ins. Group*, 253 F. Supp. 2d 221, 223 (D.R.I. 2003), quoting *Seahorse Marine Supplies, Inc. v. Puerto Rico Sun Oil Co.*, 295 F.3d 68, 81 (1st Cir. 2002).

**B. Lapidus's Opinion Is Based Upon Sufficient Facts Or Data.**

7. Lapidus's opinion is that Hasbro would pay $0.58 per die/$1.16 per game (or about 4-5% of net sales per game) as reasonable-royalty damages.

8. Bowling's patent is presumed valid, enforceable and infringed.

9. In addition, Lapidus based his opinion on the following facts or data:

**Bowling sold the patented product at a premium price in the U.S**:

10. Demand for the patented product and the licensor's established premium pricing can support a higher royalty rate. *Minco, Inc. v. Combustion Eng'g, Inc.*, 903 F.Supp. 1204, 1223-24 (E.D. Tenn. 1995). Bowling's dice sell for $1.25 each retail. (Lapidus Tr. 170:10-11.) Before the hypothetical negotiation, Bowling sold out of 10,000 dice in four days. (Lapidus R. p. 11.) Bowling had an established pricing at which he sold his dice in the U.S. for $0.64, the same price that his distributors charged. (Lapidus Tr. 116:11-13; Lapidus R. pp. 9-10; Sussman R. ¶ 40.) Bowling was adamant about maintaining that $0.64 price in the U.S. to protect his distributors. (Lapidus Tr. 117:7 – 118:13; 119:5-19; 169:18 – 171:1.) Bowling only lowered that price for *non-U.S. sales* where he does not have patents. (*Id*. at 171:21 – 172:2.)

**<u>$0.58 or 4-5% of Net Sales Is Consistent With Industry Standards</u>:**

11. Royalty rates in excess of the industry standards may be reasonable damages. *Minco*, 903 F.Supp. at 1224 (20% reasonable royalty); *see also Bio-Rad Labs., Inc. v. Nicolet Inst. Corp.*, 739 F.3d 604 (Fed. Cir. 1984), *overruled on other grounds, Markman v. Westview Insts., Inc.*, 52 F. 3d 967 (Fed Cir. 1995.) (33% royalty rate affirmed even though industry standard was from 3% to 10%). Lapidus's 4-5% royalty is consistent with the industry standard of 5% (Sussman Tr. 19:4-6), Mr. Lapidus's experience of a 2 – 8% range in the toy/game industry (Lapidus Tr. 87:22 – 88:4), RoyaltySource (Lapidus R. p. 14), and Hasbro's own licenses having royalty payments 5% or higher. (Lapidus R. p. 8; Sussman R. ¶ 26.) And Mr. Sussman testified that he has opined in other cases that royalty rates, <u>including for component parts</u>, can exceed 5% of net sales. (Sussman Tr. 6:19-25.) (emphasis added).

**<u>Hasbro's "alternative" dice were not acceptable to Hasbro or its customers</u>:**

12. "[A] non-infringing replacement product is <u>not considered a substitute unless it is 'acceptable to all purchasers</u> of the infringing product. (citation omitted) In other words, buyers must view the substitute as equivalent to the patented device." *American Seating Co. v. USSC Group, Inc.*, _ F.3d _, 2008 U.S. App. LEXIS 1864, at *15-16 (Fed. Cir. Jan. 29, 2008)[7] (emphasis added). Hasbro's replacement dice were unacceptable to Hasbro's own marketing department close in time to the hypothetical negotiation. (Lapidus R. p. 6.) Moreover, the replacement dice generated over 800 complaints within 6 weeks of use. (Lapidus Tr. 172:13 – 173:13.)

