# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

COPY

| | |
|---|---|
| * * * * * * * * * * * * | CIVIL ACTION |
| MICHAEL BOWLING | 05-229S |
| VS. | JANUARY 16, 2008 |
| HASBRO, INC. | PROVIDENCE, RI |
| * * * * * * * * * * * * | |

HEARD BEFORE THE HONORABLE WILLIAM E. SMITH

DISTRICT JUDGE

(DAUBERT HEARING)

APPEARANCES:

FOR THE PLAINTIFF: ANTHONY R. ZEULI, ESQ.
and THOMAS J. LEACH, ESQ.
Merchant & Gould, P.C.
3200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
(612) 332-5300

FOR THE DEFENDANT: JEFFREY TECHENTIN, ESQ.
and TODD WHITE, ESQ.
Adler, Pollock & Sheehan
One Citizens Plaza
Providence, RI 02903
(401) 274-7200

Court Reporter: Anne M. Clayton, RPR
One Exchange Terrace
Providence, RI 02903

Proceeding reported and produced by computer-aided stenography

# I N D E X


| WITNESS | PAGE |
|---|---|
| NEIL LAPIDUS | |
| Direct Examination by Mr. Zeuli: | 8 |
| Cross-Examination by Mr. Techentin: | 25 |
| Redirect Examination by Mr. Zeuli: | 169 |
| Recross-Examination by Mr. Techentin: | 180 |
| PLAINTIFF'S EXHIBITS | |
| 1 - | 25 |
| DEFENDANT'S EXHIBITS | |
| A, B & C - | 102 |

THE COURT: Good morning. We are here in the matter of Bowling versus Hasbro. We are here this morning on a number of motions in limine.

Let's have counsel identify themselves for the record, please.

MR. ZEULI: Your Honor, good morning. My name is Tony Zeuli. I'm counsel for Mr. Bowling.

With me today is Mr. Tom Leach; Craig Scott, who I think you know. Chris Bush is with us as well. And Neil Lapidus, our damage expert is here. Thank you.

MR. TECHENTIN: Good morning, your Honor. Jeff Techentin and Todd White on behalf of Hasbro.

THE COURT: Thank you. How do you wish to proceed this morning? Do you have any particular order you'd like to go in? And maybe you can give me a little idea of what you intend to do with some of these motions.

MR. ZEULI: I think we do. Mr. Techentin and I spoke this morning. We thought, your Honor, it would be wise to start with, if it's okay with the Court, with the motion concerning Mr. Lapidus, given Mr. Lapidus is here, and we'd like to get him on his way as soon as that could be concluded.

The other hearings or the other motions can be heard in the order the Court would like to hear them.

There's no preference from our side.

I would ask one thing or ask the Court for your instruction. With respect to the Daubert hearing this morning with respect to Mr. Lapidus, we can proceed in a number of different ways. We can certainly -- I assume the Court has read the briefs and I think there's an inherent reliability shown there of Mr. Lapidus' work and his credentials so we could get right into cross-examination, or I'd be happy to take some direct examination first if you'd like to hear from him as to his credentials and background. How ever your Honor would like to proceed is fine with me.

THE COURT: Mr. Techentin.

MR. TECHENTIN: I concur with everything that was just said, your Honor.

THE COURT: Do you have any other witnesses besides Mr. Lapidus?

MR. ZEULI: No, your Honor.

MR. TECHENTIN: We do, your Honor.

THE COURT: On that motion?

MR. TECHENTIN: On that motion.

THE COURT: Can you give me a little idea of what you have in mind?

MR. TECHENTIN: Your Honor, we're going to present the testimony of Barry Sussman, who is Hasbro's

damages expert.

THE COURT: All right. And he's going to testify on his review of Mr. Lapidus' report?

MR. TECHENTIN: That's correct, your Honor.

THE COURT: Okay.

MR. ZEULI: Your Honor?

THE COURT: Yes.

MR. ZEULI: One point if I might. I'd like to object to their calling Mr. Sussman and to the extent they have any other witnesses. There was no notice provided to us that there would be any other witnesses other than Mr. Lapidus. No notice whatsoever.

In fact, Mr. Scott may be able to inform you that he asked Mr. Techentin whether there would be any other witnesses, and Mr. Techentin yesterday refused to answer that question.

THE COURT: You know, there's a lot of flexibility when it comes to Daubert hearings. I don't know that they have any obligation to tell you how they intend to approach the challenge. You might argue that it's a matter of courtesy that he should tell you, but I don't know that you can point me to any rule of the court or civil procedure or otherwise that requires it. Can you?

MR. ZEULI: No. I don't have any rule. I would

suggest that under the fairness principle.

THE COURT: Where is Mr. Lapidus located, his business and so forth?

MR. ZEULI: He's located in Minneapolis.

THE COURT: Minneapolis?

MR. ZEULI: Yes.

THE COURT: Okay. All right. Well, the reason I'm pausing in thinking about this I was giving a little bit of thought to inviting you to argue this motion and conduct this hearing in front of a class that I'm teaching in expert and scientific evidence at the Roger Williams Law School. I thought this would be a really kind of an interesting case for them to observe, but I don't know that that would be practical given that Mr. Lapidus is from Minneapolis and he's taken the time to fly out here. I think we should probably just move forward and I'll find another case for them to observe.

And as far as your request with respect to not allowing the testimony of Hasbro's expert, I'm not going to grant that, but I will say that if in the course of the testimony it becomes apparent that there's some reason for a continuance on the basis of the non-disclosure , then I'll entertain a motion for a continuance, but I'm not sure there would be any reason

for that, but I suppose it could occur.

So let's proceed. We'll take up that motion first. Are you going to call Mr. Lapidus?

MR. TECHENTIN: Your Honor, Mr. Zeuli inquired if you would want some direct of him or we should just proceed to cross-examine him. We can go either way.

THE COURT: In my view, the burden is sort of always ultimately on the proponent of the witness, the proponent of the particular expert's testimony to carry the burden that it qualifies to come into court.

I mean, you've challenged it, but I think the best way to proceed is to go ahead and have a direct examination of him and then you can cross him. I'm not wedded to that. I mean if you both feel strongly you'd like to proceed with the cross-examination, I'm open to it. But it seems to me, since it's your burden to convince me that it should come in, you might want to take a shot at a direct first.

MR. ZEULI: Let's do that.

THE COURT: All right.

MR. ZEULI: Your Honor, plaintiff calls Neil Lapidus.

**NEIL LAPIDUS**, first having been duly sworn, testified as follows:

THE CLERK: Please state your name and spell

your last name for the record.

THE WITNESS: Neil Lapidus, L-A-P-I-D-U-S.

THE COURT: Good morning, Mr. Lapidus.

THE WITNESS: Good morning, your Honor.

THE COURT: And you may proceed.

**DIRECT EXAMINATION BY MR. ZEULI**

Q. Good morning, Mr. Lapidus.

A. Good morning.

Q. Could you please introduce yourself to the Court and tell us where you work, please.

A. My name is Neil Lapidus. I'm from Minneapolis, Minnesota. Born and raised in Minneapolis.

Q. Could you just tell us very briefly a little bit about your firm, please.

A. Our firm, your Honor, the name of the firm is Lurie Besikof Lapidus. The firm is approximately 65 years old, and it is probably the 60th largest accounting firm in the country. And I've been one of the top ten or sixth largest single practice -- single office practice in the United States.

Q. Mr. Lapidus, what is your position at the firm?

A. I'm a partner. I'm the administrative partner with the firm, a member of the executive committee of our firm. I've been a partner there for a very long time. My name or the firm name is mine in the firm.

Q. Sir, would you tell the Court a little bit about the type of work that you do.
A. I generally handle more of the larger transactions within our client base. In the office, I'm also in charge of the litigation support and expert witness work that is done within our firm, in our practice.
Q. Mr. Lapidus, would you describe for the Court the spectrum of the industries in which you've worked.
A. I have given the length of time of 30-year plus practice, I've probably worked with practices or everything, clients from architecture firms from A to Z, to zinc metals and battery breaking and probably everything in between. So we have a very diverse practice and a very large practice. It's not just limited to the Twin City area or five states practice. And also has international clients also, your Honor.
Q. Within that wide spectrum, Mr. Lapidus, do you have any experience with the toy industry?
A. Yes. Our firm and I have represented over the years many inventors of toy products and currently are representing approximately five clients who deal directly in the toy industry.
Q. Mr. Lapidus, could you tell the Court whether you've had any real world experience with licensing?
A. Yes.

Q. Can you tell the Court a little bit about the types of work that you've done in terms of licensing.

A. Your Honor, because of the size of our practice, we work in a variety of industries with not only manufacturers or people who are interested in licensing and licensing products, but also inventors or people who create products who use our firm in a consultative manner and help them kind of real-world negotiate licenses or royalty arrangements, and also have experience in terms of testifying in cases like this as an expert witness in licensing matters.

Q. Mr. Lapidus, how is your position at your firm, the wide variety of clients that you've worked on and your experience helped you in this case?

A. I think it's all those factors. The years of experience not only just in the interaction with inventors or the companies, but it's understanding the industries that they work in, the complexity of negotiations, and in many regards the similarities of some of the negotiations or discussions that either inventors or people doing licensing have. And it's just a wide range, including, ultimately, final distribution. So deals with retailing or international distribution, how that licensing may be affected or how the inventors might be affected by the contracts they

might sign. Really a financial interest also.

Q. I'd like to shift gears a little bit, Mr. Lapidus. I'd like to talk about your background, how you got to where you are today.

Could you just briefly walk the Court through your college, your educational background, if you will.

A. I'm a University of Minnesota graduate. Upon graduating college, I immediately joined a national accounting firm and spent approximately four years in that firm. And that was sort of my basic training. Achieved a level there of supervisor or manager and then joined the firm that I'm presently with today, partner of today, and have been there, your Honor, approximately 30 years.

Q. Mr. Lapidus, what was your degree in from the University of Minnesota?

A. Bachelor of science degree in accounting and business.

Q. Sir, did you take the CPA exam? And if so, did you pass it?

A. Yes, I took the CPA exam; and yes, I passed it.

Q. Have you taught any courses?

A. I should also mention, I guess, your Honor, I'm also licensed not only in the State of Minnesota but licensed in several other states. Approximately five

other states.
Q. Any courses, have you taught any courses in your 30 years?
A. Yes. I have been on the adjunct faculty for the University of Minnesota and for a variety of other community colleges. I have taught within our association of CPA firms that we are a member of, a national organization. I have also taught for the Minnesota Society of CPAs, lectured on a variety of topics from -- taught from basic accounting to advanced accounting and auditing and have given some lectures in the litigation area, damages and licensing issues similar to what we'll be discussing today.
Q. Mr. Lapidus, have you received any honors in your 30-year career?
A. Yes. I was Teacher of the Year for a period of time. In my teaching and adjunct faculty background, the leading edge or group that we are a member of representing probably the top 50 firms in the country, I received an outstanding award for that. I am currently a gubernatorial appointee to the Minnesota State Board of Accountancy and was recently elected, reappointed by the governor to the state board and recently elected chairman of the Minnesota State Board of Accountancy.

Q. Are you licensed here in Rhode Island?
A. I am not licensed in Rhode Island. I did check on the licensing requirements as a matter of accepting an engagement. They do have in Rhode Island, as they do in Minnesota, something, your Honor, called substantial equivalency. Rhode Island and Minnesota are part of approximately 30 states that have common standards so that substantial equivalency in Rhode Island and Minnesota would not be a problem in terms of testifying.
Q. And Mr. Lapidus, do you attend continuing education?
A. Yes. As a CPA in Minnesota, almost all states, your Honor, you're required to attend and maintain, at least in Minnesota, 120 hours of continuing education within a three-year cycle. Approximately 40 hours a year. And I have always been current or exceeded that standard in a variety of areas, including litigation support or licensing topics, both given by the American Institute of CPAs, the Minnesota Society of CPAs and the American Bar Association.
Q. As part of that continuing education, Mr. Lapidus, has any of it dealt with licensing?
A. Yes. As I stated, it did.
Q. As a licensed professional, what professional

organizations do you belong to that would be relevant to what your Honor is deciding today?
A. The American Institute of CPAs. Since I have been a CPA, the Minnesota Society of CPAs, and the Licensing Executive Society.
Q. Mr. Lapidus, could you just explain, briefly, for the Court's benefit, what the Licensing Executive Society is?
A. Your Honor, the Licensing Executive Society is an organization of companies and executives that deal with licensing matters, not only similar to what we're going to talk about today, but deal with that in the real world. I have made presentations to that group on some of the items we may discuss today. And it's an international organization that really promotes understanding of licensing issues and a camaraderie of individuals to deal with those kind of items in their business and their day-to-day matters.
Q. Mr. Lapidus, I'd like to shift gears again, please, and I'd like to focus particularly on your experience in your 30 years. You mentioned that you've worked on other cases involving licensing. About how many, sir?
A. Well, throughout our practice over time, I probably have been directly involved in maybe over 50

licensing issues, whether they're dealing in the manufacturing side or dealing in the inventor side.
Q. How many times, Mr. Lapidus, have you testified as an expert witness on licensing matters such as this case?
A. Probably at least six times or more than six.
Q. Has a court ever disqualified you as an expert?
A. No, sir. A court has never disqualified me as an expert.
Q. In the work that you just described, how many expert reports have you prepared that dealt with intellectual property and their licensing, sir?
A. In terms of reports for the court or reports in general?
Q. Reports in general.
A. Maybe 25 or more reports in general. And I differentiate that, your Honor, because in a consulting aspect, you may issue a report or give recommendations or formalize your recommendations that do not necessarily become part of a court record or it's not something that is controversial. They're asking you a recommendation or you're making a presentation to a board of directors as to what might be an appropriate action as to licensing matters.
Q. How many reports then, Mr. Lapidus, have you

prepared for a court?
A. Probably more than a dozen reports for a court.
Q. In your prior testimony as an intellectual property damages expert, have you represented parties accused of infringement?
A. Yes.
Q. Would you give some examples, sir, of the industries in which you have analyzed licensing issues.
A. Everything from the toy industry -- generically, I say metal bending, and it's those items, your Honor, that deal with metal products.
So anything that is metal that is shaped or formed in some manner that may have licensing, obviously, or patent issues from fireplaces to engine components on airplanes, to intellectual property dealing with some computer-related devices.
Q. Mr. Lapidus, I'd like to now turn to the assignment at hand, of this particular case. What was the assignment that you undertook in connection with this case?
A. I was asked to represent Mr. Bowling and to evaluate the damages that he incurred assuming an infringement had occurred.
Q. How did you go about evaluating the damages in this case, sir?

A. Well, first, before evaluating the damages, we had to make sure that we could -- our firm has a policy in terms of accepting assignments regardless of the location. In a national practice, we want to make sure, your Honor, that we have no conflicts, that we are able to accept the assignments. So we go through our own process of making sure that we are qualified prior to accepting an engagement, that there are no conflicts, not only with other clients but given the size of our practice that always becomes a concern, and make sure we are qualified in accepting the job.

Once we determine that and assuming that's acceptable, then we would go through a process of evaluating the information and understanding what the assignment is and ensuring that we can express an opinion as to, in this case, the damages on behalf of Mr. Bowling.

Q. Did you have an opportunity to read the pleadings, sir?

A. Yes.

Q. Did you have an opportunity to read the depositions that you felt were relevant?

A. Yes. My expert report generally outlines all the items that we looked at including a reference, your Honor, to public -- we say publicly available

information. In this day and age, the Internet is a good source of information, both not only the particular defendant or plaintiff's information, but maybe other resource information that is out there.

There are some very good resources that would allow you to check, in this case, either licensing or rates that may be used.

So the methodology that is used, and the factors that are used through the Internet, you can usually locate the industries fairly quickly.

Q. Did you use some public information known as Royaltysource, and if so, could you explain to the Court how you used it.

A. Amongst other information, besides looking at the pertinent financial information for the matter, the matter involved, the public information that's available, there is a reference, subscriber reference, your Honor, probably similar to West Law and Lexis called Royaltysource. It's an informational guide that our firm uses on a regular basis, not only necessarily in litigation issues, but in terms of counseling and advising clients on either unusual or different terms that may occur regardless of the type of industry.

So we try to stay ahead and understand for our clients the information sources that are available.

Q. Did you in this case pull information from the Royaltysource and consider it?
A. Yes.
Q. Can you tell me what information specifically you considered that was provided by Hasbro.
A. Both the information that was provided in the case, not only the depositions of Hasbro officers or employees; their public information that's available; additionally, their financial information that was available; through the deposition process that was made available to us; sales information regarding the product. I think that's probably fairly inclusive. Some of the e-mail information that was provided that was relevant that is listed or summarized in my report.
Q. Did you have an opportunity to consider the Monopoly Millennium game itself and its advertisements?
A. Yes. We actually have the game itself, and looked at the game and understood the advertising that was provided for the game and the packaging and references of the packaging made to various aspects pertinent to this case and pertinent to Mr. Bowling specifically.
Q. Did you have an opportunity to consider any licenses provided by Hasbro?
A. Yes. Hasbro provided several licenses, and we reviewed those. I also asked to see other licenses

that were not provided, including the one with the Monopoly game and did not receive that.

Q. Who did you ask for a copy of the Monopoly license you referenced?

A. I believe, your Honor, it was Hasbro's counsel. I think that's Mr. Techentin, who took my deposition.

Q. And that was not provided to you; is that correct?

A. That is correct.

Q. What information from Mr. Bowling did you consider?

THE COURT: I'm not sure I understood your last answer. You were asked whether you asked for a copy of the license, and you said Mr. Techentin is Hasbro's counsel. So I don't see in that a response to the actual question. Did you ask for a copy of the Monopoly license?

THE WITNESS: Yes.

THE COURT: And when and where did you ask for that?

THE WITNESS: During my deposition.

THE COURT: All right.

BY MR. ZEULI: (Continuing)

Q. Just to be clear, you were not provided with a copy of that license, correct?

A. I was not provided.

Q. Let's go back to --
A. Excuse me for one moment. Actually, your Honor, I know directly I asked their -- I probably asked Mr. Bowling's counsel or Mr. Zeuli for a copy, which they did not have either.
Q. Can you walk through quickly for the Court what information you considered from Mr. Bowling.
THE COURT: Mr. Zeuli, would you stay at the podium, please.
MR. ZEULI: Sure.
A. Essentially, I learned and learned about Mr. Bowling's business. He is an inventor. About his background, how he got to invent this item, what his business goals were for the product that he invented, and his desire as to not only how to market it, but what he intended long-run to do with the product that he developed.
I looked at the financial information of his business and sales information, which is financial information; and any other documents or sales invoices, manufacturing correspondence that I deemed relevant, I would ask him.
Q. Did you form an opinion as to an appropriate amount of damages in this case?
A. Yes.

Q. What assumptions, if any, Mr. Lapidus, were your opinions based on?
A. Well, the assumptions or -- assumptions are based on what I believe to be sort of the standard methodology that should be used in evaluating damages in this case, and that is something that I would refer to as the Georgia-Pacific factors.
Q. Did you make any assumptions concerning when the period of damages should begin?
A. Yes.
Q. Could you explain that to the Court, please.
A. We made the assumption that the period of damages should begin at the date that the patent was granted, which in this case was August 17th, 1999.
Q. And when you were describing the Georgia-Pacific factors, can you explain to us how the Georgia-Pacific factors are applied with respect to the hypothetical negotiation?
A. The Georgia-Pacific factors, your Honor, are 15 factors that are evaluated and used to determine a proper royalty rate. And those factors are considered in total. Even though they are 15 individual factors, you look at those factors in total. There's not a weighting, necessarily, to say that on a ten-point scale, factor number four is a seven or a nine or

increases the royalty arrangement X percent or two-tenths of one percent or anything.

It is an overall conclusion that you draw from evaluating those 15 factors that has led me to the conclusion of the royalty that I used in my report.

Q. Mr. Lapidus, did you consider each of the 15 Georgia-Pacific factors in arriving at your opinion?

A. Yes.

Q. I want to shift to the last topic and that is prejudgment interest. Sir, why did you include prejudgment interest in your expert report?

A. Well, normally -- well, first of all, as my report reads, it is at the discretion of the Court to determine interest. In the damage cases that I work on and that we do, interest is usually applied to damages. And in Rhode Island, our research showed that an interest rate was stated. And in this case, the interest rate, it's our understanding is 12 percent. And we compounded that rate. And I know there is some difference of opinion as to compounding. We compounded the rate, but the methodology that we used is my understanding of what the law is in Rhode Island, and my report reads that it is at really the discretion of the Court.

Q. My last question for you, Mr. Lapidus, is why

compound the interest?

