# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

COPY

| | |
|---|---|
| * * * * * * * * * * * * | * CIVIL ACTION |
| MICHAEL BOWLING | * 05-229S |
| | * |
| VS. | * JANUARY 24, 2008 |
| | * |
| HASBRO, INC. | * PROVIDENCE, RI |
| * * * * * * * * * * * * | * |

HEARD BEFORE THE HONORABLE WILLIAM E. SMITH

DISTRICT JUDGE

(TESTIMONY OF BARRY SUSSMAN)

APPEARANCES:

FOR THE PLAINTIFF: ANTHONY R. ZEULI, ESQ.
and THOMAS J. LEACH, ESQ.
Merchant & Gould, P.C.
3200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
(612) 332-5300

FOR THE DEFENDANT: JEFFREY TECHENTIN, ESQ.
Adler, Pollock & Sheehan
One Citizens Plaza
Providence, RI 02903
(401) 274-7200

Court Reporter: Anne M. Clayton, RPR
One Exchange Terrace
Providence, RI 02903

Proceeding reported and produced by computer-aided stenography

# I N D E X


| WITNESS | PAGE |
|---|---|
| BARRY SUSSMAN | |
| Direct Examination by Mr. Leach: | 3 |
| Cross-Examination by Mr. Techentin: | 21 |
| Redirect Examination by Mr. Leach: | 37 |
| Recross-Examination by Mr. Techentin: | 47 |
| PLAINTIFF'S EXHIBITS | |
| 2 - | 18 |
| DEFENDANT'S EXHIBITS | |
| E - | 35 |

**BARRY SUSSMAN**, first having been duly sworn, testified as follows:

THE CLERK: Please state your name and spell your last name for the record.

THE WITNESS: Barry Sussman, S-U-S-S-M-A-N.

THE COURT: Good morning, Mr. Sussman.

THE WITNESS: Good morning, your Honor.

THE COURT: You may inquire.

**DIRECT EXAMINATION BY MR. LEACH**

Q. Good morning, Mr. Sussman.

A. Good morning.

Q. Can you tell the Court who retained you in this matter.

A. Mr. Techentin of Adler Pollock and Sheehan on behalf of Hasbro.

Q. And what were you asked to do?

A. I was asked to analyze the potential damages that Mr. Bowling sustained if, in fact, his patent was found to have been infringed by Hasbro. And I was also asked to eventually analyze the report that Mr. Lapidus submitted.

Q. You have a BS in accounting, correct?

A. I do.

Q. Are you a lawyer?

A. No.

Q. Are you a certified public accountant?
A. Yes, I am, in New York and Massachusetts.
Q. Are you licensed or -- excuse me. You're not licensed in Rhode Island, are you?
A. No.
Q. And were you a partner in two national accounting firms?
A. I was.
Q. Are you a member of the Licensing Executive Society?
A. I am.
Q. And you've performed a variety of accounting, financial and economic analyses for clients in a variety of settings, correct?
A. Yes.
Q. And you've advised clients on licensing issues, correct?
A. I have.
Q. Separate from this litigation, you've not advised Hasbro on any royalty issues, have you?
A. No, I have never.
Q. Have you ever negotiated -- let me rephrase that. You've not negotiated any royalties for board game companies, have you?
A. No.

Q. And you've not negotiated any royalties for game companies, correct?
A. That's correct.
Q. And you have not negotiated any royalties for toy companies, correct?
A. That's correct.
Q. And you've been retained by both patent owners and those accused of infringement, correct?
A. Yes.
Q. How many times have you been retained by patent owners?
A. How many times have I been retained by patent owners?
Q. Yes, for damage analysis in a patent case.
A. I'm not sure I could tell you off the top of my head. I don't know offhand as I sit here.
Q. Do you have an estimate?
A. No, not offhand.
Q. Would you guess if it's more than 20 or less than 20?
A. I honestly don't know.
Q. Have you ever been retained by an individual inventor?
A. In what context?
Q. In the context of a patent litigation matter.

A. So you mean an individual, meaning a non-corporate entity, someone like Mr. Bowling, for example?
Q. Yes.
A. Nothing comes to mind specifically.
Q. Now, in your report, you state that you consulted a variety of companies regarding licensing strategy and appropriate royalty rates, correct?
A. Yes.
Q. Did any of those licenses concern board games?
A. No.
Q. Did any of those licenses concern games?
A. No.
Q. Did any of those licenses concern toys?
A. Nope.
Q. Have you ever conducted -- excuse me. Have you ever concluded that a reasonable royalty would be a dollar amount rather than a percentage of sales?
A. Yes.
Q. Have you ever concluded that a reasonable royalty would be five percent or higher of net sales?
A. Yes.
Q. Have you ever concluded that a reasonable royalty for a component of a product would be higher than five percent of net sales?
A. Yes.

Q. Have you ever concluded that a reasonable royalty would be an appropriate patent damage award where there was no established royalty?
A. Can you say that again.
Q. Yes. Have you ever concluded that a reasonable royalty would be an appropriate patent damage award where there was no established royalty?
A. Of course. Yes.
Q. Can you describe your departure from Huron Consulting Group. Actually, let me back up. You're no longer with Huron Consulting Group, correct?
A. That's correct.
Q. Can you describe your departure from Huron.
A. I resigned from Huron in the beginning of May of 2005.
Q. Can you explain why you resigned or go into the details a little bit.
A. There were a variety of reasons why it wasn't working out for me or for them.
Q. Were you asked to leave?
MR. TECHENTIN: Your Honor, objection. This is not relevant to the question of Mr. Lapidus' qualifications or his -- or the reliability of the analysis. That's the only issue that's before the Court. I would remind the Court that there's been no

challenge to Mr. Lapidus in the nature of a Daubert challenge.

