UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| MICHAEL BOWLING, a Resident of Arizona, | : | |
| Plaintiff, | : | |
| v. | : | C.A. No. 05-229 S |
| HASBRO, INC., a Rhode Island Corporation, | : | |
| Defendant. | : | |

**DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF ITS MOTION *IN LIMINE* TO PRECLUDE THE TESTIMONY OF NEIL N. LAPIDUS**

Todd D. White (# 5943)
twhite@apslaw.com
Jeffrey K. Techentin (#6651)
jtechentin@apslaw.com
Adler Pollock & Sheehan P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903
(401) 274-7200
Fax: (401) 751-0604/ 351-4607
Dated: December 19, 2007

Of Counsel:

David K. S. Cornwell, Esq.
davidc@skgf.com
Tracy-Gene G. Durkin, Esq.
tdurkin@skgf.com
Sterne Kessler Goldstein Fox
1100 New York Avenue, NW
Washington, D.C. 20005

Attorneys for Defendant Hasbro, Inc.

Defendant Hasbro, Inc. ("Hasbro") respectfully submits these Proposed Findings of Fact and Conclusions of Law in Support of its Motion *in Limine* to Preclude the Testimony of Neil N. Lapidus ("Lapdius").

**Findings of Fact and Conclusions of Law**

## I. Lapidus's CPA Credentials and Background Are Insufficient to Qualify Him as an Expert in This Case.

### Introduction

1. Plaintiff Michael Bowling ("Bowling") is the owner of U.S. Pat. No. 5,938,197 (the "'197 patent") and has sued Hasbro for infringement of the '197 patent. *See generally* Complaint.

2. Bowling alleges damages against Hasbro in the form of a reasonable royalty for any proven infringement of the '197 patent and has engaged Lapidus to represent him as an expert witness to evaluate Bowling's damages assuming an infringement had occurred. Bowling Trial Br. [Docket No. 130] at 15; Lapidus 1/16 Tr. 16:21-23; *see also* 35 U.S.C. 284 (damages in patent case to be no less than a reasonable royalty for the use made of the invention by the infringer).

3. The "trial court serves as a 'gatekeeper' for expert evidence, with the responsibility of 'ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand,'" *Currier v. United Techn. Corp.*, 393 F.3d 246, 251 (1st Cir. 2004) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993); Fed.R.Evid. 702. This function applies to nonscientific expert testimony just as it does to scientific testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).

4. To be admissible under Fed. R. Evid. Rule 702, expert testimony must be (1) based upon sufficient facts or data, (2) the product of reliable principles and methods, and (3) the product of reliably applying those principles and methods to the facts of the case. Rule 702.

5. Plaintiff has failed to meet his burden of showing that Lapidus's proffered expert testimony is reliable. *See Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998) (noting burden on party proffering expert testimony to "show that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion").

6. Lapidus's proffered testimony is inadmissible because it is not based on sufficient facts or data.

7. Lapidus's testimony would tend to confuse the jury.

8. Lapidus's testimony would not assist the jury in its understanding of the evidence in this case.

9. Lapidus's testimony would not assist the jury in its determination of any fact in issue in this case.

10. Although Lapidus has undertaken his damages analysis using the proper methodology – by consideration of the so-called *Georgia-Pacific* factors to determine a reasonable royalty – he has not reliably applied that methodology to the facts of this case.

11. Lapidus is not qualified by knowledge, skill, experience, training, or education to provide expert testimony on the subject of a reasonable royalty for plaintiff's die construction as a component in Hasbro's Monopoly game. Fed. R. Evid. Rule 702.

12. Lapidus lacks any meaningful professional background, training, or experience in the toy and game industry and has done nothing to educate himself regarding

prevailing standards with respect to licensing of products or ideas in the toy and game industry. **Exhibit 1** at 1-3 ("Expert Qualifications").

13. Lapidus's report makes no mention of any background, training, or experience in the toy and game industry. In his report, Lapidus asserts only that he has "served as an expert witness in a number of cases in evaluating damages relating to contract matters, intellectual property and relationships between companies. As a result of working with our client base, I am familiar with distribution channels and the financial aspects of licensing for a variety of industries." *Id.* at 1-2.

**Lapidus Lacks Toy and Game Industry Experience**

14. Lapidus is not credible in his testimony that he has any significant direct experience in the toy and game industry that could inform his consideration of a reasonable royalty in this case. Despite his assertion of having worked closely with several companies in the toy and game industry and of being familiar with the terms of licenses for toy and game concepts, Lapidus's evasive testimony and outright refusal to answer direct questions about his experience renders that testimony incredible. *See generally* Lapidus 1/16 Tr. 32-64.

