# EXHIBIT D

Allen v. Ghoulish Gallery
S.D.Cal.,2007.

United States District Court,S.D. California.
Edward ALLEN, an individual, Plaintiff,
v.
The GHOULISH GALLERY, an entity of unknown form; Tim Turner, an individual, April Turner, an individual, and Does 1 through 10, inclusive, Defendants.
Tim Turner, an individual, April Turner, an individual, dba the Ghoulish Gallery, Counterclaimants,
v.
Edward Allen, an individual, Counterdefendant.
**Civil No. 06cv371 NLS.**

Nov. 20, 2007.

**MEMORANDUM AND RULING FOLLOWING TRIAL; FINDINGS OF FACT AND CONCLUSIONS OF LAW**

NITA L. STORMES, United States Magistrate Judge.

***BACKGROUND***

***1** Edward Allen ("Allen" or "Plaintiff") and Tim Turner ("Turner" or "Defendant") design, create, market and sell "changing portraits" in the haunt industry. These two artists-and competitors-take an antique photo and use lenticular technology to make the portrait "change" into a haunted spirit, vampire or other spooky creature. The portrait is all inclusive and the viewer need only slightly shift position to see the alternating images.

Allen created a website for his business, Haunted Memories Changing Portraits ("Haunted Memories"), in 2003. Turner created the website for his business, The Ghoulish Gallery, in 2004. The parties have competed with and sparred with one another since the time Turner launched his website. Then, in February 2006, Allen sued Turner claiming that Turner copied Allen's federally copyright-protected website, and engaged in federal unfair competition for false advertising, common law unfair competition, unfair business practices, intentional interference with prospective economic advantage and trade libel.[FN1] Turner counterclaimed, alleging that Allen committed federal unfair competition for false advertising, false or misleading statements under state law, common law unfair competition, intentional interference with prospective economic advantage, trade libel and defamation.

FN1. Allen also sued Turner's wife, April Turner, who also counterclaimed against Allen. Before trial, however, Defendant notified the Court in his trial brief that April Turner sought to dismiss her counterclaims against Allen. Then at trial, the Court granted Defendant's motion for nonsuit as to April Turner. April Turner, therefore, is no longer a party.

On April 17, 2007, the parties consented to magistrate judge jurisdiction for all matters arising in this case, including trial. Ten days later Plaintiff substituted in as his own counsel. The Court conducted a bench trial from October 1 to 5, 2007. Plaintiff proceeded pro se, acting as both party and advocate while he testified in narrative form and performed all the functions of trial counsel. Jerrold Abeles, Esq. and Amy Borlund, Esq. represented Defendant. The Court heard testimony from the parties and outside witnesses, examined admitted exhibits and reviewed both pre and post-trial briefs. The exhibits and witness testimony evidenced the parties' rancorous business relationship.

The Court has considered all the admitted evidence and arguments, and explains its decision and reasoning in the discussion below. The Court also attaches, in an appendix, its findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

***DISCUSSION***

**A. *Federal Copyright Infringement.***

Plaintiff claimed he held a valid copyright in the contents of the "Haunted Memories Changing Portraits Website." At trial Plaintiff sought the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

benefit of the presumption of validity of the copyright by asking the Court to take judicial notice of the Certificate of Registration from the U.S. Copyright Office ("registration certificate") for his website. [Trial Ex. 55-1 to 55-2]. Judicial notice of a copyright registration may be appropriate pursuant to Fed.R.Evid. 201(b).[FN2] *See* *Idema v. Dreamworks, Inc.*, 90 Fed. App'x. 496, 498 (9th Cir.2003). At trial the Court agreed to take judicial notice of the registration certificate for the name of the website but not for its contents, as explained below.

FN2. Federal Rule of Evidence 201(b) provides: (b) Kinds of Facts. A judicially noticed fact must be one not subject to reasonable dispute in that it is either (a) generally known within the territorial jurisdiction of the trial court, or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

**1. *Ownership and Originality.***

**a. Judicial Notice of the Copyright Registration and Name of the Website.**

***2** A copyright registration certificate provides prima facie evidence of the validity of the copyright, such that the holder of the registration certificate need not put on evidence of ownership or originality in the copyrighted work. *See* 17 U.S.C. § 410(c)), *Educ. Testing Serv. v. Simon*, 95 F.Supp.2d 1081, 1087 (C.D.Cal.1999). Rather, the burden is on the defendant to overcome the presumption of validity. *Bibbero Systems, Inc. v. Colwell Systems, Inc.*, 893 F.2d 1104, 1106 (9th Cir.1990).

Plaintiff's evidence of validity is his registration certificate. The Copyright Office issued the registration certificate on December 14, 2004 under registration number TX-6-092-441. The information contained on the registration certificate lists the title of the work as the "Haunted Memories Changing Portraits Website," the author of the work as Edward Joseph Allen, the nature of the work as "audiovisual material." [FN3] Notably absent from the registration certificate is a certified copy of the audiovisual material that depicts the *contents* of Plaintiff's website. Defendant objected to the Court taking judicial notice of the copyright registration without any evidence of the contents of the copyrighted material.

FN3. Plaintiff registered the website with the Copyright Office as an "audiovisual work." *See* 17 U.S.C. § 102(a)(6). The Copyright Act defines "audiovisual works" as "works that consist of a series of related images which are intrinsically intended to be shown by the use of machines or devices (in this case a computer) such as projectors, viewers, or electronic equipment, together with accompanying sounds, if any, regardless of the nature of the material objects, such as films or tapes in which the works are embodied." 17 U.S.C. § 101.

In connection with his request for judicial notice, Plaintiff proffered a CD-ROM which he claimed is a duplicate copy of the CD-ROM submitted to the Copyright office as evidence of his original work. [Trial Ex. 55-5.] Defendant objected to admission of the CD-ROM on grounds that Plaintiff did not produce it in discovery and in any event could not authenticate it as the same CD-ROM that was sent to the Copyright Office. Plaintiff testified that he did not personally submit any audiovisual material to the Copyright Office. Rather, he applied through a copyright service called Copyright Website LLC, 742 Widgeon Street, Foster City, CA, Benedict O'Mahoney, President. He further testified that he did not send O'Mahoney any evidence of the images he sought to copyright. Rather, according to Plaintiff, O'Mahoney must have made a CD-ROM from Plaintiff's website in or about December, 2004, and sent it to the Copyright Office as a copy of Plaintiff's work. The Copyright Office thereafter issued Plaintiff a copyright registration for his website. Plaintiff testified that he had not seen a copy of the CD-ROM until O'Mahoney sent it to him with a cover letter approximately one week before trial. [Trial Ex. 55-3.] Plaintiff did not call O'Mahoney to testify at trial; nor did he obtain a certified copy of the CD-ROM from the Copyright Office which might have been self-authenticating under Fed.R.Evid. 902(4).

The Court found that Plaintiff failed to authenticate the CD-ROM as a copy of the audiovisual material covered by the copyright registration. Without that evidence, the Court could only take judicial notice of the name of the website as

that fact is readily ascertainable from the registration certificate. Therefore, the Court ruled that Plaintiff was not entitled to the statutory presumption of validity in the contents of his website.

**b. Other Proof of Validity.**[FN4]

FN4. The Court considered the CD-ROM even though it had not been produced in discovery because Defendant was well aware of the appearance of Plaintiff's website and because many of the same images on the CD-ROM had been produced to Defendant in discovery.

***3** Failure to authenticate the CD-ROM, however, was not fatal to Plaintiff's proof of copyright protection in the contents of his website. The Court recognized that the "work" Plaintiff sought to copyright was not the CD-ROM itself, but rather, a series of images that appeared on his website as it existed in December 2004.[FN5] *See Midway Mfg. Co. v. Arctic Int'l*, 547 F.Supp. 999, 1007 (N.D.Ill.1982) (citing 1 NIMMER ON COPYRIGHTS § 2.03 (the original work of authorship should not be confused with the material objects in which the work must be fixed)). Plaintiff testified that the series of images contained on the CD-ROM which he displayed via projector in the courtroom and from which he made "screen shots" [FN6] [Trial Exs. 55-6 to 55-11] accurately display the work for which he obtained copyright protection. Plaintiff also introduced screen shots of certain webpages from his website as they appeared in December 2004 that he obtained via the Internet Archive Wayback machine (http://web.archive.org).[FN7]

FN5. Before a copyright can attach to any original work of authorship, the work must be "fixed in any tangible medium of expression, now known or later developed, from which (it) can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." 17 U.S.C. § 102(a). A work is "fixed" within the meaning of the Act "when its embodiment in a copy or phonorecord, by or under the authority of the author, is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration." 17 U.S.C. § 101. All that is required is that the work is capable of being "reproduced ... with the aid of a machine or device." 17 U.S.C. § 102(a).

