IN THE UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

- - - - - - - - - - - - - - - -

MICHAEL BOWLING, :
Plaintiff, :
v. : C.A. No. 05-229S
HASBRO, INC. :
Defendant. :

- - - - - - - - - - - - - - - -

**ORDER**

WILLIAM E. SMITH, United States District Judge.

I. Introduction

This is a patent infringement action in which Plaintiff Michael Bowling ("Bowling") alleges that Defendant Hasbro, Inc. ("Hasbro") infringed Bowling's United States Patent No. 5,938,197 (the "'197 patent"), which describes a variety of polyhedral dice entitled "RANDOM NUMBER GENERATOR FOR GAME PLAYING." Bowling alleges that Hasbro, a toy and game company, sold, for a limited period of time, board games that included die with characteristics similar to Bowling's patented die. Before the Court is the Motion to Preclude Testimony of Plaintiff's Expert Witness, Neil N. Lapidus ("Motion to Preclude") brought by Hasbro pursuant to Federal Rule of Evidence 702. Bowling filed a timely objection to the Motion and this Court heard oral argument on January 16 and 24, 2008. Based on a review of all the relevant materials and for the reasons that follow, this Court grants Hasbro's Motion to Preclude.

For a comprehensive overview of the relevant facts, the reader may refer to Bowling v. Hasbro, Inc., 490 F. Supp. 2d 262, 264 (D.R.I. 2007) (granting Bowling's motion for summary judgment and denying that of Hasbro). Briefly, the '197 Patent issued on August 17, 1999. At some point in 1999, Hasbro began selling the Monopoly Millennium Edition ("Millennium Edition") and a version of the Millennium Edition marketed by Avon Products, Inc. (the "Avon Special"), both of which contained die with characteristics similar to the '197 patent die. In September 1999, Hasbro contacted Bowling by letter to discuss the possibility of using his die design. Shortly thereafter, Bowling responded by informing Hasbro that it was infringing the '197 patent, and demanding that Hasbro immediately cease its infringing activities. The parties were unable to resolve their dispute, and Bowling ultimately filed the underlying infringement action.

Bowling retained Neil N. Lapidus to determine the amount of damages caused by the alleged infringement of the '197 patent. Hasbro moves to exclude Lapidus' expert testimony on two grounds: (1) that Lapidus' credentials and background are insufficient to qualify him as an expert in this case; and (2) that Lapidus' expert opinion is unreliable because he failed to apply adequately the relevant methodology of the Georgia-Pacific factors. See Georgia-Pacific Corp. v. U. S. Plywood Corp., 318 F. Supp. 1116 (S.D.N.Y. 1970), aff'd, 446 F.2d 295 (2d Cir. 1971), cert denied, 404 U.S.

870 (1971) (establishing a fifteen-factor approach to determining a reasonable royalty to which the parties would have agreed during a hypothetical negotiation).

II. Analysis

A. Rule 702 and the Daubert/Kumho Tire Standard of Review

Federal Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993) and Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999) require the district court to act as a "gate-keeper" to determine "whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." Daubert, 509 U.S. at 592-93. Those factors that may assist the district court in making this determination include: whether the theory/technique can be and has been tested; whether the theory/technique has been subject to peer review and publication; the known or potential rate of error; and the level of acceptance within the relevant scientific community. Id. at 593-94. "Although the approach is flexible by its nature (after all, expert testimony and the peculiar facts of each case so

demand), the overarching concern is on the 'evidentiary relevance and reliability' of the proposed testimony." Seahorse Marine Supplies, Inc. v. Puerto Rico Sun Oil Co., 295 F.3d 68, 81 (1st Cir. 2002) (quoting Daubert, 509 U.S. at 595). In Kumho Tire, the Supreme Court held that the gate-keeping function applies to technical and other specialized knowledge in addition to scientific testimony. 526 U.S. at 141. The Court stressed that a district court must have "considerable leeway" in both "how to determine reliability" and "its ultimate conclusion." Id. at 152-53.

