Confidential – Subject to Protective Order

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| MICHAEL BOWLING, a Resident of Arizona, | : | |
| Plaintiff, | : | |
| v. | : | C.A. No. 05-229 S |
| Hasbro, INC., a Rhode Island Corporation, | : | |
| Defendant. | : | |

# EXPERT REPORT OF BARRY SUSSMAN, CPA

## I. INTRODUCTION

1. I am a Managing Director at Huron Consulting Group ("Huron") in its Boston, Massachusetts office. Huron is an operational and financial consulting firm. The firm specializes in providing financial and operational consulting services to a variety of issues, including estimating damages in patent infringement matters. My hourly rate in this engagement is $450.

2. I have almost 20 years of experience providing financial and accounting services. Prior to joining Huron, I was a partner in two national accounting firms. I have particular expertise in providing consulting services in the Intellectual Property area. These services have included audits of licensing agreements, consultations regarding the appropriate royalty rates for licenses, valuation of intangible assets and expert testimony in litigation. I have lectured on a variety of topics related to Intellectual Property at law firms, law schools and bar association events. A copy of my curriculum vitae is attached as Exhibit A of this report.



EXHIBIT A

3. I have been asked by Counsel for Defendant Hasbro, Inc. ("Hasbro") to conduct a financial analysis in order to reach opinions concerning Plaintiff's damages claimed in this matter. As part of my analysis, my staff and I have reviewed documents produced by the parties, pleadings, depositions, trade press articles and the expert report of Plaintiff's damage expert, Mr. Neil N. Lapidus.[1] My staff and I have also had conversations with the following Hasbro personnel: Michael Hirtle, Dorothy Echlin, Tracy Hogan, and Judy Nye. My staff and I have also spoken with Mr. Jim Koplow, the owner of Koplow Games, which sells dice.

## II. SUMMARY OF OPINIONS

4. Based on the materials reviewed, my education and experience as a CPA and a damages expert, and the analysis presented in this report, it is my opinion that:[2]

a. Hasbro had non-infringing alternative dice that were commercially acceptable, and available to use in its Monopoly Millennium Edition games in August 1999.

b. Mr. Bowling and Hasbro would have agreed to a royalty rate of $0.15 per pair of dice at the hypothetical negotiation in August 1999.

c. Therefore, applying that royalty rate to the 556,828 pairs of dice Hasbro used in its Monopoly Millennium games sold since August 17, 1999 yields royalties of $83,524. Alternatively, applying the royalty rate to the 228,049 pairs of dices Hasbro used in its Monopoly Millennium games sold since November 3, 1999 yields

---

[1] Expert Report On Damages Of Neil N. Lapidus, CPA ("Lapidus Report"), February 22, 2006. A list of materials reviewed in the preparation of this report is in Exhibit B of this report. I reserve the right to supplement this report as appropriate.

[2] For the purpose of this analysis, the '197 Patent is assumed to be valid and infringed by the accused dice used in Hasbro's Monopoly Millennium games.

royalties of $34,207.[3]

d. Plaintiff's damage expert, Mr. Lapidus' royalty analysis is flawed and overstates damages.

## III. BACKGROUND

### A. Lawsuit

5. Mr. Michael Bowling ("Mr. Bowling") filed a lawsuit against Hasbro on May 24, 2005, in which he alleged that dice included in certain games distributed and sold by Hasbro infringed his U.S. Patent No. 5,938,197 ("the '197 Patent").[4] The '197 Patent, entitled "Random Number Generator For Game Playing," issued on August 17, 1999.[5] The Complaint specifically referenced Hasbro's "Monopoly, Millennium Edition" games.[6]

### B. Hasbro

6. Hasbro was founded in 1923 by Henry and Helal Hassenfeld under the original name of Hassenfeld Brothers.[7] Today, Hasbro is one of the world's largest toy and game manufacturers.[8] It's been estimated that Hasbro Games "controls roughly 80 percent of the board game business worldwide."[9] The company is based in Pawtucket, Rhode Island and had 2005 net revenue of $3.0

[3] Applying prejudgment interest of 12 percent compounded annually to these royalty amounts yields total damages with interest of $175,876 and $71,071, respectively (Exhibits J and K).
[4] Complaint ("Complaint"), May 24, 2005, pp. 1, 5.
[5] U.S. Patent No. 5,938,197 (HA000470).
[6] Complaint, p. 1.
[7] In 1985 the company changed its name to Hasbro, Inc. (www.hasbro.com/default.cfm?page=ci_history_hasbro)
[8] Hasbro Investor Relations, (corporate-ir.net/phoenix.zhtml?c=68329&p=irol-irhome). Hasbro acquired the Milton Bradley Company in 1984 and the Tonka Corporation in 1991, which included its Parker Brothers division, and Monopoly (ibid). In 1992, Hasbro consolidated all Milton Bradley and Parker Brothers board games into a new organization called Hasbro Games (ibid).
[9] Levy, Richard C. and Ronald O. Weingartner. The Toy and Game Inventor's Handbook: Everything You Need to Know to Pitch, License, and Cash-In on your Ideas ("Toy and Game Inventor's Handbook"), Alpha Books, 2003, p. 67.

billion.[10] Hasbro's game brands include Milton Bradley and Parker Brothers, and its games include Candy Land, Life, Clue, Jenga, Monopoly, Scrabble, Trivial Pursuit and Yahtzee.[11]

7. On August 4, 1998, Hasbro acquired Avalon Hill, a strategy game company, which markets and sells Acquire, Axis & Allies, Battle Cry, Cosmic Encounter, Diplomacy, History of the World, and Risk 2210 A.D.[12] And, on September 30, 1999, Hasbro completed the acquisition of Wizards of the Coast, a hobby game company, whose games include: Magic: The Gathering, Pokemon, and Dungeons & Dragons.[13]

**C. Michael Bowling**

8. Michael Bowling is a resident of Arizona, and a supervisor of energy supply with Tucson Electric Power.[14] He has been a full time employee of Tucson Electric Power since 1990. Mr. Bowling has been playing Dungeons & Dragons ("D&D"), which is a role-playing game ("RPG") since the mid to late 1980's.[15] He is the individual inventor and owner of the '197 Patent.[16]

9. Mr. Bowling developed his interest in dice design in the late 1980's during his first D&D game.[17] He saw a business opportunity to design dice for adventure game players, such as D&D players, and formed Crystal Caste LLC ("Crystal Caste") in 1998.[18] In 1997, he developed his first dice, which were 10-

---

[10] Hasbro, Inc. 2005 Annual Report, p. 2.
[11] Hasbro.com History from 1923 to 2002, and www.hasbro.com/default.cfm?page=ci_history.
[12] HA000461, Hasbro, Inc. 1998 Annual Report, Pg. 4, and Hasbro, Inc. Product Search, www.hasbro.com/default.cfm?page=browse&brand=556
[13] "Hasbro Acquires Wizards of the Coast, Inc.", *Hasbro Press Release*, September 30, 1999.
[14] Deposition of Michael Bowling ("Bowling Deposition"), January 16, 2006, p. 15 and Complaint, p. 1.
[15] Bowling Deposition, pp. 20-22.
[16] Complaint, p. 2.
[17] Bowling Deposition, p. 53. According to Mr. Bowling, "they're [dice] an integral part" of the game, which requires seven dice to play (Bowling Deposition, pp 53-4).
[18] Bowling Deposition, pp. 54-5 and B00251. Crystal Caste, LLC reported sales of $125,639 on its 1999 Federal Tax Returns (B01400). He noticed that D&D players were always buying dice and usually had a sack of dice. This observation was reinforce in a conversation he had with the owner of Things for Thinkers, a game store and "D&D shop" he used to go to, who told him that "Dice sales are what keeps my lights on" (Bowling Deposition, p. 54-5).

sided dice he called "crystal dice."[19] He first sold his 10-sided "crystal dice" at the Gen Con show in August 1998.[20] Crystal Caste has sold $323,471 of "crystal dice" between August 1998 and January 2002.[21] Crystal Caste purchased its "crystal dice" from King Cards, in Germany, for $0.13 per die (B03097-104, B03111 and B03124).

## IV. MONOPOLY

### A. The Monopoly Game

10. Monopoly, a real estate property trading game, dates back to 1934, when Charles B. Darrow brought his game concept to Parker Brothers. However, Parker Brothers decided not to license the game due to "52 design errors."[22] Despite this setback, Mr. Darrow manufactured handmade games, and sold them in Philadelphia. He sold 5,000 sets of these handmade games, but when he could not keep up with demand, and he went back to Parker Brothers, who this time agreed to license his game concept. Hasbro pays a royalty for the game concept of Monopoly of three percent of net sales on all Monopoly editions.[23]

11. The object of Monopoly is "to become the wealthiest player through buying, renting and selling property."[24] Each Monopoly game comes with the following components: (1) a box, (2) a game board, (3) dice, (4) tokens, (5) houses & hotels, (6) property deed cards, (7) community chest and chance cards, (8) money and (9) a bankers tray. The gross selling price for a standard Monopoly game was approximately $10.53 in 1999 (HA008401). In 1999, the

[19] Bowling Deposition, pp. 80 and 107.
[20] Bowling Deposition, p. 137. He testified that he sold 10,000 10-sided "crystal dice," which he offered in six colors, at the four day Gen Con show (Bowling Deposition, pp. 141-2).
[21] Bowling Deposition, p. 161. He does not know his sales between 1998 and 1999 (Bowling Deposition, p. 162). Crystal Caste averaged $7,702 a month in sales of "crystal dice" during this period, and its average annualized sales calculate to approximately $92,424. This average may overstate its earlier years (e.g., 1998 and 1999) when Crystal Caste was not yet selling a complete set of seven dice.
[22] History of the Monopoly Game, www.hasbro.com/monopoly/pl/page.history/dn/default.cfm.
[23] Discussions with Michael Hirtle and Dorothy Echlin, HA008112 and HA008116.

standard Monopoly game box cover had its traditional white cubic dice with black pips prominently displayed.[25] Hasbro paid $0.04 per pair for its traditional cubic dice used in its standard Monopoly game.[26]

12. Over the years, Hasbro has introduced numerous variations and special editions of the Monopoly game. Some of those include a 70th Anniversary, Disney, American, Lord of the Rings, Star Wars, Times Square and Millennium Editions.[27] The gross selling prices for these Monopoly editions range from $9.50 to approximately $28.50.[28]

