UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| Michael Bowling,<br>A Resident of Arizona,<br><br>Plaintiff,<br><br>v.<br><br>Hasbro, Inc.,<br>A Rhode Island Corporation,<br><br>Defendant. | Civil Action No. C05-229 S<br><br>**EXPERT REPORT ON DAMAGES OF NEIL N. LAPIDUS, CPA** |

I submit this preliminary expert report on the damages suffered by the plaintiff, Michael Bowling ("Bowling"), as a result of alleged infringements of U.S. Patent No. 5,938,197 ("the '197 Patent") by defendant Hasbro, Inc. ("Hasbro").

I was retained in this lawsuit to determine the amount of damages caused by the alleged infringement of the '197 Patent. Assuming the claims asserted are found to be valid and infringed, it is my opinion that the appropriate measure of damages is a reasonable royalty per infringing die sold in Hasbro's Monopoly Millennium Edition game. Including prejudgment interest, my opinion is that Michael Bowling has sustained damages of **$1,340,050**. See Exhibit C.

## I. NEIL N. LAPIDUS, CPA, EXPERT QUALIFICATIONS

I am a partner at Lurie Besikof Lapidus & Company, LLP. I specialize in the management of the Firm's most complex audit engagements, litigation services and support. I am the Firm's Administrative Partner and a member of the Firm's Partnership Committee. I joined the Firm in 1978 after four years with a national public accounting firm. During my career, I have gained substantial experience in the financial analysis of both local and multi-national companies. I am also in charge of the Litigation and Valuation Services Department of



EXHIBIT
B

Lurie Besikof Lapidus & Company, LLP and have served as an expert witness in a number of cases in evaluating damages relating to contract matters, intellectual property and relationships between companies. As a result of working with our client base, I am familiar with distribution channels and the financial aspects of licensing for a variety of industries. Additionally, I have served as an expert to the Court in financial matters and bankruptcy proceedings.

I am a graduate of the University of Minnesota with a Bachelor of Science Business Degree in Accounting. I have served as an adjunct faculty member at the University of Minnesota, local colleges, and Building Owners and Managers Association. I have taught beginning to advanced accounting and related courses in cost accounting and auditing. I received the Outstanding Teacher of the Year award from a local college and was recently awarded the Leading Edge Alliance Innovation and Leadership Award. I co-authored a text on real estate accounting for the Building Owners and Managers Association. I am an expert in financial analysis.

I am a member of both the American Institute of Certified Public Accountants and am a past member of the Board of Directors of the Minnesota Society of Certified Public Accountants. I was appointed by Governor Pawlenty to the Minnesota State Board of Accountancy. I am also on the Alumni Advisory Board of the Carlson School of Management at the University of Minnesota and participate in their Mentorship Program. I am licensed as a Certified Public Accountant in the states of Washington, Minnesota, Kansas, Texas, and Wisconsin. I have served on various committees, including Ethics, AICPA Commodity Futures and have co-authored a manual on accounting principles. Additionally, I have been named to the American Arbitration Association's Panel of Neutrals.

I am active in my community and have served as Chair or Board Member with many civic organizations.

The cases in which I have testified in the last four years are listed in Appendix A.

## II. INFORMATION RELIED UPON

I have assumed that the accused dice infringe one or more of the asserted claims of the '197 patent. I have not formed any opinions as to whether Hasbro's dice do infringe any asserted claims of the '197 patent. I have also assumed the asserted patent claims are valid.

In the course of my analysis and the formulation of my opinion, I have reviewed numerous documents produced in this case as well as reviewed publicly available information deemed pertinent. My opinions are presented in Sections III and IV and are based on my independent examination of information, including those items listed in Exhibit B to this report, court filings, and my professional experience.

I understand that discovery in this case is ongoing and additional materials have been requested of Hasbro but not yet produced that may impact my opinion. Information from either the Plaintiff or Defendant may also be updated before trial. Therefore, I reserve the right to revise or expand these opinions before trial.

