# Exhibit A

Hasbro™

PLAINTIFF'S EXHIBIT 19 JMS 1/17/06

September 30, 1999

Mr. Michael A. Bowling
7931 S. Avenida de Pina
Tucson, Arizona 85747

Dear Mr. Bowling:

Hasbro Games is interested in exploring the possibility of using the die design disclosed in your recently issued patent number 5,938,197.

Please give me a call at 978-921-3402 at your earliest convenience to discuss.

Sincerely yours,

Michael Hirtle
Product Acquisition

HA000636

EXHIBIT B

# Exhibit B

# Merchant & Gould

An Intellectual Property Law Firm

90 South Seventh Street
Suite 3100
Minneapolis, Minnesota
55402-4131 USA
TEL 612.332.5300
FAX 612.332.9081
www.merchant-gould.com

Direct Contact 612.336.4724
jdaulton@merchant-gould.com

A Professional Corporation

November 3, 1999

**VIA CERTIFIED MAIL**

Cynthia S. Reed
Senior Vice President and General Counsel
Hasbro, Inc.
P.O. Box 1059
Pawtucket, RI 02862

Re: Patent Infringement Investigation of Hasbro
M&G 12206.4–US–AA

Dear Ms. Reed:

We represent Michael Bowling. Mr. Bowling is the owner of United States Patent No. 5,938,197. We have enclosed a copy of U.S. Patent No. 5,938,197 with this letter.

The '197 patent has claims directed to a unique type of playing dice. Hasbro is currently using, offering for sale, and selling dice that literally infringe the '197 patent.

In particular, we are aware that Hasbro is making, offering for sale, and selling a game identified as "Monopoly Millenium Edition." Contained within the game are playing dice that infringe the '197 patent. We have included with this letter as Exhibit A photographs of the Hasbro dice and the game in which the dice are used.

We also note that the dice are pictured on the box itself as well as on the Monopoly.com website. This also constitutes infringement of our client's trademark rights.

Please be advised that our client still has other United States patent applications pending. In addition, our client has patent applications pending in foreign countries.

This is a serious matter. The willful and intentionally infringing activities of Hasbro have caused and continue to cause damage to our client. Hasbro has known about our client's patent at least since September 30, 1999. We have attached as Exhibit B a photocopy of a letter that Hasbro sent to our client, referencing his patent. Hasbro was not being truthful with our client. The letter states that Hasbro games "is interested in exploring the possibility of using the die design" disclosed in our client's patent. We are

aware that Hasbro was offering for sale and selling the die design used in the Monopoly Millenium Edition before that letter was written. Although the letter states that Hasbro is interested in "exploring the possibility," Hasbro was, in fact, already offering for sale and selling the die design of our client's patent. This is tantamount to fraud.

On behalf of our client, we demand that Hasbro immediately cease and desist from making, using, selling, or offering for sell die designs covered by U.S. Patent No. 5,938,197. This would include at least the dice utilized in the Monopoly Millennium Edition game.

On behalf of our client, we demand an accounting for the following:

1. For each die having the geometry as shown in the photographs of Exhibit A, the number of dice sold by or on behalf of Hasbro since August 17, 1999;

2. For each die having the geometry as shown in the photographs of Exhibit A, the number of dice that are currently being offered for sale by or on behalf of Hasbro;

3. For each die having the geometry as shown in the photographs of Exhibit A, the number of dice that are currently in inventory for or on behalf of Hasbro; and

4. For each die having the geometry as shown in the photographs of Exhibit A, the number of dice that are currently being made by or on behalf of Hasbro.

Although our client is ready and willing to pursue his legal rights through the court system, our client is willing to reasonably resolve this dispute. Please be advised that our client has an established profit margin of 50 cents per die. We have information that indicates Hasbro is expecting to sell at least 500,000 Monopoly Millenium Edition games. With each game having a pair of dice, our client's lost profits are equal to $1 per game. The willfulness of Hasbro's infringement could very well treble the damages. Hasbro easily could be liable for at least $1.5 million. Despite this, our client is willing to negotiate a settlement. In exchange for a release for past patent infringement, and assuming sales no greater than 500,000 Monopoly Millenium Edition games with two dice each, our client will accept a royalty payment of 20 cents per die, for a total cashout payment of $200,000.

May we hear from you no later than November 15, 1999?

Very truly yours,

MERCHANT & GOULD, P.C.

Julie R. Daulton

JRD/tdm
Enclosures: U.S. Patent No. 5,938,197
Exhibits A–B

# Exhibit C

Feb-13-01 11:20A TEP mktg P.02

FROM-MERCHANT & GOULD MPLS 612 [illegible] 908: (WED) 12. 22' 99 15:03/ST 5:02/NO. 4261404195 P 2

Dec. 22. 1999 1:32PM MARSHALL, O'TOOLE No. 8481 P. 2/3

From:0831


# MARSHALL, O'TOOLE, GERSTEIN, MURRAY & BORUN

ATTORNEYS AT LAW

6300 SEARS TOWER

233 SOUTH WACKER DRIVE

CHICAGO, ILLINOIS 60606-6402

(312) 474-6300

FAX: (312) 474-0448



RICHARD H. ANDERSON
MICHAEL F. BORUN
RICHARD A. BRANDON
DAVID W. CLOUGH, PH.D.
MADELINE H. DEVEREUX
CHRISTINE A. DUDZIK
PATRICK D. ERTEL
KEVIN A. [illegible]
ALLEN H. GERSTEIN
ROBERT M. GERSTEIN
ROGER A. HEPPERMANN
MARTIN J. HIRSCH
DOUGLAS C. HOCHSTETLER
TREVOR B. JOIKE
RICHARD H. [illegible]
WILLIAM E. McCRACKEN
CARL E. MOORE, JR.
JAMES J. NAPOLI, PH.D.
ANTHONY NIMMO
EDWARD H. O'TOOLE
LI-HSIEN RIN-LAURES, M.D.
MARC V. SCARPELLI
RICHARD A. SCHNURR
JEFFREY S. SHARP
EARL A. VICK
JAMES P. ZELLER

SPECIAL COUNSEL:
MICHAEL R. GRAHAM

OF COUNSEL:
OWEN J. MURRAY
ALVIN D. SHULMAN

[illegible]
AUDREY L. [illegible], PH.D.
[illegible]
[illegible]
THOMAS A. CAWLEY, JR., PH.D.
JANE J. CHOI
PAUL C. CRAANE
[illegible] F. DUFFY
JAMES A. FLIGHT
KEVIN H. FLOWERS, PH.D.
[illegible]
JENNIFER B. [illegible]
[illegible] HO
ANAND M. [illegible], PH.D.
[illegible] JACKSON
WILLIAM J. KRAMER
BRENT E. MATTHIAS
GREGORY W. MAYER
WILLIAM K. MERKEL, PH.D.
THOMAS A. MILLER
MICHAEL MUCZYNSKI
CARL E. MYERS
MATTHEW C. NIELSEN
SANDIP H. PATEL
DAVID C. READ
ANTHONY G. SITKO
PAUL B. STEPHENS
JILL E. UHL
[illegible] T. VAN ASSCHE
ANDREW E. [illegible]
MICHAEL H. WEINER

REGISTERED PATENT AGENTS:
JAMES F. GOEDKEN
MARK G. [illegible]
[illegible] C. [illegible]
JOSEPH A. WILLIAMS, JR., PH.D.
MARK C. ZIMMERMAN


December 22, 1999

**VIA FACSIMILE**

Julie R. Daulton
Merchant & Gould, P.C.
90 South Seventh Street
Suite 3100
Minneapolis, Minnesota 55402-4131

Re: <u>Bowling, U.S. Patent 5,938,197</u>

Dear Ms. Daulton:

Having investigated your charges of patent and "trademark" infringement, I make the following representations and offer of settlement.

1. Hasbro's total shipments after the '197 patent issued were 269,000 units. This is our base for royalty calculations. No further shipments with the accused dice have been or will be made, and Hasbro has no need of a settlement of the type you propose (payment for sales of up to 500,000 units). Further, no television commercial for the Millenium Edition has run since the week of December 6 and none will be run in the future.

2. We must reject any settlement figure which factors your charge of willfulness. Hasbro ceased shipping the accused dice promptly upon learning of the patent of the unacceptable terms of your license offer. In fact, no production or sales have taken place since November 1, 1999.

3. We must reject any settlement figure which factors lost profits. Hasbro does not compete with your client and has not taken away any sales. If anything, Hasbro's brief period of

MARSHALL, O'TOOLE, GERSTEIN, MURRAY & BORUN

Julie R. Daulton
December 22, 1999
Page 2

promotion of the dice in question with the Millenium Edition of the most popular game in the world has enhanced your client's sales.

4. In arriving at a reasonable royalty, we cannot factor a percentage based on the wholesale price of the game for obvious reasons—the dice did not drive sales of the game as is apparent from the continued rate of sales after substituting non-accused dice. The cost to Hasbro of the two dice as compared to Hasbro's overall cost associated with the Monopoly game in question, reveals that the dice account for 1.4% of the overall cost of the product. Taking the game price of $28.50 and assuming a 5% royalty on the value of the dice, a reasonable royalty would amount to 269,000 x 28.5 x 1.4% x 5% or $5366. This calculation is based on the typical practice of Hasbro in comparable situations when dealing with outside inventors.

5. To put your latest offer in perspective, we note that you are demanding $300,000 for sales of 500,000 units. That amounts to 60¢ per game. Considering that the dice only represent 1.4% of the product's value, the maximum per game profit which Hasbro could make on the dice would be 26¢. I trust you would agree that a royalty of 235% of profits would be excessive.

6. As to your charge of trademark rights, I fail to see from your letter of December 1, 1999 that your client has developed any trademark rights in the dice themselves, much less that you have any evidence of likelihood of confusion or damages arising therefrom.

