UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| MICHAEL BOWLING, a Resident of Arizona, | : | |
| Plaintiff, | : | |
| v. | : | C.A. No. 05-229 S |
| HASBRO, INC., a Rhode Island Corporation, | : | |
| Defendant. | : | |

**DEFENDANT HASBRO, INC.'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, FOR A NEW TRIAL OR, IN THE ALTERNATIVE, FOR REMITTITUR**

Pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, Defendant Hasbro, Inc. ("Hasbro") hereby renews its motion, made at the close of the Plaintiff's case in chief and again at the close of all evidence, for judgment as a matter of law. In the alternative, Hasbro requests a new trial on the issue of damages pursuant to Rules 50(b) and 59(a) of the Federal Rules of Civil Procedure. As a further alternative, Hasbro moves to alter or amend the judgment, in the form of a remittitur, to comport with the evidence adduced at trial. The grounds in support of this motion are set forth in the accompanying Memorandum of Law.

Respectfully submitted,

HASBRO, INC.
By its Attorneys,

/s/ Jeffrey K. Techentin__________

Todd D. White (# 5943)
twhite@apslaw.com
Jeffrey K. Techentin (#6651)
jtechentin@apslaw.com
Adler Pollock & Sheehan P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903
(401) 274-7200
Fax: (401) 751-0604/ 351-4607
Dated: April 7, 2008

Of Counsel:

David K. S. Cornwell, Esq.
davidc@skgf.com
Tracy-Gene G. Durkin, Esq.
tdurkin@skgf.com
Sterne Kessler Goldstein Fox
1100 New York Avenue, NW
Washington, D.C. 20005

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| MICHAEL BOWLING, a Resident of Arizona, | : | |
| Plaintiff, | : | |
| v. | : | C.A. No. 05-229 S |
| HASBRO, INC., a Rhode Island Corporation, | : | |
| Defendant. | : | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT HASBRO, INC.'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, FOR A NEW TRIAL OR, IN THE ALTERNATIVE, FOR REMITTITUR**

Defendant Hasbro Inc. ("Hasbro") hereby submits this Memorandum of Law in support of its renewed motion for judgment as a matter of law. In the alternative, Hasbro requests a new trial on the issue of damages pursuant to Rules 50(b) and 59(a) of the Federal Rules of Civil Procedure. As a further alternative, Hasbro moves to alter or amend the judgment, in the form of a remittitur, to comport with the evidence adduced at trial.

## I. Introduction

This is a patent infringement action in which Plaintiff Michael Bowling ("Plaintiff" or "Bowling") asserts that Hasbro infringed U.S. Pat. No. 5,938,197 to Bowling (the "'197 patent) when it included certain playing dice in two versions of its venerable Monopoly® game. The two versions included a "Monopoly Millennium Edition" game and a "Monopoly 2000" game sold through the Avon company. This second version of the game is commonly referred to as the "Avon Edition." Plaintiff alleges, and Hasbro admits, that prior to and after the issuance of the

’197 patent, Hasbro included two dice as depicted immediately below in both versions of the game:



Bowling contends that the above-pictured dice (the “Accused Dice”) infringed claims 1-9 and 16-19 of the ’197 patent.

For purposes of trial, and explicitly on the basis of certain pretrial rulings by the Court in this case (particularly, but not limited to, the Court’s claim construction ruling [Docket No. 97]), Hasbro conceded that the Accused Dice infringed claims 1-9 and 16-19 of the ’197 patent. This motion follows the entry of judgment [Docket No. 205] resulting from a six-day jury trial on the three remaining issues in this case: (1) whether Plaintiff marked his patented products in accord with the patent marking statute, 35 U.S.C. § 287, and was therefore entitled to damages for infringement that occurred prior to Hasbro’s receipt of actual notice of alleged infringement on November 10, 1999; (2) the damages Bowling suffered as a result of Hasbro’s infringement (including any infringement as to which he was entitled to damages prior to the date of actual notice); and (3) whether Hasbro’s infringement of the ’197 patent was willful.

The jury returned a mixed verdict, finding that (1) Bowling marked his dice in compliance with 35 U.S.C. § 287; (2) Bowling suffered $446,182.40 in damages; and (3) Hasbro’s infringement was not willful. Docket No. 204. The Court entered judgment accordingly on March 24, 2008. Docket No. 205.[1]

[1] At Plaintiff’s request, Hasbro’s defense of inequitable conduct was tried to the Court. All evidence on that issue has been submitted. The parties have not yet argued the issue and it remains for the Court’s determination.

Hasbro brings this motion, as it did its initial Rule 50 motions, based upon Plaintiff's failures of proof on the issues of marking and damages and also based upon the jury's flagrant overstatement of damages in light of the evidence introduced at trial. As explained below, Plaintiff offered no cognizable evidence of damages and therefore entry of judgment as a matter of law in Hasbro's favor is appropriate. Because the Patent Act guarantees that as a patent owner Bowling is entitled to no less than a reasonable royalty, Hasbro respectfully submits that in the absence of any proof as to what a reasonable royalty is for his dice, Bowling can be entitled to no more than nominal damages, regardless of whether he is entitled to damages for infringing sales that occurred prior to Hasbro's receipt of actual notice pursuant to the requirements of 35 U.S.C. § 287.

Even if the trial record were to support some level of reasonable royalty, Hasbro is entitled to judgment as a matter of law on the issue of marking, and therefore Bowling's damages must be limited to infringements that occurred after Hasbro received actual notice on November 10, 1999. Bowling's marking scheme was predicated entirely upon active cooperation of his customers, both retailers and distributors. Even if Bowling could reasonably have relied upon those customers to effect his marking scheme initially, the undisputed evidence is that he continued to sell substantial quantities – in fact, the majority – of his dice to customers who gave no indication that they would cooperate and/or as to whom there is no competent evidence that they were even on notice that Bowling desired or expected their assistance with marking. Based upon the evidence at trial, Bowling failed as a matter of law to mark his dice.

Alternatively, Hasbro seeks a new trial or remittitur based upon the jury's patently erroneous damages verdict. Despite the fact that Bowling was entitled to no more than a reasonable royalty, it is beyond dispute that the jury awarded Bowling what amounted to a "lost

profit" measure of damages more than sixty (60) times greater than any reasonable royalty for which any evidence was presented at trial.

Although the jury was not given special interrogatories that required it to reveal the mechanism by which it arrived at its damages number of $446,182.40, it is obvious just how it did so. During closing argument, Plaintiff's counsel told the jury that there were 732,000 pairs of dice in total, and that 175,172 games had been sold prior to the patent's issuance, leaving a total of 556,828 games as to which Hasbro was liable for infringement. Plaintiff's counsel then said that 184,000 of these games were "Avon Edition" games, leaving 372,828 "Monopoly Millennium Edition" games.[2] The jurors alertly noticed that the 184,000 number used by Plaintiff's counsel was incorrect, and that the correct number, shown on Exhibit 87, was 184,900. The jury apparently added these "additional" 900 units to Plaintiff's counsel's numbers, yielding a total of 557,728 games, which would have contained twice that number of dice, or 1,154,456 dice in all. The jury then assessed damages in the amount of $0.40 per die, for a total damages amount of $446,182.40.[3] This verdict is "'grossly excessive' or monstrous, clearly not supported by evidence, or based only on speculation or guesswork." *Oiness v. Walgreen Co.*, 88 F.3d 1025, 1031 (Fed. Cir. 1996).

After Bowling's expert was disqualified to testify as to a reasonable royalty on Hasbro's dice, Bowling jettisoned any pretense of persuading the jury about what a reasonable royalty for

---

[2] This representation by Plaintiff's counsel was false, unsupported by any testimony, and belied by Exhibit AN. That exhibit, which shows shipments of the various "SKUs" at issue by date, shows that at least 9,504 Avon Edition units were sold between the date of the '197 patent's issuance and November 1, 1999. The 184,900 number represented Hasbro's admission regarding the number of Avon Edition units containing Accused Dice that it acknowledged had been sold ***after*** November 1, 1999. Plaintiff misstated the number of the lower-priced Avon Edition units in order to increase his claimed damages, because he was urging that damages be awarded as a percentage of the selling price of the games.

[3] This addition of 900 units meant that the jury was then calculating damages based upon more infringing units than Hasbro could possibly have sold, since the total of 557,728 and 175,172 (pre-patent) games exceeds the undisputed total number of dice purchased by Hasbro (732,000 pairs). *See* Exhibit AD.

the Accused Dice would be. He got what he wanted: a large verdict utterly divorced from any evidence as to his actual damages. This verdict cannot stand.

