UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| MICHAEL BOWLING,<br>a Resident of Arizona,<br><br>Plaintiff,<br>v.<br><br>HASBRO, INC.,<br>a Rhode Island Corporation,<br><br>Defendant. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | C.A. No. 05-229S |

**PLAINTIFF MICHAEL BOWLING'S MEMORANDUM IN SUPPORT OF HIS OBJECTION TO DEFENDANT HASBRO, INC.'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, FOR A NEW TRIAL OR, IN THE ALTERNATIVE, FOR REMITTITUR**

## I. INTRODUCTION

Hasbro, Inc.'s ("Hasbro") motion for judgment as a matter of law, a new trial, and remittitur should be denied because the jury's verdict, rendered after more than a week of trial and deliberation, is sufficiently supported by the evidence.

First, Michael Bowling ("Bowling") introduced sufficient evidence for the jury to apply the required *Georgia Pacific* factors. Among other testimony, Mr. Hirtle told the jury that *Inside Santa's Workshop* teaches that the toy industry's standard royalty rate is 5% of the manufacturer's net selling price. He also testified that when dealing with a strong brand such as Monopoly, the starting point for negotiations should be 3%. Mr. Hirtle then took the jury through the hypothetical *Georgia Pacific* negotiation starting with a baseline 3% royalty. By the end of his testimony, Bowling had more *Georgia Pacific* points in his favor, thus supporting a royalty rate higher than 3%. Not surprising, the jury's award equals 4% of net sales for each version of the game. Not only is this number supported by the evidence Bowling presented because it falls squarely within the

industry standard of 3% to 5%, but it is also reasonable given the unique bargaining positions of the parties at the time of the hypothetical negotiation. Thus, based on that evidence adduced by Bowling, the jury rendered a verdict that adopted a reasonable royalty supported by the testimony concerning the industry standard.

This matter also is not appropriate for a remittitur. Hasbro told the jury in its opening statement that "whatever you find is reasonable, that's what we will do." (Tr. vol. 1, 55:21-56:10.)[1] Now Hasbro asks the Court to disregard the jury's findings and adopt Hasbro's "value added" calculation—the very calculation that Mr. Hirtle, Hasbro's expert, admitted had never been used at or before the time of the hypothetical negotiation, and the very calculation Hasbro admits it would never accept if it were licensing its own intellectual property.

Finally, Bowling introduced ample evidence of marking to support the jury's verdict. Among other evidence, Bowling testified that at the 1998 Gen Con tradeshow, where he first sold his new dice, he had "Patent Pending" signs on the table to alert the public that he had filed for patent protection. Bowling also personally included patent pending stickers in all shipments before the patent issued.

Bowling also testified that on August 15, 1999, two days *before* the patent issued, he wrote to his existing distributors and retail customers explaining that his dice had to be marked with the patent number rather than the patent pending sticker. Bowling testified that he contacted each distributor and retailer to make sure they were properly marking the dice with the patent number. On August 15, 1999, Bowling began including the patent number sticker, along with the marking instructions, in every bag of dice that was sold. The instructions explained that the patent sticker needed to be affixed to any bin

[1] Cites to the trial record are as follows: (Tr. vol. #, page #:lines.)

containing the patented crystal dice. He also sent customers point-of-purchase tubs bearing the patent number sticker from which they could sell his dice. From August 15, 1999, through November 10, 1999, Bowling was personally responsible for making sure that all his dice sold included a patent marking sticker. Bowling also presented evidence that his retailers were following his instructions and marking, such as the Dragon's Lair bin. Hasbro presented no contrary evidence. Thus, reasonable persons could have concluded, as the jury did, that Bowling complied with the marking statute.

Put simply, this is not a case where no reasonable persons could have reached the jury's conclusion. Hasbro had a full and fair trial, the jury's verdict is supported by the evidence, and there is no manifest injustice. Accordingly, Hasbro's motion for a new trial and remittitur should be denied.

## II. ARGUMENT

### A. The Standard under Rule 50 of the Federal Rules of Civil Procedure.

A directed verdict should be granted sparingly because it denies parties the opportunity to have the facts determined by the jury. 6 James WM. Moore et al., Moore's Federal Practice §50.5[6] (3d ed. 2008). Thus, the standard Hasbro must meet is a stringent one, *Muniz-Olivari v. Stiefel Labs., Inc.*, 496 F.3d 29, 35 (1st Cir. 2007), and Hasbro cannot prevail unless the Court, drawing all reasonable inferences in Bowling's favor, finds that the record reveals *no* sufficient evidentiary basis for the verdict. Fed. R. Civ. P. 50; *Zimmerman v. Direct Fed. Credit Union*, 262 F.3d 70, 75 (1st Cir. 2001). In other words, Hasbro's motion must be denied unless Hasbro shows that reasonable persons could not have arrived at the jury's verdict. *CPC Int'l, Inc. v. Northbrook Excess*

*& Surplus Ins. Co.*, 144 F.3d 35, 42 (1st Cir. 1998); *Muniz*, 496 F.3d at 35.[2] Bowling needs only to show slightly more than a scintilla of evidence supporting the jury's award to defeat Hasbro's motion. *See Muniz*, 496 F.3d at 35.

In deciding Hasbro's Rule 50 motion, the Court must consider *all* the evidence—not just the evidence presented in Bowling's case. *Peguero-Moronta v. Santiago*, 464 F.3d 29, 33-34 (1st Cir. 2006) (stating "if the district court examined only the evidence presented in Plaintiff's case when granting Defendant's renewed Rule 50(a) motion, this would be an error of law"). The Court cannot consider the credibility of witnesses, resolve conflicting testimony, or evaluate the weight of the evidence. *CPC Int'l.*, 144 F.3d at 42. Nor may the Court substitute its judgment for that of the jury. *Megadyne Med. Prods., Inc. v. Aspen Labs., Inc.*, 864 F. Supp. 1099, 1102 (D. Utah 1994). Rather, the Court must examine all of the evidence in the light most favorable to Bowling and draw all possible inferences in his favor. *Id.*

**B. Hasbro's Rule 50 Motion Should Be Denied Because Sufficient Evidence Supports The Jury's Reasonable Royalty Award.**

"Given the hypothetical nature of the exercise, any reasonable royalty calculation 'necessarily involves an element of approximation and uncertainty.'" *Fuji Photo Film Co. Ltd. v. Jazz Photo Corp.*, 249 F. Supp. 2d 434, 452-53 (D.N.J. 2003), *aff'd*, 394 F.3d 1368 (Fed. Cir. 2005). The jury's reasonable royalty award is entitled to deference and "must be upheld unless the amount is grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork." *Monsanto Co. v. Ralph*, 382 F.3d 1374, 1383 (Fed. Cir. 2004); *Honeywell Int'l Inc. v. Universal Avionics*

[2] Because motions for judgment as a matter of law, remittitur, or new trials are not unique to patent law, Courts must apply the regional circuit law, which in this case is the First Circuit. *Monsanto Co. v. Ralph*, 382 F.3d 1374, 1384 (Fed. Cir. 2004).

*Sys. Corp.*, 426 F. Supp. 2d 211, 223 (D. Del. 2006) ("[T]he jury's award of damages is entitled to deference and must be upheld unless it is grossly excessive"). Moreover, section 284 does not mandate how the fact finder must compute a reasonable royalty, only that the figure compensate for the infringement. *See TWM Mfg. Co. v. Dura Corp.*, 789 F.2d 895, 899 (Fed. Cir. 1986). Expert testimony is not required. *Dow Chem. Co. v. Mee Indus., Inc.*, 341 F.3d 1370, 1381-82 (Fed. Cir. 2003) (stating the expert testimony is not necessary for the fact finder to determine a reasonable royalty under *Georgia Pacific*).

Here, the jury's reasonable royalty determination is not excessive and is supported by the evidence.

