UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| MICHAEL BOWLING, a Resident of Arizona, | : | |
| Plaintiff, | : | |
| v. | : | C.A. No. 05-229 S |
| HASBRO, INC., a Rhode Island Corporation, | : | |
| Defendant. | : | |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, FOR A NEW TRIAL OR, IN THE ALTERNATIVE, FOR REMITTITUR**

Defendant Hasbro, Inc. ("Hasbro") respectfully submits this reply memorandum of law in further support of its renewed motion for judgment as a matter of law or, in the alternative for a new trial or, in the alternative, for remittitur. (Docket No. 216). Hasbro submits this reply to rebut several erroneous arguments forwarded by Plaintiff Michael Bowling ("Bowling") in his objection to Hasbro's motion (Docket No. 238).

## I. INTRODUCTION

Hasbro renewed its motions for judgment as a matter of law on the issues of damages and marking – originally made at the close of Plaintiff's case, and at the close of all evidence – on April 7, 2008, within the ten days allotted by Rule 50(b) of the Federal Rules of Civil Procedure for renewing such motions. Fed. R. Civ. P. 50(b). Hasbro included within that motion a request for a new trial pursuant to Rule 59, arguing that if it was not entitled to judgment as a matter of law, the verdict was certainly against the great weight of the evidence. Finally, Hasbro also suggested that this Court consider ordering a remittitur to the highest damages amount supported by the evidence as a means of attempting to avoid a re-trial of the entire case. Hasbro's principal

argument in support of this motion was that Bowling had failed to present evidence from which a reasonable jury could arrive at the verdict when applying the appropriate legal framework. Docket No. 216 at 19-20.

On May 23, 2008 – 46 days after Hasbro filed its renewed motion and memorandum, 32 days after the original deadline for a response,[1] and after being granted the opportunity to review the entire trial transcript, Bowling filed his objection to Hasbro's motion. Despite this abundance of time to formulate his arguments, Bowling has countered Hasbro's argument almost exclusively with the refrain that the "industry standard" royalty rate of 5% of "the item's net wholesale price" identified in *Inside Santa's Workshop* (Trial Exhibit BI-1) supports the jury's verdict, and therefore the jury was free to disregard all other evidence and base its verdict on that text. *See* Docket No. 238-2 at 1, 5, 6, 15, 16, 23. Beyond that argument – which is directly contradicted by the text itself and completely without evidentiary support – Bowling is left only to argue that the limited evidence presented that fell within the broad scope of the *Georgia-Pacific* factors was legally sufficient to allow the jury to calculate a reasonable royalty. But even this argument is tied to Bowling's initial argument that *Inside Santa's Workshop* provides an industry standard applicable to the royalty for a game component because none of the other evidence rationally suggests any royalty rate whatsoever, let alone a royalty rate higher than that to which Michael Hirtle testified.

Essentially, Bowling argues that the jury's verdict approximates a 4% royalty on the sales of complete Monopoly® games and that such a royalty rate is supported by evidence. However, a 4% royalty on the games, as opposed to the dice, is not only contrary to all the evidence presented at trial, but it is contrary to the law applicable to patent royalties as well. Bowling is

---

[1] This Court granted Bowling's motion for an extension of time to respond to Hasbro's motion on April 15, 2008.

entitled only to a reasonable royalty on Hasbro's use of the patented invention, not on Hasbro's game sales. A 4% royalty may have been supported by the evidence and legally permissible on the price for which Hasbro sold the dice – but Hasbro did not sell the dice. Andt a royalty based on the sales price of the games is totally unsupported and legally prohibited.

Bowling's argument in support of the jury's verdict with respect to marking is equally flawed. Rather than argue that the evidence introduced at trial supports a jury finding that Bowling marked his dice in accordance with the plain language of the statute, he argues instead that his alternative marking scheme was "good enough." This argument cannot withstand scrutiny, as the plain language of the marking statute clearly requires that the patent-holder mark "substantially all" of the patented products, and the evidence, even as characterized by Bowling in his objection to the instant motion, simply does not support that conclusion.

For these reasons, as explained more fully herein, Bowling's arguments are unavailing and this Court should grant Hasbro's motion for judgment as a matter of law or order a new trial, or, at the very least, offer Plaintiff remittitur to the maximum amount of damages supported by the evidence – the $7,017.98 that corresponds with Hirtle's calculations – with an accompanying order for a new trial if Bowling does not accept that remittitur, as the verdict is clearly against the weight of the evidence.

## II. <u>ARGUMENT</u>

Bowling's objection suffers several substantive shortcomings. His description of the standard the Court should apply in this motion is flawed. Additionally, Plaintiff's reliance on *Inside Santa's Workshop* as a lifeline for its arguments overlooks the plain language of that text, which explicitly contradicts Bowling's characterization of its contents. Moreover, the well-established entire-market-value doctrine applicable to patent infringement damages forecloses

the possibility that this Court could find that Bowling was entitled to a reasonable royalty on the sales price of the full Monopoly games in the absence of evidence of a clear and unambiguous industry standard to the contrary. Plaintiff's effort to urge this Court to determine that the remaining evidence was legally sufficient to support the jury's verdict fails to address Hasbro's argument that the relevant evidence that Bowling produced did not provide an adequate basis from which the jury could fashion a reasonable royalty. Finally, Bowling fails to explain how the evidence introduced with regard to marking satisfies the statutory requirements, but chooses instead to argue that his marking scheme was good enough despite the fact that it falls short of the plain language requirements of the statute.

### A. Bowling's Statement of the Legal Framework for The Consideration of Hasbro's Rule 50 Motion Is Too Narrow.

Bowling characterizes the standard for granting a motion for judgment as a matter of law pursuant to Rule 50 as "stringent," and suggests that he need show only "slightly more than a scintilla of evidence" in support of the jury's verdict to defeat such a motion. Docket No. 238-2 at 3-4. Bowling also seeks to expand the scope of the evidence that the Court may consider in the context of the Rule 50 motion to "*all* the evidence—not just the evidence presented in Bowling's case." *Id.* at 4. These arguments, however, exaggerate the caution with which the Court must approach a motion for judgment as a matter of law and misstate the procedural posture of the Rule 50 motions before the Court.