**<u>Hasbro would have maintained a good profit margin</u>**:

13. Royalty rate damages may be reasonable even if they exceed the infringer's total profit. *Radio Steel & Mfg. Co. v. MTD Prod., Inc.*, 788 F.2d 1554 (Fed. Cir. 1986) (affirmed 10% royalty rate damages that exceeded infringer's total profit). Lapidus's royalty rate would preserve a large profit for Hasbro – almost 50%. Monopoly Millennium had a gross margin of $11.45, which would leave $10.28 profit after paying Bowling $0.58 per die. (Lapidus R. Ex. F.) Even after accounting for the royalty, the gross margin would still be within the Hasbro's Engineering Quick Costs. (*Id.*) Prior to adopting Bowling's dice, Hasbro had factored into the cost of Monopoly Millennium an electronic random number generator costing *more* than the price of a royalty. Bowling's futuristic dice were an inexpensive replacement, even with the royalty, to the more costly electronic random number generator.

[7] Attached hereto as Exh. C.

**Hasbro Was At A Disadvantage In The Hypothetical Negotiation:**

14. Parties disadvantaged at the time of the hypothetical negotiation may pay a higher royalty. *Ball Aerosol and Specialty Container, Inc. v. Limited Brands, Inc.*, 514 F. Supp. 2d 1051, 1065 (N.D. Ill. 2007). The hypothetical negotiation would have occurred in August 1999. (Lapidus R. p. 5.) Hasbro was already selling the accused dice in the Millennium game, had invested in packaging, marketing and manufacturing. (Lapidus R. pp. 5-6.) Hasbro had orders for 171,527 games sold in September alone. (Lapidus R. Ex. G.) Hasbro admitted it would have paid more do to this disadvantage. (Lapidus R. p.7.)

**Bowling Had Maintained His Patent Monopoly:**

15. A party that preserves its exclusive right over the patented invention is entitled to a higher royalty rate. *Ball Aerosol*, 514 F. Supp. 2d at 1065. Bowling had never licensed his patent. (Lapidus R. p.8; Sussman R. ¶ 25.) There was demand for the patented product: Bowling sold over $300,000 of his futuristic, multifaceted dice. (Lapidus R. p.11.)

16. A high profitability rate weighs in Bowling's favor. *Minco*, 903 F.Supp. at 1223. Bowling's profit margin was 70%. (Lapidus R. p.11.) Hasbro advertised the "futuristic, multifaceted dice" on the Millennium box and the dice were prominently displayed in Hasbro's TV advertising. (Lapidus R. p.10.) Lapidus concluded that the license to Hasbro would have been exclusive as to the accused die for games, but that Bowling would be allowed to continue selling other dice under the patent to his non-game customers. (Lapidus Tr. 105:9-22.) Hasbro's Mr. Hirtle testified on behalf of Hasbro that its policy was to license on an exclusive basis and that Hasbro would not have

wanted the Bowling dice to appear in any games other than Monopoly. (Lapidus Tr. 108:25 – 110:9; Lapidus R. p. 9.) Mr. Sussman agrees with Mr. Lapidus that "Crystal Caste [Bowling's company] does not sell its dice in other products [e.g., games or toys], and has primarily sold them to adventure game players, such as D&D [Dungeons & Dragons] players." (Sussman R. ¶ 34.)

17. The Federal Circuit has held insufficient similar complaints to Hasbro's about the facts and data upon which Mr. Lapidus relied. *Micro Chem.*, 317 F.3d at 1392. The Court noted that Advisory Committee note to Rule 702 instructs that:

> When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis in the amendment [to Rule 702] on "sufficient facts or data" is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other. *Micro Chem.*, 317 F.3d at 1392.

**C. <u>The Georgia-Pacific Methodology Relied Upon By Lapidus Is Reliable</u>.**

18. The parties agree that the *Georgia-Pacific* factors are "well established as a measure of royalty damages in patent cases." (Lapidus Tr. 80:18-20.) *Micro Chem.*, 317 F.3d at 1393 (*Georgia-Pacific* reliable methodology).

19. Both Mr. Lapidus and Mr. Sussman agreed that the 15 *Georgia-Pacific* factors were the correct method of determining reasonable-royalty damages in this case. (Lapidus Tr. 22:3-7, 84:12-13; Sussman Tr. 18:3-5, 22:1-3.)

20. Both experts have used the *Georgia-Pacific* methodology numerous times before in determining reasonable-royalty damages. (Lapidus Tr. 80:24 – 81:2, 175:23 – 176:8; Sussman Tr. 12:16-22.)