A. Well, if money would be awarded at a date, in this case August of 1999, it would be similar to a bank account and that money would continue to grow over a period of time. And it's pretty mathematical. There's either simple interest or compound interest. And as to damages, if they would stay in a bank account, you would earn interest on interest.

As I read the statute, it does not say you cannot use compounding; and, therefore, it would seem to be, at least in my opinion, an appropriate manner, but the Court will determine if it's compounded or if the interest rate is 20 percent or 2 percent.

Q. Just a point of clarification. I gather your point about the interest earning on interest is the bank would have been using a compound interest methodology; is that correct?

A. Yes.

MR. ZEULI: I have nothing further, your Honor.

THE COURT: Okay. I take it you're going to want to introduce the report as an exhibit. I mean, it is attached to your memo. I don't think there's any objection to it, but we should make it an exhibit for purposes of this hearing. So, if you wish, I'll have that marked and introduced as Plaintiff's Exhibit 1.

Any objection to that?

MR. TECHENTIN: No, your Honor.

THE COURT: All right.

(Plaintiff's Exhibit 1 marked full.)

MR. ZEULI: Thank you, your Honor.

**CROSS-EXAMINATION BY MR. TECHENTIN**

Q. Good morning, Mr. Lapidus.

A. Good morning.

Q. Mr. Zeuli asked you if you had reached an opinion in this regard, but he didn't ask you what your opinion was. What is your opinion as to damages in this case?

A. That the damages would be 58-and-a-quarter cents -- a royalty of 58-and-a-quarter cents per die.

Q. And you have achieved mathematically that number by subtracting Hasbro's cost of manufacture of the accused die from the sales price for Mr. Bowling's commercial die; is that correct?

A. No.

Q. Is there some other mathematical method by which you arrived at 58.25 cents per die?

A. I think we and I went through the Georgia-Pacific factors, all 15 factors, to determine what the royalty would be. And that number, in going through the Georgia-Pacific factors, is 58-and-a-quarter cents per die.

Q. I'd like to show you what's listed as Exhibit D in your expert report. Can you see that on the screen in front of you?
A. No, I don't. It's blank actually. I have a copy of Exhibit D.
Q. Do you have Exhibit D in front of you?
A. Yes.
Q. And Exhibit D is entitled "Reasonable Royalty per Die," correct?
A. Yes.
Q. There's no plus or minus signs, but there's an arithmetical equation there, correct? It lists Bowling's per die sales price at 64 cents, and then it says less Hasbro's cost per die of 5.75 cents per die. And then there's a line that says reasonable royalty per die, and it's the difference between the two numbers, correct?
A. That is what the schedule says.
Q. So mathematically wouldn't it be correct to say that the way that you arrived at 58.25 cents per die as a royalty was by taking Hasbro's cost for its accused die and subtracting that from Bowling's sales price?
A. No. I believe that you take into account all of the Georgia-Pacific factors, all the preceding pages of my report and look at many factors to get to what a

reasonable royalty would be. Exhibit D just says what the reasonable royalty is. And it is all of the items that are both prior to Exhibit D and after that tie out to 58-and-a-quarter cents per die.

Q. You would agree, though, that Exhibit D makes no reference to anything other than Bowling's per die sales price as you put it there at 64 cents and Hasbro's costs, correct?

A. No. I think that my report is of all the pages that are represented and not just one specific item, whether it be Exhibit D or either any other exhibit or any other reference to one specific line. Because you take a look at all of these factors together, I don't think you can just conclude based on one item that that is how we arrived at 58-and-a-quarter cents per die.

Q. You indicated that your task for this case was to evaluate the damages for any proven infringement by Hasbro of Mr. Bowling's patent; is that correct?

A. Yes.

Q. And the basic methodology that you followed was to determine a reasonable royalty for the use of that patent ; is that correct?

A. Yes.

Q. So in other words, you weren't attempting to calculate Hasbro's profits that it realized as a result

of the use of the die, correct?
A. No.
Q. And part of the reason for that would be that it would be an improper measure of damages to try to disgorge Hasbro's profits; is that correct?
MR. ZEULI: Objection. Misstates the law.
THE COURT: Well, let's focus on what he did do so we can try to figure that out. He's not a lawyer. I'm not sure that his opinion as to what is an appropriate method of damage calculation is really relevant. Go ahead.
MR. TECHENTIN: That's a fair point, your Honor.
Q. You also weren't attempting to calculate Mr. Bowling's loss profits, correct?
A. No, I was not.
Q. And by a reasonable royalty, that means what? What is a reasonable royalty? What is that thing that you were attempting to arrive at through this analysis?
A. I think a reasonable royalty would be to the extent that there is an infringement, this is the price that would be charged after considering kind of the methodology of the Georgia-Pacific factors, and in my opinion what that amount should be paid per die for infringement, if, in fact, infringement is found.
Q. But a reasonable royalty has some more specific

meaning than just being a damages number, isn't that correct?

A. Yes. It is considered at a period of time; it's considered a negotiation; it's considered something at arm's-length. There are many factors within the methodology of Georgia-Pacific or many considerations that you take into place at that time in arriving at my conclusion.

Q. In fact, you recite some of those factors at page five of your report; is that right?

A. Yes.

Q. That's where you list the various underlying assumptions that go into determining a reasonable royalty including ones that you mentioned as well as things such as neither party being under any compulsion to complete the transaction, correct?

A. Yes.

Q. So in arriving at a reasonable royalty, your task was to find a number, a commercially reasonable number upon which Mr. Bowling and Hasbro might have settled as a royalty had they done so as of August 19th of 1999?

MR. ZEULI: Again, your Honor, I'd object. The only thing Mr. Techentin continues to do is interject statements of the law in an attempt to trip up a witness who is not a lawyer.

THE COURT: Well, the witness is an experienced professional. He's testified in court. I don't want Mr. Techentin to misstate the law, but I think what I understood the question to be was a statement of what the task that Mr. Lapidus was asked to perform. If that was his task, he can answer that yes. If it was not his task, then he'll say no.

MR. ZEULI: Thank you, your Honor.

THE COURT: So we'll have the court reporter restate the question.

MR. TECHENTIN: Thank you, your Honor.

(Pending question read by the reporter.)

A. No. I don't believe commercially reasonable is necessarily a factor. It is a hypothetical negotiation of those items on page five, and commercially reasonable isn't necessarily a sole consideration.

Q. Let me try to put it another way. The reasonable royalty figure that you arrived at, which in this case was 58.25 cents per die, is it your expert opinion that that is a royalty figure that would have been arrived at by Hasbro and Mr. Bowling as of August 17th of 1999, given the constraints that are reflected here on page five of your report?

A. Because you keep referring to either commercially reasonable --

THE COURT: He didn't use the word "commercially reasonable" in that question.

THE WITNESS: Could I have that question read back.

THE COURT: Yes, you may.

THE WITNESS: Thank you.

(Pending question read by the reporter.)

A. Yes, but it is not limited just to the items on page five. It is limited to all -- the methodology is also limited to, or includes, and consideration has to be given to the Georgia-Pacific factors, not just the bullet points that are found on page five.

Q. But you believe, as your expert opinion in this case, that given the considerations of the various Georgia-Pacific factors and under the constraints of the hypothetical negotiation that you set forth on page five that Hasbro would have been willing to enter into a license agreement with Mr. Bowling with respect to this patent at a rate of 58.25 cents per die?

A. I believe that, yes, the reasonable royalty would have been 58.25 cents per die.

THE COURT: Before you leave that point, this may be just an obvious question, but I just want to make sure that this is what you're saying so that we're not talking past each other at all.

When you reach the conclusion that a reasonable royalty in a particular case, in this case is 58.25 percent, I understand that to be saying that given all the factors that you have talked about on page five and the Georgia-Pacific factors, your opinion is that Mr. Bowling and Hasbro would have reached an agreement on that number as a royalty as of the date of the patent, which was August 17th, 1999.

In other words, you're saying that's the number that you believe they would have reached through negotiation as opposed to this is just what I think would have been reasonable.

THE WITNESS: Yes, your Honor. That is the methodology --

THE COURT: Right.

THE WITNESS: -- of the Georgia-Pacific factors, and that's what you would take into account.

THE COURT: Right. I just want to be clear that that is what you're saying. Go ahead, Mr. Techentin.

MR. TECHENTIN: Thank you, your Honor.

Q. Before we go through your analysis here, I do have a couple of questions about your background that was brought out by Mr. Zeuli.

You testified that your firm had some experience with respect to the toy industry and even having some

representations of inventors. Can you elaborate on that and explain to the Court what that experience in the toy or game industry is.

A. Yes.

Q. Please do.

A. I think, your Honor, we have and I have, specifically, worked with both the manufacturing side in the toy industry, the distribution side in the toy industry, the inventorship or inventing in the toy industry, and there's sort of a supplemental distribution system in the toy industry when you deal with very large retailers. I refer to them as big boxes, the Target stores, the Wal-Mart stores, the Toys "R" Us stores, that sometimes use independent distributors to which they purchase. They use them, actually, as their purchasing agents for purchasing products. And I've been involved in that for many years as has our firm probably through all distribution levels.

THE COURT: So you're saying you've represented the distributors in that industry; is that right?

THE WITNESS: Additional, yes, sir.

Q. Mr. Lapidus, I'd like to focus, if I can, on your own experience. As I understand it from your direct testimony, you work for a rather large accounting firm;

is that correct?
A. Yes.
Q. How many accountants work at your firm?
A. Approximately 175.
Q. And it's fair to say there's a tremendous amount of work that goes on at Lurie Besikof that you are not involved in; is that correct?
A. I hope so.
Q. So let's focus on your own personal experience. When you say that there is experience with respect to the manufacturing side, the distribution side and the inventor side, are those all personal experiences of yours?
A. Yes. I believe, Mr. Techentin, when I answered the question, I said myself personally.
Q. And these are engagements as an accountant?
A. These are engagements as an accountant, yes, as a CPA.
Q. And who is it that you have represented within the toy or game industry as far as that is concerned?
MR. ZEULI: Your Honor, I'd like to raise one point here. This issue came up in Mr. Lapidus' deposition. There's some concerns on Mr. Lapidus' part in identifying clients of his firm of his that would then be dragged into this litigation unnecessarily.

So I wanted to just raise this with the Court. Maybe there's a way that we could deal with this such that that wouldn't happen. Maybe the Court can take an in camera review if that becomes an issue. But I wanted to just alert the Court to this issue, the sensitivity of identifying his other clients.

THE COURT: How would they be dragged into this litigation? What do you mean? I don't understand.

MR. ZEULI: To the extent that, you know, counsel for Hasbro attempts to go out and subpoena them, attempts to, you know, garner some type of information from them.

THE COURT: Discovery is closed. We're going to trial next month. I mean, I suppose they could issue trial subpoenas for his clients, but I kind of doubt that's going to happen because the main event is today. So I think it's an non-issue. So go ahead.

MR. TECHENTIN: Can you answer the question, please.

A. Your Honor, just in terms of our firm and myself as a CPA, I mean, the ethics that we have, I have confidentiality letters with some of these people and our ethical standards say our clients are confidential.

THE COURT: So you're saying that you feel bound by ethical constraints to not reveal the specific names

of your clients, is that what you're saying?

THE WITNESS: Yes. Your Honor, I have a list that contains those clients. I brought it with me, because I anticipated that this might be an issue because it was a question in my deposition. I'm more than willing, if you would like, or it's important for you in terms of making a decision to discuss these, I can do that with you privately.

MR. TECHENTIN: Your Honor, may I say one thing?

THE COURT: Well, we don't do things that way as I'm sure you understand, but we'll get to that list perhaps in a moment. Yes, Mr. Techentin.

MR. TECHENTIN: Your Honor, this did come up at Mr. Lapidus' deposition where I asked a substantially similar question and Mr. Lapidus declined to answer on grounds of confidentiality.

I would point out that there is an extensive confidentiality order in this case. And had it been provided to us in the course of discovery, they easily could have designated that information as confidential thus making it subject to a protective order that your Honor signed. Mr. Lapidus is fully familiar with that protective order having signed off on it in order to obtain confidential information in this case and even having designated his own report as confidential.

THE COURT: Slow down.

MR. TECHENTIN: I'm sorry, your Honor.

So this is -- I don't know what's happening, your Honor, but respectfully, I think Mr. Lapidus should either tell us who his clients have been so that I can ask him about them or not testify that he has experience in the toy and game industry.

THE COURT: Look, I think we can cut through this fairly simply. What I'm going to do is I'm going to allow you and direct you to answer the questions, but I'm going to place this portion of the testimony and anything relating to identification of specific clients in the record, I'm going to place under seal and make subject to the protective order that's previously been issued in this case.

In addition to that, I am going to put the attorneys in the case under an order, which I'm issuing as we speak, not to divulge any information that the witness relates with respect to the clientele of his firm. That makes all of the people in this courtroom subject to contempt if they were to reveal the names of your clients. The record will be sealed. We may or may not get into -- probably won't get into an issue at trial. I think this should accomplish the task.

Are you satisfied with that?

THE WITNESS: Well, actually, your Honor, I'm not, because I have a fiduciary duty also to those clients. If you would like to ask me questions about them, that's fine. If I can refer to them as Company A or Company B or Company C, I would be much more --

THE COURT: Why don't you pass the list up to me. Let me look at it. Let me see what we're dealing with here.

THE WITNESS: Some of them are competitors and --

THE COURT: You don't need to go any further.

I can hardly read anything on this. Your writing is really terrible.

THE WITNESS: Fortunately, I'm testifying. Sorry, your Honor. It's notes that I made.

THE COURT: I understand. It's okay.

THE WITNESS: I'm more than happy to talk with you about them.

THE COURT: Can you identify these clients without revealing their names but give enough information about them and the kinds of work you do for them? In other words, whether the client is an inventor of toys of a certain type or is a business with sales in, you know, in the range of 3 to 5 million dollars. Can you give generic descriptors that are

specific enough to allow counsel to find out what it is you do for what kind of company? That's really what he's trying to get at.

Do you feel you can do that without violating your confidentiality agreements?

THE WITNESS: Yes.

THE COURT: Mr. Techentin, I think you might be able to work around this. Let's see if you can. We're trying to find out if he's qualified on licensing in the toy industry. There were maybe five or six on there, if you just take them one through five or six, whatever the number is, and let's just get the nature of the business and so forth. Why don't you try it that way.

BY MR. TECHENTIN: (Continuing)

Q. Can you identify the companies along the lines that his Honor has suggested.

A. Yes.

Q. Are they all companies? Let me ask that first.

A. Yes.

Q. Please do so.

A. Maybe I'll just refer to them as number one, but not any significance as to a top ten or something like that.

First one, your Honor, is a company that -- an

inventor that actually pays a royalty for a certain product, a toy, and is an inventor. As a company, has been inventing for products and has been a client that I work directly with in our office. We provide not only the consulting work on the licensing and advice in terms of royalty amounts and licensing amounts, also tax work and accounting work for them. They are currently in the process of developing -- they develop products on a regular basis. They are developing other toy products sort of as we speak, not only novelty toys but action figures, things like that.

Is that acceptable, your Honor?

THE COURT: Do you want to ask any further follow-up on that?

MR. TECHENTIN: Are we going to go one by one, your Honor?

THE COURT: It's up to you.

MR. TECHENTIN: I was just going to get the list. I may not have to ask about all of them if we get the list first.

THE COURT: That's fine.

THE WITNESS: The second company has -- they're manufacturer's reps for a lot of big box stores, by that I mean it might be Wal-Mart, Toys "R" Us, Target stores, companies of retailers of that size. I provide

the direct consulting and tax work on a variety of very popular toys. The volume of this particular client in terms of the toy aspect is probably in the billions of dollars. The representation is throughout the United States and internationally.

A spin-off of that particular group is another company that -- a newly developed entity based upon our consulting that I work directly with. Actually, all of these I work directly with, is now involved in out-sourcing of the manufacture of these toys, and it's specifically toys, in Asia or I'd say foreign countries outside the United States. They are toys that deal not only in the electronic toy area, the action figure area, and just say regular toys, kind of a standard toy.

The next client that I'm directly involved in and our firm has been involved in is an inventor and gets involved, generally, in design and manufacture, a lot of promotional items, board games. We handle and help them negotiate and work with the licensing. This client is very particular about retaining rights to products and very successful in what they do. Our firm does the consulting on those, as I said, the tax aspect of that and any accounting or auditing that would be required for those companies.

The last company is also -- and if I didn't say that, it's toys, too, I guess. I guess I described board games and whatever, generally, for toys.

The last company is toys and products. Probably one of the largest grossing toys in the country and developing a very proprietary product as we speak that would have -- has won awards, toy awards for its innovation and design. And the range, your Honor, could be -- product value of a specific toy could be in excess of a hundred million dollars for the inventors.

I'm sorry I can't give you the name.

THE COURT: Was that a manufacturer or an inventor or what?

THE WITNESS: It is a manufacturer, and they are in the process of negotiation now on the distribution. It may very well be competitors of Hasbro; it may not. It may be with a division. And working specifically with the inventors, actually very similar to Mr. Bowling.

Q. That was the last one, Mr. Lapidus?

A. Yes, sir.

Q. Let me follow-up on some of that. The first company that you mentioned, you described that as an inventor. What does it mean for a company to be an inventor?

A. In this case, what I mean is they are either individuals or owners who have -- their business is either inventing or developing toys or toy products, and their business and entrepreneurial efforts are in that area. So they may get involved in not only the invention itself, they get involved in using firms, law firms to patent that invention. They're involved, obviously, in the manufacture or distribution. They have to sort out who would distribute it, how they want to do that, what their goals are. Very similar to Mr. Bowling in understanding what a person's goals would be to develop a product and to make it marketable or think they have something that it is a success versus a failure. It's a business venture.
Q. Is this company exclusively involved in the toy and game market?
A. Yes, sir.
Q. Do you have any idea as to ballpark revenues that this company sees?
A. It's in the tens of millions of dollars. They're popular products.
Q. Do they actually invent these toys and games in-house, or are they some sort of broker?
A. They generally invent them in-house, kind of similar to Mr. Bowling.

Q. And in what capacity -- strike that. What accountancy work do you do for them?
A. I think I mentioned that I am directly involved -- first of all, they're clients of our firm, but I am directly involved in not only the consulting aspect of development of toys, the cost accounting if there are issues regarding maybe what toys should sell for or market for, I would get involved in that; in negotiations with the distribution; licensing versus royalty. In other words, how they want to make this product commercially feasible or make a business venture out of this product, really very similar to Mr. Bowling.
This is, in terms of the level, your Honor, of entrepreneurship, this is probably at a much higher level, many more products than Mr. Bowling has, this particular company, and does it very successfully.
Q. Maybe I took my notes incorrectly, but did you say that this is a company that actually pays royalties on toy products?
A. Yes.
Q. They pay royalties to some other entity company?
A. As one part of their business, they may pay royalties.
Q. They may or they do?

A. They do.
Q. They do pay royalties. Why are they paying royalties if they invented a product?
A. Because they may take someone else's product, refine it and joint venture it with them or bring them in and further develop the product or have the distribution channels. In the normal course of their business, they're not only developing toys, but by developing they may find someone that they want to work with it.
Q. So in that case, they'd be paying royalty to another inventor; is that right?
A. They may pay it to another inventor, yes.
Q. And just because you're using words that are sort of conditional like "may" or "would," is, in fact, that the situation -- is that the situation with this company, that they actually pay royalties to someone else who has developed a toy that they have taken in-house, modified and then marketed?
A. Yes. And they have also, just to be clear so I'm not hedging, they have a certain area that develops their own toys. They also have an area that they go out and seek other individual's toys that they might want to license or do something else with.
Q. And do they license their toys or their concepts

out to other companies?
A. Yes.
Q. And do you know what companies they've licensed out to?
A. Yes.
Q. Have they licensed it out to any major toy or game manufacturers?
A. Yes.
Q. And are you privy to those license agreements, both the in-licensing where they're bringing the concepts into their company and the licensing out of their own concepts?
A. Probably not all of them, but some of them, yes.
Q. And do those licenses call for specified royalties?
A. Yes.
Q. And what is the base for the royalties in those agreements? Is it based on sales, or is it a lump sum? How is it structured?
A. They are all individually negotiated.
Q. Do you know if any of them called for a royalty that's based upon a sales number?
A. Yes.
Q. I asked the question do you know, so maybe I'll be careful. Do any of those carry royalties that are

based on a sales number?
A. Yes.
Q. Do you know what the rate is, the royalty rate?
A. Are you asking about one agreement or in general?
Q. I'm not asking in general. I'm asking if you know as to any of them what the royalty rate is.
A. Yes. I know the range or a general range of what those agreements are.
Q. And what are those ranges? What is that range?
A. The range may be anywhere from -- in royalties, from anywhere from two to eight percent.
Q. So if I understand you correctly, you're saying that you're aware as to this company number one there are license agreements, whether they're in or out, which carry royalty rates based on sales of some -- at least one has two, at least one has eight and there might be some in the middle; is that correct?
A. That is the range, anywhere from two to eight.
THE COURT: That's gross sales or net sales?
THE WITNESS: You know, your Honor, that might be a rate, but they may have -- it's not uncommon to have up-front fees in addition. It's not uncommon to -- I mean, each agreement that you deal with really going back to the methodology of the Georgia-Pacific factors may determine the particulars of a licensing

agreement or a royalty agreement. And it is not just to say it's X percent of sales, because they're all very different.