THE COURT: Right. Well, I mean, there are contexts in which it could be relevant, but you have not filed a motion to exclude his testimony. So I'm, frankly, a little confused. It seems like you're working at cross-purposes with yourself. On one hand, I thought you were putting Mr. Sussman on to establish that the methodology and the conclusions reached by Mr. Lapidus were consistent with the methodology used by Mr. Sussman.

But if you're going to undercut Mr. Sussman's qualifications, that would seem to then undercut his value to you as a witness to sustain or bolster the testimony of Lapidus.

So what is it -- which are you doing here?

MR. LEACH: Well, I think credentials and methodology are two separate issues. And if Hasbro believes that Mr. Sussman is more than qualified, we're just showing some of the parallels between Mr. Lapidus and Mr. Sussman or showing that Mr. Lapidus may be more qualified, and then I will get to methodology.

THE COURT: So you are -- you're conceding that Mr. Sussman is qualified to render an opinion in this case with respect to royalties. Did I just hear you

correctly?

MR. LEACH: I'm not conceding that.

THE COURT: Okay. Well, if you think he's not qualified to render such an opinion, why haven't you filed a motion to exclude his testimony? I guess I'm confused. Maybe you can clear all this up for me.

MR. LEACH: Well, I'm just getting some background.

THE COURT: I'm not asking you about the background. I want to know if he's -- if you believe he is qualified to render an opinion, then -- and you're not challenging him, then that's one thing.

If you think he is not qualified to render an opinion in this case as an expert, I could certainly understand the questions that you want to ask him to undercut his qualifications, if that's what you're attempting to do; but you haven't filed a motion to accomplish that.

MR. LEACH: I understand that.

THE COURT: So if that's what you're attempting to do, this is an inappropriate way to do it because you should have filed a motion in limine to exclude him as a witness.

MR. LEACH: What we're trying to show is that he is less qualified than Lapidus. And Hasbro, obviously,

contends that he's qualified to render an opinion in this case on damages. So I think it goes to whether or not Mr. Lapidus is qualified.

THE COURT: Well, you just said you want to show he's less qualified than Lapidus, and then you said it goes to whether he is qualified. Tell me what your position is with respect to Mr. Sussman's qualifications to testify in this case as an expert.

MR. LEACH: Your Honor, I'm trying to understand his qualifications aside from what's disclosed in his report. We have not previously deposed --

THE COURT: Well, that's your problem. You could have deposed him. This is not a deposition.

MR. LEACH: I understand that. I'm merely trying to establish that Mr. Sussman is less qualified than Lapidus. And Hasbro obviously contends that he's qualified, that their expert, Mr. Sussman, is qualified to testify.

And I think if I can show the parallels between Mr. Lapidus or that Mr. Sussman is less qualified than Mr. Lapidus, then Hasbro's motion should fail.

THE COURT: Mr. Techentin.

MR. TECHENTIN: Your Honor, I would object on the grounds we have not put this in issue. Hasbro did not advance Mr. Sussman as some bellwether for the

qualifications of an expert in this case and, therefore, this would be appropriate cross-examination of that contention.

Mr. Lapidus' credentials and his qualifications and his methodology and his analysis and his conclusions should stand or fall on their own, and to back door some sort of challenge to Mr. Sussman in this case is entirely inappropriate.

And whatever the Court concluded about Mr. Sussman's credentials on the basis of this examination would be irrelevant to whether or not Mr. Lapidus is himself qualified. So I would object to the entire line of questioning.

THE COURT: This line of questioning may be appropriate at trial. You have to recognize that.

MR. TECHENTIN: Of course, your Honor.

THE COURT: And cross-examination at trial, I mean, they can ask these questions.

MR. TECHENTIN: But at trial, your Honor, we would be advancing Mr. Sussman as an expert; and, therefore, these things would be at issue. They are not today.

THE COURT: I agree with you.

MR. LEACH: I'll move on to methodology.

THE COURT: Okay.

<u>BY MR. LEACH</u>: (Continuing)
Q. How many reports have you prepared regarding patent damages?
A. I don't have an exact number, but certainly around 50.
Q. And of those 50 times you've prepared a report in patent damages, how many included a reasonable royalty as part of those damages?
A. I couldn't tell you with any precision, but I could -- the best way for me to answer is that only a handful of those times would not have included a reasonable royalty as a measure of damages.
Q. So maybe 40 to 45 would have included reasonable royalties?
A. That's my best estimate.
Q. And of those 40 to 45 times where reasonable royalty was included, how many times did you use the Georgia-Pacific methodology?
A. If not all of those times, certainly very close.
Q. Do you know, have you ever calculated a reasonable royalty in a patent case based on a methodology other than Georgia-Pacific?
A. Not that I can recall specifically, but -- it's possible that I have, but I just can't recall.
Q. And the Georgia-Pacific methodology includes

reconstructing a hypothetical negotiation between the parties at the time of the infringement, correct?
A. That's my understanding, yes.
Q. Have you ever been disqualified as an expert witness in any proceeding?
A. No.
Q. How many times have you testified as to a reasonable royalty based on Georgia -- excuse me. I think I've covered that.
Do you know if you've ever been prevented from testifying as to a reasonable royalty based on the Georgia-Pacific factors?
MR. TECHENTIN: Objection, your Honor. That goes to his qualifications.
THE COURT: I'm going to allow it. I'm interested in this topic. So go ahead.
A. Can you repeat the question.
Q. Yes. Have you ever been prevented from testifying as to a reasonable royalty that was based on the Georgia-Pacific methodology?
A. Not that I'm aware of, no.
Q. Okay. I want to switch gears and get to the methodology that you applied in this case. Okay? In this case, you prepared a report, correct?
A. Yes, I did.