15. When asked whom he had represented within the toy and game industry, Lapidus refused to answer the question, citing concerns about confidentiality but without invoking any governing rule, standard, or regulation that would prohibit him from so testifying. Lapidus 1/16 Tr. 34:19-39:14.

16. Lapidus unjustifiably refused to answer questions even when the Court stated that it would "allow you and direct [Lapidus] to answer the questions, [but placing] this portion of the testimony and anything relating to the identification of specific clients in the record […] under seal [and] subject to the protective order that's previously been issued in the case," and even after the Court stated that it would "put the attorneys in the case under an order,

which I'm issuing as we speak, not to divulge any information that the witness relates with respect to the clientele of [Lapidus's] firm," thus making "all of the people in this courtroom subject to contempt if they were to reveal the names of [Lapidus's] clients." Lapidus 1/16 Tr. 37:8:25.

17. Instead of answering questions directly pursuant to his oath, Lapidus elected to provide vague information about his clients and their activities in the toy and game industry, effectively blocking any meaningful cross-examination of his experience. Lapidus 1/16 Tr. 39-64.

18. Even the limited information provided by Lapidus suggests that his testimony about his clients' activities in the toy and game industry is inaccurate or exaggerated. *Compare* Lapidus 1/16 Tr. 40:22-41:5 (claiming that single manufacturer's representative accounted for toy sales of "billions of dollars") *with* The NPD Group, Inc., *Toy Markets in the World*, available at http://www.toyassociation.org/AM/Template.cfm?Section=Industry_Statistics&TEMPLATE=/CM/ContentDisplay.cfm&CONTENTID=3884 (last accessed 1/31/08) (showing total global toy sales for 2006 as $67 billion, with North America accounting for 36% of sales, just over $24 billion). Hasbro, the worlds second-largest toy and game manufacturer, is unaware of any manufacturer's representative that deals in toy volumes such as that described by Lapidus. Lapidus's refusal to identify the company by name, coupled with the extraordinary description of the company's business activities, renders his testimony on this matter not credible.

19. Lapidus's testimony that he is familiar with the terms and conditions of over 100 licensing agreements in the toy and game industry is not credible. *See* Lapidus 1/16 Tr. 63:9-16. Lapidus never claimed to have such knowledge or familiarity in his report and it would

be incredible that he would not have taken account of either his own knowledge regarding established licensing agreements or prevailing industry standards with respect to toy and game licensing in his determination of a reasonable royalty. *See generally* **Exhibit 1**. Had Lapidus in fact taken account of such information, he was obliged to include that information in his report. Fed. R. Civ. P. Rule 26(a)(2)(B).

20. When Lapidus was asked specific questions about specific agreements, he was unable to explain the basic terms of any particular agreement. *E.g.*, Lapidus 1/16 Tr. 47:3-8 ("Q: I'm asking if you know as to any of them what the royalty rate is. A: Yes. I know the range or a general range of what those agreements are."); *id.* at 53:13-54:2 ("Q: What's the percentage? A: A similar range as to the first example, and generally somewhere in the two to eight percent range."). Lapidus's inability to recount the details of any agreement renders incredible his testimony that he is familiar with toy and game licensing agreements generally.

21. Industry literature exists that provides authoritative information regarding industry standards for licensing rates in the toy and game industry. Lapidus has not reviewed any such literature and consequently does not take that information into account in any manner in his estimation of a reasonable royalty. *Compare* **Exhibit 1** *with* **Exhibit 2** (Sussman Report) at 24-25 (quoting *Inside Santa's Workshop: How Toy Inventors Develop, Sell, and Cash In on Their Ideas*: "The standard royalty rate for toys and games is 5 percent of the item's net wholesale price.").

22. As explained in *Inside Santa's Workshop: How Toy Inventors Develop, Sell, and Cash In on Their Ideas*, the standard royalty of 5% of net sales pertains to complete toy and game concepts, not to individual components of games. Sussman 1/24 Tr. 19:4-6; Lapidus

1/16 Tr. 68:15-22 (acknowledging that stated standard range of 2-8% of net sales applies to toy or game concepts).

23. Lapidus's assertion that the standard royalty "range" would apply to components finds no support in industry literature or other objective sources, and is contradicted by the record evidence. Lapidus 1/16 Tr. 72:10-21 (asserting that standard applies to both concepts and components); *see also* **Exhibit 1** (Lapidus report; contains no reference to industry standard royalty rates); **Exhibit 2** (Sussman Report) at 24-25 (quoting *Inside Santa's Workshop: How Toy Inventors Develop, Sell, and Cash In on Their Ideas*: "The standard royalty rate for toys and games is 5 percent of the ***item's*** net wholesale price.") (emphasis added).