FN6. Screen shots or screen prints are photographs of images taken from one or more website pages.

FN7. The Internet Archive Wayback Machine is a service that allows people to visit archived versions of stored websites. *See* http:// web.archive.org/collections/web/faqs.html (10/10/2007).

From this evidence, Plaintiff claims he holds a valid copyright in everything found on his Haunted Memories website, located at www.hauntedmemories.com, including: (1) the Ruben Font on his business name "Haunted Memories;" (2) the Rudelsberg Font on his tag line "Spooky Antique Changing Portraits;" (3) the "spooky eyeball" pattern in the website background; (4) the gallery of characters portrayed in his changing portraits; (5) the charcoal frame jpeg image Plaintiff used to display certain characters; [FN8] (6) the use of a "Buy It Now" button; (7) black oval matting around various character pictures; (8) the use of mini-biographies for his characters; and (9) use of the "Little" designation on biographies of his child characters. Whether these elements qualify for copyright protection depends upon whether individually or in combination they meet the tests for originality and fixation. *See M. Kramer Mfg., Inc. v. Andrews*, 783 F.2d 421, 433 (4th Cir.1986). The Court finds that the images on the CD-ROM and screen shots are sufficiently fixed to fall within the meaning of the Copyright Act. Originality is discussed below.

FN8. In his trial brief, Plaintiff argued for protection for a brown frame jpeg image he used to display certain characters, but never presented any admissible evidence or testimony regarding that frame. The Court, therefore, will not consider it.

**I. Copyright Validity of Individual Elements of Website.**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

It was unclear from Plaintiff's testimony whether he claims a copyright in the individual components of his website or only in the selection, arrangement, and presentation of his website. To the extent he claims a valid copyright in the individual components of his website, the Court finds he has failed to carry his burden of proof. First, not only did Defendant present substantial evidence that the Ruben font is commonly used in the "Haunt Industry" and is in the public domain, [*See, e.g.*, Trial Exs. 11-1, 11-2, 110-2 and 198-1 to 198-11], but Plaintiff agreed to those facts [Pretrial Order Admitted Fact Nos. 91, 97]. The parties also agreed that Plaintiff did not author the Rudelsberg font and that the font was not custom-designed for him. [Admitted Fact Nos. 94, 95.] Further, Defendant presented evidence that "Buy It Now" buttons are commonly used in the public domain as a feature of retail websites. [Allen Cross Examination; Lanier Testimony.] And, Defendant testified that he got the idea to use black oval matting with a feathered edge from a colleague and that use of such a matting was typically Victorian. [Turner Testimony, Day 3.] These individual elements are not original to Plaintiff or entitled to copyright protection.

***4** Regarding the charcoal frame, Plaintiff testified he purchased the frame stock from Universal Framing and had it cut and assembled by Lyon Art Supply in Long Beach. He testified he photographed the assembled frame, converted the photo to a jpeg image and used it to display certain of his characters on his website. While Plaintiff's efforts with regard to the charcoal frame might meet the minimum level of creativity required for copyright protection, the frame itself is one commonly used to display "scary" photographs and not a proper subject for copyright protection. [*See, e.g.*, Trial Exs. 240-1, 241-1, 242-1.] Similarly, the use of "Little" to designate child characters is hardly original to Plaintiff. Finally, Plaintiff did not carry his burden to prove the "spooky eyeball" wallpaper on his website is original to him [See Trial Ex. 209-1]. Plaintiff, however, did testify that the specific mini-biographies for his characters are his creation. In any event, as the Court notes in section 2(b) below, there is no evidence Defendant has copied any of Plaintiff's mini-biographies.

**ii. Copyright Validity of Collective Elements of Website.**

If specific components of a compilation are not original or would not be protected by themselves, a party nonetheless may have protection in the selection, arrangement, and presentation of such components. 17 U.S.C. § 101; *Bensbargains.net, LLC v. XPBargains.com*, 2007 U.S. Dist. Lexis 60544, *4-*5 (S.D.Cal.2007). The required elements to establish copyright protection based on this theory include:

(1) the collection and assembly of pre-existing material, facts or data; (2) the selection, coordination, or arrangement of those materials; and (3) the creation, by virtue of the particular selection, coordination, or arrangement, of an original work of authorship.

*Id.* (citing *Feist Pubs., Inc. v. Rural Tel. Serv. Co.* 499 U.S. 340, 357 (1991)). Selection and arrangement require the "exercise of judgment." *Id.* at *6 (citation omitted). Only some minimal level of creativity is required. *Id.* at *5 (citation omitted).

The Court found that Plaintiff established by a preponderance of the evidence that he is entitled to copyright protection in the selection, arrangement and presentation of the contents of his website as it appeared in December 2004. Through the use of color, background wallpaper, text, specific gallery portraits, specific frames, fonts, mats and original mini-biographies, Plaintiff created a unique work that reflects his own creative and independent judgment. While copyright protection does not extend to the individual components of that creation, it does extend to the work as a whole.

**2. *Whether Defendant Infringed.***

**a. Standard for Copyright Infringement.**

To show infringement, in addition to ownership, Plaintiff must prove that Defendant copied the "constituent elements of the work that are original."*Feist Pubs.*, 499 U.S. at 361. Without evidence that Defendant directly copied Plaintiff, Plaintiff must submit "fact-based showings that the defendant had access to the plaintiff's work and that the two works are substantially similar."*Funky Films, Inc. v. Time Warner Entm't Co., L.P.*, 462 F.3d 1072, 1076 (9th Cir.2006) (internal quotations omitted). To determine substantial similarity, the trier of fact must

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

examine the works themselves in detail.*Id.* at 1075.

***5** The substantial-similarity test consists of an intrinsic and an extrinsic analysis. *Id.* at 1077.The intrinsic test is only for the trier of fact, and "examines an ordinary person's subjective impressions of the similarities between two works."*Id.* (internal quotations omitted). The extrinsic test is an objective one and focuses on specific criteria that can be listed and analyzed. *Id.* (internal citation omitted). Regarding a compilation work, only the selection and/or arrangement of the work are protected while the individual unprotected components may be copied.*Benbargains.net LLC*, 2007 U.S. Dist. LEXIS at *10-*11 (internal citations omitted). Where the compilation consists largely of uncopyrightable elements, a court will find copyright infringement where there is "bodily appropriation of expression" or "unauthorized use of substantially the entire item."*Id.* (finding insufficient similarity where defendants copied or derived less than 70% of their selections from plaintiff's website) (quoting *Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 205 (9th Cir.1989)).

Here, the Court will focus the extrinsic test on comparing the selection and arrangement of the websites' font, background, gallery pages, frames and matting.[FN9]The Court will compare images of Plaintiff's website as it existed in December 2004 [Trial Exs. 55-6 to 55-11] [FN10] with Defendant's website as it existed in April 2005 [Trial Ex. 248], October 2005 [Trial Ex. 253], January 2006 [Trial Ex. 249] and June 2006 [Trial Ex. 250].

FN9. The Court will not consider use of the "Buy It Now" buttons, mini-biographies or "Little" designation for the characters because none of those components appear on the screenshots Plaintiff submitted to illustrate his website as it appeared in December 2004.