B. The Georgia-Pacific Factors

Expert testimony may be received, but is not required, as an aid to determining appropriate damages in a patent infringement case. Freeman v. Gerber Prods. Co., 450 F. Supp. 2d 1248, 1260 (D. Kan. 2006). "A party whose patent has been infringed is entitled to receive 'damages adequate to compensate for the infringement.'" Avocent Huntsville Corp. v. ClearCube Tech., Inc., C.A. No. CV-03-S-2875-NE, 2006 WL 2109503, at *4 (N.D. Ala. July 28, 2006) (citing 35 U.S.C. § 284). "In the event infringement is proven, but the evidence is not adequate to establish actual damages in the form of lost profits, 35 U.S.C. § 284 requires that 'a reasonable royalty' be determined." Id. at *8. A reasonable royalty is one "which a person, desiring to manufacture and sell a patented article, as a business proposition, would be willing to pay as a royalty and yet be able to make and sell the patented article, in the market, at a

reasonable profit." Cohesive Techs. v. Waters Corp., 526 F. Supp. 2d 84, 121 (D. Mass. 2007).

In calculating a reasonable royalty rate, one may rely "upon an established royalty rate within the relevant market, if there is one, or by projecting a hypothetical negotiation between a willing licensor and licensee at the time infringement commenced." Id. at 121-22. The hypothetical negotiation upon which a reasonable royalty rate may be calculated "requires the court to envision the terms of a licensing agreement reached as a result of a supposed meeting of minds between the patent holder and infringer at the time infringement began." Id. at 122. Although the Federal Circuit has not prescribed a specific methodology for calculating a reasonable royalty, most courts look to the fifteen factors[1] set

---

[1] The Georgia-Pacific factors are, in brief: (1) royalties that a patentee receives for the patent in suit; (2) rates licensee pays for use of other comparable patents; (3) nature and scope of the license; (4) the licensor's established policy regarding licensing of its technology; (5) commercial relationship between the parties; (6) effect on and extent of derivatives or convoyed sales; (7) duration and term of license; (8) established profitability of the product made under the patent, its commercial success, and popularity; (9) utility and advantage of the patented article over old modes; (10) nature of patented invention; character of commercial embodiment of the patent as owned or produced by the licensor; (11) extent to which infringer has made use of invention; (12) portion of profit or selling price customarily allowed; (13) portion of realizable profit attributable to invention; (14) the opinion testimony of qualified experts; (15) the amount a willing licensor and licensee would agree upon at the time of infringement, had both been reasonably and voluntarily trying to reach agreement, including the amount of profit the licensee would be willing to contribute to the license. Bose Corp. v. JBL, Inc., 112 F. Supp. 2d 138, 165-67 (D. Mass. 2000).

forth in Georgia-Pacific, 318 F. Supp. 1116, to simulate a "willing licensor/willing licensee" negotiation. See Bose Corp. v. JBL, Inc., 112 F. Supp.2d 138, 165 (D. Mass. 2000); Oxford Gene Tech. Ltd. v. Mergen Ltd., 345 F. Supp. 2d 431, 441 (D. Del. 2004).

A reasonable royalty analysis, even one conducted using the Georgia-Pacific factors, by its nature "necessarily involves an element of approximation and uncertainty." Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd., 476 F. Supp. 2d 1143, 1154 (N.D. Cal. 2007). However, this approximate nature of the Georgia-Pacific analysis does not make it an unreliable methodology for purposes of Daubert. See generally Micro Chem., Inc. v. Lextron, Inc., 317 F.3d 1387, 1393 (Fed. Cir. 2003). Still, "an expert report on damages, including a reasonable royalty analysis, may not rely on unreasonable inferences or resort to 'mere speculation or guess.'" Monolithic, 476 F. Supp. 2d at 1154-55 (citation omitted). Thus, while the Georgia-Pacific rubric is presumptively reliable in both principle and methodology, expert opinion based on the Georgia-Pacific factors may be precluded where the opinion lacks an adequate factual basis or fails to demonstrate that such principles and methodology have been applied reliably to the facts of the case. Pioneer Hi-Bred Int'l, Inc. v. Ottawa Plant Food, Inc., 219 F.R.D. 135, 141 (N.D. Iowa 2003).

C. Lapidus's Expert Qualifications

Hasbro asserts that Lapidus is unqualified to give expert opinion testimony in this case because he lacks experience in the area of game-component licensing. "Before accepting expert testimony, a district court must determine that a witness is 'qualified as an expert by knowledge, skill, experience, training, or education.'" United States v. Vargas, 471 F.3d 255, 262 (1st Cir. 2006) (citing Fed. R. Evid. 702). "It is well-settled that trial judges have broad discretionary powers in determining the qualification, and thus, admissibility, of expert witnesses." Id. (citations omitted). Here, Lapidus' qualifications are ample: he holds a degree in business and accounting, and is a certified CPA and partner in a large accounting firm who specializes in complex audit engagements, and litigation services and support. Over the course of his thirty-plus year career as a CPA, Lapidus has testified as an expert witness on licensing matters on at least six different occasions; he has prepared approximately twelve expert reports dealing with intellectual property, infringement and licensing issues for various courts; and has never been disqualified as an expert. As for Lapidus' experience and familiarity with the Georgia-Pacific factors, he professes to having performed such royalty analyses on multiple occasions.