### B. The Monopoly Brand

13. In 1935, its first year with Parker Brothers, the Monopoly game became the best-selling game in America and the Western World.[29] It is currently sold in 81 countries and produced in 27 languages. Over 200 million copies of Monopoly have been sold worldwide.[30] By comparison, the average life span of a typical game that makes it to the retail phase is "a year or two."[31] The strength of the Monopoly brand is evidenced by its brand awareness, revenues and over 70-year product life.[32]

### C. Monopoly Millennium Edition

14. The Monopoly Millennium Edition ("Millennium Edition") was an upscale version of the traditional Monopoly game. As Ms. Echlin stated, this edition "contains many very upscale...components, new houses and hotels, a

---

24 Monopoly game instructions.
25 Discussions with Tracy Hogan, Hasbro's Director of Marketing and Exhibit C. According to Ms. Hogan, this version of the box had been used by Monopoly for the last 20 years, and was only changed in 2003.
26 Discussions with Dorothy Echlin.
27 Discussions with Dorothy Echlin and Monopoly.com- Browse Games, www.hasbro.com/monopoly/pl/page.browse/dn/default.cfm
28 Discussions with Dorothy Echlin, HA008112 and HA008116.
29 History of the Monopoly Game, www.hasbro.com/monopoly/pl/page.history/dn/default.cfm and Monopoly game instructions.
30 Monopoly.com- Fun Facts, www.hasbro.com/monopoly/pl/page.funfacts/dn/default.cfm
31 Toy and Game Inventor's Handbook, p 18.
32 Deposition of Michael Hirtle ("Hirtle Deposition"), January 17, 2006, p 25, and The Toy and Game Inventor's Handbook, pp. 92 & 307 and Discussions with Tracy Hogan.

metal box...a foil game board, special printed money, and probably the most significant new component from my perspective would be the new tokens."[33] The backside of the Millennium Edition wrapper identifies 8 component features, including the accused dice. In addition, the back-side wrapper also noted in bold black print: "8 collectible millennium tokens."

15. Hasbro began designing the Millennium Edition game with a target gross selling price of $28.50 and a production start date in the late first half of 1999.[34] The initial componentry of the game included an electronic randomizer instead of dice. However, in 1998, due to the cost of the electronic randomizer, Hasbro opted instead to design new dice.[35] Hasbro paid $0.115 per pair for the accused dice it used in its Monopoly Millennium games (HA008120-37 and HA000443). Ms. Echlin believed that given the "length of time it takes to tool dice, there would not have been time pressure at this point to meet the target in-stock date."[36] Hasbro met its target date, and introduced its Millennium Edition in May 1999.[37]

16. The first sales invoice for a Millennium Edition was dated May 4, 1999 (HA008041). Hasbro stopped selling the Millennium Edition in 2002. In a 1999 "Engineering Quickcost" document, Hasbro estimated first year sales of 550,000 units for the Millennium Edition (HA008112). That document also showed estimates of a net sales price of $25.08 and a gross margin at standard cost of approximately 47 percent (HA008112). And, that Hasbro's expected pre-tax profit on this game, after operating expenses, was approximately 26 percent (HA008112). It is my understanding that the Millennium Edition had a retail price of approximately $42.

---

[33] Echlin Deposition, p. 48.
[34] Echlin Deposition, pp. 35-7.
[35] Echlin Deposition, pp. 40-2, and Sefchick Deposition, p. 14-5.
[36] Echlin Deposition, pp. 48-9.
[37] Echlin Deposition, p.37 and HA008041.

**D. Monopoly 2000- Avon Special Edition**

17. Hasbro marketed a special edition of it Monopoly Millennium game through Avon Products, Inc. ("Avon").[38] This version of the Monopoly Millennium game was branded the Monopoly 2000- Avon Special Edition ("Avon Special"), and was produced at a lower cost and price than the Millennium Edition.[39] The gross selling price for the Avon Special was $9.50, compared to $28.50 for the Millennium Edition (HA008116 and HA008112). The only two common components used in both the Millennium Edition and Avon Special were the new collectible tokens and the accused dice. See Exhibit H for a comparison of these Monopoly Millennium games.

18. The first sales invoice for an Avon Special was dated July 28, 1999 (HA008050). Hasbro's stopped selling the Avon Special in 2000. In an "Engineering Quickcost" document dated March 10, 1999, Hasbro estimated first year sales of 30,000 units for the Avon Special (HA008116). That document also showed estimates of a net sales price of $9.025 and a gross margin at standard cost of approximately 36 percent (HA008116). Hasbro's expected pre-tax profit on this game, after operating expenses, was approximately 19 percent (HA008116). It is my understanding that the Avon Special had a retail price of approximately $29.

19. The Avon Special box prominently displayed traditional white cubic dice with black pips on the front, center of the box.[40] This depiction of the traditional cubic dice is the only depiction or mention of dice on the packaging of the Avon Special. In short, there was no reference or depiction of the accused dice on the Avon Special box.

[38] Avon is a leading beauty and cosmetics company with 2005 annual revenue over $8 billion (Avon.com Investors, www.avoncompany.com/investor/index.pl and Avon 2005 Annual Report, p. 27). Hasbro had used Avon has a distribution channel for toys and games in the past (Discussion with Dorothy Echlin).

[39] HA008116 and Discussion with Dorothy Echlin. Collectively the Millennium Edition and the Avon Special may be referred to as "Monopoly Millennium games."

[40] Based on a review of the Avon Special box cover and Discussions with Dorothy Echlin.

## E. Monopoly Millennium Game Sales and Dice Purchases

20. As discussed above, Hasbro began selling the Millennium Edition and Avon Special in May and July of 1999. Its sales of these Monopoly Millennium games are shown in Table 1 below. Hasbro's Monopoly Millennium game sales totaled 882,579 games in 1999, 418,280 in 2000, 102,543 in 2001 and 4,154 in 2002. Hasbro sold a total of 1,407,556 Monopoly Millennium games.

**TABLE 1**

**MONOPOLY MILLENNIUM GAME UNIT SALES (000)**

| | 1999 | 2000 | 2001 | 2002 | TOTAL |
|---|---|---|---|---|---|
| Monopoly Millennium | 601.0 | 239.2 | 105.8 | 4.2 | **950.2** |
| Avon Special | 281.5 | 179.1 | (3.3) | - | **457.3** |
| **Total** | **882.6** | **418.3** | **102.5** | **4.2** | **1,407.6** |

Source: Exhibit D

21. Table 2 below shows Hasbro's purchases of accused and replacement dice used in Monopoly Millennium games. In 1999, Hasbro purchased 732,000 pairs of accused dice, and 300,000 pairs of replacement dice. Once Hasbro switched from the accused dice in 1999, it purchased more than 600,000 pairs of replacement dice in 1999 through 2001. Thus, the total dice purchased of 1,332,300 approximate the total Monopoly Millennium games sold of 1,407,556.[41]

[41] It is my understanding that the number of Monopoly Millennium games sold was greater than the number of dice purchased, because Hasbro used dice in inventory while it was transitioning to its new dice (HA000302).

**TABLE 2**
**HASBRO DICE PURCHASES (UNITS-PAIRS) FOR MONOPOLY MILLENNIUM GAMES**
**(000)**

| | 1999 | 2000 | 2001 | TOTAL |
|---|---|---|---|---|
| Accused Dice | 732.0 | - | - | **732.0** |
| Replacement Dice | 300.0 | 287.3 | 13.0 | **600.3** |
| **Total** | **1,032.0** | **287.3** | **13.0** | **1,332.3** |

Source: Exhibit E

22. The '197 Patent issued on August 17, 1999. I am informed that Monopoly Millennium games containing accused dice sold before that date are excluded from the royalty base for purposes of calculating royalty damages. I am further informed that an issue of proper marking of dice sold by Mr. Bowling exists. Therefore, Monopoly Millennium game sales between August 17, 1999 and November 3, 1999 should also be excluded from any royalty base for purposes of calculating any royalty damages. Tables 3 and 4 below present my royalty base calculations under two scenarios: (1) assuming the damage period starts on August 17, 1999, and (2) assuming the damage period starts on November 3, 1999.

**TABLE 3**
**SCENARIO 1: ROYALTY SALES BASE OF ACCUSED DICE**

| | Royalty Sales Base (Units- Pairs) | | |
|---|---|---|---|
| | **Millennium Edition** | **Avon Special** | **Total** |
| August 1999 | 50,372 | 4,224 | **54,596** |
| September 1999 | 171,527 | - | **171,527** |
| October 1999 | 81,628 | 9,504 | **91,132** |
| November 1999 | 53,036 | 56,028 | **109,064** |
| December 1999 | 27,421 | 103,088 | **130,509** |
| ***Total*** | ***383,984*** | ***172,844*** | ***556,828*** |

Note: Damage period starts August 17, 1999. August sales are the 17th through 31st.
Source: Exhibit F

TABLE 4
SCENARIO 2: ROYALTY SALES BASE ACCUSED DICE

| | Royalty Sales Base (Units- Pairs) | | |
|---|---|---|---|
| | Millennium Edition | Avon Special | Total Games |
| November 1999 | 42,568 | 54,972 | 97,540 |
| December 1999 | 27,421 | 103,088 | 130,509 |
| **Total** | **69,989** | **158,060** | **228,049** |

Note: Damage period starts November 3, 1999. November sales are the 3rd through the 30th.
Source: Exhibit G

23. As shown in Table 3, the royalty base upon which a royalty would be applied, assuming the damage period started on August 17, 1999 would include 556,828 pairs of accused dice used in Monopoly Millennium games sold between August 17th through December 1999. Alternatively, that number would be reduced to 228,049 pairs of accused dice assuming the damage period starts on November 3, 1999.

## V. THE HYPOTHETICAL NEGOTIATION

24. It is my understanding that Mr. Bowling is entitled to "damages adequate to compensate" for Hasbro's use of the accused dice originally used in *its Millennium Monopoly games, assuming the '197 Patent is valid and* infringed.[42] It is also my understanding that a hypothetical negotiation between Mr. Bowling and Hasbro for a license to the '197 Patent would have occurred in August 1999, just prior to when infringement began. The *Georgia Pacific* decision identified 15 factors that should be considered in a hypothetical negotiation.[43] My analysis of each of these factors follows:

[42] 35 U.S.C., Section 284. This analysis assumes that the '197 Patent is valid and infringed by Hasbro's accused dices in its Monopoly Millennium Edition and Avon Special games.