The report is to be used for the specific purpose of this litigation and has been designated "Confidential" pursuant to the protective order issued in this case and is not to be used for any other purpose without the express written consent of Neil N. Lapidus.

## III. SUMMARY OF OPINIONS

After a careful review of the issues and information provided to me in this case so far, it is my opinion that Bowling has suffered damages of **$1,340,050** as measured by reasonable royalties and prejudgment interest. It is also my opinion that the Rhode Island Statutory Rate of Interest would be the proper prejudgment interest rate. I used that rate in my calculations.

## IV. ANALYSIS

### Patent Infringement Damages

It is my understanding that the following principals of Title 35, Section 284 of the United States Code states, are applicable with regards to damages in a patent infringement case. Title 35, Section 284 states as follows:

> Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.

I have calculated damages based on a reasonable royalty.

### Reasonable Royalty

The '197 patent issued on August 17, 1999, and as such damages can only be calculated for infringing product sold on or after this date. According to his deposition transcript, Bowling had marked "patent pending" on trade show displays and on the retail displays shipped with his

dice and as such it is my opinion that the damages period begins to run from the date of the patent's issuance.[1 2]

A reasonable royalty is determined by either the established royalty for the patent, or, if no such established royalty exists, a hypothetically negotiated royalty that is based upon a number of considerations, known as the *Georgia Pacific* factors.

An Established Royalty

Bowling has never licensed the '197 patent so there is no established royalty for this patent.

A Hypothetically Negotiated Royalty and the Georgia Pacific Factors

In the hypothetical negotiation methodology, a "reasonable royalty" is the amount that the parties would have hypothetically been expected to negotiate at onset of infringement, August 17, 1999. It must reflect the following:

- Negotiation between independent parties
- At arm's length
- With all parties having full knowledge of the relevant facts
- Neither party being under compulsion to complete the transaction
- With equity to both
- Determined based upon conditions in existence at the time of infringement

At the time of the hypothetical negotiation, Hasbro had already invested in the development, marketing and advertising of Millennium Monopoly editions with the infringing

[1] Deposition of Michael Bowling dated January 16, 2006, pgs. 142-143, 202-205.
[2] If it is determined that Bowling did not adequately mark and that the damage period begins to run on the date of notification, I reserve the right to update my calculations, analysis and opinions.

dice and were faced with a decision of replacing the infringing dice, changing its advertising, and changing its packaging; negotiating a license agreement with Bowling; or continuing to sell their remaining inventory risking litigation. On September 21, 1999, over one month after the issuance of the patent, an email was sent between Hasbro employees stating, "I finally got in touch with marketing and they would like to keep the special 6-sided die in this item. How do I go about a) contacting the inventor and b) finding out how much it would cost us to use 'his' die?"[3] Hasbro contacted Bowling around this time noting that they "were interested in exploring the possibility of using the die design disclosed in your recently issued patent number 5,938,197."[4]

The following are excerpts from, Michael Hirtle's (Hasbro's Vice President of Research and Development) transcript that provide insight into Hasbro's consideration of the timing of the hypothetical negotiations that would have taken place with Bowling at the time of infringement.

*Q. Do you know typically how much they would allot possibly for – if they wanted a really neat new feature in a game, is there a generally rule of thumb of how much they would allot?*

*A. It's totally open. If you have something that's exciting and innovative and is going to generate a lot of buzz, there's no determinant...You'd have to consider each on a case-by-case basis. pgs. 29-30.*

[3] HA000637
[4] HA000636

*Q. At the time that you called him in September or October, I believe you testified, of '99, were you already manufacturing the accused dice and including them in the Monopoly Millennium Edition game?*

*A. To the best of my knowledge, yes.*

*Q. Do you believe that Hasbro was at a bit of a disadvantage if Mr. Bowling knew that you already had inventory and you were selling these games and were committed to his dice?*

*A. Yes.*

*Q. And did you know that you would likely have to pay a little bit more if you told him that fact?*