Despite the above and the reckless and inflammatory tone of your letter, Hasbro wants to resolve this controversy amicably and therefore offers $7,500 in exchange for a full release of all claims. This is considered to be fair, although far in excess of what would be awarded by a Court.

Very truly yours,

Edward M. O'Toole

Edward M. O'Toole

EMO/keb

cc: Mr. Kurt R. Benson (via facsimile)

# Exhibit D

MARSHALL, O'TOOLE, GERSTEIN, MURRAY & BORUN

ATTORNEYS AT LAW

6300 SEARS TOWER
233 SOUTH WACKER DRIVE
CHICAGO, ILLINOIS 60606-6402
(312) 474-6300
FAX: (312) 474-0448

RICHARD H. ANDERSON
MICHAEL F. BORUN
MADELINE M. DEVEREUX
CHRISTINE A. DUDZIK
THOMAS L. DUSTON
PATRICK D. ERTEL
JAMES A. FLIGHT
DAVID A. GASS
ALLEN H. GERSTEIN
ROBERT M. GERSTEIN
ROGER A. HEPPERMANN
MARTIN J. HIRSCH
DOUGLASS C. HOCHSTETLER
KEVIN D. HOGG
TREVOR B. JOIKE
RICHARD H. LABARGE
GREGORY C. MAYER
WILLIAM E. MCCRACKEN
WILLIAM K. MERKEL, Ph.D.
CARL E. MOORE, JR.
JAMES J. NAPOLI, Ph.D.
ANTHONY NIMMO
EDWARD M. O'TOOLE
LI-HSIEN RIN-LAURES, M.D.
NATE F. SCARPELLI
RICHARD A. SCHNURR
JEFFREY S. SHARP
ANTHONY G. SITKO
MICHAEL R. WEINER
JAMES P. ZELLER

SPECIAL COUNSEL:
MICHAEL R. GRAHAM
LEE F. GROSSMAN

OF COUNSEL:
OWEN J. MURRAY
ALVIN D. SHULMAN

BEAU D. BARBERIS
PAUL BARENIE
AUDREY L. BARTNICKI, Ph.D.
SCOTT E. BAXENDALE
THOMAS A. CAWLEY, JR., Ph.D.
PORTIA CHEN
GREGORY J. CHINLUND
PAMELA L. COX
PAUL C. CRAANE
KEVIN M. FLOWERS, Ph.D.
JANINE M. GIRZADAS
JENNIFER P. GOETSCH
FRANKIE HO
MICHAEL R. HULL
KEITH R. JAROSIK
THOMAS KIM
WILLIAM J. KRAMER
PATRICK B. LAW**
ANDREW M. LAWRENCE*
BRYAN J. LEMPIA
BRENT E. MATTHIAS
THOMAS A. MILLER
SAEID MIRSAFIAN, Ph.D.
MICHAEL MUCZYNSKI
CARL E. MYERS
MATTHEW C. NIELSEN
SANDIP H. PATEL
AARON M. PETERS
THOMAS J. RAMSDELL
DAVID C. READ
RANDALL G. RUETH
ALISA C. SIMMONS
PAUL B. STEPHENS
ANDREW E. WARNECKE
JOSEPH A. WILLIAMS, JR., Ph.D.
MANISHA CHAKRABARTI WULF

REGISTERED PATENT AGENTS:
JAMES F. GOEDKEN
MARK G. HANLEY
MARK H. HOPKINS, Ph.D.
NABEELA R. MCMILLIAN, Ph.D.
GRETA E. NOLAND
MARK C. ZIMMERMAN

*ADMITTED IN COLORADO ONLY
**ADMITTED IN MISSOURI AND DISTRICT OF COLUMBIA ONLY

April 10, 2001

**VIA FACSIMILE**

Douglas J. Williams
Merchant & Gould
3200 IDS enter
80 South Eighth Street
Minneapolis, Minnesota 55402-2215

Re: <u>Bowling, U.S. Patent 5,938,197</u>

Dear Mr. Williams:

We have now investigated your March 6, 2001 charge that Hasbro "continues to sell infringing dice in its monopoly game." That is not the case. In fact, Hasbro has not sold any products containing the accused dice since late 1999. We did discover, however, that approximately 184,000 additional units of an Avon Monopoly game containing the accused dice were inadvertently shipped under a different SKU during November and December, 1999. This unfortunately occurred even though a specification change eliminating the accused dice had been entered for the Avon product on November 2, 1999. This situation may have been complicated by the fact that many of the Avon Monopoly units were made by an outside supplier and the fact that Hasbro was in the process of implementing an SAP inventory control system at the time.

Unlike the situation explained in my December, 1999 letter, the game price for the 184,000 units produced for Avon was $9.50 rather than $28.50. This changes the percent of cost attributed to the two dice to 2.9% of the total game cost. Thus, assuming a 5% royalty on the value of the dice, a reasonable exposure would be $2,535. (184,000 x 9.50 x 2.9% x 5%). This amount added to the $5,366 calculated in my December letter raises the total to $7,901.

Douglas J. Williams
April 10, 2001
Page 2

To resolve this matter amicably, Hasbro offers $10,000 in exchange for a full release of all claims. We believe this provides the full accounting you have asked for. Please advise.

Very truly yours,

Edward M. O'Toole

Edward M. O'Toole

EMO/keb

cc: Kurt R. Benson (via facsimile)

# Exhibit E

# Merchant & Gould

An Intellectual Property Law Firm

3200 IDS Center
80 South Eighth Street
Minneapolis, Minnesota
55402-2215 USA
TEL 612.332.5300
FAX 612.332.9081
www.merchant-gould.com

A Professional Corporation

Direct Contact | 612.336.4665
tleach@merchant-gould.com

October 25, 2005

**VIA FACSIMILE**

Todd D. White
Adler Pollock & Sheehan P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903

***Re:*** ***Bowling v. Hasbro, Inc.***
***C.A. No. 05-229S***
***M&G File No. 12206.4-US-ZA***

Dear Todd:

The parties' settlement conference statements are due this Friday, October 28, 2005. In anticipation of the settlement conference, Bowling served upon Hasbro discovery requests seeking, among other things, sales information relating to Hasbro's sales of the accused dice. Hasbro's responses to Bowling's discovery requests were due on Thursday, October 20, 2005. Please let me know if Hasbro served these responses, as we have not received them yet.

Aside from Bowling's discovery requests, at the pretrial conference the judge asked that the parties exchange sales information to facilitate a meaningful settlement conference. I provided you with Bowling's sales information related to Hasbro's counterclaims more than three weeks ago, and asked that you provide Bowling with Hasbro's information by October 21, 2005. You have not provided me with Hasbro's sales information relating to Bowling's infringement claim. If Hasbro does not intend to provide this information before the settlement conference, let me know immediately, as we will need to reschedule the settlement conference.

Sincerely,

Thomas J. Leach

TJL:sgl

cc: Christine K. Bush (via facsimile)

Minneapolis/St. Paul
Denver
Seattle
Atlanta
Washington, DC

# Exhibit F

# Merchant & Gould

An Intellectual Property Law Firm

3200 IDS Center
80 South Eighth Street
Minneapolis, Minnesota
55402-2215 USA
TEL 612.332.5300
FAX 612.332.9081
www.merchant-gould.com

A Professional Corporation

Direct Contact | 612.336.4665
tleach@merchant-gould.com

October 31, 2005

**VIA FACSIMILE**

Todd D. White
Adler Pollock & Sheehan P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903

**Re: Bowling v. Hasbro, Inc.**
**C.A. No. 05-229S**
**M&G File No. 12206.4-US-ZA**

Dear Todd:

Hasbro has not responded to Bowling's first set of interrogatories and Bowling's first set of document requests. Hasbro's responses were due on October 20, 2005. Please let me know by Wednesday, November 2, 2005, when you are available to meet and confer regarding Hasbro's failure to respond to Bowling's discovery requests.

Sincerely,

Thomas J. Leach

TJL:sgl

cc: Christine K. Bush (via facsimile)

Minneapolis/St. Paul
Denver
Seattle
Atlanta
Washington, DC

# Exhibit G

# Merchant & Gould

An Intellectual Property Law Firm

3200 IDS Center
80 South Eighth Street
Minneapolis, Minnesota
55402-2215 USA
TEL 612.332.5300
FAX 612.332.9081
www.merchant-gould.com

A Professional Corporation

Direct Contact | **612.336.4665**
**tleach@merchant-gould.com**

November 10, 2005

**VIA FACSIMILE**

Jeffrey K. Techentin
Adler Pollock & Sheehan P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903

***Re: Bowling v. Hasbro, Inc.***
***C.A. No. 05-229S***
***M&G File No. 12206.4-US-ZA***

Dear Jeffrey:

During our meet and confer on Tuesday, November 8, 2005, regarding Hasbro's failure to respond to Bowling's discovery requests, you indicated that Hasbro would probably not respond to Bowling's discovery requests for another two weeks. Hasbro has had more than enough time to respond to Bowling's discovery requests. Moreover, at the settlement conference, Judge Almond asked that Hasbro respond to Bowling's discovery requests timely to avoid any motions on this issue.

Please confirm that Hasbro will provide Bowling with written responses and documents responsive to Bowling's discovery requests by Thursday, November 17, 2005. If Hasbro refuses to respond to Bowling's discovery requests by November 17, 2005, we will take the matter to the Court.

Additionally, because Hasbro's responses are weeks late, Hasbro waives all objections it may have to Bowling's discovery request. *See* Fed. R. Civ. P. 33(b)(4) and 34. We expect Hasbro to provide complete responses to Bowling's interrogatories and produce all documents responsive to his requests.