## II. The Evidence at Trial

### A. Reasonable Royalty

A "royalty" of $0.40 per die finds no support in the record, whatsoever. More likely, the jury was persuaded by Bowling's testimony (over Hasbro's objection) that he was somehow entitled to charge Hasbro the same price for Hasbro's use of "his" dice in the Monopoly games that he charged some of his customers. Indeed, that is the only evidence that Bowling advanced at trial. He offered no opinion regarding a reasonable royalty (nor was he qualified to do so), and presented no evidence from which a reasonable royalty might be derived. Instead, Bowling chose to testify exclusively that he sold his dice for $0.64 each, with some discounts for his distributor-customers, and that his cost was something more than $0.13 per die (denying any knowledge of his actual cost of goods). This testimony, admitted over Hasbro's objection, likely led the jury to think that $0.40 represented a reasonable profit had Bowling actually sold the dice to Hasbro for use in the Monopoly games.

As the Court is aware, an established royalty could, in and of itself, be sufficient to establish a reasonable royalty for damages. Because Bowling did not have any established royalty for his invention, the reasonable royalty must be established through a hypothetical negotiation, an abstract process that "requires the court to envision the terms of a licensing agreement reached as the result of a supposed meeting between the patentee and the infringer at the time infringement began." *Rite-Hite Corp. v. Kelly Co., Inc.*, 56 F.3d 1538, 1554 (Fed. Cir. 1995).

There is a wide array of evidence that might permit a jury to determine a reasonable royalty, but Bowling presented none. *See, e.g.*, *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1393 (Fed. Cir. 2003); *TWM Mfg. Co., Inc. v. Dura Corp.*, 789 F.2d 895, 898 (Fed. Cir. 1986); *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F.Supp. 1116, 1120 (D.C.N.Y. 1970), *aff'd*, 446 F.2d 295 (2nd Cir. 1971), *cert. denied*, 404 U.S. 870 (1971). A comparison of the *Georgia-Pacific* factors and the actual evidence shows that Bowling completely failed to prove any reasonable royalty or even to present sufficient evidence that would permit the jury to determine a reasonable royalty:

| ***GEORGIA-PACIFIC FACTOR*** | **EVIDENCE INTRODUCED AT TRIAL** |
|---|---|
| 1. The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty. | None; Bowling conceded that he had not licensed his invention. *See Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1078 (Fed. Cir. 1983) (for a royalty to be "established" it "must be paid by such a number of persons as to indicate a general acquiescence in its reasonableness by those who have occasion to use the invention") |
| 2. The rates paid by the licensee for the use of other patents comparable to the patent in suit. | None; no comparable patents were introduced, nor was any evidence of Hasbro's rates paid for any comparable inventions |
| 3. The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold. | None; Bowling did not identify any aspects of the hypothetical license that would inform the amount of royalty, preferring instead to insist merely that he would not have licensed his invention to Hasbro |
| 4. The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly. | None; Bowling showed no licenses containing special conditions to maintain his monopoly and admitted that prior to the issuance of the patent he had actively sought to expand his products into board games or items such as "Crystal Yahtzee" (*e.g.*, Exhibit BO) |

| *GEORGIA-PACIFIC FACTOR* | **EVIDENCE INTRODUCED AT TRIAL** |
|---|---|
| 5. The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter. | None; Bowling introduced no evidence on this subject. In its case, Hasbro introduced evidence that Bowling and Hasbro were not competitors, since Hasbro was not selling dice as stand-alone items but rather as a component in a mass-market board game, whereas Bowling was selling dice to a niche market |
| 6. The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales. | None; Bowling did not testify to any derivative or convoyed sales or that his patented dice drove any other sales |
| 7. The duration of the patent and the term of the license. | Bowling testified as to the duration of his patent, but did not testify as to the term of the hypothetical license |
| 8. The established profitability of the product made under the patent; its commercial success; and its current popularity. | Bowling did not put on any evidence regarding the profitability of his patented dice or their current popularity; on cross-examination he acknowledged that his accounting books showed that he had suffered overall losses from the inception of his crystal dice sales through the date of the hypothetical negotiation |
| 9. The utility and advantages of the patented property over the old modes or devices, if any, that had been used for working out similar results. | Bowling testified that his dice were the first to have “non-traditional” shapes and that they worked better than his “prototype.” Bowling did not testify that his dice worked better than other existing dice. Mike Gray testified that other “non-traditional” shapes for dice existed prior to the ’197 patent and the Court took judicial notice of a number of dice patents that show that Bowling was incorrect in his claim that his were the first “non-traditional” shapes for dice |
| 10. The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention. | Bowling introduced the patent and his commercial dice, from which the jury was free to determine the nature of the patented invention and the character of his commercial embodiment of the invention. Bowling offered no proof of any benefits to those who have used the invention. |

| *GEORGIA-PACIFIC FACTOR* | **EVIDENCE INTRODUCED AT TRIAL** |
|---|---|
| 11. The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use. | Bowling testified as to the fact that Hasbro used the invention and, through the introduction of a Hasbro spreadsheet, provided evidence that Hasbro had used the Accused Dice in a number of games. Bowling offered no evidence as to the value of that use. During Hasbro's case, Michael Hirtle testified as to the value of Hasbro's use of the Accused Dice |
| 12. The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions. | None; Bowling offered no testimony on this subject. Michael Hirtle expressly stated that there was no industry standard for the licensing of a component of a game |
| 13. The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer. | Bowling introduced no evidence on this subject. Michael Hirtle testified that the Accused Dice accounted for approximately 2.4% (Avon Edition) or 1.1% (Millennium Edition) of the selling price of the games. Based on the profit numbers contained in Exhibit MA, the profit attributable to each Accused Die (as opposed to the elements uniquely contributed by Hasbro) was \$0.037 (Avon Edition) and \$0.036 (Millennium Edition) |
| 14. The opinion testimony of qualified experts. | None from Bowling. Hasbro introduced the testimony of Michael Hirtle, who testified that a reasonable royalty would be \$0.01 per Avon Edition game and \$0.014 per Millennium Edition game |
| 15. The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee - who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention - would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license. | Bowling offered no testimony on this subject. Hasbro introduced the testimony of Michael Hirtle, who testified that a reasonable royalty would be \$0.01 per Avon Edition game and \$0.014 per Millennium Edition game |

Because Bowling failed to put on any evidence of a reasonable royalty,[4] the sum and substance of the evidence at trial on this issue is limited to the testimony of Michael Hirtle, a Hasbro witness. Mr. Hirtle testified unequivocally (after Plaintiff rested) that a reasonable royalty would be approximately $0.01 per "Avon Edition" game and $0.014 per "Millennium Edition" game. His calculations for these conclusions were spelled out in detail and embodied in Exhibit MA:

**Avon Edition**

| **Cost of Dice (Cd)** | **Cost of Game (Cg)** | **Percentage Cost of Dice (Cdp) (Cd/Cg)** | **Sales Price (P)** | **Net Sales Price (Pn) (0.9*P)** | **Net Sales Price for Dice (Pnd) (Cdp*Pn)** | **Royalty Rate (R)** | **Royalty Per Game (Pnd*R)** |
|---|---|---|---|---|---|---|---|
| $0.128 | $5.42 | 0.024 (2.4%) | $9.50 | $8.55 | $0.2052 | 5% | $0.010 |

**Millennium Edition**

| **Cost of Dice (Cd)** | **Cost of Game (Cg)** | **Percentage Cost of Dice (Cdp) (Cd/Cg)** | **Sales Price (P)** | **Net Sales Price (Pn) (0.9*P)** | **Net Sales Price for Dice (Pnd) (Cdp*Pn)** | **Royalty Rate (R)** | **Royalty Per Game (Pnd*R)** |
|---|---|---|---|---|---|---|---|
| $0.128 | $11.87 | 0.0108 (1.1%) | $28.50 | $25.65 | $0.277 | 5% | $0.014 |

---

4 Although Bowling put on evidence that could be considered in the context of finding a reasonable royalty under the *Georgia-Pacific* factors (*e.g.*, the "nature of the invention"), none of that evidence is sufficient or competent to allow a fact-finder to determine a reasonable royalty. Broadly speaking, several of the *Georgia-Pacific* factors suggest a royalty rate (established royalties, comparable license agreements, industry standards, etc.). But others only provide information that could be relevant to influencing the royalty rate (for example, the commercial relationship between the patentee and the infringer).