**1. The Jury's Royalty Award Falls Within The Evidence Concerning The Toy Industry's Standard Royalty Rates.**

The jury's reasonable royalty award in this case is supported by evidence of the industry's standard royalty rates and the unique circumstances at the time of Hasbro's infringement. Mr. Hirtle testified that the starting point in a toy industry licensing negotiation was the industry standard of 5% of net sales. (Tr. vol. 5, 11:18-22; Tr. vol. 4, 103:3-18.) That methodology was confirmed by the book *Inside Santa's Workshop*, which Mr. Hirtle acknowledged as an authoritative reference on licensing in the toy industry. (Tr. Ex. BI-1 at 122; Tr. vol. 5, 10:25-11:6.) *Inside Santa's Workshop* explains that "[n]ormally, the toy industry's standard royalty is 5.0% of the manufacturer's selling price to the trade." (Tr. Ex. BI-1 at 122.)

While Mr. Hirtle, who is Hasbro's employee and advocate, did assert that the 5% industry standard only applied to whole game concepts, the jury was free to reject his contention in favor of the industry standard stated in *Inside Santa's Workshop*. *See U.S.*

*v. Angiulo*, 897 F.2d 1169, 1190 (1st Cir. 1990) ("We note with approval, however, that the trial court explicitly instructed the jury that it could accept or reject the expert testimony in whole or in part"). After all, Mr. Hirtle acknowledged *Inside Santa's Workshop* does not say anything about the industry standard applying only to total games. (Tr. vol. 5, 20:1-6; *see* Tr. Ex. BI-1 at 122.) The Court may not substitute its judgment for that of the jury's and credit Mr. Hirtle's testimony, which conflicts with the text he identified as authoritative. *See CPC Int'l*, 144 F.3d at 42; *Megadyne*, 864 F. Supp. at 1102.

Mr. Hirtle used that industry standard to calculate what a reasonable royalty would be for Bowling's dice, applying the 5% and 3% rates. (Tr. Ex. 224.) Mr. Hirtle explained that under the industry standard method, the calculation would be as follows:

(Wholesale Price) x (0.9) x (Royalty Rate) = Royalty

($28.50) x (0.9) x (5.0%) = 1.28 per pair or 0.64 per die.

(Tr. Ex. 224.) At the 5% royalty rate the royalty was $0.64 per die for the Monopoly Millennium game. (Tr. Ex. 224.) At the 3% royalty rate the royalty was $0.38 per die. For the Avon edition, which sold for $9.50, the royalties for the 5% and 3% royalty rates were $0.21 per die and $0.13 per die, respectively. (Tr. Ex. 224.) Multiplying these royalties by the total number of each infringing version of the games sold provides a royalty range between $331,189 for 3% and $554,499 for 5% when applying the industry standard method:

| Industry Standard Royalty Range | |
|---|---|
| Royalty at 3.0% | Royalty at 5.0% |
| $331,189 | $554,499 |

Ms. Echlin admitted that Hasbro sold a total of 732,000 pairs of infringing dice in its Monopoly games. (Tr. vol. 4, 44:9-20.) That was confirmed by Mr. Bowling after reviewing Hasbro's sales documents. (Tr. vol. 1, 165:23-166:4; Tr. Ex. 67.) Mr. Bowling testified, based on Hasbro's sales numbers, that Hasbro sold 175,172 pairs of dice before Bowling's patent issued. (Tr. vol. 1, 166:24-167:19.) Thus, Hasbro sold a total of 556,828 infringing pairs of dice in its Monopoly games.[3] (Tr. vol. 1, 166:24-167:19.) Of those 556,828 pairs of dice, no more than 184,000 infringing pairs were sold in the Monopoly Avon Edition ("Avon").[4] (Tr. Ex. 67; Tr. vol. 5, 117:16-119:22, 128:13-21.) Thus, 372,828 pairs of infringing dice were sold in the standard Monopoly Millennium game and 184,000[5] pairs were sold in the Avon edition.

Mr. Hirtle then testified that at the time of the infringement, the parties would have made various points regarding the strength of their bargaining positions that would affect the hypothetical royalty negotiation. When a strong brand was involved, such as Monopoly, the industry standard starting point was 3% rather than 5%. (Tr. vol. 5, 24:16-25:9.) He asserted that Hasbro would have argued that Bowling's dice are merely a component of the Monopoly game, which would lower the industry standard royalty rate. (Tr. vol. 5, 22:13-18.) Bowling would have countered that he has a valid and infringed patent. (Tr. vol. 5, 22:19-22.) Mr. Hirtle countered that the Monopoly brand would decrease the royalty rate. (Tr. vol. 5, 22:23-23:4.) Bowling would have argued that he

[3] While not presented to the jury, in fact, both parties' damages experts confirmed this was the total number of infringing dice sold. (Attachment A at Ex. G; Attachment B at Ex. J, hereto.)

[4] Hasbro attempts to argue that more than 184,000 pairs of the Avon editions were sold after the patent issued. However, both Hasbro's and Bowling's expert agreed that only 172,844 Avon edition games containing the accused dice were sold after the patent issued. (Attachment A at Ex. G; Attachment B at Ex. J, hereto.) The number Bowling used, the 184,000 Avon games, is the number most favorable to Hasbro in that it resolves any disparity in Hasbro's favor, i.e. the more Avon games sold the less the royalty.

[5] Exhibit 87 does not state that 184,*900* Avon games were sold as Hasbro claims. Nowhere in Exhibit 87 does it discuss the 184,000 Avon games.

would be fine if Hasbro took the dice out of the game and that Hasbro already had the infringing dice in the games. (Tr. vol. 1, 179:21-180:1.) He would have also argued that Hasbro's infringing games were in the stores. (Tr. vol. 5, 23:21-24.) Mr. Bowling would have also pointed out that Hasbro was in its highest sales season, which would increase the royalty. (Tr. vol. 5, 24:6-15.) Mr. Hirtle also agreed that because Bowling had not licensed his invention that fact would favor Bowling in the hypothetical negotiation. (Tr. vol. 5, 28:21-29:4.)

The jury heard other evidence that supported its damage award under *Georgia Pacific*. Mr. Hirtle admitted that for a really neat feature for a game it is totally open as to how much Hasbro would allot for that feature. (Tr. vol. 5, 38:21-39:11; Tr. vol. 2, 164:25-165:16.) Mr. Hirtle admitted that the game's operating profits were well above any of the industry standard royalties he calculated. (Tr. vol. 5, 37:6-12.) Hasbro was in a bad bargaining position because it already had product in inventory and Hasbro would have to pay more because of the position it was in. (Tr. vol. 2,167:24-168:8, 168:25-169:10; Tr. vol. 4, 141:4-11.) Hasbro's advertising and packaging was complete, which touted the infringing dice. (Tr. vol. 4, 165:13-24.) Mr. Hirtle confirmed that Hasbro would want Bowling's dice exclusively for Hasbro's use in games and it would possibly be willing to pay more for that exclusivity. (Tr. vol. 2, 166:25-167:16; Tr. vol. 4, 135:19-136:17.) Hasbro would have also considered how much Bowling's dice sold for outside of the game. (Tr. Vol. 2, 167:17-23.) Bowling testified that his dice commanded a premium because they were unique and patented. (Tr. Ex. CM; Tr. vol. 1, 111:14-112:4, 113:24-114:22, 123:22-124:12; Tr. Ex. 108 (showing the patented dice more than double the price of standard dice).) The hypothetical negotiation would have taken place during

Hasbro's peak selling season, and it would have been a problem to switch out the dice. (Tr. vol. 4, 37:17-38:11.)

Mr. Bowling testified that at the time of the infringement he believed that the product would be a huge success and its sales would be significant. (Tr. vol. 1, 110:19-111:10.) When Mr. Bowling introduced his dice at the 1998 Gen Con game fair, he sold out of all 10,000 dice before the show was over and also took an order from a distributor for 5,000 more dice. (Tr. vol. 1, 110:19-111:10.) Bowling also testified that he had to protect his distributor network, which meant that he could not discount his dice below $0.49 cents. (Tr. vol. 1, 123:22-124:4, 125:6-16.)