Hasbro moved this Court for judgment as a matter of law at the close of Bowling's case in chief on the issues of damages and willfulness. Trial Tr. Vol. 4 at 71:22 – 72:15, 75:12 – 77:15. Another motion for judgment as a matter of law was made to the Court at the close of all evidence. Trial Tr. Vol. 5 at 173:17 – 175:5. Finally, Hasbro filed a renewal of its Rule 50 motions after the jury returned its verdict. Docket No. 216.

Bowling's suggestion that Rule 50 motions should be granted "sparingly" is an incorrect statement of the law. When a plaintiff has failed to introduce evidence sufficient to prove his case, the motion should be granted. While it is true that all reasonable inferences must be drawn in favor of the nonmoving party, if the evidence introduced by the nonmoving party simply cannot satisfy the burden of proof imposed on that party, the Court is obligated to enter judgment as a matter of law. *See Trigano v. Bain & Co., Inc.*, 380 F.3d 22, 29 (1st Cir. 2003) ("[A] mere scintilla of evidence is not enough to forestall a directed verdict, especially on a claim or issue as to which the burden of proof belongs to the objecting party."). Similarly, Bowling's argument that "only slightly more than a scintilla of evidence" is required to support the jury's verdict contradicts the standard as articulated in the case law. *See Katz v. City Metal Co., Inc.*, 87 F.3d 26, 28 (1st Cir. 1996) ("To warrant submission of an issue to the jury, the plaintiff must present 'more than a mere scintilla' of evidence and may not rely on conjecture or speculation. '[T]he evidence offered must make the existence of the fact to be inferred more probable than its nonexistence.'") (internal citations omitted) (quoting *Resare v. Raytheon Co.*, 981 F.2d 32, 34 (1st Cir. 1992). Even the case cited by Bowling in support of these arguments, when read in context, reveals a more relaxed standard than the one he portrays. *See Muniz-Olivari v. Stiefel Labs, Inc.*, 496 F.3d 29, 35 (1st Cir. 2007) ("The standard is a stringent one, though the party bearing the ultimate burden of proof must have presented more than a 'mere scintilla of evidence' in his favor and cannot prevail if the jury's verdict rests on overly speculative or conjectural evidence.").

Ultimately, Plaintiff attempts to convince this Court that it would be taking an unusual and drastic step if it was to grant Hasbro's Rule 50 motions. That is simply not the case. Rule 50 is designed to prevent the imposition of verdicts that are based on evidence that does not

comport with the legal standard to be applied to the issue in question. *See Chrabaszcz v. Johnston School Committee*, 474 F. Supp.2d 298, 307 (D.R.I. 2007) (citing *Scottish Heritable Trust v. Peat Marwick Main & Co.*, 81 F.3d 606, 610 (5th Cir.1996)) (noting that one of the principal purposes of Rule 50 is to allow the trial court to re-examine the sufficiency of the evidence as a matter of law). This standard calls precisely for the analysis that Hasbro asks this Court to undertake: to review the evidence introduced by Bowling that would tend to prove a reasonable royalty, and, to the extent that any evidence exists, to evaluate whether that evidence is sufficient as a matter of law to support any reasonable royalty amount. Hasbro respectfully submits that it does not, and in that instance, judgment as a matter of law is not only appropriate, but necessary.

Bowling also attempts to expand the scope of the evidence that this Court should consider when evaluating this Rule 50 motion to include all evidence introduced during Hasbro's presentation of its case. Docket No. 238-2 at 4. However, that argument ignores the fact that Hasbro's motion came at the close of Plaintiff's case, and, at that time, this Court reserved its ruling and specifically noted that it was not denying the motion.[2] Trial Tr. Vol. 4 at 71:22 – 72:15, 75:12 – 77:15, 80:9-21. Tellingly, this Court noted that Hasbro's motion on the issue of damages likely had some merit, and warranted serious consideration. *Id.* at 80:15-18 ("Their argument on the Rule 50 is not a frivolous argument. I'm reserving. I'm not denying it. And it may have some merit."). Thus, the Court indicated at the time that Hasbro made its motion that it would not decide the merits of the motion, but reserve and rule at a later time. Notably, there was no indication from the Court that its intent was to effectively reject Hasbro's claim that the evidence introduced by Bowling was insufficient to support a reasonable royalty determination

---

[2] With respect to the Rule 50 motion on the issue of marking, Hasbro acknowledges that such motion was not made until the close of all evidence, and accordingly, all evidence introduced should be evaluated in the context of the motion on that issue.

and instruct Hasbro to present its defense. Rather, the Court reserved on the motion, essentially postponing a ruling on the merits as they existed at the time the motion was made to afford it adequate time to evaluate the merits of the motion and also to await the outcome of the case to determine whether a ruling was necessary at all.

The case cited by Bowling for the proposition that it would be error for the Court to consider only the evidence introduced by Bowling during his case is inapposite. *See Peguero-Moronta v. Santiago*, 464 F.3d 29 (1st Cir. 2006). In that case, the defendants moved for judgment as a matter of law at the close of Plaintiff's case, and that motion was granted in part and denied in part. *Id.* at 32. The defendants then moved for judgment as a matter of law again at the close of their case,[3] and that motion was granted. *Id.* at 33. On appeal, the plaintiffs argued that the district court considered only the evidence introduced in their case in chief when ruling on the motion made at the close of all evidence, and that such limited review was error. *Id.* On appeal, the First Circuit acknowledged, in dicta, that if the district court had only considered the evidence put on in the plaintiffs' case when ruling on the motion made at the close of all evidence that action would have been error. *Id.* at 33-34. However, ultimately the First Circuit determined, after its *de novo* review of all evidence, that it was an error of law to grant the defendants' "second Rule 50(a) motion." *Id.* at 54.