21. Neither Mr. Lapidus nor Mr. Sussman had ever been precluded from testifying as to a reasonable royalty that was based on the *Georgia-Pacific* methodology. (Sussman Tr. 13:18-21.)

**Both Lapidus and Sussman Relied Upon The 15 Georgia-Pacific Factors:**

22. An expert shall not be excluded because he applied the correct methodology to one version of the disputed facts. *Micro Chem*., F.3d at 1393 ("Fiorito properly applied the accepted Georgia-Pacific methodology to Micro Chemical's version of the disputed facts, explaining the effect each factor would have on a negotiated royalty.") (Emphasis added.) Both Mr. Lapidus and Mr. Sussman applied all 15 factors in reaching their opinion as to the reasonable royalty amount. (Lapidus Tr. 23:6-8, 25:19-25, 78:3-16; Sussman Tr. 18:6-7.) Mr. Lapidus prepared a 25 page report in which he described his application of each *George-Pacific* factor, whether it would weigh in favor of a higher royalty or not, and provided his opinion. (Lapidus R. pp. 8-15.) Neither expert began with a particular starting point when each applied the other factors, despite both being aware of industry standards. (Lapidus Tr. 89:2 – 90:6; Sussman Tr. 7:5-7, 18:19 – 19:15, Sussman R. ¶¶ 63, 69-73.) Mr. Lapidus determined that 12 of the *Georgia-Pacific* factors favored a higher royalty and the remaining three were neutral. (Lapidus Tr. 79:1-14.) He also explained the effect each factor would have on a negotiated royalty. (Lapidus R. pp. 8-15.) Lapidus's methodology is the same as used by Defendant's expert and is reliable even though both experts used different facts or weighted them differently.

**D. <u>Lapidus Applied The Principles And Methods Reliably To The Facts.</u>**

23. Hasbro's argument is incorrect that there is no link between Mr. Lapidus's analysis of the 15 factors and his opinion. (Lapidus Tr. 28:16-24, 31:8-21, 32:1-19, 70:6-7.) Lapidus explains how each factor resulted in a higher royalty or was neutral.

24. Mr. Lapidus testified that he did *not* limit his analysis to simply subtracting Hasbro's costs from Bowling's established sales price but rather applied all 15 factors to reach his opinion. (Lapidus Tr. 25:19 – 26:4.) *Oxford Gene Tech. Ltd. v. Mergen Ltd.*, 345 F. Supp. 431, 441-42 (D. Del. 2004) (refusing to preclude expert where defendant claimed he relied too heavily on two factors).

25. Lapidus's report (plus his day-long deposition and day-long courtroom testimony) is sufficient under the law. *Single Chip Sys. Corp. v. Intermec IP Corp.*, 495 F. Supp. 2d 1066, (S.D. Cal. 2007) ("an expert is not required to 'recite each minute fact or piece of scientific information that might be elicited on direct examination to establish the admissibility of the expert opinion under Daubert.'")

26. Hasbro's challenge to Lapidus's factual assumptions (e.g., exclusive license (Lapidus Tr. 105:9-22)) and valuations (e.g., timing of Hasbro's sales pre-holiday season) are not sufficient to preclude his testimony. *Univ. of Pittsburgh v. Townsend*, 2007 U.S. Dist. LEXIS 24620, *75, *78 (E.D. Tenn. Mar. 30, 2007)[8] (defendants argued that license would not have been exclusive as expert had opined).

27. Hasbro's complaint that Lapidus does not explain how much each factor raises the reasonable royalty is not reason to preclude his testimony. *Ball Aerosol*, 514 F.Supp.2d at 1061-1065 (Court analyzes all 15 factors and states only whether they result in a

[8] Attached hereto as Exh. D.

"higher," "lower" royalty or are "neutral."); *see also Minco, Inc. v. Combustion Eng'g, Inc.*, 903 F.Supp. 1204, 1223-24 (E.D. Tenn. 1995).