That's why, I think, the methodology here in the Georgia-Pacific factors help sort that out and, in fact, one of the discussions or items that I will go through with clients is literally going through the Georgia-Pacific factors and that helps define their business purpose and their goals.

Q. Were you aware of these license agreements in February of 2006 when you issued your report in this case?

A. Yes.

Q. And did you take them into consideration in -- that is, as germane to the question of a reasonable royalty for an item in the toy and game industry, in arriving at your conclusion about a reasonable royalty in this case?

A. In terms of my credentials and background, I would take all those items into account because that is part of the methodology of the Georgia-Pacific factors. And my experience would take them into account, yes.

Q. Did you expressly consider them in your analysis, that is, did it make it into your report?

A. Well, I think it is a consideration. And I

believe that within the Georgia-Pacific factors that is part of my report, and that is part of who I am.

Q. Did you provide this inventor with any advice with respect to appropriate royalty rates for any of these licenses?

MR. ZEULI: Your Honor, I'd like to place an objection on the record, please.

THE COURT: Okay. Everybody's got to get closer to the microphones. Okay? The witness needs to slide that microphone up a little bit.

THE WITNESS: Excuse me, your Honor. Am I okay, your Honor?

THE COURT: You're all right.

You need to speak into the microphone. What was that?

MR. ZEULI: Thank you, your Honor. I'd like to object to the line of this questioning. It's not relevant to what we're here to do today, which is to determine Mr. Lapidus' credibility, and then whether he applied the proper methodology.

THE COURT: I disagree so overruled. Go ahead.

MR. ZEULI: Thank you.

MR. TECHENTIN: I might have to have that read back, your Honor.

THE COURT: All right.

(Pending question read by the reporter.)
A. I may have given him some recommendations, your Honor, over that period of time that he has been a client with us.
Q. Would those recommendations have gone to the rate for the royalties?
A. They may have, yes.
Q. Does that mean that you don't remember distinctly either way whether you provided that type of advice?
A. No. I really -- I believe I have. I just can't specifically say in one contract or another or one meeting or another. I'm sure it was discussed, and it would be. But to say it was on which specific product or which specific item over a period of time, I'm not sure I can say one versus another.
These are very active clients and participate in matters where things like that are discussed, so that would be in the normal course. But it comes as a recommendation, and not necessarily, your Honor, the final word is this would you do a study or perform outside -- an outside independent check to see if this is correct.
Q. Let's talk about your second client here for a second. You described him as a manufacturer's representative for big box stores. What does it mean

to be a manufacturer's rep?
A. That means that they will find products or have products presented to them, and they represent or have the business contacts at these large retailers where they present the merchandise, work with the retailer, the person in charge of, in this case, a toy department, the buyers to present product for sale. And it is not uncommon for a large retailer to work through specifically selected manufacturers' rep organizations.
That's, your Honor, not necessarily one individual, but they probably are more aligned like a retailer so that they work in a department. So you might have a manufacturer's rep that handles, for instance, sporting goods. You may have manufacturer's reps that work with toys; manufacturer's reps that work with cosmetics, shampoos. And this particular company that I've identified happens to work in toys.
Q. You've indicated that the sales volume they accounted for, did you say it was in the billions, with a B?
A. Yes.
Q. Is that just in toys and games?
A. Yes.
Q. This isn't a company, though, that would be

distributing the products under license, isn't that correct?
A. That's correct. Excuse me, sir. Just to interpret it, it's the value of merchandise.
Q. I understand. You're not saying they themselves get billions of dollars in revenue?
A. I wanted to clarify that more for the judge.
Q. Buy my question is really how they do business. They aren't a licensee of these products that they are then selling as their own products, correct?
A. Yes. They are representing and the relationship -- what is interesting is it's a relationship with the retailer and the manufacturer and it draws upon part of this retail cycle and the ability to put merchandise into stores that's commercially successful.
Q. Have you ever seen any license agreements that this company number two has with respect to toy or game intellectual property?
A. I don't recall that I have. I don't think so.
Q. You described your third company as being a spin-off of number two. Does it work in the same way, or does this company work in some different way than what you described as this manufacturer's rep?
A. It actually has more of a relationship with the

inventors, does some of the research on products. So because of the success of the first company, they are now working more with inventors to have products manufactured, generally outside the United States, and is -- I think I could say a logical extension of the business that they're involved in, in the toy business.

Q. Are you aware of whether or not this third company has license agreements where it has licensed toy or game intellectual property from inventors?

A. This is a newer company that is just getting started in licensing. They do have agreements, and licensing agreements, yes.

Q. So this company has licensed some sort of toy or game technology from someone else?

A. Yes.

Q. And they're paying royalties on that?

A. Yes.

Q. Are the royalties calculated on the basis of sales?

A. Either sales or units. Units meaning product.

Q. And in the case of the agreements that are calculated on the basis of sales, is the royalty expressed as a percentage of those sales?

A. Yes.

Q. What's the percentage?

A. A similar range as to the first example, and generally somewhere in the two to eight percent range.
Q. I'll ask the question again. Does that mean that there are actually contracts of which you are aware where there is a royalty of two percent of sales, or do you not remember the numbers exactly and you just recall that they're in that range?
A. Actually, I think the range is in the higher end. I think it's probably more in the eight percent range, which I remember.
Q. The fourth company you identified was another inventor. Does that mean that this is someone who's actually creating their own toy and game concepts?
A. Yes.
Q. And they licensed those to others or no?
A. Yes.
Q. And are you familiar with those license agreements?
A. Not as directly with this particular client. I will consult on them. They have -- they're very experienced not only inventors but product folks. I do attend meetings where those items are discussed, but they have a very sophisticated not only inventorship network but distribution network.
Q. But you're not familiar with their license

agreements, the terms of their license agreements?
A. Not completely, no.
Q. Do you know about the royalty provisions in those license agreements?
A. Yes.
Q. And do they have royalties expressed as a percentage of sales?
A. Generally, yes.
Q. And do you know what the royalties are that are specified in those agreements?
A. They have been anywhere from -- the range would be anywhere from 5 percent to about 12 percent.
Q. What's being licensed there?
A. Well, this company has not only -- within their portfolio of products not only just toys, but they also have board games and -- well, generally, in the toy department. So it may also include, for example, action figures, items like that.
Q. My question wasn't what was in their portfolio. My question was what was being licensed.
A. Those products. I'm sorry.
Q. All of them?
A. Generally, yes.
Q. And a typical license for this client would be that they have a board game, for example, and they

would -- and the board game is called XYZ, and the license would be for the game XYZ; is that right?
A. Yes.
Q. The last company you identified --
THE COURT: Mr. Techentin, I think we should probably take a break for the court reporter's benefit. So let's take a ten-minute break. We'll reconvene at 11:25.
(Short recess.)
THE COURT: Go ahead, Mr. Techentin.
MR. TECHENTIN: Thank you, your Honor.
BY MR. TECHENTIN: (Continuing)
Q. Mr. Lapidus, with respect to this fifth and last company that you've identified, this is a toy manufacturer?
A. This is a -- an inventor similar to Mr. Bowling.
Q. And you said that this company accounted for one of the largest grossing toys in the industry; is that right?
A. Yes.
Q. And they have other products as well; is that correct?
A. Yes. Excuse me. Other toy products.
Q. Other toy products?
A. Yes.

Q. Do they have products other than toys?
A. Not to my knowledge.
Q. Just to be clear, are they doing games and toys or just toys?
A. I don't know. I don't know. I don't think I know their full range of products to know if they do games.
Q. Does this company manufacture and distribute its products?
A. No. They're inventors, inventorship really very similar to Mr. Bowling.
Q. So their products are distributed under license?
A. They -- yes, but they may look for, depending on the product, to say out-source the manufacturing more because of the quantities involved.
Q. I'm not sure I understand, and let me make sure we're on the same sheet of music. In a licensing situation, typically, the licensor, the inventor in cases like this, would grant a license to the licensee with respect to whatever the product is; is that correct?
A. Yes.
Q. And then the licensee would go out and have the product manufactured and sell it, correct?
A. Yes.
Q. And there would be an accounting by the licensee

to the licensor of royalties based on whatever the agreement says; is that right?

A. Generally, yes.

Q. In that circumstance, the licensee would be the entity that would be responsible for manufacturing, selling, distributing and so forth, correct?

A. Yes.

Q. My question with respect to number five is, is that how it worked? That is, is it the licensee's of number five that are actually manufacturing, selling and distributing these items?

A. They have many product lines or many different products, and some are worked on a license arrangement and some they manufacture.

Q. Okay. So some of their invented products are dealt with entirely in-house.

A. Yes.

Q. And there is no licensing agreement involved?

A. Correct.

Q. As to the products where there is a license agreement, though, they do not undertake the manufacture?

A. That is correct. They will make a decision, and I have participated in meetings where decisions like that are made based on a variety of factors.

Q. Decisions as to whether to license?
A. Decisions as to whether to license, yes, or continue to pursue the product or modification or cost studies on these products.
Q. And as to the licenses that this company has for toy products, do they carry royalty arrangements which are expressed as a percentage of sales?
A. Generally, yes.
Q. And what are those rates?
A. Similar ranges to what the other clients that we have are.
Q. Do you know what the specific rates are for any of this company's contracts?
A. Yes, I have seen them. And, again, because there are many different products, I can't tell you -- I can't reference one versus another, so that's why I'm giving you a range.
Q. And the range you gave is the same range you talked about before of two to eight?
A. Yes.
Q. Let me ask you a question generally about all of the companies that you've identified that do business under license.
As to all of those products, is it true that the licensee manufactures, sells and distributes the

product and the licensor's responsibility is really the delivering of the intellectual property to the licensee?

THE WITNESS: Can I have that question read back, please.

THE COURT: Yes.

THE WITNESS: Thank you.

(Pending question read by the reporter.)

A. I think it would depend on the specific agreement, and they may have -- the licensor may have some additional responsibility or some additional follow-up or additional development. I think it just depends on the situation.

Q. Are there any of the licenses for any of these companies that do business under license in which the licensor actually manufactures the product?

A. Yes.

Q. Which company?

A. Actually, the -- probably the relationship between the second and third companies.

Q. Can you explain that, please.

A. Well, they have, as part of the success of the initial company, they also set up a manufacturing division, your Honor, and kind of research of products so that they may have one company do the manufacture

and transfer that product then to another company. That is not uncommon. In fact, there might be something called transfer pricing or that term that you might see. So they sell businesses, from time to time sell -- you could say sell to each other, but they might sell from one division to another division. It's one division or one company's responsibility, even though it's the same ownership, to handle the manufacturing under an agreement with the company that is also owned by the same people and do the inventorship or develop the formulary.

Do you understand? I hope I've explained that properly.

THE COURT: I'm going to let Mr. Techentin follow it up.

MR. TECHENTIN: I think I can follow-up, your Honor.

Q. Leaving aside situations where the licensor and licensee might be related entities, are there any circumstances -- are there any licenses among these that you've testified to where the licensor is responsible for manufacturing?

A. I don't know. There may be. I'm identifying some very large, successful companies that may very well have been the arrangement or is currently the

arrangement, and I just have to think a little bit about that, actually.

Q. Are there any agreements of which you're aware amongst these various licensing arrangements, again, leaving aside related companies, are there any license agreements where the licensor is actually selling the product to the licensee?

A. Yes. I believe there are situations where that is the case.

Q. Which company?

A. It may be -- well, I can think of situations where that may be the case, actually, in all of these. Particularly, where there's inventors, because the patent may be held outside of the company with an individual, and then you have licensing with the individual and, therefore, that would create -- or I could think of a scenario, actually, that would create that relationship where the licensor is actually doing some of the distribution I think was the question.

Q. With all due respect, Mr. Lapidus, I'm not sure if you're testifying that you know about these things or don't know about these things.

My question is are you aware of any licenses where the licensor, where the inventor of the product is the supplier for the licensee who's out there

distributing products?
A. I believe in one company that may be the case, that they have contracts that that may be the case.
Q. And would you agree -- let me try and go at it the other way. Would you agree that that is the exception rather than the rule?
A. I know it happens so I can't say if it's an exception or the rule. And it happens. And --
Q. How many agreements are we talking about here? You've identified several different companies that have licensing arrangements. You've been a little vague in terms of the number that they have. But are we talking about a total of six or seven license agreements that you're familiar with or 60 or 70, or can you give us any estimate?
A. More than a hundred.
Q. More than a hundred license agreements. And you can think of possibly one among those one hundred where the licensor is the supplier; is that right?
A. No, I don't think that was my testimony.
Q. Can you explain what your testimony was in that regard then?
A. I believe that there are some situations where, in response to your question, that the licensor would be handling, also handling the distribution.

Q. My question was about manufacturing.
A. Excuse me. Manufacturing. If I said distribution, I misspoke. Manufacturing.
Q. So out of the more than a hundred, how many situations are we talking about where that might occur?
A. I don't know exactly. It might be ten. It might be eight.
Q. Move along to some of the information that you considered in the preparation of your opinions here.
One of the sources of information that you identified to Mr. Zeuli was Royaltysource. What information do you get about a license agreement from Royaltysource.
A. Royaltysource generally gives you a reference as to -- generally by category as to the type of licenses that have been entered into or that are available, and royalty rates may describe some unusual circumstances. It is really used as a reference, reference point on a specific product.
Q. Royaltysource doesn't provide you with the agreement itself, correct?
A. It does not.
Q. It provides you with some general information about what the product is that's being licensed and as much information as they have about material terms; is

that correct?
A. Yes.
Q. So it will give you a rate, for example, but might not give you a royalty base. To go to the Judge's question, gross sales versus net sales, for example?
A. Well, yes. I think, as to the Judge's question of gross sales versus net sales, your Honor, it's generally based on net sales. And because of either returns or defective product or may have some terms of sale, and those might be some of the standards. So I think over time net sales is probably more a benchmark.
Q. And when you performed your review of Royaltysource information, you were only able to locate two agreements that you considered to be comparable; is that correct?
A. Yes. As one source.
Q. You identified those two contracts in your report, correct?
A. Yes.
Q. And those were the Phase 10 dice game and the Magic card game?
A. Yes.
Q. You didn't identify any of the license agreements that we've just been talking about with these five different companies that you've been personally

involved with in your expert report though, correct?
A. Due to the confidentiality of the agreements, the answer is, yes, I did not identify them. And due to the confidential agreements, I would not identify them.
Q. You didn't identify them as being contracts that you were familiar with but couldn't disclose them because of any confidentiality. You didn't make any reference to them at all in your report, isn't that correct?
A. Yes, I did. In terms of my background and evaluating the 15 Georgia-Pacific factors, I have that information. And I'm not going to identify specific contracts, but I have that body of information sort of within me and within something that I would use. And that would qualify me to be able to talk about the toy industry.
Q. Just so we're specific, on page two of your report, you talk about your own qualifications and you write: "As result of working with our client base, I am familiar with distribution channels and the financial aspects of licensing for a variety of industries."
Is there any other reference in your report to your experience in the toy industry or your familiarity of license agreements in the toy industry or anything

else that we've been talking about with respect to these five companies?
A. I think the answer is yes. And it is in the taking into consideration the 15 Georgia-Pacific factors, that would be something that I would take into consideration. And therefore, it is embodied in the pages in my report. And that was questions that were, specifically, asked of me at my deposition, and I responded the same way, that I did have the background in the toy industry.
Q. Did you, in fact, or do you, in fact, today -- let me ask it that way. Do you, in fact, today consider any of these license agreements that exist with these five undisclosed companies as being comparable to the hypothetical license that you were evaluating in this case?
A. Yes.
Q. Based on your experience in the toy and game industry, and specifically with your experience with respect to licensing agreements for toy and game intellectual property, do you know if there is any industry standard for royalties in the toy and game industry?
A. Yes and no.
Q. Yes and no, meaning you do know and you don't

know, or what do you mean by that answer?

A. Yes, in that there may be some standards, but depending on the popularity of the game, the timing of introduction, really in evaluating the Georgia-Pacific factors and in today's competitive retail environment, it is subject to negotiation.

And your Honor, today's retailers, in fact, include -- they include more than just, for example, the toys. They may talk about a toy product, but because of merchandising, they may want to include, for example, jewelry or they may want to include T-shirts or anything, for example, that may have a specific symbol so that it is far more complicated than just necessarily one item under one circumstance.

Q. Understanding that the industry standard may be subject to negotiation under individual circumstances, what is the standard in the toy and game industry for the licensing of a toy or game concept?

A. I think the ranges that I gave for our clients are a fairly representative range and -- but it is subject to the terms, the negotiation, the specific circumstances and popularity of the toys or the novelty.

Q. So you're saying that your understanding of the industry standard is that without any ancillary factors

being taken into consideration that might be the subject of negotiation, a toy or game concept would ordinarily command a five percent royalty on net sales, or a two to eight percent royalty on net sales; is that correct?

A. Yes. But I think the ancillary factors are as important and the methodology of the Georgia-Pacific factors are equally as important as to any type of standards because each contract is negotiated. There are time periods. There is a lot of up-front payments and a lot of reasons why those standards may or may not be used or agreed upon.

Q. Would you, given the fact that you think that two to eight percent is the industry standard, would you disagree that five percent is the industry standard?

A. Well, that's within a range. I believe I gave you a range, and, therefore, that number is within the range. But I really express it more as a range as opposed to a specific number. That's why you turn to 15 factors to better isolate what is being negotiated.

Q. In preparing your report in this case and in educating yourself with respect to the parameters of this hypothetical negotiation that you were considering, what did you do, if anything, to educate yourself as to what the industry standards were with

respect to licensing rates for toy and game concepts or components?

A. I think I have just discussed my background, so I won't go through my background, and my working and understanding of this industry.

In addition, within my report, I worked through the methodology of the Georgia-Pacific factors and talked with the appropriate people, I guess, or the inventor to understand what their goals were based upon the assignment that I was given.

Q. Let me ask that specifically. You talked with Mr. Bowling. Did Mr. Bowling say, you know, there's an industry standard out there that is a ballpark figure for starting off on royalty rates, and it's X? Did he say anything like that to you?

A. No, I don't believe so.

Q. Did you ask Mr. Bowling that question?

A. I don't recall if I did or not.

Q. Did you --

A. Actually, I probably did not ask Mr. Bowling that question.

Q. Did you consult any books or articles or pamphlets or any printed publications that might inform you as to whether or not there was an industry standard other than what your own background had provided at that

point?
A. No. My own background provides -- I have read information over a lengthy period of time, worked with clients in the industry so that I have a very good working knowledge as to what the industry is, what these products are, the specialty items to the extent they're specialty products or specialty toys, and understand the Georgia-Pacific factors.
Additionally, Royaltysource gives you a pretty clear update, even though there were a limited amount of items, a very current resource as to what that standard is rather than anything else. And because I'm working in the industry, I think I have a good knowledge of it.
Q. Let's actually go through some of your analysis of these Georgia-Pacific factors. If you could take a look --
THE COURT: Before you get to that, there's something I'm a little confused about. I think this might be an appropriate place to ask him. I'm reluctant to interrupt the flow of your examination, but I'm going to do it anyway.
When you talk about a rate of two to eight percent on net sales or roughly on net sales, Mr. Techentin asked you a question that was directed to

both components and concepts. And what I'm struggling to understand here is that seems to be such a broad figure that could apply to so many components.

I mean, for example, a game could have 15 different components. And if everyone was getting five percent on net sales for 15 different components, how would that make any sense? And if the concept was generating another -- so I'm trying to make sense of this.

Are you saying that that's the way it works, that the ranges that you have talked about apply in the industry irrespective of whether what is being licensed is a single concept versus a game that involves multiple concepts and multiple components?

THE WITNESS: Both, your Honor. It may be that the importance of one particular item versus another may dictate that particular rate, or, in fact, if the rate may be too high or they may find an alternate source. May find something else. It might just get to cost that they could not reach an agreement, and they have an alternative.

And so I think the complication is really sitting back and, you know, looking -- with a methodology, you really sit back and look at, A, what you have, the importance of what you have, and your

ability to market it. And it might be marketed or agreed upon one set of circumstances or isolated to another set of circumstances. I just can't necessarily tell you on every item, but that is the process, those 15 factors are the methodology that you would go through to determine what a royalty would be.