MR. LEACH: May I approach the witness, your Honor?

THE COURT: Yes.

MR. LEACH: I've handed the witness what has been marked as Plaintiff's Exhibit Number 2.

THE COURT: Do you have a copy for me?

MR. LEACH: May I approach the bench, your Honor?

THE COURT: Yes.

Q. Mr. Sussman, have you had a chance to look through Plaintiff's Exhibit Number 2?

A. Yes.

Q. And can you tell me what that is.

A. It's the first report I prepared in this matter.

Q. So that is the report you prepared in this matter, correct?

A. Well, I supplemented the report after this date, so there's a second report as well.

Q. But that is one of the reports you provided in this matter, correct?

A. Yes.

Q. And in your report, you determine that a reasonable royalty was the appropriate measure of damage in this case, correct?

A. Yes.

Q. And to determine your reasonable royalty, you considered the result of a hypothetical negotiation between the parties as of August 1999, correct?

A. That's correct.

MR. LEACH: I would like to move to admit Plaintiff's Exhibit 2 into evidence.

THE COURT: Any objection?

MR. TECHENTIN: Your Honor, I would object to it being admitted as substantive evidence on this issue. Again, it's irrelevant to the question of whether or not Mr. Lapidus is qualified. And certainly we would object to its introduction as evidence for anything other than the purposes of this hearing.

THE COURT: You've got to get closer to the microphone. I'm having a hard time getting what you're saying.

MR. TECHENTIN: Oh, I'm sorry, your Honor. We would have two separate objections, one on relevance grounds, that Mr. Sussman's report isn't relevant to Mr. Lapidus' qualifications, methodology and so forth.

The second objection would just be that his report be admitted solely, if it is admitted, solely for the purposes of this hearing as was the Lapidus report.

THE COURT: Okay. Well, first of all, I would

agree with you, the report is not relevant to the assessment of Lapidus' qualifications. Those stand or fall on their own.

But it would seem to be relevant to the methodology utilized by Mr. Lapidus if, in fact, Mr. Sussman used the same methodology. It's certainly relevant for arguing that Lapidus' methodology should be accepted.

And finally, admission of the expert report for this hearing is different than and really does not determine at all whether an expert report would be admitted at trial. That's your point on the last point, isn't it?

MR. TECHENTIN: That's right, your Honor. The only observation I would make with respect to the question of its admissibility for this hearing is that your Honor's point -- this goes back to I think the dialogue that you had previously with counsel. Your Honor's point is that somehow whether Mr. Sussman's methodology mirrors in some fashion Mr. Lapidus' could be informative of whether Mr. Lapidus' methodology was proper, that only works if the plaintiff is willing to concede that this methodology is proper.

And if the plaintiff is willing to concede that, then we would withdraw that objection; but that

concession has not been made despite the Court's invitation this morning.

THE COURT: Well, maybe I misunderstand what the plaintiff is trying to do. I thought they had said they think this methodology is proper. I haven't read this report, so I don't know what it is. What is your position on this?

MR. LEACH: Yeah. We believe that Georgia-Pacific is the appropriate methodology to use to determine the reasonable royalty in a patent case.

THE COURT: And is that the methodolgy that Mr. Sussman employed in this report?

MR. LEACH: That's what I'm going to try to establish.

THE COURT: Okay. Well, first of all, I'm going to admit it, but let's -- and you can do that. What is your position? You've read the report. You know what's in it. Are you saying that Mr. Sussman's methodology is appropriate or not?

MR. LEACH: Yes.

THE COURT: Okay. So, Mr. Techentin, he says that he agrees the methodology is appropriate.

MR. TECHENTIN: That's fine, your Honor. That objection is withdrawn, then.

THE COURT: Then we'll admit this as Exhibit 2.

Go ahead.

(Plaintiff's Exhibit 2 was admitted in full.)

Q. In carrying out the hypothetical negotiation, you applied the Georgia-Pacific factors, correct?

A. Yes.

Q. And you considered all 15 factors?

A. I did.

Q. Including that there was no established royalty rate for the Bowling '197 patent, correct?

A. That's what I understood, yes.

Q. Looking at your analysis of Factor 1, your report does not state that Factor 1 tends to increase or decrease the reasonable royalty rate, correct?

A. That's correct.

Q. In fact, in your analyses of all 15 factors, you did not state whether any one of those factors tended to increase or decrease the royalty rate, correct?

A. That's correct.

Q. And in Factor 12, you note that standard licensing royalties and practices exist in the toy and game industry, correct?

A. If I could just take a minute to consult. That sounds right, but I don't have my report memorized. Can you repeat your question?