**Lapidus's Other Experience Is Insufficient to Qualify Him as an Expert**

24. Lapidus's background, training, experience, and credentials aside from the toy and game industry are insufficient to qualify him as an expert witness in this case. The mere facts that (1) Lapidus is an experienced certified public accountant, and (2) Lapidus has previously performed patent damage analyses do not render him qualified to testify as an expert with respect to patent damages arising in the toy and game industry.

25. At a minimum, a witness with generic qualifications like Lapidus's would have to educate him- or herself with respect to prevailing standards for licensing in the toy and game industry in order to qualify as someone who could provide testimony that would be of assistance to the jury. Lapidus has not done so. Lapidus 1/16 Tr. 69:21-71:14.

26. The only mention of any research into toy or game licensing standards in Lapidus's report appears in his consideration of *Georgia-Pacific* factor number 12 (customary license rates in comparable businesses). **Exhibit 1** at 13-14. There, Lapidus claims to have found two relevant licenses out of the entire toy and game industry. Lapidus acknowledges that both of those licenses were for game concepts, not components. Lapidus 1/16 Tr. 138:25-139:3.

Lapidus does not explain how either of the licenses is analogous to the hypothetical negotiation at issue. Lapidus does not purport to explain how these concept licenses might relate to a game component license, nor does he have any background or experience that would inform any analysis that he might do in that regard.

**Lapidus Has Not Performed His Analysis Consistent With Governing Standards for Certified Public Accountants**

27. Because Lapidus lacks experience, knowledge, and training specific to the toy and game industry, the only expertise he brings to this analysis are his generic qualifications as a certified public accountant.

28. Because Lapidus has, in his analysis performed in this case, failed even to abide by governing standards for certified public accountancy, his status as a certified public accountant is insufficient to qualify him as an expert witness in this case.

29. As a certified public accountant, Lapidus is subject to the American Institute of Certified Public Accountants (AICPA) Code of Professional Conduct.

30. In his provision of litigation support services to Bowling in this case, Lapidus was obliged to comply with, among other provisions, AICPA Code of Professional Conduct Rules 102 ("Integrity and Objectivity") and 201 ("General Standards"). Sussman 1/24 Tr. 30:1-31:4; **Exhibit E**.

31. Whether or not Lapidus is viewed as an independent expert or as Bowling's advocate, AICPA Code of Conduct Rule 102 requires CPAs such as Lapidus to remain objective in their formulation of opinions. Rule 102 provides that:

> In the performance of any professional service, a member shall maintain objectivity and integrity, shall be free of conflicts of interest, and shall not knowingly misrepresent facts or subordinate his or her judgment to others.

AICPA Rules of Professional Conduct Rule 102 - Integrity and objectivity, available at http://www.aicpa.org/about/code/et_102.html (last accessed 2/11/08). Additionally, Rule 201 requires CPAs to obtain sufficient relevant data to support their opinions:

> A member shall comply with the following standards and with any interpretations thereof by bodies designated by Council.
>
> [* * *]
>
> D. Sufficient Relevant Data. Obtain sufficient relevant data to afford a reasonable basis for conclusions or recommendations in relation to any professional services performed.

AICPA Rules of Professional Conduct Rule 201 – General standards, available at http://www.aicpa.org/about/code/et_200.html (last accessed 2/11/08). These rules apply to litigation services provided by CPAs. *See* Sussman 1/24 Tr. 30:6-12; **Exhibit E** ("Litigation Services and Applicable Professional Standards") at 2-3.

32. Lapidus's analysis in this case fails to meet the standards of objectivity required by AICPA Rules of Professional Conduct Rule 102. His analysis fails to acknowledge any facts or circumstances that would favor Hasbro in its hypothetical negotiation with Bowling and relies upon "facts" favorable to Bowling that are contrary to the record. For example, Lapidus asserts that Bowling sold his dice for $0.64, but fails to acknowledge or take into consideration the fact that Bowling sold his dice for significantly less than that both inside and outside the United States. *Compare* **Exhibit 1** at 9-10 *with* Lapidus 1/16 Tr. 119:20-24 and Sussman 1/24 Tr. 26:15-27:1. Lapidus fails to account for the fact that Bowling would be willing to accept a low royalty rate because, under the license and unlike his normal business model, 100% of the royalties would be profit to Bowling, who would have no cost of goods or overhead associated with those sales. Lapidus also knows that Hasbro was paying a 3% royalty for the Monopoly game concept, but never explained why Hasbro might be willing to pay over