FN10. As evidence of how Plaintiff's website appeared in December 2004, the Court will use Trial Exs. 55-6 to 55-11. At the end of the hearing on Plaintiff's request for judicial notice, the Court noted Defendant's objections and found that Plaintiff "testified in court today that what appears on that CD-ROM is, in fact, the work he created and the work he sought copyright protection for back in December of 2004."[Day 4 Transcript, 25:20-23.] The Court went on to explain that while it could not take judicial notice of the CD-ROM, it did "have evidence in the record that the screen shots from the CD-ROM and the images displayed on the screen in the courtroom from the CD-ROM are accurate representations of what the plaintiff created and sought to copyright."[Day 4 Transcript, 26:4-7.] The Court confirmed that because there was no presumption of ownership and originality, only evidence of it, the burden did not shift to Defendant. [Day 4 Transcript, 26:13-17.] Based on this ruling, the Court corrects its Bench Trial Exhibit and Witness List [Doc. No. 129] to reflect that Trial Exs. 55-6 to 55-11 were part of the trial record and admitted into evidence. The Court also notes that it took judicial notice of Trial Exs. 55-1 to 55-2 to the extent they showed that Plaintiff registered the name of his website.

**b. Substantial Similarity of Websites.**

Plaintiff claims Defendant copied the selection and arrangement of his compilation work, the Haunted Memories Changing Portraits website. Defendant argues that while he uses some of the same individual components on his website that are common in the haunt industry, the selection and arrangement of his compilation differ substantially from Plaintiff's work. Comparing Plaintiff's website-as it appeared at the time it was copyrighted in December 2004-to several versions of Defendant's website-as it appeared *after* Plaintiff's website became protected-the Court finds that there is no substantial similarity between the selection and arrangement of the parties' websites.

First, the Court examined the objective components of Defendant's website as it appeared in April 2005 [Trial Ex. 248-1 to 248-5], the earliest evidence of Defendant's website after Plaintiff received copyright protection, and found only general similarities. Defendant uses the same Ruben font for the company name and the same Rudelsberg font for the tag line-the description below the company name-that Plaintiff does. The layouts of the main page are

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

generally similar in that each have tabs-of different shapes-on the left side of the page to go to different sections of the websites. Framed portraits on both sites have either no matting or black oval matting. But the websites differ because each site uses a different color scheme: Plaintiff's is mostly black with some white, green, purple and yellow while Defendant's is black with an earth tone, some blue and orange and different shades of green and yellow. Plaintiff uses a spooky eyeball background while Defendant uses a lily pattern. The frames around the portraits are different. Specifically regarding the gallery page, Defendant's website, as it appeared in October 2005 [Trial Ex. 253-1 to 253-12], has a distinct background and does not use the same charcoal frame that Plaintiff uses in most of his portraits. Further, the headings on the two gallery pages are different. While the three-portrait-across layout is common to both, Plaintiff includes text between some of the rows of images while Defendant does not. Plaintiff also has one row of portraits where there are only two, instead of three, images. Finally, the characters displayed in the portraits of the two galleries are all different.

***6** Defendant's website as it appeared in January 2006 [Trial Ex. 249] had the same differences as noted in the April 2005 version. Then, as of June 2006 [Trial Ex. 250], Defendant's website became even more distinct with added colors and a different images surrounding the name of the website. Except for the words “The Ghoulish Gallery” written in Ruben font, the layouts, color scheme, background and frames are distinct from Plaintiff's copyrighted work.

In sum, the only substantial similarity the Court finds between the two websites based on the objective test is use of the Ruben font for the business name and Rudelsberg font for the tag line. The Ruben font, as both parties agree and as is evident in several exhibits, is publicly available and commonly used in the haunt industry. The Rudelsberg font is also widely used in the haunt industry, as Defendant testified. Further, the Court's subjective impression of the comparison between Plaintiff's protected work and the different iterations of Defendant's work is that their websites are not substantially similar. Therefore, having compared Plaintiff's protected work with Defendant's work, while the general layout and pattern of both websites appear similar, both the objective and subjective tests reveal the similarities between the selection and/or arrangement of the websites are *not* substantial enough to qualify as copyright infringement. The Court therefore finds that Defendant did not infringe Plaintiff's copyrighted website.

**B. *Federal Unfair Competition.***

Plaintiff claims that Defendant engaged in unfair competition by falsely advertising that The Ghoulish Gallery has been in business since the 1990s, making disparaging remarks about Plaintiff's business and fabricating customer feedback on The Ghoulish Gallery website. Defendant counterclaimed, arguing that Plaintiff engaged in unfair competition by trying to create products similar to Defendant's products, purchasing www.ghoulishgallery.com (Defendant's website is www.theghoulishgallery.com) and redirecting the internet traffic intended for Defendant to his own website, displaying his products at the Haunt X convention where Plaintiff was not a registered vendor, and advertising that he is the “originator” of haunted changing portraits.

Federal unfair competition claims under Lanham Act § 43(a) can be based on false advertising or false designation of origin. *See Lamothe v. Atlantic Recording Corp.*, 847 F.2d 1403, 1405-06 (9th Cir.1988) (stating that § 43(a) prohibits “false advertising about the goods or services of the advertiser” and “selling a good or service of one person's creation under the name or mark of another”). Regarding false advertising, “[r]epresentations constitute commercial advertising or promotion under the Lanham Act if they are 1) commercial speech; 2) by a defendant who is in commercial competition with plaintiff; 3) for the purpose of influencing consumers to buy defendant's goods or services.”*See Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1181 (9th Cir.2003). Based on this definition, the Court will not consider Plaintiff's false advertising claim predicated on disparaging remarks because such remarks about a competitor do not constitute commercial advertising or promotion. Likewise, the Court will not consider Defendant's false advertising counterclaim based on product similarity, the redirecting of internet traffic or Plaintiff's presence at Haunt X because those actions do not constitute commercial speech.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

***7** A claim based on false designation of origin involves "palming off" or "passing off" one's product under another's name. *Smith v. Montoro,* 648 F.2d 602, 604 (9th Cir.1981). "Passing off" is express when a competitor labels its products with a mark identical to a competitor's label or expressly misrepresents the origin of its product. *Id.* "Passing off" is implied when a company's advertising material "impliedly represent[s] that the product it is selling was produced by the competitor."*Id.* Section 43(a)'s protection against false designation need not involve use of a trademark, and may include "reverse passing off" where a person removes the original trademark or label without permission before reselling the product. *Id.* at 604-605.Section 43(a) also protects against a false association claim where a trademark or other distinguishing device is used to "confuse consumers as to the origin, approval, or endorsement of the product."*Waits v. Frito-Lay, Inc.,* 978 F.2d 1093, 1110 (9th Cir.1992).

Here, no facts indicate that Defendant could be entitled to a false designation claim based on similar products or the redirecting of internet traffic because Defendant does not allege that Plaintiff tried to "pass off" his products as Defendant's or sell Defendant's products under his name. Neither does Defendant have a false association claim based on Plaintiff's presence at Haunt X because Defendant did not prove that the Haunt X convention used a distinct trademark or other device to show its approval and endorsement of Plaintiff's products, and that Haunt X attendees were actually confused about any such endorsement.

The Court will now evaluate the unfair competition claim based on Defendant's advertisement that The Ghoulish Gallery has been in business since 1995, and Defendant's counterclaim regarding Plaintiff's statement that he was the originator of changing portraits based on antique photos.

**1. *False Advertising Under Lanham Act § 43(a), 15 U.S.C. § 1125(a)(1)(B).***

To prove false advertising under the Lanham Act, a plaintiff must establish that the defendant: (1) made false statements of fact about his or her own products in advertisements; (2) those advertisements deceived or have the tendency to deceive a substantial segment of their audience; (3) the deception is material (i.e. likely to influence a buyer's decision); (4) the defendant caused the goods to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured either by direct diversion of sales to defendant or by lessening the goodwill of the plaintiff's products. *Rice,* 330 F.3d at 1180.

**2. *Plaintiff's Claim for False Advertising.***

**a. Proffered Evidence.**

Defendant, on his changing portrait website, claimed that The Ghoulish Gallery has been in business since 1995. [*See, e.g.,* Trial Exs. 103-1, 120-1, 249-1, 250-1.] Defendant also said that as of January 2005, The Ghoulish Gallery had been in business for about the last 13 years and that he made his first portrait in 1991. [Admitted Fact No. 40.] To show that Defendant had actually not been in business since the 1990s, Plaintiff proffered an email that Defendant wrote to him in July 2004, before the launch of Defendant's website, that said he and his wife "always wanted to do a changing portrait type effect but just couldn't figure out how to do it."[Trial Ex. 19-1, Admitted Fact No. 23.] In a follow-up email, Defendant, after having asked Plaintiff about all of his product prices, also inquired for specifics about the technology he used to create the changing portraits. [Trial Ex. 19-2, Admitted Fact No. 22.] Further, Defendant testified that following a serious automobile accident in December 1996 he did not work on changing portraits until 2000 or 2001, and in the pretrial order he admitted he did not create, produce or market changing portraits from 1996 to 2002. [Turner Testimony, Day 5; Admitted Fact No. 35.]