Hasbro's first contention is that Lapidus lacks sufficient experience in the toy industry. In support, Hasbro primarily

relies on two cases for the proposition that an expert opining about royalty rates for licensing agreements must have experience in the particular industry to which the patent in question belongs. Hasbro selectively cites Abbott Labs. v. Brennan, 952 F.2d 1346, 1352 (Fed. Cir. 1992) for its position, but is wrong in doing so. In Abbott Labs., a patent case involving a medical device, the Federal Circuit upheld the exclusion of a witness expected to testify to reasonable royalties where that witness "was not an expert on patent royalties, and . . . had no prior experience of analyzing the market for a medical device, or any other product." Id. at 1351-52. Likewise, in State Contracting & Eng'g Corp. v. Condotte Am., Inc., 346 F.3d 1057, 1073 (Fed. Cir. 2003), also an infringement action, the court affirmed the exclusion of a proposed damages expert who "had no experience in placing a value on a patent and did not have any knowledge regarding reasonable royalties for construction-related patents." These cases do not hold that a damages expert conducting a reasonable royalty analysis must have experience in the specific industry in question (although it is a factor that may be considered) but, rather, that an expert conducting a reasonable royalty calculation should have experience placing value on patents and license agreements. While industry specific experience might be preferred, it is not an absolute prerequisite.

Here, Lapidus testified that he does indeed have experience in the toy and gaming industry, and that he is familiar with licensing and royalty agreements in this area. However, Lapidus' qualification as an expert does not depend on his experience in the toy industry, and he is otherwise amply qualified to testify as to reasonably royalty calculations based on his knowledge, skill, and experience with patents and licensing, especially from an accounting perspective. The problem with his proposed testimony derives not from his knowledge, skill and experience, but from the specific analysis he conducted in this case.

D. Reliability

Although Lapidus is qualified to testify, an expert's credentials and qualifications alone do not render his opinions automatically reliable for Daubert purposes. Rather, an expert's opinion must be based on reliable methodology and must be relevant to an issue to be decided by the jury. United States v. Diaz, 300 F.3d 66, 73 (1st Cir. 2002); Ed Peters Jewelry Co. v. C&J Jewelry Co., 124 F.3d 252, 259 (1st Cir. 1997). Lapidus' report and testimony reveal that no rigorous analysis was performed here; rather the witness engaged in a superficial and result oriented application of the Georgia-Pacific methodology. This superficial Georgia-Pacific analysis does not satisfy the requirements of Rule 702, and renders Lapidus' opinion inherently unreliable. As discussed below, Lapidus' analysis lacks sufficient reference to

facts, data, or any relevant information at all. Instead, it begins and ends with Lapidus' reliance on and reference to his own expertise. However, an expert opinion is not admissible when it is connected to existing data only by the *ipse dixit* of an expert. See Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co., 161 F.3d 77, 81 (1st Cir. 1998) (quoting Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997) (when opinion evidence is based solely on the *ipse dixit* of the expert, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered")).

Lapidus purports to analyze each of the Georgia-Pacific factors in terms of how each would tend to increase or decrease the royalty rate. However, Lapidus admitted at the Daubert hearing that he had no particular starting point for conducting this analysis. When pressed by Hasbro's counsel, Lapidus explained that his "own experience would give me a range and at least an idea." He further justified his lack of factual or analytical support by stating:

> You have my knowledge base that I know what a range is, and then you are moving, based upon these factors, you have a tendency to move kind of one direction or another. And each situation is particular. . . But I think my industry experience kind of takes me to know what these licenses are, and where they generally come out.

Although the Georgia-Pacific analysis mimics a "hypothetical negotiation," the analysis does not allow for rank speculation as to what terms the parties would have agreed upon. Rather, the

expert's job is to apply available information and data in order to approximate the outcome of such a negotiation. Thus, while Lapidus' professional knowledge and experience would certainly assist him in conducting the Georgia-Pacific analysis, it may not be the sole source of his expert conclusion.