[43] *Georgia-Pacific Corp. v. United States Plywood*, 318 F. Supp., 1116, 1120. The Georgia Pacific case presents "a multiplicity of inter-penetrating factors bearing upon the amount of a reasonable royalty. But there is no formula by which these factors can be rated precisely in the order of their relative importance or by which their economic significance can be

***Factor 1: The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty.***

25. Mr. Bowling has never licensed the '197 patent.[44]

***Factor 2: The rates paid by the licensee for the use of other patents comparable to the patent in suit.***

26. The accused dice were a component of the Monopoly Millennium games. Prior to August 1999, Hasbro was not aware of any agreements that were similar to the hypothetical negotiation in this matter, where it was licensing a component of a game and not a game concept.[45]

27. However, Hasbro has an established practice of licensing for whole game and toy concepts. Michael Hirtle, Hasbro's Vice President of Research and Development, is responsible for inventor relations and product acquisitions.[46] According to Mr. Hirtle the accepted industry standard royalty rate for the invention of game and toy concepts, when not dealing with an already existing strong brand, is five percent of net sales.[47] And, in the case of a strong brand, such as Monopoly, the standard royalty rate for the invention of a game concept would be 3 percent of net sales.[48] Therefore, if an inventor has a game concept that is a spin off of the Monopoly concept (or some similar strong brand) and would utilize the Monopoly concept, the standard starting point for that royalty rate for that inventor would be 3 percent of net sales. A review of all the licenses

automatically transduced into their pecuniary equivalent." (Donald S. Chisum, et al., Principles of Patent Law, Cases and Materials (Second Edition, Foundation Press: 2001), p. 1245.

[44] Bowling Deposition, p. 241.

[45] Hirtle Deposition, p. 24.

[46] Hirtle Deposition, p. 13.

[47] Hirtle Deposition, pp. 24-26 and Discussion with Michael Hirtle. He also noted that in most cases the 5 percent royalty rate is a starting point, and the rate can be reduced off of that 5 percent to reflect other factors (Hirtle Deposition, pp. 25-26, 44-45). For example, that rate would be reduced if the game concept involves a licensed entertainment property (e.g., Star Wars or Disney). Thus, the 5 percent is usually "a maximum" (Hirtle Deposition, pp. 44-45 and Discussion with Michael Hirtle).

[48] Discussions with Michael Hirtle.

produced by Hasbro evidence this standard licensing policy.[49] A review of game concepts licensed by Hasbro within five years prior to the hypothetical negotiation reveals royalties paid in the range of 1 percent to 6 percent of net sales with the majority of the agreements paying 5 percent of net sales.[50]

28. The royalty rates in Hasbro agreements were usually for exclusive license to a game or toy concept, and usually restrict the licensor from offering the licensed property to any other party or utilizing the license property itself. For example the "Exclusivity" clause in the Hasbro license for "Bop-it" states: "Licensor agrees that, during the Term, Licensor will not offer or license to any other party any property substantially similar to the Licensed Property, nor will Licensor utilize any such property itself in any manner which may conflict with the exclusive grant of rights hereunder" (HA006812).

29. When discussing how he would determine a royalty rate for a game component, Mr. Hirtle did note:

> a rule of thumb, a starting point would be to calculate the value added. If it's a component in a larger property, one would calculate the proportion or percentage that is represented by the value of the component...and then use that percentage applied to the five percent.[51]

This was the approach outlined by Mr. Hirtle as a basis for Hasbro's calculation

---

[49] Most agreements have royalty rates in the range of 1 percent to 5 percent with a few royalty rate both under 1 percent and a few over 5 percent. These license agreements included both patented and unpatented game and toy concepts.

[50] There was one license agreement for the game concept "Upwords" that paid 6% of net sales or 8% of net sales for F.O.B. and Letter of Credit Sales (HA007209-14). F.O.B. Sales are freight on board sales, which are generally set purchase plans whereby the trade can pick up product at its foreign point of manufacture for a lower price than in the United States. (See Toy and Game Inventor's Handbook, p. 454.) Thus, in this case, the increased royalty rate would offset the lower price.

[51] Hirtle Deposition, pp.27, 41-42 and Discussion with Michael Hirtle. He gave an example: "if we're talking about something that's 25 percent of the whole game – it would be 25 percent of five percent" (Hirtle Deposition, p.27). Mr. Hirtle discusses a new license that he is currently in the process of negotiating a license for a special die to be included in a new Mega Monopoly game. While not finalized, Mr. Hirtle and the inventor have agreed to a royalty of $0.10 or $0.11 per die. In this case, he noted the dice were a design element of the game and something Hasbro plans to promote (Hirtle Deposition, pp. 43-44 and Discussions with Michael Hirtle).

of the $0.08 per pair royalty it offered Mr. Bowling in 1999.

30. After Hasbro became aware of the '197 patent, it contacted Mr. Bowling, and attempted to license the '197 patent.[52] During the course of the discussions between Hasbro and Mr. Bowling and his representatives, Hasbro made Mr. Bowling an offer of $0.04 per die or $0.08 per pair of dice.[53] Mr. Hirtle stated that "the offer that I tendered was significantly higher than the five percent of the added value of the dice," because Hasbro was already using the accused dice in its Monopoly Millennium games.[54] Mr. Bowling did not accept this royalty offer made by Hasbro. Mr. Hirtle recalled a subsequent counter offer of $0.25 per die or $0.50 per pair of dice.[55] Hasbro rejected this counter-offer.

31. As discussed above, Hasbro licensed the game concept for Monopoly, and pays a three percent royalty on the net sales of Monopoly games.[56] In its 1999 financial plans for its Millennium Edition and Avon Special, Hasbro expected to pay royalties for the game concept of $0.752 and $0.271 per Monopoly game, respectively. Plaintiff's damage expert, Mr. Lapidus, opined that Hasbro would "willingly" agree to pay a royalty of $1.16 per pair of dice to be able to include the accused dice in the Monopoly Millennium games.[57] That is substantially more than Hasbro pays for the entire Monopoly game concept. Mr. Lapidus' royalties would be $0.41 higher or 54 percent more than Hasbro pays for the Monopoly game concept license on the Millennium Edition (HA008112). And, it would be $0.89 higher or 328 percent more than Hasbro pays for the Monopoly game concept on the Avon Special (HA008116). Considering Hasbro actually removed the accused dice from its Monopoly Millennium games in 1999, there is no basis to believe that Hasbro would have "willingly" agreed to a royalty as high as $1.16 per pair of accused dice.

---

[52] Hirtle Deposition, pp. 35-36. According to Mr. Hirtle, Hasbro did not believe it was infringing the '197 patent.
[53] Hirlte Deposition, p. 39.
[54] Hirtle Deposition, p. 38.
[55] *Hirtle Deposition, p. 39, and Discussion with Michael Hirtle.*
[56] HA008112 and HA008116. Discussions with Michael Hirtle and Dorothy Echlin.
[57] Lapidus Report, pp. 14-15.

***Factor 3: The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restrictive in terms of territory or with respect to whom the manufactured product may be sold.***

32. The license negotiated at the hypothetical negotiation between Mr. Bowling and Hasbro would have been for a non-exclusive license to the '197 patent in the U.S. According to Mr. Hirtle, he did not think exclusivity would have mattered, and noted he did not "think we [Hasbro] considered it critical in this instance."[58] However, he did not recall exclusivity ever being discussed.

33. He did note that Hasbro's licensing policy for game and toy concepts was typically to license on an exclusive basis.[59] According to our review of Hasbro licenses and our discussions with Mr. Hirtle, Hasbro typically seeks exclusive licenses for both game and toy concepts. Therefore, Hasbro's standard royalty rate structure assumes an exclusive license. However, since Mr. Bowling also sells his "crystal dice" to distributors and retailers in the U.S., and practices the '197 patent, any license would have to be non-exclusive.

34. As discussed above, Mr. Bowling through his company Crystal Caste has been selling his "crystal dice," which are covered by the '197 patent, to distributors and retailers in the U.S. Crystal Caste does not sell its dice in other products, and has primarily sold them to adventure game players, such as D&D players. Therefore, Hasbro would not see any value in paying any additional royalty for exclusivity and would have likely negotiated an agreement with Mr. Bowling that would have allowed Crystal Caste to continue selling the "crystal dice" to its customers.[60] A license agreement with Hasbro would have provided Crystal Caste and its "crystal dice" additional exposure, which could have led to additional sales of his dice.

---

[58] Hirtle Deposition, p.34.
[59] Discussions with Michael Hirtle.
[60] Discussion with Michael Hirtle.

***Factor 4: The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.***

35. In August 1999, Crystal Caste was a startup business that was selling two, maybe three sizes of its "crystal dice," primarily to adventure game players. The company reported income was $125,639 based on its 1999 tax returns (B01400). As noted above, Crystal Caste's average annual sales of "crystal dice" was approximately $92,424 based on reported sales between August 1998 and January 2002. Crystal Caste does not sell its "crystal dice" in board games or as part of other products.[61] In 1999, Mr. Bowling was looking for ways to promote his new business, and licensing Hasbro, would have provided him with additional exposure.

36. In fact, Mr. Hirtle of Hasbro noted that he "thought this [a possible license agreement with Hasbro] would be very good news for Mr. Bowling."[62] In 1999, Hasbro was one of the largest game manufacturers and marketers in the world, and it publicly promoted its relationships with inventors.[63] According to Mr. Hirtle, Hasbro licenses about 30 game concepts a year out of approximately 1,600 proposals.[64] In sum, a license with Hasbro would have provided Crystal Caste and its "crystal dice" with additional exposure, and possibly more sales. It also would have provided Mr. Bowling with the potential for his "crystal dice" to be used in other games distributed by Hasbro, such as Yahtzee.

37. While Mr. Bowling testified that before Hasbro approached him "licensing was never really a goal...for me," he apparently wrote a letter to the Toy Manufacturers of America in January 1999.[65] In his letter, he proposed including his "crystal dice" in new versions of Yahtzee, and he testified that he "thought it would be nice to take that crystal shape and use it as a game

[61] Bowling Deposition, p. 245.
[62] Hirtle Deposition, p. 22.
[63] Discussions with Michael Hirtle.
[64] Discussion with Michael Hirtle and Toy And Game Inventor's Handbook, p. 433.

component."[66] This letter is consistent with a willingness to license the '197 Patent.