*A. Yes. pgs. 32-33.*

At the time of the hypothetical negotiation, each party would have known that Hasbro was currently manufacturing and selling the accused dice in Millennium edition Monopoly and that they were faced with three options: (1) discontinuing use of the accused die, replacing the die in existing inventory, changing its packaging, and changing its advertising; (2) negotiating a license agreement and paying Mr. Bowling a royalty to use his patented die; or (3) continuing to sell its inventory, phase out of the infringing die, and risk litigation.[5] Discontinuing use of the accused die would include replacing the die, reworking the packaging and changing advertising. Hasbro estimated these costs to be $70,000.[6] It is my opinion that the timing of events

---

[5] According to the 1999 Report of Economic Survey issued by the American Intellectual Property Law Association's (AIPLA) the median cost of a patent infringement lawsuit in the Other East Region was $1.498 million.

[6] Hasbro's Objections and Responses to Plaintiffs' First Set of Interrogatories, pg. 9

surrounding the hypothetical negotiations, overall, indicates that the royalty rate would be high in relation to other license agreements negotiated by Hasbro and other industry standards.

In *Georgia-Pacific Corp v. U.S. Plywood-Champion Papers, Inc.* (318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), *modified*, 446 F.2d 295 (2nd Cir. 1971), *cert. denied*, 404 U.S. 870 (1971)), fifteen factors were listed that courts now consider important in the determination of the hypothetically negotiated royalty. Below are lists of those factors and their application to the patent in this case.

The fifteen Georgia Pacific Factors and their application to this case are outlined below

1. **The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty.**

   The patentee has not licensed the patent in suit. The patentee sells patented die. This factor would tend to increase the reasonable royalty.

2. **The rates paid by the licensee for the use of other patents comparable to the patent in suit.**

   I have reviewed a number of license agreements for both patented and unpatented technology provided by Hasbro. Hasbro has licensed technology that is incorporated into a game or toy and has also licensed an entire game or toy concept. Hasbro has many licensing arrangements with Licensors. The rates paid by Hasbro are between 1-8% of net sales. Over twenty license agreements provided by Hasbro had royalty payments of 5% or higher. This factor would tend to increase the reasonable royalty.

3. **The nature and scope of the license, as exclusive or nonexclusive, or as restricted or nonrestricted in terms of territory or with respect to those to whom the manufactured product may be sold.**

   The license for the '197 patent would have been exclusive to Hasbro. In addition, the license would have been exclusive to dice sold with the Monopoly Millennium editions.[7] Hasbro was looking to source a "futuristic" random number generator to include with these versions of the Monopoly game. The novelty and uniqueness of the "jewel shape" make it a premium product. It is my understanding that the retail price of these dice is more than $1.00. Hasbro would have and, in fact, did keep these dice exclusive by including them only in their Millennium editions which had premium packaging and pricing. This factor would tend to increase the reasonable royalty.

4. **The licensor's established policy and marketing program to maintain its patent monopoly by not licensing others to use the invention or by gaining licenses under special conditions designed to preserve that monopoly.**

   Bowling sells dice to game manufacturers, distributors and retailers in the gaming industry. Bowling does not operate a licensing company and has not licensed his patent. This factor would tend to increase the reasonable royalty.

5. **The commercial relationship between the licensor and the licensee, such as, whether they are competitors in the same territory in the same line of business, or whether they are inventor and promoter.**

   Bowling and Hasbro's relationship can best be characterized as one of supplier and customer. Had Hasbro sought to buy dice from Bowling when the '197 patent was pending, it is my understanding that Bowling would have charged the wholesale price he

---

[7] Deposition of Michael Hirtle dated January 17, 2006 pgs. 34-35.

would have charged a retailer buying directly from him ($0.64 per dice). It was Bowling's pricing strategy to charge game manufacturers the wholesale price. This was put in place to help maintain a high retail price and control distribution. This factor would tend to increase the reasonable royalty.