Sincerely,

Thomas J. Leach

TJL:sgl

cc: Craig Scott (via facsimile)

Minneapolis/St. Paul
Denver
Seattle
Atlanta
Washington, DC

# Exhibit H

Merchant & Gould
An Intellectual Property Law Firm

3200 IDS Center
80 South Eighth Street
Minneapolis, Minnesota
55402-2215 USA
TEL 612.332.5300
FAX 612.332.9081
www.merchant-gould.com

A Professional Corporation

Direct Contact | 612.336.4665
tleach@merchant-gould.com

February 13, 2006

***VIA FACSIMILE***

Jeffrey K. Techentin
Adler Pollock & Sheehan P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903

***Re:*** ***Bowling v. Hasbro, Inc.***
***C.A. No. 05-229S***
***M&G File No. 12206.4-US-ZA***

Dear Jeff:

Hasbro designated Kurt Benson as its 30(b)(6) witness to testify regarding Hasbro's infringement. At great cost to our client, we flew to Rhode Island expecting that Hasbro's designee would be prepared to answer questions about infringement. During the deposition, however, Mr. Benson was wholly unprepared to provide any basis for why Hasbro believes its accused dice did not infringe the asserted claims of the '197 patent under the doctrine of equivalents. To date, Hasbro has refused to provide any discovery as to the factual basis for why Hasbro believes it does not infringe the asserted '197 patent claims under the doctrine of equivalents.

Bowling is entitled to Hasbro's basis for its claim that it does not infringe under the doctrine of equivalents before the close of fact discovery. Thus, if Hasbro refuses to unequivocally admit that Hasbro infringes the asserted claims of the '197 patent under the doctrine of equivalents, we ask that Hasbro provide a witness that is capable of testifying on such matters and that Hasbro pay for Bowling's fees and costs to travel back to Rhode Island and depose a properly prepared witness. Please provide Hasbro's response by Friday, February 17, 2006.

Sincerely,

Thomas J. Leach

cc: Craig Scott (via facsimile)

Minneapolis/St. Paul
Denver
Seattle
Atlanta
Washington, DC

# Exhibit I

**CONFIDENTIAL**



UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

MICHAEL BOWLING,
a Resident of Arizona,
Plaintiff

VS. C. A. NO. 05-229S

HASBRO, INC.,
a Rhode Island Corporation,
Defendant

--------------------/

DEPOSITION OF KURT BENSON, a witness, in the above-entitled cause, taken on behalf of the Plaintiff, pursuant to notice, before Jo Anne M. Sutcliffe, Notary Public in and for the State of Rhode Island, at the offices of Duffy, Sweeney & Scott, Ltd., One Turks Head Place, Providence, Rhode Island, on January 17, 2006, at 9:08 a.m.

APPEARANCES:

FOR THE PLAINTIFF: MERCHANT & GOULD
THOMAS J. LEACH, ESQ.
-AND-
DOUGLAS J. WILLIAMS, ESQ.

FOR THE DEFENDANT: ADLER, POLLOCK & SHEEHAN
JEFFREY K. TECHENTIN, ESQ.



E-X-H-I-B-I-T-S


| EXHIBIT NO. | | PAGE NO. |
|---|---|---|
| FOR THE PLAINTIFF | | |
| 1 | Plaintiff's Amended 30(b)(6) Deposition Notice of Hasbro, Inc. | 7 |
| 2 | Memorandum dated January 26, 1993 regarding record retention | 16 |
| 3 | U.S. Patent No. 5,938,197 dated August 17, 1999 | 28 |
| 4 | U.S. Utility Patent Application No. 5,938,197 | 65 |
| 5 | Three-page document depicting monsters | 93 |
| 6 | Document regarding Cockatrice from Errantry Wiki | 95 |
| 7 | Document regarding Cockatrice from Wikipedia | 95 |




(COMMENCED AT 9:08 A.M.)

KURT BENSON,
Being duly sworn, deposes and testifies in the following manner:

EXAMINATION BY MR. LEACH

Q. Can you state your full name for the record?
A. Yes.
Q. Please do so.
A. Kurt Richard Benson.
Q. Mr. Benson, I'm Tom Leach; I represent Michael Bowling in this lawsuit against Hasbro. Do you understand what a deposition is?
A. Yes.
Q. I'm going to ask you a series of questions about facts concerning this lawsuit, and the reporter will take down your answers. If at any time you don't understand any question, please tell me and I will repeat or rephrase the question. If you answer a question, I will assume that you understood it. Is this understood and acceptable to you?
A. Yes.
Q. The reporter will transcribe this deposition and everything that is said here today will be



recorded. It is important that you answer audibly, in other words, do not answer with head nods, et cetera, so the reporter can transcribe your testimony.
At the trial all of your testimony given will be available in booklet form and if I ask you the same questions then that I will ask you today and if your answers differ from the answers given today, you may expect to account for the differences in your answers. Do you understand this?
A. Yes.
Q. Your testimony today is under oath as if you were in a court of law. You have sworn to tell the truth, and if you fail to do so, adverse consequences may result. Do you understand this?
A. Yes.
Q. What is your current position at Hasbro?
A. Vice President and patent counsel.
Q. How long have you held that position?
A. Nearly 12 years; it will be 12 years April 1st.
Q. What are your duties as general patent counsel?
A. I'm responsible for all patent issues.

we would want to share that with you.
Q. As you sit here today do you believe the accused dice infringe under the doctrine of equivalence?
MR. TECHENTIN: Objection.
A. As I've said before --
Q. Subject to what your counsel may tell you later, what do you think? I want to hear what you think.
A. I think I need to get an opinion from outside counsel on that issue and that's the way I normally function in my job.
Q. In deciding whether to ask outside counsel for an opinion, do you formulate your own opinion? For example, sometimes an issue you think you can resolve on your own, other times it's a closer call. What do you do to evaluate whether to say no, this isn't an issue, or yes, this might be an issue?
A. In a lawsuit I rely on outside counsel.
Q. And you will not provide me with any opinion as to whether you believe the accused dice infringe under the doctrine of equivalence?
A. I will not admit that we infringe under the doctrine of equivalence is basically what you're



asking me and the answer is no.
Q. So even if you believed that these dice do infringe under the doctrine of equivalence, you would not admit that?
A. I am telling you that I don't have a position to believe or not believe.
MR. WILLIAMS: Counsel, let me express what our position will be on this issue. That we have traveled here today to take the deposition of the company, the company has designated this particular witness to testify on these issues and the witness has said he has neither a position aye or nay on this issue. Unless we have a complete admission that, in fact, there is infringement under the doctrine of equivalence, we will ask to return to take this deposition if there's anything less than a complete admission at the company's -- at the Defendant's expense to redo this, because we traveled here without any indication that there was anything -- that there was going to be anything other than a complete deposition that could be taken and the witness would be prepared to testify on all issues. So I'm putting you on notice right now if there's



going to be -- if you don't admit it, then we'll either have the witness travel to us or you'll have to pay our expenses to come back to do this, to complete it. That's our position.
MR. TECHENTIN: I understand your statement.
MR. WILLIAMS: Or in the alternative, to seek to preclude any -- more likely, to seek to preclude any assertion of the defense at this late date, since the company has had literally years to look at this issue. I mean, the dispute has been around since the Millennium, and you know, anybody at this point, any reasonable attorney, and obviously, Mr. Benson is such an attorney at 25 years experience, is going to know that liability under the doctrine of equivalence is the same as liability for direct infringement and they would look at that over a five-year period to see if they've got -- if they have a real issue. So we believe the company has had more than enough time to establish this defense and we feel that it's either being withheld from us and we'll seek to preclude any assertion of that defense or any denial of that defense or



certainly to have our fees paid for a return deposition.
MR. LEACH: I just want to touch on one other issue.
Q. In deciding to give an issue to your outside counsel, how close a call is it or do you just give everything to them?
A. When it's involved in a lawsuit, I give everything to them.
Q. Can you turn your attention to Exhibit 1 again please? One more thing on the last topic. What about the first three years when it wasn't a lawsuit?
MR. TECHENTIN: What's the question?
Q. Did you do an analysis then?
A. No, I didn't.
Q. Did you think it was serious enough to have an analysis done?
A. I didn't do an analysis.
Q. Do you wish you had done an analysis?
A. I don't have any strong regrets as to what I did.
Q. Can you turn to Page 7 of Plaintiff's Exhibit 1, and specifically let me direct your attention to

Topic No. 14. Have you read that topic?
A. Yes.
Q. Are you prepared to testify on that topic?
A. Yes.
Q. And you've been designated to testify on that topic?
A. Yes.
Q. Before we go on to Topic 14, I want to jump back to infringement really quick and ask does Hasbro admit that if the accused dice are found to infringe any claim of the 197 patent, that all identical dice also infringe that claim? I'll rephrase the question if you don't understand it.
If the accused dice is found to infringe a claim of the 197 patent, do all other identically or identical accused dice also infringe that claim of the 197 patent?
MR. TECHENTIN: Objection to form.
A. Are you asking me if one die infringes --
Q. Do they all?
A. -- do they all? Yes.
Q. Just so the record is clear, if one accused die is found to infringe a claim of the 197 patent, they all do?



MR. TECHENTIN: Object to form.
A. All identical dice do, yes.
MR. LEACH: Thank you.
Q. Topic 14. Does Hasbro contend that the 197 patent is invalid?
A. We have reason to believe that it may be.
Q. And why do you believe it may be?
A. In light of possible prior activity by the patentee more than a year before his filing date.
Q. And what activity is that?
A. I wasn't present at the deposition yesterday and I don't know what the testimony was. We have seen articles that refer to the dice as the fact that he developed -- that the patentee developed those dice while he was in college and used them as a gamer when he was in college and then resurrected them and decided to file a patent application many years later when he was working on a Master's thesis, and based on that, we have reason to believe that there may have been prior public use of the invention more than a year before the filing date.
Q. Is that Hasbro's only basis for concluding that the 197 patent may be invalid?