All of Bowling's proofs, to the extent they have any bearing on a reasonable royalty analysis, fall into this second category. This deficiency left the jury without any basis to determine a reasonable royalty. For example, does the fact that Hasbro and Bowling were or were not direct competitors mean that the reasonable royalty should be 5%? 10%? 0.000003%? Of course, it means no such thing. Without any starting point, because Bowling had introduced none, the jury was completely incapable of determining a reasonable royalty even though there was some evidence that, broadly speaking, could have been relevant to a legitimate *Georgia-Pacific* analysis.

Utilizing the quantities of games identified in Plaintiff's counsel's closing argument (184,000 Avon Edition games and 372,828 Millennium Edition games), the maximum total royalties that Mr. Hirtle's testimony could sustain would be $7,059.59. Factoring in the "extra" 900 Avon Edition games, mentioned above, the maximum damages would be $7,068.59.

But, as mentioned before, Plaintiff's counsel understated the number of Avon Edition games. As shown in Exhibit AN, Hasbro sold 8,448 Avon Edition games before the patent issued, and another 9,504 Avon Edition games between the date the '197 patent issued and November 1, 1999. Thus, assuming that Hasbro sold games containing every single pair of Accused Dice that it ever purchased, and assuming that Bowling's representation of pre-patent sales was accurate, the evidence shows that the games actually sold after the patent issued containing Accused Dice would have consisted of 194,404 Avon Edition games and 362,404 Millennium Edition games. Applying Mr. Hirtle's royalty calculation, the maximum damages that the jury could have found based upon the evidence would be **$7,017.98** ($5,073.94 (Millennium Edition) + $1,944.04 (Avon Edition)).[5]

**B. Patent Marking**

In stark contrast to the question of reasonable royalty, Bowling put in substantial evidence at trial regarding the question of patent marking. His testimony, however, coupled with the documentary exhibits and the testimony of Steen Jensen and Eric Burke, falls far short of the evidentiary threshold to permit a finding of continuous and consistent patent marking. Rather, it is apparent as a matter of law that Bowling failed to mark, on a continuous basis, all or substantially all of his patented dice "either by fixing thereon the word 'patent' or the

---

[5] This calculation also assumes that Plaintiff actually marked his dice. The evidence adduced at trial was insufficient on that point as well, as discussed *infra*. Applying Mr. Hirtle's royalty analysis to the maximum number of games sold after actual notice was received by Hasbro on November 10, 1999 (184,900 Avon Edition units), Plaintiff's maximum damages based on the evidence at trial was $1,849.00.

abbreviation 'pat.', together with the number of the patent, or when, from the character of the article, this cannot be done, by fixing to it, or to the package wherein one or more of them is contained, a label containing a like notice." 35 U.S.C. § 287(a).

Bowling testified that he could not mark the dice due to manufacturing limitations. He chose not to sell his dice in individual packaging for marketing purposes, specifically because he believed that his customers would want to test-roll the dice to decide which one(s) to purchase and they could not do so if the dice were individually-packaged. Instead of marking either the dice or their packaging (the only two methods recognized in Section 287), Bowling endeavored to have his customers "mark" the containers in which his patented dice were to be displayed. Even drawing every inference in Bowling's favor, and even crediting the possibility that Bowling's instructions to his customers could have amounted to "marking" the dice within the meaning of Section 287, Bowling's admitted failure to adhere to that plan dooms any claim that he marked all or substantially all of his dice throughout the relevant time period.[6]

Bowling testified that on August 15, 1999, two days before his patent issued, he sent out letters to his customers (copies of all of his letters are included in Exhibit 24). He sent different letters to his retail customers than he did to his distributor customers. As to retail customers, Bowling directed his customers to place a label on whatever display unit they were using to display Bowling's now-patented dice. As to distributors, Bowling asked that they actively pass along Bowling's patent information to their own customers by sending "patent stickers" with the product. Notably, Bowling never even asked the distributors to tell the retailers why they were

---

[6] As agreed by the parties, the relevant time period for marking ran from August 17, 1999 (the date of the patent's issuance) through November 10, 1999 (the date on which Hasbro received actual notice from Bowling's attorney). Notwithstanding this agreement, Plaintiff's counsel misleadingly argued to the jury that "public notice" was unimportant because Hasbro "already knew" about the patent. This is, of course, contrary to the law and likely led the jury to conclude, just as it had been told, that marking was no big deal.

receiving such stickers or required that the distributors, in turn, secure the agreement of their customers to use the stickers.

Apparently recognizing that it would not be reasonable to assume that these third parties would follow his dictated procedure just because he asked them to, Bowling's letters threatened that the customers must return the countersigned letters indicating their agreement to participate in his marking scheme or he would terminate his sales relationship with them. During trial, Bowling candidly admitted that, contrary to what he said in his letters, he continued to do business with the customers who did not sign and return the letters as requested.

One great deficiency in Bowling's marking scheme was that if Bowling's distributors decided not to carry out his "marking" plan by relaying stickers to their own customers, the majority of Bowling's dice would wind up on store shelves without any patent markings. For example, Berkeley Topline North was one of the customers to whom Bowling sent a letter but from whom he never received any countersigned letter. The uncontroverted trial testimony of Steen Jensen explained that when Berkeley Topline North filled orders for Mr. Bowling's dice, it would do so by picking out a few dice from a large container in its warehouse and then putting those dice into a box along with other items ordered by that customer.

In order for Berkeley Topline North to fulfill Bowling's marking scheme, it would have to maintain a supply of "patent stickers" with Bowling's patented dice so that its warehouse personnel could include these stickers with the customers' shipments. However, Mr. Jensen testified unambiguously that although he repeatedly performed physical inventories on the dice in the warehouse, and had therefore repeatedly looked at the containers in which Bowling's patented dice were stored, he had never seen a patent sticker and never had any idea that Bowling even had a patent.

In creating this type of marking scheme, Bowling took the substantial risk that his patented article would not be marked sufficiently when it was received by the end-user. Without any countersigned letter from Berkeley Topline North, Bowling had no rational basis upon which to conclude that this distributor was complying with his marking requests. Moreover, Bowling never visited any retail stores to verify that his patented dice were actually being displayed with their corresponding patent stickers. Even if Bowling had reasonably believed that his scheme would be followed on the day that he sent out letters to all of his customers, that belief became steadily less reasonable as days and weeks passed and he received no countersigned letter from more than half of his customers.

Certainly, within a month of sending out his "request" letters with no response, Bowling was on notice that a substantial number of his customers may not be complying with his marking requests.[7] Well within the relevant time period, Bowling was on notice that he could not reasonably rely on his requests to those customers that they mark his dice. During the relevant period, Bowling shipped out more than 70% of his dice to customers from whom he did not receive any countersigned letters stating that they would obey his marking instructions. Given that his marking scheme relied on the affirmative actions of his customers, who were individuals and entities that had no fiduciary obligation or employment-related duty to comply with Bowling's requests, his customers' failure to assent to his plan is fatal to any belief that it was actually carried out.

Even if one were to believe that every single customer to whom Bowling had written a "patent label agreement" letter had complied with Bowling's requests (regardless of whether he

[7] The only other evidence proffered by Bowling on this point was the rank hearsay that he had spoken with the customers – also at the time his patent issued – and that they agreed to mark his dice. Even if this story is true, the customers' failure to send back the letters put Bowling on notice that the customers' oral agreements were not worth the paper they weren't printed on.

or she returned a countersigned letter), when Bowling obtained new customers during the relevant time period, Bowling distributed his dice to these new customers without sending any such letter. Specifically, between August 17, 1999 and November 10, 1999, Bowling added four new customers: Dragon's Lair Comics and Fantasy, Robert S. Jones, Old Guard Hobbies, and BERI Distributors. *Compare* Exhibit 24 (list of customers to whom patent label agreement letters had been sent) *with* Exhibit DO (invoices from 8/17/99 to 11/10/99). BERI distributors alone accounted for 1,305 crystal dice purchased during the relevant period, which is more than one in twenty of Bowling's dice sold during that time. In all, these new customers – as to whom Bowling had no basis whatsoever for thinking that they would comply with his marking scheme – accounted for the sale of over 2,000 patented dice.[8]

Given that Bowling never even asked BERI Distributors to assist in marking, how likely was it that BERI Distributors would actively work with its own customers to make sure that Bowling's dice were marked when they were displayed at the retail stores? According to the facts presented at trial, a reasonable jury could not find that BERI Distributors would have included copies of patent stickers (which Bowling knew would routinely be thrown away) with its shipments to its customers, or that it would take the time to place each of its own customers on notice of the obligation to mark their display case in a fashion that would associate the patent sticker with Bowling's patented dice (and no other dice).