This evidence fully supports the verdict. Based on the industry standard method of calculating a royalty in the toy industry, the jury's award amounts to 4% of net sales of each Monopoly Millennium version:

| | | |
|---|---|---|
| **Monopoly Millennium**: | (372,828 Pairs) * ($28.50) * (0.9) * (4.0%)[6] | = <u>$383,150</u> |
| **Avon Edition**: | (184,000 Pairs) * ($9.50) * (0.9) * (4.0%) | = <u>$63,031</u> |
| **Total Award** : | | = <u>$446,182</u> |

Adding $383,150 to $63,031 equals the jury's reasonable royalty damage award of $446,182, which falls squarely within the range of industry standard royalties. *Fuji Photo*, 249 F. Supp. 2d at 453 (denying a defendant's rule 50 motion where the jury considered the *Georgia Pacific* factors and awarded a royalty within the range presented by the parties). Taking the evidence in the light most favorable to Bowling, the jury credited the industry standard disclosed in *Inside Santa's Workshop* in light of the

[6] The actual percentage rate that multiplies to the jury verdict is 4.00658%, which is affected by how the numbers are rounded.

evidence regarding the circumstances at the time of the infringement and determined that an appropriate damage award was 4% of net sales of each of the games.

### 2. Applying the Evidence to the *Georgia Pacific* Factors Reasonable Persons Could Have Reached the Jury's Reasonable Royalty Award.

Hasbro ignores the record evidence concerning the *Georgia Pacific* factors and claims that *no* evidence supports the jury's reasonable royalty award. That claim is demonstrably false as the following chart—based on Hasbro's chart—reveals:

| ***GEORGIA-PACIFIC* *FACTOR*** | **HASBRO'S CHARACTERIZATION OF THE TRIAL RECORD** | **EVIDENCE ACTUALLY INTRODUCED AT TRIAL** |
|---|---|---|
| 1. The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty. | **None**; Bowling conceded that he had not licensed his invention. *See Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1078 (Fed. Cir. 1983) (for a royalty to be "established" it "must be paid by such a number of persons as to indicate a general acquiescence in its reasonableness by those who have occasion to use the invention"). | Bowling testified that he had never licensed his patent. (Tr. vol. 1, 168:7-13.) Bowling chose to keep the patented design to sell himself. Mr. Hirtle admitted that this would tend to favor Bowling in a hypothetical negotiation. (Tr. vol. 5, 28:12-29:4.) |
| 2. The rates paid by the licensee for the use of other patents comparable to the patent in suit. | **None**; no comparable patents were introduced, nor was any evidence of Hasbro's rates paid for any comparable inventions. | Hasbro continues to pay the inventor's family of Monopoly a 3% royalty, despite the patent having long since expired. (Tr. vol. 4, 96:2-8.) Hasbro's license also has continued for many years making the inventor's family very wealthy. (Tr. vol. 4,160:22-163:6.) |
| 3. The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the | **None**; Bowling did not identify any aspects of the hypothetical license that would inform the amount of royalty, preferring instead to insist merely that he would not have licensed his invention to Hasbro. | Mr. Hirtle testified that Hasbro would have wanted the license to be exclusive as to its board games. (Tr. vol. 2, 166:25-167:16.) Hasbro's desire for such an exclusive license would have increased the amount of money Hasbro would have had to |

| *GEORGIA-PACIFIC FACTOR* | HASBRO'S CHARACTERIZATION OF THE TRIAL RECORD | EVIDENCE ACTUALLY INTRODUCED AT TRIAL |
|---|---|---|
| manufactured product may be sold. | | pay Bowling for his invention. |
| 4. The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly. | **None**; Bowling showed no licenses containing special conditions to maintain his monopoly and admitted that prior to the issuance of the patent he had actively sought to expand his products into board games or items such as "Crystal Yahtzee" (*e.g.*, Exhibit BO). | Bowling had a policy not to license his patented dice. Bowling testified that he wanted to *sell* his patented dice to the toy companies. (Tr. vol. 5, 138:5-10.) |
| 5. The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter. | **None**; Bowling introduced no evidence on this subject. In its case, Hasbro introduced evidence that Bowling and Hasbro were not competitors, since Hasbro was not selling dice as stand-alone items but rather as a component in a mass-market board game, whereas Bowling was selling dice to a niche market. | |
| 6. The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales. | **None**; Bowling did not testify to any derivative or convoyed sales or that his patented dice drove any other sales. | Bowling testified that he would give manufacturers in Europe exclusive rights to his dice in exchange for exclusive rights to sell in the U.S. particular dice they manufactured. (Tr. vol. 1, 125:17-126:2.) Bowling's patented dice also allowed him to leverage into a whole product line selling standard or non-patented dice too. Not only could Bowling sell his patented dice, but those that came to him looking for his patented dice could also order standard or non-patented dice as well. Thus, Bowling leveraged his patented dice to drive sales of non-patented items. (Tr. vol. 1, 172:4- |

| *GEORGIA-PACIFIC FACTOR* | HASBRO'S CHARACTERIZATION OF THE TRIAL RECORD | EVIDENCE ACTUALLY INTRODUCED AT TRIAL |
|---|---|---|
| | | 21.) This would favor a higher royalty rate.<br><br>Moreover, Hasbro touted the dice in its television commercials and other advertisements. (Exs. 95; KK; KL.) |
| 7. The duration of the patent and the term of the license. | Bowling testified as to the duration of his patent, but did not testify as to the term of the hypothetical license. | Bowling testified that at the time of the infringement his patent had just issued. Thus, Bowling had the entire term of the patent's monopoly to exploit. (Tr. vol. 1, 176:17-22.) However, the Monopoly Millennium game was a limited edition run, with only the possibility of Hasbro using Bowling's dice in other games. (Tr. vol. 4, 163:22-24.)<br><br>Mr. Hirtle also testified that Hasbro would be willing to temporarily pay more because Hasbro already had the infringing dice in its game and advertising. (Tr. vol. 4, 165:13-24.) |
| 8. The established profitability of the product made under the patent; its commercial success; and its current popularity. | Bowling did not put on any evidence regarding the profitability of his patented dice or their current popularity; on cross-examination he acknowledged that his accounting books showed that he had suffered overall losses from the inception of his crystal dice sales through the date of the hypothetical negotiation. | Bowling repeatedly testified that his profit on the dice was on average about $0.50 per die. (Tr. vol. 1, 122:3-6, 172:25-173:3, 186:18-25.) That is almost a 400% markup on his dice. |
| 9. The utility and advantages of the patented property over the old modes or devices, if any, that had been used for working out similar | Bowling testified that his dice were the first to have "non-traditional" shapes and that they worked better than his "prototype." Bowling did not testify that his dice worked better than other existing dice. Mike | Bowling's patented dice are unique as evidenced by the PTO granting him a U.S. patent. (Tr. Ex. 1.) Bowling testified that his patented dice had a unique feel because of their shape. (Tr. vol. 1, 91:21-92:12.) His unique |