In stark contrast, this Court did not rule on the motion for judgment as a matter of law made by Hasbro at the close of Bowling's case. It chose instead to reserve, expressing no opinion on the ultimate merit of the motion other than to say that it was not frivolous and likely had some merit. Trial Tr. Vol. 4 at 80:15-18. Consistent with the First Circuit's recognition that

[3] The court referred to this as a renewed motion for judgment as a matter of law, though it was not technically a renewal of a motion for judgment as a matter of law made after a jury verdict as is contemplated by Rule 50(b) of the Federal Rules of Civil Procedure. The second motion would more accurately be described as a new motion because the first had been resolved.

another motion for judgment as a matter of law – made at the close of all evidence after a motion has been made at the conclusion of the plaintiff's case in chief – is a second motion, not a renewal of the first motion, *see Peguero-Moronta*, 464 F.3d at 54, the resolution of the first motion need not be based upon evidence introduced after the motion was brought. Hasbro's second motion pursuant to Rule 50 at the close of all evidence does not constitute a renewed request to the Court to consider its earlier motion, but is instead a new application to the Court seeking judgment as a matter of law when all evidence is considered. The separate and distinct nature of this second motion is further highlighted by the fact that Hasbro included the issue of marking in the second motion, and not in the first. And, absent any concession from Hasbro with regard to the first motion, the filing of the second motion does not negate Hasbro's right to have its first motion decided on its own merits.

A Rule 50 motion pressed at the close of Plaintiff's case is designed to allow a quick and cost-effective way of resolving litigation for which insufficient proof has been presented. *See Stevens v. G.L. Rugo & Sons, Inc.*, 209 F.2d 135, 143 (1st Cir. 1954) ("The whole purpose of a motion under Rule 50(a) is to terminate the case at that point, without putting the defendant to the necessity of introducing his own evidence and thus extending the duration of the trial."). Bowling's formulation of the framework for the evaluation of a Rule 50 motion presents an untenable choice to a defendant who in good faith believes he has a valid argument for judgment as a matter of law at the close of a plaintiff's case based upon a failure of proof. Essentially, a defendant must either waive what it considers to be a sound legal argument on its Rule 50 motion, or waive the presentation of a defense, thereby conceding defeat in the entire case in the event the motion is unsuccessful. *See Martinez Moll v. Leavitt & Sons of P.R., Inc.*, 583 F.2d 565, 570 (1st Cir. 1978) (declining to strictly apply waiver rule when district court's

representations made application of the waiver rule "untenable" in the opinion of the First Circuit). In fact, applying a previous version of Rule 50, the First Circuit suggested that reserving on a motion for judgment as a matter of law made at the close of Plaintiff's case is improper because it undermines the purpose of bringing a motion at that time – to short-circuit a plaintiff's case and decide it in a defendant's favor when the plaintiff has failed as a matter of law to prove one of the elements of a claim. *See Stevens*, 209 F.2d at 143. While reserving on such motions may be appropriate and practical procedurally because it potentially avoids the need for a new trial in the event the trial judge's decision granting the motion is reversed, this observation from the First Circuit suggests strongly that the motion brought at the close of plaintiff's case should be decided on the evidence presented to that point in the proceedings.

Stated simply, it would be inequitable to impose a rule that a defendant loses the right to have a motion for judgment as a matter of law made at the close of the plaintiff's case decided only on the evidence introduced by the plaintiff in its case in chief simply because the court reserved ruling and asked the defendant to put on its defense. A more sound approach, consistent with the First Circuit's jurisprudence on the issue, would be to consider that reservation on such a motion simply maintains the status quo for purposes of that motion until the court makes its decision. Thus, in the context of this case, the Court is faced now with two separate Rule 50 motions: one made at the close of Bowling's case and one made at the close of all evidence. Accordingly, each motion should be evaluated according to the state of the evidence at that time. Thus, Hasbro maintains that the evidence introduced by Bowling that he

purports would allow the jury to calculate a reasonable royalty is insufficient as a matter of law, and judgment should enter for Hasbro on the issue of damages.

### B. Despite Mischaracterizing And Overstating The Evidence Introduced, Bowling Fails To Articulate How The Evidence Supports A Finding That The Jury Verdict Represents A Reasonable Royalty Derived From The *Georgia-Pacific* Factors.

Even if the Court was to accept Bowling's argument that all the evidence should be considered in the context of Hasbro's motions, it is clear that the evidence could not support the jury's verdict, and, at the very least, a new trial is warranted. Bowling mischaracterizes the content of the text *Inside Santa's Workshop*, and injects strained readings of case law in an attempt to demonstrate that the evidence introduced in this case was legally sufficient to allow for a proper *Georgia-Pacific* analysis. Accordingly, Plaintiff has essentially done nothing to refute Hasbro's argument that the minimal evidence introduced by Bowling that bore any relation to the *Georgia-Pacific* factors could possibly generate a reasonable royalty number that was anything more than "speculation or guesswork." *See Monsanto Co., v. Ralph*, 382 F.3d 1374, 1383 (Fed. Cir. 2004).

#### 1. Bowling's Unwarranted and Improper Reliance on the "Industry Standard" Described in *Inside Santa's Workshop* Cripples His Argument that the Jury's Award Correlates to that Standard.