28. Hasbro's complaints that Lapidus made mistakes (e.g., failed to account for cost of replacing infringing dice) are also not sufficient to preclude his testimony. *EZ Dock, Inc. v. Schafer Systems, Inc.*, 2003 U.S. Dist LEXIS 3634, * (D. Minn. Mar. 8, 2003)[9] (shortcomings in expert's reasonable royalty analysis go to weight, not admissibility).

29. Nor is Hasbro's complaint that Lapidus applied the royalty to the price of the game, and not merely the component, sufficient to preclude his testimony. See *Freeman v. Gerber Prods. Co.*, 450 F. Supp. 2d 1248, 1262 (D. Kan. 2006); *see also Micro Chem.*, 317 F.3d at 1393 (expert entitled to consider sales of non-patented goods in arriving at reasonable royalty).

30. Hasbro's complaint that Lapidus did not consider the parties settlement negotiations is also wrong. Settlement negotiations and agreements are not an accurate gauge of a reasonable royalty because a patentee (especially a small one like Bowling) is constrained by the risk and expense of litigating a patent in suit. Risk and expense are not factors in the hypothetical negotiation because the patent is presumed valid and infringed. *Rite-Hite Corp. v. Kelley Co., Inc.*, 774 F.Supp. 1514, 1535 (E.D. Wisc. 1991).

31. Lapidus's testimony is not legally erroneous; "it is merely based on [Bowling's] version of the disputed facts." *Micro Chem.*, 317 F.3d at 1394.

## IV. Conclusion

Hasbro's motion boils down to a dispute about Lapidus's conclusions – not whether they were based on sufficient facts, proper methods, or reliable application. Lapidus explained in his report, deposition and courtroom testimony how each of the 15 *Georgia-Pacific* factors, in total,

[9] Attached hereto as Exh. E.

led him to conclude that $0.58 (4-5% of net sales) is the proper royalty in this case. That amount is supported by Bowling's version of the facts: an industry standard of 5%, Lapidus's background, Hasbro's own license history of 5% and even Mr. Sussman's testimony that he opined that a royalty in excess of 5% for a component is reasonable. Moreover, Bowling had an established policy of selling his patented product for $0.64 in the U.S. where he had patent protection. Protecting that amount was very important to Bowling as he letters demonstrated. He never deviated from that amount in the U.S.

Further, Hasbro must assume that Bowling's patent is valid, enforceable and infringed. Finally, Bowling had maintained his patent monopoly, created an average of 70% profit margin on his own sales and would have left Hasbro with almost 50% profit margin on Millennium under the hypothetical license. For the aforementioned reasons, Bowling respectfully requests that the Court deny Hasbro's motion, and allow Lapidus to provide expert testimony at trial.

Michael Bowling,
By His Attorneys,

Date: February 11, 2008

s/Thomas J. Leach___________

Thomas J. Leach, MN (*pro hac vice*)
Anthony R. Zeuli (*pro hac vice*)
MERCHANT & GOULD, P.C.
3200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Phone: 612.332.5300
Fax: 612.332.9081

Craig M. Scott, Esq. (#4237)
Christine K. Bush, Esq. (#5587)
DUFFY SWEENEY & SCOTT, LTD
One Turks Head Place, Suite 1200
Providence, RI 02903
(401) 455-0700
(401) 455-0701 (Facsimile)

**CERTIFICATE OF SERVICE**

TO:

Todd D. White, Esq.
Jeffrey K. Techentin, Esq.
Adler Pollock & Sheehan P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903-1345

David K. S. Cornwell, Esq.
Tracey-Gene G. Durkin, Esq.
Sterne Kessler Goldstein & Fox P.L.L.C.
1100 New York Avenue N.W.
Washington, DC 20005

I hereby certify that the within *PLAINTIFF'S POST-DAUBERT HEARING BRIEF IN OPPOSITION TO DEFENDANT'S MOTION IN LIMINE TO PRECLUDE TESTIMONY OF EXPERT WITNESS, NEIL N. LAPIDUS* was filed through the ECF system on the 11th day of February, 2008, and will be sent electronically to the above-named counsel who are registered participants identified on the Notice of Electronic Filing for Case No. 05-229S.

/s/ Thomas J. Leach