THE COURT: So you're saying that where there are multiple components to a game, that part of the process, and I guess this was taken up by the Georgia-Pacific factors, is the relative importance of the component in relationship to the overall game concept and the other components involved in the game, and all of that would be sort of factored into and part and parcel of the negotiation. Is that a fair way of characterizing what you're saying?

THE WITNESS: Yes, sir.

THE COURT: So then the task here is, in some way, in this hypothetical negotiation, to factor in the importance of this particular component as it relates to the game itself and all other components in the game. Is that a fair statement?

THE WITNESS: Yes, sir.

THE COURT: Now, in reference to your two- to eight-percent range, keeping that in mind, does your report conduct that evaluation? Does it evaluate the

importance of this die concept in relationship to the overall game and other components involved in the game?

THE WITNESS: Yes, I believe it does. That is --

THE COURT: How does it do that?

THE WITNESS: Through the Georgia-Pacific factors, so that you are negotiating a contract at arm's-length on one item. Wouldn't necessarily have to be in games, but you're negotiating on one item. And it would take into account the various considerations that both sides would have in reaching an arm's-length transaction and agreement as to licensing of the use of that product.

And clearly, both sides know that it might -- you know, what the use is going to be and the relative importance. They may take into account -- well, I guess they would take into account the relative importance as to what that item means, whether it be in a game or a part of a motor or --

THE COURT: Well, you say both sides know its relative importance. I'm not trying to argue with you, but that's not really true, is it? The inventor, Mr. Bowling, doesn't know the importance that Hasbro places on the item. And I guess the next question is how do you know -- how do you figure out what level of

importance a company like Hasbro places on this particular component to try to recreate this hypothetical negotiation?

THE WITNESS: Well, in this case, your Honor, he may have an idea because the product was already in a box with advertising on it advertising his product. So you do have an exchange of information that would -- not in a litigation setting, but at least he sees that his product is -- his item is there. It is being advertised. And that places -- if you understand the retailing cycle and the timing here, which I think is also important, they would have some decisions to make here fairly quickly. And I think that places a relative importance or he could determine, anyone can determine the relative importance of that particular item to the manufacturing.

THE COURT: So what you're looking at is his subjective impression of how the product is being marketed and the extent to which it highlights, if you will, the dice as well as your own look at the product, I suppose, and within -- using your own knowledge of the toy industry, what you think of the way in which the component is described and marketed as part of the selling of the product. You take all of that in. And from that, you derive a conclusion as to importance.

On a scale of one to ten, you decide it's seven in level of importance based on those things.

THE WITNESS: Yes. And I suppose just for information so what happens if you're wrong, if you have this perception and in a real, live situation and you're wrong and you think that it's more important than it really is. They find another product. They might find something that they could use that doesn't have any restrictions, or they might have an ongoing negotiation with someone else and feel that they could substitute one item for another item. And from a marketing standpoint, it might be okay. From a business standpoint, it might be okay.

THE COURT: I understand that concept in a very general sense. In other words, what you're saying is that the market provides a kind of a check, if you will, on your conclusions about relative importance, but what I don't understand is -- I understand the theory of that. I don't understand how it applies in this case.

In other words, you're talking about a hypothetical negotiation. How can you tell as a matter of how the market functions when a party like Hasbro would have walked away from the table and said, well, we'll go get this other dice? How can you possibly

evaluate that?

THE WITNESS: In the hypothetical negotiation, you can't say that they would walk away. That's why you believe or my conclusion is that 58-and-a-quarter cents per die, that an agreement would be reached. And that is the conclusion based on those factors.

But in real life, that's the other thing that happens, because sometimes inventors think it's a great product only to find out in some discussions it's probably not as good as what they thought, or it's much better than what they thought.

And in fact, there's -- and my experience and background says sometimes you have something that is really much more valuable than what you started out with.

THE COURT: Well, I'm probably really messing up Mr. Techentin's examination so I'm going to stop, but I may come back to you later.

MR. TECHENTIN: Your Honor, obviously, your Honor's understanding and interpretation of what he's saying and its rationale is more important than mine, so I welcome the interruption.

THE COURT: All right.

BY MR. TECHENTIN: (Continuing)

Q. Mr. Lapidus, you issued a report in this case and

that's been entered as an exhibit. I'm going to ask you some specific questions that arise out of that report, but just so the Court appreciates it, your methodology sort of in a nutshell was to look at each of the Georgia-Pacific factors, identify the facts that you thought were pertinent to that factor, and to draw a conclusion as to whether that factor on the whole would tend to increase or decrease or not have any impact on what the end royalty was. Is that fair?

A. Yes, but they're taken, really, in total. So you don't -- each factor sort of interrelates, and you may not necessarily repeat in one factor some of the issues that are found in another factor, or, otherwise, you'd have a very, very long report. It's just summarizing some of the items that were taken into consideration in each of those factors.

Q. But mechanically, you didn't, for example, look at a factor and say, well, you know, this factor contributes some numerical percentage or dollar amount to the value, and do it that way. You just said this one would increase it or not, or decrease it, right?

A. Yes. There is no other methodology such as you -- as I stated before in my testimony, it's not a specific increase or X percent increase or decrease.

Q. There are 15 factors in the Georgia-Pacific

analysis. And in this case, how many of those 15 factors did you find would tend to decrease the amount of the royalty?

A. I'd have to go through and look. I think --

MR. ZEULI: Your Honor, I'd like to make an objection. This is really going to the weight of the evidence, doesn't go to the admissibility.

THE COURT: Okay. Overruled.

A. I believe 12.

Q. Twelve of the 15?

A. Yes.

Q. Would tend to decrease --

A. Excuse me. I thought you said increase. Three of them, I believe, have no effect, and 12 would increase.

Q. So the answer to my question was that zero of the factors decrease the royalty in your report, correct?

A. I don't know that they would decrease, but they do not have an effect. I don't know that that is necessarily an increase or a decrease.

Q. Right. So we've got 15 factors. We've got 12 that would increase it, 3 that you find to be neutral and zero --

THE COURT: Which ones are neutral? I'm just looking through them. It seems like all the sentences at the end tend to say this would increase royalty.

THE WITNESS: Thirteen, your Honor.

THE COURT: Thirteen?

THE WITNESS: Number 13, number 14 and number 15 is the conclusion.

THE COURT: Well, maybe I didn't read the whole thing, but the last sentence says, this factor -- oh, I see, not tend. Maybe I'm reading too fast. 13 and 14? I'm not sure what that means, "See opinions and analysis included in my report." So it's your own --

THE WITNESS: That is my opinion, yes. It's one of the factors.

THE COURT: Your own opinion as one of the factors. Okay.

THE WITNESS: That's how the 15 factors are listed, sir.

THE COURT: All right. Go ahead.

BY MR. TECHENTIN: (Continuing)

Q. And these 15 factors are well-established as a measure of royalty damages in patent cases, correct?

A. Yes.

Q. And you're familiar with them as an expert witness, correct?

A. Yes.

Q. You've performed royalty analyses under the Georgia-Pacific factors on multiple occasions prior to

this case, correct?
A. Yes.
Q. So you didn't have any question about what the factors meant when you wrote your report, did you?
A. No, I don't believe so.
Q. Let's look at your first -- the first factor. That factor reads, as you've recited in your report, "The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty." And you note that Mr. Bowling has not licensed the patent, correct?
A. Yes.
Q. In other words, Mr. Bowling has not received any royalties for the licensing of the patent in suit, correct?
A. Yes.
Q. So if there are no royalties, those royalties can't be used to prove or can't be seen to tend to prove an established royalty, correct?
A. Yes.
Q. But you concluded that in light of the fact that he has not patented it, that would increase the royalty, correct?
A. Yes.
Q. And other than adding the sentence, "The patentee

sells patented die," there's no other analysis that attends your conclusion that factor one would tend to increase the reasonable royalty, correct?

A. Well, my background and understanding of this factor tend to say that anymore than in Mr. Sussman's report it was a shorter sentence than that. So that's what I believe, and that's why it is written that way.

THE COURT: Wait. It seems to me that the first factor is a way of establishing a reference point from which other things can be measured. Do you agree with that or disagree with that?

THE WITNESS: I agree with that.

THE COURT: You agree with that. Now, if Mr. Bowling hasn't patented the die and doesn't receive any royalties, then how do we know what the reference point is for considering other factors? Where do we get the reference point?

THE WITNESS: The reference point, your Honor, would be going through the other factors, if they're -- well, basically, this says that rather than having a reference point of whatever that would be, you need to work through this negotiation to decide, to determine it. And that is basically the other 14 factors.

So now you start isolating, which sounds like we will go through the other factors and determine what it

should be in absence of an amount. But the reason why I believe this would increase is it tends to show that there is demand, that there is a reason and a purpose for it, that someone is asking for that product as opposed to not. That's my opinion. You may not agree, but that's my opinion.

THE COURT: Right. Well, I don't know if I agree or not, and I'm simply trying to -- this is sort of a frustrating exercise, not you frustrating, but the exercise of the Georgia-Pacific factors is kind of a frustrating exercise. It seems to me it might work if you have a reference point. But if the reference point is floating, if the reference point is undetermined, then my concern is that you're layering subjectivity upon subjectivity.

So I'm, I guess, telling you that because I want to ask you have you, in all of your other experiences as an expert on royalties, have you ever dealt with a situation where the reference point is not established or is that, in fact, how it always works in your experience, that there is no royalty reference point?

THE WITNESS: Your Honor, more cases than not it's been my experience where there probably is not an established reference point as to this first factor. And I guess that's why you go through the other 14.

That's why it is a judgment based -- this methodology seems to try to mirror, you know, what would happen if, how can we agree, we have to come to an agreement; and, therefore, these are the factors or these are the items that you take into consideration. And that's why you can't have a scale of one to ten on each item or say it increases it, sir, an eighth of a percent or something like that. It is trying to do a hypothetical negotiation. And so I think you understand that.

THE COURT: Okay. Thank you. Go ahead, Mr. Techentin.

THE WITNESS: That's the standard -- excuse me. The Georgia-Pacific factors is the methodology.

Q. Mr. Lapidus, if I understood your testimony correctly in response to his Honor's questions, you said that in most of the cases in which you've been involved, there would not be an established royalty such as is called for by factor one. Did I understand that testimony correctly?

A. Yes.

Q. Well, is it the case in each of those situations where there is not an established royalty that the lack of an established royalty would increase the amount of reasonable royalty that you're concluding?

A. No. I think that's not the -- we may disagree as

to my explanation, but I think what I'm establishing in the first factor is that there is demand. And so, therefore, it would tend to increase a royalty. And I guess that is the issue or that's why it is written the way it is.
Q. I'm sorry. There's demand? I don't know what you're referring to there.
A. That someone is asking for the product and wants to license it and wants to use it, in this case in a game, as opposed to having no demand and not ever having seen the product and not even using it, I guess.
Q. So if I understand you correctly, what you're saying is that your analysis of factor one is that the increase would stem from the fact that there exists some, whatever it is, level of demand for the products as evidence in this case by Hasbro seeking to license the dice from Bowling; is that right?
A. Yes.
Q. But wouldn't that be the case in every single patent infringement case where you're trying to do a hypothetical negotiation with the Georgia-Pacific factors?
A. Yes. I mean, it may be. The fact that he has not licensed it before -- if he had licensed it, that exact product, then you would have a value. You would know

what has been acceptable or agreed to before. And in this case, he has not tried to do that or there has not been demand for him to do that, and that is why I concluded the way I concluded.

Q. Your statement -- and this occurs in many of your -- many of the factors, that this factor would tend to increase the reasonable royalty. I think I know what the answer is going to be, but increased by how much?

A. I think as I stated before, there is not -- it is not designed -- the methodology within the Georgia-Pacific factors do not increase or decrease any specific amount, or there is no formula that says or mathematics that say it is the increase of X percent. It is the combination of all of those that are considered in arriving at a royalty, a reasonable royalty.

Q. I think what you're saying is that the Georgia-Pacific factors are to be weighed by the expert without a strict limitation that factor one is worth two points and factor two is worth five points. But isn't that your role here, to weigh the relative factors in determining what the reasonable royalty would be?

A. No. It's to weigh them and take into account the

methodology of all 15 factors, not necessarily any specific one or another. It is all of them.
Q. So with respect to factor one, is it fair to say that you don't have any idea how much value to this hypothetical license this factor would bring?
A. No. Not a specific royalty amount.
Q. It would just increase the royalty in some fashion?
A. Yes.
Q. Increase it over what?
A. In terms of the negotiation, it would have a tendency to increase the royalty as opposed to a factor that either may not or not have an effect in this hypothetical negotiation.
Q. So is it the case that when you prepared this analysis, you didn't have any standard from which you would be increasing or decreasing?
A. In this case, because -- the answer is yes, I did not have a standard other than my knowledge of the industry has given me some ranges, and my experience in doing this.
Q. So are you saying that your standard, such as it was, is this two- to eight-percent range?
A. I think it is all of the licenses and my experience in working with clients of this nature that

would bring me to the conclusion that I got to, whether it is an increase or what tendency that factor would tend to have on the hypothetical negotiation. That is the methodology.
Q. But I'm not asking about the methodology. I'm asking for whether or not you had a starting place when you started to apply these factors that would tend to push things up or down. Did you have a standard?
A. Actually, yes, you do have -- there is a place to start, and that might be the relative or would be the relative selling price of this item. But it's not necessarily --
THE COURT: What item? The dice or the game?
THE WITNESS: The dice. The die.
Q. Did you use the selling price for the dice as a standard or as a starting point with respect to your royalty analysis?
A. No. Not necessarily.
Q. So did you have a standard, when you were doing this royalty analysis, did you have a standard or a starting point from which you would deviate up or down, as it happens only up, in determining the royalty rate?
A. My own experience would give me a range and at least an idea, but I have to be open in reviewing the factors to determine -- not necessarily have a

standard. So I did not have a standard.

THE COURT: I'm going to interject again. This is an important point, and it does go to methodology.

Is what you're saying about your methodology that you looked at all the Georgia-Pacific factors and evaluated where, within a rough range of two to eight percent, the royalties should fall based on your evaluation of the factors and given that they all tended to increase, you fall more to the high end, is that what you're saying is your methodology?

Or are you saying that the application of the factors includes within it this two- to eight-percent range that you know from your experience because that's part of your background and part of your qualifications and who you are, but it also includes other things, and you just kind of put it all together and make an assessment in light of that and in light of the price of the die and so forth what the royalty should be? Does that question make sense?

THE WITNESS: I think, your Honor, it's probably both of those, but I think it tends to the latter. You have my knowledge base that I know what a range is, and then you are moving, based upon these factors, you have a tendency to move kind of one direction or another. And each situation is particular. That's why you

analyze the factors. But I think my industry experience kind of takes me to know what these licenses are, where they generally come out. The difference is that each one is different. It might be unique. There might be other terms, and that's really the art of doing it are evaluating the 15 factors.

Q. Mr. Lapidus, you understood that you were responsible to put in your expert report the facts and the reasoning that underlay your conclusions, correct?

A. Generally, yes.

Q. And it's a fact, isn't it, that your expert report nowhere makes any reference to any preconceived notion that you had, based upon your experience, that there existed some range of royalty rates that would be applicable to situations like this one?

A. No, I don't think so.

Q. Your testimony is that your report contains a reference to your background informing you that there exists a range of two to eight percent that would be standard?

A. Yes. And one of my backgrounds is looking at the Hasbro contracts. And the second item, the second factor shows the rates that they are paying. And due to the confidentiality, I just can't disclose all of the other contracts and as to what they are.

Q. Let me ask the question perhaps more artfully. I want to be as particular as I can.

Does your report anywhere disclose that independent of the documents you reviewed that stemmed directly from this case, your background and experience had informed you that there was some industry standard or standard range of royalty rates that would be applicable in this situation?

A. Yes.

Q. Where?

A. I believe in my resumé, I say as a result of working, on page two, working with our client base, which we have talked about, I am familiar with the distribution channels and financial aspects of licensing for a variety of industries.

Q. That's where you disclose the fact that you would use two to eight percent as a back-drop for the negotiation?

A. I think that is my background that I have, and at least in this industry, and my experience. That's all I have.

Q. So let's move on to the second factor, and that's the rates paid by the licensee for the use of other patents comparable to the patent in this suit. The licensee here would be Hasbro, correct?

A. Yes.
Q. And so factor two calls on you to look at other Hasbro arrangements that are comparable and to decide whether or not -- or how that informs your decision-making; is that right?
A. Yes. That is one factor, one item.
Q. One item among the 15, you mean?
A. No. Just that what Hasbro -- as to this factor number two, this relates to what Hasbro has paid for other patents comparable to the patent at suit.
Q. So you actually looked at some Hasbro agreements, correct?
A. Yes.
Q. And did you decide that every Hasbro agreement that you looked at was comparable?
A. No. It gives me an example or a tendency as to what Hasbro is licensing and paying under some circumstances. I also have my own background, which tells me a range.
Q. Well, which of the Hasbro contracts did you think were comparable?
A. I think all of these, all of the contracts probably were more for an entire game or toy concept, but I believe it gave me some information as to what Hasbro is paying for -- what they are paying for

royalties, what their agreements are.
Q. Do you think that a royalty arrangement on a toy concept or a game concept is comparable to the royalty arrangement for a component of a game or a toy?
A. Depending on the importance of that item, it may be.
Q. As you reviewed the Hasbro license agreements that you talk about in this factor, were you able to discern any rhyme or reason why one might be at one percent and one might be at eight percent?
A. Yes.
Q. What factors would contribute to a lower or a higher rate?
A. Many of the 15 factors would contribute to that. So whether it might be exclusive or it is not exclusive -- one contract, as I recall, an agreement I reviewed had some issues regarding litigation that was settled. It might call for advance payments that might reduce the amount of the royalty. So each agreement has it own terms and understanding and license arrangements. So they might include more, have stricter terms with them where they could not include jewelry or retail items and some were broader. And that might dictate what the rate is. Some might have fixed prepaid amounts and guaranteed amounts, and some may not.

THE COURT: I may have missed something in your testimony. Did you say that the agreements you reviewed included agreements both for components and for games or game concepts or just game concepts?

THE WITNESS: I think the Hasbro agreements, your Honor, were more for games rather than -- or game concepts rather than a game component.

THE COURT: You may not know this, but -- well, let me ask it to you this way.

Did you ask for, or did the attorneys representing Mr. Bowling ask for agreements relating to game components?

THE WITNESS: Well, I think I asked for all the contracts or all that were available. I don't know if they specifically asked. And I specifically asked for the Monopoly.

THE COURT: You asked for all of the agreements that related to the Monopoly game?

THE WITNESS: Yes.

THE COURT: Okay.

THE WITNESS: And, obviously, also other agreements. Those were part of the discovery process.

MR. TECHENTIN: Your Honor, I can make some representations in that regard, and Mr. Leach will certainly correct me if I'm wrong. The initial request

that came into Hasbro was for all of our licensing agreements. We had some haggling over that because we had a lot of them, as your Honor might be able to appreciate.

What was settled upon was that we would produce a subset of our license agreements for toys and games that related to patented technology and to components. So we have produced what licenses there are that relate to components, and we produced patent licenses but not more general licensing agreements.

THE COURT: How many such agreements were there?

MR. TECHENTIN: Couple of dozen, your Honor.

THE COURT: Including patented products and components?

MR. TECHENTIN: I'm sorry, your Honor?

THE COURT: Agreements that related to patented products and components, that's what you just said you all decided on?

MR. TECHENTIN: Yes, sir.

THE COURT: And you're saying there are a couple of dozen?

MR. TECHENTIN: That's right, your Honor.

THE COURT: Is that right, Mr. Leach?

MR. LEACH: I'm not quite sure. I recall there being a full box or maybe two boxes.

THE COURT: Somewhere between one and two boxes?

MR. TECHENTIN: I don't remember it being quite that much, your Honor, but I do remember some of them having a whole lot of versions of a contract.

THE COURT: Were all of those supplied to the witness?

MR. LEACH: Yes.

THE COURT: So you remember reviewing all those? Did you review those?

THE WITNESS: Yes, sir.

THE COURT: Okay. I'm going to take a minute here.

(Brief interruption.)

THE COURT: Okay. Go ahead, Mr. Techentin.

MR. TECHENTIN: Thank you, your Honor.

BY MR. TECHENTIN: (Continuing)

Q. Mr. Lapidus, would you agree that one of the consistencies across the Hasbro contracts that you reviewed was that components, that is licenses for components, as opposed to licenses for game concepts, commanded substantially lower royalty rates than the licenses for complete game concepts?