Q. My question was just with respect to Factor 12,

you note that standard licensing royalties and practices exist in the toy and game industry, correct?
A. That is what the first sentence says, yes.
Q. And you cite a standard of five percent of the item's net wholesale as the standard royalty, correct?
A. Yes. For the game or toy specifically, yes.
Q. And you say reduce royalty of three percent of net wholesale under certain circumstances, such as with strong brands, correct?
A. I didn't understand quite what the last part of your sentence said. I'm sorry.
Q. I think in your report you cite a reduced royalty rate of three percent of net wholesale under certain circumstances, such as with a strong brand?
A. Correct. Yes.
Q. Now, in the last factor, Factor 15, you claim that the cost to remove the accused dice was estimated to be 15 cents per pair of dice, correct?
A. Yes.
Q. Now, looking at paragraph 74 of your report on page 29, you determined that the reasonable royalty should be 15 cents, the exact same amount as Hasbro's cost to remove the accused die, correct?
A. That's correct.
Q. And, in fact, if you turn back to page two of your

report, in the summary of your opinions, you state that Bowling and Hasbro would have agreed to a royalty rate of 15 cents, correct?

A. That's correct.

Q. And that amount is the same as what you were informed that it cost Hasbro to remove or replace the accused dice, correct?

A. Well, I mean, your implication is that was what I was informed isn't really a fair implication. I mean, there were documents produced that there were certain costs to remove the die. That information was prepared as of a certain date. We took that information and adjusted it to reflect the realities of the earlier hypothetical negotiation date and then came to a calculation of the cost to replace the accused die.

Q. Okay. Let me rephrase the question. The 15-cent royalty is the same as what you determined the cost to replace the dice -- to replace the infringing dice to be, correct?

A. Yes.

Q. Can you explain Hasbro's manufacturing process in the fall of 1999 for the Monopoly Millennium game.

A. I don't understand your question.

Q. Do you know generally how Hasbro's manufacturing process worked in 1999 for the Monopoly Millennium

game?

A. I know that they received components of the game from suppliers, from various suppliers, to their facility in East Longmeadow and that they packaged and shipped the game from that facility.

Q. Do you know how many they tend to keep in inventory to be able to ship?

A. I don't know specifically, no.

Q. Do you know whether Hasbro shipped any product to Wal-Mart that had the substitute die in them and the tape over the portion of the packaging that touted the infringing dice?

A. I don't have specifics as to, you know, what went specifically to what customers.

MR. LEACH: No further questions.

THE COURT: Any questions, Mr. Techentin?

MR. TECHENTIN: Could I have one second, your Honor?

THE COURT: Yes.

**CROSS-EXAMINATION BY MR. TECHENTIN**

Q. Good morning, Mr. Sussman.

A. Good morning.

Q. Mr. Leach asked you some questions this morning regarding the methodology that you employed in determining a reasonable royalty in this case.

Would it be fair to describe that methodology as having employed the Georgia-Pacific factors?

A. Yes.

Q. And your understanding is that you -- well, strike that.

You've reviewed the report of Mr. Lapidus, correct?

A. Yes.

Q. And you were here for the testimony of Mr. Lapidus at this hearing?

A. Yes, I was.

Q. Is it your understanding that you and Mr. Lapidus employed the same methodology?

A. No.

Q. Can you explain that, please.

A. Yes, I can. Mr. Lapidus and I did both look at the Georgia-Pacific factors and evaluate and discuss those factors. Where Mr. Lapidus' methodology and my methodology diverge is that I arrived at my conclusion based on my discussion of my Georgia-Pacific factors, and there's a clear link between my discussion of the hypothetical negotiation that the parties would have had in my Factor 15 be items that both parties would have had in mind, including Mr. Bowling and Hasbro, during the course of that discussion and why, based on

my analysis of the factors, the parties would have arrived at the rate that I concluded and I opined on.

On the other hand, Mr. Lapidus, while, in fact, he does discuss the Georgia-Pacific factors in his report, when he arrives at his Factor 15, very simply states his conclusion and references us to a calculation that is no place else in his report and doesn't, in fact, reference any of the factors that are discussed in prior points in his report.

So there's no connection in Mr. Lapidus' report between his analysis of the factors and the rate that he ultimately arrives at, and that's where he and I differ between our analyses and our approach.

THE COURT: Can you point to me where in the report, on what page in the report you have your discussion of Factor 15.

THE WITNESS: In my report, yes. The discussion of Factor 15, your Honor, begins on page 27. As you can see, specifically in paragraph 69, it leads off, "Mr. Bowling would have made the following points," and then I continued my discussion.

These points reference items that are brought up at earlier points in my discussion of the specific factors.

**Q.** Mr. Sussman, Mr. Leach also asked you some

questions about your qualifications in this matter. He asked you, and you indicated that you were a certified public accountant; is that correct?
A. That's correct.
Q. And you heard Mr. Lapidus testify as to whether he was one, correct?
A. That's correct.
Q. As a CPA, are you bound in your litigation services work by any codes of conduct?
A. Yes.
Q. Can you tell the Court what those are, please.
A. Well, specifically the codes of conduct include the concept such as conducting our work and maintaining our independence. Independence tends to refer to the auditing environment that a lot of CPAs conduct their work in, not specifically this environment.
The next point of the code of conduct, however, refers to conducting our work with integrity and objectivity, and that is specifically relevant to situations such as this. Specifically, the relevant literature for CPAs acknowledges the conduct of litigation services, acknowledges the concept, for example, that attorneys are hired as advocates for their clients but that, as CPAs, we are not hired as advocates for our clients, that we are supposed to

maintain a mindset of objectivity in conducting our work.

We're allowed to defend our analyses, but the presumption is that our analyses have been conducted with a mindset of objectivity.

**Q.** And having reviewed Mr. Lapidus' report and heard his testimony here, do you have an opinion as to whether or not Mr. Lapidus has obliged -- has conducted himself in accordance with that obligation of objectivity?

**A.** My review of Mr. Lapidus' report and hearing his testimony does raise a question as to whether he has met that standard for a couple of reasons.