three times that amount for a single component of the game. *Compare* **Exhibit 1** (no mention of Monopoly royalty rate) *with* Sussman 1/24 Tr. 9:12. Lapidus also acknowledges that Hasbro had options with respect to the negotiation but utterly failed to consider those options. Lapidus notes, but then ignores in his analysis, the fact that Hasbro could remove the dice from the game for a cost of approximately $70,000, significantly less than what Lapidus opines would be the anticipated cost of entering into a license agreement with Bowling. *See* **Exhibit 1** at 7 n.6 (noting without criticism Hasbro's cost estimate for replacing the accused dice).

33. Lapidus opines that of the 15 *Georgia-Pacific* factors, not a single factor would favor Hasbro in its hypothetical negotiations with Bowling, notwithstanding the facts that (1) Hasbro is a major player in the toy and game industry, (2) Bowling had actively sought to license his dice, (3) a license with Hasbro for Monopoly games could yield substantial secondary benefits for Bowling such as the promotion of his patented dice, and (4) Hasbro could design around Bowling's dice for a comparatively small price. Lapidus's refusal to acknowledge any factors favoring Hasbro strongly suggests a lack of objectivity in his analysis.

34. Lapidus even testified that he allowed his analysis to be influenced by the fact that Bowling, and not Hasbro, was his client, stating "because this [expert report] is written on behalf of Mr. Bowling, this would tend to increase his royalty." Lapidus 1/16 Tr. 104:13-15.

35. The one-sided nature of Lapidus's analysis fails to meet the requirement that certified public accountants perform their work with objectivity and integrity.

36. Lapidus's failure to apply the *Georgia-Pacific* methodology in a fair and objective manner renders his opinions unreliable; his failings in this regard do not merely go to the weight of his testimony but instead reveal that he has failed to apply a reliable methodology in a reliable fashion. Fed. R. Evid. Rule 702.

37. Lapidus's significant lack of objectivity renders his opinions unreliable and therefore inadmissible. *See*, *e.g.*, *Ed Peters Jewelry Co. v. C&J Jewelry Co.*, 124 F.3d 252, 259-60 (1st Cir. 1997) (affirming district court exclusion of expert witness based in part on "moving target" nature of the valuations rendered by expert).

38. Lapidus's opinions are also based on insufficient data, in violation of applicable standards for certified public accountancy and the express language of Rule 702. Fed. R. Evid. 702; AICPA Rules of Professional Conduct Rule 201.

39. For example, Lapidus opines that the "timing of events surrounding the hypothetical negotiations, overall, in relation to other license agreements negotiated by Hasbro and other industry standards." **Exhibit 1** at 7-8. Lapidus offers no facts or analysis to support this statement. *See id.* Nowhere in his expert report does Lapidus ever explain why a hypothetical negotiation in September of 1999 would see a higher royalty than in March of 1999 or January of 2000 or any other period. He does not cite to a single fact that would support such a conclusion.

40. At the *Daubert* hearing, Lapidus testified as to numerous "facts" that he thought would cause the timing of the negotiations to favor a higher royalty but those were either pure guesswork or counterfactual. *E.g.*, Lapidus 1/16 Tr. 130:24-131:5 (suggesting that retailers might object to Hasbro placing stickers over image of dice on box despite the fact that no such complaints were ever made when Hasbro did so); *id.* at 132:20-133:4 (claiming that timing was crucial because 90% of sales were made by December 1999); *id.* at 135:14-21 (same).

41. Lapidus's statement that 90% of sales were made before December 1999, and that Hasbro would therefore have felt particularly pressured in negotiations taking place in August 1999 is untrue. Only 63% of the sales of the Monopoly Millennium Edition and Avon

Special games took place by December 1999, and 20% of those sales occurred prior to the date of the hypothetical negotiation. *See* **Exhibit 2** (Sussman Report) at 39 (Exhibit D to report) and **Exhibit 1** (Lapidus Report) at 21 (Exhibit C to report). In an effort to create a sense of urgency around the August 17, 1999 date when his report does not contain any data to support that conclusion, Lapidus misquoted his own report. His report states that "[Hasbro] sold over 90% of the games prior to ***December 2000***" – 16 months after the hypothetical negotiation. **Exhibit 1** at 11 (emphasis added).