***8** To rebut Plaintiff's claim of false advertising, Defendant submitted the following evidence: (1) two receipts from March and April 1992 for changing portraits he sold at the House of Humor [Trial Ex. 171-1]; (2) a photo of a changing portrait he sold at the House of Humor in the early 1990s [Trial Ex. 1]; (3) a press release dated October 6, 1990 regarding the downtown Long Beach Association haunted house "produced by Tim Turner" [Trial Ex. 179-1]; (4) an undated flyer advertising the Long Beach Association haunted house that lists "The Ghoulish Gallery" presumably as an attraction within the haunted house [Trial Ex. 170]; and (5) Defendant's

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

mother's journal in which she mentions her son's changing portrait business. [Trial Ex. 180-6.] Defendant, however, did not proffer any affirmative proof The Ghoulish Gallery had been in business in the 1990s, such as a business registration or license, any receipt for taxes paid for that business, or an actual portrait that he produced for the business.[FN11]

FN11. In his trial brief, Defendant referred to an email [Trial Ex. 47-1] where Plaintiff said he did not dispute that Turner made a changing portrait before he did. Defendant, however, never identified or moved to admit that document into evidence, so it is not before the Court. Even if it were, that statement does not tend to prove that Defendant had been in business since the 1990s.

The Court does not find Defendant's proffered evidence credible to prove this advertisement:

Since 1995, The Ghoulish Gallery has taken all the mystery and nostalgia of Halloween, combined it with spooky Victorian images, and mixed it with the artistic talents of a Hollywood monster maker to conjure up an award winning selection of “spirited” Halloween specialty art commonly known as changing portraits.

[Trial Ex. 103-1.] First, the Court is dubious about the sales receipts from the House of Humor because Defendant wrote out these receipts himself, and, while he dated them one month apart, he marked them with the same receipt number. Second, Defendant provided conflicting testimony to support the picture of the changing portrait he allegedly made in about 1990; at deposition, he said that Kodak helped him produce this portrait while at trial he said that his uncle referred him to someone in advertising (not Kodak) to help him create the portrait. Plaintiff also offered the testimony of Roy Taylor, a former Senior Project Engineer for Kodak, who said in 1990 Kodak did not produce lenticulars for outside parties. Third, while the press release about the Long Beach Haunted house appears credible, it does not mention Defendant's business, The Ghoulish Gallery. The Court will not give any weight to the undated flyer regarding the Long Beach haunted house because its information regarding the price and admission time conflicts with the contents of the press release, and the flyer does not provide any dates for the haunted house. Neither will the Court give weight to the journal entries because the journal's author, Plaintiff's mother, did not testify as to how she kept her journal, the handwriting differs from page to page for some of the relevant entries, and the last relevant entry is undated and not followed by any other dated entries, so the Court cannot identify when it was written.

As for Plaintiff's claim based on Defendant's alleged fabrication of customer feedback on The Ghoulish Gallery website, Plaintiff did not present sufficient evidence of fabrication. In fact, customer Carrie Vines, the one trial witness who provided feedback on Defendant's website, testified that she personally wrote that feedback.

**b. Defendant's Liability for False Advertising.**

***9** Given Plaintiff's proffered evidence that Defendant falsely advertised that The Ghoulish Gallery had been in the business of creating changing portraits since 1995, and Defendant's failure to provide credible evidence to rebut it, Plaintiff has met his burden of showing that Defendant's promotional statement about his changing portraits either was false, or at the very least misled, confused or deceived consumers. *See* *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1140 (9th Cir.1997) (stating that relief is available under the Lanham Act even if an advertisement is not literally false but rather misleads, confuses or deceives consumers).

First, Plaintiff has shown that Defendant posted the advertisement on the main page of several versions of his website. [*See, e.g.,* Trial Exs. 103-1, 120-1, 249-1, 250-1.] Defendant also said himself that as of 2005, he had been in business for 13 years. [Admitted Fact No. 40.] And, because Defendant sold these portraits over the internet and at conventions nationwide, he caused them to enter interstate commerce. Next, Defendant's advertisement had the tendency to deceive all those who looked at the website because it was posted as the first few words on the website's main page. This deception was material because, with only four known competitors in the market place,[FN12] if a customer was deciding among the different changing portraits companies-and one company had been in the business since 1995 and while another had sold portraits since only 2003-all else being equal, a buyer would likely go with the company that had been in

the business longer. This material deception either has been or is likely to lessen the goodwill of Plaintiff's products.

FN12. In addition to Haunted Memories and The Ghoulish Gallery, the parties' primary competitors are Norm Lanier with his business, Haunted Portraits (*see* Trial Ex. 110-2), and Morbid Industries, which produces Gortraits (*see* Trial Ex. 166-1).

In sum, Defendant was out of the changing portrait business from 1996 to at least the year 2000, or later. Also, according to the emails Defendant sent to Plaintiff in July 2004, one can infer that Defendant had not previously been in the business of creating changing portraits using lenticular technology. Plaintiff has met his burden to prove all the required elements of a false advertising claim under the Lanham Act and is entitled to damages for this claim.

**c. Plaintiff's Damages for False Advertising.**

A plaintiff who successfully establishes a claim for false advertising under the Lanham Act may recover, "subject to the principles of equity ... (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action."15 U.S.C. § 1117(a). An inability to show actual damages does not preclude relief under this section; the "publication of deliberately false comparative claims gives rise to a presumption of actual deception and reliance."*Southland Sod Farms,* 108 F.3d at 1145-46 (internal quotations omitted). The court can "fashion relief, including monetary relief, based on the totality of the circumstances" and should consider compensation for the plaintiff's losses or the defendant's unjust enrichment and not simply a penalty for the defendant. *Id.* (internal citations omitted). Regarding injunctive relief, "a competitor need not prove injury when suing to enjoin conduct that violates section [section 1117]."*Id.*(internal quotations omitted).

***10** Based on Plaintiff's evidence and Defendant's failure to rebut it with credible evidence, Plaintiff is entitled to the presumption of actual consumer deception and reliance and consequently, monetary damages for this claim. While Plaintiff has not presented evidence of actual lost sales, the Court, using the equitable power granted under 15 U.S.C. § 1117(a), finds that Plaintiff is entitled to damages in the amount of $ 2,500 as compensation for Defendant's false advertisements that The Ghoulish Gallery has been in the changing portrait business since 1995.

Plaintiff is also entitled to injunctive relief. Therefore, Defendant must remove any statement from his website that states The Ghoulish Gallery has been in the changing portrait business since 1995. Defendant may advertise that The Ghoulish Gallery has been in the changing portrait business for a certain number of years, or since a date certain, if he can, if required, establish proof of that date with sufficient evidence.

**3. *Defendants' Counterclaim for False Advertising.***

Defendant claims Plaintiff engaged in false advertising with these two statements:

I've had a good run these past two years as the ORIGINATOR of Spooky Changing Portraits based on antique photo images. [Trial Ex. 166-1.] [Emphasis in original.]

Let there be no confusion. "Haunted Memories Changing Portraits" was the first to take antique photographs, create scary transforming images, and offer them as a successful line of products. NOBODY was in this business selling this particular product before I was. I can PROVE IT with facts, not with hot air! I would never make this claim if it were not true! [Trial Ex. 163-4.] [Emphasis in original.]

Plaintiff posted the first statement on the Haunted Attraction message board and posted the second on his website. Defendant argues that Plaintiff's claim as the originator of this type of product is false because Plaintiff admitted (1) he did not invent changing portraits [Admitted Fact. No. 58]; and (2) "The concept of a changing portrait is more than a century old" [Admitted Fact No. 59; *see also* Roy Taylor Testimony]. Defendant, however, did not offer any credible evidence that either he or others had made changing portraits based on antique photographs before Plaintiff did. First, Defendant's photocopied page of an antique photo that he said he made into a changing portrait in the 1990s does not, on its own, prove Defendant predated Plaintiff in this business. Next, while Defendant argues that both parties are influenced by Disney's Haunted Mansion, and submitted evidence of some of Disney's products

and images, Defendant does not offer evidence that Disney's changing portraits use antique photographs. [*See, e.g.,* Trial Exs. 198-1 to 198-11 and 240-242].