Analysis of Lapidus' treatment of a few of the fifteen Georgia-Pacific factors reveals the problem. The third factor requires analysis of the "nature and scope" of the license, and how that might affect the royalty rate. Lapidus, without any explanation or justification, declared that the '197 license would have been exclusive to Hasbro, and that this would tend to increase the royalty in Bowling's favor. When asked to elaborate, Lapidus could not cite anything to support this assertion, and furthermore, he appeared to backpedal away from his declaration, admitting that Bowling would not have given Hasbro exclusive rights to the '197 patent.

> Q: Do you seriously believe that if the parties had negotiated a license as of August 17, 1999, that Mr. Bowling would have agreed to discontinue selling his dice?
>
> A: No. But I believe it was exclusive as to the Hasbro die. So that to the extent that it's my understanding that the die that Hasbro would use or wanted to use would be exclusive to them and not necessarily exclusive as to no one else using that die.
>
> Q: But if it's not - - if it's exclusive to Hasbro that means that Hasbro has the right to prevent other people from using the die, right? Isn't that what "exclusive" means?
>
> A: I think I just explained my answer.

Regarding the fourth Georgia-Pacific factor, which involves the licensor's established policy regarding licensing, Lapidus declared in his report that "Bowling does not operate a licensing company and has not licensed his patent. This factor would tend to increase the reasonable royalty." As pointed out by Hasbro's counsel, however, Bowling does operate, and was operating in August 1999, a company named Crystal Caste Licensing, LLC. When confronted with this major discrepancy between the facts and the statements in his report, Lapidus again backpedaled, explaining, without substantiation, that Bowling's licensing company was really "more for his own interests and not generally his method of doing business."

The fifth Georgia-Pacific factor involves analysis of the relationship between the parties. Without explanation, Lapidus deemed the relationship between Bowling and Hasbro to be one of supplier and customer, thereby tilting the royalty rate heavily in Bowling's favor. In support, he cites only his interpretation of Bowling's mindset, that "he wanted to maintain, really, control of what he was selling, and that's why I see it that way." Lapidus provides no examination of either Bowling's or Hasbro's other business relationships for these or similar products; no industry data for game components; and no discussion of their relative market powers -- only his personal belief.

Although he does not reference it in his report, Lapidus made clear during his deposition testimony that he felt the "unique" timing of the hypothetical negotiation in this case supported a high royalty rate. This belief became evident during testimony about his analysis of the eleventh Georgia-Pacific factor, which deals with the extent to which the infringer used the infringing patent. Lapidus argued that August 17, 1999 was a key date in Hasbro's business cycle, that demand for the die would have been especially high at that time, and that Hasbro would have been willing to pay a higher royalty to acquire Bowling's license on that date. Again, Lapidus cites only his own "retail experience" as support for this assertion.

In addition to his failure to tie his opinions to facts or data, Lapidus' report is marred by an obvious bias in favor of Bowling. First, it is surprising to the Court, and frankly defies reason, that in his analysis of the fifteen Georgia-Pacific factors, Lapidus concluded that twelve of the fifteen factors would favor an increased royalty to Bowling, while the remaining three would be neutral. Could it possibly be that in a hypothetical negotiation between one of the largest toy and game companies in the world and a tiny sole proprietor that the little guy would hold all the cards and have all the leverage? It is conceivable that in a business relationship this could occur, but some convincing explanation or reasoning should be given to support this

counterintuitive conclusion and here there is none. Second, factors that should have been neutral given their inapplicability to this case were used by Lapidus to justify an increase in the expected royalties. Lapidus explained his tendency to transform seemingly neutral factors into ones that favor Bowling by stating "because this is written on behalf of Mr. Bowling, this would tend to increase his royalty." This lack of objectivity indelibly taints the report, and seems at odds with the Code of Conduct to which all CPAs must adhere. See AICPA Code of Professional Conduct Rules 102, 201.[2]

The fundamental defect in Lapidus' report, as pointed out by Barry Sussman, Hasbro's damages expert, during the Daubert hearing, is Lapidus' failure to connect the Georgia-Pacific factors to his

---

[2] Other statements made by Lapidus during the Daubert hearing raise questions. During the hearing, the Court (being unfamiliar with the topic) inquired as to Lapidus' knowledge of the so-called "book of wisdom." See Honeywell Int'l, Inc. v. Hamilton Sundstrand Corp., 378 F. Supp. 2d 459, 465 (D. Del. 2005) (discussing the "book of wisdom" concept, a flexible approach to evaluating damages for patent infringement) (citing Sinclair Refining Co. v. Jenkins Petroleum Process Co., 289 U.S. 689, 698 (1933) (origin of "book of wisdom")). Despite his professed knowledge in the area of intellectual property and patent licensing, Lapidus, compounding the Court's mistake, informed the Court that the "book of wisdom" was "a book that references application of the Georgia-Pacific factors, and it's a reference or literature that talks about these topics." Incredibly, Lapidus then offered to provide to the Court a copy of this "book." It turns out, of course, that the "book of wisdom" is a concept discussed in the above-cited cases, and not an actual book. Lapidus presumably should have known this; more importantly, his apparent attempt to simply make up an answer to appear knowledgeable on the subject borders on deceitful. His answer on this subject seriously undermines his credibility before this Court.