38. Mr. Bowling has attempted to promote Crystal Caste in a variety of ways. In another instance he agreed to supply 60,000 "crystal dice" to *Dragon Magazine* in a give-away promotion. He testified that "I was trying to get the name out there...spark some interest."[67]

39. As noted above, Mr. Hirtle recalled that Mr. Bowling and/or his representative offered to license the '197 Patent to Hasbro for $0.25 per die.[68] Hasbro rejected that offer because the royalty rate was too high.

***Factor 5: The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter.***

40. Mr. Bowling and Hasbro's commercial relationship would be that of an inventor and a promoter. By August 1999, Hasbro had already developed its accused dice and had established its supply of dice. I have seen no evidence that Hasbro ever intended to buy its accused dice from Mr. Bowling or Crystal Caste. Hasbro knew it was paying 11.5 cents per pair for its accused dice, and that it had alternative cubic dice, made from the same material, available for $0.12 per pair (HA008138). It would not agree to pay Crystal Caste's wholesale price of $0.64 per die, or $1.28 per pair.[69] As will be discussed later on in this report, Hasbro had alternative dice available in 1999.

41. I have not seen any evidence that supports Mr. Lapidus' assertion

---

[65] Bowling Deposition, p. 242 and B00244.
[66] Bowling Deposition, pp. 243-4. As noted above, Hasbro markets and distributes Yahtzee.
[67] Bowling Deposition, pp. 252-3. Mr. Bowling did not recall when this promotion with Dragon Magazine occurred (Bowling Deposition, p. 252).
[68] Discussions with Michael Hirtle.
[69] Hirtle Deposition, pp. 45, and Bowling Deposition, p. 197. As will be discussed later, Mr. Bowling produced Crystal Caste invoices in 1999 that show it sold his "crystal dice" to customers for as low as $0.194 per 6-sided crystal die to King Cards in Germany, and $0.355 in the U.S. (B03185 and B03196). Other 1999 invoices show Crystal Caste had a 25 percent "Distributor Discount" off of his $0.645 price (See for example, B03229).

that the commercial relationship between Mr. Bowling and Hasbro would have been one "of supplier and customer."[70] Furthermore, Mr. Lapidus did not present any evidence that licensing Hasbro to use its accused dice in Monopoly Millennium games would impact Crystal Caste's wholesale pricing strategy.[71] In fact, Hasbro generally considers the royalty rates in its license agreements confidential.[72] In sum, Hasbro believes in promoting its relationships with inventors, which would have provided Crystal Caste with additional exposure, and potentially increased sales.

***Factor 6: The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.***

42. I have not seen any evidence that the use of the accused dice promoted the sales of either Monopoly Millennium game or other Hasbro products.[73] As noted above, Hasbro has been prominently depicting its traditional white cubic dice with black pips on its Monopoly box covers for years. Moreover, the box cover on the Avon Special did not even show or mention the accused dice, it showed the traditional white cubic dice with black pips. Hasbro sold 457,300 Avon Special games between 1999 and 2001. As will be discussed later, cubic dice are non-infringing alternative dice that were commercially acceptable, and available to Hasbro in 1999. In fact, when Hasbro could not reach agreement with Mr. Bowling they replaced the accused dice with non-infringing alternative cubic dice. Hasbro sold over 670,000 Monopoly Millennium games after it switched to its replacement dice in 1999.

43. Mr. Lapidus referenced "various website communications" that reflected the importance of the accused dice in the Millennium Edition.[74] As will

[70] Lapidus Report, p. 9.
[71] Lapidus Report, pp. 9 and 10.
[72] Discussions with Michael Hirtle.
[73] Hirtle Deposition, p. 12.
[74] Lapidus Report, p. 10.

be discussed later, the complaints only account for a very small percentage of Monopoly Millennium games sold with the replacement dice.

44. Also, I have not seen any evidence that the "crystal dice" sold by Crystal Caste generate sales of non-patented items for Mr. Bowling.

***Factor 7: The duration of the patent and the term of the license.***

45. It is my understanding the '197 Patent expires in January 2018. Hasbro's Monopoly Millennium games were special edition games and were expected to have a limited product life of about two to three years.

***Factor 8: The established profitability of the product made under the patent; its commercial success; and its current popularity.***

46. There is no established profitability for the accused dice as a component of a game. [75] Hasbro used its accused dice as a component of its Monopoly Millennium games. There is no evidence that the accused dice led to the commercial success of the Millennium Edition or Avon Special.[76] And, there was no change in price on Monopoly Millennium games sold with the replacement dice. Hasbro sold more than 670,000 of those games with replacement dice. The Monopoly brand has been around a long time, and continues to have very strong brand-awareness. It also continues to be one of the most popular board games in the world, with over 200 million copies sold worldwide.

47. In 1999, Crystal Caste was a startup, and it was still developing its "crystal dice" products. It has sold its "crystal dice" to distributors and retail customers that target adventure game players, such as D&D and other RPGs players. Crystal Caste does not sell its "crystal dice" as components in other products, including games. Any royalties received from Hasbro in this

[75] Hirtle Deposition, pp. 31-2.
[76] Exhibit H is a summary of the component and their features for the regular Monopoly, the Millennium Edition, and the Avon Special.

hypothetical negotiation would be incremental revenues to Crystal Caste's "crystal dice" sales. In short, an license agreement with Hasbro would also provide additional exposure for the startup company, and potentially more sales.

***Factor 9: The utility and advantages of the patented property over the old modes or devices, if any, that had been used for working out similar results.***

48. The "old modes" were cubic dice, and they were available to Hasbro in August 1999. In fact, Hasbro actually replaced the accused dice with non-infringing cubic dice in its Monopoly games in 1999. Given the availability of standard dice, Ms. Echlin noted that Hasbro may have "used a standard cubic dice considering all of the other premium components that were already in the product [Monopoly Millennium games]."[77] Mr. Hirtle also noted that "keeping the dice in the game was more a matter of the cost involved in taking the dice out...having these dice in the game was not particularly important to the overall property."[78]

49. As Hasbro began development of the Millennium Edition, it looked at alternatives to its regular white cubic dice with the black pips. As noted above, an early option considered was an electronic randomizer.[79] The electronic randomizer was not included in the Millennium Edition because of costing issues.[80]

50. Ms. Sefchick was the designer of Hasbro's accused dice that were ultimately manufactured and used in the Millennium Edition and Avon Special.[81] In an internal Hasbro email, dated August 4, 1999, Ms. Sefchick raised the issue of whether patent protection was being sought on the die shape (HA000321). The response she received was that Hasbro "did not see anything protectable," and that since the dice are "ancillary [sic] to the game we are marketing," they

[77] Echlin Deposition, p. 48.
[78] Hirtle Deposition, p. 12.
[79] Deposition of Eileen Sefchick ("Sefchick Deposition"), p.11.
[80] Sefchick Deposition, p.12.
[81] Sefchick Deposition, pp. 14-16.

were not sure "the expense would be warranted" (HA000321). In the end, Hasbro did not seek patent protection on the die shape.[82]

51. Once Hasbro became aware of the '197 patent in late summer or fall of 1999, Mr. Hirtle attempted to contact Mr. Bowling. Hasbro attempted to acquire a license to the '197 patent.[83] Ultimately an agreement between the parties could not be reached and Hasbro immediately began steps to remove the accused dice from its Monopoly Millennium games (HA000329-31, HA000337-8).

52. On October 28, 1999, Mr. Hirtle sent an email stating that since Hasbro has been unable to reach an agreement with the inventor, Hasbro will stop using the dice to avoid any risk (HA000329). He also noted, "Please take whatever steps are necessary in eliminating this die from the product and promotional materials" (HA000329). The next day Tim Haskins, a Hasbro cost engineer, sent an email to start using the new dice, which were going to be part number 7594094203 (HA000330). A November 1, 1999 email from Tim Haskins noted that Hasbro had "150,000 dice sets in-stock and 120,000 scheduled to ship from the orient mid Nov" (HA000331). On November 5, 1999, the 150,000 dice sets in-stock was apparently revised to 175,000 dice sets (HA000302). The A.S.A.P. Specification Change Notice was issued on November 2, 1999 (HA000337-8).

53. Hasbro immediately began using the interim replacement dice it had in inventory, which were black cubic dice with white pips (HA000302). The first shipment of its permanent replacement dice were ordered on November 4, 1999, and were received on November 22nd and 29th (HA000443). Hasbro's permanent replacement dice were amber cubic dice with glitter and inlaid black pips, and they were made from the same material as the accused dice.

54. When Hasbro actually decided to make the switch in 1999, it was

[82] Sefchick Deposition, p. 22.
[83] Hirtle Deposition, pp. 35-36. Hasbro did not believe it was infringing the '197 patent, but wanted to avoid the potential of any possible claim.

able to start producing its Monopoly Millennium games with its amber replacement dice within one month. And, during that month, Hasbro was able to use the black cubic dice it had in stock. Hasbro paid $0.124 per pair for its amber replacement dice, which was comparable to the $0.115 per pair it paid for the accused dice.

55. After Hasbro began shipping the Millennium Edition with the interim replacement black dice, it received some complaints regarding the lack of the accused dice (HA006641-89). Doreen Mars, Hasbro's Director of Consumer Affairs, testified that the level of complaints regarding the interim replacement dice was not excessive, and that she was aware of other products with similar complaint levels.[84] She also mentioned that based on her experience, when customers are extremely unhappy with something, the calls get elevated to "the person in charge," and she did not recall this ever occurring with Monopoly Millennium games.[85] In fact, a review of the complaint calls regarding the replacement dice show 818 complaints about the Millennium Edition from November 1, 1999 through December 31, 1999.[86] This was a small number compared to the number of Millennium Edition games sold without the accused dice.

56. In sum, Hasbro had non-infringing alternative dice that were commercially acceptable and available to it in August 1999. In fact, it actually used those alternative cubic dice in Millennium Edition and Avon Special games. The replacement dice used by Hasbro were commercially acceptable, as evidenced by the more than 670,000 games sold with those dice, and the relatively small number of complaints received by Hasbro.

57. Hasbro estimated that it spent approximately $63,000 to switch from the accused dice to non-infringing replacement dice in November 1999.[87]

[84] Deposition of Doreen Mars ("Mars Deposition"), January 17, 2006, pp. 10-1.
[85] Mars Deposition, p. 19.
[86] HA006641-89. Ms. Mars believed that this listing of complaints captured more than 90% of the total dice related complaints about the Monopoly Millennium games (Mars Deposition, p. 27).
[87] A breakdown of Hasbro's approximately $63,000 replacement cost is provided in Exhibit I.