6. **The effect of selling the patented specialty in promoting sales of other products of the licensee, the existing value of the invention to the licensor as a generator of sales of its nonpatented items, and the extent of such derivation or convoyed sales.**

The dice were included in the Monopoly Millennium edition. The dice were included on the picture of the game board with the caption "futuristic, multifaceted dice..." on the box. I also reviewed Hasbro's television commercial for the Monopoly Millennium edition.[8] That commercial prominently features the patented dice. Finally, a review of various website commentaries identify that the dice were an important part of the entire Monopoly Millennium edition.[9] The dice were one of a number of features incorporated into the game that were designed to command a high selling price for the game.

I interviewed Michael Bowling and found that his patented dice are important drivers of sales of nonpatented products. A customer can only order the patented dice from Bowling. While doing so, they will frequently order nonpatented products from Bowling rather than calling another supplier for similar non-patented products. This factor would tend to increase the reasonable royalty.

[8] HA008119
[9] B00516-B00519, B00521-B00527,B00680-B00682, B00673-B00676

7. **The duration of the patent and the term of the license.**

The term would have begun on the date the patent issued and would have continued for as long as the dice were included in the Monopoly Millennium game. Hasbro sold their last Monopoly Millennium editions in December, 2002. In addition, they sold over 90% of the games prior to December 2000. The short life of the product is not unexpected for a high priced version of a product created specifically to sell based on excitement over a specific point in time. This factor would tend to increase the reasonable royalty.

8. **The established profitability of the product made under the patent, its commercial success, and its current popularity.**

Bowling sold over $323,000 of dice from August 1, 1998, to January 1, 2002. The gross margin on Bowling's dice was on average 70%. During the 1998 Gen Con show, Bowling sold out 10,000 of a single die in fewer than four days.[10] When I interviewed Bowling, this success led him to believe that he had created a patented product that created a lot of buzz and excitement. Mr. Bowling's mindset in 1998 and 1999 was that he was going to capitalize on this buzz and excitement by selling a lot of dice at high profit margins.

When asked if the retail price would be a factor in negotiating a license agreement, Hasbro's Mr. Hirtle replied, "I mean the fact that someone is willing to pay $1.50 for something that costs six or eight cents to make, I mean, that might be a factor, but I don't

[10] Deposition of Michael Bowling dated January 16, 2006 pgs. 140-141.

give it very much weight myself." When asked "What weight would you give it if you were on the other side of the equation?" he replied, "I would argue vigorously that it should be given a great deal of weight. I mean, my job at Hasbro is to negotiate the terms of contracts with Hasbro's best interest in mind."[11] The high retail and wholesale price in conjunction with a low cost to produce make the patented dice very profitable. Bowling was able to command a high price because his die was patented and because it was unique and exciting. This factor would tend to increase the reasonable royalty.

9. **The utility and advantage of the patent property over the old modes or devices, if any, that had been used for working out similar results.**

The '197 dice solved a problem of how to create a futuristic and cost effective random number generating device. Hasbro evaluated an electronic randomizer to generate numbers, but this was ultimately too expensive.[12] Traditional square dice were instead replaced by the accused dice. The directions to the game state, "The dice still roll you snake eyes or double sixes, but they look like precious jewels." The directions state that "besides the properties and spaces, the game has been redesigned for the new Millennium." The accused dice were a cost effective means of generating random numbers and looking "futuristic." This factor would tend to increase the reasonable royalty.

[11] Deposition of Michael Hirtle, January 17, 2006, pgs. 45-46.
[12] Deposition of Dorothy Echlin dated January 17, 2006, pgs. 34-35.

**10. The nature of the patented invention, the character of the commercial embodiment of it as owned and produced by the licensor; and the benefit to those who have used the invention.**

The nature of the invention is a random number generator. The benefit over traditional cubed dice is that the "futuristic" shape coincides with marketing a game for the new Millennium while not being cost prohibitive like an electronic component. When the dice were removed, Hasbro received many complaint calls.[13] This factor would tend to increase the reasonable royalty.

**11. The extent to which the infringer has made use of the invention, and any evidence probative of the value of that use.**

Hasbro purchased 732,000 sets of dice and sold 732,000 games included in the infringing dice over an eight month period, even after identifying that they potentially infringed on the '197 patent (See Exhibit E). Upon removing the dice, Hasbro received complaint calls and negative comments from unsatisfied customers appeared on publicly available websites such as Amazon.com.[14] This factor would tend to increase the reasonable royalty.