A. Yes.
Q. Do you have any prior references that you believe -- do you have any patents --
MR. WILLIAMS: He just said no. You can skip over that.
Q. Are there any other reasons that Hasbro contends or are there any other reasons for the basis or for the -- let me stop.
Are there any other reasons for Hasbro's contention that the 197 patent is invalid except for the one that you just provided?
A. I don't believe so.
Q. Are you sure there's no others or do you believe --
A. Well, as far as I'm aware at this time, there are no others. I mean, there's always a possibility that if we decided to do a further search, we might turn up something.
Q. When you say "further search", have you done a search at all?
A. Yes.
Q. Have you produced all the documents?
A. As far as I'm aware, yes.



Q. And the results of that search, you've concluded that nothing anticipates or renders obvious the claims of the 197 patent?
A. I don't believe anything anticipates. Obviousness is somewhat of an open question. But I don't really -- I don't -- I haven't concluded that it's invalid based on prior art.
Q. So at this time Hasbro has no other reasons that support its contention that the patent's invalid?
A. That's correct.
Q. Mr. Benson, I understand that you're also designated to testify on Hasbro's royalty calculations.
A. Yes.
Q. Now, earlier I believe your counsel said that Mike Hirtle may be more appropriate.
MR. TECHENTIN: He may be better suited, although candidly, I'm -- I haven't had a lot of time with Mr. Hirtle. Mr. Benson is prepared to talk to the question of royalty amounts, but I'm saying you may want to try twice on that one.
Q. Are you familiar with Hasbro's typical royalty practice?

MR. LEACH: Back on the record.
Q. Did you and your counsel discuss any of the line of questioning on the break?
A. Yes.
MR. LEACH: I believe it's inappropriate to discuss the lines of questioning.
MR. TECHENTIN: This is a 30(b)(6) deposition. You're going into -- you're clearly going into a fine line, as Mr. Benson has already indicated. Part of what you're going into is in the nature of dealing with outside counsel. It is entirely appropriate for us to have consulted on the question of where the line is between the questions of privileged information and the type of information that you are free to inquire into with Mr. Benson, and that was the nature of the discussions and I think that we have -- I think we can proceed. I don't think -- there was nothing at all inappropriate with delineating that during the break.
MR. LEACH: Did you discuss only privileged information and not the substance of the doctrine of equivalence?



MR. TECHENTIN: Yes. Everything that was discussed was related to the question of privilege.
MR. LEACH: So nothing related to the testimony he was giving on the doctrine of equivalence?
MR. TECHENTIN: Well, I mean, it's an outgrowth. You've been questioning him about the doctrine of equivalence, and I'm not going to say it didn't have anything to do with that, but I'm going to say that it had to do with the question of what is in the nature of privileged information on this topic, something that has already been made clear to you on the record that is of concern based on the invocation of outside counsel and outside counsel's advice on the very issue that you're talking about.
Q. So earlier you testified that the accused dice meet the function way result test. What more do you need to conclude that there's no infringement on the doctrine of equivalence based on your definition of facets?
MR. TECHENTIN: Objection. Go ahead.
A. I would need to do a thorough doctrine of



equivalence analysis which, as I've said before, I have not done.
Q. What's involved in that analysis?
A. Well, actually, I probably wouldn't do the analysis myself; I would look to outside counsel for that advice.
Q. So aside --
A. I have not gotten advice from outside counsel, a complete analysis of that.
Q. So as you sit here today, Hasbro has no position on whether it infringes under the doctrine of equivalence?
A. Our position is that it does not infringe until we are advised to the contrary.
Q. What is your basis for alleging no infringement under the doctrine of equivalence?
A. I said until I have a basis to reach a conclusion, I'm not going to say that it does fringe, I'm going to say that it doesn't because that's my understanding. I have not gotten a complete analysis and I'm not going to say that I have.
Q. This case has been pending for five years. How long does it take to get an analysis?



MR. TECHENTIN: Objection.
A. The case has not been pending for five years. I mean, it was filed, when, last spring? But regardless, I have not gotten an analysis under the doctrine of equivalence as I previously testified.
Q. I think it was filed in September of 2003. Does that seem correct?
A. No, it doesn't. I believe -- while I believe you may have filed a case out in Arizona --
Q. How long have you known about this issue?
A. I agree I've known about the issue for some time, since 1999.
Q. Have you bothered to ask whether you infringe under the doctrine of equivalence?
MR. TECHENTIN: Objection. And to the extent that it seeks any privileged communications, I instruct you not to answer.
MR. WILLIAMS: Well, now, counsel, here we go back again. We've got a designation here that you all say you don't infringe, and this is the person that's supposed to contend that, so are you going to assert the privilege or are you going to -- what's your position? Who's going to

A. That's part of the reason I would look at the case law, to find out those points.
Q. Do you have any idea what they are now as you sit here today?
A. Well, I would do -- I would do research and come up with a well reasoned opinion, not come up with an off-the-cuff answer just to satisfy a question.
Q. Do you agree that you had notice that you were going to testify today on behalf of Hasbro on its non-infringement position?
A. Yes.
Q. And how long have you had notice of that?
A. Not too long, just a couple days, really.
Q. Did you see -- aside from Plaintiff's Exhibit 1, did you see any other notice from Plaintiff of a 30(b)(6) deposition?
A. Did I see -- no.
Q. So this is -- Exhibit 1 is the only deposition notice that you've seen?
A. Yeah. I think so.
MR. TECHENTIN: I don't know what you've seen, so --
A. I don't recall having seen any others.



Q. I can represent that Plaintiff has served on Hasbro a first deposition notice, 30(b)(6) deposition notice or just a regular Plaintiff's 30(b)(6) deposition notice of Hasbro and you haven't seen that?
A. I've seen this notice here.
Q. And you're not sure if you've seen one that was served prior to this one?
A. I don't believe I have.
Q. You see here that this says amended?
A. Yes.
Q. Did you go back and look to see if -- what the other one was and what the differences were?
A. No, I didn't.
Q. Were you aware that there was one served on Hasbro earlier than the amended notice that's in front of you?
A. No. I may have heard of it, but I hadn't seen anything.
Q. Did you know --
A. I knew there was some discussion about when the depositions were going to be taken.
Q. Did you know you were going to be the one designated to testify on behalf of Hasbro related



to non-infringement issues?
A. Yes.
Q. How long have you known that?
A. A couple of days.
Q. How many?
A. Maybe four or five.
Q. Would it take you longer than four or five days to conduct an analysis under the doctrine of equivalence?
MR. TECHENTIN: Objection.
A. Perhaps not.
Q. Yet you didn't bother to do it?
A. I did not have time to dedicate to an issue of -- to an opinion under the doctrine of equivalence, no.
Q. Is there anyone else under this notice that's going to testify to infringement under the doctrine of equivalence?
A. No.
Q. You're the only one?
A. I am giving you Hasbro's position as of today and the best information I have.
Q. And Hasbro's position is it doesn't know of any reason why it's accused dice do not infringe



under the doctrine of equivalence?
A. Hasbro's position is that it has not done an analysis under the doctrine of equivalence.
Q. Yet earlier you admitted that the accused dice perform substantially the same function in substantially the same way to obtain substantially the same result, is that correct?
A. That's correct.
Q. What else do you need to determine whether something infringes under the doctrine of equivalence?
MR. TECHENTIN: Objection.
A. An opinion from my outside counsel.
Q. When will we get that?
MR. TECHENTIN: Objection.
A. As soon as we have completed such an opinion.
Q. And you're not going to claim privilege to that?
A. I don't know. I need to consult with outside counsel on that issue and I don't have an opinion and I can't tell you whether or not we're going to claim privilege at this point on that. I have to say that if we have an opinion of non-infringement from outside counsel under the doctrine of equivalence, the likelihood is that

is and has been an avid gamer for quite a number of years and that he was familiar with the Dungeons and Dragons Game and that as a result he almost certainly would have been familiar with the three characters that are depicted by the mininature models that he -- the figurines that he sold. And if he was familiar with them, he would have absolutely known that they were priority subject matter of Dungeons and Dragons Wizards the Coast Hasbro, but yet he still chose to sell these pieces regardless.

Q. Do you know what Mr. Bowling did when he learned that Hasbro claimed that his sales of these figurines infringed Hasbro's patent?

A. My understanding is that he discontinued.

Q. Did he offer to pay any damages to Hasbro?

A. I believe so.

MR. LEACH: Can you mark this as an exhibit please?

(WHEREUPON, EXHIBIT NO. 5 MARKED FOR IDENTIFICATION)

Q. I'm handing you what is marked as Plaintiff's Exhibit 5. This is a portion of Hasbro's counterclaim which includes exhibits of the three



figures that Hasbro -- oops. I think -- this last page shouldn't be on there, the very last page -- alleges are covered by its copyrights and that Bowling infringes. Do you agree?

A. Yes.

Q. Now, these copyrighted figures, it's Hasbro's illustration of them or it's the creativity and the design that is copyrighted, correct?

A. Correct.

Q. For example, Hasbro may have its depiction of a vampire, but that doesn't mean that anyone's depiction of a vampire would infringe that copyright, correct?

A. That's correct.

Q. And can you turn to the second page, and I believe it's -- shows a monster named Cockatrice, and I can spell that, it's C-O-C-A --

MR. TECHENTIN: C-O-C-K.

MR. LEACH: Yeah. Sorry.

Q. C-O-C-K-A-T-R-I-C-E. And is this Hasbro's rendition of its Cockatrice?

MR. TECHENTIN: Objection to form.

A. Yes.

Q. Are you aware of other Cockatrices or other



people's renditions of Cockatrices?

A. Not specifically.

MR. LEACH: Can you mark these?