[8] On cross-examination, Bowling testified that he sent the patent label agreement letters only to his existing customers because they had his "patent pending" stickers and he needed to be sure that they changed the stickers to the ones with a patent number. He went on to state that because the new customers did not have the "patent pending" stickers in the first place, there was no need to send them patent label agreement letters. This is just dissembling on Bowling's part. Bowling sent the patent label agreement letters to get the customers to agree to label his dice, just as the name on Bowling's file suggests (*see* Exhibit 24). Whether or not his failure to send new letters to new customers was merely an oversight is beside the point. At least as to the dice being sold to Bowling's new customers, no matter what else might be believed about Bowling's marking scheme, there is no evidence that these dice were marked, nor is there any inference that might be drawn to suggest that they had been marked.

After the first date that Bowling sent out a batch of letters to his existing customers, Bowling did not follow-up on his marking scheme – Bowling failed to obtain countersigned letters from the majority of customers to whom he sent letters and failed to send his new customers letters requiring that they mark his dice with the designated patent labels. Even assuming all facts in the light most favorable to Bowling, Bowling's actions plainly constitute a failure to mark "continuously" "all or substantially all" of his dice. The following table shows the net results of Bowling's marking scheme during the relevant period[9]:

| **Total Dice Sold** | **Dice Sold to Customers Who Returned Countersigned Agreement** | **Dice Sold to Customers Who Did Not Return Countersigned Agreement** | **Dice Sold to New Customers (No Agreement Letter Sent)** | **Percentage of Sales to Customers With No Agreement** |
|---|---|---|---|---|
| 22,594 | 6,254 | 14,130 | 2,210 | 72.3% |

## III. <u>Argument</u>

"A motion for judgment as a matter of law only may be granted when, after examining the evidence of record and drawing all reasonable inferences in favor of the nonmoving party, the record reveals no sufficient evidentiary basis for the verdict." *Zimmerman v. Direct Fed. Credit Union*, 262 F.3d 70, 75 (1st Cir. 2001). When reviewing a renewed motion for judgment as a matter of law, the Court must view the facts in the light most favorable to the plaintiff, drawing all reasonable inferences in the plaintiff's favor. *Lama v. Borras*, 16 F.3d 473, 475 (1st Cir. 1994). The Court's job is not to "evaluate the credibility of the witnesses or the weight of the evidence." *Id.* Instead, the jury's verdict must stand "unless the evidence, taken in the light most favorable to the prevailing party, points unerringly to an opposite conclusion." *Zimmerman*, 262 F.3d at 75. Where, as here, there is a complete dearth of evidence presented

9 The information contained in this table is derived from Exhibit DO (showing all of Bowling's sales during marking period) and Exhibit 24 (Bowling's patent label agreement file).

with respect to an essential element of the plaintiff's claim (in this case, both damages and marking) entry of judgment as a matter of law is both warranted and appropriate.

**A. Hasbro Is Entitled to Judgment as a Matter of Law on Damages**

The jury's verdict awarding Bowling a damages amount 60 times greater than could possibly be supported by the evidence introduced at trial cannot stand. Under the patent damages statute, 35 U.S.C. § 284, a patent owner is only entitled to "a reasonable royalty for the use made of the invention by the infringer." Bowling's failure to present any relevant evidence in his case that would allow the jury to determine a reasonable royalty that correlates to Hasbro's use of the patent amounts to a failure of proof that warrants judgment as a matter of law in favor of Hasbro and an award to Bowling either for no damages or nominal damages. *Transclean Corp. v. Bridgewood Serv., Inc.*, 290 F.3d 1364, 1376-77 (Fed. Cir. 2002) (plaintiff not entitled to any reasonable royalty damages where plaintiff failed to "establish[] the amount, if any, of a reasonable royalty"); *Lindemann Maschinenfabrik GmbH v. American Hoist & Derrick Co.*, 895 F.2d 1403, 1406-08 (Fed. Cir. 1990) (affirming award of minimal damages when no reliable proof of a reasonable royalty was present). Should the Court determine that some measure of damages is supported by the evidence, there is no doubt that the jury's verdict far exceeds the maximum value supported by the evidence that could be assigned to Hasbro's use of the patent. Accordingly, a new trial must be awarded. However, the Court can offer Bowling the opportunity to accept a remittitur of the damage award to the maximum value supported by the evidence, and order a new trial only in the event Bowling does not accept. *Scheidt v. Dimick*, 70 F.2d 558, 563 (1st Cir. 1934) (noting duty of trial court to set aside jury verdicts that are "beyond any figures which could be reached upon a fair and reasonable consideration of the case" unless the claimant elects to reduce the verdict by remittitur); *Harris Corp. v. Ericsson, Inc.*, C.A. No.

98-2903, 2003 WL 21750710, at *8 (N.D.Tex. July 17, 2003) (ordering remittitur to maximum value of damages supported by evidence).

### 1. <u>Bowling Is Entitled to No More Than a Reasonable Royalty</u>

Bowling produced no evidence of and did not argue for any measure of damages other than a reasonable royalty. Thus, despite the language of the patent damages statute that indicates that reasonable royalty represents a floor for damages, a jury may not rationally award a verdict greater than a reasonable royalty in this case because there is no basis in the evidence to do so. *Maxwell v. J. Baker. Inc.*, 86 F.3d 1098, 1109-10 (Fed. Cir. 1996) (damages award beyond a reasonable royalty must be supported by evidence). As the Federal Circuit has noted innumerable times, unless other damages such as lost profits are proved by evidence, the patentee is entitled to a reasonable royalty, and nothing more. *See, e.g.*, *Kearns v. Chrysler Corp.*, 32 F.3d 1541, 1552 (Fed. Cir. 1994) ("Where, as here, a patent owner fails to prove lost profits, the court is left with no alternative but to have damages determined on the basis of a reasonable royalty."); *King Instr. Corp. v. Perego*, 65 F.3d 941, 959 (Fed. Cir. 1995) (reasonable royalty constitutes adequate damages where acceptable non-infringing alternatives to the patented item existed).

Bowling did not even attempt to introduce evidence that would support any form of damages award, and he certainly did not make out a case for an award of lost profits. "To recover lost profits as actual damages, a patent holder must demonstrate that there was a reasonable probability that, but for the infringement, it would have made the infringer's sales." *Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1577 (Fed. Cir. 1992). This analysis was further explained in *Panduit Corp. v. Stalin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir. 1978):

> To obtain as damages the profits on sales he would have made absent the infringement, *i.e.*, the sales made by the infringer, a patent owner must prove: (1) demand for the patented product, (2) absence of acceptable noninfringing substitutes, (3) his manufacturing and marketing capability to exploit the demand, and (4) the amount of profit he would have made.

Bowling testified to nothing more than his sales price, and provided no evidence of his profits from his patented product. Bowling's sales of less than 200,000 dice from 1998 to 1999 could never demonstrate a demand for nearly 1.4 million dice; Hasbro conclusively showed that traditional six-sided cubic dice were acceptable noninfringing alternatives; Bowling's small operation lacked the capacity to produce hundreds of thousands of dice per month; and Bowling's ostrich-head-in-the-sand approach to his own cost structure prevented any actual determination of his profitability despite his improper testimony about his sales price. He falls so far short of the burden of proof for a lost profits claim articulated in *Panduit* that even he recognized that lost profits was not an appropriate measure of damages, and merely argued for a reasonable royalty at every juncture.

Bowling's failure to assert that he sought anything more than a reasonable royalty serves as a waiver. In his Trial Brief, Bowling stated in full: "Bowling seeks damages in the amount of a reasonable royalty for Hasbro's infringing sales from the date the '197 patent issued on August 17, 1999." Plaintiff's Trial Brief [Docket No. 130] at 15. This is a categorical disavowal of any other form of damages, and it cannot be saved by the suggestions of Plaintiff's counsel at trial that reasonable royalty was the starting point for damages, but that the jury could award more damages if it saw fit. *See Minks v. Polaris Indus., Inc.*, 6:05-cv-1894-Orl-31KRS, 2007 WL 1725211, *1-2 (M.D. Fla. June 14, 2007) ("Unquestionably, a great deal of time during trial was wasted by Plaintiff attempting to evade the basic laws of economics and common sense.").