| *GEORGIA-PACIFIC FACTOR* | HASBRO'S CHARACTERIZATION OF THE TRIAL RECORD | EVIDENCE ACTUALLY INTRODUCED AT TRIAL |
|---|---|---|
| results. | Gray testified that other "non-traditional" shapes for dice existed prior to the '197 patent and the Court took judicial notice of a number of dice patents that show that Bowling was incorrect in his claim that his were the first "non-traditional" shapes for dice. | shape allowed for larger numbers and that they had good action when rolled. (Tr. vol. 1, 76:4-8; 91:25-92:5.) Bowling also testified there was a collectability factor to the dice. (Tr. vol. 1, 66:14-24; 79:21-80:7.)<br><br>Bowling testified that when they debuted at the 1998 Gen Con tradeshow people bought them like candy and he sold out of all 10,000 dice. (Tr. vol. 1, 110:19-111:1; 111:19-24.) Hasbro touted the multi-faceted dice both on the product's packaging and prominently featured the dice in its television advertising. (Tr. Exs. KK, 95.) Hundreds of customers called and complained that they did not receive their special "jewel shaped" dice. (Tr. Ex. 56.) Even Hasbro's own marketing department wanted to keep Bowling's dice in the game. (Tr. Ex. 80.) Certainly Bowling's patented dice had advantages over existing dice—they were new, unique, collectable, and customers demanded them.<br><br>Mr. Jensen thought the dice were cool and had not seen any like it before. (Tr. vol. 3, 75:14-22.) |
| 10. The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those | Bowling introduced the patent and his commercial dice, from which the jury was free to determine the nature of the patented invention and the character of his commercial embodiment of the invention. Bowling offered no proof of any | Bowling testified that his patented dice had a unique feel because of their shape. (Tr. vol. 1, 91:21-92:12.) He also testified that his unique shape allowed for larger numbers and that they had good action when rolled. (Tr. vol. 1, 76:4-8; 91:24-92:5.) |

| *GEORGIA-PACIFIC FACTOR* | **HASBRO'S CHARACTERIZATION OF THE TRIAL RECORD** | **EVIDENCE ACTUALLY INTRODUCED AT TRIAL** |
|---|---|---|
| who have used the invention. | benefits to those who have used the invention. | Bowling testified there was a collectability factor to the dice. (Tr. vol. 1, 66:14-24; 79:21-80:7.) Bowling was able to charge a premium for his dice over existing polyhedral shaped dice. (Tr. Ex. 108; *compare* Tr. vol. 1, 67:4-10, *with*, 111:14-112:4.)<br><br>Hundreds, if not thousands, of customers called and complained to Hasbro that they did not receive their special "jewel shaped" dice. (Tr. Ex. 56.) Even Hasbro's own marketing department wanted to keep Bowling's dice in the game. (Tr. Ex. 80.)<br><br>Hasbro wanted a futuristic randomizer for its Monopoly Millennium game and switched from an expensive "electronic randomizer" to Bowling's dice without changing the price point. (Tr. vol. 5, 114:12-116:5.) |
| 11. The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use. | Bowling testified as to the fact that Hasbro used the invention and, through the introduction of a Hasbro spreadsheet, provided evidence that Hasbro had used the Accused Dice in a number of games. Bowling offered no evidence as to the value of that use. During Hasbro's case, Michael Hirtle testified as to the value of Hasbro's use of the Accused Dice. | The Monopoly Millennium game was a really important game for Hasbro and it commanded a significantly higher price than other versions. (Tr. vol. 3, 105:8-23.) Hasbro was not going to use just standard cubed dice. (Tr. vol. 3, 107:18-22; Sefchick Depo. at 48:1-10.) Hasbro commanded a premium by using premium components. Tr. vol. 3, 107:23-108:2.) Hasbro wanted the random number generator in the game to be something special. Hasbro believed that the dice would contribute to the |

| *GEORGIA-PACIFIC FACTOR* | HASBRO'S CHARACTERIZATION OF THE TRIAL RECORD | EVIDENCE ACTUALLY INTRODUCED AT TRIAL |
|---|---|---|
| | | popularity and sales of the Monopoly Millennium game. (Tr. vol. 3, 122:7-13.)<br><br>Hasbro was not going to use regular cube dice; instead it was looking for a unique die. (Tr. vol. 3, 107:18-22; Sefchick Depo. at 48:1-10.)<br><br>Hasbro touted the multi-faceted dice both on the product's packaging and prominently featured the dice in its television advertising. (Tr. vol. 3, 122:14-25, Tr. Exs. KK, 95.) Hundreds of customers called and complained that they did not receive their special "jewel shaped" dice just in November and December. (Tr. Ex. 56; Tr. vol. 3, 26:25-27:20.) Even Hasbro's own marketing department wanted to keep Bowling's dice in the game. (Tr. Ex. 80.) |
| 12. The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions. | **None**; Bowling offered no testimony on this subject. Michael Hirtle expressly stated that there was no industry standard for the licensing of a component of a game. | Bowling introduced the book *Inside Santa's Workshop*, which Mr. Hirtle stated was an authority on licensing in the toy industry. (Tr. BI-1; Tr. vol. 5, 10:25-11:6.) That book states that the toy industry's standard royalty rate is 5% of net sales. (Tr. Ex. BI-1 at 122.) Nowhere in that book does it state that the toy industry's standard applies only to whole game concepts and not components. (Tr. Ex. BI-1; Tr. vol. 5, 20:1-6.) |

| *GEORGIA-PACIFIC FACTOR* | HASBRO'S CHARACTERIZATION OF THE TRIAL RECORD | EVIDENCE ACTUALLY INTRODUCED AT TRIAL |
|---|---|---|
| 13. The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer. | Bowling introduced no evidence on this subject. Michael Hirtle testified that the Accused Dice accounted for approximately 2.4% (Avon Edition) or 1.1% (Millennium Edition) of the selling price of the games. Based on the profit numbers contained in Exhibit MA, the profit attributable to each Accused Die (as opposed to the elements uniquely contributed by Hasbro) was $0.037 (Avon Edition) and $0.036 (Millennium Edition. | Hasbro touted the dice on the packaging and in its television commercials. (Exs. KK, 95.) Hasbro saw Bowling's dice at the 1998 Gen Con tradeshow where they were selling fast. (Tr. vol. 2, 108:24-109:9.) Thus, Hasbro knew they would be well received. That fact was confirmed by the hundreds of complaints received when they substituted regular cubed dice for the unique jewel shaped dice. (Tr. Ex. 56.) Hasbro's own marketing department wanted to keep the patented dice in the game. (Tr. Ex. 80.)<br><br>Hasbro also touted the dice in its television commercials and other advertisements. (Exs. 95; KK; KL.) |
| 14. The opinion testimony of qualified experts. | None from Bowling. Hasbro introduced the testimony of Michael Hirtle, who testified that a reasonable royalty would be $0.01 per Avon Edition game and $0.014 per Millennium Edition game. | Mr. Hirtle testified that the book Inside Santa's Workshop was an authoritative reference in the toy industry. (Tr. vol. 5, 10:25-11:6.) The book *Inside Santa's Workshop* explains that "[n]ormally, the toy industry's standard royalty is 5.0% of the manufacturer's selling price to the trade." (BI-1 at 122.) That book does not state that the toy industry's standard royalty rate does not apply to game components. (BI-1; Tr. vol. 5, 20:1-6.) Mr. Hirtle explained to the jury the range of royalties under the toy industry's standard royalty rate. (Ex. 224.) Moreover, Mr. Hirtle admitted that its value added method, which Hasbro used to arrive at |

| *GEORGIA-PACIFIC FACTOR* | HASBRO'S CHARACTERIZATION OF THE TRIAL RECORD | EVIDENCE ACTUALLY INTRODUCED AT TRIAL |
|---|---|---|
| | | the $0.01 and $0.014 per year royalties, had never been used before the date of the hypothetical negotiation. (Tr. vol. 5, 18:18-22.) He admitted that his value added formula did not take into account patent protection or for inventory and product that would have to be scrapped. (Tr. vol. 4, 141:18-142:12.) He also admitted that Hasbro would not accept that method in licensing its own intellectual property. (Tr. vol. 4, 13:2-15:5.) |
| 15. The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee – who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention – would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who | Bowling offered no testimony on this subject. Hasbro introduced the testimony of Michael Hirtle, who testified that a reasonable royalty would be $0.01 per Avon Edition game and $0.014 per Millennium Edition game. | At the time of the hypothetical negotiation, Mr. Bowling believed his dice were a huge success and would have demanded a high royalty, if he was going to license his design. Moreover, he was concerned about this new distributor network which was vital to his business. Mr. Bowling testified that at the time of the infringement, sales of his patented dice were going "extremely well." (Tr. vol. 1, 168:18-169:18; Tr. Ex. 219.) At trade shows people were buying his patented dice like candy. (Tr. vol. 1, 111:19-25.) At the trade show where Bowling introduced his dice, he sold out of all 10,000 dice and was ecstatic as to how well they sold. (Tr. vol. 1, 111:19-24.) Bowling's profit on the dice was about $0.50 per die. (Tr. vol. 1, 122:3-6; 172:25-173:3; 186:18-25.)<br><br>Moreover, Bowling was |