As described, *supra*, Bowling latches on to *Inside Santa's Workshop* and continually trumpets its contents as if a mere glance at the text would lead even the most casual observer to conclude that the jury's award in this case was reasonable. He even goes so far as to argue that the jury was free to disregard the testimony of Mike Hirtle, in which he unequivocally stated that the 5% standard royalty rate described in the text was not applicable to components of games, but rather only to entire game concepts, in favor of some supposed statement in the text that a standard royalty for a component is 5% of the net sales price of the toy or game in which it is

contained. Docket No. 238-2 at 5-6. In support of this argument, Bowling suggests that Mr. Hirtle acknowledged that the text itself does not limit the 5% standard to entire game concepts. *Id.* at 6. In so doing, Bowling mischaracterizes Mr. Hirtle's testimony and *Inside Santa's Workshop*.

When Mike Hirtle testified as to the contents of *Inside Santa's Workshop* – and specifically the fact that the industry standard royalty rate does not apply only to total games – he was being directed to a specific page in the text, and his answer can only be construed to apply to the specific reference to which he was directed. Specifically, Mr. Hirtle was being shown page 122 of the text, and was asked to comment on that page. Trial Tr. Vol. 5 at 20:1-6 ("Q. Confirm for me, sir, and we still have it on the screen, that in the Santa's Workshop book, it does not say anything about a total game. In Santa's Workshop, it says the standard royalty is five percent of the manufacturer's selling price, correct? A. That's correct."). Clearly Bowling directed Mr. Hirtle to a specific page ("and we still have it on the screen") when he posed the question. It is patently unreasonable to presume that this statement – as Bowling suggests – constitutes an admission from Mr. Hirtle that the industry standard described in *Inside Santa's Workshop* is not intended to apply to full game concepts rather than mere components of games. It is equally absurd to presume that Mr. Hirtle was representing that the entire text was devoid of references to the fact that the 5% royalty standard was applicable only to complete game concepts. Indeed, Mr. Hirtle could not have been clearer that he believed that other parts of the text made it explicit that the 5% standard applied to a game or toy property rather than for an individual component, testifying: "I'm sure you'll find elsewhere in this book where there's more, a better definition when it talks about royalties." Trial Tr. Vol. 5 at 16:5-9.

Mr. Hirtle was right. The actual text of *Inside Santa's Workshop* contains two references to a 5% industry standard royalty rate on the net sales of the item. The first is page 122, which is highlighted so prominently by Bowling: "Normally, the toy industry's standard royalty is 5 percent of the manufacturer's selling price to the trade. If an item sells 400,000 pieces at $10, the inventor's share of the sales receipts will be $200,000." Exhibit BI-1 at 122. The second reference comes at page 200: "The standard royalty for toys and games is 5 percent of the item's net wholesale price." Exhibit BI-1 at 200. Notably, both passages that refer to this standard base it on the sale price of the "item." Interestingly, the word "item" has a very specific meaning in *Inside Santa's Workshop* because it is actually defined in the book's glossary: "**Item**: Single product." Exhibit BI-1 at 269.

This definition guts Bowling's claim that the 5% industry standard is applicable to all licenses in the toy and game industry. If an "item" is a "single product," an infringer is not selling a licensed product as an "item" merely by including that licensed product within an "item" that it offers for sale. The licensed product, therefore, is not an "item" within the application of the industry standard described in *Inside Santa's Workshop*. And, the net sales price of the "item" is completely disconnected from the licensed product. As applied to this case, the dice that allegedly infringe on Bowling's dice design patent are the licensed product, but the Millennium Edition and Avon Edition Monopoly games are the "item" that is being sold. The net sales price of the "item" does not and cannot transfer to the licensed product.

If the 5% standard royalty is to be applied to the dice as an "item," then by the express language of *Inside Santa's Workshop* Bowling is only entitled to 5% of the net sales price of the "single product" involved: the dice. But, of course, there is no "net sales price" for the dice because, as Mr. Hirtle accurately pointed out, "[w]e didn't sell the dice." Trial Tr. Vol. 5 at

39:17. The logical impossibility of applying the industry standard to a licensed product that does not have a selling price associated with it is precisely why Mr. Hirtle opined, without any contradiction, that there is no established industry standard royalty rate for component licenses. Trial Tr. Vol. 4 at 110:16-21.

Once the true nature of the content of *Inside Santa's Workshop* is uncovered, the remainder of Bowling's argument that the royalty number fell in between the royalty for the Monopoly® brand and the industry standard crumbles like a house of cards in a stiff wind. The jury may choose to disbelieve Mr. Hirtle's cost-based calculation of a royalty, but it is not permitted to believe evidence that was not put before it and does not even exist. To the extent that the jury's verdict was based on a belief that the industry standard of 5% applied to components of games, there was no evidence introduced to that effect, and any reliance on that belief in arriving at the verdict is *per se* unreasonable. *See Brooke Group, Ltd v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) (noting that a jury verdict that is based on an expert opinion that is unsupported by the facts is unreasonable). Of course, unlike the *Brooke Group* case, there was no expert opinion here stating that a component license should be 5% of the net sales of the entire game.

Patent law does recognize situations in which a licensed component of an integrated product can generate a royalty for the licensor based on the sales price of the entire product – the "entire market value rule." That rule clearly prohibits such a royalty calculation in this instance. "The entire market value rule 'permits recovery of damages based on the value of the entire apparatus containing several features, where the patent related feature is the basis for customer demand.'" *Imonex Servs., Inc. v. W.H. Munzprufer Dietmar Trenner GMBH*, 408 F.3d 1374, 1379 (Fed. Cir. 2005) (quoting *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1580

(Fed. Cir. 1989)). Liability is triggered under that rule when the patented component and the non-patented components form one interrelated item, but, in the absence of the patented component, demand for the item would be greatly reduced or nonexistent. *Rite-Hite v. Kelley Corp.*, 56 F.3d 1538, 1549-50 (Fed. Cir. 1995). In order to obtain royalty damages based upon the entire market value of the product in which the patented component is contained, the plaintiff must prove that the component was the primary driver of sales of the overall product. *See Tec-Air, Inc. v. Denso Mfg. Michigan, Inc.*, 192 F.3d 1353, 1362 (Fed. Cir. 1999) (holding the rule applicable when customers wanted fans specifically because of the patented component and without the patented component the fans did not meet the standards demanded by the customer). Bowling did not even attempt to introduce such evidence, nor could he have done so because product sales continued unabated following the swap-out of the dice.