A. Generally, yes.

Q. Take as an example, Pooh Honey Pot Hop inventor license agreement, is that one that you had reviewed?

A. Well, I don't -- sitting here now, without looking at a list, I don't know. But if that was provided --

MR. TECHENTIN: Your Honor, there's a trial exhibit number up there, but if we might have this marked for today's hearing as Defendant's Exhibit A.

THE COURT: All right. May be so marked.

MR. TECHENTIN: I have a copy for the witness, your Honor, if that might make it a little easier. If I may approach.

THE COURT: Sure. Hand it to the witness.

Q. The licensed property is described in paragraph one on the first page. Do you see that?

A. Yes.

Q. And this is a license for something known as Musical Candy Land or EE, II, EE, II, OO. Do you see that?

A. Yes.

Q. Now, seeing what this product is, do you have any recollection of having reviewed this agreement?

A. I believe I reviewed this, yes.

Q. And this -- the licensed property is, essentially, a version of playing a game on vinyl mats using the Candy Land theme; is that right?

A. I just know what it reads. It says it's played on large vinyl mats or individual mats. You can all read

it the same way, I guess.
Was there a question?
Q. I think my question went to what is the nature of the item that's being licensed here. This is, essentially, a musical chairs game with some componentry and employing the Candy Land theme; is that right?
A. Yes. I think that's what it reads in the definition, yes.
Q. And in the definition, there's a sentence, the next to last -- excuse me, it's the last sentence, that says: "The parties hereto acknowledge that there are certain similarities between the item and a certain product developed by licensee," and that's Hasbro here, "and known in the United States as Pooh Honey Pot Hop licensee's item 4810." Do you see that?
A. Yes.
Q. And the Candy Land concept was, according to the terms of this license, already owned by Hasbro at that point, correct?
A. It would appear so, yes.
Q. And so this is basically a concept for a game employing one of Hasbro's established marks, correct?
A. Yes.
Q. And what's the royalty rate in this case?

A. Under page 7067, it is one percent of net sales.

Q. Given that this contract pertains to an item that incorporates an established Hasbro brand name, and appears to be connected in some way to the fact that there were two competing similar items on the market, do you believe that this contract is more analogous to the situation that Hasbro faces with Mr. Bowling than a plain vanilla licensing contract for a game concept, less analogous, or the same?

A. Well, because I'm not familiar with how this was arrived at, I don't know that I know --

Q. So --

A. -- necessarily.

Q. So this would just go into the mix; is that right?

A. This would give me an indication as to an example of what Hasbro is paying or negotiated at a specific date and on a specific product with some terms.

Q. If you could take a look at what's been marked as Defendant's Exhibit B.

THE COURT: Are you going to go through every agreement?

MR. TECHENTIN: No, your Honor. There's only a couple.

Q. This is a Quick Fill Cap inventor license agreement. Do you happen to recall this agreement?

MR. TECHENTIN: May I approach, your Honor?
THE COURT: Yes.
A. I believe I saw this contract, yes.
Q. And this is for a patented Quick Fill Cap for Water Blasters, correct?
A. Yes.
Q. And would you agree that this is a license for a component as opposed to a game concept or a toy concept?
A. Yes.
Q. And what's the royalty rate that's reflected in this agreement?
A. The royalty rate on page 7282 shows a half a percent of net sales. It also describes, on that same page, advance payments, which may affect the terms or tend to reduce the price.
Q. But this is, basically, a half percent net sales royalty, correct?
MR. ZEULI: Objection to characterization of the document.
THE COURT: Well, if he disagrees with that, he can disagree with it.
A. It says what it is, but there are other terms, much different dating. It is -- the date at least I think I can make out on page 7279 is 2004, but it is an

agreement and with some different terms rather than just a royalty payment.
Q. Okay. Let's look at another agreement that's a little more contemporary. This has been marked as Exhibit C. This is a Solenoid Jaw Mechanism inventor license agreement.
Do you recall reviewing this agreement, Mr. Lapidus?
A. Yes.
Q. And this is, would you agree, a license agreement for a component as opposed to an agreement for a complete toy or game concept?
A. Yes.
Q. And this agreement, according to the date at the top, dates from February of 2000, correct?
A. Yes.
Q. And that's just a few months after the relevant date in this case, correct?
A. Approximately six months.
Q. And if you turn to page four of this agreement, this agreement calls for a one percent of net sales royalty, correct?
A. Yes. And similar terms -- yes.
Q. And unlike the last example we looked at, there's no advance of royalties in this one, correct, looking

at paragraph 6A?
A. Not in this agreement.
Q. Okay.
MR. TECHENTIN: Your Honor, I move for admission of Exhibits A, B and C.
THE COURT: Any objection?
MR. ZEULI: No, your Honor.
(Defendant's Exhibits A, B and C marked full.)
Q. Mr. Lapidus, would you agree that the contracts we just looked at, Exhibits B and C, the two component contracts, are more closely analogous to the hypothetical license between Mr. Bowling and Hasbro than would be a license for a toy or game concept?
A. I don't know.
Q. You don't have any opinion on that subject?
A. Well, the timing would be -- I don't know more because of timing because I think that was a very important factor in Mr. Bowling's contract negotiations as of August 17th, 1999, and this -- and that's my answer.
Q. Okay. But just focusing, if we can, on this second Georgia-Pacific factor which asks you as the expert to look at the rates paid by Hasbro for other patents that are comparable to the patent in suit, my question is when you're looking at these various

contracts, given that you don't have one that's exact, don't you weigh them and say, well, this one is pretty close so this is something that I'm going to give more weight to, and this one is very different so I'm going to give less weight to that?
A. Yes, in terms of the contract also. Advances or the datings of the contract.
Q. When you were doing this analysis, did you give greater weight to the contracts that existed that dealt with components than you did to the others?
A. Yes. I believe I took that into consideration.
Q. And that's reflected in your report where?
A. As to the conclusion of the royalty.
Q. Exhibit D that we looked at before?
A. No. As to my conclusion as to the amount of 58-and-a-quarter cents.
And as to number two, I looked at all of those license agreements, as I've stated, so not only these but probably 17 or more other agreements, a whole pile of agreements. And that gave me an indication of how Hasbro, in this case, negotiates agreements.
Q. And here you say that we see a range between one and eight percent, and many of them are five percent or more, and you conclude that those facts when on balance increase the royalty, right?

A. Yes.

Q. But if you don't have a starting point, how can you know that a range of one to eight percent is going to increase it? If the starting point is more than eight percent, wouldn't that decrease the royalty?

A. I think the term "This factor would tend to increase a royalty" is saying that the factor or the necessity in the negotiation is -- has relative importance or would probably favor the inventor and tend to increase the request that the inventor would make rather than decrease that request. It doesn't say how much, but it says it is considered that it may tend to favor more one party, say, than another party. And because this is written on behalf of Mr. Bowling, this would tend to increase his royalty.

Q. Let's look at factor three.

THE COURT: This might be a good time to take a lunch break. So we'll do that. Let's go off the record.

(Discussion off the record.)

(Lunch recess.)

THE COURT: Okay. Are you ready to proceed Mr. Techentin?

MR. TECHENTIN: Yes, your Honor. Thank you.

THE COURT: Okay. Go ahead.

**BY MR. TECHENTIN**: (Continuing)

Q. Mr. Lapidus, when we left off, we were just starting to try to talk about your factor number three, and this is on page nine of your report. I'll put that up on the screen.

And the third factor requires you to consider the nature and scope of the license, correct?

A. Yes.

Q. And in your consideration or discussion of factor three, the first sentence that you write is "The license for the '197 patent would have been exclusive to Hasbro." Do you see that?

A. Yes.

Q. Do you seriously believe that if the parties had negotiated a license as of August 17th of 1999, that Mr. Bowling would have agreed to discontinue selling his dice?

A. No. But I believe it was exclusive as to the Hasbro die. So that to the extent that it's my understanding that the die that Hasbro would use or wanted to use would be exclusive to them and not necessarily exclusive as to no one else using that die.

Q. But if it's not -- if it's exclusive to Hasbro, that means that Hasbro has the right to prevent other people from using the die, right? Isn't that what

"exclusive" means?
A. I think I just explained my answer.
Q. Let me get this straight. Are you saying that Hasbro would have had an exclusive license, but Mr. Bowling would have been free to go to Mattel and license the same die?
A. No. I am saying that as to the particular die that would be produced by Hasbro, either as to color or pips or jewel-like product, that would be exclusive to Hasbro, not the actual die itself. So it may deal with colors or it may deal with some unusual marking that Hasbro would want, and that would tend, then, to show some exclusivity as to that die but not necessarily as to the whole product itself.
Q. So what you're saying is that Hasbro, in your hypothetical negotiation, would have agreed to restrictions on its use of the patent. That is, that Hasbro would have been able to produce that translucent pipped jewel-shaped die as you described it, but would not, for example, be able to produce a die that looked like Mr. Bowling 's dice?
A. That they would be able to use this specific jewel-shaped die, but it would not appear, say, in other products for Hasbro, or if Hasbro, for whatever reason, has extra orders of them, they're not going to

appear on the market, or you have a situation where he is distributing his die to -- he is selling his die to distributors and, therefore, that unique model would be as to Hasbro and not to anyone else.

Q. So in other words, Mr. Bowling would remain free to go to Mattel, for example, and license a ten-sided version of his die?

A. Something different.

Q. Ten-sided would be different from what Hasbro had, right?

A. Yeah. Anything different for whatever reason. It may be as to color or as to any distinction, I guess is what I'm saying.

Q. And you also go on in the next sentence to say that Hasbro would be restricted to using that particular shape of die in the Monopoly Millennium Edition games, right?

A. Yes.

Q. So Hasbro, for example, couldn't take it out and put it in a Yahtzee game?

A. That's correct.

Q. Or some other game that it markets with dice?

A. Yes.

Q. And it's your opinion that those restrictions on Hasbro's use, that is that Hasbro could only use the

one shape and Hasbro could only use it in association with one game would actually increase the royalty that Hasbro would be willing to pay?
A. Yes. I think it works both ways. It's not just as to Hasbro; it's also as to Mr. Bowling or as to the inventor.
Q. Mr. Bowling who retains all rights in the die; is that correct?
A. Well, but as to that particular item, he is not going to be able to sell it either. So there are some restrictions going really both ways. And it really limits the inventor and the licensor as to what -- the licensee as to what they can do with that product.
Q. You don't know in your discussion in factor three any restrictions of Mr. Bowling's exploitation of the '197 patent, do you?
A. I'm sorry. I don't understand that question.
THE COURT: Rephrase it.
Q. In your discussion of factor three, you don't know of any restrictions on Mr. Bowling's exploitation of the patent that would result from the license agreement with Hasbro, do you?
A. Yes. That particular item, that particular die would be limited, so there would be a limitation.
Q. So Mr. Bowling couldn't market something that

looked like Hasbro's die?
A. Yes.
Q. Okay. Now, where in the entire record of evidence that you reviewed in this case did you find any suggestion that these terms and conditions for a license agreement were either contemplated by either Hasbro or Mr. Bowling or would have been acceptable to Hasbro or Mr. Bowling?
A. I believe in the deposition with Mr. Hirtle there is some references as to those restrictions or restrictions that Hasbro would want.
Q. And you cite to Mr. Hirtle's deposition at pages 34 to 35, right?
A. Yes, I believe so.
Q. That's footnote 7?
A. Yes.
Q. And this is -- I'll put up on the screen a page from Mr. Hirtle's deposition, page 34. I think what you're referring to begins on line 16 where he says, (Reading:) In terms of -- and this is a question being posed to him -- when I say exclusivity, would Hasbro have required that he not license it to another game during the period that Monopoly incorporated it into their game? I mean, he can sell it individually or stuff, but would you have at least wanted to make sure

that the dice was not showing up in your competitive games?

And the answer was, (Reading:) I think that -- I think that when our lawyers got involved in the actual drafting of an agreement, that would have been certainly one of the elements that they would have tried to achieve.

Is that the testimony you're referring to?

A. Yes.

Q. And do you know that what you're describing here in terms exclusivity in factor three is the same that is being discussed in this question and answer?

A. Yes. I believe that it goes to some restriction or some individual specialty that they would like, and it would not allow him, for example, if that color or type were something very unique and other people were interested, he would not be able to sell it to someone else. They would not be able to sell it to someone else. Excuse me.

Q. You also note in this discussion that the retail price of the dice is more than a dollar, correct? It's on page nine of your report.

A. Yes.

Q. And the fact that Mr. Bowling sells dice at retail for more than a dollar doesn't -- isn't a component of

the nature or scope of the license, is it?
A. Well, in that circumstance, I think it is referring to the fact that it is a premium product. He is not necessarily selling it at more than a dollar. His distributors may very well be selling it for more than a dollar. It says the retail price, not his price.
Q. But factor three asks you to look at the license that would have been negotiated between Hasbro and Mr. Bowling, right?
A. Yes.
Q. And the fact that some distributors might be selling his dice for some particular price doesn't speak to the nature and scope of the license, does it?
A. As to this factor, it's my opinion that it does.
Q. Okay. Factor number four talks about a licensor's established policy and marketing program to maintain its patent monopoly by not licensing to others, correct?
A. Yes.
Q. And you say that he doesn't operate a licensing company and has not licensed the patent and, therefore, that would tend to increase the royalty, correct?
A. Yes.
Q. Would it surprise you to know that Mr. Bowling

does, in fact, have a licensing company called Crystal Caste Licensing, LLC, and has had that company since 1998?

A. Yes, I am aware of that. And he is the owner of that, and he pays a management fee to his company. So this is a case not uncommon where the inventor might either license it or produce it. I've seen examples of that, and I think it's really more arm's-length rather than necessarily selling it to himself.

Q. But did you know that when you wrote this report?

A. Yes.

Q. But you wrote that he does not operate a licensing company, notwithstanding the fact that he operates a company called Crystal Caste Licensing, LLC?

A. The licensing company that he owns and operates is really paying him a management fee, and he's not licensing it in the sense of a lot of other products or doing it for additional income. He's really probably doing it more for his own interests and not generally his method of doing business.

Q. And you would acknowledge as well that as of 1998 and 1999, the time leading up to this hypothetical negotiation --

THE COURT: You've got to slow down.

MR. TECHENTIN: I'm sorry, your Honor.

Q. -- Mr. Bowling was actively interested in licensing his dice, wasn't he?
A. Yes.
Q. And wouldn't that go to the license -- to Mr. Bowling's established policy and marketing program with respect to licensing?
A. Well, he hadn't licensed anything so he really -- at the level that he is at, he has not gone through -- he is trying to do it, but he had not gone through and really established anything save Crystal Caste Licensing, Inc., the S-corporation.
Q. But you don't discuss anywhere in factor four the fact that Mr. Bowling was actively attempting to license his product at the relevant time period, do you?
A. No.
Q. In factor five, you open by saying that Bowling and Hasbro's relationship can best be characterized as one of supplier and customer, correct?
A. Yes.
Q. And that's distinct from one of the other options that's presented in the language of factor five, which is as inventor and promoter, correct?
A. Yes.
Q. So is it your expert opinion that Hasbro and

Mr. Bowling would have worked out a licensing agreement under which Hasbro would have purchased Mr. Bowling's dice for inclusion in its Monopoly Millennium game?

A. Well, either that alternative or he was really -- if he could not supply, and let's say they could make it cheaper, that would just be a term of negotiation or something that they would work out.

So that I believe in Mr. Bowling's goals and business line, he would be more selling that product to them. And, if, in fact, they could manufacture it cheaper, I still believe the definition would be more of supplier and customer.

Q. So you're saying that even if Hasbro was manufacturing the dice itself, you'd call that a supplier/customer relationship?

A. Under this arrangement, yes. I don't think that that is -- that's originally how he viewed it, because he wanted to maintain, really, control of what he was selling, and that's why I see it that way. That was more important to him, to maintain the quality of the product and the distribution, than to have it done somewhere else.

Q. Are you saying that Mr. Bowling would have exercised some approval authority over the dice that were actually used pursuant to the license?

A. Well, I don't know if it conforms to the patent. I don't know that he would have any additional restrictions, but there were some restrictions as to his distribution in terms of color, which is the other factor. But I believe that -- well, I don't know. I guess I don't know if he would have been actively involved in that, but I believe his position was more -- his position and his pricing strategy was more that he would sell the die to them or to a customer, in this case Hasbro.

Q. Well, I'm confused, Mr. Lapidus, because you've characterized this as supplier and customer, and you've talked in this factor about Mr. Bowling's wholesale price of 64 cents per die. Are you saying that it's your belief that, under this negotiation, Mr. Bowling would be selling dice to Hasbro that Hasbro would then pack into its games and ship or not?

A. I believe, at the end of the day, given Hasbro's ability to manufacture it cheaper, that would be a negotiation and a decision that would need to be made based on all these factors. But I'm also saying that in terms of the pricing and how it relates to the royalty, he would view it as a customer relationship. And therefore, the pricing would probably be at a wholesale price and that is how it should be viewed.

That was his pricing strategy and his goals.
Q. So if I understand you right, what you're saying is that regardless of who manufactured or who supplied or who packed it or where the dice came from, whether they came from Hasbro's established supplier or from Mr. Bowling's factory, the price would have been Mr. Bowling's wholesale price?
A. The price would have tended to be more of a customer/supplier relationship. That is what I am saying. Supplier/customer relationship.
Q. And you wrote in here that that price was 64 cents per die, right?
A. Yes.
Q. But, in fact, Mr. Bowling's established pricing structure called for bulk sales at substantially less than 64 cents a die, isn't that correct?
A. Not in terms of a retail price. The pricing that he would be selling for at retail would be at 64 cents. He has a distributorship relationship that would need to be maintained intact so he cannot discount them substantially, but the retailer price, when he sells to a retailer, that is at 64 cents.
Q. So what you're saying is that -- and let's take a look at something real quick.
Putting up on the screen what's been marked as

Exhibit D, and this is a letter from April of 1999, so about four months before the date of your hypothetical negotiation, from Mr. Bowling to a Paul Hartman at PBM Express. Have you seen this document before?
A. Do you have an original that I can read? Thank you. I've looked at it. Yes, I've seen it before.
Q. And this sets forth a pricing structure that's based on bulk unit sales. So he starts in the third paragraph, he talks about 49-and-a-half cents per die with a thousand units, and then he starts -- in the center, he talks about an outside of the United States pricing structure of from 45-and-a-half cents down to 35-and-a-half cents, correct?
A. That's what it reads, yes.
Q. And that's -- the 35-and-a-half cents comes to just over 20,000 units, correct?
A. Outside the United States, yes.
Q. And based on the estimates at the time that the Hasbro Monopoly games had included the accused dice, Mr. Bowling would be anticipating about a million dice being sold, right?
A. Inside the United States, yes.
Q. And a million is a lot more than 20,000, correct?
A. Location is fairly important, but a million is more than 20,000.

Q. So it's your opinion that notwithstanding the fact that Mr. Bowling was willing to sell dice for 35 cents apiece if he could sell 20,000 of them, that he would be unwilling or reluctant, anyway, to go below 64 cents if he had an opportunity to sell a million of them?
A. I believe there's a distinction in the first paragraph, and he is looking for large volume distributors throughout Europe, Canada, Australia and Japan.
It's my understanding his patent is not valid in those locations, so I think it's a very different sales proposition than selling them within the United States. It's a very important distinction.
Q. Has someone told you that Mr. Bowling doesn't have a valid patent in those locations?
A. Yes. I believe so. That his patent was limited to the United States.
Q. If we look at the second page, there's a handwritten note, and you can look at the entire document if you wish, but this is a separate letter to a company called Backstab in Paris. And the text of the letter is substantially the same, but there's a handwritten note at the bottom from Mr. Bowling where he says: "In reference to the numbers above, these are the rates that I charge wholesale. I will lower this

for you due to the advertising value. How about 30-and-a-half cents per unit for 23,000 pieces? Let me know what you think. Michael." Do you see that?
A. Yes.
Q. Same question. You don't think that -- you think that Mr. Bowling would be insistent upon getting as close to 64 cents as he could based on a million unit sales to Hasbro notwithstanding his willingness to go down to 30 cents per die under other certain circumstances at approximately the same time?
A. This letter is dated -- this letter is written, addressed to someone in Paris for distribution in Germany, Austria and Switzerland. So I would have the -- I'm sorry, for a location other than the United States. It's a little unclear but for a location outside the United States.
So I think it's, unfortunately, a different ball game. I think he'd like to sell them for more. His patent is not available in those areas.
Q. And I think you already testified to this before, but you would acknowledge, wouldn't you, that in fact, within the United States, Mr. Bowling was selling dice for less than 64 cents apiece, correct?
A. Yes. To distributors.
Q. In factor six, factor six asks you to consider the

effect of selling the patented specialty in promoting sales of other products of the licensee and to look at the value of the invention as a generator of sales for the patentee's non-patented items, correct?