**Q.** Can you explain what those reasons are, please.

**A.** Sure. The first one arose as a result of my listening to his testimony last week in this hearing. And specifically, in response to the line of questioning, and I can't quote his testimony verbatim, your Honor, so you'll excuse me, I hope, but with respect to his testimony, I believe he said something along the lines of, with respect to one of the factors, because he was retained by Mr. Bowling, that would result in this factor increasing a royalty rate.

And so, to me, certainly on the surface that doesn't sound like you're conducting your analysis with

a sense of objectivity.

Otherwise, the other things that I noticed within Mr. Lapidus' report was just a general sense of lack of balance of his analysis in considering positions that both parties might have.

So, for example, I mean, I flipped through Mr. Lapidus' report, and I struggled to find any single point that Mr. Lapidus brings up that could be construed to weigh in favor of Hasbro in the concept of a hypothetical negotiation that would be to strengthen Hasbro's position.

And, frankly, I read the same documents that Mr. Lapidus did, I assume, and this just countered to the facts of the case.

So as specific examples of that, one thing that comes to mind is Mr. Lapidus mentions the 64 cents that Mr. Bowling charges for his dice in many instances for the wholesale price. And, in fact, I believe in his report he says that that's what Mr. Bowling charges, period.

The fact of the matter is that Mr. Bowling charges other prices for that die, substantially lower prices outside the United States, but also has offered discounts within the United States. And those prices are within the record, but Mr. Lapidus never mentions

them in his report at all.

He did concede on the stand last week in this hearing that that was the case, but he never mentioned them in his report at all. And, to me, that struck me as it's a fact and it's a relevant fact, and he might choose to use that in a different fashion than I might in our analysis, but to not mention it at all or to consider it struck me as less than objective.

Something else I noted was that clearly the documents describe a three percent royalty that Hasbro pays for the concept of Monopoly, and Mr. Lapidus doesn't mention that in his report either.

Another factor that I think is, you know, very relevant that is, you know, clearly in the record, there is an e-mail that takes place that is sent at the time that Hasbro came up with its design of the dice. And the question by the inventor, the Hasbro inventor of the die, is, you know, should we seek patent protection for this.

And the response, you know, again, this is contemporaneous documentation prior to this litigation, prior, in fact, to the negotiation with Mr. Bowling, is that -- the response is that the dice are ancillary to the game and, therefore, probably not worth the cost to pursue a patent.

To me, that struck me as very relevant to Hasbro's mindset about the importance of the die and how they might approach negotiations with Mr. Bowling, and yet it's not considered or mentioned or discussed.

Again, we could argue forever as to the weight you should apply to that, but it's not even discussed or mentioned by Mr. Lapidus in his analysis.

The last thing that comes to mind, and I'm sure there are others, but I don't think the purpose is to go through specifically all of Mr. Lapidus' factors, but the last thing that really, you know, comes to mind that I think is very important is Mr. Lapidus does mention in his report that Hasbro had options. And the option that he points out is that they had the option to replace the die, and he acknowledges that Hasbro estimated the cost at $70,000.

The problem is that he never brings that into his discussion. He sort of lets it lie. He doesn't critique the number, but he lets it lie and never brings it into the discussion as a point that Hasbro would have brought up in the hypothetical negotiation.

And, you know, we discussed the Litigation Services Handbook briefly last week. I say "we." Excuse me, your Honor. Mr. Techentin and Mr. Lapidus had that discussion. Mr. Lapidus acknowledged knowing

of the book, acknowledged reading it at points in times and considering it at points.

That book considers the costs that a licensee might consider to change away from the patented technology to be the second most important factor in negotiations, and yet Mr. Lapidus apparently didn't even consider it at all. So I consider that as an example of just a fundamental lack of objectivity in his analysis, which is really counter to the way CPAs are supposed to approach their work.

Q. And just so that we're clear, I'd like to put up on the screen -- can you see this in front of you on your screen?

A. My screen has gone dark. Oh, now it's there. Yes.

Q. This is from the transcript of the hearing that we had last Thursday. And the question begins "But if you don't have a starting point." Do you see that before you?

A. I do.

Q. And is this the testimony that you were referring to where he talked about his opinions as to reasonable royalty being influenced by his representation of Mr. Bowling?

A. That is what I was referring to, yes.

Q. So you talked about one of the rules as a CPA being this objectivity rule. Are there any other rules that you think are relevant here?
A. Yes, there is.
Q. Go ahead. Tell us what that is.
A. And this did come up in your examination of Mr. Lapidus last week. The term in the accounting field, your Honor, is, there are some general standards. And as that term would imply, these general standards apply to our work in all fields, you know, whether we're conducting audits or consulting as we are in this case in litigation.

And Mr. Lapidus mentioned some of those standards as having adequate supervision, you know, because we work with staff on these types of cases. And another standard is -- the term is "sufficient relevant data," and what that refers to is the need for CPAs to have information and data and documentation that they rely upon to reach their opinions.

So in an audit, for example, this is clearly not an audit, CPAs will have voluminous files of work papers and tests that they've done to support their issuance of their opinion.

It's no different in a case like this. You would expect the CPA to accumulate documentation, do

independent research, conduct interviews, read depositions to reach their opinions and for their opinions to be supported by this sufficient relevant data.

Q. And having reviewed Mr. Lapidus' report and having heard his testimony here, are there any issues with his use of sufficient relevant data in arriving at his conclusions?

A. I do believe there are. There are several instances in his report, your Honor, that -- in which he makes statements or arrives at conclusions that I believe not only are not supported by sufficient relevant data but are not supported by any data. I'll use the term they're just sort of standing out there naked.