42. Other statements by Lapidus are similarly unsupported by relevant data. He opines that the relationship of Bowling and Hasbro would have been one of supplier and customer, but cites to no record evidence in support of that conclusion. **Exhibit 1** at 9-10. Confronted at the *Daubert* hearing with the question why Hasbro would purchase dice from Bowling when it already had an established supply channel, Lapidus invented a new meaning for "supplier," opining that even if Hasbro was manufacturing the dice itself, Bowling would be considered a supplier "under this arrangement." Lapidus 1/16 Tr. 114:13-16.

43. Lapidus's conclusions about the supplier/customer relationship between Hasbro and Bowling are not merely unsupported, they demonstrate either a fundamental lack of understanding of the parameters of the hypothetical negotiation or a studied ignorance of real-world negotiations. Hasbro had a supplier from whom it was purchasing dice for less than six cents each. Bowling's cost to manufacture was more than double that figure. Hasbro and Bowling would literally be throwing money away to engage in a supplier/customer relationship since the dice would cost over seven cents more to manufacture. Moreover, for Bowling to "supply" the dice, Hasbro would have to discontinue its existing relationship, inspect and approve Bowling's raw materials and manufacturing processes, perform product testing on the

dice themselves (for lead paint, for example) – all of which was already in place. Bowling, on the other hand, would have to develop molds for the dice (Bowling didn't even have a six-sided die at the time) and subject himself to Hasbro's quality control and other restrictions. Lapidus gives none of these facts any thought whatsoever, instead jumping to a conclusion about the hypothetical relationship between Hasbro and Bowling that has nothing to do with reality but everything to do with being able to mention Bowling's $0.64 wholesale price.

44. Lapidus's ultimate conclusion regarding a reasonable royalty is similarly unsupported.

45. Lapidus sets forth his conclusion about reasonable royalty in Exhibit D to his report. That conclusion consists exclusively of an arithmetical calculation: he subtracts Hasbro's cost to manufacture the accused die from Bowling's nominal wholesale price for his dice, and the result is the "reasonable royalty." **Exhibit 1** at 22.

46. There is no discussion in Lapidus's report concerning how his reasonable royalty figure was determined.

47. There is no discussion in Lapidus's report concerning why Hasbro would be willing to pay a royalty of $0.5825 per die (or $1.165 per game).

48. There is no discussion in Lapidus's report concerning why Bowling would not be willing to accept a royalty of less than $0.5825 per die (or $1.165 per game).

49. There is no discussion in Lapidus's report concerning why the parties would reach a royalty that, in the case of the Avon Special edition game, would amount to a 12.22% royalty on a single component of the game.

50. There is no discussion in Lapidus's report concerning why the parties would reach a royalty that would amount to over 1,000% of the cost of the component itself.

51. Given the lack of relevant data underlying Lapidus's conclusions, his opinions are offered in violation of both Fed. R. Evid. 702 and AICPA Rules of Professional Conduct Rule 201. His testimony is therefore unreliable and inadmissible. *Irvine v. Murad Skin Research Labs., Inc.*, 194 F.3d 313, 320-21 (1st Cir. 1999) (expert's damages calculations unreliable where the expert lacked "adequate factual data to support [his] conclusions").

## II. Lapidus Has Not Applied the *Georgia-Pacific* Methodology Reliably to the Facts of This Case

52. Lapidus opines that a reasonable royalty in this case is $0.5825 per infringing die, or stated differently, $1.165 per game containing infringing dice. **Exhibit 1** at 22 (Lapidus Report Exhibit D).

53. Because there was no established royalty for Bowling's invention, Lapidus purports to have arrived at his conclusion as to reasonable royalty by means of the consideration of the factors articulated in *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F.Supp. 1116, 1120 (D.C.N.Y. 1970) (the "*Georgia-Pacific* factors"). **Exhibit 1** at 5; Lapidus 1/16 Tr. 25:21-25.

54. As set forth in his expert report, Lapidus's methodology consisted of stating certain background information and then reciting each *Georgia-Pacific* factor, discussing each *Georgia-Pacific* factor including a statement of his conclusion as to whether each factorwould tend to increase, decrease, or not impact the reasonable royalty in this case. After reciting and discussing each factor, Lapidus stated his opinion as to reasonable royalty. **Exhibit 1**.

55. In stating his conclusion regarding reasonable royalty, Lapidus's explanation consisted of the following:

> In my opinion, a reasonable royalty of **$0.5825** per die is a reasonable royalty. See Exhibit D. The royalty of $0.5825 per die

> is the equivalent of a 4.22% royalty on the Millennium Edition and an 11.92% royalty on the Avon Edition. Overall the royalty is equal to a 5.28% royalty across both versions and is reasonable. See Exhibit G. In my opinion, Bowling has suffered **$648,705** in damages measured by a reasonable royalty caused by Hasbro's infringement. See Exhibit C.