While Plaintiff admits that he did not invent the concept of "changing portraits," he never conceded that he was not the first to create changing portraits based on the *use of antique photos.*In reviewing images from Plaintiff's website, as of 2003, Plaintiff was taking antique photos and using them to create his haunted, changing portraits. Defendant presented no evidence to contradict that Plaintiff was the first to make changing portraits using antique photos. Based on the evidence before the Court, Plaintiff's statements that he was the "originator" of changing portraits based on the use of antique photo images does not appear false nor likely to mislead, confuse or deceive customers. Defendant, therefore, does not prevail on his counterclaim for false advertising.

**C. *Counterclaim for False or Misleading Statements.***

***11** It is unlawful for any person or entity "with intent directly or indirectly to dispose of ... personal property ... or to induce the public to enter into any obligation relating thereto, to make or disseminate ... in any ... advertising device ... any statement, concerning that ... personal property ... which is untrue or misleading ...." Cal. Bus. & Prof.Code § 17500. This false advertising law prohibits not only false advertising, "but also advertising which[,] although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public." *Laster v. T-Mobile USA, Inc.,* 407 F.Supp.2d 1181, 1193 (S.D.Cal.2005) (citation omitted). For the same reasons outlined in section B above, the Court denies Defendant's counterclaim for false or misleading statements under state law.

**D. *Unfair Competition.***

**1. *California Common Law.***

Common law unfair competition "is normally invoked in an effort to protect something of value not otherwise covered by patent or copyright law, trade secret law, breach of confidential relationship, or some other form of unfair competition."*City Solutions v. Clear Channel Commc'ns., Inc.*, 365 F.3d 835, 842 (9th Cir.2004) (internal quotations omitted). In California this tort has four elements: (1) the plaintiff invested substantial time, skill or money in developing its property; (2) the defendant appropriated and used the property at little or no cost; (3) the plaintiff did not authorize or consent to the property's appropriation and use; and (4) the plaintiff was injured by the appropriation and use. *Id.* Common law unfair competition is considered either synonymous with "passing off" one's goods as those of another, or analogous to passing off, by selling products confusingly similar to a competitor's products so as to exploit the competitor's reputation in the market. *Southland Sod Farms,* 108 F.3d at 1147. "Passing off" violates both common law unfair competition and unfair competition under the Lanham Act.*Smith,* 648 F.2d at 604.

**2. *The Parties' Claims for Common Law Unfair Competition.***

Plaintiff claims that Defendant engaged in unfair competition by using the words "haunted memories" in the metatags for his website; posting a written attack on Plaintiff on The Ghoulish Gallery website and accusing Plaintiff of copying and being dishonest and unprofessional; threatening Plaintiff in an email to him; fabricating customer feedback on his own website and writing a false review that Plaintiff's works were inferior; and directly contacting Plaintiff's potential and prior customers and vendors. The Court finds that Plaintiff did not prove his claim for unfair competition because none of these actions amount to "passing off," where Defendant took Plaintiff's products and used them without his consent.

Defendant claims Plaintiff engaged in unfair competition by harassing Defendant's customers and making disparaging remarks to them and industry professionals; threatening legal action against people who favored Defendant's products; interfering with Defendant's business by posing as a fake customer; and trying to confuse his products with Defendant's. As explained in section B above, Defendant did not prove his unfair competition counterclaim based on similarity of products because no facts indicate that Plaintiff tried to "pass off" his products as Defendant's or sell Defendant's products under his name. Neither does Defendant prevail on this counterclaim based on his other allegations because none of them involve Plaintiff taking Defendant's

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

products and using them without permission.

***12** In short, neither party prevails on their respective claims for common law unfair competition.

**E.** ***Unfair Business Practices.***

**1.** ***Cal. Bus. & Prof.Code §§ 17200 et seq.***

California's unfair competition law ("UCL") prohibits any "unlawful, unfair or fraudulent business practice." Cal. Bus. & Prof. §§ 17200 et seq. The "unlawful" prong of the UCL proscribes "anything that can properly be called a business practice and that at the same time is forbidden by law." *Smith v. State Farm Mut. Auto. Ins. Co.*, 93 Cal.App. 4th 700, 717-718 (2001) (internal quotations omitted). The UCL "borrows" these "violations of other laws and treats them as 'unlawful' practices independently actionable under the unfair competition law." *Id.* at 718. To decide whether a practice is unfair, a court determines whether "the gravity of the harm to the victim outweighs the utility of the defendant's conduct." *People ex rel. Renne v. Servantes*, 86 Cal.App. 4th 1081, 1095 (2001). A business practice is "fraudulent" if "members of the public are likely deceived." *Comm. on Children's Television v. Gen. Foods. Corp.*, 35 Cal.3d 197, 224 (1983).

A plaintiff can obtain injunctive relief and/or restitution for a UCL violation. Cal. Bus. & Prof. §§ 17203; *Mathews v. Gov't Employees Ins. Co.*, 23 F.Supp.2d 1160, 1165 (S.D.Cal.1998).

**2.** ***Plaintiff's Claim for Unfair Business Practices.***

Plaintiff bases his claim for unfair business practices on the same claims he makes for false advertising and unfair competition. Of these claims, Plaintiff only prevailed on his claim that Defendant has been falsely advertising that The Ghoulish Gallery has been in business since 1995. Based on the Court's finding that this is a false advertisement, the Court finds that Defendant's act of advertising that The Ghoulish Gallery has been in business since 1995 is also an unfair business practice. Plaintiff is thus entitled to the same injunctive relief as outlined in section B.2.c. above.

**F.** ***Intentional Interference with Prospective Economic Advantage.***

**1.** ***Governing Law.***

To show interference with prospective economic advantage one must prove:

1) an economic relationship between plaintiff and a third party, with the probability of future economic benefit to the plaintiff, 2) defendant's knowledge of the relationship, 3) intentional acts by the defendant designed to disrupt the relationship, 4) actual disruption of the relationship, and 5) proximately caused economic harm to the plaintiff.

*Milne Employees Ass'n v. Sun Carriers*, 960 F.2d 1401, 1411-12 (9th Cir.1991). To prevail on such a claim, the plaintiff must prove "an act that is wrongful independent of the interference itself." *CRST Van Expedited, Inc. v. Werner Enters.*, 479 F.3d 1099, 1108 (9th Cir.2007). Acting with an improper motive does not constitute an independent, wrongful act. *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 1158 (2003). Rather, an independently wrongful act must be "unlawful, that is, ... proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." *Id.* at 1159 (citing *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal.4th 376, 408 (1995) (Mosk, J., concurring) ("It follows that the tort may be satisfied by intentional interference with prospective economic advantage *by independently tortious means*" )).

**2.** ***Plaintiff's Claim for Intentional Interference.***

***13** Plaintiff asserts all the facts stated in his claim for unfair competition in support of his claim for intentional interference with prospective economic advantage. The only factual claims the Court finds possibly relevant here are Defendant's contact with Plaintiff's potential and prior customers and vendors, namely, Carrie Vines, Roy Brashears and Chris Russell.

Carrie Vines purchased products from Plaintiff first and praised him for his work. [*See* Trial Exs. 16-15, 16-20.] Later, she bought changing portraits from Defendant and posted positive feedback on Defendant's website. [Trial Ex. 85-1.] Vines testified that she was the first to contact Defendant regarding

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

his work, bought one of his portraits and then provided feedback for his website. Defendant did not disrupt Vines' relationship with Plaintiff, and therefore, Plaintiff has no claim for intentional interference with his customer relationship with Carrie Vines.

Plaintiff complained that Defendant disrupted his established business relationship with Roy Brashears, a vendor who sold Plaintiff's changing portraits through Haunted Ventures FX. After Plaintiff found out Brashears was also selling changing portraits from a competitor, Norm Lanier of Haunted Portraits, Plaintiff wrote Brashears an email on January 28, 2005 and demanded that Brashears not sell Lanier's products anymore. Plaintiff explained to Brashears:

I am not mad at *you*-just upset about the situation.