ultimate conclusion as to the reasonable royalty rate that would have resulted from a hypothetical negotiation between these parties. It appears that Lapidus reached his conclusion by way of a simple mathematical calculation. Lapidus' report concludes that a royalty of $0.5825 per die is a reasonable rate for calculating damages for infringement by Hasbro on Bowling's '197 patent. To reach his conclusion, Lapidus simply subtracted Hasbro's per die manufacturing cost from Bowling's per die sales price.[3] Lapidus denied that his calculation was so patently result oriented, and instead testified that he reached his conclusions by taking "into account all of the Georgia-Pacific factors . . . to get to what a reasonable royalty would be." (Emphasis added.) Upon reviewing Lapidus' report, however, it is clear that this statement is simply untrue. Rather, the Georgia-Pacific factors are superficially analyzed in order to reason backwards to his pre-ordained conclusion.

As discussed above, Lapidus' calculation primarily is based on his conclusion that the relationship between Bowling and Hasbro would have been one of supplier and customer. Lapidus provides no facts to indicate why, despite Hasbro's ability to manufacture and supply the dice on its own, as it was doing, the parties would have

---

[3] Lapidus reaches $0.5825 as a reasonable royalty per die by selecting (arbitrarily, it appears) $0.6400 as Bowling's per die wholesale price and subtracting from it $0.0575 as Hasbro's cost per die.

negotiated as customer and supplier rather than as licensor and licensee or inventor and promoter. The importance of this characterization to the outcome can hardly be overstated. Indeed, it is <u>the</u> single most important finding supporting Lapidus' ultimate opinion. Because Lapidus considers Bowling to be the supplier in this equation, he assumes Hasbro would have been willing to pay top dollar for the dice (he uses the highest amount charged by Bowling to his wholesale customers as his benchmark). Lapidus gives no explanation for why the parties would have entered into such a relationship, and, further, no justification for why Hasbro would have agreed to pay a $0.64 per die wholesale rate, when, in fact, Bowling had been selling his die at a rate as low as $.30 per die to other wholesale customers.[4]

By its nature, a hypothetical negotiation involves a degree of speculation. The <u>Georgia-Pacific</u> analysis attempts to make the exercise an educated one, informed by facts, data, research, and relevant information that can be gleaned from and about the parties and their relationship. But mere reference to the <u>Georgia-Pacific</u> factors, cannot change the sow's ear of rank speculation into a silk purse of reliable expert opinion. Rather, expert opinion testimony "must be shown to be based on more than the subjective

---

[4] In doing so, Lapidus fails to take into account various market factors, including the possibility of a volume discount, that would have been considered by the parties when reaching an agreement as to a reasonable royalty rate.

belief or unsupported speculation of the expert." Hartford Ins. Co. v. Gen. Elec. Co., 526 F. Supp. 2d 250, 252 (D.R.I. 2007). An "expert is a conduit of facts and not merely a subjective speculator relying on stature alone." Grimes v. Hoffmann-Lauraceae, Inc., 907 F. Supp. 33, 35 (D.N.H. 1995). Yet, in this case, Lapidus does just this - he speculates using his "knowledge base" as his sole source of information. A court is not required to "take the expert's word for it" simply because he or she is a qualified individual applying an accepted methodology. See Caraker v. Sandoz Pharms. Corp., 188 F. Supp. 2d 1026, 1030 (S.D. Ill. 2001). Rather, the Court serves "as a gatekeeper in order to ensure, as a condition of admissibility, that proffered expert testimony rests on a sufficiently trustworthy foundation." Crowe v. Marchand, 506 F.3d 13, 17 (1st Cir. 2007). Here, it is evident that Lapidus drafted a report specifically intended to superficially justify a royalty rate that would maximize damages awarded for Hasbro's alleged infringement of the '197 patent. Lapidus' report and testimony lack a dependable foundation, are not reliable, and for this reason, must be excluded.

IT IS SO ORDERED.

WESmith

William E. Smith
United States District Judge
Date: 3/17/08