At the hypothetical in August 1999, Hasbro would have known it could switch to alternative cubic dice that would be commercially acceptable. Based on its cost of switching in November 1999, a cost of switching in August 1999 has been estimated. Hasbro's cost to switch to its alternative dice in August 1999 was estimated to be $145,880. The cost increased from approximately $63,000 to $145,880, because more games had to be re-labeled and more replacement dice had to be purchased.

58. As shown in Table 5 below, that cost estimate includes the following cost components: (1) the revised sleeves and instruction manuals, (2) new pressure sensitive labels, (3) labor for applying those new pressure sensitive labels, (4) revised advertising and (5) purchase of additional replacement dice. Hasbro believes that these are the major cost components it incurred in 1999, when it actually removed the accused dice from its Monopoly Millennium games.

**TABLE 5**
**HASBRO'S ESTIMATED COST TO REMOVE THE ACCUSED DICE (A.S.A.P ORDER)**

| Change Factor | Estimated Costs in August 1999 |
|---|---|
| Estimated Cost to Redo Sleeve and Instructions | $ 7,000 |
| Pressure Sensitive Label for Sleeve | $ 5,568 |
| Labor For Pressure Sensitive Label Placement | $ 45,197 |
| Advertising Expense to Edit Commercial | $ 26,000 |
| Cost of Replacement Dice | $ 62,115 |
| **Estimated Costs to Remove Accused Dice** | **$ 145,880** |

Source: Exhibit I

***Factor 10: The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.***

59. The patented invention is a crystal shaped dice. The patented dice perform the same functions as traditional cubic dice.

60. Mr. Bowling has been selling "crystal dice" since 1998, primarily to adventure game players, such as D&D players. He has not licensed any third

parties or included his dice with other products, such as in board games.

61. Mr. Bowling testified that his "crystal dice" price to his customers has always been $0.64. However, Crystal Caste invoices show that in 1999, it was regularly selling its "crystal dice" for $0.495 or $0.645 with a 25 percent distributor discount, which was $0.484 (see for example, B03199 and B03229). According to other 1999 invoices, Crystal Caste sold its 6-sided "crystal dice" for as low as $0.194 to King Cards in Germany, and to Yellow Submarine USA in California for $0.355 (B03196 and B03185). It is quite clear from its invoices in 1999 that Crystal Caste's pricing policy included selling its "crystal dice" to customers at prices substantially lower than $0.645, and it often discounted (up to 25 percent) off of that $0.645 price.

***Factor 11: The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.***

62. I have assumed that the accused dice originally used in Hasbro's Millennium Edition and Avon Special use the invention covered in the '197 patent. As discussed above, Hasbro removed the accused dice from those games in 1999, the same year those products were introduced. In fact, it sold more than 670,000 Monopoly Millennium games with its non-infringing replacement dice.

***Factor 12: The portion of the profits or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.***

63. According to industry literature standard licensing royalties and practices exist in the toy and game industry. The book entitled Inside Santa's Workshop: How Toy Inventors Develop, Sell, and Cash In on Their Ideas states, "The standard royalty for toys and games is 5 percent of the item's net wholesale

price."[88] This book goes onto describe the standard practice of reducing the royalty paid to the inventor if the invention is combined with a licensed entertainment property.[89] One industry participant commented, "If a license is involved, it is generally expected that I take a third-party royalty of 3 percent. If there is no other royalty-bearing license, I can expect a more normal deal."[90]

64. These industry standards for toy and game concept licenses have been in place and practiced for decades.[91] In most circumstances, the toy/game company has the leverage in the license negotiations with inventors. As noted in the Toy and Game Inventor's Handbook, "Executives set parameters like advances, royalties, and guarantees."[92] In general, the larger the company the more negotiating leverage it has: "Eighty percent of the sales volume is done by 20 percent of the companies. The best placement for an inventor is with companies that are the biggest and most financially sound."[93] Another factor in these negotiations is the number of inventor submission these large companies review every year compared to the number they actually end up licensing. For example, Hasbro Games reviews 1,600 outside concepts annually, but ultimately licenses only 30 concepts, and, Mattel, Inc. reviews 3,000 outside concepts annually, but licenses only 50 concepts.[94]

---

[88] Levy, Richard C. and Ronald O. Weingartner, Inside Santa's Workshop: How Toy Inventors Develop, Sell, and Cash In on Their Ideas ("Inside Santa's Workshop"), Henry Holt and Company 1990, p. 200.
[89] Inside Santa's Workshop, p.162
[90] Toy and Game Inventor's Handbook, p. 299.
[91] This evidenced by Inside Santa's Workshop (1990) and Toy and Game Inventor's Handbook (2003) as well as Hasbro own produced agreements. (Also see "Let's Make a Deal" by Richard C. Levy and Ronald O. Weingartner, 2003.)
[92] Toy and Game Inventor's Handbook, p. 239.
[93] Inside Santa's Workshop, p.111.
[94] Toy and Game Inventor's Handbook, pp. 433 and 436. Hasbro Toy Group also reviews an additional 3,000 outside concepts annually and licenses only 30 to 35. (Toy and Game Inventor's Handbook, pp. 433-434.)

***Factor 13: The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risk, or significant features or improvements added by the infringer.***

65. As discussed above, Monopoly is a very strong brand, and one of the most popular games in the world. I have seen no evidence that the accused dice contributed to the success of the Monopoly Millennium games, especially the Avon Special, which did not even reference or depict the accused dice anywhere on the box. On the Millennium Edition box, the accused dice are not treated any more prominently than the traditional cubic dice on the standard Monopoly games. Because of the strong Monopoly brand and history, the gross margins on Monopoly Millennium games were estimated in 1999 to be 47 percent for Millennium Edition and 36 percent for Avon Special (HA008112 and HA008116). I have seen no evidence that the accused dice contributed to these gross margins for Monopoly Millennium games.

66. As discussed above, the accused dice are one of several components in Monopoly Millennium games. Mr. Hirtle stated that a rule of thumb for looking at a component of a game was to calculate the added value of the component. He calculated the "added value of the dice" by taking the cost to manufacture the dice as a percentage of the total cost of the product. In this case the dice cost approximately $0.115 and the transfer cost to make the Millennium Edition was $12.276, the added value of the dice equal one percent (HA008120-51, HA000443 and HA008112). Then applying five percent of the one percent added value of the dice to the Millennium Edition net sales price of $25.08 equals a royalty of $0.012 per game.[95] That is a royalty of a little over a penny per game. Mr. Hirtle also stated that he thought his offer of $0.08 per game was "extremely generous," because it was "about eight times" the royalty he would have offered under this added value method.[96]

[95] This calculation is shown in Exhibit J.
[96] Hirtle Deposition, pp. 38-39.

***Factor 14: The opinion testimony of qualified experts.***

67. I have not relied on the opinion of other qualified experts in forming my damages opinions in this matter.

***Factor 15: The amount that a licensor (such as a patentee) and a licensee (such as the infringer) would have agreed upon (at the time infringement began) if both had been reasonable and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee – who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention – would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.***

68. As noted above, the hypothetical negotiation between Mr. Bowling and Hasbro would have occurred in August 1999, before the infringement began. The hypothetical negotiation analysis assumes that both parties would be "willing" and "prudent," and that a license agreement would result from this negotiation.

69. In the hypothetical negotiation, Mr. Bowling would have made the following points. First, the '197 patent was valid and infringed by the accused dice that Hasbro had been using in its Millennium Edition since May 1999 and its Avon Special since July 1999. Second, Hasbro was looking for some different dice to use in its premium priced Millennium Edition, and needed his "crystal dice" to complete its "futuristic" look. Third, his company, Crystal Caste, had sold these 6-sided "crystal dice" individually for between $0.194 and $0.645.

70. Mr. Bowling would recognize that there would be no manufacturing or sales risk or costs incurred on his part as these royalties would have been incremental revenues to his Crystal Caste business. And, he would know that Hasbro could remove its accused dice from of its Monopoly Millennium games.

In that case, he would not get any royalties revenues, or the exposure that a license agreement with Hasbro would provide Crystal Caste and his "crystal dice."

71. Hasbro would counter with the following points. First, the Monopoly brand continues to have very high brand awareness and be very popular throughout the world. Second, while the accused dice may fit the theme of the Millennium Edition, they did not generate sales or increase commercial demand for the Monopoly Millennium games. In fact, the accused dice are not even referenced on the Avon Special. Third, Hasbro pays a three percent royalty for the Monopoly game concept, and the dice are only one component of the game. Fourth, Hasbro could remove the accused dice from the Monopoly Millennium games and use non-infringing alternative cubic dice that were commercially acceptable, and also fit the theme of game. The cost to remove the accused dice was estimated to be $145,880, and that would work out to $0.15 per pair of dice, based on approximately 985,000 additional units Hasbro expected to use the accused dice in over its 2 to 3 year product life.[97]

72. Hasbro would also note that it believed the added value of the accused dice to the Monopoly Millennium games was approximately a penny per pair of dice. However, it would also realize that it was already manufacturing and distributing games with the accused dice in them. As Mr. Hirtle noted, "keeping the dice in the game was more a matter of the cost involved in taking the dice out...having the dice in the game was not particularly important to the overall property."[98] Finally, Hasbro would note that given the number of games it manufactured and distributed that use dice as components, there was a potential for Hasbro to use its accused dice in other games, which would mean more

[97] The 985,000 of additional units were estimated by combining the 1999 sales forecasts for Millennium Edition and Avon Special, assuming a two year product life, and subtracting out the 175,172 units Hasbro sold prior to August 17, 1999 (HA008112 and HA008116). This may understate expected additional sales if the product was expected to have a 3-year life. This estimate may also be conservative to the extent that it understates Hasbro's expected additional sales in August 1999. Hasbro sold over 1.4 million Monopoly Millennium games between 1999 and 2002.

[98] Hirtle Deposition, p. 12.

royalty revenues for Mr. Bowling.

73. The cost of an acceptable non-infringing alternative can cap a royalty that a "prudent" licensee will be willing to pay.[99] Hasbro's availability of alternative cubic dice to use in its Monopoly Millennium games would cap the total royalty that it would be willing to pay to Mr. Bowling at $0.15 per pair. For all of the reasons discussed above, it is my opinion that Mr. Bowling and Hasbro would have agreed to a reasonable royalty rate of $0.15 per pair of dice.