**12. The portion of the profit or selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.**

I performed a search for comparable royalties through Royaltysource. Royaltysource provided information on a number of license agreements for the gaming industry. From

---

[13] HA006641-HA006689
[14] B00516-B00519, B00521-B00527,B00680-B00682, B00673-B00676

this search, there were two royalty agreements that were relevant to my analysis. The Phase 10 Dice game was licensed for a royalty of five percent of net sales. In addition, the game Magic was licensed by Wizards of the Coast for between two and seven percent of sales. This factor would tend to increase the reasonable royalty.

**13. The portion of the realizable profit that should be credited to the invention as distinguished from nonpatented elements, the manufacturing process, business risk, or significant features or improvements added by the infringer.**

Deposition testimony by Michael Hirtle indicates that the license agreements entered into by Hasbro are generally determined and paid based on a value added factor. The value added factor is calculated as the cost of the licensed part in relation to the cost of the item overall multiplied by a percentage royalty for the entire game.[15] None of the license agreements provided by Hasbro indicated that royalties were paid in this manner.

I analyzed the effects of licensing the accused dice on the gross margin of the Millennium editions and the Avon edition (See Exhibits E and F). The additional cost to license the dice is $1.165 per game. This results in reduced margins for all games. However, the adjusted gross margins taking into account the cost of a license for all versions fell within the range of the 1999 Engineering Quick Costs. This factor would not tend to increase or decrease the reasonable royalty.

**14. The opinion and testimony of qualified expert.**

See opinions and analysis included in my report.

---

[15] Deposition of Michael Hirtle dated January 17, 2006, pgs 27-28.

**15. The amount that a licensor (such as the patentee) and a licensee (such as an infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, that amount which a prudent licensee – who desires, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention – would have been willing to pay as a royalty (while making a reasonable profit) and which amount would have been acceptable by a prudent patentee who was willing to grant a license.**

See opinions and analysis included in my report.

**Conclusion**

In my opinion, a reasonable royalty of **$0.5825** per die is a reasonable royalty. See Exhibit D. The royalty of $0.5825 per die is the equivalent of a 4.22% royalty on the Millennium Edition and an 11.92% royalty on the Avon Edition. Overall, the royalty is equal to a 5.28% royalty across both versions and is reasonable. See Exhibit G. In my opinion, Bowling has suffered **$648,705** in damages measured by a reasonable royalty caused by Hasbro's infringement. See Exhibit C.

**Prejudgment Interest**

Bowling is entitled to prejudgment interest on any damages suffered. The interest is calculated from the time damages began to accrue: August 17, 1999, with compounding. Although a number of possible rates may be used, and the Court has final discretion, I believe the appropriate rate is the Rhode Island Statutory Rate of Interest (12%).[16] I calculated that the prejudgment interest in this case, as of the date of this report, is **$691,345**. Total damages including a reasonable royalty and prejudgment interest is **1,340,050**.

---

[16] Rhode Island Statute, RI Gen. L. § 9-21-10.

## V. DATA AND OTHER INFORMATION CONSIDERED

The information I considered in forming my opinions to date is listed in Exhibit B to this report.

## VI. EXHIBITS AND SCHEDULES TO BE USED AS A SUMMARY OF SUPPORT FOR MY OPINIONS

This report includes some exhibits and schedules that may be used at trial to support my opinions. I reserve the right, however, to supplement these materials with additional summaries or exhibits to be used at trial.

## VII. QUALIFICATIONS INCLUDING OTHER TESTIMONY

See Exhibit A.

## VIII. COMPENSATION FOR THE STUDY AND TESTIMONY

Fees for services performed by Lurie Besikof Lapidus & Company, LLP professionals have been or will be charged at hourly billing rates ranging from $75 to $370 per hour. Out-of-pocket expenses are billed as incurred. The current hourly rate for Neil N. Lapidus is $370. My work on this case is anticipated to be ongoing.