(WHEREUPON, EXHIBIT NOS. 6 AND 7 WERE MARKED FOR IDENTIFICATION)

Q. I'm handing you, Mr. Benson, what have been marked as Plaintiff's Exhibits 6 and 7. Can you take a look at those?

MR. TECHENTIN: I'm sorry. If I could just interject. I note for the record that none of these have bates numbers on them.

MR. LEACH: Correct.

MR. TECHENTIN: Are those from the document production, though? They appear familiar to me. I just want to be sure that they're the same documents that we've seen in production.

MR. LEACH: I've produced these, but they're not the bates labeled ones. I printed them off last night. I had them on my computer.

MR. TECHENTIN: But they're the same as what was --

MR. LEACH: Yes, they're the same. It's what I had in my file that I provided.



MR. TECHENTIN: Okay.

Q. So with respect to the Cockatrice, do these three images appear similar? And when I say three, I mean Hasbro's copyrighted figure and the two that I've handed you.

A. I mean, they have some similarity.

Q. Would you agree, then, that it's possible for someone to sell, for example, a figurine of a Cockatrice and believe it's -- and believe that they are free to do that because there's a number of different such creatures?

THE WITNESS: Would you repeat that question again?

Q. Would you agree that someone could believe in good faith that they're free to sell a figure such as a Cockatrice given that there's a number of renditions of that type of creature?

A. It's possible.

Q. For example, if I want to sell a vampire, I wouldn't immediately think that it's copyrighted. Would you agree with that statement?

MR. TECHENTIN: Objection.

A. You need to be specific as to what vampire you're talking about. I mean, I can't -- I don't

think you can necessarily conclude that you can just take any vampire image and sell it without infringing somebody's copyrights.
Q. But you do agree that there's a number of different forms of vampires.
A. Yes.
MR. TECHENTIN: Are you moving away from these documents, because I just had a question about them?
MR. LEACH: Go ahead.
MR. TECHENTIN: I noticed that the picture of the Beholder, I would have expected to see one of our bate stamps on there. Did we not bate stamp these or are these not --
MR. LEACH: That's from the counterclaim so they wouldn't be bate stamped. That's right out of the pleadings.
MR. TECHENTIN: Oh, okay. Okay.
Q. Do you know why Hasbro sued Bowling for copyright infringement?
A. Why? Because we believed that he was infringing our copyrights.
Q. And how did this come to your attention?
A. From an attorney at Wizards of the Coast.



Q. Would Hasbro have sued Bowling for copyright infringement had Mr. Bowling not sued Hasbro for patent infringement?
A. I don't know.
Q. What do you think?
A. I have no way of making a guess. I can say that the properties involved are considered to be very valuable properties of Wizards of the Coast.
Q. Do you know how much Hasbro contends that it's harmed or has been harmed by Bowling's alleged copyright infringement?
A. Well, I believe damages would be according to statute, statutory damages and copyright where there's registration involved, so all I can do is refer you to the statute.
Q. And you have no other basis for damages other than statutory damages?
A. I think in a copyright case you have your choice of damages, whether it's based on profits or on statutory damages.
Q. Does Hasbro contend that it's entitled to lost profits or disgorgement of profits or statutory damages? Which of those, please, or all?
A. I believe that we would contend that it would



be statutory damages.
Q. And when you say statutory damages you mean the amount set per infringing work based on the statute, not lost profits, not disgorgement of profits?
A. Right.
Q. And how much would that be?
A. You'd have to refer to the statute. I mean, it's in the loss statute and I believe it can be up to $30,000 per piece.
Q. Is Hasbro claiming $30,000 per piece?
MR. TECHENTIN: Objection to form.
A. Again, I need to rely on advice of counsel on that. I have asked outside counsel to do an analysis of the copyright issue and I have not received a complete analysis.
Q. Again, we're here today to get Hasbro's testimony on these issues which we've provided notice for in the 30(b)(6) deposition and you're saying that you're relying on outside counsel.
A. We believe that --
MR. TECHENTIN: There's a formula in the statute.
MR. WILLIAMS: There's a question



pending.
A. I'm relying on the statute, yeah, and an opinion from outside counsel. I mean, there's a formula, as just stated. There is a formula in the statute and I believe it goes up to $30,000 per infringement.
Q. So correct me if I'm wrong, but I believe the statute is $750 to $30,000 per infringement. I think there's a range.
A. That's right. That's what I said.
Q. I'm wondering where in that range does Hasbro contend damages should fall? $30,000, 750?
A. 30,000.
Q. So Hasbro contends that it is entitled to $30,000 per infringed work?
A. Correct.
Q. That's the damages it's seeking? And what does it base that on?
A. On the fact that there appears to be infringement and that it appears to have been willful based on the fact that we believe that Plaintiff had -- or the Defendant, Counterclaim Defendant had knowledge of the property rights, was aware that those properties were copyrighted

works.
Q. And what evidence do you have that he was aware of the copyrighted works?
A. I wasn't present at the deposition yesterday and I believe that that issue was explored yesterday.
Q. So you have no facts as to willfulness aside from what you testified earlier?
A. That's correct.
Q. Does Hasbro sell mininatures?
A. Yes.
Q. Does it sell a miniature for each one of the alleged monsters?
A. I believe they do. I'd have to verify that.
Q. Do you know how much they sell each of these monsters for?
A. I do not.
Q. Can you find out?
A. Yes.
Q. Do you know what any of the profit margins are on any of the figures that they sell that are covered by the copyrights?
A. No, I don't.
Q. What basis does Hasbro have to believe that the



accused products were actually copied from Hasbro's allegedly copyrighted material?
A. I believe it's apparent from the figures in a comparison with the copyrighted work.
Q. Are you aware that Mr. Bowling does not make the figures that he sells?
A. Yes.
Q. You're aware that he just bought the product from someone else and resells them?
A. That's correct.
Q. So do you believe that he had no hand in what they looked like?
A. I don't know whether he had any hand whatsoever in what they looked like, whether he had any input with the sculptor, whether he collaborated with the sculptor, or whether he had an opportunity to select different pieces from the sculptor.
Q. Do you know if Hasbro has sued the manufacturer or any other company involved in these?
A. I don't know.
Q. A bit ago you testified that these copyrights are valuable to Hasbro. Does Hasbro intend to seek out who's manufacturing these?



A. I don't know what has transpired. Typically, all of that would take place out of Wizards of the Coast.
Q. Why would you go after Michael Bowling and not the manufacturer?
A. Well, for one thing, we were sued for infringement by Michael Bowling and it certainly brought it to our attention. We became aware that he was selling these pieces in the U. S.; it's my understanding that the manufacturer is in Europe and so it it's certainly much more prominent in the U. S.
Q. Do you own the copyrights in Europe on these figures?
A. Yes.
Q. So you do have the option of suing the manufacturer?
A. I believe so. I have not done that analysis myself.
Q. Have you sued anyone else over these copyrights in the past?
A. Not that I'm aware of.
Q. Are you aware of other people that are selling figures that resemble or possibly infringe your



copyrights?
A. I'm personally not aware.
Q. Is Hasbro aware of them?
A. To the best of my knowledge, no.
Q. Have you ever been in a lawsuit over these copyrights?
A. No. When you say "have you", are you asking me personally?
Q. No. You're responding on behalf of Hasbro.
A. To my knowledge, no.
Q. Is it true that the copyright issue in this case is not an important issue?
A. No, that's not true.
Q. Did Hasbro bring the copyright claims just to divert attention away from Bowling's case?
A. No. Hasbro brought the copyright issue because we felt that there was a legitimate infringement of Hasbro's rights.
Q. Will Hasbro sue other infringers with as much vigor as they've sued Michael on this issue?
MR. TECHENTIN: Objection. Go ahead.
A. As I said, the fact that Michael Bowling was selling these items in the U. S. gave this issue a lot more prominence. I don't know what, if

Q. So that's reasonable to you?
A. Yes.
Q. What proof do you have that the manufacturer copied your copyrights?
A. I think that you'd rely on the similarity of the items to the copyrighted work.
Q. Have you compared the figures to the copyrighted work?
A. Yes.
Q. Did you notice any differences?
A. I would have to have the pieces in front of me right now to make that analysis, to make that comparison.
Q. Would you agree that under the statute of copyright damages it fluctuates based on the culpability of the infringer or accused infringer?
A. Yes.
Q. Isn't it true that Bowling merely bought these products from an outside vendor and resold them?
A. I don't know. As I testified before, I don't know whether he had any input into the development of the pieces.
Q. And isn't it true that as soon as he was notified



that Hasbro was accusing him of copyright infringement he stopped?
A. That's what I've been told.
Q. Do you think that goes to the culpability of his acts?
A. I'm not -- I don't see why it does.
Q. Well, isn't it true that once he got notice that Hasbro had copyrights he stopped?
A. That's what I've been told.
Q. So would that make him less culpable or more culpable do you think?
A. As I just said, I don't know that it matters either way.
Q. Well, he didn't disregard Hasbro's copyrights, did he? As soon as he learned of them he stopped.
A. As soon as he was -- received our counterclaim in the lawsuit he stopped. At least I've been told, has been represented.
Q. So would that make him less culpable?
A. I don't think so.
Q. Why?
A. I don't see any reason why it would.
Q. So the fact that he stops rather than just



continuing on to sell disregarding your copyrights has no bearing on whether he's more or less culpable?
A. For the infringements that took place prior to his -- prior to that, I don't see that, no.
Q. So you would say that for the things he sold prior to notice of your copyrights, you're still accusing -- or you still believe that that constitutes willful infringement?
A. That's correct.
Q. And it's willful just because he should have known that you had copyrights on those figures and sold them anyways?
A. I think he would have known and that, therefore, it's culpable.
Q. So do you have any other facts that support your contention that Bowling willfully infringed Hasbro's copyrights?
A. As I've said before, I was not present at Mr. Bowling's deposition yesterday so I can't make that kind of a statement without knowing exactly the testimony that took place.
Q. But you believe it's reasonable to seek $90,000 for the minimum amount of activity that he did?