Accordingly, if this Court finds that the jury's award of damages is based on anything other than a reasonable royalty, it is error and cannot stand.

### 2. <u>Hasbro Is Entitled to Judgment as a Matter of Law on Damages</u>

In 1860, the United States Supreme Court addressed the concept of the burden of proof placed upon plaintiffs with respect to proving a reasonable royalty for patent infringement:

> if [the plaintiff] fails to furnish any evidence of the proper *data* for a calculation of his damages, he should not expect that a jury should work things out for him by inferences or presumptions founded on such subtile [*sic*] theories. (Internal quotation omitted) (Emphasis in original).

*City of New York v. Ransom*, 64 U.S. 487, 491 (1860).

Since the Supreme Court's holding in *Ransom*, Congress has legislated in the area of patents and provided that patentees are presumed to have sustained actual damages; therefore, the law now provides that they are entitled to obtain no less than a reasonable royalty damages resulting from infringement. 35 U.S.C § 284. However, proof of damages remains a part of the inventor's burden when bringing a patent infringement case. *Kearns,* 32 F.3d at 1551 ("A patent owner bears the burden of proof on damages."); *Datascope Corp v. SMEC, Inc.*, 879 F.2d 820, 828 (Fed. Cir. 1989) ("Datascope's failure even to assert a specific royalty rate it would have accepted or agreed to, let alone sustain and support it with evidence, left the district court without a guidepost for finding a greater royalty and leaves us unpersuaded that its decision was 'arbitrary, fanciful or clearly unreasonable' in light of what was presented in the record."); *Devex Corp. v. General Motors Corp.*, 667 F.2d 347, 363 (3d Cir. 1981) ("The statute requires the award of a reasonable royalty, but to argue that this requirement exists even in the absence of any evidence from which a court may derive a reasonable royalty goes beyond the possible meaning of the statute."), *aff'd* on other grounds, 461 U.S. 648 (1983). In the absence of proof of a

reasonable royalty, Bowling is entitled to zero, or no more than nominal, damages. *See, e.g.*, *Dowagiac Mfg. Co. v. Minnesota Plow Co.*, 235 U.S. 641, 650 (1915) ("although the plaintiff was entitled to prove what would have been a reasonable royalty, and thereby to show a proper basis for an assessment of damages, no proof upon that subject was presented."); *Transclean Corp. v. Bridgewood Serv., Inc.*, 290 F.3d 1364, 1376-77 (Fed. Cir. 2002) (plaintiff not entitled to any reasonable royalty damages where plaintiff failed to "establish[] the amount, if any, of a reasonable royalty").

"Judgment as a matter of law is appropriate if the presentation of the party's case reveals no 'legally sufficient evidentiary basis' for a reasonable jury to find for that party." *Mag Jewelry Co., Inc. v. Cherokee, Inc.*, 496 F.3d 108, 117 (1st Cir. 2007). And, as the foregoing caselaw illustrates, a failure of proof with regard to damages constitutes a failure of proof for the claim in the context of a patent infringement lawsuit. As demonstrated *supra*, Bowling failed to introduce any evidence that could be properly evaluated by a jury to reach a reasonable royalty. Therefore, there cannot be a sufficient evidentiary basis for a jury verdict that awards a royalty of $0.40 per die in the face of no testimony that indicated a proper royalty of anything more than $0.007 cents per die ($0.014 per Monopoly Millennium game).

It was precisely this sort of speculation that this Court was trying to avoid when it excluded Plaintiff's damages expert prior to trial. *Bowling v. Hasbro, Inc.*, No. 05-229, 2008 WL 717741 (D.R.I. March 17, 2008). Just as permitting Mr. Lapidus to testify, cloaked in a mantle of expertise, on the subject of reasonable royalty would have been inappropriate because of his rank bias and unreliable analysis, so too was Bowling's invitation to the jury to disregard the entire reasonable royalty framework in favor of some lost profits proxy based on Bowling's selling price. Bowling's decision not to present any evidence that might have been germane to

the issue of reasonable royalty fostered a verdict that was completely disconnected from the actual trial evidence that, as a matter of law, was pertinent to the question of reasonable royalty.[10]

Outside of the patent infringement context, cases in which there is a complete failure to present evidence on a point required to be proved by the plaintiff are the classic case for the grant of judgment as a matter of law. In *Custom Design, Inc. v. Family Dollar Stores, Inc.*, No. 03-522, 2005 WL 1005140, *2 (D.R.I. April 29, 2005), this Court reaffirmed its earlier grant of a judgment as a matter of law because the nonmoving party failed to introduce any evidence about the value of the goods for which it was seeking damages. Similarly, in this case, Bowling seeks a reasonable royalty for Hasbro's infringing use of his patent, but he has failed to present a shred of evidence to show what that reasonable royalty should be. This is a clear case for the application of Rule 50. Accordingly, this Court should enter judgment as a matter of law awarding Bowling either no damages at all, or merely nominal damages for Hasbro's infringing us of his patent.

### 3. <u>Alternatively, Hasbro is Entitled to a New Trial on Damages</u>

Hasbro also prays for relief in the form of a new trial if this Court determines that judgment as a matter of law is inappropriate. There is case law aplenty that commands that a jury verdict purporting to assess a reasonable royalty measure of damages must be vacated if it is not within the range of possible royalties supportable in the record evidence. However, in this case Hasbro's witness, Mike Hirtle, gave the only testimony that tended to establish a reasonable

[10] Bowling certainly had evidence at his disposal that he opted not to introduce. On the eve of trial he amended his exhibit list to include numerous Hasbro licensing agreements. He did not even attempt to introduce them. He was free to examine Hasbro's witnesses on the subject of royalties or any other facts that might have been germane to the hypothetical negotiation. Despite serving them with trial subpoenas and actually calling them as witnesses, he asked not a single question about royalties. He consciously chose not to rely on evidence, but instead on impassioned pleas of "how dare Hasbro decide what I can charge for my dice".

royalty at all – assigning a royalty of approximately a penny per game to the value of Hasbro's infringing use of the patent after demonstrating an exacting mathematical analysis for determining the royalty rate on a component part of a game. Bowling provided no foil to this testimony, as the only number that he testified to was his sales price for his own dice, sold in a different manner to a different market. His sales price is a completely irrelevant consideration in arriving at a reasonable royalty for Hasbro's use of the dice. Yet, the jury reached a verdict assigning a $0.40 per die royalty, more than sixty times what the evidence allowed. If ever a verdict has been against the weight of the evidence, this one is.

The Court should grant a motion for a new trial when the verdict "is against the clear weight of the evidence such that upholding the verdict will result in a miscarriage of justice." *Arrieta-Colon v. Wal-Mart Puerto Rico, Inc.*, 434 F.3d 75, 89 (1st Cir. 2006). The Federal Circuit has had little trouble affirming District Court grants of new trials when, as in this case, the jury verdict so clearly departs from the bounds of the evidence. A principal case granting a new trial on these grounds is *Unisplay, S.A. v. Am. Elec. Sign Co., Inc.*, 69 F.3d 512, 519 (Fed. Cir. 1995). In that case, a jury verdict was considered not supported by relevant evidence when it awarded a 14% royalty in the face of evidence that only supported a royalty amount between 7.5% and 10%. *Id.* at 517-518. The court even rejected the verdict despite the fact that it was supported by an exhibit that was entered, holding that the exhibit was entered erroneously as well. *Id.* at 518. Ultimately, the court held that the District Court abused its discretion when it refused to grant a new trial. *Id.* at 519. Moreover, the Federal Circuit has held that the evidence forwarded as proof of reasonable royalty must rest on sound "factual <u>and</u> economic predicates." *Riles v. Shell Exploration and Prod. Co.*, 298 F.3d 1302, 1311-1311 (Fed. Cir. 2002) (emphasis added).

Many other cases similarly have found that the grant of a new trial is warranted in the face of a jury verdict that is outlandish when measured against the record evidence. *See also, e.g.*, *SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 926 F.2d 1161, 1168 (Fed. Cir. 1991) ("[T]he district court may reject the extreme figures proffered by the litigants as incredible and substitute an intermediate figure as a matter of its judgment from all of the evidence."); *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1581 (Fed. Cir.1996) (rejecting a high jury verdict and noting that increasing a damage award for any reason, such as delay, etc., is improper). Additionally, a jury verdict that "is *ipso facto* arbitrary must be set aside." *Hughes Tool Co. v. Dresser Indus., Inc.*, 816 F.2d 1549, 1558 (Fed. Cir. 1987).