| *GEORGIA-PACIFIC FACTOR* | HASBRO'S CHARACTERIZATION OF THE TRIAL RECORD | EVIDENCE ACTUALLY INTRODUCED AT TRIAL |
|---|---|---|
| was willing to grant a license. | | leveraging his dice into a whole product line of patented and non-patented dice. (Tr. vol. 1, 172:4-21.) In August of 1999, when Bowling's patent issued, he believed the market potential for his dice "appeared to be limitless." (Tr. vol. 1, 175:10-17.) Shortly thereafter, Hasbro, one of the largest toy manufacturers in the world, wrote him a letter explaining that it was interested in his patented dice. (Ex. 63.)<br><br>Bowling testified that in August of 1999, if Hasbro came to him and wanted his dice he would have sold them to Hasbro for $0.645. (Tr. vol. 1, 182:18-21.) If Hasbro wanted to manufacture them Bowling would have reduced the amount to $0.58, which is Hasbro's manufacturing cost. (Tr. vol. 1, 182:22-183:8.)<br><br>Bowling testified that he would not discount below or undercut his U.S. distributor price of $0.49 because they were establishing his brand and giving him access to many retail stores. (Tr. vol. 1, 123:20-124:3, 125:6-16.)<br><br>Conversely, at the time of the infringement, Hasbro was in a poor bargaining position. (Tr. vol. 2, 167:24-169:10.) Hasbro already had advertising done, which featured the infringing dice. (Tr. vol. 4, 165:7-19.) Hasbro also had packaging completed that featured the |

| *GEORGIA-PACIFIC FACTOR* | **HASBRO'S CHARACTERIZATION OF THE TRIAL RECORD** | **EVIDENCE ACTUALLY INTRODUCED AT TRIAL** |
|---|---|---|
| | | infringing dice. (Tr. vol. 4, 165: 20-24.) Hasbro pursued Bowling seeking a license to his invention. (Tr. vol. 4, 139:6-15.) Mr. Hirtle admitted that this was the only time that Hasbro had a product in the box and then determined that it was infringing and that would cause the royalty to go up. (Tr. vol. 4, 141:4-17.) Mr. Hirtle testified that Hasbro was in its highest selling season. (Tr. vol. 5, 24:6-9.)<br><br>While Mr. Hirtle testified that a reasonable royalty would be \$0.01 per Avon Edition game and \$0.014 per Millennium Edition game, he admitted that the method he used to get those numbers had never been used before the date of the hypothetical negotiation. (Tr. vol. 4, 145:5-8.) Hasbro's "value added" formula does not take into account patent protection or the fact that Hasbro has inventory of the infringing product. (Tr. vol. 4, 140:22-141:2.)<br><br>Mr. Hirtle also discussed applicable hypothetical negotiation factors going back and fourth regarding the various points Mr. Bowling would make and those Hasbro would make. (Tr. vol. 5, 21:6-26:13; Ex. 221.) Mr. Hirtle also admitted that the rock bottom operating profit for the accused games was well above the industry's standard royalties discussed in Ex. 221. (Tr. vol. 5, 37:6-12.) |

Bowling provided the jury with evidence concerning the bargaining positions of the parties at the time of the infringement, the toy industry's standard royalties, profits the parties made on their respective products, the popularity of the patented product and other relevant *Georgia Pacific* factors, and the jury determined a reasonable royalty. After considering the evidence in light of the *Georgia Pacific* factors, the jury awarded an amount that was less than the profit Bowling makes selling his dice to retailers and still allowed Hasbro a significant profit on its infringing games. *See Fuji Photo*, 249 F. Supp. 2d at 453 (denying a defendant's Rule 50 motion where the jury considered the *Georgia Pacific* factors and awarded a royalty within the range presented by the parties); *Monsanto Co.*, 382 F.3d at 1385 (affirming a denial of a Rule 50 motion and noting that the "reasonable royalty" may be higher than the infringer's profits); *Honeywell Int'l*, 426 F. Supp. 2d at 225 (denying defendant's JMOL claiming an excessive royalty based on a number of the *Georgia Pacific* factors and the "field's normative royalty range"); *Kemin Foods, L.C. v. Pigmentos Vegetales Del Centro S.A.*, 357 F. Supp. 2d 1105, 1128-29 (S.D. Iowa 2005) (denying a Rule 50 motion where it was unclear how the jury reached the damage award, but the award was supported by evidence).

Moreover, the jury might have believed Mr. Hirtle that the industry standard was 5% for a whole game concept, but weighed the other *Georgia Pacific* factors more heavily in arriving at its reasonable royalty award on the die component. Certainly reasonable persons could have recognized the poor bargaining position Hasbro was in and afforded that great weight in determining its royalty award.

In sum, Bowling introduced sufficient evidence on the *Georgia Pacific* factors from which the jury rendered its reasonable royalty award.[7] *See Maxwell v. Angel-Etts of Cal., Inc.*, 53 Fed. Appx. 561, 566 (Fed. Cir. 2002) (unpublished) (evidence on only a few *Georgia Pacific* factors is enough to defeat a Rule 50 Motion). Regardless of whether Hasbro calculates the royalty differently and may not agree with the verdict, the jury's award was supported by sufficient evidence after a fair trial. *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1394 (Fed. Cir. 2003) (denying defendant's motion for JMOL or a new trial because trial was fair and the jury's verdict was supported by the evidence).[8, 9]

### 3. It Would Not Be A Miscarriage of Justice To Deny Hasbro Another Trial On Damages Given That Sufficient Evidence Supports The Verdict.

Under First Circuit law, a district court should not grant a motion for a new trial unless the outcome is against the clear weight of the evidence such that upholding the verdict will result in a miscarriage of justice. *Arrieta-Colon v. Wal-Mart P.R., Inc.*, 434 F.3d 75, 89 (1st Cir. 2006). As explained above, the jury's verdict was supported by the evidence concerning a reasonable royalty and is not against the clear weight of the

---

[7] Hasbro's desire to substitute its computation to arrive at a lower figure merely indicates the damages Hasbro would prefer to pay—that the fact finder *might* have viewed its evidence more favorably is not a basis for reversal. *TWM Mfg.*, 789 F.2d at 899. Hasbro cannot show that the jury's award is, in view of all the evidence, so outrageously high as to be unsupportable as an estimation of a reasonable royalty. *See SEB S.A. v. Montgomery Ward & Co.*, No. 99 Civ. 9284 (SCR), 2007 U.S. Dist. LEXIS 80394, *16-*18 (S.D.N.Y. Oct. 9, 2007).

[8] The cases Hasbro cites to support its positions are distinguishable. This is not a case where there was no evidence to support the jury's award. To the contrary, the jury apparently rejected Hasbro's "value added" method because it had never been used before and did not square with the authoritative texts identified by Mr. Hirtle. Thus, the jury rejected Hasbro's proffered reasonable royalty of $7,017.98 based on its "value added" calculation.

[9] Although the Court properly excluded Hasbro's invalidity defenses, those defenses would certainly have failed. Hasbro also filed a request for reexamination claiming the patent was invalid. However, the Patent Office confirmed patentability of all but one of the asserted claims. (*See* Attachment C, hereto)

evidence. Since Hasbro cannot satisfy either prong of the above test, its motion must be denied.