Bowling has not invoked this doctrine, nor has he even suggested any evidence that could render it applicable. Rather he has tried to make an end-run around it by mischaracterizing the industry standard described in *Inside Santa's Workshop*. In the absence of any evidence that the infringing dice drove the sales of the Millennium and Avon Edition Monopoly games, Bowling is not entitled to a royalty on the net sales price of the complete games as a matter of law, regardless of how loudly he protests.

### 2. Bowling's Attempt to Cobble Evidence Together that Could Be Applied to the *Georgia-Pacific* Factors Does Not Address the Fundamental Flaw of a Lack of a Starting Point from Which to Negotiate.

In Hasbro's motion, it acknowledged that Bowling introduced some evidence that was relevant to some of the *Georgia-Pacific* factors, but did not present any evidence that was suggestive of a specific royalty from which the negotiation would start or from which an actual royalty amount or rate could be determined, thus rendering any calculation of a royalty

necessarily speculative and unreliable. Docket No. 216 at 9 n.4. In demonstrating this lack of workable evidence, Hasbro outlined a chart in which it categorized the evidence presented as it related to each of the *Georgia-Pacific* factors. *Id.* at 6-8. Bowling has now countered that argument by recreating that chart with a third column that gives his story of how the evidence applies to the *Georgia-Pacific* factors, and by explaining that not all the *Georgia-Pacific* factors need be considered to complete a valid reasonable royalty calculation for patent damages. Docket No. 238-2 at 10-25.

With respect to the evidence that Bowling assigns to each of the *Georgia-Pacific* factors, it suffices to say that not a single piece of relevant evidence indicated by Bowling in his lengthy chart is suggestive of a royalty amount or percentage. Other than *Inside Santa's Workshop*, which is irrelevant with respect to calculating royalties on game components, *see*, *supra*, Part II.A.1, and the 3% royalty paid for the Monopoly® game concept – which is not comparable to the hypothetical license in this negotiation because it too relates to a license for an entire game concept as opposed to a component – all the evidence gathered by Bowling in support of the jury verdict merely identifies factors that would tend to increase or decrease the royalty amount. However, as was the case when this Court disqualified the testimony of Bowling's damages expert, the question remains, raise it from what? *See Bowling v. Hasbro, Inc.* No. 05-229S, 2008 WL 717741, at *4 (D.R.I. March 17, 2008) ("Lapidus purports to analyze each of the *Georgia-Pacific* factors in terms of how each would tend to increase or decrease the royalty rate. However, Lapidus admitted at the *Daubert* hearing that he had no particular starting point for conducting this analysis."). If the jury was not permitted to base its verdict on the speculation of an expert who conducted his speculative analysis without relation to an established starting point

from which to begin, a jury verdict based on the very same rank speculation, this time necessitated by the lack of evidence presented by Plaintiff to the jury, cannot stand.

The relevant evidence presented by Bowling, as gleaned from his chart, can be summarized as follows: Bowling had never patented his dice before, and Hasbro would not have wanted him to license it to any other game companies. His dice are unique and popular, and this uniqueness made them desirable for Hasbro in its futuristic Monopoly version, as evidenced by their prominence in the commercial for the game. Bowling made a profit on the dice of something less than $0.50, and he granted foreign distributors discounts in exchange for exclusive rights to sell some of their dice designs. Docket No. 238-2 at 10-19.

Some of the evidence suggested by Bowling is questionable. In addition to improperly relying on the Monopoly® license and *Inside Santa's Workshop*, Bowling mischaracterized Mr. Hirtle's testimony regarding exclusivity. Bowling says that "Mr. Hirtle testified that Hasbro would have wanted the license to be exclusive as to its board games." Docket No. 238-2 at 10. In fact, in the testimony to which Bowling cites, Mr. Hirtle testified that he thought that "when our lawyers got involved in the actual drafting of an agreement, that would have certainly -- that would have been certainly one of the elements that they would have tried to achieve." Trial Tr. Vol. 2 at 167:7-11. Mr. Hirtle did not say that Hasbro would actually pay more for such a provision, nor was there any testimony to suggest that Bowling would have been willing to grant Hasbro exclusivity in the hypothetical license. Similarly, Bowling suggests that Mr. Hirtle testified that Hasbro would have been willing to pay more for the license because "Hasbro already had the infringing dice in its game and advertising." Docket No. 238-2 at 12. Mr. Hirtle's actual testimony was that Hasbro "might have been willing to offer temporarily maybe a little bit more." Trial Tr. Vol. 4 at 165:17-18. Moreover, because the hypothetical negotiation

takes place immediately before infringement, Hasbro's hypothetical situation was no different from that of any infringer who had expended any effort to develop the infringing product. By way of a final example, Bowling states that he testified "repeatedly" that his profit on sales of the dice was $0.50. Docket No. 238-2 at 12. However, he admitted on cross-examination that his profits were something less than that because that number did not take into account anything other than his cost to purchase the dice from his manufacturer and was – in fact – only his gross margin. Trial Tr. Vol. 1 at 184:8 – 185:15. This is not an exhaustive list of the favorable characterizations catalogued by Bowling – which perhaps rise to the level of unreasonable inferences – but rather is intended to serve as an example.

However, even taking all of Bowling's descriptions of the evidence as true, it is still not possible to find support for a sustainable reasonable royalty calculation. Once the standard articulated in *Inside Santa's Workshop* and the Monopoly license royalty agreement are removed from consideration – as they must be because they are not relevant to the royalty that should be paid for a game component – there is simply no foundation from which to start building a reasonable royalty calculus. The cases cited by Bowling do not cure this defect.