A. Yes.

Q. And you say that you interviewed Mr. Bowling, and Mr. Bowling told you that the dice, the patented dice were important drivers of his non-patented products, correct?

A. Yes.

Q. Would it surprise you to know that as of August 17th, 1999, Mr. Bowling's company was not selling any non-patented items?

A. Well, I didn't know that. I believe he does have other Crystal Caste products, and if those are patented also, it is what it is.

Q. Factor eight asks you to look at the established profitability of the product, its commercial success and its current popularity, correct?

A. Yes.

Q. In order to evaluate that factor, you make reference to $323,000 in dice sales from August of 1998 to January of 2002, correct?

A. Yes.

Q. The hypothetical negotiation that you're

undertaking here took place on August 17th of 1999, correct?
A. Yes.
Q. So it would be fair to say that Mr. Bowling would not have been conscious of his profitability of his product from August 18th of 1999 through January of 2002 at the time of the negotiation, correct?
A. Beyond August 17th of 1999, that is true.
Q. But you included that data in your analysis?
A. Yes.
Q. And then you went on to say that the gross margin on Mr. Bowling's dice was on average 70 percent, correct?
A. Yes.
Q. And the factor, the actual factor, the language there reads "established profitability," correct?
A. Yes.
Q. It doesn't talk about gross margin, correct?
A. Well, I believe that the established profitability relates to gross margin.
Q. But you wouldn't agree as a CPA that established profitable and gross margin are the same thing, would you?
A. Under this circumstance, yes, I would. The profitability of a product would likely have a higher

gross margin than a lower gross margin. So I think the two are parallel or similar.

Q. So when determining as a certified public accountant the profitability of a product, you're going to take the gross margin for that product and not account for any cost?

A. I think a measure of profitability, an important measure of profitability is the gross margin. And the situation at -- and, therefore, I use gross margin rather than maybe other expenses that someone may or may not have. I think a better measure is gross margin, and I believe that establishes profitability.

Q. Did you look at the established profitability of the product?

A. Yes.

Q. Mr. Bowling gave you, in fact, his profit and loss statements, correct?

A. Yes.

Q. And he gave you the profit and loss statements beginning in September of 1998, which were his first patented dice sales, and up through and past the date of the hypothetical negotiation in August, correct?

A. Yes.

Q. And so you know, as you sit here, that, in fact, during that period of time Mr. Bowling 's company lost

money selling these dice, correct?
A. Initially, that is correct. But his margins for the product were still very high, and he was generating a lot of interest in selling the product at later dates in 1998 rather than at the beginning of his sales cycle.
Q. But just so that we're clear, because factor eight asks you, the expert, to examine the established profitability and not the promises or anticipation or mindset of future profits, in light of that, you disregarded the fact that Mr. Bowling's dice actually returned a net of minus 15 percent, didn't you?
A. His margins were very high. He had other expenses, and I believe that given the fact, as referenced in the third sentence, during a show he was selling 10,000 die for a specific show, he would establish good profitability.
Q. But even with those 10,000 dice in a single day, Mr. Bowling was losing money, isn't that right?
A. But his margin was very high, so there may have been other reasons why he was losing money, introducing it to the market. And it's broader than just taking into account the fact that he lost money in one year or at one period of time.
Q. But Mr. Bowling wasn't selling anything through

this company except his dice, right?
A. And establishing a market for his dice.
Q. So any of his costs were associated with these dice, right?
A. Yes.
Q. So if you're going to talk about the profitability of those dice, you have to take those costs into account, don't you?
A. You have to take them into account, but I think it is a better measure to be concerned about someone's gross margin than it is necessarily about all of their costs.
Q. So you're not analyzing factor eight at all. You're substituting your own factor eight, throwing out the words "established profitability" and inserting "gross margins," isn't that what you're doing?
A. No. Because a measure of profitability is gross margin. I would not take that into account. And any studies that I looked at for Hasbro regarding the popularity of the Monopoly game has a line called gross margin.
So normally, that is a very important line item to determine the profitability of a product.
Q. Let's look at factor 11. This is on page 13 of your report. Factor 11 asks you to consider the extent

to which the infringer has made use of the invention and any evidence that's probative of the value of that use, correct?
A. Yes.
Q. And if I can direct you back in your report to page seven, on page seven, you discuss the options that Hasbro had available to it as of the date of the hypothetical negotiation.
You articulate three different options, discontinuing the use of the existing die, replacing it, changing the packaging, changing its advertising. That's the first option, correct?
A. Yes.
Q. And the second is negotiating a license agreement and paying Mr. Bowling a royalty, correct?
A. Yes.
Q. And the third is continuing to sell, phase out the infringing die and risk litigation, correct?
A. Yes.
Q. And then you proceed to note that Hasbro estimated its costs to switch out the die as to be $70,000, correct?
A. Yes.
Q. And you don't take issue at all with Hasbro's estimate of $70,000 to swap out the die, do you?

A. I think it is low. I don't believe it is $70,000.
Q. Do you have any reason to believe that it's more than $70,000?
A. Yes.
Q. What are the facts upon which you would base that?
A. Based on the number -- well, first of all, based on the timing, that an August 17th date, you have a lot of games that are at retailers that would have to be either removed from the shelves -- actually, they would have to be removed from the shelves, possibly the packaging and advertising changing and the all dice removed. And to the extent the packaging is damaged, repackage those die.

With my background in retailing, when you start removing product off of shelves, there's generally penalties involved in taking merchandise away from a retailer that would cut substantially into the margin, their gross margin, the retailers.

So that I can't think of a situation that it would only cost $70,000 for a million die. That would be about six cents a die. I would think, if that were the case, it would be very easy to remove it. But given the time of the year and the selling season and over 90 percent of the sales of the Millennium Edition occurred before December 31st, 1999, that would tell me

it should be far more costly. And that's what I believe.

Q. So a large component of that additional cost that you just talked about was actually going into retailers, removing the items from shelves, swapping out the dice and repackaging them; is that correct?

A. I don't know that it would be the retailers' responsibility. My experience has been it has been the manufacturer's responsibility. And the other penalties or discounting that occur because a product is not either available for sale, the advertising is misleading, those penalties are substantial, and it's usually a reduction of the sales price.

Q. Mr. Lapidus, I'm going to try to repeat my question. I would ask you to listen to it because I don't think you answered it quite the way that I asked it.

Is a substantial portion of that cost beyond $70,000 that you believe would be accurate derived from Hasbro being obliged to go to places like Target and Wal-Mart and actually replace the dice on those units?

A. Yes.

Q. Okay. But when you discussed option number one, going to the retailers wasn't even a part of that option, was it?

A. It's certainly an option. There is a cost to doing it. It's an option. You may not like the option, but it's an option.

Q. In number one, you described what Hasbro's option was is discontinuing the use of the die, replacing the die in existing inventory, changing its packaging and changing its advertising, which is precisely what Hasbro did in November of 1999, isn't it?

A. They discontinued using it after I would believe the supply was used up. To the extent they could either change or cover their packaging, they did on those. And the new orders, it's my understanding, they either eliminated the reference to futuristic die, and, of course, they changed their advertising, but there is a cost to do that. And they have to evaluate, at least I believe, that is one option. There is a cost and a very expensive cost to do that.

Q. Nonetheless, you don't, in your report, make any reference to the challenge of the $70,000 number, correct?

A. No.

Q. Now, turning back to factor 11 and the value of the use, of the infringer's use of the invention, do you not think it's relevant what the cost to work around the invention would be to Hasbro?

A. In this case, I think the answer is no. In this case, I think the circumstances are different because the product is already in the packaging. It is already -- I'm sorry. The die are already in the -- they're part of the game. And that's why option number one, to either repackage, redo it, remove it, do something with it is important on top of the timing of August 17th to the selling cycle of selling the Monopoly Millennium Edition game. And that's justified by the number of units and the popularity of when it was sold before December 31st or before the year 2000.
Q. Let me give you a hypothetical example and see if this helps explore this a little bit.
Assume that you have a company that comes out with a particular type of widget, and they're selling it, and it's in a package. And someone comes to have a patent on that widget and so you're in the situation where you have a hypothetical negotiation or an actual negotiation between a patentee and someone who is about to become an infringer. And that infringer has the option of changing widgets to something that doesn't infringe, it completely satisfies the product need, doesn't infringe on the patent and costs $10 to make the change. Under those circumstances, would it be rational for the infringer to take a license on the

patent that would cost it $100.
A. Under your hypothetical example, no.
Q. And here, Hasbro had the option of stopping using the dice at a cost of approximately $70,000, perhaps more, if your reasoning is correct, but would it not be rational for Hasbro to consider that cost of avoiding the patent, whatever it is, in weighing that against a potential agreement on a license?
A. No. I believe the merchandise was already in the product and identified as being there. So that's why I believe option number one would be to take it out and change it if, in fact, they could at a cost, and unique timing makes it very, very difficult to do that. It is an option, but it makes it a very, very difficult option to do because of the date.
Q. And Hasbro did, in fact, swap it out in November, correct?
A. Well, I'm not sure it was swapped out or new merchandise came in and the swap might have been made where the product was originally packaged. I believe they also put masking tape or whatever over the product but even heard complaints about that. And that is part of number 11.
So not only does Hasbro have standards, but it's my experience that the retailers have standards. And

you can't have product that has either altered packaging, because usually packaging is agreed to in retailing, and put either tape or do something that would modify what the original is so that a customer can remove it. It's generally not done.

Q. But it was done here, wasn't it? I mean, Hasbro removed the dice, included cubic dice, stickered over the reference to the jewelled dice and sold them to retailers without any complaints from the retailers, isn't that right?

A. I think they heard complaints from the customers.

Q. They heard complaints from consumers, you mean?

A. Yes.

Q. But not from Target, not from Wal-Mart and so forth?

A. Well, I don't know that.

Q. You don't know that.

A. I do not know that. I know the calls from the customer, who is the ultimate user.

Q. But you don't find the fact that Hasbro was willing to undertake the cost to swap out the dice with cubic dice as being indicative at all of what Hasbro believed the value of the football-shaped dice was to its game?

A. I believe that given the quantities that they had

and the timing, that they were limited to three options. And I believe their marketing and sales department knew the kind of volumes and could estimate them as to how much they would be selling before the end of the year, by the year 2000. That's why they called it the Millennium Edition.

They're not selling a lot of New Year's Eve hats today in outlet stores, but they were selling them in the month of December. There's not a big call for them in the middle of January. And I think this is a similar example to this Millennium Edition and, in fact, Hasbro's sales figures confirm that.

Q. Let me try and ask that question in a different way. Factor 11 asks you to look at evidence that is probative of the value of the use by the infringer, and more specifically, the extent to which the infringer has made use of the invention.

Doesn't it bear some degree of relevance whether the infringer discontinues the use of the product?

A. I believe it does, but 90 percent of the sales were already made by the end of the year, and I believe that that is integral to a decision that they would have to make in terms of either pulling them off their shelves and selling nothing, which may not be an acceptable alternative; offending a company like

Wal-Mart, which is a major customer, a significant customer, or Toys "R" Us are two of their most significant customers. So I believe they had a decision to make given this unique timing.
Q. You say that it's unique timing. The timing was August 17th of 1999. And the reason we know that is because you're required to conduct this hypothetical negotiation on that date, correct?
A. Yes.
Q. In fact, Hasbro did replace the accused dice with cubic dice in November of 1999 and shipped product with those cubic dice, correct?
A. Yes.
Q. And shipped a substantial quantity of these games in November and December of 1999, correct?
A. Yes. But also continued to sell what they had or what was the other die also.
Q. And the use of the cubic dice in those games didn't generate the ire of Wal-Mart or Target, did it?
A. I don't know, but it generated the ire of the customers, the ultimate consumer.
Q. But wait one second. You just opined that if this happened in August, Hasbro would run some substantial risk of getting into trouble with its customers who are these stores that are purchasing these products?

A. Yes.

Q. And my question is what possible factual predicate can there be for that conclusion given that it actually happened in November and that didn't happen? Why is August 17th different from November 1st?

A. Well, because they are selling product. They are receiving complaints from their customers, and I think that is integral in the retailing process. Rather than just saying that the retail store was happy, I'm sure discussions went on with the buyers as to what kind of alternatives they could make. And the product was already on the shelves. So I believe they replaced it and maybe at that time, given the cycle for -- because 90 percent of the product was sold before December 31st, there was a very short buying time frame and, in fact, they were selling both products.

So, usually, in my retail experience, the original orders are some time during the period of August and September. And based upon that volume, your Honor, or October, there is a reorder that comes in. And so the retailers are sophisticated enough to know their buying customers' buying trends, and they reorder accordingly.

And generally, as to the manufacturer, it is not uncommon to negotiate terms that they are able to

reorder within a certain period of time so they would have it for their largest selling season, which is basically the Christmas or holiday selling season. And Hasbro's numbers bear it out. Their quarterly figures bear it out. And I, unfortunately, think that was the predicament that they were in.

Q. Is there -- we went through this at your deposition. Is there any reference in your report, any explicit reference in your report to the significance that August 17th of 1999 might have as a component of the business cycle of Hasbro?

A. Yes.

Q. And where?

A. And you did go through that in my report. It's interesting. The one item that you did not get to was factor number seven. You don't have to have much more of a road map to say, quote: In addition they sold over 90 percent of the games prior to 2000. And that is one reference. And the sales data that is presented shows that. And we went through that in a lot of detail during my deposition.

There are many other references. I can give them to you, but I think that single factor in retailing, and the fact that the product was there creates the pricing of the royalty as what it is, that

is a very important issue in retailing.
Q. Is there a single reference in this report to the Hasbro business cycle? And I mean that literally with respect to those words. Are those words used in your report?
A. I don't think so. But in the information I reviewed and the references I gave, it is there. And --
Q. Is there -- I'm sorry. My question was whether it was in your report. My next question is, is there a single reference, an explicit reference in your report to the reordering patterns of Hasbro's retailer customers?
A. No. But in looking at these factors and understanding retailing, that is just basic information that you would have to know to make a decision as of an August 17th date, and you have the information of their sales patterns. So that information was there.
Q. You made reference a couple of times during our discussion of factor 11 to these consumer complaints.
Do you think that there were a lot of consumer complaints about this product?
A. I believe that there were consumer complaints. That was a consideration.
Q. There were consumer complaints. My question was,

were there a lot of them?
A. What do you mean by a lot?
Q. Well, was it statistically significant?
A. I did not do a statistical analysis of them.
Q. In fact, the records that you reviewed revealed 818 complaints, correct?
A. I don't have with me the exact number but that sounds like a proper number.
Q. And how many units of Monopoly Millennium Edition and the Avon Special Edition were sold?
A. In excess of a million.
THE COURT: Let me be clear about something. One million were sold after the die was removed and the cubic die was put in or one million total?
THE WITNESS: I think total, your Honor.
THE COURT: Wouldn't the complaints relate to the product that has the substitute dice?
Q. How many games were sold that did not have the accused dice in them?
A. Sorry. How many products were sold that did not? I don't know if I have that number with me.
Q. It's well in the hundreds of thousands. Would you agree with that?
A. Yes.
Q. Okay. And very quickly, if we turn to factor 12

in your report, this is where you discuss the comparable royalties from Royaltysource, correct?
A. Yes.
Q. And out of the universe of royalties that were available to you from Royaltysource, you located two that you had deemed relevant, correct?
A. Yes.
Q. Those were for a Phase 10 dice game, correct?
A. Yes.
Q. Do you know what that game is?
A. No.
Q. Did you do anything to figure out what the game was comprised of?
A. I think I know a little bit about it.
Q. It's a game that consists of a box, ten dice, and a set of instructions, correct?
A. Yes.
Q. Do you know what Magic, the Gathering is, Magic, the card game?
A. Yes.
Q. That's a card game that has a unique game play that allows some sort of person-to-person card game experience, correct?
A. Yes.
Q. It's a little hard to describe, but both of those

licenses were for game concepts, correct, not for components?
A. Yes.
Q. But you deemed those to be relevant to your analysis?
A. Yes. Because we looked at them, that's correct, similar to other contracts that I've been involved in. I did not go back and look at those, but this is something that I looked at so I put it in there, yes.
Q. So for the Phase 10 dice game, for example -- and this is a game that consists almost exclusively of dice, correct?
A. Yes.
Q. And dice are the sum and substance of the game play, correct?
A. Not unique dice.
Q. But the use of the dice is the game play, correct?
A. Yes.
Q. And in fact, you get ten dice in that game, correct?
A. Not unique dice, but ten dice.
Q. And that royalty rate was five percent, correct?
A. Yes.
Q. And again, Magic, the Gathering, that product was licensed as a complete game concept, correct?

A. Yes.
Q. In factor 13, factor 13 requires you to look at the portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risk or significant improvements added by the infringer.
And this is the first factor that we encounter in your report that doesn't increase the royalty, correct?
A. Yes.
Q. And this one doesn't increase or decrease. This one is just neutral, correct?
A. Yes.
Q. And this is a factor that would ask you, as an expert, to look at the Monopoly Millennium game and say, well, where do these dice fit in the great scheme of this game, isn't that right?
A. Yes.
Q. And so as an expert, you ought to look at this game and say, well, it's Monopoly; it's an established brand, correct?
A. Yes.
Q. In fact, it's the most popular board game ever, correct?

A. Yes.
Q. And as part of Monopoly, it brings with it the game play of Monopoly, correct?
A. Yes.
Q. And it's a special edition of Monopoly, so it's got some driving sales just as a result of being Special Edition Monopoly, correct?
A. Yes. And the pricing reflects that also.
Q. And the pricing how?
A. Of the game.
Q. Meaning that it's more expensive?
A. The retail price is substantially more expensive than call it a regular Monopoly game.
Q. That's true for the Millennium Edition but not for the Avon Edition, isn't that right?
A. I think you said the Millennium Edition.
Q. So the games in which this die appeared were both the Avon and Millennium Edition, correct?
A. Yes.
Q. And one was at a premium price point; one wasn't, correct?
A. Yes.
Q. But looking at factor 13, you need to take into account all the different things that are incorporated into this game and that might drive its profit other

than the dice, correct?
A. Yes.
Q. So that would include things like, in addition to the fact that it's Monopoly, new game tokens, correct?
A. Yes.
Q. Which have a collectible value in and of themselves, correct?
A. They may, yes.
Q. And the fact that it was a new and different game board, correct?
A. That is one of the features along with -- there are several features. Futuristic dice was one. Those are others.
Q. Wouldn't you agree that in the scheme of Monopoly Millennium or the Avon Edition, that the dice were a relatively small component?
A. Well, I think during my deposition you also asked that question, and I said no, and I would again because the dice, number one, they were advertised. But more than that, the dice are the only component of the game that is used by each individual, each player on each turn.

So in order to initiate the game and to keep the game going, you have to use the dice. You may not need the money, you may not need houses, but you need the

dice each time for each player.
Q. Other than that analysis -- well, strike that.
When the game is on the shelf, you're not playing the game now, right?
A. You are not playing the game when the game is on the shelf.
Q. I'm sorry. I meant at the retailer. At the retailer, it's on the shelf, you're not playing the game, correct?
A. No. But there's a picture and an ad that says futuristic die.
Q. There are a lot of pictures on the game, you would agree with that, right?
A. Yes.
Q. Okay. And Monopoly, the word "Monopoly" is significantly bigger than any dice, correct?
A. The word or -- the word on the package? Yes.
Q. In fact, the picture of the dice on the Monopoly Millennium Edition game is significantly smaller than it is on the normal, standard edition of Monopoly, isn't that correct?
A. Well, I don't recall the relative size. Are you saying the dice or the name?
Q. The dice.
A. I'm sorry. I'm not sure I understand the

question.
Q. The dice are depicted on the traditional Monopoly game, correct, on the box?
A. Yes. Well, I don't know. Sitting here, because there's a number of different editions, I don't know the exact size of the die or if it says traditional die on the box versus futuristic die on the packaging for the Millennium Edition.
Q. As a driver of sales, though, it's the material on the outside of the box that's going to drive the sales as opposed to the game play once you get it home and you start playing with the dice, correct?
THE WITNESS: Can you repeat that question, please.
Q. Let me ask it this way. As a driver of sales for a game, the features that are advertised on the outside of the box are going to be more important than things that you discover when you get home and actually open it up, isn't that fair?
A. Well, I don't know. I mean, I would think you have a reason to buy it when there is a -- when there are -- or you see some of the items that are there, you know what you're getting. And that's why you wouldn't have the complaints that I didn't receive something that, in fact, the product said I would receive, which

is a Georgia-Pacific factor.

So I don't know that I've ever done a study. It might just be my own observation that you would expect that if you'd see something on the cover that would probably also drive sales.

Q. All right.

A. On the packaging, excuse me, not on the cover.

Q. Would it be fair to say that one of the significant bases upon which you conclude that the dice were an important part of the game is that they were shown and talked about on the outside of the box?