And so one thing that comes to mind, for example, is there's -- and I don't have his report in front of me, but there's a brief phrase towards the beginning of his report in which Mr. Lapidus says that, given the timing of the negotiations, it would suggest to him that the rates that the parties would arrive at would be higher than industry standards.

That statement isn't supported at all in his report. There's no other reference to the timing of negotiations in his report at all. And I know I was

listening to the hearing very carefully last week, and the subject came up, and Mr. Lapidus insisted that there were other references in his report to it.

But I read the report, and it's very clear that there's nothing else in his report that supports that statement. There's no footnote. There's no citation that supports that statement. And in this hearing, he didn't say anything further to suggest that there was support.

There are other issues like that in his report. Another that comes to mind is the concept that he believes that Mr. Bowling and Hasbro would have entered into a supplier/purchaser relationship, and that conclusion is unsupported in any way in Mr. Lapidus' report.

And, in fact, there's quite a lot of documentation, including the fact that Hasbro already had an existing supplier relationship for substantially less money than Mr. Bowling apparently wanted to charge that was in place and that as a manufacturer, they would have wanted to keep their existing relationship in place in order to facilitate the smooth sale of their product.

So it's items like that. And, again, this also references back to the problem I have with Mr. Lapidus'

ultimate conclusion. Yeah, there's a discussion of the Georgia-Pacific factors, but there's a very large disconnect between his discussion of his factors and his ultimate conclusion.

MR. LEACH: Your Honor, I'd like to object to this line of questioning in that this, again, goes to the weight. This is all for cross-examination at trial.

THE COURT: That's just incorrect. You called him as a witness, and it doesn't go to weight. It goes to methodology and reliability. So overruled.

Q. Mr. Sussman, I'm going to put up on the screen here a pamphlet entitled "Litigation Services and Applicable Professional Standards." Do you recognize this document?

A. I do.

Q. Can you tell the Court what that is.

A. This is a publication that is put out by the AICPA, which is the American Institute of Certified Public Accountants. You can see it's titled "Consulting Services Special Report 03-1," and this references both the concepts that I just discussed, your Honor, among others.

Q. The portion on page three that I've sort of drawn a box around, the Rule 102, Integrity and Objectivity,

that's the first standard that you were testifying about?
A. Yes. And I should just be clear, Mr. Techentin, and your Honor, that this document is not where these standards are originally propounded. This is intended as a summary document and sort of practice aid for CPAs like myself to refer to for this type of service. I just wanted to be clear on that.
Q. And on the next page, page 4, in paragraph 23, there's one entitled "Sufficient Relevant Data," and that's discussing the second factor that you were identifying for the Court?
A. That was, and I think you'll see -- if you flip back to the prior page at the bottom, you'll see the header "General Standards" as I discussed.
Q. Rule 201?
A. Yes.
MR. TECHENTIN: I've had this marked as Defendant's Exhibit E, your Honor. I'd move its admission.
THE COURT: Any objection?
MR. LEACH: We object. This document has not been produced in this case.
THE COURT: Well, Mr. Lapidus acknowledged his familiarity and his reference to this document, the

larger full document, in the course of his examination. So I'll overrule your objection. I'll admit this as Exhibit E, is it?

MR. TECHENTIN: E. Yes, your Honor.

(Defendant's Exhibit E was admitted in full.)

Q. Mr. Sussman, are you familiar with something called the Book of Wisdom?

A. I am.

Q. Can you explain what that is.

A. First of all, it's not a book. Second of all -- and excuse the levity, your Honor. The Book of Wisdom is a concept that I believe was first referenced in the 1930's or '40's, and -- but it's certainly been referenced more recently in court decisions.

And what that specifically refers to is the concept -- and your Honor made an interesting statement last week that you were very frustrated by this process and how this analysis works. There's been a lot of articles written on this concept, and the fact that this analysis has to take place at the time of the hypothetical negotiation, yet we know a lot of other stuff clearly can be frustrating. And practitioners and writers of articles and so forth have struggled with this concept for a long time.

What the Book of Wisdom specifically relates to

is the concept that, even though we're supposed to do our analysis as of the date of the hypothetical negotiation with the implication that we don't know what's come since then, it's okay to peek into the future to discern relevant information if we think that information is going to be relevant to us, and that's what the courts have said.

Now, as a practitioner, it's a delicate line to balance, you know, how much do you peek into the future, how much do you not. And so it's something that we consider. And you look at the facts and circumstances of the case, you look at what the parties know at the time, but you also know that it's okay to peek forward; and if there's something that you really think is appropriate to bring up, then you bring it up.

**Q.** And as a practitioner who has engaged in the process of calculating reasonable royalties under cases analogous to this one, is that Book of Wisdom something that you believe you need to know and understand in order to be able to perform those calculations?

**A.** Yeah. Someone who does work in this field should know what the Book of Wisdom is.

MR. TECHENTIN: Thank you. I have no further questions, your Honor.

THE COURT: Thank you.

Mr. Leach, any redirect?

MR. LEACH: Yes.

**REDIRECT EXAMINATION BY MR. LEACH**

Q. Mr. Sussman, on Factor 15 of your report, you go through what you were discussing earlier about the different positions of the parties. And after doing the Georgia-Pacific analysis, isn't it true that you come to the exact number that it would have cost Hasbro to switch out the dice, i.e., 15 cents?

A. Yes, because standard methodology understands and contemplates that the maximum that a licensee would be willing to pay for technology is the cost that it would take them to convert to other acceptable technology.