**Exhibit 1** at 15 (emphasis in original).

56. "Exhibit D" to Lapidus's report consists of a mathematical calculation in which Lapidus subtracts Hasbro's cost to manufacture its accused die ($0.0575) from Bowling's "Per Die Sales Price" for his commercial embodiment of the invention ($0.64), yielding what Laidus calls the "Reasonable Royalty Per Die" of $0.5825. **Exhibit 1** at 22.

57. Despite the obvious arithmetic presented in Exhibit D to his report, Lapidus denies that he arrived at his opinion about reasonable royalty by means of subtracting Hasbro's cost to manufacture its accused die from Bowling's "Per Die Sales Price." Lapidus 1/16 Tr. 25:14-18. Instead, Lapidus insists that he arrived at his conclusion as to reasonable royalty based on his having gone through all 15 *Georgia-Pacific* factors. Lapidus 1/16 Tr. 25:21-25.

58. Because there is no nexus between Lapidus's discussion of the *Georgia-Pacific* factors and his conclusion regarding a reasonable royalty in this case, Lapidus was not credible when he testified that his conclusion arose out of his consideration of the *Georgia-Pacific* factors.

59. Lapidus's reasonable royalty conclusion is no more than the *ipse dixit* of Lapidus himself.

60. Lapidus's consideration of the individual *Georgia-Pacific* factors misapplies both the facts of this case and the established methodology for performing a *Georgia-Pacific* analysis.

**The First *Georgia-Pacific* Factor**

61. The first *Georgia-Pacific* factor requires the consideration of established royalty rates. Lapidus concedes that there is no established royalty rate. **Exhibit 1** at 8. Instead of conceding that the lack of established royalties does not inform his analysis, Lapidus opines that the absence of an established royalty would "tend to increase the reasonable royalty." Lapidus's analysis of this factor is therefore flawed.

**The Second and Twelfth *Georgia-Pacific* Factors**

62. The second *Georgia-Pacific* factor requires the consideration of the rates paid for similar patents to the patent-in-suit. Lapidus reviewed a number of agreements and found them to have royalty rates between 1% and 8%, with a substantial number of agreements having rates at or above 5%. **Exhibit 1** at 8. This factor is related to the twelfth *Georgia-Pacific* factor, which looks to customary royalties for the use of analogous inventions. Lapidus openly acknowledged that component licenses generally account for lower royalties than complete toy or game concepts (Lapidus 1/16 Tr. 96:17-23), but his actual reasonable royalty analysis merely bundles all licenses together without any differentiation between those licenses that are genuinely similar to the patent-in-suit and those that are not. *See* **Exhibit 1** at 8, 13-14; **Exhibits A, B, C**; Lapidus 1/16 Tr. 96:17-102:3. Lapidus does not consider either the second or the twelfth *Georgia-Pacific* factors in any meaningful way.

**The Third *Georgia-Pacific* Factor**

63. The third *Georgia-Pacific* factor requires the consideration of the nature of the license. Lapidus opines that the license would be "exclusive to Hasbro." **Exhibit 1** at 9. There is no record evidence for the notion that Hasbro would have insisted on exclusivity, or that Bowling would have agreed to an exclusive license (which would, after all, have put Mr. Bowling's dice company out of business). Lapidus acknowledges that, but on cross-examination

attempted to redefine the term "exclusive" to mean that Hasbro would not have used the die in any games other than Monopoly. Lapidus Tr. 105:14-22. Lapidus fails to account for the fact that, had Hasbro agreed to this species of "exclusivity," that would have been a concession on Hasbro's part which would, in theory, have decreased the royalty rate. The second factor requires the consideration of the nature of the license, and to the extent Lapidus even attempts to do that, he either makes faulty assumptions or simply invents terms that had never even been considered by either of the parties.

**The Fourth *Georgia-Pacific* Factor**

64. With respect to the fourth *Georgia-Pacific* factor, Lapidus relies on the fact that Bowling "does not operate a licensing company" and "has not licensed his patent" in his report, but testified that he was aware that Bowling does, in fact, operate a licensing company (Crystal Caste Licensing LLC) and was actively pursuing licensing his dice even before the date of the hypothetical negotiation. **Exhibit 1** at 9; Lapidus 1/16 Tr. 112:12-113:3. Lapidus does not account for the actual facts of record when considering the fourth *Georgia-Pacific* factor but instead rests his conclusions on erroneous assumptions.