* * *

The problem is that Norm has ripped off my entire concept (he has publicly admitted that my site was his “inspiration”). Over the past six months, he has devalued the market for spooky changing portraits significantly by virtue of the fact that he sells smaller versions, charges less, and offers what I feel are substandard designs. I don't want there to be any chance of buyer confusion between our products.

Consequently I will not do business with anyone who supports or aids him. As long as his stuff remains on your site I cannot fill any order you may get for my product.

[Trial Ex. 188-1; Allen Testimony, Day 3, Cross-Examination.] [Emphasis in original.]

On March 26, 2005, Brashears wrote to Plaintiff and informed him he was removing Plaintiff's products from the Haunted Ventures FX website “NOT based on the quality of your work ... [but] based on .. your ... condemn[ation of] your competition and the merchandise that he produces.”[Trial Ex. 189-2.] Consequently, Brashears carried Defendant's and Lanier's changing portraits. Plaintiff did not prove Defendant interfered with Plaintiff's relationship with Brashears. Rather, Plaintiff himself appeared to disrupt his own relationship by giving Brashears an ultimatum and demanding that he either not offer multiple choices to his customers, or risk having orders go unfilled.

Finally, Plaintiff complains that Defendant disrupted his potential relationship with vendor Chris Russell. At trial, Russell testified that he never met Plaintiff or Defendant before the Ironstock trade show in June 2005. Russell explained that Plaintiff contacted him a few times in June 2005 and asked him to put Plaintiff's products “in Tim[ ] [Turner's] face” at the Ironstock show. Russell was put off by his communications with Plaintiff and never agreed to display or sell his products. Russell did not meet Defendant until the actual Ironstock show. While Plaintiff successfully impeached Russell's testimony by presenting two emails from Russell to Plaintiff in September and October 2004 praising Plaintiff's work, Plaintiff never presented any other evidence that Defendant knew of his relationship with Russell and somehow interfered with it.

**3.** ***Defendant's Counterclaim for Intentional Interference.***

***14** Defendant asserts all the facts stated in his claim for unfair competition in support of his claim for intentional interference with prospective economic advantage. The Court finds the most plausible factual bases for this claim to be based on Defendant's relationships with customers Carrie Vines and Jessica Zemeck.

Plaintiff learned from Defendant's website that Defendant established a relationship with Plaintiff's former customer, Carrie Vines. [Trial Ex. 85-1.] Plaintiff then sent Vines an email asking whether she actually wrote the feedback posted on The Ghoulish Gallery website, and she responded that she did. [Trial Ex. 85-4.] He also called her to talk about the feedback. [Vines Testimony.] Plaintiff then took his case “public” and posted on the Haunted Attraction message board the entire email correspondence detailing his transaction with Vines and commenting that she “mysteriously decided to trash me on my competitor's website” and wondered why she “turn[ed] against me so viciously.”[Trial Ex. 157-1.] He even posted comments about her on his website. [Vines Testimony.] Even assuming that Plaintiff intended to disrupt Vines' relationship with Defendant, Vines maintained, through her testimony, that she thought Defendant produced a better changing portrait than Plaintiff. Thus, there is no evidence that Plaintiff actually disrupted Vines' customer relationship with Defendant.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Finally, Defendant claims that Plaintiff interfered with an economic relationship with potential customer Jessica Zemeck. Zemeck attended a haunt convention, Horrorfmd Weekend, in 2006, where she saw both Plaintiff's and Defendant's products for the first time. Zemeck first spoke to Plaintiff at his booth and asked him what the difference was between his products and Defendant's. Plaintiff said that his products had extra stages of animation, but then focused his conversation on portraying Defendant as a liar. Zemeck testified that Plaintiff said something to the effect of "Turner will tell you he came up with the idea first, but he's lying," and that "Turner has launched a huge smear campaign against me."Zemeck thought this was "weird" because it was not a good sales approach, and decided to not purchase from either Plaintiff or Defendant because she did not feel comfortable. She testified that Defendant said nothing negative about Plaintiff.

Defendant has shown-through a reasonable inference of Zemeck's testimony-that he had an economic relationship with Zemeck, an attendee at Horrorfmd Weekend, with the probability of receiving a future economic benefit. Plaintiff testified that he thought Zemeck came over from Defendant's "camp," and said disparaging comments about Defendant to Zemeck. Because of Plaintiff's comments, Zemeck did not purchase from Defendant, which caused economic harm to him. While Plaintiff may have said disparaging remarks about Defendant that directly influenced Zemeck's decision to not purchase Defendant's products, those comments do not arise to an "independently wrongful act" that is "proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard."Therefore, Defendant does not prevail on his claim for intentional interference with prospective economic advantage.

**G.** ***Trade Libel.***

**1.** ***Governing Law.***

***15** Under California law, "trade libel is an intentional disparagement of the quality of property, which results in pecuniary damage."*Aetna Casualty & Surety Co. v. Centennial Ins. Co.*, 838 F.2d 346, 351 (9th Cir.1988) (internal quotations omitted). Trade libel is distinct from defamation:

It is more akin to unfair competition. Trade libel and product disparagement are injurious falsehoods that interfere with business. Unlike classic defamation, they are not directed at the plaintiff's personal reputation but rather at the goods a plaintiff sells or the character of his other business.

*Id.* (internal citations omitted); *see* *Microtec Research v. Nationwide Mut. Ins. Co.*, 40 F.3d 968, 972 (9th Cir.1994).

To prove trade libel, Plaintiff must show (1) a statement that (2) was false, (3) disparaging the quality of the plaintiffs property, (4) published to others in writing, (5) induced others not to deal with plaintiff, and (6) caused special damages. *New.Net, Inc. v. Lavasoft*, 356 F.Supp.2d 1090, 1113 (2004) (internal citations omitted). Regarding special damages, "bare allegation of the amount of pecuniary loss is insufficient for the pleading of a trade libel claim."*Id.* (finding no special damages where the complaint did not specify an amount of damage) (internal quotations omitted). If the plaintiff alleges special damages based on a general loss of customers, the plaintiff should prove:

facts showing an established business, the amount of sales for a substantial period preceding the publication, the amount of sales subsequent to the publication, [and] facts showing that such loss in sales were the natural and probable result of such publication.

*Id.*

**2.** ***Plaintiff's Claim for Trade Libel.***

Plaintiff asserts all the facts stated in his claims for false advertising and unfair competition as the predicates for his trade libel claim. The Court finds the most plausible factual basis for Plaintiff's trade libel claim to be Defendant's website posting about Plaintiff on or around October 2004. [Trial Ex. 39.] In the posting, Defendant never refers to Plaintiff by name, but says:

What's up with that other site that claims they were the first one with the Changing Portraits?

... Recently, one of the copycat sites alleged, "Since launching my website in May 2003, I've been imitated twice now (Yes, I was the FIRST, folks-don't you believe anything different!)"This individual asks potential customers to believe him when he alleges that he was the first. Yet in the previous

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

sentence, he admits that his company was launched in 2003. The Ghoulish Gallery was started in 1992-a full twelve years earlier!

One has to wonder what else someone like this might be lying about? The quality of their work? Their return policies? Perhaps even their customer feedback?... As for our own credibility, one of the very first things you see on our homepage is an IMDb link that allows you to verify that The Ghoulish Gallery owner is who he says he is. From this one example alone, you should be able to determine who is being honest with their customers and who is not.

***16** While Defendant's published statement disparages the quality of Plaintiff's products, it is not sufficiently factual to be proved right or wrong. Further, Plaintiff did not show that Defendant's statements induced others not to deal with him or caused him special damages. For example, Plaintiff did not show his sales numbers before and after the publication, and did not prove that the statement caused any alleged decline in sales. Therefore, Plaintiff does not prevail on his trade libel claim.