## VI. ROYALTY DAMAGES AND PREJUDGMENT INTEREST

74. Royalties were calculated by applying my royalty rate of $0.15 per pair of dice to the royalty sales base of accused dice sets in two scenarios. The first scenario calculated the royalty sales base of accused dice since August 17, 1999, which was 556,828, and resulted in royalties of $83,524.[100] Alternatively, the second scenario calculated the royalty sales base of accused dice since November 3, 1999, which was 228,049, and resulted in royalties of $34,207.[101] I am informed that 12 percent is the appropriate interest rate to use to calculate prejudgment interest. Total royalty damages with interest are $175,876 in scenario I, and $71,071 in scenario II.

## VII.COM MENTS ON THE LAPIDUS REPORT

75. Mr. Lapidus issued the Expert Report on Damages of Neil N. Lapidus, CPA ("Lapidus Report") on February 22, 2006.[102] In his report, Mr. Lapidus opines on a royalty rate of $0.5825 per die or $1.16 per pair, which

[99] Regarding the availability of non-infringing alternatives: "the maximum royalty which would normally be acceptable to a licensee is one that is equal to the cost of the next best available alternative...if the licensee finds that several viable alternatives are available at relatively low cost, he will consider the intellectual property to be of limited value worth and will not offer a high royalty" (Finnegan & Mintz, "Determination of a Reasonable Royalty In Negotiating a License Agreement: Practical Pricing For Successful Technology Transfer," Licensing Law and Business Report, (June-July 1978).

[100] Exhibit J.

[101] Exhibit K.

equates to a 4.22 percent royalty on the Millennium Edition and an 11.92 percent royalty on the Avon Special.[103] Utilizing this royalty he determines damages due to Mr. Bowling are $648,705. Adding prejudgment interest at a rate of 12% total damages with interest are $1,340,050.[104] Mr. Lapidus royalty damages analysis is flawed, and substantially overstates damages. Following is my discussion on the flaws in Mr. Lapidus' analysis.

76. Mr. Lapidus' analysis misused available licensing information. As discussed above, the industry practice is to start at 5% of net sales for toy or game concepts.[105] Information also shows these rates for toy or game concepts are normally reduced, when licensing a strong brand or entertainment licensed property.[106] Mr. Hirtle noted that royalty rates for game concepts dealing with strong brands such as Monopoly are reduced to 3 percent. However, Mr. Lapidus fails to acknowledge this standard or consider it when calculating royalties for a component of a game. In fact, his royalty for the dice, which are "one of a number of features incorporated into the game" was 4.22 percent and 11.92 percent for Millennium Edition and Avon Special, respectively. Those rates for a component exceed the three percent rate for a game concept in both cases. In the case of Avon Special, his rate is almost four times greater than the Monopoly game concept rate.[107] Considering Monopoly is one of the oldest, most famous and successful game concepts in the world, this is clearly unreasonable.

77. Second, he misused the available licensing information related to Hasbro's own past licensing practices. His review of the Hasbro agreements result in his making two main conclusions: (1) "the rates Hasbro has paid are

---

[102] Expert Report on Damages of Neil N. Lapidus, CPA ("Lapidus Report"), February 22, 2006.
[103] Lapidus Report, p. 15.
[104] Lapidus Report, p. 15.
[105] Inside Santa's Workshop, p. 200. After review of the supporting Hasbro Monopoly Millennium game sales data, there were some issues observed with some of the average prices in Mr. Lapidus' tables. Apparently there was some incorrect pallet pricing for some of the sales, which overstated his Millennium Edition net sales revenues. Therefore, his adjusted royalty as a percent of net sales should be 4.39 percent.
[106] Inside Santa's Workshop, p. 162 and Toy and Game Inventor's Handbook, p. 299.

between 1-8% of net sales," and (2) "over twenty license agreements provided by Hasbro had royalty payments of 5% or higher."[108] His review of these agreements is overly broad and ignored the fact that these agreements were for toy and game concepts. The one agreement with an 8% royalty is not paying 8% on standard net sales, but on net sales of F.O.B. sales or Letter of Credit sales.[109] F.O.B. sales are freight on board sales, which are generally set purchase plans whereby the trade can pick up product at its foreign point of manufacture for a lower price than in the United States.[110] Therefore, with a lower price and a lower royalty base, a slightly higher royalty on this type of sales is not equivalent to 8% of typical net sales.

78. Mr. Lapidus' third misuse of licensing information occurs in his review of other comparable license agreements for the Phase 10 Dice game and Magic, a card game by Wizards of the Coast.[111] These licenses provide for royalties of 5% of net sales and between 2% to 7% of sales, but are once again on whole game concepts.[112] The information provided on these licenses, when reviewed, is consistent with the industry standard; however, they are not comparable to the hypothetical license, as this license is for one component of an established and successful board game brand.

79. In his Report, Mr. Lapidus acknowledges that Hasbro had the alternative of "discontinuing use of the accused die, replacing the die in existing inventory, changing its packaging, and changing its advertising."[113] He even acknowledged Hasbro's estimate of these cost of $70,000.[114] However, his analysis ignored any impact of that commercially acceptable alternative dice that were available in 1999. That is, that the cost of this alternative would cap the

---

[107] Lapidus Report, pp.10 and 15.
[108] Lapidus Report, p. 8.
[109] HA007209-14.
[110] Toy and Game Inventor's Handbook, p. 454.
[111] Lapidus Report, pp. 13-14.
[112] Lapidus Report, pp. 13-14.
[113] Lapidus Report, p. 7.
[114] Lapidus Report, p. 7.

amount that Hasbro is willing to pay to license the '197 Patent.[115] Even though he noted it in his report that such an alternative was available at the time of hypothetical negotiation in 1999.[116]

80. Mr. Lapidus also inappropriately characterizes the importance of the accused dice to the whole of the game. He opines that the dice were "one of a number of features incorporated into the game that were designed to command a high selling price for the game."[117] However, he fails to acknowledge the most important aspect and selling feature of the game - the Monopoly brand. The owners of the Monopoly game concept were only receiving a royalty rate of 3% of net sales, yet Mr. Lapidus fails to make this comparison, which would clearly show his royalty rates of 4.22% and 11.92% are unreasonable. Mr. Lapidus also overstates the dice's display on the Millennium Edition box.[118] Hasbro has a history of displaying the dice on Monopoly board covers. He also fails to acknowledge that the Avon Special Edition prominently displays traditional white dice on the front of the box, the instruction booklet, and the game board and, in fact, nowhere are the accused dice pictured in this edition of the game.

81. Another assumption he makes is that the commercial relationship between Mr. Bowling and Hasbro would be of a supplier and a customer. Hasbro would never have purchased its dice from Bowling for two main reasons: (1) costs- Hasbro purchased the accused dice from one of its normal suppliers for less than 10% of Bowling wholesale price and (2) Hasbro had an established supply arrangement for its accused dice. I have seen no evidence to suggest that Mr. Bowling and Hasbro would have had this type of relationship and not one of an inventor and a promoter.

82. Another unsupported statement in the Lapidus Report is that the

---

[115] Finnegan & Mintz, "Determination of a Reasonable Royalty In Negotiating a License Agreement: Practical Pricing For Successful Technology Transfer," Licensing Law and Business Report, (June-July 1978).
[116] Lapidus Report, p. 7.
[117] Lapidus Report, p. 10.
[118] The dice are picture on the back of the acetate sleeve. Lapidus Report, p. 10.

patented dice are important drivers of non-patented items.[119] First, this statement is supported only by an interview with Mr. Bowling.[120] That does not appear to be supported by any financial data. Second, this statement is unrelated to the inclusion of the accused dice in the Millennium Edition and the Avon Special, where there is no evidence that the dice drove sales of the product. In fact, since the Avon Edition had no markings of the accused dice, but instead was marked with traditional dice, thus, the sales of the Avon Special Edition were not driven by the accused dice.

83. As a result of these flaws in his analysis and unsupported assumptions asserted by Mr. Lapidus, his royalty rate is unreasonable and his damages are overstated.

April 24, 2006
Date

Barry Sussman

[119] Lapidus Report, p. 10.
[120] Lapidus Report, p. 10.

Huron CONSULTING GROUP



**Barry Sussman**

Managing Director

bsussman@huronconsultinggroup.com

Boston
P 617-226-5520
F 617-226-5555
99 High Street, 15th Floor
Boston, MA 02110

New York
P 646-277-8809
F 212-785-1313
1301 Avenue of the Americas, 6th Floor
New York, NY 10019

**Curriculum Vitae**

Barry is a Managing Director at Huron Consulting Group. He has 17 years of accounting, financial, and business experience.

Professional experience

*Intellectual Property Experience*

- Testified as an expert in numerous trials and depositions.
- Performed all aspects of intellectual property damage analyses including lost sales, lost profits, reasonable royalty, market assessments, capacity, incremental costs, product line profitability, valuation, price erosion, convoyed sales, lost royalties, unjust enrichment, and prejudgment interest for both plaintiffs and defendants.
- Assisted counsel throughout litigation processes including analyzing issues and developing damage analysis strategies, preparing interrogatories and document requests, preparing expert reports, analyzing opposing expert reports, developing questions for depositions of a variety of personnel including, financial, marketing, industry, manufacturing and opposing experts, formulating trial strategy, and preparing demonstratives.
    - Cases involved patent, trademark, trade dress and trade secret infringement, false advertising/unfair competition, and royalty disputes.
    - Industries include apparel, biotechnology, bottling, chemicals, computer hardware and software, consumer products, electronics, filtration/water purification, medical products, pharmaceuticals, security, and telecommunications.
- Conducted numerous reviews of license agreements to ascertain compliance with payment terms.
- Consulted with a variety of companies regarding licensing strategy and appropriate royalty rates.
- Participated in the valuation of a variety of intangible assets.

*Financial Consulting Experience*

- Retained as an expert on a variety of non-intellectual property business disputes. Provided expert testimony in a wide variety of venues including Federal Court, State Court, Bankruptcy Court, and arbitration. Disputes included breach of contract, fraud, post-acquisition, and contractual interference.
- Served as the sole arbitrator in post-acquisition disputes.
- Performed business valuations of closely held companies for business planning or regulatory (ESOP) purposes.
- Performed investigations of financial and accounting fraud for large corporations.
- Created financial models on behalf of organizations for use in a variety of circumstances, including general business planning, acquisition due diligence, and troubled debt restructuring.