February 22, 2006

Neil N. Lapidus

**EXHIBIT A**

Mr. Lapidus has testified in the following matters within recent years:

Mary Ellen Pinkham vs. Sara Lee Corporation et al, U.S. District Court, District of Minnesota, Fourth Division, Civil File No. 4-87-454, 1993

Steven J. Shamblott vs. Datacard Corporation, State of Minnesota, County of Hennepin, District Court, Fourth Judicial District, File CT 91-00330, 1992

DeParq, Hunegs, et al bankruptcy, U.S. Bankruptcy Court, District of MN, Case No. 92-47077

CTC Distribution v. United Parcel Service, Inc. et al, U.S. District Court, District of Minnesota, Third Division, Civil File No. 3-92-CIV-215

Diesel Systems, Ltd. v. Onan Corporation, U.S. District Court, District of Minnesota, Third Division, Civil File No. 4-92-424

Medical Graphics Corporation v. SensorMedics Corporation, U.S. District Court, District of Minnesota, Third Division, Civil File No. 3-94-525

Samuel D. Heins v. Schatz, Pacquin et al, American Arbitration Association Case No. 56-180-00615-94

Callister v. Carlson Marketing Group, Inc., (jurisdiction information not immediately available)

James D. Van Buskirk, an individual, and Aravan, Inc., a Minnesota corporation v. Grow Biz International, Inc., U. S. District Court, District Of Minnesota, Third Division, File No. 3-96-CV-26

Moorhead Electric, Inc. v. Wilde Construction, Inc. et al., Minnesota District Court, Seventh Judicial District, Civil No. C1-98-1643

Richard Brozo v. Oracle Corporation, U.S. District Court, District of Minnesota, 00-751 RHK/JMM

Raquel Berg v. Thomas Nelson, Inc., et al., U.S. District Court, District of Minnesota, 99-CV-1374

In Re: Marriage of Applebaum, State of Minnesota District Court, Fourth Judicial District, Hennepin County, DC 258461

Quality Business Forms of Minneapolis, Inc. v. Secured Choice, Inc., State of Minnesota District Court, Fourth Judicial District, Hennepin County, CT-01-0051

John D. Isaacs v. American Iron & Steel Company, et al., State of Minnesota District Court, Fourth Judicial District, Hennepin County File No. CT-03-2445

Hearth & Home Technologies Inc. and HON Technology Inc. v. Travis Industries, Inc., U.S. District Court, District of Minnesota, File No. 02-CV-4191

Travis Industries, Inc. v. Hearth & Home Technologies Inc. and HON Technology Inc., U.S. District Court, District of Washington, File No. C03-2526P

**EXHIBIT B**

**DATA AND OTHER INFORMATION CONSIDERED**

Court Filings in This Matter

- Complaint
- Answer and Counterclaims
- Hasbro's Amended Objections and Response to Plaintiffs' First Set of Interrogatories, Interrogatory No. 4
- Hasbro's Objections and Responses to Plaintiffs' First Set of Interrogatories

Depositions

- Deposition of Michael Bowling dated January 16, 2006
- Deposition of Doreen Mars dated January 17, 2006
- Deposition of Michael Hirtle dated January 17, 2006
- Deposition of Kurt Benson dated January 17, 2006

Information Produced by Michael Bowling

- B00001-B01680

Information Produced by Hasbro, Inc.

- Hasbro Monopoly Millenium Edition Game
- HA000001-HA000967
- HA001310-HA008151

Other Information

- Royaltysource Search – Games and Gaming Technology
- Interview of Michael Bowling

Michael Bowling v. Hasbro, Inc.