A. At least $90,000, yes.
Q. That doesn't seem high to you?
A. No.
Q. For selling 18 sets of figures and stopping as soon as he found out that Hasbro had copyrights?
A. I'm not in a position to question the purpose behind the copyright laws that set those statutory damages and I think we can follow the law on that point.
Q. Well, it sets a range, the minimum being 750, and actually, it can be reduced if it's not -- if it was an innocent mistake or such things like that to, like, 250, but the standard range is 750 to 30,000, and you're saying that you believe his conduct mandates that Hasbro get the maximum amount of money per infringing work?
A. Yes, I do.
MR. LEACH: Okay. I think we're ready for the next witness.
THE WITNESS: Okay.
MR. TECHENTIN: Okay.

(ADJOURNED AT 1:22 P.M.)

# Exhibit J

Merchant & Gould
An Intellectual Property Law Firm

3200 IDS Center
80 South Eighth Street
Minneapolis, Minnesota
55402-2215 USA
TEL 612.332.5300
FAX 612.332.9081
www.merchant-gould.com

A Professional Corporation

Direct Contact | 612.336.4665
tleach@merchant-gould.com

February 21, 2006

***Via Facsimile***

Jeffrey K. Techentin
Adler Pollock & Sheehan P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903

***Re:*** ***Bowling v. Hasbro, Inc.***
***C.A. No. 05-229S***
***M&G File No. 12206.4-US-ZA***

Dear Jeff:

This letter responds to your letter of February 17, 2006, to me regarding Hasbro's failure to produce a 30(b)(6) witness competent to testify about Hasbro's infringement under the doctrine of equivalence.

In our phone call today, you confirmed that Hasbro refuses to pay Bowling's costs and fees to travel back to Rhode Island to depose a properly prepared witness. Hasbro had over a month to prepare a 30(b)(6) witness concerning Hasbro's factual basis regarding infringement under the doctrine of equivalents. Hasbro never objected to the 30(b)(6) notice or the topic relating to infringement, and yet it failed to produce a competent witness. Hasbro cannot avoid its obligation to produce a competent witness on this topic by agreeing to now respond to an interrogatory to which Hasbro refused to previously answer. Hasbro's repeated discovery abuses do nothing other than drive up the costs of litigation for Mr. Bowling and prevent him from preparing his case.

Sincerely,

Thomas J. Leach

TJL:sgl

cc: Craig Scott (via facsimile)

Minneapolis/St. Paul
Denver
Seattle
Atlanta
Washington, DC

# Exhibit K

**Abigail E. Ries**

**From:** cmecf@rid.uscourts.gov
**Sent:** Tuesday, June 26, 2007 10:42 AM
**To:** cmecfnef@rid.uscourts.gov
**Subject:** Activity in Case 1:05-cv-00229-S-LDA Bowling v. Hasbro, Inc. "Order on Motion for Extension of Time"

*****NOTE TO PUBLIC ACCESS USERS*** You may view the filed documents once without charge. To avoid later charges, download a copy of each document during this first viewing.**

**U.S. District Court**

**District of Rhode Island**

Notice of Electronic Filing

The following transaction was received from Baldinelli, Doreen entered on 6/26/2007 at 11:41 AM EDT and filed on 6/26/2007

**Case Name:** Bowling v. Hasbro, Inc.
**Case Number:** 1:05-cv-229
**Filer:**
**Document Number:**

**Docket Text:**
TEXT ORDER granting [98] Assented to MOTION for an Extension of Time to Suspend Deadline for Filing Pretrial Memoranda Pending Chambers Conference. So Ordered by Judge William E Smith on 06/26/2007. (Baldinelli, Doreen)

The following document(s) are associated with this transaction:

**1:05-cv-229 Notice will be electronically mailed to:**

Christine K. Bush cbush@duffysweeney.com

David K.S. Cornwell davidc@skgf.com

Thomas J. Leach tleach@merchantgould.com, aries@merchantgould.com; kdrieman@merchantgould.com

Craig M. Scott cscott@duffysweeney.com, ehanson@duffysweeney.com

Jeffrey K. Techentin jtechentin@apslaw.com, kmooney@apslaw.com

Todd D. White Twhite@apslaw.com, stheriault@apslaw.com

Douglas J. Williams dwilliams@merchantgould.com

**1:05-cv-229 Notice will be delivered by other means to:**

Tracey-Gene G. Durkin
Sterne Kessler Goldstein & Fox P.L.L.C.
1100 New York Avenue, NW
Washington, DC 20005

06/27/2007

# Exhibit L

**Abigail E. Ries**

---

**From:** Techentin, Jeffrey [Jtechentin@apslaw.com]
**Sent:** Tuesday, June 26, 2007 11:00 AM
**To:** cscott@duffysweeney.com; cbush@duffysweeney.com; Douglas Williams; Tom Leach
**Cc:** davidc@skgf.com; tdurkin@skgf.com; White, Todd
**Subject:** Bowling v. Hasbro
**Attachments:** amended interrogatory response - interrogatory no 1.pdf

Counsel:

Please see the attached amended interrogatory response, which is being served today by first class mail.

We recognize that this response raises issues that must be dealt with in an expeditious fashion, particularly in light of Craig's advice to me that you are interested in a trial date as early as August (though I am informed by the court clerk that such a date is highly unlikely in any event). Please be advised that we are available at your and the Court's convenience to address this matter in advance of the scheduled chambers conference. In fact, we would suggest that we have a conference as soon as practicable, with *pro hac* counsel appearing telephonically. Of course, if you wish to discuss this matter directly, please feel free to give me a call.

Very truly yours,

Jeffrey Techentin

---

Jeffrey K. Techentin
Adler Pollock & Sheehan P.C.
One Citizens Plaza, 8th Floor
Providence, Rhode Island 02903
phone: 401.274.7200
direct: 401.427.6147
fax: 401.351.4607
e-mail: jtechentin@apslaw.com

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| MICHAEL BOWLING, a Resident of Arizona,<br><br>Plaintiff,<br><br>v.<br><br>HASBRO, INC., a Rhode Island Corporation,<br><br>Defendant. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | C.A. No. 05-229 S |

**HASBRO'S SECOND AMENDED OBJECTIONS AND RESPONSE TO PLAINTIFFS' FIRST SET OF INTERROGATORIES, INTERROGATORY NO. 1**

Pursuant to Rule 26 and Rule 33 of the Federal Rules of Civil Procedure, Defendant Hasbro, Inc. ("Hasbro") hereby amends its prior responses to the Plaintiffs' First Set of Interrogatories (the "Interrogatories") as follows.

**GENERAL OBJECTIONS**

1. Hasbro objects to the Interrogatories, and the definitions and instructions contained therein, to the extent that they purport to expand upon Hasbro's obligations under the Federal Rules of Civil Procedure.

2. Hasbro objects to the Interrogatories, and the definitions and instructions contained therein, to the extent they seek the disclosure of information protected from discovery by the attorney-client privilege, the work product doctrine and any other applicable privilege or immunity.

3. Hasbro objects to the Interrogatories, and the definitions and instructions contained therein, to the extent that they are overly broad, unduly burdensome, and/or seek information not relevant to the claim or defense of any party to this action.

4. Hasbro objects to the Interrogatories, and the definitions and instructions

contained therein, to the extent that they request information that is as readily accessible to the Plaintiff as it is to Hasbro. Hasbro has no obligation to undertake any investigation for the Plaintiff.

5. Hasbro objects to the definition of "Describe" contained in the Interrogatories to the extent it seeks to require Hasbro to identify facts and documents "desirable to make such statement and/or description complete," as that definition is both vague and ambiguous. Hasbro cannot ascertain what information the Plaintiff might deem "desirable" in response to the Interrogatories.

6. Hasbro reserves the right to supplement its responses and objections should additional information become available. These general objections are incorporated into each of the specific answers to the Interrogatories.

**SPECIFIC OBJECTIONS AND RESPONSES**

1. Describe all facts and reasons for Hasbro's contention that the '197 patent is invalid or unenforceable. For each reference or combination of references that Hasbro contends invalidates the '197 patent, specifically identify where each claim element is found in the reference or combination of references. The description should also include a full description of all facts supporting the contention, identification of any documents concerning the contention, and the identity of all persons with knowledge of facts concerning the contentions.

**RESPONSE:** Hasbro contends that the '197 patent is invalid and unenforceable as a result of the fact that the die construction claimed in the '197 patent, was invented either (a) individually by Albert Lizarraga and not the plaintiff, or (b) jointly by Albert Lizarraga and the plaintiff, and as a result of the fact that Mr. Bowling breached his duty of candor and good faith to the U.S. Patent and Trademark Office by making an affirmative misrepresentation of a material fact, and/or by failing to disclose material information, and/or by submitting false material information, coupled with an intent to deceive, specifically by failing to disclose the involvement of Albert Lizarraga in the invention of the subject matter of the '197 patent to the U.S. Patent and Trademark Office or affirmatively misrepresenting to the U.S. Patent and

Trademark Office the facts relating to the invention of the die. The patent is further unenforceable against Hasbro as a result of Hasbro's acquisition of Albert Lizarraga's rights in the invention. The plaintiff, his counsel, Albert Lizarraga, and Susan Lizarraga have information relevant to this contention.

Hasbro further contends that the plaintiff breached his duty of candor and good faith to the U.S. Patent and Trademark Office, and that the patent is invalid and/or unenforceable as a result, by virtue of the plaintiff's affirmative misrepresentation of a material fact and/or failure to disclose material information, and/or submission of false material information, coupled with an intent to deceive, specifically by representing to the U.S. Patent and Trademark Office the fact that the plaintiff had discovered material advantages in the use of the die construction claimed in the '197 patent, and by implication that the plaintiff had manufactured and tested the claimed die construction, when, in fact, the plaintiff had never produced any die in the form claimed in the patent, and therefore could not have performed any testing or other analysis upon which the plaintiff could make any representation regarding discovered advantages to the die construction. The plaintiff and his counsel have information relevant to this contention.