There is simply no plausible application of the evidence presented at this trial that leads to the conclusion that $0.40 is a reasonable royalty for Hasbro's use of Bowling's patented invention. If Mr. Hirtle's testimony was credited, he gave the only applicable and relevant damages testimony in the entire trial; if it was not, there was no such evidence. His testimony leads to only one conclusion: damages were no higher than $7,017.98, less than one penny per die. The $0.40 per die figure arrived at by the jury is nearly 63 times Mr. Hirtle's numbers.

This case requires a new trial. The jury made almost precisely the same error as the jury did in *Unisplay*. They ignored the record evidence and merely arrived at a number that was "fair" in their minds, this time in light of improper evidence from Bowling about the price for which he sold his dice. In *Unisplay*, the jury was also led down the wrong path by plaintiff's counsel, 69 F.3d at 518, just as plaintiff's counsel in this case led Hirtle down the path to testifying, over Hirtle's strenuous objections, about an "industry standard" that Hirtle repeatedly

stated was not a standard for a component of a game and that was completely inapplicable to the potential license at issue in this case.[11]

Plainly, the verdict in this case is outrageous when examined in the context of the evidence that was presented to the jury. It cannot stand. No sound economic principles could have guided the jury to reach this conclusion. *See Riles v. Shell Exploration and Prod. Co.*, 298 F.3d at 1311. Not only is the verdict against the manifest weight of the evidence, *Unisplay*, 69 F.3d at 519, it is directly contrary to the evidence. Therefore, this Court should order a new trial.

### 4. As a Further Alternative, the Court Should Order a New Trial Conditioned on Plaintiff's Refusal of a Remittitur.

Hasbro also urges the Court to offer a remittitur to Bowling for the maximum value supported by the evidence. It is within the discretion of the trial court to reduce a jury verdict if it is against the manifest weight of the evidence and to offer the reduced verdict to the plaintiff with the option either to take the reduced verdict or accept a new trial. *See Huber v. JLG Indus., Inc.*, 344 F.Supp.2d 769, 775 (D.Mass. 2003). The appropriate standard on remittitur is to reduce the damages award to the highest number that is supported by the evidence. *Bookland of Maine v. Baker, Newman & Noyes, LLC*, 271 F.Supp.2d 324, 328-29 (D.Me. 2003).[12]

Myriad cases have found remittitur appropriate in the reasonable royalty for patent damages context. By way of example, the court in *QPSX Developments 5 Pty Ltd. v. Nortel Networks, Inc.*, 2008 WL 728201, at *3 (E.D. Tex. March 18, 2008), lowered a jury verdict form $28 million to $12 million. A similar result was obtained in *Informatica Corp. v. Business*

---

[11] Plaintiff's counsel's suggestion that an "industry standard" royalty rate of 5% of the net sales price for the games was applicable was not evidence of any such standard. While Mr. Hirtle obligingly performed the mathematics involved in calculating 5% and 3% royalties on the games themselves (*see* Exhibit 224), Mr. Hirtle <u>protested throughout</u> his testimony that such calculations were completely irrelevant to the determination of a royalty rate for a component of a game.

[12] The Federal Circuit instructs that the law of the regional circuits applies to remittitur procedures. *Shockley v. Arcan, Inc.*, 248 F.3d 1349, 1358 (Fed. Cir. 2001).

*Objects Data Integration, Inc.*, No. C 02-03378, 2007 WL 2344962, at *5 (N.D.Cal. Aug. 16, 2007), where the court reduced a damages award by 48%. *See also Minks*, 2007 WL 1890708, at *2 (reducing award from nearly $28 million down to almost $1 million); *Integra Lifesciences I, Ltd. v. Merck KGaA*, No. CV.96 CV 1307-B(AJB), 2004 WL 2284001, at *1 (S.D.Cal. Sept. 7, 2004) (reducing damage award from $15 million to $6.375 million). Neither is remittitur foreign to this Court. In *Fleet Nat'l Bank v. Anchor Media Television*, 831 F.Supp. 16 (D.R.I. 1993), Judge Boyle ordered a remittitur of all punitive damages in a case involving a breach of a commercial contract.

A particularly instructive case is *Harris Corp. v. Ericsson, Inc.*, No. 3:98-CV-2903-M, 2003 WL 21750710, *7 (N.D.Tex 2003), where the court rejected a verdict that was based upon the highest royalty rate supported by the evidence because of a certain nuance in the testimony. That nuance was that no one had testified that the higher royalty rate mentioned by the witness would have continued in perpetuity. *Id.* In light of the jury's clear misinterpretation of the evidence, the court found that the verdict was excessive and ordered remittitur.

In this case there can be no doubt of the exorbitant nature of the verdict. Damages of nearly half a million dollars are wholly unsupported by the evidence. The only evidence presented that even informed the inquiry was that of Mr. Hirtle, and his testimony supports a verdict no higher than $7,017.98. A sixty-three fold increase cannot be found in that testimony. Accordingly, this Court should offer Bowling remittitur to $7,017.98, and if he declines, order a new trial.

### B. Hasbro Is Entitled to Judgment as a Matter of Law on The Issue of Patent Marking.

Bowling's decision not to mark either the patented article or the packaging is fatal to his claim that he complied with 35 U.S.C. § 287(a). He does not even claim to have met the plain

language of the statute, which requires that the articles themselves bear the patent number or, where appropriate, that the patent number be affixed on the packaging containing one or more of the articles. Bowling's testimony was that he opted not to package the dice for resale because of marketing concerns, but custom of the trade is not a relevant consideration an article itself can be directly marked (thus precluding satisfaction of the marking statute by means of marking the packaging). *Wayne-Gossard Corp. v. Sondra, Inc.*, 434 F.Supp. 1340 (E.D. Pa. 1977), *aff'd* 579 F.2d 41 (3$^{d}$ Cir. 1978). But even if marking the dice themselves is excused, there is no basis upon which to excuse a failure to mark packaging. There are two means by which a patentee may satisfy the statute, and Bowling opted for neither of them. The marking statute is voluntary; there is no obligation to mark, nor is there any catch-all "I did as much as I thought I needed to do" standard for marking. 35 U.S.C. § 287(a) (A patentee "***may*** give notice to the public" by the specified actions) (emphasis added). Having elected not to comply with the statute, he cannot be found to have complied with its terms.

But even if Bowling's marking scheme – distributing patent stickers to be placed on unknown "containers" in which his dice were displayed – somehow satisfies Section 287(a)'s marking requirement, Bowling's inconsistent and incomplete attempts at marking during the relevant time period (from August 17, 1999, the issuance of the patent, to November 10, 1999, the date on which Hasbro received actual notice from Bowling) do not constitute "constructive notice" under the patent marking and notice statute. Even viewing all the evidence presented at trial in the light most favorable to Bowling, the jury's determination that Bowling's marking scheme satisfied the plain terms of 35 U.S.C. § 287(a) is unreasonable and cannot be upheld.

**1. No Reasonable Jury Could Find That Bowling Continuously Marked <u>All Or Substantially All Of His Patented Dice.</u>**

For the purposes of this Motion, the pertinent portion of the patent marking and notice statute provides, in full:

> Patentees, and persons making, offering for sale, or selling within the United States any patented article for or under them, or importing any patented article into the United States, may give notice to the public that the same is patented, either by fixing thereon the word "patent" or the abbreviation "pat.", together with the number of the patent, or when, from the character of the article, this cannot be done, by fixing to it, or to the package wherein one or more of them is contained, a label containing a like notice. In the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice.

35 U.S.C. § 287(a).

The purpose of the marking statute is (1) to help avoid innocent infringement; (2) to give patentees incentive to notify the public that the article is patented; and (3) to help the public identify whether an article is patented. *Nike v. Wal-Mart Stores, Inc.*, 138 F.3d 1437, 1443 (Fed. Cir. 1997) (citations omitted). To comply with the requirement of "constructive notice," a patentee must consistently mark substantially all its patented articles, and cease marketing unmarked articles. *See Am. Medical Sys.* v. *Medical Eng'g Corp.*, 6 F.3d 1523, 1538 (Fed. Cir. 1993). The marking statute prohibits a patentee who fails to mark its patented article from recovering for infringement during the time period in which the patentee failed to mark its article. *See id*.; 35 U.S.C. § 287(a).