Hasbro's reliance on *Unisplay* is misplaced. The *Unisplay* court found that the jury's reasonable "royalty determination was not supported by *relevant* evidence." *Unisplay, S.A. v. Am. Elec. Sign Co.*, 69 F.3d 512, 518 (Fed. Cir. 1995) (emphasis in original). There, Unisplay's expert's testimony was not relevant because it was not directed to the appropriate time period. *Id.* (Unisplay's expert was testifying "to what the parties might arrive *at the time of the trial*"). Here, Mr. Bowling and Mr. Hirtle appropriately testified regarding a hypothetical negotiation that would have occurred at the time of the infringement. (Tr. vol. 4, 140:5-142:12. ("And so in 1999, when this hypothetical negotiation would have been occurring. . ."); Tr. Vol. 1, 176:17-19. ("Q. Now, in August of 1999, how much left of the life of your patent was remaining? A. I think the whole life."); Tr. vol. 4, 145:5-8 ("Q. Isn't it fair to say that the added value, you had never actually used that prior to August of 1999 to calculate a royalty on a patented component, correct. A. Yes. That's correct."); Tr. vol. 4, 165:7-24 ("Is it fair to say that in this particular instance, back in August '99…"); Tr. vol. 5, 21:16-29:9; 37:6-12 (testimony regarding a hypothetical negotiation in August of 1999, between the parties.)).

Unisplay's expert also focused on a royalty rate that applied to projected sales rather than the actual sales. *Unisplay*, 69 F.3d at 518 (emphasis added). Here, Bowling presented evidence to the jury of actual infringing sales. (Ex. 67.) The *Unisplay* court found that Unisplay did not provide *any* evidence or testimony to show that the royalty calculation the jury adopted reflected what the parties might have agreed to at the time

the infringement began. *Id.* at 518-19. Here, there was sufficient evidence, *detailed supra*, from which the jury could have concluded that willing parties would have agreed upon the reasonable royalty awarded. *See Megadyne*, 864 F. Supp. at 1103 (a reasonable royalty reflects the parties' expectations and bargaining positions at the time infringement began). In *Unisplay*, the court found that jury's verdict was not within the royalty range encompassed by the record as a whole. 69 F.3d at 519. Here, the jury's reasonable royalty award fell within the range of royalties supported by the evidence.

While Mr. Hirtle argued that Hasbro would not have paid more than a penny per game, the jury was free to recognize Mr. Hirtle's bias and discount or ignore that testimony in favor of other evidence supporting the jury's award, such as *Inside Santa's Workshop*. (*See* Tr. Ex. BI-1.) Moreover, Hasbro's claim that it would never have paid what the jury awarded is irrelevant in the hypothetical negotiation. *Hanson*, 718 F.2d at 1081 (Fed. Cir. 1983) (whether the defendant was never willing to pay a reasonable royalty is irrelevant in the hypothetical negotiation because the willing-buyer/willing-seller concept is employed to compensate the patentee and its validity does not depend on the actual willingness of the parties to engage in such negotiations). The law does not allow an infringer, such as Hasbro, to set the royalty just by claiming it would never had paid that much. *TWM Mfg.*, 789 F.2d at 900 (stating that the "willing licensee/licensor approach must be flexibly applied as a 'device in the aid of justice'" else an election to infringe becomes a handy means to impose a compulsory license on a patent owner); *Monsanto Co.*, 382 F.3d at 1384 (stating that the imposition on a patent owner who would not have licensed his invention for a given royalty is a compulsory license against the person wronged in favor of the infringer).

**C. Remittitur Is Inappropriate Because the Jury's Verdict Is Due Deference and Is Supported By The Evidence.**

In arguing that the jury's award is excessive[10], Hasbro faces a demanding standard. *Muniz*, 496 F.3d at 40. The jury award will not be overturned unless it is grossly excessive or shocking to the conscience. *Id.* The jury heard evidence relating to the *Georgia Pacific* factors and returned a verdict well within the range of the parties' evidence. The jury did not give Bowling the $0.58 per die that he requested nor did it determine that Hasbro's $0.005 per dice royalty was correct. The jury appropriately considered the *Georgia Pacific* factors and determined an intermediate figure. *Fuji Photo*, 249 F. Supp. 2d at 453. Even if reasonable minds could differ on the amount of damages, remittitur is inappropriate. *Soitec, S.A. v. Silicon Genesis Corp.*, C.A. No. 99-10826, 2002 U.S. Dist. LEXIS 16841, at *31 (D. Mass. Aug. 23, 2002) (stating the jury's verdict does not even come close to meeting the standard for remittitur despite that reasonable minds could differ on the award).

*Harris Corp. v. Ericsson, Inc.*, No. 3:98-CV-2903-M, 2003 WL 21750710, *6 (N.D. Tex. 2003) does not help Hasbro. In *Harris Corp.*, the court granted remittitur because there was no evidence to support a 1.75% royalty rate applied to the entire damage period. *Id.* Harris Corp.'s expert testified that the hypothetical negotiation would have resulted in a 1.75% royalty rate for the first five years and a 0.5% royalty rate for the remainder of the license. *Id.* at *5. That was the highest damage amount the evidence supported. *Id.* at *5-*6. Harris Corp's attorney subsequently changed his argument and asked for damages based on the 1.75% royalty rate for the *entire* damage period, i.e. using the 1.75% instead of the 0.5% for the years after year five. *Id.* at *7. At

---

[10] During closing argument, Bowling's counsel specifically told the jury that it could not award Bowling more than a reasonable royalty if it found that Hasbro treated Bowling badly. (Tr. vol. 6, 5:25-6:7.)

the urging of Harris Corp., the jury applied the 1.75% royalty rate for the entire damage period. *Id.* The *Harris* court reduced the award using the 1.75% for the first five years and 0.5% for the remaining damages period as the evidence supported. *Id.* at *9. Unlike *Harris*, there was sufficient evidence in this case regarding the *Georgia Pacific* factors from which the jury could have determined its reasonable royalty award. *Soitec,* 2002 U.S. Dist. LEXIS 16841, at *31 (refusing a remittitur where evidence regarding the *Georgia Pacific* factors supported the jury's verdict).

Here, the jury's verdict must be upheld because it is not grossly excessive or monstrous, clearly not supported by the evidence or based on speculation or guesswork. To the contrary, it is clear that the jury accepted a damage model aligned with the toy industry's standard royalty rates and rejected Hasbro's "value added" method. The jury likely rejected Hasbro's "value added" method because Mr. Hirtle, Hasbro's licensing expert, admitted that in 1999, it had *never* employed that method to calculate a royalty. (Tr. vol. 5, 18:18-22.) Mr. Hirtle also explained that Hasbro's "value added" method only accounts for relative costs and does not consider a product's value. (Tr. vol. 5, 12:2-6, 18-21, 13:2-15:5) Moreover, despite arguing that Bowling should accept Hasbro's "value added" royalty, Mr. Hirtle emphatically stated that Hasbro would never accept it in licensing its own intellectual property. (Tr. vol. 5, 13:24-15:5) (when asked if Hasbro would accept its value added royalty Mr. Hirtle stated, "[o]f course not").

### D. The Evidence Showed that Bowling Complied With the Marking Statute.

#### 1. Sufficient Evidence Supports the Jury's Finding that Bowling Appropriately Gave Notice To The Public By Marking The Packaging.

The law does not require Bowling to physically mark the die. *Sessions v. Romadka*, 145 U.S. 29, 50 (1892) ("It is not altogether clear that the stamp could not have been made upon the smaller sizes [of trunk catches], but, in a doubtful case, something must be left to the judgment of the patentee, who . . . affix[ed] a label to the packages in which the fasteners were shipped and sold."); *Metrologic Instruments., Inc. v. PSC, Inc.*, No. 99-4876, 2004 U.S. Dist. LEXIS 24949, at *57 (D.N.J. Dec. 13, 2004) (marking the packaging is sufficient even though it is physically possible to place the patent number on the article); *Wayne-Gossard Corp. v. Sondra Mfg. Co.*, 579 F.2d 41, 43 (3d Cir. 1978) (finding that despite being able to mark socks, marking the packaging satisfied the notice requirement of § 287).