In *Fuji Photo Film Co., Ltd. v. Jazz Photo Corp.*, 249 F. Supp.2d 434, 453 (D.N.J. 2003), the jury was presented with relevant upper and lower limits on the reasonable royalty calculation and arrived at a verdict almost precisely in the middle of that range. In *Honeywell Int'l, Inc. v. Universal Avionics Systems Corp.*, 426 F. Supp.2d 211, 225 (D. Del. 2006), there was a normative range in the industry for licenses of the product in question. In *Maxwell v. Angel-Etts of California*, 53 Fed. Appx. 561, 566 (Fed. Cir. 2002) (unpublished), the court issued a conclusory statement that the royalty calculation was reasonable based on the evidence that was presented that was relevant to some, but not all, of the *Georgia-Pacific* factors. It did not say,

however, that a reasonable royalty calculation is permissible and reasonable if the relevant factors do not direct the jury to any particular royalty number, but instead invite the jury to speculate as to the appropriate range within which to work.

The bottom line remains that the evidence introduced by Bowling merely invited the jury to speculate. His attempts to suggest otherwise in his brief are entirely unavailing. Because, as this Court recognized when it rejected the testimony of Bowling's damages expert, it is not permissible to generate royalty numbers out of thin air, this jury verdict on damages must be set aside. Judgment as a matter of law is appropriate because Bowling failed to present sufficient evidence in his case to establish a reasonable royalty. Alternatively, a new trial is appropriate because the jury's verdict is against the clear weight of the evidence actually presented at trial. Finally, as a further alternative, the Court should offer remittitur to the highest royalty number permitted by the evidence, the $7,017.98 that corresponds with Mr. Hirtle's calculations, which, if it is not accepted by Bowling, will result in a new trial.

### C. Bowling's Version Of The Marking Evidence Is No Different Than That Presented By Hasbro, And It Cannot Support A Finding That Bowling Complied With The Marking Statute.

Hasbro's argument on the question of whether Bowling complied with the marking statute acknowledged that Bowling introduced a quantity of evidence that was relevant to the issue. However, Hasbro ran that evidence through the gauntlet of the requirements of the marking statute, 35 U.S.C. § 287(a), and showed that the evidence was insufficient to support a rational conclusion that Bowling has marked "substantially all" of the patented dice as the statute requires. *See Am. Medical Sys.* v. *Medical Eng'g Corp.*, 6 F.3d 1523, 1538 (Fed. Cir. 1993). Bowling attempts to counter this argument by articulating superficial and often inaccurate disparities between Hasbro's recounting of the evidence and his own. Docket No. 238-2 at 26-

34. But these superficial differences do not even address Hasbro's argument. Bowling has not pointed to any evidence that substantially all of his customers marked his dice. In fact, the evidence as described by Bowling does not even support a reasonable belief that Bowling's customers complied with the marking scheme. Instead what Bowling attempts to do is argue that Hasbro's argument boils down to the weight to be given to the evidence instead of its legal sufficiency. However, the weight of the evidence is of no moment when the evidence plus the reasonable inferences drawn from it do not satisfy the legal requirements of proof.

Bowling recounts the evidence of marking introduced at trial as follows: Shortly before he received his patent, he sent letters along with his patent stickers instructing his retailers and distributors that they must mark his dice, or else he would stop selling to them. Docket No. 238-2 at 30. He requested a returned countersigned letter, and received those letters from some of them. *Id.* He also began including patent stickers with all sales of his dice and display tubs, with instructions to affix those stickers to the display in which the dice were placed. *Id.* at 30-31. Notably, Bowling does not even assert that he wrote to any of his new customers to request their compliance with his marking scheme.[5]

---

[5] Other than Steen Jensen and Eric Burke, none of Bowling's customers testified with respect to their compliance with Bowling's marking scheme. Mr. Jensen, of course, testified (1) that he was utterly unaware of such a scheme, (2) that, had Berkeley Topline North been including stickers in its shipments to customers, the stickers would have been stored with the dice, and (3) that despite conducting regular physical inventories of the dice, he had never seen any stickers in the Berkeley Topline North warehouse. His testimony is uncontradicted that Berkeley Topline North was not complying with Bowling's marking scheme.

In the absence of customer testimony, there is a complete dearth of competent evidence to show compliance by customers from whom Bowling did not receive a countersigned agreement to comply with the marking scheme (*i.e.*, those listed on the summary pages of Plaintiff's Exhibit 24 without check marks next to the names). The only attempt by Bowling to introduce evidence on this point whatsoever was his recollection that in phone conversations his customers told him they would mark. That testimony, however, was stricken after Hasbro objected:

> Q. Okay. If you didn't receive a letter back from one of your distributors or wholesalers, how did you ensure, if at all, that they were going to honor your request to put the patent stickers on it?
> MR. TECHENTIN: Objection, your Honor. Calls for hearsay.
> THE COURT: Overruled.
> A. Well, at this point in time, I talked to all these people regularly. My accounts were manageable at the time so we would talk probably once a week, at least. And I had conversations.

He also highlights certain pieces of evidence that he asserts tend to prove that his marking scheme was followed by his customers. In particular, Bowling points to the evidence that Dragon's Lair placed marking stickers on its displays containing Bowling's dice notwithstanding the fact that Bowling's dice were displayed in cases containing many other – unpatented – dice. *Id.* at 32. The only other piece of inconclusive evidence that Bowling forwards as supportive of a verdict that found that he marked substantially all of his dice is that Steen Jensen from Berkeley Topline North – a distributor – testified that if he had received a letter, the instructions probably would have been followed and that he received requests for additional patent stickers. *Id.* at 31-33.