A. As an item, yes. That's one consideration.

Q. Other than that and the fact that you used the dice every time you play the game, is there anything else?

A. The marketing department of Hasbro wanted a futuristic die and wanted the die that Mr. Bowling had the patent to, the '197. And that was important to Hasbro. It was important, maybe, to the word "Millennium," and that is an important consideration also.

Q. Let's talk for just a second about the Avon Edition. The Avon Edition didn't depict these futuristic dice on the box at all, did it?

A. I do not believe so.

Q. In fact, the Avon Edition had pictures of traditional white cubic dice on them, didn't it?
A. Yes.
Q. So does that indicate that these dice were less of an important feature to the Avon Edition?
A. It would probably mean it might be a less important feature.
Q. You didn't discuss that in your report at all?
A. No. I discussed both editions. And someone may buy the Avon Edition to save price because they see an ad for the Millennium Edition, but they're clearly two different price points, and the die were in each edition.
Q. We've now gone through every one of the Georgia-Pacific factors that you dealt with in any detail. I did skip over one. You brought us back to that.
So on the basis of that analysis, you then reach a conclusion as to a reasonable royalty, correct?
A. Yes.
Q. And that conclusion immediately follows number 15, and says: "In my opinion, a reasonable royalty of 58.25 cents per die is a reasonable royalty. See Exhibit D," correct?
A. Yes.

Q. And Exhibit D is what we already looked at.
A. Yes.
Q. And Exhibit D presents the royalty of 58.25 cents as the difference between Bowling's per die sales price of 64 cents and Hasbro's cost to manufacture the accused dice, correct?
A. Yes.
Q. Is it your testimony that you haven't selected the reasonable royalty on the basis of this mathematical calculation?
A. I think that's just a representation of it. It is not just the mathematical application, that is correct. It is based upon all of the 15 factors that we have just been through.
Q. So you looked at all the factors, and you considered what Hasbro and Mr. Bowling would hypothetically negotiate on the use of this patent; you considered all 15 of the things that we've talked about in depth today, and the number just happened to be 58.25 cents, which represents Mr. Bowling's selling price minus Hasbro's cost to manufacture?
A. It is 58-and-a-quarter cents, and I don't think it just happens to be. That's what it is. And that's my -- the 15 factors are my reason for selecting that. And as to representing Mr. Bowling, it works off of

necessarily his sales price, but that is the conclusion at 58-and-a-quarter cents.

Q. I'm trying to understand. Is it just coincidence that the reasonable royalty would be equal to this mathematical calculation, or is the way that you arrived at what the reasonable royalty would be to do the mathematical calculation itself?

A. I think it is because of taking into account the 15 factors, is taking into account, really, Mr. Bowling's pricing strategy and how he would price the demand that he could place on that product at the time of August 17th, knowing that you are in a sales cycle that 90 percent of the sales are going to be made within 120 days, approximately, your Honor, or less. And that puts a very strong demand, knowing that the packaging is there, knowing all of these items, I believe that that favors, strongly favors Mr. Bowling. That's my opinion. That's why you go through the factors.

THE COURT: Here's -- what Mr. Techentin is getting at is an important point. And I'm going to try to ask you the question, and I'm not going to cross-examine you about it because I'm trying to understand it.

I understand what you're saying about the 15

factors, and he's made his points about them. But there's a sort of disconnect, if you will, between the formula that's represented on Exhibit D and the 15 factors.

Now, I don't think you intend there to be a disconnect, but at least on the face of it there's a disconnect, because this looks like just kind of a raw mathematical calculation. You know, A minus B equals C. That's what this looks like.

So what you're saying here now is that this calculation, which gives me a raw mathematical simple calculation embodies into it all of the 15-factor analysis that you did. And what I need to understand is how the 15-factor analysis kind of works into this calculation.

Now, you just said, and I understand this, that in part it works in because it reflects a high per die sales price because Bowling had the patent. He had the product. He had the idea. You're in a compressed selling cycle for the product. Hasbro would want the product in the hypothetical negotiation; therefore, Bowling would get a higher price for it. I understand that.

Now, I guess what I'm struggling a little more with is how the other two pieces fit into this, or how

the 15-factor analysis kind of drives the next two lines of that formula. Could you try to expound on that a little bit.

THE WITNESS: Yes, your Honor. I think that Exhibit D is basically priced off of sort of Mr. Bowling's, you know, pricing schedule. I could have expressed it, as I did in the next sentence, as a percentage of sales or a percentage of revenue. I did it more in terms of representing Mr. Bowling as to his pricing strategy, whether you would express it as a percent of net sales or present it really as how Mr. Bowling sells his merchandise, and that's based on so much per die.

So that when you take into account the 15 factors, I believe, and it's my opinion, that Mr. Bowling would really not need to have a lot of flexibility or not a lot of flexibility as to his pricing. He could stay fairly inflexible. The product is there. It is in the store shelves. Retailers basically can't remove it or repackage it. It's an alternative, but it's an expensive alternative. And they don't want to have product that has been changed or modified. That would be their ideal situation.

Given the time of year, given the fact it's there, there's even reason to believe he could have

demanded more. I looked at it on that side. The quantities are already out, are already ordered.

The report deals with Mr. Bowling's side. I could have expressed it as a number in terms of Hasbro's side, in terms of here's a percent as to what it would be to their first pricing rather than second pricing or discounted pricing. But it is not just his price less something. It's far -- as I spent the day here explaining, and if you appreciate sort of the timing, there's very little flexibility in that. Unfortunately, there just isn't. And that goes to Hasbro also. And I think you can make a decision, let's sell the product and risk the litigation. And I think that was one of the three points.

In my opinion, that's really what favors this more. It's probably why we're here today. That's why we're here today. But it is really priced off of his pricing strategy, and I could express it any way, and the next sentence does. It says it's 4.92 or another percentage of the Avon Edition. They may think that that's high, but you start taking into account the timing and you take into account that they wanted the product, it gets to be very expensive.

It's interesting that Hasbro in their Millennium Edition, that the average price is about $10, the

retail price of this product is closer to $40.

So it's really saying Hasbro as the manufacturer can get a premium, but the basic components, which Hasbro thinks are valuable, would have to be negotiated at a lower price. I don't happen to believe that.

And I principally don't, and feel very strongly about this dating, this August 17th and the retail cycle. It's not about really any other necessarily that I didn't go back and look at other contracts and say, well, this is priced at this price or this client does it this way. I don't even have the ability to go back to other clients and ask them what they would do. It's just not appropriate.

So now you have Mr. Bowling saying you're in a very tight time frame here. This merchandise starts selling and, in fact, the sales statistics prove that out. And I think that was Hasbro's mindset. They had to get that product out.

THE COURT: Okay. Mr. Techentin --

MR. TECHENTIN: Your Honor, let me just follow-up on that a little bit.

Q. Let me see if I understand, Mr. Lapidus. What you're saying is that because this happened on August 17th and not September 1st or June 1st or some other days, that Hasbro is in a uniquely disadvantageous

position, is that what you're saying?
A. Well, September 1st and August 17th, let's, if I can, explain the fourth quarter of the year or Hasbro's largest sales volume quarter, a $4 billion company does not quite half of their volume in a period of 90 days.
In order to do that volume, they need to have the product on the shelves ready to go, packaged properly, and available for their customer and available for consumers, the ultimate customer. And I think that is a significant factor in this analysis.
Q. Do you in your report anywhere discuss the significance of the fourth quarter other than the reference that you just made to the fact that 90 percent of the games were sold prior to December?
A. Well, yes. And I think my own background, it is not specifically stated there, but my own background into retailing and, of course, Hasbro's background into retailing, would say that. I can't put down each and every item, but it is not directly there, but it is alluded to and we've been through this before, but we'll do it again.
Q. Is it your testimony under oath to this Court that you believe that in your report you disclosed the significance of the August 17th date as a component of Hasbro's business cycle driving Hasbro to be willing to

pay nearly any price for this die as a basis for your conclusions?
A. I think that in factor number seven, where I have said that 90 percent of the games or I have the sales information to know, as did you, the number of games that would be sold and my retail experience of timing of how you have to have that merchandise there, it puts Hasbro in a very vulnerable position as to those products. That is my testimony.
Q. And what have you done to educate yourself with respect to the Hasbro business cycle as it informs the question of whether or not Hasbro would be over a barrel in its negotiations with Michael Bowling as of August 17th of 1999?
A. Looking at the publicly available information about Hasbro and about their sales. I mean, this is pure retailing of a product that sells during the last quarter of the year. And it can't just show up two days before it is going to be sold. The distribution and all that it takes to do the ordering and approve colors is done far in advance.
Q. Do you know how these Monopoly Millennium Edition games were assembled?
A. Exactly, no.
Q. Do you know where they were assembled?

A. The exact location, no. I believe I do know how they would be done, but do I know exactly how they were, no.
Q. Do you know what the capacity of the Hasbro East Longmeadow facility is to produce games on a short turn-around?
A. No, but all of those options were available to them and this is what they chose. And at least in my report it seems to bear that out, factor number three.
Q. Do you know of any reason why in August of 1999 they were less capable of changing the game in two days than they were in November of 1999?
A. I think given the sales cycle, even in August, they were -- the sales cycle of the major retailers, in August they were pretty well -- they were too far down the line to make significant changes to the game.
Q. My question was, is there some reason why in August they were less capable of making this change in two days than they were in November of '99 when that's just what they did?
A. Yes. Because normally, the sales cycles would be, A, they may have had more complaints than what we know about in November, which is why they decided to start making the changes; or secondly, the reorders, which would be the initial packaging in retailing, would

allow them to make the change without taking the merchandise off the shelves. And that's just my retail background that tells me that. So the timing becomes very critical.

Q. What packages are they taking off the shelves in August that they're not taking off in November?

A. Well, November, the merchandise, many of the initial orders may be sold so that they wouldn't have to take them off the shelves. They just replaced them as opposed to going through the process of taking them off the shelves, either shipping them back, doing something to control the value of the product and the condition of the product. They just can't sit in aisles and start changing merchandise. So I think there's a big difference.

Q. Mr. Lapidus, you don't know that there was a single item sitting on any shelf at any time on August 17th, or on November 2nd, or on August 23rd, or any other date, do you?

A. Yes, I do.

Q. You do know that. How do you know that?

A. Because of the sales of the product. If they're selling product, it has to be on someone's shelves. I can't tell you, but in December, the December volume was three times that of the November volume. That

means the product had to be there. It had to be shipped out. They were calling for product.

THE COURT: Okay. I'm going to interject here, because I want to get through this today for one thing. I need to understand a couple of basic facts. Mr. Techentin, you can probably just make some representations to this effect. What was the date on which the product was changed over in terms of the production line?

MR. TECHENTIN: November 1, your Honor, was the date of the issuance, or November 2 was the date of the change order that was put in place by Hasbro.

THE COURT: And that change order resulted in the cubic die being put into the games, right?

MR. TECHENTIN: Correct, your Honor. The change order specified that they were no longer to use what we'll call the accused dice, and they were to replace the two dice in the game with dice from existing inventory.

THE COURT: Now, the packaging as of November 1, was the packaging modified, or was it taped over, or what happened?

MR. TECHENTIN: Yes, your Honor. Because we had a substantial supply of the packages in-house, there were stickers, and they stickered over relevant

portions of the outside of the game.

THE COURT: That was all as of November 1. So the product sold -- when did that product make it onto the shelves?

MR. TECHENTIN: Your Honor, the distribution process is such that they're making them to order. So that if product is leaving the Hasbro facility on November 5th, it likely was manufactured on November 4th or November 3rd. There's not a substantial inventory that's kept on-hand. It's made and shipped is the way that it works.

THE COURT: Okay. And it's not important that we be that precise here, but generally speaking, we can say that product sold before November, say, 2nd or 3rd contained the accused die and the original packaging of the Millennium and Avon Edition, right?

MR. TECHENTIN: That's correct, your Honor.

THE COURT: And product sold after November 3rd had the replacement die and was stickered?

MR. TECHENTIN: That's right, your Honor.

THE COURT: Would Bowling's counsel agree with that representation? As I said, it's not important -- precision isn't exactly important here.

MR. TECHENTIN: Your Honor, let me point out, there's another issue that has to do with some

materials from some games that apparently went out after the change order. That's a different issue.

THE COURT: We'll get to that in a second.

MR. ZEULI: Just two points I'd like to make, your Honor. One, he's talking about an order to have the change implemented. He's not saying that on November 1, we no longer put the infringing device in the product. We sent an instruction, hey, folks, please make that change. So we don't know exactly when the change was made.

THE COURT: I think Mr. Techentin is representing that product -- that that was when the change order went in, and so product was going out and onto the shelves probably within a few days of that.

MR. TECHENTIN: Your Honor, I would disagree. This is an ASAP change order. It gets issued from the people at East Longmeadow. It goes to the production facility in East Longmeadow. There is not a time lag here. This isn't coming out of Pawtucket, it gets posted to the company website and people see it or they don't see it.

This immediately goes to the production people, and they have a list of instructions as to, you know, what do I do when this thing is coming down the line. I grab two of this part and one of this part and one of

this thing, and I put them in there. And that's how they assemble it. So when the ASAP change order goes in there --

THE COURT: Slow down.

MR. TECHENTIN: I'm sorry. I forgot we were on the record, your Honor.

When the ASAP change order goes in, those people are immediately instructed you don't grab the dice out of this bin anymore. You grab two of this die.

THE COURT: Okay. I got it. I got it.

So are you basically in agreement with that?

MR. ZEULI: Probably not. I understand what he's saying, but there are just a number of things that are inconsistent with that.

For example, the change order was issued on November 2nd. On November 1, there's an e-mail that mentions 150,000 dice sets in stock and 120,000 dice sets scheduled to ship from the Orient.

So we don't know what happened to the 270,000, you know, that were in stock at that time.

THE COURT: You all don't know that?

MR. ZEULI: We don't know -- what we don't know is whether the dice were removed from those games and replaced with the other die, or whether they just went out the door with the accused dice.

THE COURT: Okay. Well, I'm not going to spend a lot of time on this. The reason I'm asking the question is the witness is making certain assumptions which you're contesting, obviously, with your questions, about to what degree the timetable in which this game was marketed and sold would drive the negotiating power of the two entities. And the kinds of facts that are helpful to analyzing that from my point of view, and I would think from the witness's point of view, frankly, would be the kinds of things we're talking about, how many games were sold during the first period, how many games were sold with the replacement die and stickers. You know, from that, can you tell anything about how it affected sales. What happened if there were die being produced in another country? If there were hundreds of thousands of die, did those make it into the games, or did they get thrown away, or what happened? I don't know if it's going to matter all that much, but that's the kind of thing that it could be relevant.

For our present purposes, I think I understand your respective positions. He says the timing drove the negotiating positions of the parties, and you're challenging that, and I understand the thrust of your challenge. I think we can move on here. I do want to

get through this today.

MR. TECHENTIN: I have one last topic, your Honor.

THE COURT: Okay.

**BY MR. TECHENTIN**: (Continuing)

Q. Mr. Lapidus, in your expert report, and you've testified to this just recently with the Judge, your expert report essentially suggests that the royalty rate that would be reached at this hypothetical negotiation is a function of, anyway, Bowling's selling price; is that right?

A. Well, it is just priced off of his selling price. It's not necessarily -- I guess you could maybe say it's a function. But it's concluded based on the factors and using his pricing mechanism per die as opposed to a percent of the sales of or the selling price of the product. Either way you'd get to the same answer.

Q. Where in your report do you discuss why Hasbro would ever agree to pay this much for the die?

A. I think that's what I've been testifying to today, and, specifically, we're going back again to this timing issue and the predicament that they were in. And I believe my whole report discusses it. I don't think it's -- I think that's why I'm here. And in

terms of being used as an expert and want the opportunity to present that because I believe that, given my understanding of the facts in this case and the 15 Georgia-Pacific factors, that that is the conclusion I come to.

Q. You're aware that Mr. Hirtle testified on behalf of Hasbro that his approach to what a royalty would be was based on considering the value that the dice would add to the game and then applying a reasonable royalty rate to that. Are you familiar with that testimony?

A. Yes.

Q. And so Mr. Hirtle's approach was to say, well, let's look at the component cost of the game and plus that up to a number for the net sales, and then we'll take a five percent royalty on whatever the die is contributing to net sales; is that right?

A. If it would be possible to do that. I don't think it's possible to do that, but I think that's what his deposition said.

Q. You did not take that approach in calculating reasonable royalty, correct?

A. Well, I think, Mr. Techentin, his deposition also said that he has never done that approach. That that's the approach he would either like to use, I'd want to look at his deposition, but that's the approach that he

would like to use but he had never done that.

The couple of examples you brought to court to show percentages did not at all relate to that methodology, and that was that solenoid and the other item -- in the exhibits, the Solenoid Jaw Mechanism or the Quick Fill Cap, which were parts. And I think the Honey Pot, I haven't seen any evidence of that, that it was a certain percentage of the total or a percentage of the value added. That's not in any of the agreements. And that's Hasbro's agreements.

Q. So if you want to use those, perhaps, as a benchmark, those suggest that where you're talking about a component, the demonstrated range would be in the area of one half to one percent of net sales, correct?

A. I think I testified what the agreement said, but I think as to your question, those -- at least that methodology is not recited in those agreements.

Q. I'm not asking you about the value-added methodology. I'm asking you based on the Hasbro contracts that you have in front of you and that you've reviewed, those contracts suggest that Hasbro's practice, anyway, is to expect a royalty for components in the neighborhood of one half to one percent?

A. These are the three agreements, and one of them

has an advance. They're dated different dates, and they say what they say in terms of a percentage.

Q. So based on Mr. Hirtle's understanding -- and Mr. Hirtle was the one who was negotiating with Mr. Bowling with respect to potentially licensing the product, in fact, back in 1999, correct?

A. Yes. Actually, if I can add something that's kinds of interesting, your Honor, the dates of these agreements are February and March of a specific year, which would seem at a proper selling point to be negotiating a contract, not in August. And it gets back to my timing issue.

Q. Given Mr. Hirtle's testimony that he would expect a comparatively low royalty based upon the value added of the dice to the game and the contracts that you reviewed that range from one half to one percent, other than the unique timing of the August date within the Hasbro business cycle, do you disclose anything in your report that justifies why Hasbro would be willing to accept a royalty rate 12 to 24 times that high in the case of the Avon Edition?

A. I believe in going through those factors, yes. That that -- the factors get you to that percentage, and I believe my report says that.

Q. Mr. Lapidus, my question is designed to elicit why

Hasbro would agree, other than the timing, is there anything in your report that discusses why this royalty would be acceptable to Hasbro assuming that it was a willing licensee?
A. Yes. I believe all of the factors do, but I think the timing and how this occurred is a key item, is really instrumental in determining that royalty value.
Q. Is there any component of your report that you can point to that discusses this issue of here's why I think Hasbro would be amenable to a 58-and-a-quarter cent per die royalty?
A. Yes. I think all the factors show that it would tend to increase the royalty, and, therefore, that is how you get to the conclusion of 58-and-a-quarter cents per die.
MR. TECHENTIN: Can I have one second, your Honor?
Q. Mr. Lapidus, are you familiar with something called the Litigation Services Handbook?
A. Yes.
Q. Is that a reference that you use?
A. Yes.
Q. Is it a reference that you consider to be authoritative in any respect?
A. It's a reference.

Q. Is it a reference that you have used in the context of preparing damages analyses in patent infringement cases?
A. I may have looked at it, yes.
Q. Did you refer to that in the context of your preparation of a report in this case?
A. I do not know. I don't believe so.
Q. When was the last time that you looked at the portion of the Litigation Services Handbook concerning patent infringement damages?
A. I don't know.
Q. Are there other authorities that you consider to be either authoritative or highly informative with respect to your role as an expert determining patent infringement damages?
A. That is a good support. I think ABA and their CLE courses have good authoritative support or lecture topics that are given and information that's distributed is -- would be a good reference point, but the Georgia-Pacific factors are really putting you in a negotiation point rather than saying there's a specific guide or rule that you have to use either a percentage or a number or another number.
Q. As a certified public accountant, are you obliged to follow any rules or codes of conduct?

A. Yes.
Q. And what are those?
A. Well, it would be based upon the work that you are performing. So, I mean, what are you saying? I'm not sure what you're looking for. Codes of conduct with respect to litigation support or just codes of conduct in general?
Q. Are there codes of conduct that apply in the context of your provision of litigation support such as a case like this?
A. Yes.
Q. What are those?
A. You would use properly trained people. You could consider any authoritative support. You would document your work. Those would be a number of -- maintain independence, maintain confidentiality. Those are a number of those guidelines.
MR. ZEULI: Excuse me. I'm sorry to interrupt you.
Your Honor, in the interest of time, this is a vigorous cross-examination, they'll have this opportunity at trial, but it goes to just that, cross-examination and the weight and not to admissibility. I would ask that -- and given it's four o'clock now, that we move on.