So I think the point of my report is that, while Hasbro really would have wanted to pay less, as little as a penny per game, the fact that they knew they had these costs that they were facing, and that would have amounted to about 15 cents per game, would lead me to conclude and led me to conclude that they would have been willing to pay up to that maximum.

Q. So in looking at all the Georgia-Pacific factors, basically what you're telling me is that you can set all those aside, the Georgia-Pacific factors aside, except for that one and look, you know, how much would it cost to switch out, and there's your number. Is

that how your arrived at it?

A. That's a complete and utter mischaracterization of what I said, Counsel. I mean, I discuss all the factors, and ultimately I arrived at the number I arrived at, but I did discuss and consider all those factors and explained why I arrived ultimately at the number I did.

Q. So that wasn't the overriding factor in coming to your conclusion. I mean, what I'm hearing from you is that you looked at all the factors and it just so happened, it was a coincidence that it came out at that number.

A. No, that's not what you're hearing from me at all, Counselor, and I apologize for not being clear.

Let me say a couple of things. First of all -- and let me reference the Litigation Services Handbook as an example.

That book, the chapter on patent damages, and Mr. Lapidus, as I said, acknowledges having read it and paying it some mind, so to speak, discusses the concept that the first thing in these types of cases are, is there an established royalty.

And, you know, if the courts can establish that there is an established royalty, that tends to carry the day. And I suppose there could be circumstances

where it might not, but I can't contemplate any as I sit here.

Both Mr. Lapidus and I acknowledge that there is no established royalty; and so, therefore, we considered the rest of the Georgia-Pacific factors. As part of my analysis, I considered the cost that Hasbro would have to pay to switch out and move away from the allegedly infringing die.

I should point out that, as I know I've already said today, the article in the Litigation Services Handbook does suggest that that is the second most important factor that a licensee would consider in their negotiations with a licensor.

Now, the fact of the matter is that I did consider other factors in my discussion, and there was a range indicated in the documents that would suggest what Mr. Bowling would be willing to suggest and as high as the 64 cents that Mr. Lapidus offers but as low as, you know, frankly almost nothing because there was no cost to Mr. Lapidus (sic) for entering into this licensing agreement. This was all going to be gravy to him.

This was all going to be no cost that would -- profits that would drop purely to the bottom line, and so the fact that 15 cents per die fits within a range

that it would seem that Mr. Bowling would be satisfied with makes it, in my mind, a very reasonable conclusion.

Q. Now, you didn't list the Litigation Services Handbook in your report, did you, as one of the things you considered when you prepared your report?

A. I may not have, but there's lots of articles that I read and I don't -- I mean, there's lots of articles and books and so forth that I've read through the course of my career that -- I certainly don't read every single article that -- excuse me, don't list every single article in the context of this.

Q. And you didn't say in your report that this is the second most -- that you consider that the second most significant factor is the amount to change out, did you, in your report?

A. I didn't say that, no.

Q. Did you consider that factor when you provided your report on, let me get the date here, April 26, 2006? Did you consider the litigation handbook and specifically what you've been talking about on April 24, 2006 or before that when you submitted your report?

A. Well, I considered my entire background and my knowledge in doing this work and my experience in the

field and any writings and articles that I've read through the years as giving me the general background and experience --

Q. But that's not what I'm asking you. Did you pull that out and look through the litigation handbook?

A. I might have during the course of doing this assignment.

Q. And you didn't list it as one of the things you considered in your report?

A. I apparently did not.

Q. And it wasn't produced in this case?

A. It's a publication that's widely available to anyone that wants it.

Q. You understand, though, that everything you consider, that you pull out and look at when you're preparing a report needs to be turned over to opposing counsel, correct?

MR. TECHENTIN: Objection, your Honor. That mischaracterizes the law on that subject.

THE COURT: Well, it does slightly mischaracterize the law. I don't think they're required to give you every book and article and piece of paper that the expert relies on in writing his report. Are you saying that the rules require that?

MR. LEACH: No, maybe not that far but --

THE COURT: All right.

MR. LEACH: No further questions, your Honor.

THE COURT: Okay. Do you have any recross?

MR. TECHENTIN: No, your Honor.

THE COURT: All right. I have a couple of questions, and these questions sort of reveal some of my frustration about trying to get a grasp on this process of predicting damages based on hypothetical negotiations, which I find to be not the most precise kind of science or expertise that I've encountered.

So let me start by asking you this. Are you aware of whether there were any actual negotiations between Bowling and Hasbro once the patent issue was brought up by Bowling to Hasbro?

THE WITNESS: I believe there were.

THE COURT: Okay. And are you aware of what the results of those negotiations were?

THE WITNESS: Well, clearly the parties did not enter into a licensing agreement.

THE COURT: Right.

THE WITNESS: The record, as I understand it, it's certainly not acknowledged between both parties. So I think it's fair to say that.

THE COURT: What's not acknowledged?

THE WITNESS: Well, for example, I -- certainly

in my discussions with Mr. Hirtle, I understand that Hasbro offered eight cents as a rate for the dice, okay. Clearly, Mr. Bowling didn't accept that because we wouldn't be sitting here today.

Mr. Hirtle suggested that there might have been a counteroffer of either 25 cents per die or -- I think it was 25 cents per die. There has been no acknowledgment in the record that that counteroffer occurred, so I don't know for a fact -- I can't say conclusively that a counteroffer was made.