**The Fifth *Georgia-Pacific* Factor**

65. The fifth *Georgia-Pacific* factor requires the consideration of the nature of the relationship between Hasbro and Bowling. Lapidus assumes that they would have the relationship of customer and supplier and notes that as a supplier, Bowling would normally charge his $0.64 nominal wholesale price. **Exhibit 1** at 9. There is no factual basis for these assumptions. It would be economically irrational for Hasbro to purchase the dice from Bowling rather than using its own established supply channels. Additionally, Bowling charged substantially less than $0.64 for his dice in the United States, but Lapidus does not consider that fact in the context of this factor.

**The Sixth *Georgia-Pacific* Factor**

66. The sixth *Georgia-Pacific* factor requires the consideration of, among other things, the impact of the patented product in promoting sales of other, non-patented items. In his report, Lapidus states that he "found" that Bowling's patented dice "are important drivers of sales of nonpatented products." *Id.* at 10. His reliance for this assertion on an interview with Bowling, when all of Bowling's sales records have been provided to Lapidus himself, is highly suggestive that Lapidus is too willing to credit Bowling rather than determine facts by review of the record evidence.

67. Had Lapidus actually checked the records that were provided to him, he would have found that at the time of the hypothetical negotiation in August 1999, Bowling did not have any non-patented items for sale, so there could not have been any such business impact. Lapidus did not know that fact, apparently not having even bothered to cross-check the information he was provided by Bowling against the documents given to him for review. Lapidus 1/16 Tr. 120:11-16.

**The Seventh *Georgia-Pacific* Factor**

68. The seventh *Georgia-Pacific* factor requires the consideration of the duration of the patent and the term of the license. Lapidus recites what he believes the relevant terms to be, and opines that their short duration would increase royalty, but does not explain either (1) why, or against what standard, the stated time periods are "short," or (2) why that "short" period would yield a higher royalty rate. **Exhibit 1** at 11.

**The Eighth *Georgia-Pacific* Factor and the "Book of Wisdom"**

69. The eighth *Georgia-Pacific* factor requires the consideration of the established profitability of the product made under the patent. Lapidus refused to consider the established profitability of Bowling's patented dice, which he acknowledged had actually lost

money up until the date of the hypothetical negotiation, instead relying on the gross margin for Bowling's dice. *Id.* at 11; Lapidus 1/16 Tr. 122:16-123:6.

70. Asked if, as a certified public accountant, he thought "profitability" and "gross margin" were the same thing, Lapidus testified that ***they are one and the same***, claiming that "an important measure of profitability is the gross margin." *Id.* at 121:21-122:12. He made this claim even while acknowledging that Bowling had lost money while maintaining margins that were "very high." *Id.* at 123:2-6.

71. Lapidus's testimony on the subject of the established profitability of Bowling's dice is opportunistic, disingenuous, and deceptive. As a certified public accountant with many years of experience, Lapidus cannot subjectively believe that margin and profit are one and the same, particularly given that the product saw margins of 70% while generating net losses.

72. By considering only gross margins and not the "established profitability" of Bowling's dice, Lapidus failed to consider the eighth *Georgia-Pacific* factor.

73. Lapidus's consideration of future sales data as evidence supporting his conclusions about established margins is also inappropriate. *See* **Exhibit 1** at 11 (noting sales of dice from August 1, 1998 to January 1, 2002). Although there are circumstances under which post-hypothetical negotiation data – sometimes called a "book of wisdom" – may be taken into account to correct uncertainties regarding the situation at the time of the negotiation, the Supreme Court has expressly cautioned against its use generally, since to do so might "charge the offender with elements of value nonexistent at the time of his offense." *Sinclair Refining Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689, 698 (1933).

74. Lapidus was questioned about his knowledge of this "book of wisdom" concept, and his answers were deceptive and untruthful.

75. The Court asked what the "book of wisdom" is and Lapidus replied "That is a book that references application of the *Georgia-Pacific* factors, and it's a reference or literature that talks about these topics." Lapidus 1/16 Tr. 182:4-9.

76. The "book of wisdom" is not a book. As a legal concept arising out of the *Sinclair Refining Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689 (1933) case, it pre-dates the *Georgia-Pacific* decision (and therefore the *Georgia-Pacific* factors) by nearly 40 years. It is not a reference or literature, and it does not talk about "these topics."