**3. *Defendant's Counterclaim for Trade Libel.***

Defendant claims that these three statements make Plaintiff liable to him for trade libel: (1) following customer feedback that said Plaintiff's competitor's products were not of "the same quality," Plaintiff wrote, "Eddie's Note: This fellow is referring to the work of 'Dim Terder'-name withheld to protect the mediocre.... Needless to say, I do not endorse the 'Fhoulish Fallacy' in any way ... [Trial Ex. 177-1]; (2) Plaintiff's posting on the Haunted Attraction message board where he said, "Hurry Tim, Hurry! Slash those prices!... Yes, the Gortraits will probably hurt my business, but I don't care.... The copycats can now all fight it out amongst themselves." [Trial Ex. 166-1]; and (3) "Let me be clear-I do not like my competition.... [I]n my opinion they are unabashed a* *holes" [Trial Ex. 164-1].

The first statement, where Plaintiff refers to Defendant as "mediocre," is probably better characterized as a subjective opinion rather than a definitive statement, since the word "mediocre" would be difficult to prove true or false. If one reads the next statement as saying Defendant is a "copycat," while Defendant successfully rebutted the claim for copyright infringement as to Plaintiff's protected work, he did not necessarily prove that he was not a "copycat" of Plaintiff's unprotected work. Finally, Plaintiff identifies the third statement as his opinion. Even if these statements were false, Defendant sets forth no proof that they induced others not to deal with Defendant or caused him special damages. Thus, Defendant does not prevail on his counterclaim for trade libel.

**H. *Defamation.***

**1. *Governing Law.***

Defamation "involves the intentional publication of a statement of fact that is false, unprivileged, and has a natural tendency to injure or which causes special damage."*Smith v. Maldonado,* 72 Cal.App. 4th 637, 645 (1999). Defamation is effected by libel or slander. Cal. Civ.Code § 44. "Libel is a false and unprivileged publication by writing ... which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation."Cal. Civ.Code § 45. Libel per se excludes the need to prove special damages: "[Damage] to plaintiff's reputation is conclusively presumed and he need not introduce any evidence of actual damages in order to obtain or sustain an award of damages including, in an appropriate case, punitive damages."*Barnes-Hind v. Superior Court,* 181 Cal.App.3d 377, 382 (1986) (citation omitted).

**2. *Defendant's Defamation Counterclaim.***

***17** Defendant claims that Plaintiff posted a statement on a public message board that constitutes libel per se because it implies Defendant has a diagnosable mental disorder. [Ex. 181-2] The alleged defamatory statement is part of a series of posts that appear on the Haunted Attractions message board between October 16 and 19, 2006. Plaintiff began the post on October 16, 2006, when he let readers know his 5 x 7 changing portraits were now being offered for sale at Knott's Berry Farm. Defendant responded, explaining that while Plaintiff's smaller changing portraits were being sold in the gift shop at Knotted's Berry Farm, they were not being "featured" there like Defendant's larger-sized 16 x 20 changing portraits. Plaintiff then responded with the post claimed to be defamatory. It reads:

"Hyper competitiveness"

Tim,

Thanks for stepping on my post to regurgitate old news about yourself. If you recall, I did not interfere with your post last year when you boasted about getting your work in their maze (Knotted's Berry Farm), so why must you interfere with this post about my good fortune with Knotted? There's enough room in their park (and at trade shows and in this industry) for both of us. Why can't you be gracious about it and leave it alone? ..

On a related note, the following excerpt is from "Competition Freaks"-an article written by Marianne Szededy-Maszak which appeared in the L.A. Times in 2005.

"Today, a broad array of recent psychological research has led some researchers to conclude that hyper-competitiveness resembles a diagnosable mental disorder-a volatile alchemy of obsessive compulsiveness, narcissism, neurosis and sometimes a dose of paranoia.

Psychologists have even linked the hypercompetitive personality to such seemingly disparate conditions and behaviors as road rage, drunk driving, eating disorders, addiction and depression.

It's a style and temperament that affects all other relationships and which, 8 over time, becomes fundamentally impairing, causing fractured families, social isolation and even the disintegration of careers."

To find out more about this pathetic and destructive condition, I encourage 10 everyone to print out and read the full article when you have time-it's fascinating.

Defendant maintains that the only conclusion readers could draw from this "hypercompetitive" post is that Plaintiff is publicly accusing Defendant of being hypercompetitive and thus having a diagnosable mental disorder. The syllogism on which Defendant relies is (1) Hyper competitiveness constitutes a diagnosable mental disorder, (2) Defendant is hypercompetitive, (3) therefore, Defendant has a diagnosable mental disorder. Plaintiff protests this interpretation, claiming his post did not refer to Defendant, just to the fact that the industry is incredibly competitive. Plaintiff also maintains the statement is one of opinion, not fact, so it is protected speech.

***18** Language can be libelous on its face even if it is also susceptible of an innocent meaning. *MacLeod v. Tribune Publishing Co.,* 52 Cal.2d 536, 549 (1959). The test is whether the defamatory meaning can be discerned by the reader without explanatory matter. *Id.*

[I]f the reader would be able to recognize the defamatory meaning only by virtue of his or her knowledge of specific facts and circumstances, extrinsic to the publication, which are not matters of common knowledge rationally attributable to all reasonable persons, then ... the libel cannot be libel per se but will be libel per quod.

*Barnes-Hind,* 181 Cal.App.3d at 387. Two witnesses at trial, Scott Broad and Karen Murphy, testified that they read the "hypercompetitive" post and thought it referred to Defendant. Notably, both Broad and Murphy were already aware of the bad blood between Plaintiff and Defendant before these posts were written. Neither testified they took the hypercompetitive statement to mean Defendant has a diagnosable mental disorder. Significantly, the posts that follow the hypercompetitive post suggest that readers generally felt the competition between these rivals had just gone too far, for example:Eddie made good. So did Tim. Each are talented. Why piss on another's parade? Co-exist quietly. Life will be much brighter. [Uncle Creepy, Trial Ex. 181-3, 181-10]

Let's all try to get along. [Jonathon, Trial Ex. 181-4, 181-11]

... there has been fuel to this fire for some time and us posting post after post just keeps adding to it. I believe there is more to every story. There is Eddie's side, Tim's side and a lot of all of us no [sic] nothing about. I actually love and use both products ... I'm a happy customer of both products. [Tyler Barnett, Trial Ex. 181-13]

What I don't approve of is the poor sportsmanship and very poor business conduct that was displayed. Personally, I think both products look good. Unfortunately, I just don't believe openly trying to hurt a rival is good for business. [Johnmusic, Trial Ex. 181-15]

Even assuming readers took Plaintiff's post as referring to Defendant in such a way that it could constitute libel per se, not all injurious statements are libelous. For example, statements of opinion are generally not actionable unless the opinion is based upon declared or implied facts that are capable of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

being proven right or wrong. *Ruiz v. Harbor View Comty. Ass'n.*, 134 Cal.App. 4th 1456, 1471 (2005). Here, the accused statement that "some researchers conclude that hyper-competitiveness resembles a diagnosable mental disorder" necessarily implies that other researchers do not so conclude. Thus the first assumption in the syllogism, namely "Hyper competitiveness resembles a diagnosable mental condition" is not sufficiently factual to be proven right or wrong. The second assumption, Defendant is hypercompetitive, is likewise not sufficiently factual to be proven right or wrong. To the extent that readers thought Plaintiff's statement accused Defendant of having a mental disorder, that statement can only be viewed as an opinion. Thus, Defendant's defamation counterclaim fails.

## *CONCLUSION*

***19** Based on the foregoing, the Court rules as follows:

1. Plaintiff's claim for copyright infringement is **DENIED;**

2. Plaintiff's claim for unfair competition under the Lanham Act in the form of false advertising is **GRANTED** with respect to Defendant's advertisements that he has been in business since the 1990s, and Plaintiff is entitled to monetary and injunctive relief as explained in section B above;

3. Defendant's counterclaim for unfair competition under the Lanham Act is **DENIED;**

4. Defendant's counterclaim for false or misleading statements under California law is **DENIED;**

5. Plaintiff's claim and Defendant's counterclaim for common law unfair competition are **DENIED;**

6. Plaintiff's claim for unfair business practices is **GRANTED;**

7. Plaintiff's claim and Defendant's counterclaim for intentional interference with prospective economic advantage are **DENIED;**

8. Plaintiff's claim and Defendant's counterclaim for trade libel are **DENIED;**

9. Defendant's counterclaim for defamation is **DENIED.**

The Clerk is hereby directed to enter judgment (1) in favor of Plaintiff and against Defendant for Plaintiff's claims for false advertising under the Lanham Act and for unfair business practices under California's Business and Professions Code sections 17200 *et seq.*; (2) against Plaintiff and in favor of Defendant for Plaintiff's claims for copyright infringement, common law unfair competition, intentional interference with prospective economic advantage and trade libel; and (3) in favor of Plaintiff and against Defendant for Defendant's counterclaims for false advertising under the Lanham Act, false or misleading statements under state law, common law unfair competition, intentional interference with prospective economic advantage, trade libel and defamation.