Testimony experience

- Brooks Automation, Inc. v. BlueShift Technologies, Inc. and Peter van der Meulen, (BLS05-03973), Suffolk Superior Court, Commonwealth of Massachusetts – Deposition and Trial (Jury) (2005).
- CipherTrust, Inc. v. Trusecure Corporation, et al, (CV 1232), U.S. District Court, Eastern District of Virginia – Deposition (2005).
- Advanced Technology Center, Inc., v. Synopsys, Inc., (CV812494), Superior Court of the State of California for the County of Santa Clara – Trial (Bench) (2004).
- Petra Krauledat, et. al., v. Harvard Bioscience, Inc., JAMS Arbitration – Hearing (2003).
- OrthoRehab, Inc. and OrthoMotion, Inc., v. OrthoLogic Corporation and OrthoLogic Canada, Ltd., (01C-11-224 WCC), Superior Court of the State of Delaware – Deposition (2003).

Huron
CONSULTING GROUP

- Maui Jim Northeast, Inc. and Chris E. Mailng, v. Maui Jim, Inc., (00-12593 PBS), U.S. District Court, District of Massachusetts – Deposition (2003).
- Ecolochem, Inc., v. Southern California Edison Company, (92 3436 AHM), U.S. District Court, Central District of California – Deposition and Trial (Bench)(2002).
- Heimann Systems GmbH v. American Science and Engineering, Inc. (00CV10276), U. S. District Court, District of Massachusetts – Deposition (2001).
- Inverness Medical Technology, Inc. v. NOVA Biomedical Corp., American Arbitration Association – Deposition and Hearing (2001).
- ACT Manufacturing, Inc. v. 3Com Corporation (CV10731), U.S. District Court, District of Massachusetts – Deposition (2001).
- Cache, Inc. v. M.Z. Berger & Co., Inc., et. al. (99CV12320), U.S. District Court, Southern District of New York – Deposition (2001).
- Weather Specialty Underwriters, LLC v. American Specialty Underwriters LLC, et. al. (ESCV1998-01470), Essex Superior Court, Commonwealth of Massachusetts – Deposition (2000).
- RealWorld Corporation v. William Mann, et. al. (SUCV1998CV670), Suffolk Superior Court, Commonwealth of Massachusetts - Deposition (2000).
- Eastern Edison Company v. Meridian Middleboro Limited Partnership, et. al., Suffolk Superior Court, Commonwealth of Massachusetts – Trial (Bench) (2000)
- BF Acquisition, Inc., et. al., v. Avon Corrugated Corp., et. al. (SUCV1996-06417), Suffolk Superior Court, Commonwealth of Massachusetts - Deposition (1998).
- Pragmatech v. Silknet Software, Inc., Arbitration – Hearing (1997).
- In re: Marketechs, Inc. David Nickless, Trustee v. Robert Felge, et. al. (96-44155), U.S. Bankruptcy Court, Western District of Massachusetts – Trial (Bench)(1997).
- Continental X-Ray Corporation v. XRE Corporation, (93CV03522), – U.S. District Court, Northern District of Illinois – Deposition and Trial (Jury)(1996).
- Value Line, Inc. v. IBC USA (Publications), Inc., (95CV02266), U.S. District Court, Southern District of New York – Trial (Bench)(1995).

Education & certification

- Bachelor of Science, Accounting, Lehigh University
- Certified Public Accountant, New York and Massachusetts

Professional associations

- Member, American Institute of Certified Public Accountants
- Member, Massachusetts Society of Certified Public Accounts
- Member, Licensing Executives Society
- Member, Intellectual Property Owners Association
- Associate Member, American Bar Association
- Associate Member, Boston Bar Association

Speaking engagements

- "Panel Discussion: Use of Experts in Litigation", *Bingham McCutchen LLP: Associate training program,* December 2004.
- ABA Intellectual Property Litigation Roundtable, Boston Host, Fall 2004 and ongoing.
- "Getting the Data for a Defensible Damages Study", *Law Seminars International: Calculating & Proving Patent Damages,* September 2004.
- "Damages in Patent Infringement Cases" Boston University Intellectual Property Trial Advocacy program, guest lecturer, March 2004 and 2005.
- "Damages in Patent Infringement Cases" Franklin Pierce Law Center, July 2005.
- "Valuation: How Much is the Gold Worth", *Law Seminars Institute: Mining Your Patent Portfolio,* October 2005

Publications

- "Accountants' Role in Litigation: Accounting Litigation", MCLE Program Materials, 1998.
- "With Legal Costs Mounting Companies Mull Own Counsel", Banker & Tradesman, July 28, 1997.
- "A Statistical Study of Reported Patent Damages Decisions", American Bar Association Patent, Trademark and Copyright Law: Litigation and Corporate Practice Program Materials, April 1995.

## EXHIBIT B

## MATERIALS REVIEWED AND RELIED UPON IN PREPARATION OF THIS REPORT

### Documents

All documents cited in the text, footnotes, and exhibits of this report.

### Pleadings

Complaint
Answer and Counterclaim
Plaintiff's Answers to Hasbro Inc.'s First Set of Interrogatories
Hasbro's Objections and Responses to Plaintiff's First Set of Interrogatories
Hasbro's Amended Objections and Responses to Plaintiff's First Set of Interrogatories
Hasbro's Objections and Responses to Plaintiff's Second Set of Interrogatories
Hasbro's Objections and Responses to Plaintiff's Third Set of Interrogatories
Hasbro's Amended Objections and Responses to Plaintiff's First Set of Interrogatories, Interrogatory No. 4.
Hasbro's Amended Objections and Responses to Plaintiff's First Set of Interrogatories, Interrogatory No. 2.
Plaintiff's Answers to Hasbro, Inc's Second Set of Interrogatories
Hasbro's Objections and Responses to Plaintiff's Fourth Set of Interrogatories
Hasbro's Objections and Responses to Plaintiff's First Set of Requests for Admission to Hasbro, Inc.
Hasbro's Objections to Plaintiff's Second Set of Requests for Admission to Hasbro, Inc.
Hasbro's Objections and Responses to Plaintiff's Third Set of Requests for Admission to Hasbro, Inc.
Hasbro's Objections and Responses to Plaintiff's Fourth Set of Requests for Admission to Hasbro, Inc.

### Bates Numbered Documents Reviewed

Documents/Items Produced By Hasbro:

- HA000001-000967
- HA001310-008305
- HA008334-008403
- Monopoly Millennium Edition and Monpoly-2000 Avon Special Edition

Documents Produced By Mr. Bowling:

- B00001-02474
- B02475-02819
- B03097-03341

# EXHIBIT B

## Depositions (and Exhibits)

| | |
|---|---|
| Deposition of Michael Bowling, | January 16, 2006 |
| Deposition of Michael Hirtle, | January 17, 2006 |
| Deposition of Dorothy Echlin, | January 17, 2006 |
| Deposition of Doreen Mars, | January 17, 2006 |
| Deposition of Kurt Benson, | January 17, 2006 |
| Deposition of Eileen Sefchick, | March 6, 2006 |

## Websites

www.hasbro.com
www.monopoly.com
www.walmart.com
www.crystalcaste.com
www.avoncompany.com

## Other

The Toy and Game Inventor's Handbook: Everything You Need to Know to Pitch, License, and Cash-In on your Ideas. Alpha Books. 2003. *Richard C.* Levy *and Ronald O. Weingartner.*

Inside Santa's Workshop: How Toy Inventors Develop, Sell, and Cash In on Their Ideas. Henry Holt and Company 1990. *Richard C.* Levy *and Ronald O. Weingartner.*

"Let's Make a Deal" by Richard C. Levy and Ronald O. Weingartner, 2003

**EXHIBIT C**




*Source:*
www.walmart.com

**Michael Bowling v. Hasbro, Inc.** Exhibit D

**Monopoly Millennium Game Unit Sales**
**(000)**

| | 1999 | 2000 | 2001 | 2002 | | TOTAL |
|---|---|---|---|---|---|---|
| Monopoly Millennium [1] | 601.0 | 239.2 | 105.8 | 4.2 | | **950.2** |
| Avon Special [2] | 281.5 | 179.1 | (3.3) | - | | **457.3** |
| **Total** [3] | **882.6** | **418.3** | **102.5** | **4.2** | | **1,407.6** |
| | | | | | $ | 676 |

*Notes:*

[1] Material #s for Monopoly Millennium are 409420000, 409420001, 409420400, 409420480, 409420920, 409421020, 402530450, 402530451, 413640000, and 413780000.

[2] The Material # for Monopoly 2000- Avon Special is 412950000.

[3] The source for all Monopoly game sales is a document entitled "Monopoly Millennium Shipments Summary 1999 thru 2002" at bates HA008040.

**Michael Bowling v. Hasbro, Inc.** **Exhibit E**

## Hasbro Dice Purchases (Units- Pairs) For Monopoly Millennium Games (000)

| | 1999 | 2000 | 2001 | TOTAL |
|---|---|---|---|---|
| Accused Dice [1] | 732.0 | - | - | **732.0** |
| Replacement Dice [2][3] | 300.0 | 287.3 | 13.0 | **600.3** |
| **Total** [4][5] | **1,032.0** | **287.3** | **13.0** | **1,332.3** |

*Notes:*

[1] Product number for the accused dice is 7594094202.

[2] Product number for the replacement dice is 7594094203.

[3] The Specification Change to go to a new die was written on 11/2/99. The first order for that new die was placed on 11/4/99.

[4] The source for all Monopoly dice purchases is a document entitled "Monopoly Millennium 1999-2001" at bates HA000444.

[5] Source does not include dice from stock that Hasbro used immediately after change order was issued (maximum of 175,000 pairs). See HA000302.

**Michael Bowling v. Hasbro, Inc.** **Exhibit F**

**SCENARIO 1: ROYALTY SALES BASE OF ACCUSED DICE**

| | Royalty Sales Base (Units- Pairs) [1] | | |
|---|---|---|---|
| | Millennium Edition | Avon Special | Total |
| August 1999 [2] | 50,372 | 4,224 | **54,596** |
| September 1999 | 171,527 | - | **171,527** |
| October 1999 | 81,628 | 9,504 | **91,132** |
| November 1999 | 53,036 | 56,028 | **109,064** |
| December 1999 | 27,421 | 103,088 | **130,509** |
| **Total** [3] | **383,984** | **172,844** | **556,828** |

*Notes:*

[1] Huron has assumed Mr. Lapidus' analysis of Units sold during the damage period from August 17, 1999 until the last of the purchased accused dice had been sold.