# Exhibit C

## Damages - Reasonable Royalty and Pretrial Interest

Reasonable Royalty Per Die $ 0.5825

| | Games | Dice |
|---|---|---|
| Total Purchased and Sold | 732,000 | 1,464,000 |
| Less: Sales Prior to Patent Issuance (3/8/99 through 8/16/99) | 175,172 | 350,344 |
| Total Infringing Games and Dice Sold | 556,828 | 1,113,656 |

| Sales by Month | Games | Dice | Royalties |
|---|---|---|---|
| Aug-99 | 54,596 | 109,192 | 63,604 |
| Sep-99 | 171,527 | 343,054 | 199,829 |
| Oct-99 | 91,132 | 182,264 | 106,169 |
| Nov-99 | 109,064 | 218,128 | 127,060 |
| Dec-99 | 130,509 | 261,018 | 152,043 |
| Total Sales | 556,828 | 1,113,656 | $ 648,705 |

| Pretrial Interest Compounded at 12% (Rhode Island Statutory Rate) for the year or month ended | Interest Rate | Interest at 12% |
|---|---|---|
| 1999 | 12.00% | 18,420 |
| 2000 | 12.00% | 80,055 |
| 2001 | 12.00% | 89,662 |
| 2002 | 12.00% | 100,421 |
| 2003 | 12.00% | 112,472 |
| 2004 | 12.00% | 125,968 |
| 2005 | 12.00% | 141,084 |
| 02/23/2006 | 12.00% | 23,263 |
| Total Pretrial Interest | | $ 691,345 |

**Total Reasonable Royalty and Pretrial Interest** **$ 1,340,050**

Michael Bowling v. Hasbro, Inc.

# Exhibit D

## Reasonable Royalty Per Die

| | | |
|---|---|---|
| Bowling's Per Die Sales Price | $ | 0.6400 |
| Less: Hasbro's Cost Per Die | | 0.0575 |
| Reasonable Royalty Per Die | $ | 0.5825 |

Michael Bowling v. Hasbro, Inc.

# Exhibit E

## Hasbro Purchase Orders for Accused Dice

| Purchase Order | Sets | Dice | Price/1,000 | Price/Set | Price/Ea |
|---|---|---|---|---|---|
| 450013353 | 286,500 | 573,000 | $ 115.09 | $ 0.115 | $ 0.0575 |
| 450015106 | 57,000 | 114,000 | 115.00 | 0.115 | 0.0575 |
| 450015903 | 31,500 | 63,000 | 115.00 | 0.115 | 0.0575 |
| 450018598 | 34,500 | 69,000 | 115.00 | 0.115 | 0.0575 |
| 450019251 | 85,500 | 171,000 | 115.00 | 0.115 | 0.0575 |
| 450021197^ | 153,000 | 306,000 | 114.91 | 0.115 | 0.0575 |
| 450022035 | 28,500 | 57,000 | 114.83 | 0.115 | 0.0574 |
| 450023833 | 21,000 | 42,000 | 114.83 | 0.115 | 0.0574 |
| 450031728 | 34,500 | 69,000 | 114.74 | 0.115 | 0.0574 |
| | 732,000 | 1,464,000 | $ 114.93 | $ 0.115 | $ 0.0575 |

^ Per HA000443, the quanity ordered was 150,000.
The quantity shipped was 153,000.