Hasbro further contends that at least claims 1 through 6, 10 through 12, 17, and 18 are invalid and unenforceable on the grounds that they are anticipated by U.S. Pat. No. 4,497,487 ("Chance Device") (the '487 patent). The '487 patent claims a game involving two twenty-sided dice and includes the following two figures to depict those dice in two-dimensional form:



FIG. 3

FIG. 4



According to the "Brief Description of the Drawings," these figures depict a "planar, diagrammatic embodiment of the invention." The fact that the representation is "planar" is also clear from the lines drawn across the edges of the flattened die, highlighted below:



The fact that these figures are planar, schematic representations of the dice disclosed in the '487 patent renders them distinct from the disclosure in U.S. Pat. No. 5,224,708 (issued to Gathman) (the '708 patent), despite the fact that the '708 patent employed a similar drawing to represent a schematic view of a twenty-sided die said to embody that invention. As the plaintiff is aware, the United States Patent and Trademark Office only allowed the '197 patent over the prior, Gathman patent upon an examiner's amendment to the effect that the extension member of the die construction claimed in the '197 patent would be comprised of facets having a surface area that is different from a surface area of the facets comprising the end caps. Based on the examiner's amendment, it is apparent that the examiner considered the '708 patent to disclose a twenty-sided die composed of twenty facets of identical shape and size (and therefore surface area). This conclusion is consistent with the express language of the '708 patent itself, which describes the dice as having "identically shaped flat surfaces" and which includes this same language in the claims. Each of the surfaces in Figure 3 of the '708 patent is properly

understood, and apparently was understood by the examiner, to be an equilateral triangle.

The disclosed die design in Figures 3 and 4 of the '487 patent is not composed of twenty equilateral triangles. Because the figure is planar, determination of the actual "shape" of the depicted facets may be readily accomplished through observation and measurement. In the '487 patent, the dice are shown as being composed of two distinct sets of faces: (1) ten identically-shaped faces, each of which is an equilateral triangle:



and (2) ten identically-shaped faces, each of which is an isosceles triangle arranged to form a regular pentagon:



This first set of faces constitutes the "extension member" in the parlance of the '197 patent, and the second set comprises the two "end caps." There can be no dispute regarding the fact that these two sets of faces have different surface areas. Each of the triangles on the "end caps" has an edge equal to the length of an edge of each of the "extension member" equilateral triangles, but the remaining two edges are shorter and the height of the "end cap" triangles is less than that of the "extension member" faces.

Because the '487 patent discloses polyhedral dice identical to the Gathman patent except that the surface area of the end cap facets is different from the surface area of the extension member facets, this disclosure anticipates at least claims 1 through 6, 10 through 12, 17, and 18 of the '197 patent, even as modified by the examiner's amendment.

Hasbro further contends that at least claims 1 through 9 and 16 through 19 of the '197 patent are invalid and unenforceable on the grounds that they are anticipated by, at a minimum,

the disclosures in François Sulpice Beudant, *Traité Élémentaire de Minéralogie*, v. 2 at Pl. 4 (2[d] Ed. Paris, Chez Verdière, 1832):




and Jacques Louis Comte de Bournon, *Traité Complet de la Chaux Carbonattée et de l'Arragonite*, v. 3 at Pl. 17 (London, William Phillips, 1808):

Fig. 266.



Other references from mineralogy and crystallography anticipate certain of the claims of the '197 patent. For example, James D. Dana, *Descriptive Mineralogy* (6th Ed., Edward S. Dana ed., New York, John Wiley & Sons 1909) at 651, anticipates claims 1, 2, 3, and 16 of the '197 patent, but does not reflect the limitation described in claim 4:



As a result, the Dana reference, but for the limitation in claim 4 and in claim 17(b)(iv) that the

extension member facets be "triangular-shaped," also discloses the subject matter of claims 5 through 9, and 17 through 19 of the '197 patent.

By contrast, other figures such as that disclosed in Ian Mercer, *Crystals* at 58 (Cambridge, Mass., Harvard Univ. Press 1990) show facets that are "triangular" in shape, even if not composed of a single triangle; these references therefore anticipate claims 1 through 9 and 16 through 19 of the '197 patent:



Models of crystals like the one depicted immediately above have been sold in the United States and elsewhere for more than 100 years for the study of crystallography, and remain commonplace in geology departments. The model depicted below, for example, is housed at the University of Rhode Island along with many dozens of other models; the one depicted here clearly anticipates at least claim 1 of the '197 patent[1]:

[1] The model depicted here does not have indicia on each of the faces of the object, and therefore does not anticipate claims 2 and 17 of the '197 patent and the corresponding dependent claims. However, it is common for such models to have indicia on each of their facets. For example, the following model from the Krantz series of crystal models shows numerical indicia on each of its faces (from Mercer, *Crystals* at 59):





In addition to the fact that the '197 patent is invalid or unenforceable because the relevant claims are anticipated, each of the claims of the '197 patent asserted to have been infringed by Hasbro are and, at the relevant time, would have been obvious to one skilled in the relevant art because they involve only "the simple substitution of one known element for another or the mere application of a known technique to a piece of prior art ready for the improvement." *KSR Int'l v. Teleflex*, 550 U.S. ___, slip op. at 14 (Apr. 30, 2007).

In light of the close relationship of crystallography, the geometry of crystals, and the pertinent art of the design of dice, the plaintiff's invention was obvious in light of the prior art at all relevant times. Identical or substantially identical structures are present in the prior art, particularly the prior art in the fields of dice design and crystallography, the differences between which and the claimed die design would be immediately surmounted by application of ordinary skill in the art of the design of dice. Such differences are limited to (1) in some cases, the use of indicia on "extension member" faces, (2) in some cases, the extension of the end caps to a pyramidal point, and (3) the extrapolation of the design of the dice to dice with different numbers of indicating faces. The solution of these differences would have been readily apparent to one with ordinary skill in the relevant arts.

The prior art is replete with representations of the same or substantially the same geometric forms as those claimed in the '197 patent, including numerous representations of such figures in the context of crystallography and mineralogy.[2] *See* (in addition to the references

[2] The fields of solid geometry and crystallography are inextricably linked and have been for centuries. For

*supra*), *e.g.*, Delvalle Lowry, *Conversations on Mineralogy* (Philadelphia, Uriah Hunt, 1822), at figs. 192, 201, 202, and 203; and George H. Williams, *Elements of Crystallography* (3[d] Ed. New York, H. Holt & Co., 1892) at 127. One example common to the prior art is depicted below:



Fig. 266. Fig. 267.[3]

As can be readily seen, this art is identical to the claimed six-sided die construction in the '197 patent except that the "end caps" are shortened, so that instead of a pyramidal shape, the ends have a sloped, then flattened shape:



Given such prior art, the claimed die construction in the '197 patent would have been obvious to one of ordinary skill in the art of the design of dice, who would only have to apply well documented and commonly understood principles of dice design to yield the claimed invention in its entirety.

It is well known to those with ordinary skill in the arts of dice and the design of dice that dice for use in generating a variety of randomized outcomes may be formed of polyhedral figures known initially, and primarily, in the crystallographic and mineralogical areas. For example,

---

example, reference continues to be made to "Haüy constructions" of various geometric solids, referring to the process of constructing polyhedra by the accumulation of identical building blocks, a method explained by René Just Haüy in his *Essai d'une théorie sur la structure des crystals appliquée à plusieurs genres de substances crystallisées* (1784). *See, e.g.*, http://mathworld.wolfram.com/HauyConstruction.html.

[3] Bournon, *supra*, at Pl. 17.

many of the traditional shapes for polyhedral dice are, in addition to being known geometric figures, also well-known crystallographic figures. The cube, for instance, which is the basis of the most common six-sided dice, is known in geometry as a Platonic solid, but also in crystallography as the crystalline form of fluorite. Stylistic modifications to the basic cubic form for a six-sided die echo other crystal forms as well:


4

5

6

Likewise, the tetrahedron, commonly used as the basis for a four-sided die (and claimed as such in U.S. Pat. No. 3,208,754), is the basic crystal form of copper antimony sulfide (also known eponymously as tetrahedrite):


7

8

9

Diamond, among other substances, naturally crystallizes into a regular octahedron, its most common crystal habit and the basis of the common eight-sided die:

---

4 M. Reeks, *Hints for Crystal Drawing* (New York, Longman, Greens & Co. 1908) at 25.

5 F.S. Beudant, *Minéralogie* (Paris, Langlois & Leclercq 1851) at 22.

6 U.S. Pat. No. 1,539,015.

7 Beudant, *supra* at n. 5, at 23.

8 Wm. Phillips, *An Elementary Introduction to Mineralogy* (Brooke and Miller, eds., London, Longman *et al.* 1852) at 13.

9 http://www.dicecollector.com/D4_OPAQUE_SHARP_SOLID_DRAGON_1.jpg.



[10]

[11]

[12]

Closely related is the tetragonal bipyramid, similar in form but consisting of isosceles faces. This crystal form and the corresponding playing die are depicted immediately below:


[13]

[14]

Where the design of dice departs from the most common forms of polyhedral dice, and where the dice have other than four, six, eight, ten, twelve, and twenty sides, the form of dice becomes steadily more disconnected from common geometry while the connection between crystallography and dice design becomes almost seamless. The most common twelve-sided dice, for example, are formed of pentagonal dodecahedra, a form also called a "pyritohedron" based on the fact that this form is a crystal habit of the mineral pyrite.