In order to recover for infringement, the patentee must prove by a preponderance of the evidence that the patentee marked substantially all of the patented articles and that "once marking was begun, the marking was substantially consistent and continuous." *Nike*, 138 F.3d at

1446. When evaluating a patentee's compliance, the focus of the inquiry "is not on what the infringer actually knew, but on whether the patentee's actions were sufficient, in the circumstances, to provide notice *in rem*." *Id.* (citing *Amsted Indus. v. Buckeye Steel Castings*, 24 F.3d 178, 187 (Fed. Cir. 1994)). Evidence that a patented article was merely marked on occasion and not as a matter of routine or consistent practice is insufficient to support a finding of compliance with the constructive notice provision of 35 U.S.C. § 287(a). *Cybiotronics, Ltd. v. Golden Source Elec., Ltd.*, 130 F.Supp.2d 1152, 1160 (C.D. Cal. 2001).

The law is very clear that once a patentee has begun marking its patented article, "[the marking] must be substantially consistent and continuous in order for the party to avail itself of the constructive notice provisions of [the marking statute]." *See Am. Medical Sys., Inc.*, 6 F.3d at 1537; *see also Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1111 (Fed. Cir. 1998). When patentees, like Bowling, cannot ascertain what patented articles were marked when distributed, those patentees have been found ***not*** to satisfy the "substantially consistent and continuous" marking requirement as a matter of law. For example, in *American Medical Systems*, the Federal Circuit found that a patentee, who began to mark and distribute certain patented articles, but also continued to distribute unmarked patented articles, did not adequately put the public on notice that its product was patented. 6 F.3d at 1538. The Court found that by failing to mark substantially all of the patented articles on a consistent and continuous basis, the patentee who distributed both marked and unmarked articles failed to satisfy the requirements of the marking statute and, thus, was not eligible to recover for infringement under the constructive notice provisions of Section 287(a). *Id.* In other words, full compliance with 35 U.S.C. § 287(a) is not achieved until the patentee consistently marks substantially all of its patented products, and is no longer distributing unmarked products. *Id.*

More recently, the Court in *Bernardo Footwear, LLC v. Fortune Dynamics, Inc.*, C.A. H-07-0963, 2008 WL 154461 (S.D. Tex. 2008) mirrored the *American Medical Systems* decision when it held that a patentee did not satisfy the constructive notice portion of the marking statute even though that patentee began consistently and continuously marking its new patented articles with the patent number after a certain date. *Id.* at *2. Although the *Bernardo Footwear* patentee distributed marked product after that particular date, the patentee also continued, at the same time, to fill certain orders from its warehouse inventory, some of which was not marked with the patent number. *Id.* Because the patentee "did not differentiate in its record-keeping between marked and unmarked products and did not check [its articles] before shipping to be sure they [were] marked with the patent number," the Court was able to determine at the summary judgment stage that the patentee was not entitled to recover monetary damages for infringement because it failed to mark continuously and consistently substantially all its patented articles. *Id.* at *3.

In this case, assuming the facts in the light most favorable to Bowling, Bowling may have asked the customers that he had as of August 15, 1999, to mark his dice when sold or distributed. However, there was no evidence presented at trial showing that Bowling asked or required his customers acquired after August 15, 1999, to mark his patented dice. When dealing with the constructive notice provision of § 287, courts embrace a "practical common sense approach" to determine whether a patentee satisfied the purpose of the statute and provided notice to the public of patent coverage. *Metrologic Instruments, Inc. v. PSC, Inc.*, C.A. No. 99-4876, 2004 WL 2851955, at *21 (D. N.J. 2004).

It is Bowling's burden to prove by a preponderance of the evidence that he consistently and continuously marked substantially all his dice. However, after Hasbro pointed out that

Bowling did not receive return letters from the majority of his customers as of August 15, 1999, and did not send additional letters to new customers like BERI Distributors, who sold a large percentage of Bowling's dice during the relevant time period, Bowling failed to present any evidence demonstrating that he continued to market only marked dice during this time period. Practical common sense dictates that Bowling's new customers would not have taken it upon themselves to mark Bowling's patented dice when Bowling never asked them to do so. Practical common sense also dictates that the customers who failed to return Bowling's August 15, 1999, letter likely failed to mark all or substantially all of Bowling's patented dice. Because Bowling failed to perform any follow-up to determine whether his patented dice were in fact being marked by his customers in the manner requested, and failed to present any evidence that only marked dice were distributed during the relevant time period despite evidence and testimony to the contrary, no reasonable jury could find that Bowling complied with the statute's notification requirements and put the public on notice that his dice were patented.

**2. <u>Bowling Did Not and Cannot Establish When He Began Marking.</u>**

To prove his entitlement to any damages for infringement occurring prior to November 10, 1999, Bowling must establish the date on which he began to comply with the marking statute. *See Am. Medical Sys.*, 6 F.3d at 1537 (plaintiff "entitled to damages from the time when it either began marking its products in compliance with section 287(a) or when it actually notified [defendant] of its infringement, whichever was earlier"). Bowling never identified, and apparently cannot identify, when his products actually began to appear in the marketplace marked with the patent number, thereby placing the world on notice of their patented status. In the absence of such proof, Bowling cannot establish that he ever complied with the marking statute.

Bowling himself never marked his dice or their packaging, so he cannot testify when the products actually were "marked." Instead, Bowling enlisted the aid of his customers to effect the marking of bins or other containers in which dice were displayed. Thus Bowling sent letters to his customers on August 15, 1999, asking them (1) to affix patent labels to the containers in which dice were displayed, (2) in the case of his distributor customers, to relay patent labels to their retailer customers, and (3) to indicate their agreement by countersigning the letters and returning them to him. Exhibit 24. Of the 40 customers to whom he sent such letters, just 13 complied, the last of which (for ACD Distribution) was dated September 15, 1999. As to Bowling's other 27 customers (plus the four new customers to whom Bowling started selling dice during the marking period), there is no record (and no evidence) that they agreed to mark or when that happened. Critically, for each and every one of these 44 customers, plus the untold number of retailers who were receiving their dice from Bowling's distributors, there is no record (or evidence) whatsoever of when they actually began to mark the containers in which dice were being displayed for sale.

Because Bowling adduced no evidence on this subject at all, the record is entirely devoid of any evidence to show that a single die was "marked" (in the sense of being displayed for sale in a container bearing the patent number) on August 17, 1999, or August 18, 1999, or any other date through November 10, 1999. Because Bowling utterly failed to prove when he began to mark continuously all or substantially all of his dice, no reasonable jury could find that he met the requirements of 35 U.S.C. § 287(a) with respect to marking his patented dice on any date prior to Hasbro receiving actual notice.

### 3. Bowling Did Not Take Reasonable Steps To Ensure That The Customers Distributing His Patented Dice During the Relevant Time Period Complied With The Constructive Notice Provision of 35 U.S.C. § 287(a).

The success of Bowling's marking scheme was contingent on Bowling's customers consistently marking substantially all his dice with the appropriate patent identification. When a patentee relies on others to make or sell patented articles, "the patentee is obliged to take reasonable steps to ensure that the licensee marks those patented articles." *Maxwell v. J. Baker, Inc.*, 805 F. Supp. 728, 733 (D. Minn. 1992) (citing *Butterfield v. Oculus Contact Lens Co.*, 332 F. Supp. 750, 761 (N.D. Ill. 1971)). In other words, a patentee is not relieved of its marking obligations when it delegates the patent marking activity to persons making or selling any patented article for or under the patentee. *Amsted Indus., Inc.*, 24 F.3d at 185 (citing 35 U.S.C. § 287(a)); *see also In re Yarn*, 602 F.Supp. 159, 169 (W.D.N.C. 1984) (the portion of Section 287 that refers to persons who make or sell products "for or under" the authority of the patentee "applies to authorizations by patentee of other persons to make and sell patented articles regardless of the particular form these authorizations may take . . . .") (quotation omitted).

In *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098 (Fed. Cir. 1996), the court found that the plaintiff made "extensive and continuous efforts" to ensure that the party acting "for or under" her, who was charged with manufacturing and selling her patented article, complied with the marking requirements of 35 U.S.C. § 287(a). Specifically, in *Maxwell*, the court applied "the rule of reason" standard to find that the plaintiff "made reasonable efforts to ensure compliance with the marking requirements" when she took all of the following steps: (a) she promptly notified her retail customer to mark the patent number on all shoes containing her patented article; (b) she notified her retail customer's manufacturers directly of the need to mark her patented article upon learning that her retail customer did not properly direct its manufacturers to do so; (c) she notified her retail customer on several occasions when she discovered it failed to properly mark shoes using her patented system; and (d) she received, in response to her urging,

notification from her retail customer that it used its best efforts to correct its failure to mark by notifying its manufacturers of their marking obligations. *Id.* at 1112.