Bowling showed the jury the patented dice that he sold in 1999, to illustrate their small size. Bowling also testified that due to the manufacturing process the patent number could not be placed on the dice. (Tr. vol. 1, 126:3-16; Tr. vol. 2, 61:15-25.) Moreover, if Bowling wanted to try to etch the patent number on his dice it would have required additional steps. (Tr. vol. 2, 61:18-25); *see Rutherford v. Trim-Tex, Inc.*, 803 F. Supp. 158, 164 (N.D. Ill. 1992) (finding that marking the package was sufficient despite the product being capable of being marked, because marking the product would have required an additional step and the marking was sufficient to provide notice to the public). Hasbro introduced no contrary evidence. The nature of the product and its size also support the jury's finding that Bowling was not required to place the patent number

on the dice. *Id.* at 162. Based on this evidence, the jury correctly found that Bowling was not required to place the patent number on the dice.

**2. Sufficient Evidence Supports the Jury's Finding That Substantially All of Bowling's Dice Were Continuously Marked During the Relevant Period.**

Testimony established that days before his patent issued, Bowling wrote letters to his existing retail and distributor customers providing them with patent number stickers and instructing them to replace the "patent pending" stickers with the new patent number sticker on all bins used to sell his patented dice. (Ex. 24; Tr. vol. 1, 131:25-138:9.) Bowling sent these letters only to his existing customers because they were already selling his dice using the "patent pending" stickers. (Tr. vol. 1, 131:25-132:11.) He did not need to send letters to new customers for two reasons: (1) he included patent number stickers, instructions to place the sticker on any containers with his dice and tubs with the patent number stickers affixed to them in every order he shipped after August 15, 1999, and (2) they did not have existing inventory with the patent pending sticker that needed to be covered up. (*See* Tr. vol. 1, 131:25-132:11.) Those letters made clear that the retailers needed to mark bins or tubs containing Bowling's patented dice with the patent sticker:

> This letter is to inform you that from this date forward we require that Crystal Caste™ dice be sold with it's patent identification, U.S. patent #5,938,197. Our patent number must be affixed to all containers, bags or tubs.
>
> It is important that all Crystal Caste™ dice on display be labeled with our sticker identifying our patent protection. We are asking you to label your existing tubs or bins with the enclosed stickers. If you need more please contact us at (888) 3CC-DICE.
>
> From today forward, we will place a sticker on our tubs and in the bags of loose dice.

(Ex. 24 at B 00701.) Bowling explained that from August 15, 1999 forward he would place a patent number sticker on all tubs and in all bags of loose dice. (Ex. 24 at B

00701.) Bowling also received requests from his retailers asking for more patent number stickers. (Ex. 24 at B00698, B00701.)

Bowling sent a different letter to his distributor customers. The distributor letters required his distributors and their retail customers to mark all of his patented dice with the patent number:

> Dear Robert,
>
> This letter is to inform you that from this date forward we require that Crystal Caste™ dice be sold with it's patent identification, U.S. patent #5,938,197. Our patent number must be affixed to all containers, bags or tubs.
>
> It is important that all Crystal Caste™ dice out in the stores, or in your inventory, today be labeled with our sticker identifying the patent protection. We are asking you to label all of your Crystal Caste™ containers with the enclosed sticker and place one inside of each bag of dice that you have on hand. Also, please send a label to all of your retail customers with an existing supply of Crystal Caste™ dice so that they may place the sticker on our, or whatever, container our dice is in. If you need more please contact us at (888) 3CC-DICE.
>
> From today forward, we will place a sticker on our tubs and in the bags of loose dice.

(Ex. 24 at B00708.) Bowling made clear that any bins or tubs with his dice in inventory and out in stores must be labeled with his patent number sticker. (Ex. 24 at B00708.) Moreover, at this time Bowling talked to his customers regularly. (Tr. vol. 1, 139:8-10.) Bowling called each distributor and retailer letting them know the letter was coming. (Tr. vol. 1, 139:11-16; Tr. vol. 2, 79:6-24.) Not one store or distributor refused to follow his instructions. (Tr. vol. 1, 139:11-16.) Moreover, during the relevant period, Bowling was the only person responsible for making sure his marking stickers were provided to customers. (Tr. vol. 1, 139:24-140:6.) In 1999, Bowling had no reason to believe that his retailers or distributors were not carrying out his marking requests. (Tr. vol. 1, 140:10-13; Tr. vol. 5, 146:5-17.) Bowling explained that without an agreement to mark, he would not continue to sell to them. (Ex. 24; Tr. vol. 1, 136:13-24.) The Dragon's Lair bin confirms it was done. (Tr. vol. 5, 168:25-171:2; Burke Depo. at 31:3-7, 107:21-109:5

(confirming that the dice display bin at Dragon's Lair had Bowling's patent number sticker appropriately affixed to it, despite Bowling not placing it on there).)

A representative photo of Exhibit 227, one of Bowling's point-of-purchase display tubs with the patent number sticker affixed to it is shown below:




(See Ex. 227.)




(See e.g. Ex. 226.)

That Bowling did not "affix" the patent-number sticker directly to the bag of dice, but rather placed it in the bag provided *better* notice to the public given the industry and how his products were sold, i.e., loose in tubs. (*See* Tr. vol. 2, 66:13-68:19.) Above right is a representative photo of Exhibit 226 showing how Bowling packaged his dice with instructions and the patent number stickers. While Bowling sent out point-of-purchase tubs and patent-number stickers to his customers, he also included a sticker in every one of the bags of dice he shipped so when the dice were removed from the bags and placed in the sales tubs or bins, the sticker could be affixed to the display rather than be thrown out with the bag as would have occurred had it been "affixed" to the bag. (Tr. vol. 1, 128:11-129:22, 136:4-12.) In fact, customers asked Bowling to stop sending the tubs, so just bags with the patent number stickers would go out. (Tr. vol. 5, 161:23-162:24.)

Thus, not only did Bowling mark the packaging, but he made it easy for customers to properly mark the containers in which the dice were sold. (Tr. vol. 5, 153:25-159:14.)

### 3. Hasbro's Preferred Version of the Facts are Irrelevant Because Sufficient Evidence Supports the Jury's Verdict.

Hasbro improperly asks the Court to reweigh the evidence and conclude, despite the jury's verdict, that Bowling did not comply with the marking requirements. Specifically, Hasbro argues that because Bowling does not have signed marking letters from each of his customers, those customers were not properly marking. Hasbro also argues that because Bowing did not send letters out to *new* customers after August 17, 1999, that they must not have marked the product. Hasbro made those arguments at trial, and the jury rejected them. It is not for the Court to reconsider that evidence.

Additionally, Hasbro's argument mischaracterizes the testimony adduced at trial. Bowling sent letters to the customers he had before the patent issued because those customers had "Patent Pending" stickers on the bins. (Tr. vol. 1, 131:22-132:11.) He needed to make sure they replaced the patent pending sticker with the patent number sticker. (Tr. vol. 1, 131:22-132:11.) After the patent issued, all new customers would receive dice with the patent number stickers, instructions that the sticker had to be on any bins containing the patented dice and he sent bins with the patent number sticker already affixed to it. (Tr. vol. 1, 136:4-12; Tr. vol. 2, 79:6-24; Tr. vol. 5. 153:2-21.) Bowling also testified that he periodically talked to these people and would not have continued to sell to them if they were not marking. (Tr. vol. 1, 136:13-24, 139:1-16; Tr. vol. 2, 79:6-13.)

Bowling also explained that he only needed to send letters out to his then existing customers so they would replace the "patent pending" sticker with the "patent number" sticker. (Tr. vol. 1, 131:25-132:11; Tr. vol. 5, 153:2-11.) As to his new customers,

Bowling personally included in every bag of dice patent number stickers and instructions to place them on any bin containing his patented dice. (Tr. vol. 5, 153:12-21.) Bowling also sent point-of-purchase tubs bearing the patent sticker to each customer. The jury accepted Bowling's testimony and rejected Hasbro's argument.