First, this characterization of the evidence is, again, not entirely accurate. Mr. Jensen's testimony was much more circumspect than Bowling suggests:

> If I had to say, I would say we would have followed directions. In a warehouse operation dealing with matters like this, unless we are asked, we tend to let it slide because it's just more hassle. But if we get a specific request, in general we would honor that. We would do what we are asked to do but only what we are asked to do and no more.
>
> Q. Do you have any reason to believe that that wasn't done?
>
> A. If it reached the right people, if somebody responsible for doing it. There is a chance that maybe Robert signed it and shuffled it away and didn't pass it on to someone who could actually do it. But, in general, with a letter like this received by us, we would do what they asked us to do.

---

> I don't know exactly at what point I called them. I may have called them in advance of sending the letters to give them a heads-up that the letter was coming. But I haven't had one store or distributor refuse to mark my dice. They all said they would do it.
> Q. And Mr. Bowling, in August –
> MR. TECHENTIN: Sorry, your Honor. I renew my objection. Ask that that answer, the hearsay portion be stricken.
> THE COURT: Sustained. The last portion of the answer regarding what others said will be disregarded by you.

Trial Tr. Vol. 1 at 139:1-23. Accordingly, the record is devoid of any evidence that any of Bowling's customers who did not return countersigned letters ever agreed to follow Bowling's marking scheme.

Trial Tr. Vol. 3 at 49:2-16. A plain reading of this passage belies the characterization made by Bowling that "Mr. Jenson [*sic*] testified that if [Berkeley Topline] received Bowling's marking letter, which clearly they did, they would have complied with it." Docket No. 238-2 at 33. Bowling chooses to ignore that Jensen was intentionally equivocal with respect to whether Berkeley Topline would have abided by the instructions in Bowling's letter, and the reasonable inference to be drawn from this testimony is that Berkeley Topline's ***<u>intention</u>*** would have been to comply. More importantly, Bowling deliberately misstates the evidence when he writes that Berkeley Topline "clearly [received Bowling's marking letter]." Plaintiff's Exhibit 24 contains all of Bowling's countersigned letters. There is none there for Berkeley Topline North, where Mr. Jensen worked.

Once again, however, Hasbro notes that even under Bowling's characterization of the evidence, it cannot defeat a challenge that it is insufficient as a matter of law to support a finding that Bowling marked substantially all of his patented dice. In fact, Bowling seems to acknowledge this truth when he attempts to argue that his method of placing stickers in the bags in which he shipped his dice, rather than on the dice or on the packaging, provided "*better* notice to the public given the industry and how his dice were sold." Docket No. 238-2 at 29. Bowling's argument, in this respect, actually presupposes the accuracy of Hasbro's contention that Bowling did not comply with the marking statute. The statute calls for either the product or the packaging to be marked with the patent number to allow for the patent holder to take advantage of the constructive notice provision. 35 U.S.C. § 287(a). Bowling admits that he did not comply with the plain language of the statute.

Bowling attempts to save his marking scheme by trumpeting "the court's long-standing focus on the notice effected by the method of marking the patented article rather than on the

precise mechanistic compliance with the statute." Docket No. 238-2 at 32 (quoting *Rutherford v. Trim-Tex, Inc.*, 803 F. Supp. 158, 161 (N.D. Ill. 1992)). However, the myriad cases addressing the issue of alternative marking when marking the patented product do not deviate from the explanation that marking the packaging of the product is the permissible alternative method. *See, e.g., Union Carbide Corp. v. Graver Tank & Mfg. Co.*, 282 F.2d 653, 675 (7th Cir. 1960) ("patentees may give notice to the public that an article is patented by marking a notice to that effect on the package containing it"); *Chicago Pneumatic Tool Co. v. Hughes Tool Co.*, 192 F.2d 620, 626 (10th Cir. 1951) (permitting marking on the packaging of drill bits); *Saf-gard Products, Inc. v. Service Parts, Inc.*, 491 F. Supp. 996, 1010 (D. Ariz. 1980) (finding that marking the packaging for radiator caps was sufficient). Bowling contends that he chose ***not*** to mark the packaging for the dice because to do so would have inhibited his marketing, as opposed to marking, plans. The law is absolutely clear that deviations from the statute that are driven not by physical necessity but by marketing concerns are not sufficient to satisfy the marking statute. *See Metrologic Instruments, Inc. v. PSC, Inc.*, Civil Action No. 99-4876 (JBS), 2004 WL 2851955, at * 20 (D.N.J. Dec. 13, 2004) (rejecting a marking scheme that placed the patent number in an instruction booklet that accompanied the patented product as opposed to on the product itself "for pure reasons of marketing").

In light of governing law, Bowling's marking arguments must fail. Bowling admits that the evidence proffered at trial shows that he did not mark the product or the packaging with respect to his patented dice. Instead, he asserts that putting loose stickers inside the baggies in which he shipped his dice can somehow comply with the marking statute, thereby providing notice to the public of the patent protection. Even if the plan was legally sufficient, as a practical matter it was plagued with uncertainty because it required that retailers, most of whom had likely

never even heard of Bowling, actually receive the loose stickers and place them on the displays in which his dice (and no others, of course) were showcased. There was not one shred of evidence that any retailer who had received his dice from one of Bowling's distributors had ever even seen a sticker, let alone used one in connection with the display of Bowling's patented dice.

Ignoring this total lack of proof on the practical question of "did Bowling's marking plans actually come to pass," his argument that the scheme is legally sufficient is absurd. Bowling does not cite to a single case that holds that including stickers in the packaging for customers to affix is satisfactory because there is none. Moreover, there is no evidence introduced that the number of stickers included by Bowling was sufficient to mark each of the dice that were shipped or each of the containers in which they were kept. Indeed, there is no evidence that Bowling had any idea how many customers his distributors might be reselling his dice to. There was no evidence as to who those retailers were or that they were ever contacted by any of Bowling's distributors. The only means by which one might conclude that "all or substantially all" of Bowling's dice were sold with any sort of patent marking associated with them is the one that Bowling apparently relied upon when he undertook the scheme: blind faith.