THE COURT: What does this have to do with admissibility?

MR. TECHENTIN: I'll stop, your Honor.

THE COURT: Okay.

MR. TECHENTIN: I have nothing further.

THE COURT: Mr. Zeuli, do you have any redirect?

MR. ZEULI: Yes, your Honor.

(Brief recess.)

THE COURT: Are you ready, Mr. Zeuli?

MR. ZEULI: Yes, sir. Thank you, your Honor.

**REDIRECT EXAMINATION BY MR. ZEULI**

**Q.** Mr. Lapidus, do you still have Exhibit D before you. It's the April 7, 1999 letter. Should be on your --

MR. ZEULI: May I approach the witness, your Honor?

THE COURT: Yes.

**Q.** Mr. Lapidus, what I want to have you do is take a look at this letter and help the Court understand the difference between the 64 cents rate that was applied in the United States and the rates that were applied outside of the United States.

And I direct your attention to the first sentence of paragraph three. There it's talking about a 49-and-a-half cent rate for a thousand unit minimum

order. Do you see that, sir?
A. Yes.
Q. And you understand that to be the price that Mr. Bowling sold to his distributors?
A. To his distributors, that's correct.
Q. And then the next sentence goes on and says that the distributors sell them for 64-and-a-half cents per unit, correct?
A. Yes.
Q. And then the retailers for $1.25?
A. Yes.
Q. Can you help the Court understand why it is that Michael Bowling would have treated Hasbro as a retailer rather than a distributor?
A. Well, a couple of reasons. Number one, he is not using the distributor chain, so he is going directly from himself to his customer. And in order to maintain the integrity of his, say, wholesale or distributor chain, he would have to charge more than 49 -- for sure in this case, this exhibit, 49-and-a-half cents or he probably would not have any wholesalers or distributors because he is basically undercutting their price.
So when he sold on his own, it is my understanding he sold for 64-and-a-half cents. So when he sold directly to a customer, that is what his price

was.

Q. If I can direct your attention to the fourth or fifth paragraph. It begins with "These qualities." Do you see that paragraph?

A. "These quantities"?

Q. I'm sorry. "These quantities." Then the second sentence says, "We have the same terms for all of our distributors in the United States."

Do you understand that to mean that it's the terms represented up above of the 65 cents, if you will?

A. Yes. Not relating to the pricing structure because there is a reference that says, "Our pricing structure outside the United States."

Q. And then Mr. Bowling specifically says, does he not, that he does not give any discounts here at all, correct?

A. That's what he says, yes.

Q. And the "here at all" would refer to what?

A. The United States.

Q. And what is your understanding as to why Mr. Bowling did sell outside of the United States at a lower price?

A. Well, it's not a patented product outside the United States, and, therefore, he could not get the

same price that he could get where his patent is enforceable.
Q. Let me take you back to the Georgia-Pacific factor number 11. And Mr. Techentin had you go through a hypothetical. Do you recall that?
A. No.
Q. Well, I'll represent to you that there was a hypothetical. And part of the hypothetical was that you were to assume that there was an acceptable, and that was the words I wrote down, an acceptable replacement for the widget that he was describing that was about to infringe.
Let's go to this case. Were the dice, the non-infringing dice that Hasbro eventually put into their products, were those acceptable to Hasbro's own marketing department?
A. They were not. They specifically -- and I thought I stated, and maybe it wasn't in this specific item, Georgia-Pacific factor number 11, that they wanted his die and very specifically wanted his die. And I reviewed information that showed that it was his.
Q. And by "his die," you're referring to Michael Bowling's?
A. Yes.
Q. Sort of the alleged infringing die.

And then would you say that the dice that eventually replaced the accused dice, were those acceptable to the customers who eventually ended up with these games?
A. Well, a number of them, obviously, complained and replacement die were either sent out, or I suppose the product was returned, but they received complaints because people said the picture shows a die or you promised me this and, in terms of buying, that's what I expected to have in the packaging and it was not there.
Q. In fact, they received 818 complaints, correct?
A. Well, as I stated, I don't remember the exact number, but I think it was something in that range.
Q. You heard earlier, did you not, that Mr. Techentin was representing that they made some change, if you will, in November, correct?
In other words, they made a change to the non-accused dice sometime in November, correct?
A. Yes. It does become a little more complicated because, your Honor, they can change sort of the manufacturing process. And regardless of whether they can do it instantly or not, if I even assume for a moment that they can, which they probably can't, but if I assume they can, you still have merchandise on shelves, and you still have some inventory.

So you just can't, unfortunately, stop the process. And given the timing, you probably wouldn't want to stop a process.

So one of the reasons why I didn't see an alternative would be to stop selling completely.

Q. Mr. Lapidus, do you know how many Millennium games were sold from the time of the change until the end of December? Roughly or exactly, do you know?

A. Well, in November, they sold -- actually, their highest month in 1999 up to that point, 109,000 units. I don't know the date, know each day.

And in December, they sold 281,000 units.

Q. Were you aware, sir, of the date range in which those 818 complaints about the missing futuristic dice were made?

A. Well, it would probably be within that time period, because --

Q. That's right. I'll represent to you the date ---

A. -- they're replacing all the dice.

Q. The date of the complaints were made in December of '99.

Mr. Lapidus, are you familiar with the Book of Wisdom and the ability to use future data in calculating a reasonable royalty?

A. Yes.

Q. Can you explain to the Court how the Book of Wisdom works with respect to the Georgia-Pacific factors.

A. Essentially, you really don't have or are not required to have an absolute starting point or a starting percentage in that if there is not, as to Georgia-Pacific factor number one, your Honor, if you don't have available -- an available, exact percentage for that product, that is when you work through this series of factors to determine what that item, what that product would be. And that's generally the process.

You don't absolutely have to have or can have in many situations even a starting point, because that's the source oftentimes of conflict, and that's how it arises, because you don't have a starting place or this is a new or different item. And that's oftentimes the case. It makes it more frustrating. That's why you might refer to other sources, even other contracts. But it goes far beyond just that. I think there are other factors, and I guess I've expressed them to the Court today.

Q. I think you testified earlier that in perhaps a majority of the cases in which you've been involved, there was not an established royalty to begin with

before applying the Georgia-Pacific factors, correct?
A. Yes.
Q. In any case in which there was no established royalty from which to begin, was your testimony ever precluded by any court?
A. No.
Q. Was it even challenged?
A. No.
Q. Is it fair to say it's commonplace, perhaps, to have patent cases in which there is no established royalty rate but from which the Georgia-Pacific factors flow as an analysis?
A. Yes. And that's because of the peculiarity or specificity of the product and when it is not necessarily generational, when you're moving from one level to another, that is very often the case. And if, I can assure you, your Honor, if I would find comparisons, someone would say, well, maybe they're not necessarily comparable. And a solenoid in this case isn't like a die. And they are toys, and they are -- or it's a very special item, not just necessarily in toys, that require going through some review.
Q. Mr. Lapidus, let me turn you to factor one of your analysis of the Georgia-Pacific factors.
And in answering some of Mr. Techentin's

questions, I believe you had testified that the demand -- the demand was from Hasbro, but I'd ask you to look at paragraph number one and what you wrote, and I'm wondering if that was a mistake.

I'm wondering if in the second sentence you're talking about the demand by the customers and distributors of Michael Bowling.

A. Well, it is the customers of Michael Bowling, but Hasbro or someone would be a customer.

So I mean, customers, I think, include the entire population of someone that would buy product, not necessarily just -- it would be all his customers.

Q. So in the sentence that talks about the patent, he sells patented die, who is the demand that you're referring to?

A. The demand -- well, would really be their customers. So whoever they are selling the product to.

Q. The Court talked to you a little bit about the relative importance of the dice to the overall Hasbro game. Do you recall that?

A. Generally, yes.

Q. Okay. I take it that the relative importance of the dice is not the only task at hand in analyzing the value of the dice to the game; is that correct, under the Georgia-Pacific factors?

A. Yes.

Q. In analyzing the relative importance, did you consider the advertising that Hasbro had done both in media and on the box covers of the accused dice?

A. Yes.

Q. Did you consider the marketing demands of the Hasbro marketing department for those dice?

MR. TECHENTIN: Objection, your Honor.

THE COURT: Just one second.

MR. TECHENTIN: Leading the witness.

THE COURT: You're objecting to leading?

MR. TECHENTIN: Yes, your Honor.

THE COURT: All right. Don't lead.

MR. ZEULI: Yes, your Honor.

<u>BY MR. ZEULI</u>: (Continuing)

Q. What else did you consider with respect to the relative importance of the dice to the overall Monopoly game?

A. Not only the availability, the fact of packaging and the timing as to when this product was there. The type of game that it was packaged for, and the fact that it, in information I reviewed, they wanted that particular die so their demand and their understanding of having a futuristic die in the game was something that was important to them.

Q. I want to go back to where we began this morning, and that had to do with a number of companies that you've been involved with that dealt with toys and licensing. And you identified some particular licenses that you were aware of.

Did you use any of those licenses in preparing your report in this case or reaching your opinion in this case?

A. No.

Q. Did you physically go back and see any of those license agreements from those companies that you sort of identified, companies one through five, to prepare your report or give your opinion in this case?

A. No. They would not be available to me. Strictly my own experience in working with these people, but not -- I would not go back and look at any specific items. And our clients would consider them and have considered them confidential.

Q. Last question for you then. Why was this hypothetical negotiation four months before the Millennium game came out different from other hypothetical negotiations that you have undertaken as part of your work as an expert witness?

A. I think several reasons. One is that I think peculiar in this case is the timing, the fact that the

product was I'd say manufactured, but advertised and already put in the merchandise to be sold really puts both parties in a unique position.

MR. ZEULI: I have nothing further, your Honor. Were you done? I'm sorry.

A. And I think, if I didn't say it, all of the advertising surrounding that was unique, and contained either pictures, images of this dice. So I think that makes it a very unique situation and very unique in retailing, and I place a very heavy emphasis on that.

MR. ZEULI: Nothing more for this witness.

THE COURT: Mr. Techentin, do you have any recross?

MR. TECHENTIN: Very briefly, your Honor.

**RECROSS-EXAMINATION BY MR. TECHENTIN**

Q. Mr. Lapidus, Exhibit C to your report was sales by month of the infringing items, correct?

A. No. Well, those are their purchase orders -- well, I'm sorry. C? Excuse me.

Q. Well --

THE COURT: Just let him answer the question.

A. Yes. As to one section of it where it says "Sales by month."

Q. Is this the source from which you were testifying for Mr. Zeuli as to the differences between November

sales and December sales?
A. Actually, no. I have another schedule that shows probably total sales for the game that more supports the demand.
Q. What schedule is that?
A. It is in my notes. Actually, you took a copy of it.
Q. But that's not in your report; it's in your notes?
A. It's in my notes, that's correct. When I made that statement, I was looking at my notes.
MR. TECHENTIN: I don't have any further questions, your Honor.
THE COURT: I have a few questions. Let's talk about that last point. You testified that December sales were 281,000 units, but this report says that sales are 131,500 units. What's the basis for that difference and which is it, if you know?
THE WITNESS: Your Honor, I think the total sales were 281, and the difference may be on the -- because of the timing, the reorder that did not include the product.
THE COURT: So this is product with the offending die?
THE WITNESS: Is their demand, yes, sir.
THE COURT: The 281 includes both the offending

and replacement, is that what you're saying?

THE WITNESS: Yes, sir. But I didn't calculate a royalty, obviously, on the replacement.

THE COURT: That's fine. You were referred to by Mr. Zeuli something called the Book of Wisdom. What's that?

THE WITNESS: That is a book that references application of the Georgia-Pacific factors, and it's a reference or literature that talks about these topics.

THE COURT: Okay. Is that referenced in your report? Maybe I missed it.

THE WITNESS: I do not see it referenced here, your Honor.

THE COURT: Are you saying that you relied on that book to conduct the Georgia-Pacific analysis?

THE WITNESS: No. Just that it is a reference source that probably differentiates if you have -- an explanation, if you would have a patent versus -- something that has a set dollar amount versus formulating it through the Georgia-Pacific factors.

So I guess my point is it's not unusual to start with a product, in this case the dice, where there is not a patent, where someone hasn't signed something or had something in advance, I'm used to seeing that and that is very common, whether it be dice or any other

item. And therefore, it's not a -- to me, it's pretty standard that you don't have it.

THE COURT: So where does one obtain the Book of Wisdom, if one were interested in seeing it?

THE WITNESS: We could get you a copy.

THE COURT: Either of you know? Counsel, what is this Book of Wisdom? I'm in search of wisdom.

MR. ZEULI: Yes. Yes. Wisdom is always good, isn't it? You know, honestly, I don't know that it is an actual book. It may be, but normally the Book of Wisdom comes in in the Georgia-Pacific factors. It may have what Mr. Lapidus testified to, but it goes to allowing the parties to look forward.

THE COURT: I just want to know where I get it.

MR. ZEULI: I guess I don't know the answer to that. Maybe Mr. Techentin knows.

MR. TECHENTIN: Your Honor, the Book of Wisdom is a metaphor, it's not a book.

THE COURT: How am I supposed to know that. Tell me what it is, if it's not a book.

MR. TECHENTIN: Your Honor, as I understand it, the Book of Wisdom is a construct of Supreme Court case law. And what it says and what all this means is that, for example, if there were things that were knowable at the time that you conducted a hypothetical negotiation,

but those facts are no longer known, for example, sales forecasts, at the time of the hypothetical negotiation the parties would have had available to them sales forecasts, but those sales forecasts are no longer available, what the Supreme Court told us is that under those circumstances an expert can take into account actual sales data. Now, that sales data wouldn't have been available at the time because it was forecasted at that time, but we don't have that forecast. What the Supreme Court said is the expert may take advantage of that, quote, unquote, Book of Wisdom, that is actual experience.

THE COURT: What case does that come from?

MR. TECHENTIN: For hypothetical negotiation?

THE COURT: What case does that come from?

MR. TECHENTIN: **Sinclair Reference Company versus Jenkins Petroleum Company**, or Refinement Company, I'm sorry, 1933, your Honor.

THE COURT: All right. I can find it. Okay. Now, Mr. Lapidus, you've testified as an expert a number of times. You have knowledge of what the Daubert factors are that we apply to evaluating expert testimony. And I'm wondering, as to the methodology that you have used here, do you know of any way of testing the methods that are applied when you do your

expert analysis of what you were called upon to do here, and that is, to analyze or to conduct or describe a hypothetical negotiation?

THE WITNESS: I suppose, your Honor, in just thinking about it, you would test it, probably put it before the jury and see what that conclusion is. It is a hypothetical negotiation. It's as of a date. And in this case, that, in my mind, becomes very important, and I think that that's been brought out here today. But at the end of the day, is it 58-and-a-quarter cents or 68-and-a-quarter.

THE COURT: Here's what I'm really asking. I agree, putting it before the jury is a form of an ultimate test. The question is whether an expert should be able to opine or the jury should just be able to get all the information and figure it out.

What I'm asking you is are you aware of any scholarly work that has attempted to sort of put the kind of analysis that you have applied here to the test to determine its reliability, to determine its accuracy.

So for example, do you know of anyone who has sort of done a study, if you will, that compares the expert's analysis of the Georgia-Pacific factors in a hypothetical negotiation and actually puts parties into

a negotiation and sort of compares where the two come out? Have you ever heard of that sort of thing?

THE WITNESS: I think I know what you mean, your Honor. I have not heard of that and am not aware of someone going back and testing it, and I think, probably, because of the unique circumstances. I think -- and I've taken a CLE class in Daubert issues, and I didn't think I'd be using it all day here today, but in going through it, clearly a test would be if you are doing this on a regular basis. And it's my understanding and my learning that that is probably more important because you will always disagree about the number, but are you actually qualified and able to do that and have you done it before and done it at least throughout some period of time. And that's something that you do on a regular basis. We may not agree with the number, but that is my understanding.

And I don't know anywhere, you can ask counsel here if there's any studies that that has been checked. I'm not sure it would be able to be checked because it's done not arm's-length, and this starts out with the supposition that it's going to be arm's-length.

THE COURT: A similar question is are you aware of any peer review studies of this methodology? In other words, are there any scholarly articles out there

that talk about whether expert testimony of this type is reliable?

I mean, you're in the field and I'm not. I just wonder if you have ever run across anything of that kind.

THE WITNESS: Your Honor, I think, yes, as to sort of understanding Georgia-Pacific or why those factors are important. I believe there is some literature. I can't turn you to something right now. I can check and look for you. I would believe there would be some writing on it. This has been used -- this is not a new concept, as you know. And we will surely disagree, probably, and that's why it comes in the context of being here in court as to what a number would be and has this one been applied perfectly to this case or factor number one or factor number two.

Factor number one, you don't take that necessarily first. You may take factor number seven first. You may look at the duration of the license and say that that's where I may start.

So it is really looking at all of these items and putting some weighting on them. But I don't know if there's anything -- I can't specifically turn you to an article, but if you'd like me to check, I will to better help you understand it.

THE COURT: I'm going to give the parties an opportunity to file some post-hearing briefs so you can consult with counsel on that. If you can find it, he'll provide it, I'm sure.

All right. I think that's enough. I think you can step down. Thank you very much. Let's go off the record for a minute.

(Discussion off the record.)

THE COURT: Now, I haven't read all the cases in which this type of expert testimony has been accepted, but I have to say that I have some concerns about how this testimony stacks up in terms of the kinds of things that Daubert, Khuomo Tire require us to consider.

The methodology here, as the witness testified, there's no way to test this methodology. There hasn't been any testing of it. It's not falsifiable, so to speak. It doesn't sound like there's any real serious peer review going on. I can't discern any way to figure out an error rate. You've got acceptance, it seems to be fairly well accepted that someone with his credentials could give expert testimony on this so-called hypothetical negotiation, but I'm really having a hard time understanding -- this isn't a criticism of Mr. Lapidus or Mr. Sussman. I haven't

read his report yet. But I've really got a hard time with this whole idea that someone can sort of place themselves in a hypothetical negotiation that would have taken place in 1999 and sort of recreate what would have happened in that hypothetical negotiation, and then render an opinion as to what the outcome of that negotiation would be. It sounds like -- it sounds more like rank speculation to me.

And I'm also wondering why the raw data, whatever it is, shouldn't just be given to the jury with an instruction that reflects the Georgia-Pacific factors as the kinds of things that the jury should factor into an assessment of the damages, if any, if they find an infringement, and let the jury sort it out after you argue the various points.

In other words, I don't see why this is really outside of the common understanding of the people on the jury. You know, jurors understand how products get marketed. I think jurors, actually, would be very good at sort of taking the game in their hands and looking at the thing and asking the question, well, how important is this dice to the overall marketing of the product. I think your average juror is your average game consumer. So why wouldn't a juror be pretty good at kind of making that assessment. Well, by gosh, the

dice is really important to the way this whole thing looks, or it's a trivial part of the whole packaging. Put the advertising material in front of the jury, put the packaging in front of the jury, put the time frame in front of the jury, the sales data, all of that goes to the jury and let them figure it out in light of the factors, the Georgia-Pacific factors what the -- and the other information, what royalties are typical, and in what context and let them figure it out. So that's the thing I'm sort of struggling with.

So between now and whenever your briefs are filed, I'm going to read the cases where judges have considered challenges to this type of testimony, but from what I understand, I'm not sure there's been a lot of really serious challenges to this type of testimony. Maybe there have been, but we'll see.

He testified that he hadn't ever been challenged in this way.

MR. TECHENTIN: I think I can say with some confidence that the bulk of the relevant cases have now been cited in the briefs between the two parties. I don't think there's a lot of case law out there that we have to discuss.

THE COURT: The only point I make is if there's anything more you want to say about him, his testimony

and his opinion in light of the -- any more you want to say about his proposed testimony in light of the testimony he's given in this hearing, I want to give you an opportunity to say it, to summarize it, marshal it, if you want to. You don't have to.

MR. TECHENTIN: Your Honor, I actually think that that would be helpful. Something in the nature of a post-trial brief where we're providing some actual record citations. And in terms of timing, I would ask the Court to take into consideration the fact that we would like to have the benefit of the transcript for that, and I don't know what the timing for that is.

THE COURT: Okay. Let's go off the record. That will help.

(Discussion off the record.)

THE COURT: So I'll see you next week, the 24th, 9:30.

(Court concluded at 4:55 p.m.)

C E R T I F I C A T I O N

I, Anne M. Clayton, RPR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

Anne M. Clayton

Anne M. Clayton, RPR

Jan. 28, 2008

Date