THE COURT: So what you know based on what you've seen in the record is that Hasbro offered 8 cents and that maybe, but not definitely, Mr. Bowling may have offered 25 cents. As you just said, that was never confirmed by Mr. Bowling, so you're uncertain about that.

THE WITNESS: That's right. And even if it was offered, it was offered through a representative of his. So that further clouds the picture.

THE COURT: Now, as far as you know, was that the -- sort of the last, best offer of either party subject to the qualification of what you've given with respect to Mr. Bowling?

THE WITNESS: I haven't seen anything else.

THE COURT: All right. Now, does that factor

into your analysis at all? I recognize that it's post the date of the patent; but in connection with your evaluation of the so-called Book of Wisdom and Mr. Lapidus' evaluation of this Book of Wisdom, it would seem to me that that is at least possibly a relevant post-patent factor that one might take into consideration in trying to speculate as to what the hypothetical negotiation would have revealed.

THE WITNESS: I think your Honor is right. Let me clarify a little bit. I do mention the 8 cents in my report, and I also mention the 50 cents in my report with appropriate qualifications.

THE COURT: Fifty cents or 24 cents?

THE WITNESS: I think it's 25 cents per die, but I'd have to search through it, and I think it ultimately comes to 50 cents per game.

THE COURT: So when you refer to eight cents offered by Hasbro, what's that a reference to, per die or per pair of die?

THE WITNESS: It is four cents per die, and I'm trying to find my report as we're talking. I believe it is four cents per die. That totals eight cents per game. Yes, it's page 30 of my report. The total is eight cents per game, and then in the latter part of that paragraph it's -- 25 cents per die is the

potential counteroffer for a total of 50 cents per die, per game. Excuse me, 50 cents per pair of die.

So, to continue, I do mention that in my report, and I do think it's relevant. However, given the question that surrounds the counteroffer, for example, I'm hesitant to put too much weight on that. If, you know, to go into further hypotheticals, if, for example, that counteroffer was clear, on paper and acknowledged by both parties, then I would have an even bigger problem with Mr. Lapidus' analysis because why would he possibly suggest a higher number than a number that his client had already agreed to or was already willing to settle for?

Now, given different timing issues and the like in certain situations it's possible that, because it's an earlier date, the client would have wanted more money at an earlier date. It's possible that factors could arise that would result in that type of analysis.

I'm hesitant, given the grayness around that 50 cents, to really consider it too strongly as a cap because it hasn't been acknowledged.

On the Hasbro side of the equation, I'm also too hesitant to cap their highest number at Mr. Hirtle's offer because I did become aware of the information that would suggest that ultimately they were going to

pay more money to get themselves away from these accused die.

And if they were willing to pay -- if they were going to pay 15 cents per die, then the pure economics of it suggests that they would be willing to pay more than eight because in the end they still would have saved themselves some money.

THE COURT: So doesn't it also have to factor into the analysis that you're looking at these offers in a context where the patent is disputed and where each party has staked out their position in litigation that takes issue with the validity of the patent whereas, in this hypothetical negotiation, if I understand it correctly, we have to assume that the validity of the patent is established.

In other words, you don't do this hypothetical negotiation, you don't get to a damage calculation until the jury determines that the patent is valid, right?

THE WITNESS: Your understanding is absolutely correct, your Honor.

THE COURT: The market power of the parties changes considerably from what it was when they were actually engaged in negotiations.

THE WITNESS: That's certainly a fair statement,

your Honor, and I want to clarify that I do my report and I state very clearly that the assumption of the assessment is that the patent is found to be valid and infringed.

And I do think, just for the record, that Mr. Lapidus makes the same assumption, as he appropriately should.

THE COURT: I guess that's all I have. Thank you.

Anybody want to follow up on any of that?

MR. TECHENTIN: Your Honor, if I can just ask one question that I think might clear up the record here.

**RECROSS-EXAMINATION BY MR. TECHENTIN**

**Q.** Mr. Sussman, just because there's some confusion, I think when we talk about royalties, whether it's per die or per game, your opinion is that the royalty is 15 cents per game, that is, for two dice or per die?

**A.** Per game.

MR. TECHENTIN: That was it, your Honor.

THE COURT: Right. I got that.

Okay. Before you leave the stand, I'm going to ask this question of counsel, though. Mr. Sussman's report seems to use a compound interest methodology, and I understood you to be objecting to the compound

interest methodology contained in Lapidus' report. So which is it?

MR. TECHENTIN: Your Honor, it's not compounded, and your Honor has been practicing law in the State of Rhode Island for some time, and Mr. -- it's true that Mr. Sussman's original report compounded interest. He amended the report to take that reference out. That report is not before you, but I don't think we're going to make too big a deal about that.

I don't think there's any question between the two parties that the question of interest is a question for the Court to decide. We would submit that the application of interest is one that is best dealt with by the clerk after you get a judgment.

Really, the substance of our motion goes to whether or not Mr. Lapidus, if he is allowed to testify as an expert, should be allowed to put an inclusive-of-interest damages calculation in front of jury, which we would submit that he should not be able to do.

But we would submit on the law simply that if Rhode Island is the benchmark for interest in this case, it should be applied as Rhode Island law is applied, which is without compounding. If you take -- and if you take the high rate, the 12 percent rate, you

don't get compounding. And if you take a different rate, maybe you do. But that's the issue, your Honor.

THE COURT: Okay. Mr. Sussman, you can step down. Thank you.

THE WITNESS: Thank you, your Honor.

# C E R T I F I C A T I O N

I, Anne M. Clayton, RPR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

Anne M. Clayton

Anne M. Clayton, RPR

Feb. 5, 2008

Date