77. Having fabricated that response, Lapidus continued to embellish, claiming that the "book of wisdom "is a reference source that probably differentiates if you have – an explanation, if you would have a patent versus – something that has a set dollar amount versus formulating it through the *Georgia-Pacific* factors." Lapidus 1/16 Tr. 182:16-20. He even offered to get the court "a copy" of the "book of wisdom." *Id.* at 183:3-5.

78. Lapidus clearly did not know what the "book of wisdom" was with respect to evaluating damages for patent infringement, but instead of testifying truthfully and telling the Court that he did not know or was not sure, he flatly made up answers in an effort to forestall any challenge to his status as an authority on patent damages. As a result, Lapidus is not a credible witness.

**The Thirteenth *Georgia-Pacific* Factor**

79. The thirteenth *Georgia-Pacific* factor requires consideration of the value of the patented invention as compared with other, non-patented elements. In this case, the value of the dice has to be weighed against the remaining portions of the Monopoly games, whether

the Millennium Edition or the Avon Special. These include the Monopoly brand, the gameplay, and the other physical components of the game.

80. The dice form a small fraction of the value of the game and are comparatively minor compared to the non-patented elements, particularly the Monopoly brand itself.

81. Lapidus does not consider the nonpatented elements of the games at all. **Exhibit 1** at 14. Instead, he devotes his entire discussion of the thirteenth *Georgia-Pacific* factor to (1) rejecting the notion of calculating royalty amounts based on a value added factor, and (2) determining whether his proposed royalty amount ($1.165 per game) would exceed the anticipated profits from the game. *Id.*

82. The thirteenth *Georgia-Pacific* factor is the only factor actively discussed by Lapidus that he does not find to increase the reasonable royalty. Instead, Lapidus concludes that this factor neither increases nor decreases the royalty. *Id.*

83. In determining that the thirteenth *Georgia-Pacific* factor would neither increase nor decrease the reasonable royalty, Lapidus fails to consider the matters germane to the factor itself, namely what the portion of the realizable profit is that should be attributed to the dice, as opposed to other parts of the game. In so doing, Lapidus did not follow the *Georgia-Pacific* methodology.

**Lapidus's Faulty Application of the *Georgia-Pacific* Factors Renders His Testimony Inadmissible**

84. Although individual mistakes or misstatements regarding particular *Georgia-Pacific* factors might go to the weight of Lapidus's testimony, the aggregate failure to apply that methodology in a reliable manner goes directly to the admissibility of the testimony. Fed. R. Evid. Rule 702.

85. Lapidus's overall failure to consider the *Georgia-Pacific* factors in a manner consistent with the facts of the case or with the plain meaning of the factors themselves renders his opinions unreliable.

## III. Conclusion

For the reasons stated above, in its moving papers, and on the evidence presented at the hearing, Hasbro respectfully requests that the testimony of Neil N. Lapidus be excluded from trial.

Respectfully submitted,

HASBRO, INC.

By its Attorneys,

/s/ Jeffrey K. Techentin___________
Todd D. White (# 5943)
twhite@apslaw.com
Jeffrey K. Techentin (#6651)
jtechentin@apslaw.com
Adler Pollock & Sheehan P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903
(401) 274-7200
Fax: (401) 751-0604/ 351-4607
Dated: February 11, 2008

Of Counsel:

David K. S. Cornwell, Esq.
davidc@skgf.com
Tracy-Gene G. Durkin, Esq.
tdurkin@skgf.com
Sterne Kessler Goldstein Fox
1100 New York Avenue, NW
Washington, D.C. 20005

*442298_1*

**CERTIFICATE OF SERVICE**

TO:

Craig M. Scott, Esq.
Christine K. Bush, Esq.
Duffy & Sweeney & Scott, Ltd.
One Turks Head Place, Suite 1200
Providence, RI 02903

Thomas J. Leach, Esq.
Anthony R. Zeuli, Esq.
Douglas J. Williams, Esq.
Law Firm of Merchant and Gould P.C.
3200 IDS Center
80 South 8th Street
Minneapolis, Minnesota 55402-2215

David K. S. Cornwell, Esq.
Tracy-Gene G. Durkin, Esq.
Sterne Kessler Goldstein Fox
1100 New York Avenue, NW
Washington, D.C. 20005

I hereby certify that I filed the within Proposed Findings of Fact and Conclusions of Law in Support of Motion *in Limine* to Preclude Testimony of Plaintiff's Expert Witness, Neil N. Lapidus through the ECF system on the 11th day of February, 2008, and that notice will be sent electronically to the above-named counsel who are registered participants identified on the Mailing Information for Case No. 05-229S.

/s/ Jeffrey K. Techentin________

*442298_1*