**IT IS SO ORDERED.**

## *APPENDIX*

***Findings of Fact.***[FN1]

FN1. Any conclusion of law that is deemed to be a finding of fact is incorporated in this section by reference.

1. Plaintiff launched the website for his business "Haunted Memories Changing Portraits" in April 2003.

2. In July 2004, Defendant sought advice from Plaintiff regarding details of how Plaintiff produces his changing portraits and questions about Plaintiff's business.

3. Defendant created the website for his business "The Ghoulish Gallery" in October 2004.

4. In December 2004, Plaintiff obtained a federally registered copyright for his "Haunted Memories Changing Portraits" website.

5. Defendant advertised on his website that The Ghoulish Gallery has been in business since 1995.

6. Defendant admitted that he was not in the changing portrait business from December 1996 to 2000, 2001 or 2002.

7. Defendant did not present affirmative evidence that The Ghoulish Gallery had been in business since 1995.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

8. Plaintiff advertised that he was the originator of spooky changing portraits based on antique photo images.

9. Defendant did not provide credible evidence that he, Disney or any other producer created changing portraits using antique photo images before Plaintiff did.

***20** 10. Plaintiff did not take Defendant's goods and pass them off as his own.

11. Defendant did not take Plaintiff's goods and pass them off as his own.

12. Carrie Vines purchased a changing portrait from Plaintiff and was happy with it.

13. Vines had a seller-customer relationship with Plaintiff.

14. Vines then found Defendant's website and purchased a changing portrait from him. She liked Defendant's work better than she liked Plaintiff's work.

15. Vines wrote the customer feedback posted on Defendant's website.

16. Vines had a seller-customer relationship with Defendant.

17. Roy Brashears sold Plaintiff's products on his website, Haunted Ventures FX. Brashears also sold Norm Lanier's products on his website at around the same time.

18. Plaintiff demanded that Brashears no longer sell Lanier's products, or else Plaintiff would not fulfill any orders for Brashears.

19. Plaintiff and Chris Russell had a potential vendor-vendee relationship.

20. Defendant had a potential seller-customer relationship Jessica Zemeck.

21. Zemeck spoke to Plaintiff before she spoke to Defendant.

22. Plaintiff told Zemeck that Defendant was a liar and that Defendant had launched a huge smear campaign against Plaintiff.

23. Zemeck did not buy anything from Plaintiff or Defendant because based on her conversation with Plaintiff, she did not feel comfortable purchasing from either one of them.

24. Defendant published a statement of opinion on his website on or around October 2004 impugning the quality of Plaintiff's work.

25. Plaintiff published three disparaging statements about Defendant or the quality of his work.

26. Plaintiff posted a message on the Haunted Attraction message board that included a quote from an article entitled “Competition Freaks” that said “some researchers ... conclude that hyper-competitiveness resembles a diagnosable mental disorder.”

***Conclusions of Law.***[FN2]

> FN2. Any finding of fact that is deemed to be a conclusion of law is incorporated in this section by reference.

**A. Copyright Infringement.**

1. Plaintiff is entitled to copyright protection in the selection, arrangement and presentation of the contents of his website as it appeared in December 2004.

2. Defendant had access to Plaintiff's work because Plaintiff's website was publicly available on the internet.

3. There is no substantial similarity between Plaintiff's website as it appeared in December 2004 and Defendant's website as it appeared in April 2005, October 2005, January 2006 and June 2006.

4. Defendant did not infringe Plaintiff's federally copyright-protected website.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**B. False Advertising Under Federal and State Law.**

5. Defendant's statement that The Ghoulish Gallery had been in the business of creating changing portraits since 1995 (the "1995 advertisement") was false, or at the very least misled, confused or deceived consumers.

6. The 1995 advertisement had the tendency to deceive all those who looked at the website because it was posted as the first few words on the website's main page.

***21** 7. The 1995 advertisement was material, as it was likely to influence a buyer's decision when compared to a competitor who had only been in business since 2003.

8. Defendant caused the goods sold by The Ghoulish Gallery to enter interstate commerce.

9. The 1995 advertisement has been, or is at least likely to have lessened the goodwill of Plaintiff's products.

10. Defendant is liable to Plaintiff under the Lanham Act for the false 1995 advertisement.

11. Plaintiff is entitled to damages in the amount of $ 2,500 as compensation for the 1995 advertisement.

12. Plaintiff is entitled to injunctive relief for the 1995 advertisement. Defendant may advertise that The Ghoulish Gallery has been in the changing portrait business for a certain number of years, or since a date certain, if he can, if required, establish proof of that date with sufficient evidence.

13. Defendant is not liable to Plaintiff for false designation under the Lanham Act.

14. Plaintiff's advertisement that he was the originator of spooky changing portraits based on antique photo images is not false nor likely to mislead, confuse or deceive customers.

15. Plaintiff is not liable to Defendant under the Lanham Act for false advertising.

16. Plaintiff is not liable to Defendant under Cal. Bus. & Prof.Code § 17500 for false advertising.

**C. Common Law Unfair Competition.**

17. Plaintiff is not liable to Defendant for false designation under common law unfair competition.

18. Defendant is not liable to Plaintiff for false designation under common law unfair competition.

**D. Unfair Business Practices.**

19. Defendant is liable to Plaintiff for unfair business practices based on the 1995 advertisement.

20. Plaintiff is entitled to the same injunctive relief under this claim as the Court has ordered for the 1995 advertisement.

**E. Intentional Interference with Prospective Economic Advantage.**

21. Defendant did not actually disrupt Plaintiff's relationship with Carrie Vines.

22. Defendant did not actually disrupt Plaintiff's relationship with Roy Brashears.

23. Defendant did not actually disrupt Plaintiff's relationship with Chris Russell.

24. Plaintiff did not actually disrupt Defendant's relationship with Carrie Vines.

25. Defendant is not liable to Plaintiff for intentional interference with prospective economic advantage.

26. Defendant had an economic relationship with Zemeck with the probability of receiving future economic benefit.

27. Plaintiff knew of Defendant's economic relationship with Zemeck.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

28. Plaintiff intended to disrupt Defendant's economic relationship with Zemeck.

29. Plaintiff actually disrupted Defendant's economic relationship with Zemeck.

30. Plaintiff proximately caused economic harm to Defendant.

31. Plaintiff's disparaging comments to Zemeck regarding Defendant were not an independently wrongful act proscribed by some constitutional, statutory, regulatory, common law or other determinable legal standard.

***22** 32. Plaintiff is not liable to Defendant for intentional interference with prospective economic advantage.

**F. Trade Libel.**

33. Defendant did not publish a false, factual statement that disparaged the quality of Plaintiff's work.

34. Plaintiff did not prove that Defendant's statement induced others not to deal with Plaintiff.

35. Plaintiff did not prove that he suffered special damages due to Defendant's statement.

36. Plaintiff does not prevail on his claim for trade libel.

37. Plaintiff published two statements of opinion and one factual statement that was proved neither true nor false, all of which disparaged Defendant or the quality of his work.

38. Defendant did not prove that Plaintiff's statement induced others not to deal with Defendant.

35. Defendant did not prove that he suffered special damages due to Plaintiff's statement.

36. Defendant does not prevail on his counterclaim for trade libel.

**G. Defamation.**

37. Plaintiff's statement about Hyper competitiveness is a statement of opinion.

38. Defendant does not prevail on his counterclaim for defamation.

S.D.Cal.,2007.
Allen v. Ghoulish Gallery
Slip Copy, 2007 WL 4207923 (S.D.Cal.), 2007-2 Trade Cases P 75,989

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.