[2] Scenario 1 assumes damages start on August 17, 1999, which is the date the '197 patent issued. August sales are the 17th through the 31st.

[3] Verification of these sales has been performed and the source of the data is the "Monopoly Millennium Summary 1999 thru 2002", HA008040-8108

**Michael Bowling v. Hasbro, Inc.** **Exhibit G**

**SCENARIO 2: ROYALTY SALES BASE ACCUSED DICE**

| | Royalty Sales Base (Units- Pairs) [1] | | |
|---|---|---|---|
| | **Millennium Edition** | **Avon Special** | **Total** |
| November 1999 [2] | 42,568 | 54,972 | **97,540** |
| December 1999 | 27,421 | 103,088 | **130,509** |
| **Total** [3] | **69,989** | **158,060** | **228,049** |

[1] Huron has assumed Mr. Lapidus' analysis of Units sold during the damage period from November 3, 1999 until the last of the purchased accused dice had been sold.

[2] Scenario 2 assumes damages start on November 3, 1999, which is the date Mr. Bowling notified Hasbro of its infringement. November sales are the 3rd through the 30th.

[3] Verification of these sales has been performed and the source of the data is the "Monopoly Millennium Summary 1999 thru 2002", HA008040-8108.

**Michael Bowling v. Hasbro, Inc.** **Exhibit H**

**COMPARISON OF MONOPOLY GAME VERSIONS**

| Component | Original Version (#9) | Millennium Edition | Avon Special |
|---|---|---|---|
| **Box** | -Appr. 16" by 10.5" by 2"<br>-Cardboard<br>-Standard graphics | -Outer sleeve made of acetate with color graphics and game description on backside<br>-Appr. 10.5" by 10.5" by 3.25"<br>-Embossed designed tin box | -Appr. 10.5" by 10.5" by 3.25"<br>-Cardboard<br>-Redesigned graphics |
| **Game Board** | -Standard paper overlay<br>-Standard text font<br>-Light blue backing | -Silver foil, holographic overlay<br>-Contemporary text font<br>-Shiny black backing with silver lettering for the edition | -Standard paper overlay<br>-Standard text font<br>-Different graphics and properties (properties have color pictures)<br>-Dull black backing |
| **Tokens** | -11 standard tokens | -8 redesigned collectible tokens that are larger and heavy duty | -8 redesigned collectible tokens that are larger and heavy duty |
| **Houses & Hotels** | -Standard shape & color (green & red) | -Larger redesign shape in clear colored plastic (green & red) | -Standard shape<br>-Redesigned color (gold & blue) |
| **Dice** | -6 sided dice<br>-White with black pips | -Initially: Accused dice (clear amber)<br>-Replaced: 6 sided dice (clear amber with sparkles) | -Initially: Accused dice (clear amber)<br>-Replaced: 6 sided dice (clear amber with sparkles) |
| **Deed Cards** | -Standard cards with color print on the fronts<br>-Standard text font | -Standard card with color print on the front<br>-Contemporary text font<br>-Added edition lettering in silver ink | -Standard cards with color print on the fronts<br>-Standard text font<br>-Faint graphic, color picture of property on front |
| **Chance/Community Chest Cards** | -Standard cards on color paper (orange & yellow)<br>-Standard black text and graphics | -Redesigned card backs on white paper with silver and black ink.<br>-Standard black ink and graphics<br>-Added edition lettering in silver ink | -Standard cards on color paper (orange & yellow)<br>-Standard black text and graphics<br>-Redesigned backing (colored in graphic design of game) |
| **Money** | -Standard money design on color paper (7 different colors) | -Redesigned money on clear color plasticized paper (7 different colors) | -Redesigned money design<br>-Standard color paper (7 different colors) |
| **Game Instructions** | -Small foldout on plain white paper<br>-No graphics | -Large booklet in full color with text, graphics and photographs | -Small booklet with graphic cover and some limited photographs on the inside |
| **Tray(s)** | -White tray with 5 sections | -2 black trays that are thicker than standard version<br>-Many sections (7 for money, one for deed cards, etc.) | -2 black trays that are thicker than standard version<br>-Many sections (7 for money, one for deed cards, etc.) |

Exhibit I

Michael Bowling v. Hasbro, Inc.

| HASBRO'S ESTIMATED COST TO REMOVE THE ACCUSED DICE (A.S.A.P ORDER) | | | |
|---|---|---|---|
| Change Factor | Actual Costs in November 1999 [1] | Estimated Costs in August 1999 [2] | Comment Regarding Adjustment to Estimate |
| Estimated Cost to Redo Sleeve and Instructions | $ 7,000 | $ 7,000 | No Change |
| Pressure Sensitive Label for Sleeve | $ 3,292 | $ 5,568 | Added Labels for Sales of Monopoly Millennium [3] |
| Labor For Pressure Sensitive Label Placement | $ 26,718 | $ 45,197 | Added Labor for Addition Label Placement [4] |
| Advertising Expense to Edit Commercial | $ 26,000 | $ 26,000 | No Change |
| Cost of Replacement Dice | N/A | $ 62,115 | Scrapping of Dice in Sales of Monopoly Games [5] |
| **Estimated Costs to Remove Accused Dice** | **$ 63,010** | **$ 145,880** | |

*Notes:*

[1] These cost which were estimated in Hasbro's Objections and Responses to Plaintiffs' First Set of Interrogatories (page 9) and were explained in further detail in conversations with Dorothy Echlin.

[2] Cost are adjusted to analyze any added expense of incurring the change on August 17, 1999 instead of on November 2, 1999.

[3] Dorothy Echlin, in discussions, provided the cost of $7.25 per 1,000 for the Pressure Sensitive Labels. Given that 313,995 Monopoly Millennium games sold between August 17, 1999 and November 2, 1999, the additional cost is calculate as the actual cost plus 313,995 divided by 1,000 times $7.25.

[4] Dorothy Echlin, in discussions, provided the cost of $58.85 per 1,000 for the Labor for placement of the Pressure Sensitive Labels. Given that 313,995 Monopoly Millennium games sold between August 17, 1999 and November 2, 1999, the additional cost is calculate as the actual cost plus 313,995 divided by 1,000 times $58.85.

[6] To be conservative, Huron has assumed the replacement of all accused dice purchased up until August 17, 1999 less the number of games sold with the accused dice prior to August 17, 1999 (732,000-55,500-175,172=501,328). (See Lapidus Exhibit C and HA000443.) The total accused dice purchased after August 17, 1999 are equal to 55,500. These replacement costs are estimated by utilizing the cost per pair ($0.1239 per pair) paid on the initial order in November 1999. (See HA008138). This cost was then applied to the 501,328 (pairs).

*Confidential- Subject to Protective Order*

Exhibit J

**Michael Bowling v. Hasbro, Inc.**

**SCENARIO 1: ROYALTIES AND PRE-JUDGMENT INTEREST**

**Royalty Sales Base (Pairs)** [1]

| | Millennium Edition | Avon Special | Total Games | Per Unit Royalty Per Pair [4] | Royalties [5] | Royalties & Interest [6] |
|---|---|---|---|---|---|---|
| August 1999 [2] | 50,372 | 4,224 | 54,596 | $ 0.15 | $ 8,189.40 | $ 17,598.42 |
| September 1999 | 171,527 | - | 171,527 | $ 0.15 | $ 25,729.05 | $ 54,770.15 |
| October 1999 | 81,628 | 9,504 | 91,132 | $ 0.15 | $ 13,669.80 | $ 28,825.76 |
| November 1999 | 53,036 | 56,028 | 109,064 | $ 0.15 | $ 16,359.60 | $ 34,173.53 |
| December 1999 | 27,421 | 103,088 | 130,509 | $ 0.15 | $ 19,576.35 | $ 40,508.61 |
| **Total** [3] | **383,984** | **172,844** | **556,828** | | **$ 83,524.20** | **$ 175,876.47** |

**Interest Rate** [7] 12.0%

*Notes:*

[1] Huron has assumed Mr. Lapidus' analysis of Units sold during the damage period from August 17, 1999 until the last of the purchased accused dice had been sold.

[2] Scenario 1 assumes damages start on August 17, 1999, which is the date the '197 patent issued.

[3] Verification of these sales has been performed and the source of the data is the "Monopoly Millennium Summary 1999 thru 2002", HA008040-8108

[4] Assumed Negotiated Royalty Rate

[5] Royalties are calculated as total royalty base times royalty rate.

[6] Royalties are brought calculated with interest through the end of April 2006.

[7] Interest rate is 12%, the Rhode Island Statutory Rate, compounded annually.

*Confidential- Subject to Protective Order*

Exhibit K

## Michael Bowling v. Hasbro, Inc.

### SCENARIO 2: ROYALTIES AND PRE-JUDGMENT INTEREST

**Royalty Sales Base (Pairs)** [1]

| | Millennium Edition | Avon Special | Total Games | Per Unit Royalty Per Pair [4] | Royalties [5] | Royalties & Interest [6] |
|---|---|---|---|---|---|---|
| November 1999 [2] | 42,568 | 54,972 | 97,540 | $ 0.15 | $ 14,631.00 | $ 30,562.66 |
| December 1999 | 27,421 | 103,088 | 130,509 | $ 0.15 | $ 19,576.35 | $ 40,508.61 |
| **Total** [3] | **69,989** | **158,060** | **228,049** | | **$ 34,207.35** | **$ 71,071.27** |

**Interest Rate** [7] 12.0%

*Notes:*

[1] Huron has assumed Mr. Lapidus' analysis of Units sold during the damage period from August 17, 1999 until the last of the purchased accused dice had been sold.

[2] Scenario 2 assumes damages start on November 3, 1999, which is the date Mr. Bowling notified Hasbro of its infringement.

[3] Verification of these sales has been performed and the source of the data is the "Monopoly Millennium Summary 1999 thru 2002", HA008040-8108

[4] Assumed Negotiated Royalty Rate

[5] Royalties are calculated as total royalty base times royalty rate.

[6] Royalties are brought calculated with interest through the end of April 2006.

[7] Interest rate is 12%, the Rhode Island Statutory Rate, compounded annually.

*Confidential- Subject to Protective Order*