# Exhibit F

## Monopoly Millenium Editions Gross Margin Analysis

### Gross Margin at Standard and Adjusted for Infringing Dice

| | Millenium Edition - 409420000 | | Millenium Edition - 409420001 | | Millenium Edition - 409420400 | | Millenium Edition - 409420480 | | Avon Edition - 412950000 | | Simple Average | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Gross Sales Price | $ 28.500 | | $ 28.500 | | $ 28.500 | | $ 28.500 | | $ 9.500 | | $ 24.700 | |
| Sales Allowance | 3.710 | | 3.710 | | 3.710 | | 3.710 | | (0.030) | | 2.962 | |
| Net Sales Price | 24.790 | 100.00% | 24.790 | 100.00% | 24.790 | 100.00% | 24.790 | 100.00% | 9.530 | 100.00% | 21.738 | 100.00% |
| Product Costs | | | | | | | | | | | | |
| Transfer Cost | 12.390 | 49.98% | 11.240 | 45.34% | 13.710 | 55.30% | 12.610 | 50.87% | 4.060 | 42.60% | 10.802 | 49.69% |
| Obsolence & Variances | 0.100 | 0.40% | 0.110 | 0.44% | 0.070 | 0.28% | 0.090 | 0.36% | 0.040 | 0.42% | 0.082 | 0.38% |
| Royalties | 0.850 | 3.43% | 0.850 | 3.43% | 0.850 | 3.43% | 0.850 | 3.43% | 0.320 | 3.36% | 0.744 | 3.42% |
| Gross Margins at Standard | 11.450 | 46.19% | 12.590 | 50.79% | 10.160 | 40.98% | 11.240 | 45.34% | 5.110 | 53.62% | 10.110 | 46.51% |
| Adjustments to Costs for Accused Dice | | | | | | | | | | | | |
| Reasonable Royalty Per Game | 1.165 | 4.70% | 1.165 | 4.70% | 1.165 | 4.70% | 1.165 | 4.70% | 1.165 | 12.22% | 1.165 | 5.36% |
| | 1.165 | 4.70% | 1.165 | 4.70% | 1.165 | 4.70% | 1.165 | 4.70% | 1.165 | 12.22% | 1.165 | 5.36% |
| Adjusted Gross Margin | 10.285 | 41.49% | 11.425 | 46.09% | 8.995 | 36.28% | 10.075 | 40.64% | 3.945 | 41.40% | 8.945 | 41.15% |
| Change in Gross Margin Percentage | | 4.70% | | 4.70% | | 4.70% | | 4.70% | | 12.22% | | 5.36% |

Adjusting for the inclusion of the royalty cost for the accused die results in a reduction of gross margin of $1.165 per game or 4.70% for the Millenium Edition and 12.22% for the Avon Edition. The Engineering Quick Costs estimated the gross margin for Millenium editions to be 46.65% and Avon editions to be 35.78%. Even after accounting for the royalty, all of the editions are within the expected gross profit range.

See Hasbro's Amended Objections and Response to Plaintiff's First Set of Interrogatories, Interrogatory No. 4

See HA008112 and HA008116

Michael Bowling v. Hasbro, Inc.

# Exhibit G

## Monopoly Millenium Edition Sales

### Sales and Royalty Analysis

| Sales Units | Millennium Edition | Avon Edition | Units |
|---|---|---|---|
| Aug-99 | 50,372 | 4,224 | 54,596 |
| Sep-99 | 171,527 | - | 171,527 |
| Oct-99 | 81,628 | 9,504 | 91,132 |
| Nov-99 | 53,036 | 56,028 | 109,064 |
| Dec-99 | 27,421 | 103,088 | 130,509 |
| Total | 383,984 | 172,844 | 556,828 |

| Sales $ | Millennium Edition | Avon Edition | $ |
|---|---|---|---|
| Aug-99 | 1,588,938 | 39,967 | 1,628,905 |
| Sep-99 | 4,749,135 | - | 4,749,135 |
| Oct-99 | 2,101,294 | 89,927 | 2,191,221 |
| Nov-99 | 1,390,129 | 530,137 | 1,920,266 |
| Dec-99 | 772,488 | 1,029,093 | 1,801,581 |
| Total | $ 10,601,984 | $ 1,689,124 | $ 12,291,108 |

| | | | |
|---|---|---|---|
| Average Price^ | $ 27.61 | $ 9.77 | $ 22.07 |
| Per Die Royalty | $ 0.5825 | $ 0.5825 | $ 0.5825 |
| Die Per Game | 2 | 2 | 2 |
| Royalty Per Game | $ 1.165 | $ 1.165 | $ 1.165 |
| Royalty Percentage | 4.22% | 11.92% | 5.28% |

^ Average price does not reflect any adjustments for intercompany sales. Per my review of Hasbro's license agreements, intercompany sale prices are adjusted to reflect an external sales price for royalty calculations. The royalty percentage rate would be lower if intercompany sales were adjusted to external sales prices.
My analysis utitlizes a first in, first out basis for determining which units were sold with the accused dice.