[15]

[16]

[17]

10 J. Müller, *Grundzüge der Krystallographie* (Braunschweig, Friedrich Vieweg & Sohn 1845) at 22.

11 http://www.dicecollector.com/D8_OPAQUE_SHARP_SOLID_DIAMOND_DICE_01.jpg.

12 U.S. Pat. No. 4,717,154.

13 Edward S. Dana, *A Text-Book of Mineralogy* (New York, John Wiley & Sons 1908) at 60.

14 http://www.dicecollector.com/D8_OPAQUE_SHARP_SOLID_TSR.jpg.

15 James D. Dana, *Descriptive Mineralogy* (6th Ed., Edward S. Dana ed., New York, John Wiley & Sons 1909) at 85.

16 U.S. Pat. No. 3,608,905.

Another well-known method of producing twelve-sided dice is to employ a rhombic, not pentagonal, dodecahedron, a shape known as the crystal form of garnets and other minerals.


[18]


[19]


[20]


[21]


[22]

A further method of producing dice with different numbers of sides (so long as the total number of sides is even) is based on the use of dipyramidal structures analogous to the octahedral diamond example, above. Twelve-sided dice can be (and have been) made in the form of a truncated hexagonal dipyramid, the crystal habit of Bucklandite.


[23]


[24]

As noted above, eight-sided dice can be (and have been) made of square, or tetragonal, bipyramids, the crystal habit of scheelite. Four-sided dice can be (and have been) made in the form of a tetragonal disphenoid, a crystal habit of chalcopyrite:

---

17 http://www.dicecollector.com/D12_OPAQUE_ROUNDED_SOLID_1.jpg.

18 Fredrick Accum, *Elements of Crystallography* (London, Longman, Hurst, Rees, Orme, and Brown, 1813) at Pl. II.

19 U.S. Pat. No. 1,517,113.

20 U.S. Pat. No. 3,904,208.

21 http://www.dicecollector.com/D12_OPAQUE_SHARP_SOLID_5.jpg.

22 http://www.dicecollector.com/D12_OPAQUE_ROUNDED_SOLID_BLACK_LOUVRE_EGYPTIAN_COPY.jpg.

23 http://www.dicecollector.com/LOTTERY_07_ROLL_TO_RICHES.jpg.

24 Dana, *supra* at n. 15, at 517.

[25]


[26]


[27]

Indeed, mineralogy has proved a great resource for dice design, whether directly or indirectly. One designer, at least, has created a six-sided die in the form of a tristetrahedron, known primarily as a crystal habit of the mineral sphalerite



[28]
[29]

Other six-sided dice have been made of hexagonal prisms (a crystal habit of calcite), which can be modified (to avoid the possibility of the die landing on the ends) by the addition of "end caps":

[30]
[31]

The use of "end caps" is common in the prior art. U.S. Pat. No. 5,150,900, for example, discloses rounded end caps on an octagonal prism die:

---

25 Reeks, *supra* at n. 4, at 95.

26 U.S. Pat. No. 4,346,900.

27 http://www.dicecollector.com/D4_OPAQUE_ROUNDED_SWIRL_WEDGE.jpg.

28 Edward S. Dana, *A Text-Book of Mineralogy* (New York, John Wiley & Sons 1908) at 48.

29 http://www.dicecollector.com/PAPER_D06_MY_DESIGN_TRIAKIS_TETRAHEDRON_PIPPED.jpg.

30 Dana, *supra* at n. 28, at 54.

31 http://www.dicecollector.com/METAL_BRASS_D6_05.jpg.



FIG. 2

Utilizing pyramidal end caps, as the plaintiff did, on a prismatic die yields the crystal form of quartz[32]:

266.


[33]

In fact, this is apparently exactly what the plaintiff himself did in creating a "crystal"-shaped four-sided die for inclusion with his set of "crystal dice." He took a standard elongated cube and placed pyramidal "end caps" on the form in order to prevent the dice from landing on any but the four rectangular faces. The Plaintiff's die is virtually indistinguishable from the artwork created in the crystallographic context:

Fig. 849.


[34]



[35]

Such use of pyramidal end caps comprised of discrete facets is nothing new, but rather is present in the prior art involving the design of dice; and indeed, the use of pyramidal structures is itself suggested by the crystallographic prior art:

---

32 Edward S. Dana, *A Text-Book of Mineralogy* (New York, J. Wiley & Sons 1908) at 83.

33 Dana, *supra* at n. 28, at 83.

34 P. Groth, *Physikalische Krystallographie* (Leipzig, Wilhelm Engelmann 1905) at 427.

35 http://crystalcaste.com/mm5/graphics/00000001/011xxF.gif.


[36]

[37]

Other aspects of dice design involve the interpolation or extrapolation of existing crystal forms to yield additional types of dice, which do not occur naturally. For example, dice designers have varied the hexagonal prism die form, referenced above, by selecting a different number of sides, creating dice that consists of a prism of some selected number of non-pinacoidal sides:


[38]

[39]

Likewise, the notion of using dipyramidal or deltahedral structures (common in mineralogy) can be expanded to permit the creation of a theoretically infinite variety of dice. U.S. Pat. No. D323,684 discloses one such die, a fifty-sided bipyramidal structure. That die, the die manufactured under that patent, and other die forms following the same basic pattern are depicted immediately below:


[40]

[41]

[42]

[43]

---

36 U.S. Pat. No. 4,566,697.

37 Müller, *supra* at n. 10, at 26.

38 http://www.dicecollector.com/D08_OPAQUE_SHARP_SOLID_STICK_02.jpg

39 U.S. Pat. No. 4,900,034.

40 U.S. Pat. No. D323,684.

41 http://www.dicecollector.com/D50_OPAQUE_ROUNDED_SOLID.jpg.

Essentially, die design has often comprised nothing more than the placement of indicia on certain, or all, faces of a corresponding crystal figure to create a functioning die. That is precisely what the plaintiff did in designing his dice, regardless of whether he believed the design to be innovative. One example not involving the plaintiff involves the 24-sided die disclosed (but not claimed) in U.S. Pat. No. 4,489,946. That die consists of a tetrahexahedron with indicia on each of the 24 faces of the polyhedron. The tetrahexahedron – the crystal habit of copper – has been well known in the crystallographic and mineralogical areas for centuries. *See*, *e.g.*, Tennant and Mitchell, *Mineralogy and Crystallography* (London, R. Griffin & Co., 1860) at 308; P. Groth, *Physikalische Krystallographie* (Leipzig, Wilhelm Engelmann, 1905) at 521.


44



45



46

The dice are formed merely by placing indicia on the faces, something that is already reflected in the crystallographic reference shown above. Only subtly different from the tetrahexahedral shape of copper crystals, the crystallized form of Leucite forms a trapezohedral 24-sided shape disclosed in the prior art. Once again, dice design tracks the crystallographic forms perfectly:


47

Fig. 369.


48

897.


49



50

---

42 http://www.dicecollector.com/D34_OPAQUE_ROUNDED_SOLID_2.jpg.

43 http://www.dicecollector.com/D16_OPAQUE_SHARP_SOLID_METASCAPE.jpg.

44 T. Liebisch, *Geometrische Krystallographie* (Leipzig, Verlag von Wilhelm Engelman, 1881) at 235.

45 U.S. Pat. No. 4,489,946.

46 http://www.dicecollector.com/D24_PRODUCTION_GAMESCIENCE.jpg.

In the context of the '197 patent, the plaintiff's invention amounted to nothing more than placing indicia on certain sides of a known crystal form. In essence, his die invention consisted of supplementing the indicia on the following shape, designed some two hundred years ago by Jacques Louis, Comte de Bournon, with five more numbers, a mere ministerial task for anyone with rudimentary knowledge of dice:



In addition, in light of the foregoing examples of various dice shapes, as well as those many others existing in the relevant prior art, it is apparent that there is a "design need or market pressure" to generate new and different shapes for polyhedral dice that renders the relevant patent claims "obvious to try." *KSR*, *supra*, at 17. Because the plaintiff's invention, at least as to all claims that he contends Hasbro to have infringed, was obvious in light of the prior art, the claims of the '197 patent alleged to have been infringed are invalid and/or unenforceable.

---

47 http://webmineral.com/specimens/Leucite.jpg.

48 P. Groth, *Physikalische Krystallographie* (Leipzig, Verlag von Wilhelm Engelmann 1876) at 323.

49 Dana, *supra* at n. 28, at 460.

50 http://www.dicecollector.com/D24_LD_DIFFUSION_01.jpg.

I, Christine A. Meehan, am employed by Hasbro, Inc. as a paralegal in Hasbro, Inc.'s corporate counsel's office. I have assembled the information required to answer these interrogatories. Although I do not have personal knowledge of all the information contained herein, I am executing these Answers on behalf of Hasbro, Inc. I affirm my good faith basis as to the accuracy of the information so provided.

For the Defendant, Hasbro, Inc.

Christine A. Meehan

As to Objections for the Defendant

HASBRO, INC.
By its Attorneys,

Todd D. White (# 5943)
Jeffrey K. Techentin (#6651)
Adler Pollock & Sheehan P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903
(401) 274-7200
Fax: (401) 751-0604/ 351-4607
Dated: June 26, 2007

**CERTIFICATE OF SERVICE**

I hereby certify that on this 26th day of June 2007, I caused a true copy of the within to be served on the following individuals by regular mail, postage prepaid:

Craig M. Scott, Esq.
Christine K. Bush, Esq.
Duffy & Sweeney & Scott, Ltd.
One Turks Head Place, Suite 1200
Providence, RI 02903

Of Counsel:

Thomas J. Leach, Esq.
Douglas J. Williams, Esq.
Law Firm of Merchant and Gould P.C.
3200 IDS Center
80 South 8th Street
Minneapolis, Minnesota 55402-2215

David K. S. Cornwell, Esq.
Sterne Kessler Goldstein Fox
1100 New York Avenue, NW
Washington, D.C. 20005

419458_1