In direct contrast to the diligent efforts of the *Maxwell* patentee, other than sending letters to his then-existing customers and failing to follow-up when most of the letters were not returned, Bowling made no effort to ensure that his retail customers and distributors marked his dice. Bowling's efforts were akin to those of the patentee in *Butterfield v. Oculus Contact Lens Co.*, 332 F.Supp. 750 (D.C. Ill. 1971), where the patentee provided each of its customer-licensees with a rubber stamp containing the patent marking identification on it. *Id.* at 761. The court found that, despite providing these stamps, the patentee did not make a reasonable effort to control the conduct of its customer-licensees with respect to patent marking when (1) the patentee offered no evidence to show that the rubber stamps were ever used by the licensees to mark the containers containing the patentee's patented article, (2) the patentee did not require its licensees to use the rubber stamps and never followed-up to see if they were used, and (3) the patentee did nothing to assure that the containers were marked when delivered to the end-user. *Id.*

Bowling's undisputed conduct here is precisely analogous to the plaintiff in *Butterfield*. Although Bowling testified that he sent all of his customers "tubs" that had a patent sticker on them, he adduced no evidence whatsoever that any customer ever actually used the tub to display his patented dice.[13] Although Bowling's August 15 letters to his customers purported to require that they use the patent labels (or, in the case of distributors, that they send them along to their

[13] At deposition, Bowling stated categorically that he never visited any retailers to see how his dice were displayed, and he acknowledged that testimony at trial. His trial testimony, however, indicated that he had seen his dice on display at the "Things for Thinkers" store in Tucson. Anything that Bowling saw there, however, would plainly be irrelevant because Bowling's invoices show that he had never sold any dice to Things for Thinkers before the end of the relevant marking period. *See* Exhibits DM (pre-patent issuance invoices) and DO (invoices from patent issuance through November 10, 1999). Bowling did not even attempt to show that his observation of dice at Things for Thinkers was during any relevant time frame.

own customers), the undisputed facts that (1) the majority of the customers never countersigned the letters and (2) Bowling continued to sell to customers from whom he had not received any countersigned letter clearly show that Bowling did not "require" any compliance with his marking scheme. Just as in *Butterfield*, Bowling completely failed to follow up with any of his customers to ensure that they were actually displaying his patent number in association with his dice.

Finally, again precisely as in *Butterfield*, Bowling did not take reasonable steps to ensure that end-customers for dice sold through distributors would have any notice of his patent. Bowling asked his distributors to "send a label to all of your retail customers with an existing supply of Crystal Caste™ dice so that they may place the sticker on our, or whatever, container our dice is in" [*sic*]. He did not require anything of his distributors, even that they simply pass along a sticker to the retailers. More importantly, he did not even ask the distributors to tell the retailers what to do with the stickers or to ensure that the stickers would be associated with Bowling's patented dice – and no others. Even if the distributors had actually sent along the stickers as requested, one is left to wonder just what the retailers did with them – placed them on bins containing only Bowling's dice, or placed them on a case in which Bowling's dice were displayed along with other dice, or placed them somewhere else entirely, or never did anything with them at all. Of course, the reason one is left to wonder about all this is that Bowling did not present one iota of evidence to show that any distributor ever forwarded a single sticker, or that any of the distributors' customers actually displayed a single sticker.

Indeed, the evidence that was adduced at trial was uncontradicted that one of Bowling's major customers never forwarded any of these stickers. Steen Jensen, of Berkeley Topline North ("BTN"), testified unequivocally that he had repeatedly observed the Crystal Caste dice as they

were maintained at the BTN warehouse, and that he had never seen any of the patent stickers. He further testified that the company's practice was to have warehouse workers fill orders for dice by taking dice from the storage bins in the warehouse and placing them in a box with whatever else had been ordered by the customer. If there were no stickers in the BTN bins, there were no stickers for the workers to include with their shipments to retailer customers. Jensen having testified unequivocally that there weren't any such stickers in the bins, there can be no doubt that BTN did not send a single sticker to any of its customers. BTN alone accounted for 2,900 patented dice sold by Bowling during the marking period (Exhibit DO at B03248), nearly 13% of Bowling's sales during that time.[14]

Even assuming that Bowling's plan to mark containers in which dice were displayed constituted marking the dice or their packaging, as required by 35 U.S.C. § 287(a), and even viewing the evidence in the light most favorable to Bowling, there is no doubt that he failed to mark all or substantially all of his dice during the marking period on a continuous basis. Bowling failed to require that his existing customers comply with his scheme, failed to follow up with any of them to ensure that they were complying with his scheme, failed to take reasonable steps to ensure that his distributors' customers would relay his instructions to their own retailer customers, and, finally, completely failed even to notify his new customers of the existence of a marking scheme, let alone to ensure that they would execute his plans. As had been the case in *Butterfield*, no reasonable jury could find that Bowling took reasonable steps to ensure that the

[14] Of equal importance is the fact that before October 15, 1999 (the date of the only shipment to BTN during the marking period) BTN would have been filling orders from existing inventory. Bowling's testimony was that he included patent stickers in the bags of dice that he sent to the distributors, but BTN would not have received any of those until at least October 15, 1999, two months after the patent's issuance. Even if BTN had known to take the stickers out of the bags and keep them with its dice in inventory so that it could relay them to retailers, it could not have done so. There is no evidence as to how many dice BTN sent to its retailer customers during the marking period, but it was by far Bowling's largest customer prior to August 17, 1999, accounting for more than 20% of Bowling's total sales (25,350 dice out of a total of 125,250). Exhibit DM. Given that BTN placed a re-order in October 1999, it was presumably shipping dice during the marking period.

parties working for or under him complied with the marking requirements of 35 U.S.C. § 287(a) with respect to marking his patented dice. Accordingly, the Court should enter judgment as a matter of law in Hasbro's favor on this issue, or alternatively grant a new trial in order to obtain a verdict consistent with the evidence.

## IV. **Conclusion**

For the reasons set forth herein, this Court should enter judgment as a matter of law in favor of Hasbro as follows:

(1) On the issue of marking under 35 U.S.C. § 287, as a matter of law Plaintiff failed to mark all or substantially all of his patented articles continuously at any time prior to November 10, 1999; and

(2) On the issue of damages, as a matter of law Plaintiff is entitled to no more than nominal damages in the amount of $1.00.

In the alternative, the Court should order a new trial on the issues of marking and damages.

In the further alternative, the Court should order a new trial *nisi remittitur* of all damages in excess of $7,017.98.

Respectfully submitted,

HASBRO, INC.
By its Attorneys,

/s/ Jeffrey K. Techentin__________
Todd D. White (# 5943)
twhite@apslaw.com
Jeffrey K. Techentin (#6651)
jtechentin@apslaw.com
Adler Pollock & Sheehan P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903
(401) 274-7200
Fax: (401) 751-0604/ 351-4607
Dated: April 7, 2008

Of Counsel:

David K. S. Cornwell, Esq.
davidc@skgf.com
Tracy-Gene G. Durkin, Esq.
tdurkin@skgf.com
Sterne Kessler Goldstein Fox
1100 New York Avenue, NW
Washington, D.C. 20005

## CERTIFICATE OF SERVICE

TO:

Craig M. Scott, Esq.
Christine K. Bush, Esq.
Duffy & Sweeney & Scott, Ltd.
One Turks Head Place, Suite 1200
Providence, RI 02903

Thomas J. Leach, Esq.
Anthony R. Zeuli, Esq.
Douglas J. Williams, Esq.
Law Firm of Merchant and Gould P.C.
3200 IDS Center
80 South 8th Street
Minneapolis, Minnesota 55402-2215

David K. S. Cornwell, Esq.
Tracy-Gene G. Durkin, Esq.
Sterne Kessler Goldstein Fox
1100 New York Avenue, NW
Washington, D.C. 20005

I hereby certify that I filed the within Renewed Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial or, in the Alternative, for Remittitur and the Memorandum in Support thereof through the ECF system on the 7th day of April, 2008, and that notice will be sent electronically to the above-named counsel who are registered participants identified on the Mailing Information for Case No. 05-229S.

/s/ Jeffrey K. Techentin________

*449531_2*