This case is distinguishable from *Butterfield v. Oculus Contact Lens Co.* 332 F. Supp. 750 (D.C. Ill. 1971). In *Butterfield*, the plaintiff established that it only provided a rubber stamp to each of its licensees that included the patent number. *Id.* at 761. Plaintiff produced no evidence that (1) the rubber stamps were ever used by licensees to mark the containers delivered to purchasers, (2) that the plaintiff require that they be used, and (3) that the plaintiff inquired if they were. *Id.* The *Butterfield* court found that the patentee did nothing to assure that the containers were marked with the patent number and that there was no indication that they were. *Id.*

Those facts are in stark contrast to the evidence of Bowling's actions. (*See* Tr. vol. 5, 149:17-161:3.) Bowling sent letters to existing customers requiring them to replace the patent pending stickers with patent number stickers. (Ex. 24.) He included patent number stickers in every bag of dice sold and instructions to place the patent number sticker on any container used to sell his crystal dice. (Tr. vol. 1, 136:4-12; Tr. vol. 5, 153:17-21.) He placed patent number stickers on point-of-purchase tubs and sent them out to distributors and retailers. (Tr. vol. 5, 155:12-156:20; Tr. Ex. 227.) He followed up with phone calls. (Tr. vol. 2, 79:6-13; Tr. vol. 5, 146:5-17; Tr. vol. 5, 169:1-6.) He knew customers were complying because he received requests for more patent marking stickers. (Tr. vol. 5, 150:5-9.)

Such marking complies with the marking statute given "the Court's long-standing focus on the notice effected by the method of marking the patented article rather than on the precise mechanistic compliance with the statute." *Rutherford*, 803 F.Supp. at 161 (citing *Sessions*, 145 U.S. at 50). Not only did Bowling properly mark, but his method of marking was specifically tailored to the industry to assure that the public received notice of his patent.

Moreover, evidence proved that Bowling's marking efforts were effective. After the patent issued, Dragon's Lair became a customer of Crystal Caste. (Ex. DO at DDO.018.) An invoice dated September 25, 1999, shows that Bowling sent Dragon's Lair a 21 compartment display. (Ex. DO at DDO.018; Tr. vol. 1, 142:4-143:10.) Bowling sent the display to Dragon's Lair along with patent number stickers. (Tr. vol. 1, 143:11-16.) However, Bowling did not place the patent number stickers on the multi-compartment displays because he did not know which compartments would include the patented dice or how the display would be used. (Tr. vol. 1, 143:17-144:13.) Mr. Burke testified that the 21 compartment display case had affixed to it *two* of Bowling's patent number stickers on each end of the top row, where Bowling's dice were placed. (Tr. vol. 5, 168:25-171:2; Burke Depo. at 31:3-7, 107:21-109:5.) Thus, someone at Dragon's Lair received the patent number stickers and instructions and properly placed them on the bin.

Hasbro also misstates the testimony of Mr. Jensen, an employee of Berkeley Topline and the evidence regarding Berkeley Topline's sales of Bowling's dice. While Mr. Jensen dealt with the dice inventory, it was not the main part of his job, because he handled approximately 20,000 different products. (Tr. vol. 3, 44:19-45:12.) However, Robert Warors was working for Mr. Jensen counting dice in 1999. (Tr. vol. 3, 46:5-

47:13.) Mr. Jensen recalled that Bowling's company was asking them to send out patent number stickers. (Tr. vol. 3, 46:5-47:13.) On August 15, 1999, Bowling sent Berkeley Topline a patent marking letter along with patent number stickers asking them to make sure their retailers marked his dice. (Tr. Ex. 24 at B00708.) Mr. Warors signed that document and returned it to Mr. Bowling. (Tr. Ex. 24 at B00708; Tr. vol. 5, 168:5-24.) Mr. Jenson testified that if they had received Bowling's patent marking letter, which clearly they did, they would have complied with it. (Tr. vol. 3, 48:24-49:16.) Moreover, every tub that Bowling sent out in the fall of 1999 had a patent number sticker on it. Mr. Jensen stated that Berkeley Topline would have left the stickers on the tubs. (Tr. vol. 3, 48:5-10.) Mr. Jensen also recalled Bowling's tubs or point-of-purchase displays and recalled that Bowling wanted Berkeley Topline to get the tubs to the retailers. (Tr. vol. 3, 87:2-88:2.) Berkeley Topline included these tubs in every order that went out. (Tr. vol. 3, 88:11-20.) He was also certain that it was possible that Berkeley Topline did send out the patent marking stickers. (Tr. vol. 3, 52:9-17.)

Hasbro's argument that Berkeley Topline did not mark the dice because Mr. Jensen's recollection is vague on this point is irrelevant. The Court cannot weigh evidence, but must take the evidence in the light most favorable to Bowling. *Megadyne*, 864 F. Supp. at 1102. Moreover, Mr. Jensen might not have been the person at Berkeley Topline that was responsible for these activities. Mr. Jensen was not the person responsible for packaging orders and sending them out. (Tr. vol. 3, 49:18-50:7.) He just ordered the dice and would not see it after that. (Tr. vol. 3, 51:3-5.) Mr. Jensen did not handle the product, but rather dealt with the paper work. (Tr. vol. 3, 70:17-71:16.)

In sum, Hasbro's Rule 50 Motion regarding marking should be denied because Bowling introduced sufficient evidence to support the jury's finding that Bowling complied with the marking statute from August 17, 1999 through November 10, 1999.

## III. CONCLUSION

Hasbro's rule 50 motion, its motion for a new trial and its request for remittitur should be denied because the jury's verdict is supported by sufficient evidence. The jury's reasonable royalty award is supported by multiple *Georgia Pacific* factors and it falls within the royalty range supported by the evidence. A new trial should not be granted because the verdict is not against the great weight of the evidence such that upholding the verdict would result in a miscarriage of justice. Remittitur is also inappropriate because the jury's verdict falls within the range of reasonable royalties supported by the evidence.

Finally, Hasbro's Rule 50 motion on patent marking should be denied because evidence supports the jury's finding that Bowling complied with the marking statute. While Bowling provided sufficient evidence that he complied with the marking statute, Hasbro provided no evidence that he did not. Hasbro offered only unsupported speculation and innuendo. The jury properly weighed the evidence and rejected Hasbro's arguments. The jury's verdict should be upheld and Hasbro's motion denied.

Michael Bowling,
By His Attorneys,

Date: May 23, 2008

/s/Thomas J. Leach
Anthony R. Zeuli *(pro hac vice)*
Thomas J. Leach, MN (*pro hac vice*)
MERCHANT & GOULD, P.C.
3200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
(612) 332-5300
(612) 332-9081 (Facsimile)

/s/Christine K. Bush
Craig M. Scott, Esq. (#4237)
Christine K. Bush, Esq. (#5587)
DUFFY SWEENEY & SCOTT, LTD
One Turks Head Place, Suite 1200
Providence, RI 02903
(401) 455-0700
(401) 455-0701 (Facsimile)

**CERTIFICATION**

TO:

Todd D. White, Esq.
Jeffrey K. Techentin, Esq.
Adler Pollock & Sheehan P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903-1345

David K. S. Cornwell, Esq.
Tracey-Gene G. Durkin, Esq.
Sterne Kessler Goldstein & Fox P.L.L.C.
1100 New York Avenue N.W.
Washington, DC 20005

I hereby certify that the within Plaintiff Michael Bowling's Objection and Memorandum In Support of His Objection To Defendant Hasbro, Inc.'S Renewed Motion For Judgment As A Matter Of Law Or, In The Alternative, For A New Trial Or, In The Alternative, For Remittitur was filed through the ECF system on the 23rd day of May, 2008, and will be sent electronically to the above-named counsel who are registered participants identified on the Notice of Electronic Filing for Case No. 05-229S.

/s/ Christine K. Bush