Moreover, Bowling's formulation of the marking evidence on this front is sorely lacking. His assertion that no customer refused to mark his dice ignores the opposite truth – very few of his customers explicitly agreed to abide by it either. His own business records reveal that fewer than half of the customers from whom he requested counter-signed letters signifying agreement to his marking scheme actually sent those letters. His own business records show that despite his threat to cease sales to those who did not send back the letters, he continued to sell to all of his customers. In fact, his own business records show that he continued to add customers and never made any written requests that these new customers mark his patented product.

Bowling makes no argument against these evidentiary truths save his bald assertion that he made efforts to ensure that his marking scheme was followed. No reliable or competent evidence has been presented to support that assertion. While the law recognizes that, under certain circumstances, patentees must rely upon the efforts of third-parties to effect marking of the patented products, the law requires that such reliance be reasonable. It is not reasonable to assume that one's customers will follow a multi-step plan to mark products in the absence of procedures put in place by the patent-holder to ensure that the marking scheme is followed. Bowling nearly concedes this point, attempting to distinguish only one of the cases cited by Hasbro in support of this proposition. Like his evidentiary arguments, Bowling's arguments on that case are unavailing.

Bowling suggests that *Butterfield v. Oculus Contact Lens Co.*, 332 F. Supp. 750, 761 (D. Ill. 1971), is distinguishable because the patent owner in that case was found to have produced no evidence that any customers followed the proposed marking scheme, whereas Bowling has set forth the evidence of Dragon's Lair utilizing his stickers and bins and Steen Jensen's testimony that Berkeley Topline North likely would have followed his requests if indeed they received their letter. Once again, Bowling overstates the value of his evidence because, as explained above, Mr. Jensen actually testified that Berkeley Topline North had not complied with a marking scheme and Eric Burke of Dragon's Lair testified that the container in which Bowling's patented dice were displayed also contained numerous other, non-patented dice, undermining the effectiveness of any notice to the public as to which dice were actually patented. Both of these witnesses underscore the fact that, in the language of the *Butterfield* court, "[t]he purpose of the statute was obviously not accomplished." 332 F. Supp. at 761.

Moreover, Bowling's selective reading of *Butterfield* to mean that there was "no evidence" on the issue of compliance is incorrect. Similar to Bowling's patent label agreements, the plaintiff in *Butterfield* actually had entered into license agreements with some, but not all, of its customers that included an obligation to mark the products. *Id.* If *Butterfield* is apposite, the mere existence of agreements, without evidence that the agreements were followed, is insufficient to show marking. Bowling, of course, did not offer any evidence at all with respect to the vast majority of his customers or dice sales.

Bowling's marking argument is nothing more than smoke and mirrors. He asserts no real differences in the evidentiary basis for a marking finding than that provided by Hasbro, and the differences he articulates add nothing that saves his case from collapsing under the weight of its own legal infirmities. In the absence of competent evidence tending to show that substantially all of Bowling's dice were marked, the jury's verdict cannot stand. Bowling's objection to Hasbro's motion is merely a plea that the Court should respect the jury's verdict because it is the jury's verdict. It does not explain how the evidence presented at trial satisfies the evidentiary standard. Accordingly, the court should grant judgment as a matter of law in favor of Hasbro on the issue of marking.

## **CONCLUSION**

For the reasons stated herein, along with those articulated in its Renewed Motion For Judgment as a Matter of Law or, in the Alternative, for a New Trial or, in the Alternative, For Remittitur and the Memorandum of Law in Support thereof, Hasbro, Inc. respectfully requests that this Court grant judgment as a matter of law in its favor as follows:

(1) On the issue of marking under 35 U.S.C. § 287, as a matter of law Plaintiff failed to mark all or substantially all of his patented articles continuously at any time prior to November 10, 1999; and

(2) On the issue of damages, as a matter of law Plaintiff is entitled to no more than nominal damages in the amount of $1.00.

In the alternative, the Court should order a new trial on the issues of marking and damages.

In the further alternative, the Court should order a new trial *nisi remittitur* of all damages in excess of $7,017.98.

Respectfully submitted,

HASBRO, INC.
By its Attorneys,

/s/ *Adam M. Ramos*
Todd D. White (# 5943)
twhite@apslaw.com
Jeffrey K. Techentin (#6651)
jtechentin@apslaw.com
Adam M. Ramos (#7591)
aramos@apslaw.com
Adler Pollock & Sheehan P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903
(401) 274-7200
Fax: (401) 751-0604/ 351-4607
Dated: June 2, 2008

Of Counsel:

David K. S. Cornwell, Esq.
davidc@skgf.com
Tracy-Gene G. Durkin, Esq.
tdurkin@skgf.com
Sterne Kessler Goldstein Fox
1100 New York Avenue, NW
Washington, D.C. 20005

**CERTIFICATE OF SERVICE**

TO:

Craig M. Scott, Esq.
Christine K. Bush, Esq.
Duffy & Sweeney & Scott, Ltd.
One Turks Head Place, Suite 1200
Providence, RI 02903

Thomas J. Leach, Esq.
Anthony R. Zeuli, Esq.
Douglas J. Williams, Esq.
Law Firm of Merchant and Gould P.C.
3200 IDS Center
80 South 8th Street
Minneapolis, Minnesota 55402-2215

David K. S. Cornwell, Esq.
Tracy-Gene G. Durkin, Esq.
Sterne Kessler Goldstein Fox
1100 New York Avenue, NW
Washington, D.C. 20005

I hereby certify that I filed the within Reply Memorandum of Law in Support of Renewed Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial or, in the Alternative, for Remittitur through the ECF system on the 2nd day of June, 2008, and that notice will be sent electronically to the above-named counsel who are registered participants identified on the Mailing Information for Case No. 05-229S.

/s/ *Adam M. Ramos*

*456151_1*